**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

AUSTIN HAMBLIN and KISKA          *
HAMBLIN                            *
                                  *
                                  *
vs.                               *   NO:  7:25-cv-00245
                                  *
MARTIN COUNTY SHERIFF'S           *
DEPARTMENT, BRAD INGRAM,          *
ANDERS DAHL, KELSEY BROWN,        *
RORY GAMMONS, AND                 *
WESLEY PHELPS                     *


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

 ORAL AND VIDEOTAPED DEPOSITION OF JAMES BRADLEY INGRAM

Taken January 15, 2026

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of JAMES BRADLEY INGRAM, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on Thursday, January 15, 2026, from 9:02 a.m. to 12:51 p.m., in the offices of Permian Court Reporters at 605 West Texas, Midland, Texas, before Stephanie J. Blair, Certified Shorthand Reporter Number 6819 in and for the State of Texas, pursuant to the Federal Rules of Civil Procedure.

A P P E A R A N C E S

For the Plaintiffs:

     Mr. Kurt Mueller
     The Kurt Mueller Law Firm, PLLC
     565 South Mason Road PMB223
     Katy, Texas 77450
     (713) 360-2110
     kurt@kurtmuellerpllc.com

For all Martin County Defendants:

     Mr. Denis Dennis
     Kelly, Morgan, Dennis, Corzine & Hansen, P.C.
     4840 East University, Suite 200
     Odessa, Texas 79760
     (432) 367-7271
     ddennis@kmdfirm.com

For the Defendant, Brian Snellgrove (appearing via Zoom):

     Mr. Robert J. Perez
     Attorney at Law
     221 North Kansas, Suite 1103
     El Paso, Texas 79901
     (915) 542-1222
     rjperezlaw1@gmail.com

Also Present:  Austin Hamblin and Kiska Hamblin

JAMES BRADLEY INGRAM

**3**

I N D E X

Witness:                                                     Page

JAMES BRADLEY INGRAM

    Examination by Mr. Mueller                      4

    Examination by Mr. Dennis                      125

    Examination by Mr. Perez                       127

    Reporter's Certificate                         131

E X H I B I T S

1   First Discovery Request                            8
2   Second Discovery Request (retained)        11
3   Affidavit of Anders Dahl                          27
4   Search Warrant                                    36
5   Discovery pages 14-16                             47
6   Inventory of Items Seized                         52
7   Facebook post                                     74
8   Martin County Sheriff's Policy Manual             77
9   Arrest Warrant                                   102
10  Return and Inventory                             111
11  E-mail string                                    112
12  Photographs                                      112
13  Text messages                                    113
14  Text messages                                    117
15  Exhibit E                                        123
16  Letter 4/14/25                                   123
17  Letter 11/4/25                                   124

MR. MUELLER:  I'll go ahead and just announce appearances for the record.

My name is Kurt Mueller.  I'm the plaintiff [sic] for the plaintiffs.  Austin Hamblin and Kiska Hamblin are here with me.

Mr. Dennis?

MR. DENNIS:  I'm here with Brad Ingram, who's the defendant in this case.  I represent Martin County defendants.

MR. MUELLER:  And the court reporter's name, if you don't mind.

(A discussion was had off the stenographic record.)

MR. MUELLER:  And Stephanie Blair, our court reporter, is here for the record.

Okay.  You can go ahead and swear him.

JAMES BRADLEY INGRAM, having been first duly sworn by the Certified Court Reporter, testified as follows:

EXAMINATION

BY MR. MUELLER:

Q.   Okay, sir.  Could I start with your full legal name, please.

A.   James Bradley Ingram.

Q.   Okay.  And what is your current employment,

sir?

A.    I'm retired.

Q.    When did you retire?

A.    October the 2nd of 2024.

Q.    2024, okay.

And at that time, who were you employed by?

A.    Martin County.

Q.    Okay.  How long had you worked for Martin County?

A.    Off and on about 15 years.

Q.    What was your last position there?

A.    Sheriff.

Q.    In order to become familiar with the materials in order to testify on behalf of the county, how did you go about that preparation process for today's deposition?

A.    I met with Mr. Dennis three times, I believe, and just had knowledge of the case.

Q.    Okay.  What process led to your selection as the county representative?

MR. DENNIS:  He -- he -- he had no input into that.  I made the decision.

MR. MUELLER:  Okay.

Q.    (BY MR. MUELLER)  Do you have any duties or

roles with the county on an ongoing basis?

A. No.

Q. Did you review any specific documents in order to prepare for today's deposition?

A. Yes.

Q. Which documents do you remember recalling [sic]?

A. Went over part of the policy manual that was in force when I was sheriff.

Q. Okay. Any other documents?

A. No, sir.

Q. Did you review any of your prior answers relating to this case?

A. No, sir.

Q. Okay. Did you speak with or interview anyone at the sheriff's office in order to prepare for today's deposition?

A. I talked to Anders Dahl, who was a investigator at the time this warrant was executed and ended up being my chief deputy.

Q. Okay. Could you brie- -- briefly describe that discussion.

A. I asked him if he remembers certain pieces of evidence that --

Q. Okay.

JAMES BRADLEY INGRAM

**7**

A.    -- that were seized during the search warrant. He was the person that logged the -- kept the log of the evidence during the -- the search warrant.

Q.    Did you speak with Mr. Dahl on one occasion or more than one occasion?

A.    I believe we spoke twice after being served.

Q.    So do you remember, was there a particular reason for the second call?

Was it a follow-up on prior materials or --

A.    Yes, there was a reason for the second call.

Q.    Okay.  Was there -- what was that specific reason?

A.    I wanted to be sure that the bag of methamphetamine and a illegal firearm was taken from the ho- - the house --

Q.    At the --

A.    -- and what happened to it.

Q.    At the time of the search?

A.    Uh-huh.

Q.    Okay.  At the time you were working at the sheriff's office, were you the final policymaker for the sheriff's office?

A.    When I was the sheriff, I was.

Q.    What was the policy with respect to storage

and di- -- and disposition of seized property at the time you were sheriff?

A.    It was documented in the -- in the policy.  It was logged into evidence.  If it was a large amount, it could be photographed.  And I tried to keep an evidence officer working, but that was hard to do so sometimes I was the only one with a key to the evidence room.

Q.    Okay.  I'm going to hand you what I will mark as Exhibit 1, the first discovery requests for defendants in the civil action.  This was dated August the 25th.

(Exhibit 1 marked.)

Q.    (BY MR. MUELLER)  Do you recall -- have you ever seen this document before?

A.    Probably.

Q.    Okay.  Can -- descr- -- name all the persons who were present for the sheriff's office during the search that occurred at the Hamblin residence.

A.    I was there -- I -- I was not there at the very start, but I was there soon after it started. Jesse Metcalf, Anders Dahl, Kelsey Brown, and then there was a deputy from Howard County.

Q.    Okay.  Mr. Snellgrove was present as well. Correct?

A.    He showed up later, yes, sir.

JAMES BRADLEY INGRAM

**9**

Q.    How did Mr. Snellgrove come to be at the scene?

A.    The defendant asked him to -- for us to call him to get him there.

Q.    So is it your understanding that was at the de- -- at the plaintiff's request that he was there?

A.    Yes.

Q.    Okay.  And you facilitated that request.

A.    Yes.

Q.    Why?

A.    Because he asked us to call Mr. Snellgrove. Mr. Snellgrove was sending a -- a team to help load any seized evidence.

Q.    So Mr. Snellgrove was planning to come regardless of my client's request.

A.    He -- he knew there was a possibility he would be called.

Q.    A possibility he would be called.

Can you describe -- did you have conversations specifically with Mr. Snellgrove regarding that possibility?

A.    Probably.

Q.    What -- what was the nature of your request to him with -- before my clients made a request?

A.    We had been talking for several months.  He

JAMES BRADLEY INGRAM

**10**

was telling me that there was a problem with his inventory, and it took him a while to come into the office to get the first report done. And we to- -- we told him we might need some help with that much property, and he -- and he was in a- -- agreed to be there.

Q.  Does the sheriff office often ask third parties for assistance in seizing property?

A.  Martin County doesn't execute that many search warrants and certainly not one of this magnitude.

Q.  The original search warrant called for the seizure of, I believe, two items that were named. Is that correct?

Or let me rephrase.

How many -- how many items were on the original search warrant to be seized?

A.  I don't --

Q.  You don't know?

A.  I don't know.

Q.  Were there more items that were seized than were on the warrant?

A.  Probably.

Q.  Okay. When the sheriff's office has done searches in the past, has the victim been present during those searches and seizures?

**11**

A.    I can think of one other time that the -- it was a -- a marriage relationship and they were estranged and --

Q.    Okay.

A.    -- the wife was there and the warrant was against her husband.

Q.    Okay.  So on one other occasion, you had someone there --

A.    Uh-huh.

Q.    -- and -- but it wasn't routine practice.

A.    We didn't really have a routine because we did not do that many search warrants.

Q.    How many search warrants did you typically do in a year?

A.    Two or three.

        (A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  I'm gonna hand you what's been marked as Exhibit Number 2.

        (Exhibit 2 marked.)

Q.    (BY MR. MUELLER)  This is the second discovery request related to this ac- -- action dated November the 7th.  Are you familiar with this document?

A.    Probably.

Q.    Ho- -- what communications were there between

**12**

you and other members of the sheriff's office and Mr. Snellgrove in writing?

Do -- is there, for example, text messages?

Was there e-mails relating to the search and seizure or storage of the property?

A. I don't know.

Q. Do you re- -- do you recall ever exchanging correspondence with Mr. Snellgrove relating to the storage of the property, written correspondence?

A. It's possible.

Q. Describe any prior incidents, complaints, or reports in the 10 years prior to your resignation relating to any complaints relating to seized property.

Were there any such complaints?

MR. DENNIS: I'm gonna object to form because there's no resignation here.

MR. MUELLER: Apologize. Did I say resignation?

MR. DENNIS: Yeah.

MR. MUELLER: I apologize, I meant retirement.

You want me to rephrase the question?

MR. DENNIS: No, you're fine. You're fine.

A.    There was one -- one instance where deputy was on a stop and he seized property and a complaint was made and he was terminated because of the stop.

Q.    (BY MR. MUELLER)  With respect to this search and seizure, was there any internal review relating to complaints that were made regarding the disposition of the property?

A.    On which case?

Q.    On this case, the Hamblins' case.

A.    No, there -- there were no complaints made on this.

Q.    Okay.  Was a chain of custody maintained with respect to the seized items?

A.    As far as I know, yes.

Q.    Was there a court order releasing the property to Mr. Snellgrove?

A.    No, sir.

Q.    Was there any court hearing that determined the lawful ownership of the property that was seized from the Hamblins?

A.    There was no court, no.

Q.    Okay.  Did you -- well, le- -- let me rephrase.

Who contacted Snellgrove to inform him that the property could be released?

A.   I don't know.

Q.   Was -- would it have been standard practice for someone to call him and indicate that the property could be released?

Was that policy at that sheriff's office?

A.   When we got there, Mr. Hamblin would say, "Oh, that's Mr. Snellgrove's," or, "That's Brian's," and tha- -- and so when the person you're searching says that that property belongs to the victim of the -- the crime, that kinda helped to determine ownership.

Q.   Was it your understanding that Mr. Hamblin had indicated that all property seized belonged to someone else?

A.   I -- I don't know.

Q.   Okay.  Describe the written policy regarding execution of search warrants under your tenure.

A.   There's not one.

Q.   Describe the policy relating to disposition of stolen property.

A.   Property had to be requested and then paperwork filled out, and depending on the prop- -- what the property was -- if it was like a weapon or something like that, it was run through the computer to see if it had turned up stolen or anything like that.

Q.   Was any such computer search done on this

occasion?

A.    Anything that had a -- a serial number, I would assume, had to -- was checked.

Q.    Were any serial numbers returned as flagged during that search?

A.    No, sir.

Q.    Beyond the Texas Code of Criminal Procedure, Article 18.10, does the Texas -- does the department rely on anything else relating to its evidence handling procedures?

A.    Just the -- the policy manual.

Q.    Okay.  With respect to the policy manual, what are the written policies with respect to safekeeping of seized property?

A.    It is kept safe.  It can be returned to the owner when de- -- the owner is determined.  It -- it's photographed and the photographs are kept for -- for court.

Q.    Were photographs taken of the items seized in this case?

A.    Yes -- well, it -- I don't know if still photos, but a -- a video.

Q.    A video of each item was taken?

A.    Of the entire thing.

Q.    Okay.  By whom?

**16**

A.    I believe Anders Dahl was the evidence person.

Q.    All right.  Who taught Mr. Dahl the procedures for inventory procedure policies?

How'd he know how to do that?

A.    Sir, he was a 25-year-old -- 25-year veteran in law enforcement, numerous training certificates.

Q.    Well, let me ask a more specific question with respect to your sheriff's office --

A.    Okay.

Q.    -- and your policies.

A.    Okay.

Q.    How did he come to learn of those policies or become aware of those policies?

For example, did you guys have training classes that he attended?

Was there workshops, some -- you know, can you go into how that process happened.

A.    Each deputy was given a copy of the policy manual.  There were no training -- there -- no extra training.

Q.    So they were simply expected to read the policy manual and implement it without any active classes, for example.

A.    I've never seen an active class on the

execution of a search warrant.

Q. Okay. What training have you had relating to civil asset forfeiture and property rights?

A. TCOLE requires two courses for ad- -- advancement and certificates. One of them is a, what, 2801, 3801 arrest search and seizure, and one of them is titled asset forfeiture.

Q. Beyond those two classes, did you have any --

A. No.

Q. -- training?

Is there any sort of continuing education that you undergo?

A. To keep your license, you -- you have to have 20 hours per year. In a two-year period, you have to have 40 hours.

Q. Were any of those trainings relating to search and seizure?

A. I don't know. I don't have my -- I don't have access to my records.

Q. Fair enough.

What policies as described in your policy manual relate to the release of evidence to a victim without a court order?

If you'd like a copy of your policy manual, I -- I can -- be happy to give it to you if you

want to refer to it.

A.    To my recollection, the -- once the office is satisfied that the -- the person owns -- is the true owner, we try to get the property back as quickly as we can.

Q.    What is your process for becoming satisfied?

How d- -- how -- how do you determine whether you're satisfied or not?

Is there any sort of check marks, indicia that you look at?

A.    Martin County's a small county, a rural county, and so everybody pretty well knows everybody.

Q.    Okay.  But we're talking about individual items of seized property --

A.    Uh-huh.

Q.    -- so I assume that everyone is not aware of everyone's property.  So how do they determine to their own satisfaction whether a piece of property belongs to an alleged claimant or not?

A.    The -- the report would be che- -- checked to see who the victim of -- was who reported the property stolen.

Q.    Okay.  So let's suppose that I'm reporting a piece of property stolen.  All right?  What -- what then would you do?

A.   You would go to the office and fill out a -- an offense report and a written statement swearing that the -- the property was -- had been stolen.

Q.   Okay.  If you recovered property that generally met the description of what I described, how would you determine who the lawful owner is?

A.   We could go to the prosecuting attorney and tell him what we had, and he would say, you know, keep it or give it aw- -- give it back to the reporter -- reporting party.

Q.   So the prosecuting attorney would make the decision whether or not to return --

A.   Sometimes.

Q.   -- property.

A.   Sometimes.

Q.   Okay.  Other times what would the process be?

A.   If it was a car, the registered owner would get it back if they requested it.

Q.   Okay.  For items that don't have a registration, what would the i- -- what would the process be?

Like let's suppose -- let's say I s- -- I say someone stole my wheelbarrow and you find a wheelbarrow.  Let's assume it doesn't have a serial

JAMES BRADLEY INGRAM

20

number.  What process would you go through to determine if the -- if the prosecuting office didn't give you the all clear, what else would you do?

A.   I don't know.

Q.   You don't know?

A.   Huh-uh.

Q.   Okay.  What storage facilities did the department have available to you at the time that the search warrant was executed?

A.   What what?

Q.   The storage facilities for the -- for the keeping of evidence.

A.   The building where the jail and dispatch is located have a evidence room.  There's a couple -- there's a storage building in Stanton, I was told, that had old stuff in it, and then there was a- -- another building where the rec roo- -- rec area for the prisoners in the -- when the old jail was opened, that building had some stuff stored in it.

Q.   So would you on behalf of the sheriff's office store things in these locations for things that you'd seized?

A.   If it was within the scope and feasible to fit the evidence in -- in the -- mai- -- all we -- all I ever used was the new evidence room in the new -- new

building.

Q.   Okay.  So how much space was in the new evidence room?

A.   I don't know.

Q.   Can you give me like an approximate size?

Like is it the size of, I don't know, like a Walmart, or is it the size of like a house or size of this room?

A.   Probably -- there was a narcotics room that was locked and then there was just a general room where everything else went, and it -- it would probably be two of these rooms.

Q.   Okay, fair enough.  So like two -- two conference room size.  Okay, fair enough.

And how about the other space that you mentioned, how large was that?

A.   What other space?

Q.   Did you met- -- because you mentioned there was the new storage room and then you mentioned there was a separate space, or did I misunderstand you?

Was there just the one space for storage of evidence?

A.   At the new jail facility, there -- there was an evidence area that was divided by a locked door, narcotics behind the locked door and then everything

else on shelving in the front.

Q.   Okay.  Were any of the items that were seized in this search and seizure stored at that location?

A.   No, sir.

Q.   Was there space at the storage -- at your facilities for any of the items that were seized?

A.   No.

Q.   You have a drug space that you mentioned.  Is that right?

You have space for stee- -- storage of narcotics.

A.   Yes.

Q.   There was allegedly narcotics that were taken during this seizure.  Was that stored at your narcotics facility?

A.   The narcotics and the gun was turned over to the Howard County deputy that was on the scene.

Q.   Okay.  Why?

A.   Because it's -- that would have been a Howard County case.  We weren't trying to dig up new cases to work.  We were just trying to recover stolen property from Martin County.

Q.   All right.  Was -- did Howard County have any storage facilities available to them that you could have used?

**23**

A.    I don't know.

Q.    Did you inquire?  Did you ask?

A.    No.

Q.    Okay.  Have you used stor- -- private storage facilities, for example, rental spaces for storing of evidence?

A.    There is a -- a rental building rented by the county or the sheriff's office in Stanton.  I've never been in it, but I -- I -- because I -- I was told it was just full of stuff, just junk.

Q.    Okay.  Who conducts audits relating to the Martin County sheriff's def- -- department's evidence rooms?

A.    I guess the sheriff would.

Q.    When was the last audit of the evidence room conducted in your tenure?

A.    I couldn't say.

Q.    How often did you perform audits?

A.    I -- I never conducted an audit.  I had people that were assigned as evidence technicians and they -- they would go through when they had time.

Q.    How does the de- -- sheriff's office maintain records relating to chain of custody for items that are seized?

A.    There would be a chain of custody attached to

the original offense report.  If there was a warrant, the -- the ch- -- that would be returned with the warrant to the magistrate who signed it.  If we kept it locally, it was logged into a ledger:  date, time, offense, everything, and the location it was stored.  If it was removed, there was another column that it was removed and the reason it was removed.

Q.   Okay.  And that's done for every individual item that's seized?

A.   That's kept in that room.

Q.   Well, how about with respect to items that are not kept in the room, how is chain of custody maintained in those circumstances?

A.   Mr. Snellgrove was advised to not get rid of the -- the property until de- -- final deposi- -- disposition of the case.

Q.   I understand, but how was chain of custody maintained with respect to that?

A.   The property that was seized was videotaped at his -- at his facility.

Q.   And what date did that videotaping occur?

A.   And what?

Q.   What date did the videotaping occur?

A.   The day of the search warrant or the next day.

**25**

Q.    Was there any other inventory done by the sheriff's office to validate that the items were being maintained at that location?

A.    As far as going with a piece of paper, no, but verbal re- -- driving out to Mr. Snellgrove's and making sure everything was still okay, yes.

Q.    With respect to the sheriff's office storage facility, is that locked?

A.    Yes.

Q.    And who maintains the keys to that lock?

A.    I don't know right now.  When I was sheriff, I -- I was the only one -- unless I had an evidence technician.

Q.    So it would either be yourself or an evidence technician that would maintain the keys.

A.    Uh-huh.

Q.    All right.  With respect to the storage location at Snellgrove, was there a lock on that?

A.    It was his place of business.  I -- I don't know.

Q.    Did the sheriff's office put any sort of lock on that facility?

A.    No, sir.

Q.    What forms exist or are required for transferring custody of evidence to a third party?

JAMES BRADLEY INGRAM

26

Are there any records that are required to be maintained with respect to that?

A.    Not that I'm aware of.

Q.    Okay.

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  With respect to -- okay. Who's responsible for ensuring that the return and inventory is filed with the court?

A.    The -- the retu- -- the warrant return?

Q.    Yes.

A.    Whoever -- Mr. Dahl signed the -- the warrant. I don't remember if it was him or Mr. Metcalf that returned the warrant.

Q.    Was a return done in this case?

A.    To my knowledge, yes.

Q.    Okay.  You don't know by whom.

A.    No, sir.

Q.    Okay.

A.    It was not by me.

Q.    Is there a surety bond that's maintained by the sheriff's department?

A.    All peace officers have a bond --

Q.    Okay.

A.    -- when they're deputized.

**27**

Q.   Did Mr. Snellgrove have a bond?

A.   I don't know.

Q.   Mr. Snellgrove was depu- -- apologize, he was -- what's the word I'm looking for?

MS. HAMBLIN:  Conscripted.

MR. MUELLER:  Thank you.

Q.   (BY MR. MUELLER)  Mr. Snellgrove was conscripted according to the affidavits in this case so is he required to have a bond to your knowledge?

A.   Can -- I don't know what you mean by "constricted" [sic].

Q.   Well, in one of the affidavits that was related to this case, it was -- here, let me...

Okay.  This will be Number 3.

(Exhibit 3 marked.)

Q.   (BY MR. MUELLER)  All right.  I'm handing you what's been marked as Exhibit Number 3.  This is an affidavit of Anders Dahl that was signed on the 2nd of October of 2025.

Would you please read the fourth paragraph out loud for me.  Thank you.

A.   (Reading)  I conscripted Brian Snellgrove to aid in the execution of the warrant -- of the search warrant by requesting him to appear at the location where the warrant was executed, identified [sic] the

property subject to the warrant, and store such property at his place of business located at 2100 Westside Drive, Stanton, Texas 79782, until my control and supervision.

Q.   Thank you, sir.

So I -- since, again, Mr. Snellgrove was conscripted by Mr. Dahl, who was your employee, was he required to have a bond?

A.   I don't know.

Q.   Okay.  And it says here that he was under Mr. Dahl's control and supervision.  Did you -- were you aware of that at the time, that he was under his control and supervision?

A.   I knew someone called Mr. Snellgrove.  I wasn't aware who it -- which deputy called.

Q.   Okay.  When did Brian Snellgrove first contact the sheriff's department regarding the alleged theft?

A.   I -- I don't know.

Q.   Okay.  Who took the initial theft report?

A.   Deputy named Weston Phelps.

Q.   And what was his role in doing the intake with respect to that report?

A.   He was the deputy working that day that Mr. Snellgrove came to the office to make the report.

Q.   Describe the evidence Mr. Snellgrove provided

to prove ownership of the tools before the warrant was issued.

A.   I -- I don't know.

Q.   What is your pr- -- well, let's make it more specific.

What independent verification did your office perform to confirm the serial numbers per- -- were -- provided by Snellgrove?

A.   He had serial numbers that he said would match e- -- Snap-on equipment.

Q.   Okay.

A.   And he had no -- no receipt or an- -- of anything that those serial numbered items had been sold.

Q.   What was the process conducted into allegations that tickets were being zeroed out?

A.   What was --

Q.   The --

A.   -- the --

Q.   -- the --

A.   -- process?

Q.   Yeah, in determining that.

There was a claim that tickets were being zeroed out by Mr. Hamblin.  What was the process conducted to look into those allegations?

**30**

A.   Mr. Ham- -- Hamblin told Mr. Snellgrove that that's what had happened and that's why he had the property, and I remember him saying, "You know, Brian's -- Snap-on never comes and picks up any used equipment."

Q.   How do you know that Mr. Hamblin said that to Mr. Snellgrove?

A.   I was standing there.

Q.   Okay.  A- -- did you -- did your office interview any customers who [sic] accounts were allegedly charged or zeroed out?

A.   I believe some deputies went to Odessa.  I don't know if they found the people they were looking for.

Q.   What was the process of verifying the financial loss that was claimed by Snellgrove?

A.   We took Mr. Snellgrove's word of what something from Snap-on cost.

Q.   Was there any investigation into a Carl Sukowa- -- S-U-K-O-W-A-T-Y?

MS. HAMBLIN:  Sukowaty.

MR. MUELLER:  Sukowaty.

Q.   (BY MR. MUELLER)  -- Carl Sukowaty account?

Was there an investigation into a Carl Sukowaty account?

A.    I don't know.

Q.    Okay.  Did the department subpoena business records from Snap-on corporate to verify any statuses with respect to tools?

A.    Not that I'm aware of.

Q.    Was there any particular reason that that wasn't done?

A.    I couldn't say.

Q.    Where is the investigative report detailing the interview or -- with the babysitter, McKenzie?

There was a babysitter who had provide [sic] interviews with respect to that case -- this case.

A.    I believe that occurred with Mr. Metcalf, and I don't know.

Q.    Okay.  What di- -- ha- -- did you review the fideo -- video footage that was taken by Snellgrove?

A.    No, sir.

Q.    Okay.  What is the policy of the sheriff's office with respect to dash cameras and body cameras at the time of the search?

A.    That they're to be worn and turned on, and there is -- if it reaches a point where nothing else evidentiary is happening, then the deputy can say something to that effect and turn it off.

Q.   Okay.  So -- and how about for dash cameras, are -- were there dash cameras in the vehicles at the time?

A.   The -- they were.

Q.   Okay.  What o- -- vehicles were used by the sheriff's office on the day of the search?

A.   Just the -- the assigned vehicles that the deputies normally drove.

Q.   All right.  Were video- -- were dashcam videos retrieved by -- logged from the day of the search relating to what those dashcams con- -- captured?

A.   I don't know.

Q.   You don't know.

Was it standard -- what's -- what was the policy relating to dashcams at the time?

Did you archive all footage?

Did you review foota- -- what was the policy?

A.   Footage was archived for -- I -- I -- I don't remember the length of time and then -- and -- and there was a change from saving to a computer to the iCloud at some point, and I don't know where --

Q.   Okay.

A.   -- where -- where that time fell in.

Q.   All right.  And with respect to the bodycams

that were worn by the officers, how many of -- how many officers from you were on scene at the time?

Was it four including yourself?

A.   Myself, Anders...

I believe four of us.

Q.   Okay.  And so what happened to those bodycams from the four of you?

A.   I didn't have one on, and the other three downloaded theirs to -- I believe by then when you pulled into the parking lot, it downloaded to the iCloud, but I'm not sure.

Q.   Was there any particular reason you were not wearing a body camera?

A.   I didn't want to.

Q.   Okay.  Why?

A.   I didn't have to.

Q.   All right.  What was the authentication process for the video footage reviewed by the police in this incident?

A.   The authentication process?

Q.   Yes.

How was -- how was video footage authenticated and determined to be accurate?

A.   Well, there was video footage taken at the scene before the -- the property was taken, and then

there was Mr. Snellgrove's warehouse -- footage was taken of everything as it was spread out and you could see.

Q.   Okay.  Did, for example, one of your sheriff's or deputies -- was he present at the time it was -- that video by Snellgrove was made?

Did he assist in the making of it?

A.   My -- Mr. Dahl made a video, I believe, after.

Q.   Mr. Dahl also made a video.

A.   He made one at the scene and then he went out and -- and made one --

Q.   Okay.

A.   -- at the Snellgroves'.

Q.   And where is that video?

A.   (Witness indicates.)

Q.   You don't know?

A.   I don't know.

Q.   Okay.  Was the video that was taken by Snellgrove put into your own computers or system?

Did you keep a record of it?

A.   I can't recall Snellgrove taking a -- a video of it.  I -- so I don't know.

Q.   All right.  In the video footage that was taken, were any serial numbers visible or recorded?

A.    I believe so.

Q.    And is there a record of those items that were recorded in that video?

A.    On the one I returned.

Q.    Okay.  Were any text messages provided to the department relating to this case?

A.    From?

Q.    From anybody.

A.    I -- I couldn't say.  I don't know.

Q.    Okay.  Do the initials MK or ME mean anything to you with respect to people that were involved in this case?

A.    No.

Q.    Okay.  Does the name Christian mean anything to you?

A.    No.

Q.    All right.  Was there a classification of this case as organized criminal activity?

A.    I don't recall.  I don't -- I don't know.

            (A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  When did the deputies arrive at the Hamblin residence on May the 17th?

A.    I don't know.

Q.    (Indiscernible.)

**36**

And how long were they present?

A.   How long were they there?

Q.   Yeah.

A.   It was after lunch.  They -- they probably got there around 8:00, and I remember going and getting pizza so I don't know what time the departure was.

Q.   Okay.  I'm handing you what's been marked as Exhibit Number 4.  This is a copy of the search warrant.

(Exhibit 4 marked.)

Q.   (BY MR. MUELLER)  Are you familiar with this document?

A.   I remem- -- I -- I thought the -- the warrant was several pages, more pages than that.

Q.   All right.  Well, this search warrant is signed as the 16th day of A- -- May at 3:20 p.m., which would be the day before the search, correct, 16th of May?

Because it happened on the 17th.  Right?

A.   I don't recall.  It -- it was signed prior to the search.

Q.   All right.  Very well.

On this search warrant affidavit, what items are listed as items to be searched and seized?

A.   Snap-on plasma cutter model 301, a Snap-on air compressor, "to seize the same and bring before me".

Q.   Okay.  So the Snap-on plasma cutter model 301 and a Snap-on air compressor so those are two specific items.

How many items were seized during the search?

A.   A truckload.

Q.   Okay.  So more than two?

A.   Uh-huh.

Q.   What was the basis for seizure for the items not listed on the warrant?

A.   They were plain view and statements were made that they belonged to Mr. Snellgrove.

Q.   All right.  With respect to plain view, which items were seized respected [sic] to plain view?

A.   Sir, I was not the officer involved in it.  I was just there.

Q.   Supervising?

A.   They're -- the small hand tools were all in a barn or shed behind the house --

Q.   Okay.

A.   -- and I -- I did see some of that o- -- there was things taken from inside the house that -- where I was not present.

Q.   Okay.  When you weren't present, who was the commander responsible for the operation?

Who was in charge?

A.   Well, I had chief deputy, patrol sergeant, and a CID sergeant so they wer- -- they all had command.

Q.   So there were -- there's no one person who was making a decision at that point.  They all had equal say.

A.   I believe Deputy Brown was in the house and located the -- the short-barreled firearm and the methamphetamine, and Officer Dahl -- Investigator Dahl was closer to the -- the barn for a longer time because there was a lot of stuff that was in- -- inside the shop.

Q.   But there was no one person who was in charge?

A.   I guess it -- it was a very fluid thing because it covered a lot of area.

Q.   Okay.

A.   And it -- if they -- anyone had tried to take something that -- like a chair that was not marked, then someone would have said, "No, you can't take that."

Q.   What do you mean by "marked"?

A.   As a Snap-on.

Q.   Was -- was anything marked Snap-on automatically taken?

A.   No, I believe there were some things that

**39**

Brian said were not his.

Q.   Okay.  So for items not on the search warrant that were marked Snap-on, what was the basis for believing them to be stolen?

Was it simply Snellgrove saying they were stolen?

A.   Mr. Hamblin was saying those belonged to Brian.

Q.   So either Mr. Hamblin was saying it or Mr. Snellgrove was saying it.

A.   Pretty much.

Q.   Okay.  And do you have any record, whether video or otherwise, that documents these interactions?

A.   There's video.

Q.   With respect to each item?

A.   I -- there were hundreds of items.  I -- I don't know what you --

Q.   Well, that's sort of my point, sir, because I'm trying to establish what the probable cause or plain view was with respect to every single item that was seized because every single item needs a legal basis, as I'm sure you're well aware.

A.   The suspect said that it -- it didn't belong to him, it belonged to Mr. Snellgrove.

Q.   With respect to every item that was taken?

A.    Uh-huh.

Q.    Okay.  And that's documented.

A.    On video.

Q.    Okay.  What time did you arrive at the scene?

A.    I don't recall.

Q.    Why did you arrive at the scene?

What -- why did you come to that search?

A.    Because I knew it was going to be a large case and just to have presence there in a neighboring county.

Q.    Okay.  Was the fact that the claimant was Mr. Snellgrove -- did that have any factor in you being present?

A.    No, sir.

Q.    Did Mr. Snellgrove request that you personally be present?

A.    No, sir.

Q.    What was -- what were you doing at the scene?

Because you said you weren't necessarily participating in each item search, cou- -- so could you just walk me through what you were doing.

A.    I just stood around a lot.

Q.    Okay.  What was the weather like?

A.   Hot.

Q.   What -- can you describe how entry was made into the Hamblin residence.

A.   I was not there.

Q.   What documents were provided to Austin Hamblin or Kir- -- Kiska at the time of the search?

A.   At entry or when it was over?

Q.   Either way.

A.   I don't know what was le- -- at entry, I don't know.  I -- I know they were given telephone screenshots of what was ta- -- taken.

Q.   Okay.  Were they provided a copy of the warrant?

A.   They should have been.

Q.   Were they provided a receipt for the items that were taken?

A.   I think the -- just the -- the property log was the receipt.

Q.   Was that given to them at the time that the search was --

A.   Yes.

Q.   -- was condu- -- concluded?

Okay.  Were there any documentation relating to Austin Hamblin's consent be- -- beyond the video?

A.   Austin Hamblin's what?

Q.   Consent relating to search or seizure.

Di- -- was there any documentation that -- for example, did he sign any permission or did --

A.   No.

Q.   Okay.

A.   It was verbal.  We were never asked to leave.

Q.   Yo- -- you were present with a search warrant. Correct?

A.   Yes.

Q.   Okay.  Was -- is there such a thing as a consent to seize form?

A.   I'm not familiar with that.

Q.   Okay.  With respect to Deputy Gammons from Howard County, how did he come to be involved in this case?

A.   Since the warrant was executed in Howard County, I believe Sheriff Parker just wanted one of his men present.

Q.   Was he involved in the planning or preparation of the search?

A.   I don't know.

Q.   Were any instructions from your office given

to him relating to the search?

A.   I don't know.

Q.   What was the interagency agreement with respect to this raid?

A.   I don't guess there was one.

Q.   What damage was caused to the Hamblin residence?

A.   I don't know.

Q.   Beyond the police vehicles that you mentioned that were used, were any other vehicles used in the search or seizure of items?

A.   Mr. Snellgrove brought a -- a Snap-on truck.

Q.   Okay.  And could you just describe the truck.

I mean are we talking a pickup truck?  A van?  What?

A.   No, like a -- one that would be used for a -- someone that worked for Snap-on to make a route, like a route truck.

Q.   So like a van?

A.   A big van, yeah.

Q.   Okay, a big van.

How about a trailer?

A.   It seems like there was a trailer present.

Q.   All right.  With respect to heavier items, how were they moved?

JAMES BRADLEY INGRAM

**44**

A.    I went to a store in Big Spring and bought a hand truck --

Q.    Okay.

A.    -- so some of the heavier stuff to be used [sic].  It -- some of the stuff was hard to get loaded.

Q.    So was the hand truck sufficient to move the items, or was any other equipment used?

A.    I think just the hand truck and...

Q.    What was the cost incurred by the county in this operation?

Was there any financial cost to this?

A.    (Witness indicates.)

Q.    No, okay.

When -- when was Mr. Sn- -- Snellgrove first invited to the scene, do you recall?

A.    When I got there, Mr. Hamblin was there and the question arose of the ownership of the property, and he asked that we call Brian.

Q.    Okay.  Was Mr. Snellgrove given any instructions by your office when he arrived?

A.    Not that I recall.

Q.    Was he told to identify property?

A.    I don't know.

Q.    Did Mr. Snellgrove enter any buildings as part

**45**

of his participation?

A.   Enter any buildings?

Q.   Yes.

A.   I think he went in the ar- -- the shop, barn, whatever it was, garage area where a lot of the Snap-on products were to see -- to look at them.

Q.   Who authorized him to do that?

A.   It was just a consensual thing.

Q.   So it was your understanding Mr. Hamblin asked Mr. Snellgrove to enter those places.

A.   I don't know.

Q.   Okay.

A.   He did nothing to stop him.

Q.   Okay.  Was Mr. Snellgrove supervised by one of your s- -- officers at all times that he was par- -- present?

A.   To my recollection.

Q.   Which officer supervised him?

A.   Probably Dahl.

Q.   What authority did Snellgrove have to direct your deputies on which items to seize?

A.   I don't know.

Q.   Okay.  Did you observe Snellgrove having conversations with any of your deputies?

A.   Probably.

Q. Do you recall any conver- -- do you recall anything Snellgrove said other than identifying items, like saying, "That's mine"?

Do you recall him saying anything else?

A. The one thing I re- -- recall Mr. Snellgrove's -- he was surprised of -- at the amount of Snap-on products that he s- -- saw.

Q. Who is Andrew Nichols?

A. I don't know.

Q. Okay. Was he present at that scene?

A. I don't know.

Q. All right.

A. Don't know him.

Q. How would you describe your relationship between yourself and Mr. Snellgrove?

A. I guess it -- okay.

Q. But do you socialize with Mr. Snellgrove?

A. I went to a Bible study that was about three or four months long at the Snellgroves' residence, and I've seen him very little since then.

Q. Okay. How do you -- what is your understanding of the plain view doctrine?

A. My understanding if -- if an officer sees something believed to be contraband, which is defined in several places, that is in plain view, then you have the

right to take it if there -- if you think it's stolen or contraband or has been used in a crime.

Q. Are you familiar with the concept of readily apparent?

A. I -- I'm -- probably not the way you're talking about it.

Q. Okay.

(A discussion was had off the stenographic record.)

Q. (BY MR. MUELLER) All right. This'll be Exhibit 5 -- oh, no, this is --

MR. MUELLER: Is this 5?

Okay.

(Exhibit 5 marked.)

Q. (BY MR. MUELLER) This is -- I'm handing you what's been marked as Exhibit Number 5. This is pages 14, 15, and 16 from discovery file that was given to defendants as part of the criminal case. It comprises the initial theft report and the items seized, and it is marked as the Martin County Sheriff's Office on the top.

Take a look at this document, see if you're familiar with it, please.

Are you familiar with this document, sir?

A. That was the original offense report, I believe, maybe with the supplement.

Q.   Okay.  Now, on this inventory list, it says: Inventory list for property seized at 3700 Hamblin -- Hamilton Street, Big Spring, Howard, Texas [sic] pursuant to a search warrant...

And then it lists 51 specific items, and then it says it's a total value of $283,445.  Is that correct to your knowledge?

A.   If that's what it says.

Q.   Okay.  With respect to, for example -- let's start with item number 30.  Could you please reas [sic] what item number 30 on that is, please.

A.   A Snap-on red popcorn maker.

Q.   Okay.  What is suspicious about a popcorn maker?

A.   I guess the fact that it had "Snap-on" on it at the time.

Q.   Mr. Hamblin was a Snap-on employee, cor- -- to your knowledge.

A.   Uh-huh.

Q.   And you were aware of that at the time --

A.   I --

Q.   -- that he was a Snap-on employee.

A.   Yes.

Q.   All right.  What -- why would a Snap-on employee owning Snap-on equipment be suspicious?

A.    I think because it was said that he was not supposed to have it by Mr. Snellgrove.

Q.    So Mr. Snellgrove said that he wasn't supposed to have the popcorn maker.

A.    Not a Snap-on popcorn maker.

Q.    Not a Snap-on popcorn maker.

And you relied on his representation.

A.    Yes, sir.

Q.    Did you make any independent investigation beyond that to determine who the proper owner was?

A.    No, sir.

Q.    So, for example, item number 3, I'll just read to you, Snap-on pliers.  Again, my same -- same question, why would pliers from a person who works for Snap-on -- why would that be suspicious?

A.    Because either Mr. Hamblin said it belonged to Mr. Snellgrove or Mr. Snellgrove said that was his.

Q.    And so your understanding is with respect to every single item on this list -- and then there are, again, 51 of them -- your -- your understanding is with respect to all 51 items with exception obviously of the two that's in the search warrant, so that's 49 -- the 49 items that are not on the search warrant, either Mr. Hamblin said they're Snellgrove's or Snellgrove claimed they were.

A.   Uh-huh.

Q.   Okay.  And that's documented on video with respect to all those items.

A.   I'd have to watch the video again.  I don't know.

Q.   You don't know, okay.

With respect to the items that have serial numbers, for example, item number 1, Snap-on 75th Anniversary roll cabinet, serial number 95161820 and 95205988, did you put those serial numbers into your computer system to check them out?

A.   I don't know, sir.

Q.   Okay.  Did you make any independent inquiry based on those serial numbers to determine who owned them?

A.   No, sir.

Q.   Did ask Snap-on corporate for any records relating to those serial numbers?

A.   Did not speak to s- -- corporate.

Q.   Okay.  And did Mr. Snellgrove provide to you any business documents relating to those serial numbers?

A.   Not me personally.  I don't know if the investigator got anything.

Q.   All right.  To the best of your knowledge, was

any drug test performed on any items taken?

A.   I don't know.

Q.   You don't know.

Why was the firearm seized?

A.   I am told it was a short-barreled weapon and there wasn't a tax stamp to allow possession of that weapon.

Q.   How was that determination made at the scene?

A.   I don't know.

Q.   Did your deputies carry a measuring device with them?

A.   S- -- so- -- usually.

Q.   Do you know if they measured it?

A.   I don't know.

Q.   Was it in fact a short barrel?

A.   Never saw it.  It was turned over to Howard County.

Q.   Okay.  There was a motorized vehicle -- a motorized bicycle that was taken.  Do you have any specific knowledge of that particular item or how it was identified?

A.   I believe it had Snap-on on the frame.

Q.   Okay.

(A discussion was had off the

stenographic record.)

Q.    (BY MR. MUELLER)  There was a TV swivel mount that was taken as part of the search.  Let me see if I can find that on the...

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  With respect to the tool cabi- -- cabinets, there was, for example, item 25 red S- -- apologize -- Snap-on red tool chest, item 26 Snap-on red wall cabinet, and there are mother -- other items that are cabinets.  Were any of those items opened to see if they contained items?

A.    I believe the -- at least the cabinets on wheels were.

Q.    Okay.  Did they contain any other items?

A.    They contained personal items of the -- the children, I believe.

Q.    Okay.  Did it contain any other tools?

A.    I don't know.

Q.    All right.  There was a --

MR. MUELLER:  Thank you.

Q.    (BY MR. MUELLER)  I'm gonna hand you what's been marked as Exhibit Number 6.

(Exhibit 6 marked.)

Q.    (BY MR. MUELLER)  This is an affidavit that

was signed by Warren Kniepkamp relating to items.  Could you please just read the paragraph on the first page.

A.    (Reading)  I, Warren --

MS. HAMBLIN:  Kniepkamp.

A.    Yeah.

-- owner and operator -- own -- own and operator of Snap-on Franchise [sic], since 2017, do attest that I have provided Austin Hamblin, my son-in-law, the following list prior to May 2023.

Q.    (BY MR. MUELLER)  Were you aware of this document?

A.    A day before yesterday.

Q.    A day before yesterday.

MR. DENNIS:  I've seen it, yeah.

Q.    (BY MR. MUELLER)  Okay.

A.    Of course.

MR. MUELLER:  I would hope so.

Are you sure you gave it to me?

Q.    (BY MR. MUELLER)  Anyways, so this is a list of inventory items that were provided by the father-in-law that are Snap-on tools and also lists other items that are not Snap-on tools that were given to Austin by another licensed Snap-on dealer.

Were you aware of any of this information relating to your investigation?

A.   No, sir.

Q.   On this last page, it lists Items Left on Snap-in [sic] Truck.  I just wan- -- want -- direct your attention to this, and I'll also give you back a copy of your search inventory and ask whether to your knowledge any of those items were seized as part of the search.

THE WITNESS:  Have you seen...

A.   Looks like iPhone.

No, sir, I don't see any of those.

Q.   (BY MR. MUELLER)  Okay.

MR. MUELLER:  I see Mr. Perez has joined us.  Hello, Mr. Perez.  Hello, sir.

Q.   (BY MR. MUELLER)  Okay.  Yeah, according to this affidavit, these items were left on the Snap-on truck.  I- -- do -- so do you -- do you know if that truck was inventoried as part of your search?

A.   I -- I don't know.

Q.   Okay.

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  How was the pink tool set that was seized cl- -- se- -- come to be seized?

A.   The what?

Q.   There was a pink tool set.

A.   I'm --

**55**

Q.    You have no knowledge of that?

A.    I don't know, sir.

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  Was the iPhone that was taken searched in any way?

A.    I don't know.

Q.    Okay.  The -- at the time this search occurred, was Mr. Hamblin still employed by Mr. Snellgrove?

A.    It's my understanding his termination with the company was very close to the search so I don't know.

Q.    Okay.  I -- I know, for example, that the -- there was a -- the iPhone is listed as being issued by Snellgrove Enterprises.  If Mr. Hamblin was still in his employ at the time of the search, that wouldn't necessarily be illegal for him to have it, would it?

A.    I -- no, but if Mr. Snellgrove said, "That's my phone and I want it back," then I would think he would have the right to his phone.

Q.    Okay.  Did either of the Hamblins provide your officer any receipts or other documentation that provided claim to own any items that were seized?

A.    No, I hadn't heard anything from Mr. Hamblin until I was served on this lawsuit --

Q.    Okay.

A.    -- and I still hadn't heard it from him but...

Q.    Were any documents seized as part of the search such as receipts, check stubs, personal documents, any records?

A.    I don't know.

Q.    Don't know.

Do you have any knowledge why drug charges were not brought relating to this matter?

A.    Cannot fathom why drug charges were not brought.

Q.    Were any of the sheriff's vehicles used to transport any of the items that were seized after they were seized obviously?

A.    None of ours were.  I'm assuming the Howard County deputy took the short-barreled firearm and the drugs in his vehicle.

Q.    And to your knowledge all other items were transported by Snellgrove.

A.    Uh-huh.

Q.    Did -- what consideration was made du- -- relating to the conflict of interest by Snellgrove storing property he claimed to own before, you know, ownership was determined?

A.    Repeat the question.

Q.    Sure.

Was there any process that your office conducted to consider a potential conflict of interest from Snellgrove storing seized items?

A.    No.

Q.    Do you know when Snellgrove was contacted relating to authorization to have the pri- -- items released?

A.    No, sir.

Q.    Who made the determination the items could be released?

A.    The determination what, sir?

Q.    Who made the determination the items could be released?

A.    I don't know.  When I left office, Mr. Hamblin was indicted -- under indictment and...

Q.    Yeah, well, obvious- -- perhaps not obviously, but I'm not only asking you, I'm asking the county because you're here as the county's representative.

So does the county have any knowledge relating to this?

A.    I don't know.

Q.    All right.  Did the county have any processes in place to verify the items were being stored in a segregated location by Mr. Snellgrove?

A.    I don't know.

Q.    Did the county have any procedures in place to make sure that Mr. Snellgrove was following the procedures required by law relating to the storage of items?

A.    I don't know.

Q.    Did the county inform Mr. Snellgrove of the processes required by law for the storage of items?

A.    Mr. Snellgrove was told to not get rid of the items until the disposition.

Q.    I understand that he was told that, but was he informed of all the statutory requirements relating to the storage --

A.    I don't know.

Q.    -- of items?

A.    I don't know.

Q.    Was Mr. Snellgrove informed of any of your own sheriff's department's policies relating to the storage of items?

A.    I don't know.

Q.    Who would have informed him if he was to be informed, do you --

A.    Would have been me, my chief deputy, or my investigator.

Q.    Who made the final decision to transport the

items to -- who made the final decision to allow Mr. Snellgrove to transport the items?

A.   I did.

Q.   And who made the final decision to allow Mr. Snellgrove to store the items?

A.   I did.

Q.   Did you as part of that process consider marking a segregated area with police tape or otherwise showing it to be owned by or controlled by the county?

A.   No, sir.

Q.   Do you -- were -- did you make any efforts to verify at any time that the items were in fact being kept per your instructions?

A.   I talked to Mr. Snellgrove a time or two after that to make sure everything was -- that he still had everything.

Q.   Okay.  Do you recall like what questions you asked him or what processes you went through?

A.   Just called, asked him how he was and did he still have the -- the tools.

Q.   When Mr. Snellgrove disposed of the tools, did he send you any records relating to that?

A.   No.

Q.   So the county's last knowledge of what happened to the tools was when they were put on the

truck by Snellgrove.  After that, you don't know because you --

A.   No, I saw the tools in his shop.

Q.   You saw the tools in his sho- -- in the shop. Describe that.  Describe what you saw.

A.   There was a -- he had a metal barn with a concrete floor and the front part of it was just solid with the tools and items that had been taken from Big Spring.

Q.   How did you know they were the same items?

He's a Snap-on dealer.

A.   He told me.

Q.   Okay.  Did you verify any of the serial numbers that were there?

A.   No, sir.

Q.   Did you verify it was the same number of items?

A.   No.

Q.   Were there any other items of -- any other items that were kept in proximity to the items you observed?

A.   I think -- yes, I think there was like an area where the items from Big Spring were, and then behind it, there were his business items.

Q.   How were those areas separate -- separated or

demarcated?

A.   It was Mr. Snellgrove's barn.  I -- he knew.

Q.   Okay.  When the items were being taken by Mr. Snellgrove to his location, was he accompanied by anyone from the sheriff's office?

A.   The truck was followed by a county unit.

Q.   Who was in that unit?

A.   I don't know.

Q.   Do you know if the unit helped Mr. Snellgrove unload any of the items?

A.   No, I believe Mr. Snellgrove had a employee -- the same employees that he brought to help load the stuff.

Q.   What insurance covered those items as they were being transported?

     Is the -- does the county have insurance for items as they're transported?

A.   I don't know.

Q.   Okay.  Did the county consider storing the items in a private storage locker or pod?

A.   No.

Q.   Were there any -- could -- could any of -- any of the items seized been stored in the sheriff's department's storage facilities?

A.   Very few.

JAMES BRADLEY INGRAM

**62**

Q.   Okay.  Was there any particular reason they weren't?

A.   Just keeping everything together.

Q.   Okay.  The county has -- does the coun- -- does the county have barns at county road bridge -- county road bridge and barns, is that a thing?

A.   I don't know.

Q.   Okay.  Do you have an impound lot?

A.   No.

Q.   How do you impound vehicles when you do, or do you impound vehicles?

A.   We had -- when I was there, a wrecker service would pick them up and then he kept them.

Q.   Does the county now use any commercial storage units for the storage of the items --

A.   I do not --

Q.   -- such as --

A.   -- know.

Q.   Okay.  Did the county have any conversations with Howard County relating to potential storage options?

A.   I don't know.

Q.   Did the county have any discussions with the Texas Rangers relating to the storage of items?

A.   I don't know.

**63**

Q.   Were the Texas Ranger involved in this case?

A.   No.

Q.   Did you make any stops after you left the house during the seizure, or did you -- what -- what di- -- what -- what did you do after you left the house on the day of the seizure?

A.   I don't remember.

Q.   Okay.  What time about -- approximately did that seiz- -- search and seizure end again?

A.   I don't know.  It would just be a guess.

Q.   Okay, fair enough.

Were the Texas Rangers ever asked to investigate any part of this case?

A.   No.

Q.   Okay.  I'm curious why you laughed.  You seem to --

A.   Well, I -- I heard that the present sheriff tried to get the Rangers to investigate me when the case was dropped by the DA --

Q.   Okay.

A.   -- but that -- that's somewhat hearsay.

Q.   Fair enough.

Did you -- what was your budget at the time relating to search and seizure and storage?

Did you have -- did you have money that

could have paid for commercial storage?

A.   I didn't have a line item in my budget for that.

Q.   Well, I'm sure you didn't have a line item, but did you have funds that could have been a- -- put for that expenditure?

A.   Probably.  I don't know.

Having funds and getting funds are two different things.

Q.   What notifications were given to the Hamblins relating to the legal processes available to them to contest the seizure of the property --

A.   I --

Q.   -- on behalf of the county?

A.   I don't know.

Q.   Did the county provide any notifications relating to he- -- hearings that they could participate in relating to the se- -- seizure of property?

A.   I don't know.

Can I ask you a question?

Q.   Sure.

MR. DENNIS:  No.  No.  No.  No, you can't.

THE WITNESS:  Okay.

A.   Never mind.

Q.   (BY MR. MUELLER)  He won't let you.

Did Mr. Snellgrove post any bond relating to the storage of the items at his property?

A.   I don't know.

Q.   What was the physical address where the property was stored when it was seized?

A.   It was on Westside Drive.  I do- -- I would have to look at the actual physical numbers.

Q.   Is it his place of residence?

Is it his place of residence where it was stored?

A.   It's a barn behind his residence.

Q.   Okay.  Did the sheriff's office have any independent access to that sh- -- storage facility?

A.   No.

Q.   Did the barn have any security to the sheriff's --

A.   I don't know.

Q.   -- office knowledge?

A.   I don't know.

Q.   Why -- why do the items that you seize that you do maintain at the sheriff's office -- you mentioned earlier they're kept under lock and key.  Why?  Why are they kept under a lock and key?

A.   Just because it's evidence and that's the way

evidence is handled.

Q.   Okay.  So if evidence sh- -- is kept under lock and key, then why wasn't the evidence that was held by Snellgrove kept under lock and key?

A.   Didn't have the facilities to do that.

Q.   Did the county consider any storage options other than Snellgrove for the items to be stored?

A.   I don't know.

Q.   Who had access to the barn?

A.   I don't know.

Q.   Were the items ever physically inspected after May 17th by the sheriff?

A.   Yes.

Q.   Describe that.

A.   Just drove out to the -- Mr. Snellgrove's and there was an employee in the shop and I walked through and looked over the stuff that had been taken.

Q.   When was that?

A.   I don't know.

Q.   Okay.  Was there any log maintained, or did you take any photographs of it?

A.   I took photographs.

Q.   Okay.  Are those photographs still in your possession?

A.   I'm not sure.

Q.   All right.  Who is the sheriff office's custodian of records?

A.   I am, the sheriff.

Q.   Who actually typed the inventory of the items seized document?

A.   I believe my investigator, Anders Dahl.

Q.   I'm gonna go back to --

MR. MUELLER:  Yeah, thanks.

Q.   (BY MR. MUELLER)  -- Exhibit Number 5.  Item number 50 says:  Assorted Snap-on hand tools, power tools contained in roll cabinet drawers and tool chests.

Why weren't those items individually inventoried?

A.   I don't know.

Q.   What is the standard procedure with respect to inventorying of items?

A.   It's not uncommon to bulk just miscellaneous or assorted items in such and such.

Q.   An- -- and that's the -- the standard policy at the time?

A.   I don't know if it was a policy.  It happens.

Q.   Why did -- you mentioned earlier that the $283,000 for -- $283,445 evaluation [sic] was provided by Mr. Snellgrove.  Was that right?

A.    Yes.

Q.    Did the department do any independent research to verify that valuation?

A.    No, not that I'm aware of.

Q.    Were field notes taken during the search and seizure relating to inventory?

A.    I don't know.

Q.    To your know- -- where are the items that were seized currently?

A.    I don't know.

Q.    Was the police report that was given to the plaintiffs redacted?

A.    I don't know.

Q.    Is [sic] police reports given to suspects redacted by your office?

A.    I don't know when I was in office that any reports were given to suspects.  It went through attorneys.  So I don't know.

(A discussion was had off the stenographic record.)

MR. MUELLER:  Take five.

(Recess.)

THE VIDEOGRAPHER:  It's 11:01:35.  Back on the record.

Q.    (BY MR. MUELLER)  With respect to the evidence

that was seized, when did the department -- when did the county, I suppose, learn that the informa- -- that the items were no longer needed for evidence?

A.   I don't know.

Q.   Did the department lear- -- did the sheriff's department or the county learn that the plasma color -- cutter that had been seized had been sold?

A.   I don't -- no --

Q.   Okay.

A.   -- I don't know.

Q.   Mr. Snellgrove's residence, what county is that in?

A.   Martin.

Q.   And the warrant was executed in which county?

A.   Howard.

Q.   So why were the items transported to Martin County and not kept in Howard County?

A.   Probably Howard County didn't want that much, but we wanted -- wanted them back in our county.

Q.   Okay.  All right.  I'm gonna quote from Article 18.10, which relates to how returns are made. The article says in substantive part:  Except as otherwise provided in Subsection (b), the property may not be removed from the county in which it was seized

without an order approving removal, issued by a magistrate in the county in which the warrant was issued.

Was such a order provided to you?

A.   Was what, sir?

Q.   Was such an order given to you?

A.   No, sir.

Q.   Okay.  Does the state la- -- does the state law impose on you any obligations when it comes to storage facilities for evidence, or is the evidence required to be kept in a certain room, certain conditions?

Is there a statute that --

A.   I --

Q.   -- requires that?

A.   -- I don't know.

Q.   Was the sheriff's office ever notified the case was dismissed, the (indiscernible) case?

Don't know?

A.   I don't know.  Not while I was sheriff.

Q.   Okay.  Do you know if Kiska Hamblin was told she would receive a final count with respect to the items that was seized?

A.   Do I know wha- --

Q.   Do you know if she was told that?

71

A.    Was told what?

Q.    That she would receive a final count with respect to items.

A.    I don't know.

Q.    Okay.  Did Kiska Hamblin ever request a copy of the police report from your office?

A.    Not to -- by -- to me, no.

Q.    Does the name Billy Reynolds mean anything to you?

A.    Wha- --

Q.    Bill- -- Billy Reynolds.

A.    Billy Reynolds.

      Billy Ray or just Billy?

Q.    That's what I have is Billy Reynolds.

A.    Oh.

Q.    Well, who's Billy Ray Reynolds?  Who's Billy Ray?

A.    There's a -- the county judge in Glasscock County is the chief deputy in Martin County, and his name is Billy Ray, but I'm not sure what his last name is.

Q.    Okay, fair enough.

      Were the plaintiffs ever informed that their property was being kept at Snellgrove's?

A.    I don't know.

Q.   Was there a written notice ever provided to the plaintiffs regarding the right to a Chapter 37 hearing --

MS. HAMBLIN:  47.

Q.   (BY MR. MUELLER)  -- 47 hearing?

A.   Was written notice ever --

Q.   Provided to them regarding their rights to a Chapter 47 hearing.

A.   No --

Q.   Okay.

A.   -- not to my knowledge.

Q.   What is your kno- -- what is your understanding of how property can be contested by the person who it was seized from?

How is that process supposed to undertake?

What is it supposed to do?

A.   I guess the person who is questioning the property goes to a magistrate and requests a -- a -- I thought it was a Chapter 26 property hearing, I don't know if the number's right --

Q.   Okay, fair enough.

A.   -- and then a judge will do that.

Q.   Did the sheriff's office ever receive any e-mails from either Kiska or A- -- Austin Hamblin

relating to the items that were seized?

A.    I didn't so I don't know if anyone else did.

Q.    Is it the policy of the sheriff to send out written notices relating to where items are seized or stored?

A.    No, sir.

Q.    Okay.  What was your understanding of how Snellgrove was to be informed that he could dispose of the property?

What was the process that was supposed to take place?

A.    Just that he was supposed to maintain the property until disposition of the case.

Q.    Okay.  And he would learn about the disposition of the case how?

A.    Word of mouth probably.

Q.    Okay.  Did the sheriff's office ever post anything regarding Facebook relating to this case?

A.    I'm not sure.

Q.    Okay.  With respect to the body camera footage that was taken during the raid, when was -- when did that items -- when did that get reviewed by your office?

A.    Wha- -- when did the body --

Q.    The -- yeah, how -- when was the body camera

footage reviewed --

A.    I don't --

Q.    -- by your office?

A.    -- know.

Q.    Okay.  I'm gonna hand you what's been marked as Exhibit Number 7 once I find more stickers.

(A discussion was had off the stenographic record.)

(Exhibit 7 marked.)

Q.    (BY MR. MUELLER)  This is a Facebook pa- -- post from Carl [sic] Ingram and the sheriff county office [sic] dated May 24th, 2023.

Can you read your -- could you read the sheriff's office portion of the post, please.

A.    (Reading)  The Martin County Sheriff's Office received a report of a large theft on May the 11th, 2023.

Investigation led to the execution of a search warrant which was executed in Howard County, Texas on May 17th, 2023.

During the execution [sic] a very large amount of new tools were recovered.  The owner was present and able to take -- and able to value the cost of the tools at $283,000.

The subsequent arrest has bee- -- arrest

warrant has been obtained but has not been served at this time.

I would like to thank the Howard County Sheriff's Office for their corporation and participation in this investigation.

Q.    Okay, thank you.

Did you write that?

A.    I wrote the narrative.

Q.    And is that standard procedure for your office?

A.    I don't do Facebook.  I either have a deputy or my wife put stuff on Facebook that we think is noteworthy to be there so that's -- that's not the only thing that ever hit Facebook that I'm...

Q.    I also note there was a comment in this Facebook post from Julie Todd Snellgrove, which reads: Thank you guys so much for once again coming to our rescue.

What was Julie Todd Snellgrove's involvement in this case?

A.    She's the wife of Brian Snellgrove.

Q.    Did she participate in making a complaint?

A.    No.

Q.    In making the decision to store items at Snellgrove's barn, did the county seek any legal advice

relating to that?

A.   No.

Q.   Does the county have legal advice available to it?

A.   The county has the county attorney --

Q.   Okay.

A.   -- for -- who's kind of the first step of legal advice.

Q.   Are you aware of other sheriffs who have -- let's say in Texas more specifically -- who have stored property relating to a search and seizure at the private residence of a third party?

A.   I don't know.

Q.   Okay.  In any of your trainings that you went through over the -- your years as a sheriff, did they ever advise you in your trainings to store items at the private residence of a third party?

A.   No.

Q.   Are you aware of any statements from the current sheriff relating to this matter?

A.   No.

Q.   Okay.  Let's go ahead and go through some of the manual that you wrote.

There's another copy of this floating around somewhere.

(A discussion was had off the stenographic record.)

Q. (BY MR. MUELLER) This'll be Exhibit Number 8.

(Exhibit 8 marked.)

Q. (BY MR. MUELLER) This is Martin County Sheriff's Office Policy Manual that was signed by you.

Are you familiar with this document?

A. Yes.

Q. How did this document come to be?

A. I prepared it using a model policy ma- -- manual through Texas Association of Counties and modified it to fit a de- -- small department such as ours.

Q. Generally speaking, what modifications did you make?

A. Well, I had one deputy working at a time. It -- some policy requires three deputies be present to do something. Just the things that were not physically possible, we had to change and tried to keep things as simple as we could.

Q. All right. I'll direct your attention -- these are not individually paged, are they?

No.

I'm gonna direct your attention to the Policy: Audits and Inspection, which I believe are

page -- this page.

A.    Do you know what s- -- section it -- that is?

Q.    Yeah --

A.    (Indiscernible.)

Q.    -- it's policy section 2.

A.    There should be a table of contents --

Q.    Yeah --

A.    -- there.

Q.    -- section 2, Audits.

A.    Section 2?

Q.    Yeah.

A.    Okay.

Q.    Now, according to the procedure on item III, it says:  The following operations shall be audited and inspected by a person either designated by the Sheriff or their designee [sic].

Then in subsection A-3, it says: Schedule for Agency auds [sic], inspection of high risk critical tasks:  The following ei- -- operations/tasks shall be aud/inspected on the following schedule: Property/Evidence, Annual [sic].

Do you see that, sir?

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  Do you see that, sir?

**79**

A.    Yes, sir.

Q.    Okay.  Wa- -- was an annual audit done?

A.    No, sir.

Q.    And why not?

A.    Because we didn't have the manpower.

Q.    Okay.  With respect to item 6, "Mandated training, Annual Report," was an annual report c- -- provided -- prepared?

A.    No, sir.

Q.    And why is that?

A.    Manpower shortage.

Q.    Are you the hiring authority for the sheriff's office?

A.    I -- I was.

Q.    So if you needed more manpower, why didn't you hire more manpower?

A.    Because the commissioner's court allots the number of people I'm allowed to have.  Like I said, having money and getting money is two different things.

Q.    And what limit did they impose on you in terms of number of personnel?

A.    I had to fight for ever [sic] person I -- I had.

Q.    How many employees did you have when you were

sheriff?

A.    When I left, I had 21 employees.  That included law enforcement, dispatch, and jail.

Q.    You said you adopted [sic] this for a small department.  Correct?

A.    Yes, sir.

Q.    So you wrote this policy and adopted it for a small department, and knowing that, you still didn't do the policy that you said you were gonna do.

So my question is to you why didn't you either write it differently or follow the policy that you deemed necessary?

A.    I don't have an answer for that, sir.

Q.    Okay.

A.    Policy can be made orally or done away with orally.

Q.    Are you saying that this policy was done away with?

A.    No, I'm not saying that.

Q.    Are you saying this policy was modified?

A.    From the draft I got it from, I don't remember.

Q.    The -- the draft you got it from?  I thought you prepared this draft.

A.    I got this from the Texas Association of

Counties' model policy.

Q.    I understand that, but then you were the one that modified it and approved it and had the county vote to approve it.

A.    Yes.

Q.    Okay.  Let's take a look at Duty to Disclose, section 9.  Hopefully it has some red text, at least on my draft.  I don't know if your draft does.

A.    Okay.  What's close to it?

Q.    Domestic Misconduct is --

A.    Okay.

Q.    -- the one before it.

A.    I'm right there.

Q.    Next time, page numbers.

MR. DENNIS:  Bates stamp anyway, huh?

MR. MUELLER:  Uh-huh.

A.    I -- I'm not finding --

Q.    (BY MR. MUELLER)  Okay, that's fine.  I will give you my copy.

All right.  This is the Duty to Disclose policy.  I am on the second page of it under Subheading B, Credible [sic] Evidence.  Would you read item number 3 for me out loud.

A.    B number 3?

Q.    Yes, please.

A.    (Reading)  With respect to civilian witnesses, any information which may indicate the person has a motivation beyond civic duty must be disclosed. i.e. law enforcement redu- -- reduces or does not charge the subject with a crime in exchange for information or testimony.

Q.    Thank you, sir.

So with respect to a civilian witness such as Mr. Snellgrove, what du- -- what biases or motivation do you think he might have had beyond civic duty?

MR. DENNIS:  Objection, form.

MR. MUELLER:  Fair enough.

Q.    (BY MR. MUELLER)  Were you aware of any motivations he had beyond civic duty?

A.    Financial.

Q.    Did you report that to the prosecutor's office?

A.    To the who?

Q.    To the prosecutor's office.

A.    I don't remember.  I believe there was a conversation, yes.

Q.    How did his financial motivations influence your investigation, processing of this case?

A.    It didn't.

Q.    How did it influence your decision to store the items at his location?

A.    It -- it didn't.

Q.    Let's go to Section 24, Property and Evidence.

A.    Where is that in relationship to Stop, Search, and Seizure of a Person?

Q.    It is -- that's Section 30, and this is Section 24.

A.    Okay.

MR. MUELLER:  Incidentally, what are you thinking in terms of lunch?  Do you care?

MR. DENNIS:  No.

Go -- can we go off the record for a minute.

(Recess.)

Q.    (BY MR. MUELLER)  All right.  Are you with the correct page, sir?

A.    Yes, sir.

Q.    All right.  I want to go through this policy with respect to property and evidence.

Okay.  Can you read item number 1 for me out loud, please.

A.    Purpose:  The purpose of this policy is to outline the procedure of this Agency with respect to property, contraband or evidence that is seized.  All

property, with the exception of the vehicles, will be dealt with under the [sic] policy.

Q. Now, I note that word "will". What does that mean to you, that something will be done?

Does that -- is that mandatory language?

A. I guess it fall- -- falls in between "shall" and "should".

Q. Falls in between "shall" and "should," okay. Fair enough.

Let's do po- -- let's do number 2. I'll read for you this time.

A. Thank you.

Q. (Reading) With respect to evidentiary items, this agency shall maintain a proper cuss [sic] of items and secure such items in a manner that will ensure the [sic] evidence is available to be admitted at trial.

Did the e- -- did the agency maintain a proper chain of custody with respect to the items that were taken in this case?

A. That would be determined by a court.

Q. Well, to your mind did they maintain it?

A. Yes.

Q. Okay. And in what -- in what recordkeeping fashion was that chain of custody maintained?

A. It was kept on private property and maintained

by the owner.

Q.    I mean the records of it.

A.    There's probably none.

Q.    There's probably none.

Okay.  I- -- item 3 B:  When seizing items of value, officers shall make a handwritten inventory of the items at the scene of the seizure.

Was a handwritten inventory of the items produced in this case?

A.    Yes.

Q.    And -- okay.  And where is that handwritten inventory?

A.    I don't know.

Q.    Okay.

(Reading)  Two officers shall conduct this inventory on [sic] the property if available.

Were two officers available?

A.    Yes.

Q.    Did two officers conduct the inventory?

A.    I don't know.

Q.    (Reading)  If two officers are available, both officers then shall sign the handwritten inventory.

Did two officers sign the handwritten inventory?

A.    I don't know.

Q.   Okay.  Item C:  In cases where professional expertise is required to make a proper accounting of the property, the Sheriff or his Designee shall be notified so the services of a expert may be obtained [sic].

Was an expert obtained in this case, sir?

A.   No, sir.

Q.   (Reading)  Once an item is seized, it shall be transported by the officer to the appropriate agency office.

Were the items seized transported to the appropriate agency office?

A.   No, sir.

Q.   Okay.  Item F:  Clearly one of the most important aspects of the property and evidence function is security.  Security is established by both tangible, i.e. locks, video, double-key, alarms, et cetera, and intangible mechanisms, i.e. random inspections, audits, proper selection of staff, et cetera.  The officer in charge must limit access to the property/evidence room. Only those staff members who are necessary to the proper [sic] evidence function should be allowed in storage areas.

So let's go through that one by one.

Do you agree that one of the most important aspects of property and evidence function is

security?

A.    Yes.

Q.    Do you agree that security should be established by tangible means?

A.    Yes.

Q.    Were locks used in this case?

A.    I don't know.

Q.    Was video used in this case?

A.    I don't know.

Q.    Was double-key security used in this case?

A.    I don't know.

Q.    Were alarms used in this case?

A.    I don't know.

Q.    Do you believe it -- it -- do you agree that intangible mechanisms are important?

A.    Yes.

Q.    Were random inspections done in this case?

A.    Yes.

Q.    Wa- -- you're referring to your previous visits.

A.    Uh-huh.

Q.    Were those announced?

Did you say you were coming?

A.    Uh-huh.

Q.    Were audits performed in this case?

**88**

A.    No.

Q.    Was a proper selection of staff performed in this case?

A.    Proper selection of?

Q.    Staff.  It's right here in the policy, proper selection of staff.

A.    No.

Q.    Was that done?

Okay.

(Reading)  The officer in charge must limit access to [sic] the property/evidence room.

Who was the officer in charge?

A.    I was.

Q.    Did you limit access to the property/evidence room?

A.    Yes.

Q.    How?

A.    It was locked.

Q.    How do you know that?

By whom?  Mr. Snellgrove?

A.    No, you said the property room.

Q.    Yes, the -- do you --

A.    That's different from Mr. Snellgrove's barn.

Q.    I see.

So you don't -- you didn't limit access

89

to the barn.

A.    No.

Q.    Okay, fair enough.

(Reading)  Only those staff members who are necessary to the property/evidence function should be allowed in the [sic] storage areas.

Were only those staff members who were necessary to property/evidence function allowed in the storage areas?

A.    I don't know.

Q.    Is Mr. Sn- -- was Mr. Snellgrove allowed in the storage area?

A.    Yes, sir.

Q.    Okay.  Item H:  Evidence shall be properly marked or tagged with report number, date of seizure, arresting officer's name as well as suspect name where applicable [sic].

Was the evidence so marked?

A.    No, not all of it.

Q.    Okay.  Item I:  The item shall then be stored in a secure area.  The only exception to this provision shall be cases where the case will be charged by a different agency or cases where a forensic unit has seized the evidence.

Was it stored in a secure area, sir?

A.    No.

Q.    Okay.  Was this a case where it was being charged by a different agency with respect to the -- to the Snap-on tools?

A.    No.

Q.    Seizi- -- item J:  Seizing officers or their designee [sic] shall deliver evidence to the property room.

Was the evidence delivered to the property room?

A.    No, sir.

Q.    In K -- item K --

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  Item K:  In cases where a discrepancy has been found and reported, the seizing officer responsible for that evidence or property shall cause an immediate investigation within his or her unit to resolve the discrepancy at issue.

Were there discrepancies from the policy in this case?

A.    Not that I'm aware of.

Q.    There were several items where you said things were not done according to policy.  We've already gone through them.  Do you want me to go back through them

again, sir?

A.   If you want to.

Q.   Okay, fine.

We'll go back to item D, for example.

(Reading)  Once an item is seized, it shall be transported by the officer to an [sic] appropriate agency office.

Was that done, sir?

Was it done, sir?

A.   No.

Q.   Okay, no.

Is that a discrepancy, sir?

A.   I guess you could view it that way.

Q.   When that discrepancy was found, did the seizing officer call for an immediate investigation?

A.   No, sir, everyone knew what was happening.

Q.   At this moment, sir, I'm just trying to determine whether you followed the policies that you provide, sir.

A.   Okay.

Q.   Let's go through item 7, Stolen Property.

Item 7 --

MR. MUELLER:  You all right?

Q.   (BY MR. MUELLER)  Item 7, Stolen Property:  In addition to the general provisions of the policy, the

**92**

following particular provisions must also be complied with when dealing with stolen property or property for which is probable cause to believe is stolen.  It should be noted that the state legislatures set diverse requirements for types of stolen property and for property that's been recovered as stolen from varying crimes.  It is the intent of this policy to be broad enough to cover all stolen property irrespective of the crime or type property which will meet all the requirements of law [sic].

So i- -- item A:  When dealing with any type of stolen prof- -- property, officers responsible for that property shall comply with the provisions of Texas law.

Article 18.10 provides in substantive part:  Except as otherwise provided Subsection (b), the property may not be removed from the county in which it was seized without order approving removal issued by the county in which the warrant was issued [sic].

Was Texas law followed in this case, sir?

MR. DENNIS:  Objection, form.

You can answer if you know.

A.   I'm not required to request the property hearing, I don't believe, but there was no hearing.

Q.   (BY MR. MUELLER)  I apologize, let me repeat

**93**

because I perhaps wasn't clear.

(Reading)  Except as otherwise provided by Subsection (b), the property may not be removed from the county in which it was seized...

Was the property removed from the county in which it was seized, sir?

A.   Yes, it was.

Q.   (Reading)  ...without an order approving the removal issued by the magistrate [sic].

Was an order issued by the magistrate, sir?

A.   No, sir.

Q.   So -- okay.  Item B:  Officer shall secure the property believing [sic] to be stolen and create an inventory detailing the property taken in custody in accordance with general provisions of this policy.

Was a full inventory of all items taken performed, sir?

A.   To my knowledge, yes.

Q.   Want to go to item 8, Other seized property, item A.

Start with the ei- -- 8:  In the course of investigating crime, it's often necessary to see [sic] what courts refer to as "mere evidence" to establish connection between a suspect and a crime.

This would include evidence such as wallets with identification, clothing, photographs and any other item that belong to suspect, victim or witness of crime [sic].

Were any photographs seized as part of this search?

A.   I don't know.

Q.   Were any personal items seized as part of this search?

A.   I don't know.

Q.   With respect to item 11, Inspections and Audits, item A:  Inspections of Evidence/Property Storage Area will be conducted to ensure:  Storage areas are clean and orderly.

Was an inspection done of Snellgrove's barn with -- to make sure that it was clean and orderly?

A.   It was when the property was unloaded.

Q.   Who conducted that inspection when the property was unloaded?

A.   I was there.

Q.   When it was unloaded, you were present at Snellgrove's --

A.   Well, shortly after.  I might not have been there when it started but...

Q.   Okay.  So you were present when the evidence

was taken off of Snellgrove's van and put into the barn.

A.    Some of it.

Q.    Okay.  On the way from the place where the items were seized, the Hamblins' residence, to Snellgrove's property, do you recall that -- if you made any snops [sic] along the way?

A.    No, sir, I do not.

Q.    Okay.  When you -- what was your participation in the unloading of the items from Snellgrove's --

A.    Nothing.

Q.    You were merely present?

A.    Yes.

Q.    Okay.  You -- describe what you observed.

A.    Pretty much what these pictures show.  The -- they had laid them out in a -- in a manner that you could see more what it was.

Q.    Okay.  Who -- do you know who took these photographs?

A.    No.

MR. DENNIS:  For the record, they're looking at, what is that, Exhibit 7?

MR. MUELLER:  Yeah, Exhibit 7.  Thank you.

MR. DENNIS:  Sorry.

Q.    (BY MR. MUELLER)  He's good.

Item B:  Integrity of the [sic] property is maintained.

With respect to the inspection of the storage area, did you ensure the integrity of the property would be maintained?

A.   No.

Q.   With respect to item C, "Provisions of the agency orders and directives followed," did you give Mr. Snellgrove a copy of the agency orders and --

A.   No.

Q.   -- directives?

Item E:  Accountability procedures are maintained.

Describe the accountability procedures that were in place.

A.   There were none, just verbal.

Q.   Item B:  Inventories, audits and Inspections shall [sic] be conducted as follows:  Semi-annually, the primary property/evidence manager shall conduct an inspection determine adherence to procedures ued for control of controlled property [sic].

Who is the primary property/evidence manager?

A.   I guess the sheriff would be.

Q.   Did you conduct in a -- a semiannual

inspection to determine adherence to procedures?

A.   No.

Q.   It says:  This inspection shall be documented via memo- -- memorandum directed to the Chief of Police.

Was any such memorandum dire- -- pre- -- prepared?

A.   No.

Q.   Item C:  An annual inventory of property will be conducted by a Supervisor not routinely or directly connected with property control.

In your office who would that supervisor be?

A.   Probably my chief deputy or my sergeant investigator.

Q.   Okay.

(Reading)  The supervisor will be assi- -- accompanied by an evidence custodian.

Who were your evidence custodians?

A.   They came and went.  About the time we would just about to get a handle on things, the -- someone would take a job elsewhere, have to start over.

Q.   Yeah.

Item D:  Annual unannounced inspections at [sic] random sample inventories of property storage are conducted as directed by the Sheriff or their

designee.

Was your review of Snellgrove's barn such a inspection?

A.   No.

Q.   Was any documentation of that visit performed or created?

A.   No.

Q.   Item E:  At least quarterly, the person responsible for the property and evidence control function, or his or her designee, conduct an inspection or adherence to procedures used for control of property [sic].

Who was the person responsible for property and evidence control of the property kept at Snellgrove's place?

A.   I was.

Q.   Okay.  Did you or your designee conduct an inspection of adherence to procedures quarterly?

A.   No.

Q.   Want to go to section 3, body-worn cameras.

A.   Is that after Audits?

Q.   Yes, it's immediately after Audits.

A.   Got you.

Q.   Okay.  Item III, Procedure -- okay.  Item 4: Officer's assigned Body Worn cameras [sic] will wear

them at all times while on duty in any type of uniform.

Were you assigned a body-worn camera?

A.   No, sir.

Q.   Were all your officers at the scene wearing body-worn cameras?

A.   Yes.

Q.   Item C:  The recording shall continue until law enforcement event or citizen contact is completed and citizen involved departs or until the Officer, who's recording the event through his body-worn camera discontinues his or her participation in the law enforcement event or citizen contact by leaving the scene [sic].

Was that policy followed with respect to the Hamblins?

A.   I would have to look at the film.  I don't know.

Q.   Item D:  S- -- searches of any kind.

How many searches were conducted at the Hamblin residence?

A.   One.

Q.   One search.

Was the entirety of the search from beginning to end documented on the body-worn cameras by each officer?

A.    I don't know.

Q.    Seizure of any evidence, was the seizure of all evidence recorded on the body-worn cameras?

A.    I believe so.

Q.    Item E:  When the body-worn video recording's [sic] entered into the video server, the video will be labeled, but need not be limited to...

Was the body-worn video entered into a video server?

A.    What -- what's your question?

Q.    Was it entered into a server?  Was that done?

A.    I believe it was automatic when you pull in the parking lot.

Q.    That -- so when you pull in the parking lot, it automatically uploads from the body-worn camera to the server?

A.    Uh-huh.

Q.    Okay.  Was any of the video taken destroyed prior to 120 days after its creation?

A.    Not that I'm aware of.

Q.    What was the document retention policy with respect to video?

A.    I believe it was -- I -- I don't know.

Q.    Item VI A:  In a -- in -- in a case where an

event is recorded which involves an arrest or any seizure of evidence or property, the arresting Officer shall fill out the body-worn video form indicating that the event has been recorded.

Was such a form filled out by your officers?

A.   I do not know.

Q.   At the time the search warrant was performed, was an arrest warrant in existence for Austin Hamblin at that time?

A.   Yeah, I believe it was just a search warrant.

Q.   Just a search warrant at that time.

When was the arrest warrant obtained?

A.   It was in the police report you showed.  I -- I don't know.  It was shortly thereafter.

Q.   What is your policy when it comes to executing arrest warrants?

A.   I don't know that we have a...

Q.   When you receive an arrest warrant, how do you typically process them?

A.   It would be given to dispatch to enter into the TCIC/NCIC computer so if the person was found in a different jurisdiction, it would show up.  Then a deputy or a team of deputies would go out and try to locate the

subject, call in to the office to confirm that the warrant was still valid.

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  Okay.  I'm gonna mark this as Exhibit 9.

(Exhibit 9 marked.)

Q.   (BY MR. MUELLER)  This is an Arrest Warrant for Austin Hamblin that was signed on the 16th of May, 2023.  Are you familiar with this document, sir?

A.   Yes.

Q.   Okay.  So you had an arrest warrant for Austin Hamblin on the 16th and the search occurred on the 17th. Why didn't you arrest Austin Hamblin?

A.   I thought it was the other way around.

Q.   Okay.

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  In Snellgrove's answers to interrogatories, he stated that there was more than one search that took place on the day of the search.  Do you have any idea what he might be referring to by that?

A.   No, sir.

Q.   Okay.  You didn't write it, but I figured I'd ask.

A.    Unless he was -- is referring to the barn and the house being diff- -- separate searches.

Q.    Fair enough.

A.    That would be a guess.

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  Were there any internal communications among the -- among the sheriff or between the sheriff and Snellgrove in writing relating to this case?

A.    In writing?

Q.    Yeah.

A.    No.

Q.    Were there like -- did Snellgrove e-mail you? Did you e-mail him?

A.    I don't know.

Q.    Okay.  Did he e-mail the office?

A.    Did he what?

Q.    Did he e-mail the office of the sheriff?

A.    I don't know.

Q.    Okay.  Who was in charge of the sheriff's office after you retired in 2023?

A.    Who was in charge?  Randy Cozart.

Q.    Is he currently in charge today?

A.    As far as I know.

Q.    In your answers to the discovery requests -- earlier in item 11, I asked to:  Identify and describe all written policies, procedures, training manuals in effect in 2023 regarding seizure, inventory, storage, return, and disposition of property; state whether You contend your actions complied.  If not, describe deviations [sic].

Your written response was:  Relied on the Texas Code of Criminal Procedures.

Why didn't you mention the manual that was in existence in response to my written question?

A.    Well, I feel like the Code of Criminal Procedure would outweigh anything that I drafted.

Q.    Did you not consider it a written policy, procedure, or training manual?

A.    I did.

Q.    Okay.  Did Mr. -- to your knowledge did Mr. Snellgrove ever contribute to your campaign for sheriff?

A.    No, sir.

Q.    Mr. Snellgrove is county commissioner at this time.  Was he at the time that you were in office?

A.    He was not a commissioner on the day of the search.  No, he would have taken office the January after I reti- -- retired in October.

**105**

Q.    Okay.  Did he have any role with the government at that time?

A.    Huh-uh.  No, sir.

Q.    In response [sic] to item 9, I asked:  Produce policies, procedures, manuals and training materials 2023 [sic] regarding seizure, inventory, storage, return, and disposition of property.

In response you said:  See Texas Code of Criminal Procedure.  There might have been a binder.  It might not have anything on search and seizure.  It may not be in existence any longer.

Can you describe the binder that you were referring to.

A.    It would be this.

Q.    Okay.  Was any internal review done of any officers relating to this search?

A.    No.

Q.    What is your understanding of the final disposition of the items that were seized?

A.    Of the what, sir?

Q.    Of the items that were seized.  What's your understanding of the disposition of those items?

A.    I don't know.

Q.    Do you -- do you have any knowledge that -- are any of them in Mr. Snellgrove's possession to your

knowledge?

A.   I do not know.

Q.   In 21 I said:  Admit at least some items from Plaintiff's residence are no longer in any Defendant's possession [sic].

You denied it because why, sir?

A.   I'm sorry?

Q.   I -- in 21 I asked you to admit that at least items seized from pre- -- Plaintiff's residence are no longer in any Defendants' possession.  You denied it. Would you like to see that writing if you don't understand me?

I'm just asking you why you denied that, sir.

A.   That anything --

Q.   That at least some items are no longer in any Defendants' possession that were seized.

I'll -- yeah, I'll show it to you.

A.   Define "defendant".

Q.   Well, that would be the county, the officers, and --

A.   Okay.

Q.   -- Snellgrove.

A.   In the civil court?

Q.   Yes.

You don't know?

Okay.  What was your understanding of why the case got dismissed against Austin Hamblin fr- -- by the prosecutor's office?

A.    I didn't really get an -- an explanation.  I didn't know it had been dismissed till I got served.

Q.    What conversations did you have with Brian Snellgrove prior to the search?

A.    Mainly trying to get him to come in to the office to -- to do the original report.  We was -- it'd need to come and we'd get something in writing.  We'd need a -- a list of -- of what he felt like was missing.

Q.    Okay.  So he made an initial report and then -- to one of your officers --

A.    Uh-huh.

Q.    -- but he wanted to come in and make an additional report, or did you have problems with him coming in and making the first --

A.    It just --

Q.    -- report?

A.    -- took -- it took a matter of time for him to come to the office to give the -- the initial report.

Q.    Okay.  Did you take any reports from him?

A.    No.

JAMES BRADLEY INGRAM

**108**

Q.   You mentioned earlier that he was notified that he might have to participate in the search or seizure.  Did you notify him of that?

A.   I told him we didn't have the means to transport the a- -- the amount of property he had -- was claiming was gone, and he said he would bring a truck and a -- people to help load.

Q.   Okay.  Did -- what people did he bring to help load?

A.   Some of his Snap-on employees.

Q.   Do you know any of their names?

A.   No, sir.

Q.   Did they -- did any of the employees participate in the search and seizure?

Did you see them walk around the property?

A.   I saw them carrying property to the truck.

Q.   Okay.  How many of them were there approximately?

A.   Three or four.

Q.   Okay.  Did you know who any of them were?

A.   I don't know who any of them were?

Q.   I was asking do you know who any of them were. Do you know any of them?

A.   Huh-uh.

Q.   What -- what is your understanding of the security of Snellgrove's property generally speaking?

A.   It's my belief that there's a security camera or an alar- -- a- -- alarm system there, but I do- -- I don't know any details.

Q.   All right.  Did you have any concerns that the items could be stolen from the barn?

A.   Not really.

Q.   Mr. Snellgrove recently reported a theft of a hard drive from his residence.  Are you aware of that?

A.   No, sir.

Q.   All right.  Have you as sheriff seen thefts from barns in Martin County?

A.   Some.

Q.   Okay.

A.   Not many.

Q.   Fair enough.

Because in your own policies you acknowledge the importance of security at the sheriff's department's facility, did sh- -- did security concerns not factor into this storage location for you?

A.   I felt like that the Snellgrove facility would be secure enough.

Q.   What about it made you feel that way?

A.   The barn sat right behind his residence --

JAMES BRADLEY INGRAM

**110**

Q.   Is the --

A.   -- one way in and one way out with --

Q.   Is the sheriff's office manned 24 hours a day?

A.   Yes, sir.

Q.   Is the barn manned 24 hours a day?

A.   I don't know.

When I was sheriff, it was manned 24 hours a day.

Q.   I understand.

MR. MUELLER:  All right.  Give me -- give me a couple of minutes to see if I have anything more, and we might be wrapping this up.

(Recess.)

Q.   (BY MR. MUELLER)  With respect to the Snellgrove property, including the barn, did your office -- or did the sheriff's office receive any theft reports from that property prior to the date of the search?

A.   Not that I'm aware of.

Q.   Okay.  Was -- when Snellgrove was running for commissioner, you were running for reelection of sheriff at the same time, right, in that same term?

A.   Yes --

Q.   Okay.

JAMES BRADLEY INGRAM

**111**

A.   -- no, I ran -- he ran for the off- -- he ran the governor's election, I think.

Q.   Okay.

A.   I ran the pres- -- the sheriffs run the presidential.

Q.   Okay.  Beyond --

A.   I think that's right.

Q.   Okay.  Did -- how many times had you been elected sheriff, I guess, total?

A.   I was appointed and then elected twice.

Q.   Okay.  Was Snellgrove involved in any way in your campaigns?

A.   Huh-uh.

Q.   Did Snellgrove provide any financial benefit to you?

A.   (Witness indicates.)

Q.   Okay.  I would like to mark as Exhibit 10 the Return and Inventory related to the search warrant.

(Exhibit 10 marked.)

Q.   (BY MR. MUELLER)  Are you familiar with this document?

A.   Yes, sir.

Q.   Okay.  This document appears to be the entirety of the return and inventory with respect to the search and seizure, and it does not within the text of

**112**

it reflect that anything was returned to the magistrate. Was there a s- -- return -- an inventory return to the magistrate?

A.    I believe so, sir.

Q.    And --

A.    I --

Q.    -- is there any reason that that was not reflected in this document?

MR. DENNIS:  I thought it said, "See Attachment A."

Okay.  That's what it says so...

MR. MUELLER:  And I ta- --

Okay.  Mark that.

Q.    (BY MR. MUELLER)  I asked earlier relating to in- -- e-mails between your office and people involved in this case.  I'll mark these two pages as Exhibit 11.

(Exhibit 11 marked.)

Q.    (BY MR. MUELLER)  Okay.  Were you aware of correspondence between the sheriff's office and other people on this case?

A.    No, I never saw it before.

Q.    Okay.  I'd like to mark as Exhibit 12 a collection of photographs.

(Exhibit 12 marked.)

Q.    (BY MR. MUELLER)  This is one, two --

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  I believe this is 11 pages if I counted correctly.

Are you familiar with any of these photographs, sir?

A.   I know that they're the -- the home that Mr. Hamblin lived in at the time of the search.

Q.   Do you know who took these photographs?

A.   I do not.

Q.   These photographs were contained in the discovery for the civil case, but were not in discovery for the criminal case.  Do you know why?

A.   That -- it could have been surveillance to prepare the warrant, just to get a description of the property.  I don't -- I don't know --

Q.   Okay.

A.   -- but I've never seen it.

Q.   I want to mark as Exhibit 13 two pages.  These are messages between Brian Illengram [sic] and Snellgrove.

(Exhibit 13 marked.)

Q.   (BY MR. MUELLER)  Are you familiar with these messages, sir?

A.   I must be.

Q.    I'll read them into the record.

It says from Brian Ingram -- or to Brian Ingram rather:  Brian --

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  Then it's from Snellgrove.

(Reading)  If it's ok I'd [sic] like to visit about timing of all that needs to go down.

(Reading)  Brian.

You respond:  Let me check and see where we are.

Did you write that, sir?

A.    (Witness indicates.)

Q.    He responds:  ...be there in 15 to 20 if that works for you.

(Reading)  Brian.  Hope you're doing [sic] after you have a chance to slow down for the day? If you're not tired I want some of what you're take [sic].

(Reading)  Hamblin arrested.

(Reading)  Thanks.

Do you remember that exchange, sir?

A.    Not really.

Q.    Then it says:  Can I get a copy of the report on Austin.  He's filed unemployment.  I need to dispute

his claim [sic].

(Reading)  Yes, sir, I have a copy -- I'll have someone print off a copy.

Did you write that, sir?

A.    (Witness indicates.)

Q.    Did someone print off a copy?

A.    I don't know.  Probably.

Q.    (Reading)  Thank you.

(Reading)  It'll [sic] be ready in the morning.

Was it ready in the morning, sir?

A.    I don't know.

Q.    Goes on to say:  Did you talk to Josh Hamby the other day?

Who's Josh Hamby?

A.    He's the 118th district attorney.

Q.    (Reading)  He just -- he had just figures -- finished a big murder case.

(Reading)  No.  I missed him.

(Reading)  I think you got there just as everything was wrapping up.  With everything that's happened since October, I strongly suspect your current sheriff has a hand in this.  I'm surprised he dug [sic] a commissioner into it.

Do you remember that exchange, sir?

A.    I remember seeing him at the -- I was retired. I -- I knew the victim in a murder case over there and I knew the person accused of it, and I attended a good bit of that trial.  And I saw a- -- just as the verdict came in, Brian was coming in wanting to talk to -- to Hamby.

Q.    (Reading)  He spent his first 6 months looking for something I done wrong that could file charges on me [sic].

Who were you referring to?

A.    Randy Cozart.  He made no secret about that.

Q.    (Reading)  He bragged about that in the office from what I can [sic] hear.

(Reading)  When Hamby dropped the case, which is not uncommon, all of a sudden there's this [sic] lawsuit and he put in the paper he was trying to get the Rangers and DA to pick up the case.  They both said it was civil.

(Reading)  Just sorry you got drug into this.  This is not something the courts want to start when the bad guy sees the victim of the crime [sic].

(Reading)  Yah.  Felt [sic] backwards.

Do you remember that exchange, sir?

A.    Uh-huh.

Q.    (Reading)  I know.

(Reading)  I don't think he will get very far [sic].  The odd thing is Metcalf did nearly all the leg work on this case and he was not sued.

Do you remember this exchange, sir?

A.   Uh-huh.

Q.   Did you have other exchanges with Snellgrove, sir?

A.   I couldn't say.

Q.   Marking --

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  Marking as Exhibit 14 the series of exchanges between Snellgrove and Dahl -- Anders Dahl.

(Exhibit 14 marked.)

Q.   (BY MR. MUELLER)  Okay.  Were you familiar with these messages, sir?

A.   No.

Q.   Who's Anders Dahl?

A.   He was the investigator at the time of the --

Q.   Okay.

A.   -- re- --

Q.   And the --

A.   -- search.

Q.   And the date of this -- do you see the date on

**118**

that top message, sir?

It's in gray.

A.    May 17th of '23.

Q.    That was the day of the search.  Correct?

A.    I --

Q.    You're not sure?

A.    I'm not sure.

Q.    Okay.

A.    Been three years ago.

Q.    Fair enough.

O- -- okay.  On the day of the search at 8:23 in the morning, Snellgrove is exchanging with Dahl, the investigator.  Says:  He told another employee that wouldn't be at work till 9 [sic].

(Reading)  He just tried to call me on his personal cell phone.

There's a picture of what looks like a tool case.

(Reading)  That might have been his personal or a trade he took in and didn't tell me about.

(Reading)  Ok.

Do you -- were you aware of this exchange?

A.    No.

Q.    Okay.  Then there's a picture of what looks

like more tools.  Another picture of tools.

(Reading)  Grandparents are asking me if kids at the house.  Need to come get them [sic].

(Reading)  Their [sic] kids are inside with their mom.

(Reading)  Ok.

There's a photograph of a car.

(Reading)  His pickup was just at my diesel tank at one of my farms.  Sped like crazy when he follow him [sic].

(Reading)  Tomorrow I find out whose truck that's registered to [sic].

Is it common for the sheriff's office to run plates just on random cars?

A.    If it's trespassing on land, it's -- wouldn't be uncommon if there was a diesel theft possibility.

Q.    Okay.

(Reading)  Kiska is now Trying to harass one of my employees wifes.  Just drove up there with Kiska's -- is Austin's wife [sic].

(Reading)  I called and reported it.

(Reading)  Yes, sir.  Dealing with criminals is not ple- -- present -- pleasant.

(Reading)  I've inventoried at $17,500 at retail so far [sic].

This is still on the day of the search -- oh, apologize.  This is actually the next day at 6:41 a.m.

(Reading)  I'll be back at 9:30 to 10:00 [sic].

(Reading)  Yes, sir.

(Reading)  I'm at -- back at the warehouse.  Edgar the assistant's here if you want to interview [sic]?

Was Edgar one of the people at the search?

A.    I don't know.

Q.    (Reading)  Will be there shortly.

(Reading)  I just e-mailed u a list. 283,445.

Is that where that number came from, from this text message, sir.

A.    The what?

Q.    Is that where that number came from?

$283,445 is -- it came from this text message?

A.    I suppose.

Q.    Okay.

(Reading)  Thank you, sir.  Dispatch is e- -- entering the arrest warrant of Hamblin.  Theft

JAMES BRADLEY INGRAM

**121**

150,000, 300,000 with hundred thousand bo- -- dollar bond [sic].

(Reading)  Thx.

(Reading)  Got a tip they also may have a storage unit.

(Reading)  Yes, sir.  I'm working on it. Heard the same thing [sic].

What was the result of that investigation into a storage unit?

Was there an investigation into a storage unit of the Hamblins?

Q.    Into a what?

Q.    A storage unit that the Hamblins had.

A.    I don't know if they're calling that the barn or the garage or -- or what.

Q.    Okay.

(Reading)  They able to pick him up?

(Reading)  Not that I've heard.

(Reading)  Did u call?

(Reading)  Give me a call when you have time.

(Reading)  Austin is trying it to [sic] sell the enclosed trailer that was in the driveway. Been contacted some of -- been contacting some of our customers.

(Reading)  Can I get a police report on the Austin situation.  He filed for unemployment [sic].

(Reading)  Call either my sheriff or my Chief deputy as those are the ones that release information [sic].

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  (Reading)  He filed [sic] to get unemployment.  I need it to dispute his claims.

(Reading)  Call either the sheriff or my Chief deputy as they are the ones that can release the [sic] information.

Were you familiar with that, sir?

A.    (Witness indicates.)

Q.    Okay.

A.    There was some worry with some of Mr. Snellgrove's employees the day of this, and I remember going out to a -- a home south of -- south of the railroad tracks where this employee lived.  He wa- -- he was afraid of retaliation.

Q.    Okay.  I'm handing you what's been marked as Exhibit Number 18.  This is what was Ex- -- Exhibit E relating to some videos that were produced.

(A discussion was had off the stenographic record.)

MR. MUELLER:  Then we'll mark it as 15.

(Exhibit 15 marked.)

Q.   (BY MR. MUELLER)  These two videos came from Dahl.  You earlier said that all the officers except for yourself had body cameras so I've -- I have two questions.

First, with respect to Dahl's video, it says that there was video taken from 8:02 to 8:49 and then 10:44 to 11:01.  Why was video not captured for almost two hours?

A.   I don't know, sir.

Q.   Okay.  Is -- do -- where is the video from the other officers' body cameras?

A.   I don't know, sir.

Q.   Is that video still available in the county's records?

A.   I don't know, sir.

Q.   Okay.  I'm handing you what's been marked as 16.  This is a letter from the Chief Deputy Billy Reynolds of -- sheriff of Martin County, dated April the 14th of 2025.

(Exhibit 16 marked.)

A.   Okay.

Q.   (BY MR. MUELLER)  Were you aware of this statement from the --

A.    I --

Q.    -- sheriff?

A.    I had heard that they tried to get the district attorney's office to start an investigation and the Rangers to pick up the case.

Q.    Okay.  What had you heard regarding that?

A.    I heard that they approached them and were told that this was a civil matter.

Q.    And I am marking as Exhibit 17 the letter from Chief Deputy Billy Reynolds dated November the 4th of 2025.

(Exhibit 17 marked.)

MR. MUELLER:  Thank you.

Q.    (BY MR. MUELLER)  Were you aware of the contents of this letter, sir?

A.    No, sir, never saw it.

Q.    Okay.  All right.  Did you have anything else that you wanted to add for your testimony today?

A.    No, sir.

Q.    Okay.

MR. MUELLER:  Well, that will conclude my deposition so we'll go off the record.

MR. DENNIS:  Well, see what --

MR. MUELLER:  Oh.

MR. DENNIS:  -- Robert's got.

JAMES BRADLEY INGRAM

**125**

MR. MUELLER:  Yeah, that's fair enough, if Mr. Perez wants something.

MR. DENNIS:  I may have a couple of questions.

MR. MUELLER:  Fair enough, I'm sorry.

MR. DENNIS:  You got any questions, Robert?

MR. PEREZ:  I'll defer to you first.

MR. DENNIS:  Okay.

EXAMINATION

BY MR. DENNIS:

Q.  All right.  You're the former sheriff of Martin County.

A.  Uh-huh.

Q.  And you went out of office when?

A.  October the 2nd of '24.

Q.  Okay.  Now, this case was charged and indicted in Howard County.

A.  Yes.

Q.  Correct?

Not Martin County.

A.  I- -- I think -- it was indicted at Martin -- in Martin County, but the -- the district judge and di- -- district attorney have overlapping jurisdictions so...

JAMES BRADLEY INGRAM

**126**

Q.   Okay.  So the same judge, Judge Seaton --

A.   Judge --

Q.   -- covers Martin and --

A.   Howard and Glasscock.

Q.   -- and Howard and Glasscock.  All right.

All right.  Now, you were physically present for the search, I think, on May 17th.  You went over there.

A.   Yes, sir.

Q.   And i- -- you can tell on the video -- this is an obvious question -- but there were little kids that were in that house.  Correct?

A.   Yes.

Q.   And in that house, you seized bags of meth, meth pipes, and firear- -- a firearm --

A.   Illegal firearm.

MR. MUELLER:  Object to form on that one.

Q.   (BY MR. DENNIS)  -- with the kids there.

A.   Yes.

Q.   Did the Hamblins ever come and request their dope back?

MR. MUELLER:  Object to form.

A.   No, sir.

MR. DENNIS:  That's all I have.

JAMES BRADLEY INGRAM

**127**

MR. PEREZ:  I have just a few questions.

EXAMINATION

BY MR. PEREZ:

Q.   The search that took place at the Hamblins' home, there were video cameras or bodycams on many different officers.  Isn't that correct?

A.   Yes, sir.

Q.   Would you say that that's an accountability procedure?

A.   Could -- I'm hard of hearing, sir.

Q.   Would you say it would be a fair statement that that is an accountability procedure?

A.   Yes.

Q.   That -- whoever wants to look at those videos can see them and make up their mind as to what's being said.  Isn't that correct?

A.   I -- far as I'm concerned.

Q.   Okay.  And my understanding is that in your presence admissions were made by Austin Hamblin that he was illegally in possession of Snellgrove's property.

A.   Correct.

Q.   And he said that more than one time, didn't he?

A.   Yes.

Q.   So when you're talking about plain view, my --

I -- I take it that a search warrant was being executed by officers with the sheriff's department.  Correct?

A.   Correct.

Q.   And when they showed up, they came across a crime scene.  Would that be a fair statement?

A.   Yes, sir.

Q.   They not only found the stolen property that Mr. Snellgrove had made reference to, but they potentially ran into a lot more stolen property.  Isn't that correct?

A.   Yes, sir.

Q.   And not only did they come into and see stolen property, they saw a -- drugs, methamphetamine.  Correct?

A.   Correct.

Q.   And an illegal shotgun.  Correct?

A.   I didn't see it.  I was told it was a short-barreled AR-15.

Q.   Oh, it was an AR.

A.   That -- that's what I was told.

Q.   Okay.  And when something like this happens, as law enforcement, do you just walk away, or do you have an obligation to act on what you have seen?

A.   No, there's an obligation to act.  We -- we turned the narcotics and the firearm over to the Howard

County deputy because we were in his county and we had no desire to start investigations on their crimes. We were just trying to recover stolen property from Martin County.

Q. Understood.

And basically Austin Hamblin admitted to stealing the property. Isn't that correct?

A. Through a -- his route, he said he would sell something to a mechanic and then pick it up the next week on a return and then he -- I heard him say to Brian, "Snap-on never comes and picks up used material, you know that," and so tha- -- that's what I heard Mr. Hamblin say.

Q. So he's basically admitting that the property there's not his.

A. Yes, sir.

Q. Okay. And if somebody steals somebody else's property, does that property then become theirs?

A. No, sir.

Q. That's obvious. Right?

I mean that's just common sense. Correct?

A. Yes, sir.

Q. And as a law enforcement officer, you have an obligation to protect the rights of a crime victim.

Isn't that correct?

    A.   Yes, sir.

    Q.   And in this case Austin Hamblin is admitting that he committed a criminal act against Mr. Snellgrove. Isn't that correct?

    A.   Yes, sir.

                MR. PEREZ:  No other questions.

                MR. DENNIS:  You still done?

                MR. MUELLER:  I'm good.

                MR. DENNIS:  All right.  We're off the record.

                (Deposition concluded, 12:51 p.m.)

**131**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

AUSTIN HAMBLIN and KISKA          *
HAMBLIN                           *
                                  *
                                  *
vs.                               *   NO:  7:25-cv-00245
                                  *
MARTIN COUNTY SHERIFF'S           *
DEPARTMENT, BRAD INGRAM,          *
ANDERS DAHL, KELSEY BROWN,        *
RORY GAMMONS, AND                 *
WESLEY PHELPS                     *

_____

REPORTER'S CERTIFICATE

ORAL AND VIDEOTAPED DEPOSITION OF

JAMES BRADLEY INGRAM

Taken January 15, 2026

_____

I, Stephanie J. Blair, Certified Shorthand Reporter in and for the State of Texas, do hereby certify to the following:

That the witness, JAMES BRADLEY INGRAM, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

___ was requested by the deponent or a party before the completion of the deposition and

returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

XXX was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.  Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 28th day of January, 2026.

_____
Stephanie J. Blair
CSR No. 6819, Expires 10/31/27
Firm Registration No. 155
Permian Court Reporters, Inc.
605 W. Texas
Midland, Texas 79706
(432) 683-3032



DEPOSITION EXHIBIT



# THE **KURT MUELLER**
### LAW FIRM PLLC

565 S Mason Rd #223
Katy, Texas 77450
Telephone: 713-360-2110
E-Mail: kurt@kurtmuellerpllc.com
Licensed in Texas, Virginia, and Limited Federal Courts

August 25, 2025

**Re: First Discovery Request to Defendants in Civil Action Hamblin v Martin Co. et al, No. 7:25-cv-00245**

Messrs. Dennis & Perez:

Plaintiffs pursuant to Federal Rules of Civil Procedure 26, 30, 33, 34, and 36, hereby serve the following Interrogatories, Requests for Production ("RFPs"), and Requests for Admission ("RFAs") on all Defendants.

Plaintiffs also provide notice of intent to take depositions pursuant to Rule 30.

Production of all discovery should be done via electronic means if possible. Please feel free to contact me via email and I can provide you a link to provide electronic discovery.

---

## I. INSTRUCTIONS

1. Rules of construction. The singular includes the plural and the plural includes the singular; "and" as well as "or" shall be construed both conjunctively and disjunctively to bring within scope all responsive information; and "including" means "including without limitation."
2. Separate responses. Although directed to all Defendants, each Defendant must serve separate answers and responses based on their own knowledge, information, possession, custody, or control.
3. Scope & timeframe. Unless otherwise stated, the relevant period is January 1, 2022 to present.
4. Diligent search. Make a reasonable and diligent inquiry and include information known to your current or former employees, agents, representatives, or attorneys (subject to privilege).
5. Form objections. State each objection with specificity and respond to any unobjectionable portion. Boilerplate, generalized objections are improper.
6. Privilege log. If withholding material under a claim of privilege or protection, provide a log compliant with Fed. R. Civ. P. 26(b)(5) identifying for each item: date, author, recipients, general subject matter, basis of the privilege, and the specific request to which it is responsive.
7. ESI production format. Produce documents as kept in the usual course of business or label them to correspond to the RFPs.
   - Emails and loose electronic files: native format with available metadata; or searchable PDF with metadata load file (date/time, author, recipients, subject, file path).
   - Spreadsheets/CSV/databases: native format.
   - Photos/video/audio: original/native or highest available resolution.
   - Paper: searchable PDF with Bates numbers.
   - Identify any systems that cannot export in these formats and confer promptly on an alternative.

8. **Lost/destroyed materials.** If responsive materials once existed but are lost, missing, destroyed, or otherwise unavailable, identify them and describe the circumstances, dates, and persons involved.

9. **Continuing duty.** These requests are continuing; promptly supplement under Rule 26(e) if you learn that any response is incomplete or incorrect.

10. **Avoiding unnecessary duplication; cross-referencing prior productions.** To avoid duplicative production only, if the same document or item of information is responsive to more than one Interrogatory or Request for Production, You need produce it once. However, for each Interrogatory or Request, You must still (a) serve a separate written response, and (b) specifically identify the documents or information You rely upon to answer that request. A cross-reference does not limit the scope of any request or Your duty to make a diligent search for all responsive materials. If an earlier production does not fully satisfy a later request, You must produce the additional responsive materials (or state, after reasonable inquiry, that none exist). This instruction is intended solely to avoid duplicate productions and may not be used to refuse, narrow, or delay any response.

11. **Organization, responsiveness, and "no dump" requirement.**
    o **Produce only responsive material.** Do not include non-responsive documents or data that obscures responsive material. Production must not be made "in ways that raise unnecessary obstacles for the requesting party." (Rule 34 Committee Notes on Rules—2006 Amendment)
    o **Organization:** You must either (i) label and organize documents to correspond to the specific Request(s) to which they are responsive; or (ii) if you elect to produce "as kept in the usual course of business," also provide a reasonably detailed index that identifies, for each Request, the pinpoint location where responsive materials can be located within the produced collections.
    o **Search transparency (ESI):** If you used search terms, date filters, or custodian limitations to collect responsive ESI, identify the custodians, date ranges, and search terms/filters employed for that production.
    o Do not produce data in bulk "container" formats (e.g., password-protected archives, PSTs, ZIPs) that prevent reasonable review, unless agreed in writing or necessary for native format; if used, provide an itemized index of the container's contents.
    o **Privilege/non-responsive segregation:** If documents are withheld or redacted pursuant to Rule 26(b)(5), use pages marked with redactions so that family relationships and page ranges remain apparent.
    o **Certification:** Each production constitutes a certification under Rule 26(g) that you conducted a reasonable search and that the production complies with this Instruction and does not dilute responsive materials with non-responsive matter.

---

## II. DEFINITIONS

- "Plaintiffs" means Austin Hamblin and Kiska Hamblin.
- "Defendant"/"You" means the particular responding Defendant and their current and former officers, employees, agents, and representatives. "Defendants" means all named Defendants collectively.
- "Sheriff's Department" means Martin County Sheriff's Department and its personnel.
- "Snellgrove" means Defendant Brian Snellgrove, including any person acting for him or at his request.
- "Nichols" means Andrew Nichols.
- "Search" means the search of Plaintiffs' residence conducted on or about May 17, 2023.
- "Seized Property" means any item taken or removed from Plaintiffs at or in connection with the Search, including Snap-on branded tools/equipment.
- "Document" and "Communication" are as used in Fed. R. Civ. P. 34 and 26 and include ESI of every kind (emails, texts, messages, logs, photos, audio/video, CAD/RMS, bodycam, etc.).
- "Identify" (person): full name, role/title, employer/agency, last known address/phone/email. Identify (document): date, author, recipients, type, subject, Bates, and current custodian.

## III. INTERROGATORIES TO ALL DEFENDANTS

Interrogatory No. 1 Identify all persons present for or participating in the Search, including agency, rank/title, and role.

Interrogatory No. 2 Identify each item of Seized Property (with make/model/serial where known), its current location or last known whereabouts, and what ultimately happened to it.

Interrogatory No. 3 Describe the chain of custody for each item of Seized Property from seizure through current location or disposition, including each custodian and dates.

Interrogatory No. 4 Describe all communications You had with Snellgrove or Nichols regarding Plaintiffs, the alleged theft, the Search, or the Seized Property (date, medium, participants, substance).

Interrogatory No. 5 Describe all internal communications among Defendants or Sheriff's Department personnel regarding Plaintiffs, the alleged theft, the Search, the Seized Property, or the related criminal case (date, medium, participants, substance).

Interrogatory No. 6 Describe the factual basis for seeking and obtaining the Search warrant, including who initiated the investigation, what information was presented to the magistrate, by whom, and any corroboration steps taken.

Interrogatory No. 7 State whether a signed search warrant existed at the time of the Search, whether it was on hand, shown or provided to Plaintiffs, and, if not provided, why not.

Interrogatory No. 8 Explain the procedures followed after seizure (inventorying, tagging, storage, logging, notices to Plaintiffs or others), and who was responsible.

Interrogatory No. 9 State whether any Seized Property was transferred or released to Snellgrove or any person outside law enforcement, and if so identify each item, date, recipient, authorization, and documentation.

Interrogatory No. 10 State whether any notice to Plaintiffs, consent from Plaintiffs, or court order was obtained before releasing/transferring/disposing of any Seized Property; if so, identify.

Interrogatory No. 11 Identify and describe all written policies/procedures/training materials in effect in 2023 regarding seizure, inventory, storage, return, and disposition of property; state whether You contend your actions complied and, if not, describe deviations and reasons.

Interrogatory No. 12 Describe any similar complaints, lawsuits, or internal investigations within five years before/after the incident alleging mishandling, failure to return, or improper disposition of seized property (or state none known).

Interrogatory No. 13 Describe Snellgrove's involvement in the investigation, the Search, identification or removal of property, and post-Search actions concerning the Seized Property.

Interrogatory No. 14 Identify all facts, evidence, or Documents You contend supported accusation/suspicion that Austin Hamblin stole tools or equipment, and identify when each item became firstr known to you.

Interrogatory No. 15 Identify all persons with knowledge of any relevant facts (contact information and subjects of knowledge).

## IV. REQUESTS FOR PRODUCTION TO ALL DEFENDANTS

RFP No. 1 (Search Warrant). Produce the Search warrant, supporting application/affidavit/exhibits, and return.

RFP No. 2 (Seized Property Inventory). Produce all inventories, logs, receipts, vouchers, or lists of items seized (including any copy provided to Plaintiffs).

RFP No. 3 (Photos/Video/Audio). Produce all photographs, video, and audio relating to the Search or Seized Property (including bodycam/dashcam, scene photos, property photos, 911/dispatch audio).

RFP No. 4 (Comms with Snellgrove/Nichols). Produce all communications between any Defendant and Snellgrove or Nichols regarding Plaintiffs, the alleged theft, the investigation, the Search, or the Seized Property.

RFP No. 5 (Internal Comms). Produce all internal communications among or between Sheriff's Department personnel or Defendants regarding Plaintiffs, the alleged theft, the Search, the Seized Property, or the related criminal case.

RFP No. 6 (Release/Transfer). Produce all documents evidencing any release, transfer, or return of Seized Property to any person or entity.

RFP No. 7 (Sale/Auction/Disposal). Produce all documents relating to any sale, auction, destruction, or other disposition of Seized Property (including bills of sale, auction listings/receipts, destruction logs).

RFP No. 8 (Plaintiffs' Return Requests). Produce all requests/demands by or on behalf of Plaintiffs for return of Seized Property and all responses thereto.

RFP No. 9 (Policies/Procedures). Produce policies, procedures, manuals, and training materials (2020–present) regarding seizure, inventory, storage, return, and disposition of property.

RFP No. 10 (Internal Review/IA). Produce all documents relating to any internal review, complaint, or investigation regarding the handling or disposition of Plaintiffs' Seized Property.

RFP No. 11 (Reports/Statements). Produce all offense/incident/arrest/case reports, narratives, and witness statements relating to the alleged theft, the Search, or Seized Property.

RFP No. 12 (Criminal Disposition). Produce all documents reflecting the dismissal of criminal charges against Austin Hamblin (orders, notices, DA communications).

RFP No. 13 (DA Communications). Produce all communications between any Defendant and the District Attorney regarding the investigation, prosecution, or dismissal of charges against Austin Hamblin.

RFP No. 14 (Discipline/Training). Produce all documents evidencing any discipline, remedial training, or employment action taken in connection with these events.

RFP No. 15 (Agreements with Snellgrove). Produce all documents evidencing or reflecting any understanding or agreement with Snellgrove concerning Seized Property.

RFP No. 16 (Materials from Snellgrove/Nichols). Produce all documents provided by Snellgrove or Nichols relating to the alleged theft or Seized Property (statements, lists, receipts, ownership proofs).

RFP No. 17 (Valuation). Produce all documents reflecting the value of Seized Property or alleged value supporting any charge level.

RFP No. 18 (Defense Materials). Produce all documents You intend to rely upon to support any defense in this action.

RFP No. 19 (Chain of Custody). Produce all chain-of-custody records for each item of Seized Property (intake logs, evidence/property room entries, transfer forms, database printouts).

RFP No. 20 (Transport Vehicles & Physical Removal). Produce all documents reflecting the vehicles and physical removal used for Seized Property, including:
(a) identification of vehicles/units (unit numbers, license plates, trailers/tow identifiers, fleet assignments);
(b) any towing/haul tickets, load sheets, or fleet records; and
(c) any photographs or video depicting loading/removal into those vehicles.

RFP No. 21 (Dispatch/CAD/GPS/Radio re Transport). Produce all dispatch/CAD entries, unit history reports, AVL/GPS data, radio/audio logs or transcripts, and call notes reflecting arrival, departure, transport, and routing for vehicles or units used to remove Seized Property from Plaintiffs' residence.

RFP No. 22 (Personnel & Initial Intake Location). Produce all documents identifying the persons who loaded, transported, or unloaded Seized Property (including duty rosters or assignment sheets) and records showing the initial destination of each item (address/facility and specific evidence room/locker/bay), including intake paperwork.

RFP No. 23 (Final Disposition/Current Location). Produce all documents relating to final disposition of each seized item, including release forms, receipts, bills of sale, auction records, communications with purchasers/transferees, and documents identifying the current or last known location of each item.

---

## V. REQUESTS FOR ADMISSION TO ALL DEFENDANTS

RFA No. 1 Admit that on or about May 17, 2023, officers of the Martin County Sheriff's Department conducted a search of Plaintiffs' residence pursuant to a warrant.

RFA No. 2 Admit that Brian Snellgrove was present at Plaintiffs' residence during the Search.

RFA No. 3 Admit that during the Search, Brian Snellgrove identified items he claimed were stolen.

RFA No. 4 Admit that officers seized items during the Search based, in part, on Snellgrove's identification.

RFA No. 5 Admit that Plaintiffs were not provided a copy of the warrant prior to or during the Search.

RFA No. 6 Admit that Seized Property included Snap-on branded tools/equipment.

RFA No. 7 Admit that among the Seized Property was a Snap-on plasma cutter.

RFA No. 8 Admit that among the Seized Property was a Snap-on air compressor.

RFA No. 9 Admit that theft charges were brought against Austin Hamblin arising from the Search and related investigation.

RFA No. 10 Admit that the criminal charges against Austin Hamblin were dismissed.

RFA No. 11 Admit that the charges were dismissed due to insufficient evidence.

RFA No. 12 Admit that at least some of the Seized Property was not returned to Plaintiffs.

RFA No. 13 Admit that at least some of the Seized Property was released or transferred to Brian Snellgrove.

RFA No. 14 Admit that Plaintiffs were not provided notice prior to the transfer to Snellgrove.

RFA No. 15 Admit that no court order or judicial authorization was obtained to release Seized Property to Snellgrove.

RFA No. 16 Admit that at the time of any transfer to Snellgrove, there had been no judicial determination that the Seized Property so transferred belonged to him.

RFA No. 17 Admit that Plaintiffs were not given a hearing or opportunity to be heard regarding the disposition of the Seized Property before it was transferred or disposed.

RFA No. 18 Admit that Plaintiffs did not consent to the transfer or disposition of any Seized Property.

RFA No. 19 Admit that officers of the Martin County Sheriff's Department were present and participated in the Search.

RFA No. 20 Admit that, prior to obtaining the warrant, the only evidence suggesting theft by Austin Hamblin known to You consisted of information provided by Snellgrove or persons acting on his behalf.

RFA No. 21 Admit that at least some items seized from Plaintiffs' residence are no longer in any Defendant's possession.

RFA No. 22 Admit that You cannot produce a complete chain-of-custody record identifying every custodian and transfer for each item seized.

RFA No. 23 Admit that You do not maintain records identifying the specific vehicles used to transport each seized item from Plaintiffs' residence.

RFA No. 24 Admit that at least one item seized from Plaintiffs' residence was disposed of (sold, transferred, destroyed, or otherwise) without any receipt, bill of sale, or written release being maintained.

RFA No. 25 Admit that You do not know the current location of at least one item seized from Plaintiffs' residence.

RFA No. 26 Admit that You do not possess photographs or video that collectively depict all items at the time they left Plaintiffs' residence.

---

## VI. NOTICE OF INTENT TO TAKE DEPOSITIONS & REQUEST FOR DATES

Pursuant to Fed. R. Civ. P. 30(a)(1) and 30(b)(6), Plaintiffs intend to depose the following party witnesses:

Individuals (Rule 30(a)(1))

1. Brad Ingram
2. Anders Dahl
3. Kelsey Brown
4. Rory Gammons
5. Weston Phelps
6. Brian Snellgrove

Organization (Rule 30(b)(6))
7. Martin County Sheriff's Department (corporate representative)

Proposed Rule 30(b)(6) Topics (non-exhaustive):

A. Policies/procedures/training (2020–present) re: search warrants; seizure, inventory, storage, return, disposition of property; and evidence systems (RMS/CAD/property room).

B. Planning/execution/documentation of the May 17, 2023 Search (personnel present; inventory of items seized).

C. Chain of custody and storage locations for each seized item; all releases/transfers (including any to Snellgrove) and authorizations.

D. Communications with Snellgrove and/or Nichols about the investigation, seized items, release/disposition, or valuation.

E. Communications with the District Attorney regarding charging decisions, case status, dismissal, and property disposition/return.

F. Dispositions (return, sale, auction, destruction) of any seized items and related paperwork (receipts, bills of sale, release forms, court orders, notices).

G. Any internal reviews/complaints/investigations regarding handling or disposition of Plaintiffs' seized property.

H. ESI systems potentially containing responsive data (email servers, bodycam systems, CAD/RMS, property databases) and preservation/collection steps.

Dates & Logistics. Please provide available dates for each deponent within 30 days of this notice, and indicate your preference on location/mode. Plaintiffs prefer to conduct depositions in Houston, Texas. Alternatively, Plaintiffs may be willing to proceed by remote means under Rule 30(b)(4). Please provide preferences or location / means of depositions and if Plaintiff elects to conduct depositions in person proposed suitable locations that may be mutually convenient. If You elect not to respond, Plaintiff may unilaterally notice depositions dates and/or times in accordance with law.

Cordially Yours,

Kurt Mueller



## IN THE UNITED STATES DISCTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| AUSTIN HAMBLIN and KISKA HAMBLIN, *Plaintiffs and Counter Defendants,* | § § § § § § | |
| v. | § § | |
| MARTIN COUNTY SHERIFF'S DEPARTMENT, BRAD INGRAM, ANDERS DAHL, KELSEY BROWN, RORY GAMMONS, WESTON PHELPS, each in their individual capacity, and BRIAN SNELLGROVE, *Defendants,* | § § § § § § § § § | 7:25-CV-00245-RCG |
| v. | § § | |
| BRIAN SNELLGROVE, *Counter Plaintiff.* | § § § | |

### AFFIDAVIT OF ANDERS DAHL

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF MARTIN | § |

BEFORE ME, the undersigned authority, personally appeared **Anders Dahl**, who being duly sworn, deposed and stated as follows:

1. "My name is **Anders Dahl**. I am over 18 years of age, of sound mind, and competent to make this affidavit. At the time of the events that comprise the subject matter of this lawsuit, I was employed as a Deputy Sheriff with the Martin County, Texas, Sheriff's Department. I make this affidavit based on my personal knowledge.

2. "On or about May 17, 2023, I participated in the execution of a lawfully issued search warrant for3700 Hamilton, Big Spring, Texas 79720. A true and correct copy of the warrant and supporting affidavit is attached as **Exhibit A**.

3. "During the search, I acted in reliance on the search warrant signed by a neutral magistrate. I reasonably believed the warrant was valid and authorized our actions.

4. "I conscripted Brian Snellgrove to aid in the execution of the search warrant by requesting him to appear at the location where the warrant was executed, identify the property subject to the warrant, and store such property at his place of business located at 2100 Westside Drive, Stanton, Texas 79782, under my control and supervision."

Exhibit F—Affidavit of Anders Dahl

5. "A written inventory of items seized was prepared at the time of the search pursuant to Texas Code of Criminal Procedure art. 18.09. A copy of the inventory and warrant return is attached as **Exhibit B**.

6. "During the entirety of my execution of the search warrant, I was wearing my department-issued Axon body-worn camera (bodycam), which was fully operational and properly affixed to my uniform in accordance with the policies and procedures of the Martin County Sheriff's Department. Attached as **Exhibit E** to this motion are two videos from by bodycam which were captured contemporaneously during the execution of the search warrant as the events occurred. The bodycam automatically began recording upon activation and recorded the events in real-time, with accurate date and time stamps generated by the device's internal system. The recordings have not been altered, edited, or otherwise modified in any way. The digital files were securely downloaded and stored in the department's digital evidence management system (e.g., Axon Evidence.com), which restricts access and maintains a verifiable chain of custody in accordance with departmental and evidentiary protocols. I have reviewed **Exhibit E**, and I recognize the bodycam videos as accurate depictions of the events I witnessed and participated in on May 17, 2023. The recordings fairly and accurately represent what I saw, heard, and experienced during the incident. These recordings were made in the regular course of my duties and it was the regular practice of the Martin County Sheriff's Department to make and preserve such recordings at or near the time of the events recorded.

7. "At no time did I personally give or authorize the giving of seized property to Brian Snellgrove or any other private person outside of authorized procedures. To my knowledge, all seized property was handled and stored in accordance with Sheriff's Department policies and applicable Texas law.

10. ""On the date the search warrant was executed, Martin County did not have the means to transport the property subject to the warrant, nor did it have a facility equipped to store the property subject to the warrant and keep it safe.

11. "We were careful to take only property identified by Brian Snellgrove and confirmed by, acquiesced to, and/or released by, Austin Hamblin. Moreover, during the execution of the search warrant, neither Austin Hamblin nor Kiska Hamblin sought to exercise any ownership over any of the property seized on May 17, 2023, and they further did not do so after the execution of the search warrant and after May 17, 2023.

8. "After dismissal of the indictment against Austin Hamblin, I never received anything from Plaintiffs asserting ownership over any of the property originally seized under the search warrant. As far as I knew, the last known owner of the property seized under the search warrant was Brian Snellgrove."

9. "At all times, I acted in good faith, under lawful authority, and in the reasonable belief that my actions were lawful and appropriate as a law enforcement officer executing a court-issued warrant."

Exhibit F—Affidavit of Anders Dahl

10. "Attached as **Exhibit E** to this motion are two videos from by bodycam which were captured during the execution of the search warrant. In the course of my employment and by virtue of my duties and responsibilities, I had access to and am familiar with the manner in which my bodycam footage was created and maintained. It was the regular practice of the Martin County Sheriff's Department to make these kinds of records at or near the time of each act, event, condition, opinion, or diagnosis set forth in the record; and such records are made by, or from information transmitted by, persons with personal knowledge of the matters set forth. All such records were kept in the course of the regularly conducted activities of the Martin County Sheriff's Department. These records are original records or exact duplicates of the original records."

**FURTHER AFFIANT SAYETH NOT.**

_Anders Dahl_
ANDERS DAHL

SUBSCRIBED AND SWORN TO BEFORE ME this ___2___ day of ___October___ 2025 by Anders Dahl.

(Seal)
CHRISTINA HENNSLEY
NOTARY PUBLIC
STATE OF TEXAS
ID # 13495734-0
My Comm. Expires 06-20-2028

_____
NOTARY PUBLIC, STATE OF TEXAS

Exhibit F—Affidavit of Anders Dahl

SEARCH WARRANT

THE STATE OF TEXAS

COUNTY OF MARTIN

THE STATE OF TEXAS to the Sheriff or any Peace Officer of Martin County, Texas, or any Peace Officer of the State of Texas,

GREETINGS:

WHEREAS, the Affiant whose signature is affixed to the Affidavit is a Peace Officer under the laws of the State of Texas and did heretofore this date subscribe and swear to said Affidavit before me (which said affidavit is by this reference incorporated herein for all purposes), and whereas I find that the verified facts stated by Affiant in said Affidavit show that Affiant has probable cause for the belief he expresses therein and established the existence of proper grounds for the issuance of this Warrant:

NOW THEREFORE, you are commanded to enter the suspected place and premises described in said Affidavit to wit: "A single family dwelling bearing the address of 3700 Hamilton, Big Spring, Howard County, Texas 79720. This dwelling is a brick home. This dwelling is multi-color light tan in color bricks with off white siding with copper color trim. The front door of this dwelling faces an eastern direction. There is commonly a large white in color enclosed trailer parked in the driveway. There is commonly a black in color Nissan Titan bearing TX LP MNY-6850 parked in the yard of this dwelling. There is commonly a boat on a trailer parked in the yard of this dwelling. The dwelling is in the care, custody, and control of Austin Eugene Hamblin, W/M, 12/10/1990", and to search for the property described in said Affidavit to wit: Property acquired by theft or in any other manner which makes its acquisition a penal offense to-wit: a Snap-On Plasma Cutter model 30I and a Snap-On Air Compressor, and to seize the same and bring it before me. Herein fail not, but have you then and there this warrant within three (3) days, exclusive of the day of its execution, with your return thereon, showing how you have executed the same.

ISSUED AT _3:20_ o'clock _P._ M., on this the _16th_ day of _May_, 2023, to certify which witness my hand this day.

_____
Shane R. Seaton
118th District Judge
Martin County, Texas

DEPOSITION
EXHIBIT

PENGAD 800-631-6989



## MARTIN COUNTY SHERIFF'S OFFICE



### JAMES B. "BRAD" INGRAM, SHERIFF

INTERSTATE 20 / PO BOX 1124, STANTON, TEXAS 79782
OFFICE (432) 756-3336    FAX: (432) 607-2902
HTTP://CO.MARTIN.TX.US

CASE NUMBER: 23-0135*1
CHARGE: THEFT PROP GT=$150KLT$300K        CLASSIFICATION:

SUPPLEMENT DATE: 07.17.23                 ZONE:
SUPPLEMENT TIME:                          CASE STATUS: PEND-APPR
SUPPLEMENT OFFICER: DAHL, ANDERS E

ASSOCIATED CASE(S):     ASSOCIATED CHARGE(S):     CHARGE LEVEL:
                        None                      None

1) On 05-11-2023, Martin County Deputy Sheriff Weston Phelps took a theft report # 23-0135 from Snellgrove Enterprise owner Brian Snellgrove, which is the parent company for the Stanton, Texas Snap On Dealership located at 2100 Westside Drive, Stanton in Martin County, Texas. Also present during the making of this report was an employee of Mr. Snellgrove's identified as Andrew Nichols.

2) Mr. Snellgrove related to Deputy Phelps that his Snap On products have been going missing over an extended period of time.

3) Mr. Snellgrove related that he had determined his employee identified as Austin Eugene Hamblin, white male, 12-10-1990, Texas Driver License: 24374061 has been involved in the theft of Snap On products or the diversion of sales proceeds.

4) Mr. Snellgrove related he believes Austin Hamblin has zeroed the sales receipts out and appropriated the product or cash value for the product instead of returning it to Snellgrove Enterprise.

5) Mr. Nichols related he is friends with an individual identified as McKenzie Rae Schrecengost, white female, 12-01-1999 who has worked as a babysitter for Austin Hamblin at the Hamblin residence located at 3700 Hamilton Street, Big Spring, Texas 79720.

6) Mr. Nichols provided Deputy Phelps with several photographs and video footage provided by Ms. Schrecengost taken at Hamblin's residence which depicted a large number of Snap On products to include large tool cabinets filled with hand tools, floor jacks and an air compressor.

7) On 05-15-2023, Martin County Sheriff's Investigator Anders Dahl interviewed Mr. Snellgrove who related he has determined the value of the loss of Snap On products or proceeds are approximately $200,000.00.

8) On 05-15-2023, Inv. Dahl contacted Ms. Schrecengost by telephone (432) 230-4441 which was recorded on Inv. Dahl's body camera who related the following.

9) Over the last month, Ms. Schrecengost has observed at the Hamblin residence one Snap On MIG Welder, one Snap On TIG Welder, one Snap On Plasma Cutter and one Snap On Air Compressor seen 1 ½ weeks ago.

10) On 05-15-2023, Martin County Chief Deputy Sheriff Jesse Metcalf spoke with Mr. Snellgrove who related in the timeframe of these thefts, his records reflect two Plasma Cutters (Plasma 30I) and two air compressors were present in inventory. One Plasma Cutter sold and one should still be in the warehouse but is missing. One Air Compressor sold to a customer in March 2023 and one Air Compressor shows to be allocated on May 3, 2023 to the same customer, but the ticket is zeroed out.

11) On 05-16-2023, 118th District Judge Shane R. Seaton issued a search warrant authorizing the search of the Austin Hamblin property located at 3700 Hamilton Street, Big Spring, Howard County, Texas for stolen Snap On products.

12) On 05-17-2023, Inv. Dahl along with deputies from the Martin County Sheriff's Office and Howard County Sheriff's Office executed the search warrant at approximately 8:00AM.

13) Inv. Dahl contacted Mr. Hamblin at the front door of his residence. Inv. Dahl explained the purpose for

DISCOVERY

Deputies presence at the residence. Inv. Dahl then read Mr. Hamblin his Miranda Rights. Mr. Hamblin related he understood his rights and waived his right to an attorney.

14) Inv. Dahl requested Mr. Hamblin show Inv. Dahl all the Snap On products at his property. Mr. Hamblin complied and took Inv. Dahl through his property pointing out the Snap On tools and property.

15) Mr. Snellgrove arrived at Mr. Hamblin's residence during the execution of the search warrant to assist in identifying stolen Snap On tools.

16) Mr. Hamblin did not object to the seizure of all Snap On products from his residence but did relate that he had purchased some Snap On products through the years. Inv. Dahl and Martin County Chief Deputy Jesse Metcalf advised Mr. Hamblin to provide all receipts for his Snap On product purchases, which would be forwarded to the Martin County District Attorney for consideration.

17) Those receipts are attached to this case file.

18) The seized Snap On property was released to Mr. Snellgrove for the purposes of storage and inventory to assess the total dollar value of the stolen property recovered.

Inventory list for property seized at 3700 Hamilton Street, Big Spring, Howard County, Texas on 05-17-2023 pursuant to a search warrant issued by 118th District Judge Seaton.

1) Snap On 75th Anniversary roll cabinet, S/N# 95161820, 95205988
2) Snap On 1 ½" wrench
3) Snap On pliers
4) Snap On 15-piece tool kit
5) Blue Point (Snap On) socket set
6) Snap On butane gas soldering kit
7) Blue Point (Snap On) hand riveter
8) Snap On 9 piece extensions
9) Snap On bolt cutters
10) Snap On grease gun
11) Snap On 4-foot tool storage light
12) Snap On product in box to be mailed
13) Snap On lawn chair
14) Apple IPhone issued by Snellgrove Enterprises
15) Snap On recirculating parts washer, S/N# DBO048940
16) Snap On black high gloss roll cabinet, S/N# W126171A, MOD# KETN682A0PC
17) Snap On red powder tool box, S/N# AB370402A, MOD# KRA6200FPB0
18) Snap On red air compressor, S/N# JAC22178-010, MOD# BRA7180VEM
19) Snap On red plasma cutter, S/N# E96041
20) Snap On MIG welder, S/N# E28082
21) Snap On TIG welder, S/N# 28723
22) Snap On black & gray welding table
23) Snap On black & pink roll cabinet
24) Snap On gray & pink roll cabinet
25) Snap On red tool chest
26) Snap On red wall cabinet
27) Snap On teal roll cabinet, S/N# AC456766A, MOD# KCP1422BAT
28) Snap On black & pink roll cabinet
29) Snap On clear door display cabinet, S/N#HD037300A, MOD# SSX22P177
30) Snap On red popcorn maker
31) Snap On black bump box speaker
32) Snap On black portable air compressor, S/N# 20491113, MOD# CTNF9050
33) Snap On black roll cabinet
34) Snap On black roll cabinet
35) Snap On floor jack
36) Snap On floor jack
37) Snap On red motorized bicycle
38) Snap On tray table

**DISCOVERY**

39) Snap On tray table
40) Snap On tray table
41) Snap On tray table
42) Snap On fan, S/N# 5221002593
43) Blue Point (Snap On) pink tool box
44) Snap On black wet/dry vacuum, S/N# 2021232975
45) Porto Cool Jetstream, S/N# 22102014311059
46) Glass meth pipe
47) Glass meth pipe
48) Two small bags containing methamphetamine
49) One short barrel rifle with no serial number
50) Assorted Snap On hand tools, power tools contained in the roll cabinet drawers and tool chests.
51) Snap On red bicycle
Total value for the above recovered stolen property = $283,445.00

19) On 05-18-2023, Inv. Dahl obtained arrest warrant #23FEL2-00080 authorizing the arrest of Austin Eugene Hamblin, W/M, DOB: 12-10-1990 from Martin County Justice of the Peace Nancy Bradshaw for the offense of Theft of Property, $150K – 300K, a Second-Degree Felony. Judge Bradshaw recommended a bond of $100,000.00.
20) On 06-07-2023, Austin Eugene Hamblin surrendered himself at the Martin County Sheriff's Office and was booked into jail.
21) Mr. Hamblin was arraigned by Martin County Justice of the Peace Nancy Bradshaw on 06-07-2023.
22) On 06-08-2023, Mr. Hamblin was bonded out of jail by Carol Stephens, 529 Scott Drive, Big Spring, Texas 79720.


Inv. Anders Dahl/ M4


========================================================

LOCATION OF OFFENSE: 2100 Westside Drive

========================================================

23-0135

| Code | Quantity | Description | Serial No. | Value |
|------|----------|-------------|-----------|-------|
| Stolen/Etc. | 1 | VARIOUS STOLEN SNAP-ON TOOLS/TOOLS BOXES/EQUIPMENT | | 283,000.00 |
| | | | Total | 283,000.00 |

04/10/2023

DISCOVERY

02/11/2024

RE:    Austin E. Hamblin
       List of items.  See attached.

To whom it may concern:

I, Warren Kniepkamp, owner and operator of Snap-on Franchisee, since 2017, do attest that I have provided Austin Hamblin, my son-in-law, the following list of items prior to May 2023.

Date: 2-12-24

Warren Kniepkamp

This instrument was acknowledged before me on February 12,2024

By _Warren Kniepkamp_

Notary Public Signature

Print _Lupe Loving_

Title or Office: _notary_

My commission expires: _5/12/25_

STATE OF NEW MEXICO
NOTARY PUBLIC
Lupe Loving
Commission No. 1101945
May 12, 2025

## Inventory of Items Seized

1) Tools from Warren Kniepkamp, Snap-On Tool Dealer/Father-In-Law
    a) 1/2in Ratchet Set in Foam (3 Piece)
    b) 1/2in Extension Set in Foam
    c) SAE Wrench Set in Foam 7/8th-1in
    d) SAE Wrench Set in Foam 5/16-3/4
    e) 1/2in 18v Impact (
    f) 3/8in 18v Impact (
    g) Underhood Light
    h) Socket Organizers
    i) Volt Meter
    j) Straight Prybars
    k) 36in Adjustable Wrench
    l) Transmission Ext Bar
    m) Road Chest (Red)
2) Tools That Cannot Be Replaced Due to Sentimental Value
    a) Ratchets Coded from 1975ERA
        i) 1/2in
        ii) 3/8in
        iii) 1/4in
    b) Snap-On 6 Point SAE Sockets
        i) 1/2in
        ii) 3/8in

        iii) 1/4in

    c) Snap-On 12 Point SAE Sockets

        i)  1/2in

        ii) 3/8in

        iii) 1/4in

    d) Allen Wrench Sets

        i)  SAE

        ii) METRIC

    e) Snap-On SAE Wrench Set Coded 1975ERA

3) Other Miscellaneous Tools Taken That Were NOT "Snap-On"

    a) Harbor Freight Surface Prep Tool & 3 Extra Wheels

    b) Hydraulic Short Wrench Set

    c) Various locking Pliers

    d) Gasket Sets

    e) Bolts from Personal vehicle

    f)  6 Position switch for truck

    g) Speed square

    h) Stud finder

    i)  Levels

    j)  Multiple USB Chargers

    k) 120v Electric Testers

    l)  Screwdriver Bits

    m) Craftsmen Power Probe Master Set

    n) Electric Wire

    o) Electrical Connectors (Wire lugs, Butt Connectors ETC.)

2

4) ITEMS LEFT IN SNAP-ON TRUCK

    a) Pictures of family

    b) Apple Airpods

    c) Oakley Sunglasses

    d) Post-it Notes, Sharpies, High LIGHters, and other office supplies that were paid for out of personal pocket.

    e) Electric stapler

    f) Tv Swivel Mount

    g) Computer Mouse

    h) Keyboard

    i) Microfiber Towels

    j) Extension cords and HDMI Cables

    k) Tie Down Straps, Bunge Cords

    l) Personal Receipts, Check stubs and other Personal Documents

3

Exhibit 7

 **Carla Ingram**
May 24, 2023

 **Brad Ingram Sheriff Martin County Texas**
May 24, 2023

MARTIN COUNTY SHERIFF'S OFFICE



# People who shared this    ✕

 May 24, 2023

MARTIN COUNTY SHERIFF'S OFFICE

RECOVER STOLEN TOOLS

The Martin County Sheriff's Office received a report of a large theft May 11, 2023.

Investigation led to the execution of a search warrant which was executed in Howard County, Texas on May 17, 2023.

During the warrant execution a very large amount of new tools were recovered.  The owner was present and was able to value the cost of the tools at $ 283,000.00.

A subsequent arrest warrant has been obtained but has not been served at this time.

I would like to thank the Howard County Sheriff's Office for their cooperation and participation in this investigation.

Sheriff Brad Ingram

 Julie Todd Snellgrove and 31 others

 Like       Share

Most relevant ▾

 **W Todd Smith**
Outstanding police work!

1y   Like

 **Julie Todd Snellgrove**
Thank you guys so much for once again coming to our rescue! ❤️

1y   Like

# MARTIN COUNTY SHERIFF'S OFFICE

## JAMES B. "BRAD" INGRAM, SHERIFF

  

**Martin County Sheriff's**

The Martin County Sheriff's Policy Manual is the result of countless hours of research, consultation and review of modern police procedures, evolving law and emerging best practices. It is a living document; additions, changes and deletions will inevitably be required, almost from the date of its publication. Nonetheless, issuing this manual is necessary to provide guidelines for our personnel and to give insight to the communities we serve into how we do our jobs and what they can expect from us.

Each of us has an obligation to become familiar with the manual, to abide by its policies and to ensure that our comportment reflects the Department's Core Values and Mission Statement and the Law Enforcement Code of Ethics, all of which are incorporated into the Policy Manual.

The manual is not, however, a substitute for critical thinking and good judgment. No written guidance document can anticipate the entire range of human behaviors that police employees might encounter, nor can every contingency be predicted. We are all expected to follow policy. Occasionally, given the complex and nuanced nature of police work, we may need clarification from a supervisor as to how to interpret the manual in a specific situation. Always, we are expected to use our best professional judgment and our basic human decency to guide our actions.

This Policy Manuel is the property of the Martin County Sheriff's Office; unauthorized copying of the Manuel is not permitted. To obtain a copy of this Manuel for any purpose contact The Martin County Sheriff's Office and make a public information request.

James B. "Brad" Ingram
Sheriff Martin County Texas

301 N. ST. PETER ST / PO BOX 1127, STANTON, TEXAS 79782
OFFICE 432.756.3336 FAX: 432.607.2992
HTTP://CO.MARTIN.TX.US

# MARTIN COUNTY SHERIFF'S OFFICE

## JAMES B. "BRAD" INGRAM, SHERIFF

 

### CODE OF ETHICS

**AS A LAW ENFORCEMENT OFFICER,** my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all persons to liberty, equality and justice.

**I WILL** keep my private life unsullied as an example to all, and will conduct myself in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

**I WILL** never act officiously or permit personal feelings, prejudices, political beliefs, aspirations, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

**I RECOGNIZE** the badge of my office as a symbol of public faith and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will never engage in acts of corruption or bribery, nor will I condone such acts by other police officers. I will cooperate with all legally authorized agencies and their representatives in the pursuit of justice.

**I KNOW** that I alone am responsible for my own standard of professional performance and will take every reasonable opportunity to enhance and improve my level of knowledge and competence.

**I WILL** constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession...LAW ENFORCEMENT.

Martin County Sheriff's Office
Policy Manuel
Table of Contents

1. GENERAL DUTIES
2. AUDITS
3. BODY WORN CAMERAS
4. CELLULAR PHONE POLICY
5. CRITICAL INCIDENT
6. CROWD CONTROL
7. DIMINISHED CAPICITY
8. DOMESTIC MISCONDUCT
9. DUTY TO DISCLOSE
10. EMPLOYEE NEPOTISM & FRATERNIZATION
11. ETHICS
12. EXCITED DELERIUM
13. FILM OF LE ACTIVITY
14. HIRING PROCESS
15. IDENTIFICATION OF SUSPECTS
16. INVESTIGATION OF CITIZEN COMPLAINTS
17. MISSING PERSONS
18. MOBILE RECORDING DEVICES
19. MOTOR VEHICLE STOPS
20. OFF DUTY CARRY
21. PATROL RIFLE
22. PERSONS WITH DISABILITIES
23. PRESCRIPTIONS
24. PROPERTY & EVIDENCE
25. PURSUIT AND EMERGENCY VEHICLE OPERATIONS
26. RESPONSE TO RESISTANCE
27. SECONDARY EMPLOYMENT
28. SEXUAL HARRASSMENT AND SEXUAL MISCONDUCT
29. SOCIAL NETWORKING
30. STOP SEARCH ARREST PERSON
31. TRANSPORTATION AND RESTRAINT OF PRISIONERS

# MARTIN COUNTY SHERIFF'S OFFICE

# STANTON, TEXAS

# GENERAL DUTIES.

# MARTIN COUNTY SHERIFF'S OFFICE

## STANTON, TEXAS

## POLICY: GENERAL DUTIES

**I.    PURPOSE:** The purpose of this policy is to describe a deputy's job description, job expectation, and performance criteria.

**II.    POLICY:** The policy of this agency is for its Officers to perform their jobs in a professional manner with utmost integrity, using the Texas Code of Criminal Procedure and the Texas Penal Code as the guideline for actions and responses while answering calls.

**III. PROCEDURE:** It is the intent of this policy that all Officers follow CCP Art 2.13., 5.01, 6.06, 6.07, 8.04, 8.05, 14.01, 14.04, 14.05, and PC Sec 9.21, 9.22, 9.31, 9.32, 9.33, and 9.55 when having responded to a call involving immediate attention. In addition to the above listed Articles and Sections, officers will also adhere to the General Orders of the Martin County Sheriff's Office., Specific Duty List and Requirements of Duty, all which will be listed below.

## IV.  GENERAL ORDERS OF THE MARTIN COUNTY SHERIFF'S OFFICE

1.
To advance the objective of this Office in preserving order and protecting the lives, rights, privileges, and property of the people in Martin County and in the State of Texas to the best of my ability and in an entirely impartial manner.

2.
To practice at all times Courtesy, Service, Protection, and Integrity.

3.
To keep myself clean and presentable, and in good physical, mental, and moral health.

4.
To know and obey orders and instructions at all times.

5.
To keep all County equipment entrusted to me fully accounted for and in proper condition.

6.
To be encouraged to register to vote, and to vote my convictions as a citizen on public questions and political races, but to take no other part in any public politics or campaigns except as authorized by law and policy.

7.
To conduct my business in a straightforward manner, relying upon poise, competence, and discretion rather than threats and argument to carry out my duties.

8.
To take up matters affecting me and my position with my immediate superior and through proper channels.

9.
To submit through proper channels constructive suggestions for the betterment of the Office and its service.

10.
To conduct myself at all times, both on and off duty, in such a manner that I may merit the voluntary commendation of all law-abiding citizens and visitors with whom I come in contact, both those with whom I meet in carrying out my duties and those I shall live among as a citizen in order that credit may be reflected upon the Martin County Sheriff' Office.

## V.   Specific Duties to be Performed

Work assigned, rotating shift
Respond to calls for service in the County
Conducting preliminary investigations at crime scenes
Collect evidence at crime scenes
Conduct follow up investigations
Service of Civil Process
Familiar with Texas Penal Code, Texas Code of Criminal Procedure,
Texas Transportation Code and Texas Family Code
Driving and safe operation of County owned vehicles
Documenting incidents in incident reports and gathering of evidence
Searching, pursuing and detaining suspects
Responding to burglar, robbery alarms
Responding to domestic violence calls
Making arrests
Enforcing traffic parking laws
Working with other officers as well as other local, state, and federal
entities
Preparing for and attending court appearances
Participating in mandatory and elective training
Keeping proficient with firearms and self-defense
Any other duties assigned to the Deputy

## VI:  REQUIREMENTS OF DUTY

**Employee conduct will always be consistent with this Office's values, and any supervisor's instructions.**

(a) Employees will maintain themselves in such a physical condition as to be able to handle the requirements of their assignment.

(b) Employees will not exhibit cowardice or shirk their duty in case of danger.

(c) Employees will consider themselves available for duty in any emergency situation.

(d) Employees will report for all duty assignments, including assigned court appearances, at the time and place required by assignment or orders and be properly prepared and equipped to immediately assume their duties.

(e) Employees will remain at their assignment and on-duty until properly relieved by another employee or until dismissed by their supervisor.  Employees are to know the hours of their shift.  Night shift employees are to remain on duty until their shift is completed.  If all assignments and calls for service are complete, the Employee may consider themselves off duty and on call until the day shift call out time begins.

(f) Employees are considered on-duty while on authorized breaks.

(g) Employees will remain alert and observant while on-duty and devote their time and attention to the business of the Department. Any exceptions require supervisor approval.

(h) Employees will not engage in any strike, work slowdown or stoppage, concerted failure to report for duty, or any other action

which interferes with the efficiency or integrity of the administration of criminal justice or departmental discipline, nor will any employee encourage, coerce or conspire with any other individual to do so.

(i) Employees assigned to investigate an incident where the complainant and/or suspect is considered a friend or relative will contact their supervisor; supervisors will reassign the incident to another employee if warranted.

(j) Unless otherwise authorized by the Sheriff, employees will not go outside of this Office in an attempt to resolve official matters until appropriate Office procedures have been followed.

(k) Employees will write a memorandum to the Sheriff through their chain-of-command before filing claims for damages or entering into legal compromises or settlements regarding events connected with the performance of duty.

## VII. Duty to be Familiar with the Law and with Responsibilities of Self and other Public Officials.

The law enforcement officer shall apply himself to the study of the principles of the laws which he is sworn to uphold. He will make certain of his responsibilities in the particulars of their enforcement, seeking aid from his superiors in matters of technicality or principle when these are not clear to him; he will make special effort to fully understand his relationship to other public officials, including other law enforcement agencies, particularly on matters of jurisdiction, both geographically and substantively.

## VII.    Utilization of Proper Means to Gain Proper Ends.

The law enforcement officer shall be mindful of his/her responsibility to pay strict attention to the selection of means in discharging the duties of his/her office. Violations of law or disregard for public safety and property on the part of an officer are wrong; they are self-defeating in that the Public's view will be prejudiced negatively against the officer. If the law is to be honored, it must first be honored by those who enforce it.

## IX.    Cooperation with Public Officials in the Discharge of their Authorized Duties

The law enforcement officer shall cooperate fully with other public officials in the discharge of authorized duties according to the Martin County Sheriff's Office Policies & Procedures.   He/She shall be very careful assuring himself/herself that the actions taken are in accordance with current law, and shall guard against the use of his/her office or person, in any improper or illegal action. In any situation open to question, he/she shall seek authority from his/her superior officer, giving him a full report of the situation or proposed service or action.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

## POLICY: AUDITS AND INSPECTIONS

I.   **Purpose:** Some law enforcement operations and tasks have a high risk, high liability potential. These law enforcement operations must be undertaken in a consistent, methodical manner in an attempt to undertake the necessary operation/task, yet reduce the liability potential. This liability potential can be reduced when the agency can document that the procedures in place were consistently followed. A law enforcement agency must conduct formalized, regular audits and inspections of these high risk, high liability operations and tasks.

II.  **Policy:** This agency will conduct audits and inspections of designated police operations and tasks on a both a scheduled and unannounced frequency.

III. **Procedure:** The following operations and tasks shall be audited and inspected by a person/unit designated by the Sheriff or their designee. This person/unit shall be directly responsible to the Sheriff. The person(s) conducting the audit/inspection shall use the formal checklist to ensure that all relevant areas of concentration are addressed in the audit/inspection. The ultimate purpose for these inspections is to ensure that the operation/task is being conducted consistent with Agency policy/procedure and the law. Scheduled inspections shall enlist and involve the personnel of the unit/function being inspected, unless there is an indication that this would inhibit the process of the audit/inspection. Unannounced audits/inspection shall be conducted at the direction of the Sheriff.

A. **Schedule for Agency audits and inspections of high risk, critical tasks:** The following operations/tasks shall be audited/inspected on the following schedule:

| | |
|---|---|
| 1) Access to the criminal information system | Annual |
| 2) Citizen complaint investigations | Annual |
| 3) Property/Evidence (Narcotics, Money, Guns) | Annual |
| 4) Less lethal weaponry | Bi- Annual |
| 5) Video camera supervisory reviews | Quarterly |
| 6) Mandated training | Annual Report |

B. **Inspection Process:** The process of the inspection/audit shall respect the dignity of all agency personnel and conducted in a professional manner. This is a process to identify both positive and negative outcomes and the adherence to Agency policies and procedures.

**1) Written Report:** Each audit/inspection shall be reduced in writing.
  a. Specific examples of positive and negative issues, if observed, shall be identified.
  b. If innovative approaches are observed, these shall be referenced and specific commendation to the person(s) responsible.
  c. This report shall be forwarded directly to the Sheriff.

**C. Follow-Up Requirements:**
  **1)** Each audit/inspection report that identified a deficiency or area of concern shall result in a follow-up audit/inspection within one month of the discovery of the deficiency.

**D. Maintenance Of Audit/Inspection Reports:**
  **1)** All reports of audit/inspections shall be maintained in a secure location for a minimum of five (5) years.

**MARTIN COUNTY SHERIFF'S OFFICE**

**STANTON, TEXAS**

**POLICY: BODY WORN VIDEO RECORDING**

**RELATED: DUTY TO DISCLOSE, MOBILE VIDEO RECORDER**

I.  **Purpose:** The purpose of this policy is to direct deputies and supervisors in the proper use and maintenance of **Body Worn Video Recorders (BWV)** as well as directing how video will be utilized as a quality control mechanism and evidence.

II. **Policy:** The policy of this agency is to provide Officers with body worn video recording devices in an effort to collect evidence to be used in the prosecution of those who violate the law, for Officer evaluation and training, and to provide accurate documentation of law enforcement and citizen interaction. The use of a BWV system provides persuasive documentary evidence and helps defend against civil litigation and allegations of officer misconduct. Officers assigned the use of these devices shall adhere to the operational objectives and protocols outlined herein so as to maximize the effectiveness and utility of the BWV and the integrity of evidence and related video documentation.

III. **Procedure:** It is the intent of this policy that all Officers who will be using BWV equipment shall be trained on the manner in which the BWV shall be tested, maintained, used and how the recorded events will be properly documented and maintained as evidence in future judicial proceedings.

   A.  It shall be the responsibility of each individual Officer to test the BWV equipment at the beginning of each tour of duty. Officers equipped with the BWV will ensure that the batteries are fully charged prior to the beginning of their shift or special event.

   In the event that the equipment is found to be functioning improperly, the Officer shall report the problem immediately to their immediate supervisor so that the information can be documented, and arrangements made for repair.

IV. Officer's assigned Body Worn Video cameras will wear them at all times while on duty in any type of uniform. BWV will be worn on the front of the Officer's body in the mid to upper torso region. Officers are authorized to utilize during routine law enforcement events overt recording equipment such as BWV recorders when the Officer is a party to the conversation.

   A.  Officers are required to record with audio and video the following incidents:

      a.  All calls for service in which citizen contact is made

      b.  All traffic stops

      c.  All citizen transports (excluding ride-alongs)

    d.  All investigatory stops

    e.  All foot pursuits

    f.  When arriving at law enforcement events and/or citizen contacts initiated by other Officers

    g.  Other incidents the Officer reasonably believes should be recorded for law enforcement purposes

**B.** Officers will make every reasonable effort to ensure that the BWV recording equipment is accurately capturing events. A reasonable effort includes:

    a.  Activating the video/audio recording as soon as the Officer makes citizen contact or the law enforcement event begins

    b.  Activating the video/audio when the Officer arrives at a street encounter, or citizen contact initiated by another Officer

    c.  Positioning and adjusting the BWV to record the event

    d.  Officers are prohibited from turning off the BWV during any citizen contact or law enforcement event

    e.  Officers shall not erase, alter, modify or tamper with BWV recordings

**C.** The recording shall continue until the law enforcement event or citizen contact is completed and the citizen involved departs or until the Officer, who is recording the event through a BWV discontinues his or her participation in the law enforcement event or citizen contact by leaving the scene.

**D.** The recording shall include, but are not limited to:

    a.  Arrests of any persons

    b.  Searches of any kind

    c.  Seizure of any evidence

    d.  Requests for consent to search

    e.  Miranda warnings and response from in custody suspect

    f.  Statements made by citizens and defendants

    g.  K-9 searches of vehicles

    h.  Issuance of written violations

**E.** When a BWV recording is being entered into the video server, the video will be labeled, but need not be limited to:

    a.  Case tracking number

    b.  Date recorded

    c.  Date submitted

    d.  Officer's name submitting the media tape

    e.  Hold for evidence indication

F. If an Officer assigned BWV equipment, participates in a law enforcement event or citizen contact and becomes aware that the event was not recorded using the BWV equipment, the Officer shall immediately notify the dispatcher that the stop was not recorded and should notify the supervisor as to the reasons why the event was not recorded. The notification to the supervisor shall be in writing to the Chief Deputy and Sheriff.

V. **Supervisory Responsibility TAPES or other storage media**

A. The original digital files from body worn video recorders will be downloaded and stored on a designated network server to prevent destruction. Officers will make every reasonable attempt to download video and audio files before the end of each shift.

B. Non-evidentiary video and audio recordings will be maintained in the network server for a minimum of 120 days after their creation. Due to the limitations of data storage there is no guarantee that citizens or deputies will be able to access non-evidentiary recordings after 120 days.

C. Video/audio recordings containing information that may be of value for case prosecution or in any criminal or civil proceeding shall be copied to a DVD or other media and handled as other forms of evidence and a proper chain of custody will be maintained at all times.

D. This media will be subject to the same restrictions and chain of evidence safeguards as detailed in the agency evidence control procedures.

E. Media will not be released to another criminal justice agency for trial or other reasons without having a duplicate copy made and returned to safe evidence storage.

F. All recording media, recorded images and audio recordings are the property of this agency. Dissemination outside the agency is strictly prohibited without specific authorization of the Sheriff or designee.

G. To prevent damage to, or alteration of, the original recorded media, it shall not be copied, viewed or otherwise inserted into any device not approved by the Agency BWV technician.

H. Malicious destruction or deletion of video and audio files is prohibited.

I. All digital video and audio files are subject to open records request as allowed by Texas law. Recordings that are the subject of a denied open records request must be maintained until the dispute between the Agency and the person or entity requesting the recordings is resolved.

J. Tapes or other storage media shall be stored in a locked area with access limited to supervisory personnel designated by the Sheriff.

K. Tapes or other storage media shall be held in accordance with the state's record retention act for law enforcement records. **It is recommend that all recordings be held for a minimum of 120 days unless:**

a. **The recording has evidentiary value or if the recording has been subpoenaed due to an event which is captured, the recording shall be maintained until all legal action has been resolved.**

b. **If a recording is used by the Office for training purposes, the recording shall be maintained as a training record for five years**

c. **If the recording is referred to the District Attorney for advice or prosecution then the recording shall be held for a minimum of six years or final action. The recording shall be maintained for the longer period of time.**

d. **If a recording is used in a disciplinary action against an employee, then the recording shall be held for a minimum of three years from the completion of the disciplinary action.**

L. Tapes shall be subject to review by the Sheriff or his designees.

M. Video shall not be reproduced except for case presentation without the express written authority of the Sheriff or his designee.

N. At least once every (60) sixty-day period, first line supervisors of the Uniformed Division should review a taped event of each Officer in the Uniformed Division.

O. Supervisors should use these reviews as a quality control measure. Following such a review, the supervisor will hold a meeting with the Officer and provide him/her with either positive reinforcement or constructive criticism with respect to the stop reviewed. Constructive criticism may relate to Officer safety issues, demeanor, policy issues or legal issues related to the stop as well as any other supervisory observation relative to performance.

P. If upon review, the Sheriff or his designee finds that corrective action is necessary regarding an Officer's conduct, the Sheriff or his/her designee, may take the necessary action. In such cases, a special BWV review schedule should be implemented with respect to that particular Officer for a set duration in order to ensure compliance with the corrective action.

## VI. Use of BWV Recordings as Evidence in Criminal/Motor Vehicle Prosecutions

A. In a case where an event is recorded which involves an arrest or any seizure of evidence or property, the arresting Officer shall fill out the BWV form indicating that the event has been recorded.

B. In misdemeanor or felony cases this form shall be immediately delivered to the Officer's direct supervisor. The supervisor shall then review the recording and determine its evidentiary value. If the supervisor determines that the recording should be maintained as evidence, the supervisor shall make a notation on the BWV form so that the incident may be copied and maintained as evidence with the case by following the established procedure.

C. Where a supervisor has made a determination that a recording shall be maintained as evidence, they must deliver a signed copy of the BWV form indicating that the recording should be saved to the Chief Deputy. The copying

of the tape in question shall be done at the direction of the Chief Deputy, and only the person designated by them shall make the copy. A copy of the BWV form shall be maintained in the case file. Evidentiary tapes shall be marked with the corresponding report # and shall be forwarded to the evidence division for maintenance or custody until such time as the case in question reaches disposition.

D. Where there is any indication that the BWV may contain evidence that may be helpful to a suspect's/defendant's defense, that recording must be saved and turned over to the prosecutor assigned to the case in accordance with the "Duty to Disclose" policy of this Agency.

E. When an Officer makes a videotape or film recording of any transaction covered by this policy and a citation is issued or an arrest is made, the Officer shall note on the uniform citation that a videotape has been made of the transaction.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

**POLICY: CELLULAR TELEPHONE POLICY**

I. **Purpose:** The purpose of this policy is to insure the safety of officers by providing complete information through the most effective means available and providing for the efficient operation of the Agency

II. **Policy:** This policy sets forth the department rules and regulations regarding the use of department issued cellular phones as well as the use of personal cellular phones while on duty as a member of this Agency.

III. **Procedure:** for use of an AGENCY ISSUED ("AI") CELLULAR PHONE:

   a. General Use. Cellular phones are provided to officers in order to enhance the efficiency of the Agency. All officers are required to answer their Agency cellular phones at all times because all officers are subject to emergency callout at any time. If an officer is going to be out of the area and unable to respond to an emergency if needed, that officer is required to notify, the Sheriff or Chief Deputy of the absence. Cellular phones shall be used for the following:

   b. When it allows citizens involved in a law enforcement event, either as victims or witnesses, to contact family members, employers, child care providers, etc. to inform of their possible delay.

   c. When it is used to contact reporting parties, informants, and other citizens.

   d. When it is utilized to return calls which result from unidentifiable pages.

   B. Miscellaneous issues relating to cellular phone use.

   a. Car to car communications. Officers should refrain from using cellular phones in order to relay information about a Law enforcement incident where such information would provide for the safety of all officers responding to said incident. The information should be communicated to all officers car to car or through the dispatcher. The use of cellular phones should be utilized when the information being given is of a confidential nature and the officer would rather not put out certain information over the radio.

   b. Operating an Agency vehicle. Use extreme caution if a cellular phone is used while driving. Use hands free options whenever possible. No cellular phone call will be allowed from an Agency vehicle while in a school zone during specified school zone times. Absolutely no texting while driving.

   c. Public Use of Cellular Phone. If using a cellular phone in public, be courteous and cautious of your surroundings. Do not discuss sensitive information in public where one or both sides of your conversation may be overheard by the public.

**IV. Procedure for use of privately owned cellular phones while on duty.**

    A.  All safety, and courtesy issues pertaining to Agency issued phones apply to privately owned phones, with the exception of the answering requirement.

    B.  Officers should be aware that records relating to cellular phone usage during working hours may become part of a criminal case file where such records are exculpatory toward a criminal defendant or otherwise relevant to the prosecution.

    C.  Officers should be aware that records related to cellular phone usage during working hours may be discoverable in a lawsuit against the officer for events occurring at work while in possession of a personal phone.

**V.  Personal cellular phones and administrative investigations.**

    A.  Production of cellular telephone records: Employees who elect to carry cellular phones during work hours, either agency issued or personal, shall provide telephone usage records during administrative investigations, when requested. These records shall be for the dates and times of working hours.

    B.  Employees shall produce personal and/or agency issued cellular telephone records during administrative investigations regardless of the time of usage when the usage concerns an allegation of misconduct that is "directly, narrowly, and specifically related to the employee's performance of duty or fitness to perform."

**VI. Use of cellular phones equipped with cameras and recording devices.**

    A.  All officers shall be aware that the use of a recording device such as a department issued camera, department issued video recorder, or a department issued cell phone equipped with a camera and or video recording device capable of recording and documenting evidence at the scene of an incident under investigation by the department must be consider to have potential evidentiary value. These images and recordings contain potentially inculpatory and exculpatory materials. Therefore, when any member of the department uses a recording device of any type to capture images or verbal recordings related to incidents under investigation by the department the material must be preserved and disclosed.

    B.  Officers should consider in some cases where exigent circumstances exist, such as the evidence as the evidence is transient in nature, then the responding officer based on the totality of the circumstances may choose to document the evidenceWhen any officer documents evidence through the use of cellular telephone camera or recording device, that evidence shall be disclosed to a supervisor or the lead investigator assigned the investigation.

    C.  The supervisor / investigator will take the appropriate steps to ensure the evidence is properly preserved and the chain of custody followed.

    D.  Under no circumstances will an officer who has recorded any evidence in accordance with this policy re-produce, copy, or forward the image or recording

by means of social media, internet, e-mail or similar media sharing devices with any person other than those persons who are acting in their official capacity in accordance with Texas law.

E.  The officer who transfers evidence from a recording device to any person or agency will document that evidence transferal in the records management system of the department where that investigative case file is maintained.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

**POLICY: CRITICAL INCIDENT**

1. **Purpose:** The purpose of this policy is to direct a proper response to critical incidents by this agency.

2. **Policy:** It is the policy of this agency to provide a thorough investigation and review of all critical incidents involving members of this agency.

3. **Procedure General:** The agency shall conduct an administrative critical incident review of all firearm discharges, in-custody deaths or serious injuries, and all uses of force/response to resistive suspects when the injury results in hospitalization. This review shall result in a written critique and specifically address the following issues and make a specific determination whether:

   A. The force, control and/or restraint was consistent with Agency policy;

   B. There are any issues requiring a re-evaluation of Agency policy and/or procedures;

   C. There are any training needs identified;

   D. The equipment provided by Agency was adequate; and

   E. Supervisory involvement was reasonable.

4. Officer involved shootings and in-custody death investigations: Initial Response:

   A. First Officer on Scene:

      1) Neutralize scene- Insure that scene has reached a level of control such that there is no longer a threat of harm to citizens, officers or suspects,

      2) Provide for the immediate medical attention of all persons injured,

      3) Secure the scene (s) of the event (s); to the extent possible use crime scene tape to secure any area that may contain evidence pertinent to the events being investigated,

      4) Assign sufficient personnel to insure that the scene perimeter is not breached,

      5) Remove the involved officer from the center of the scene to a discreet area such as a police vehicle (do not place the officer in the backseat), and

      6) Secure and segregate all witnesses to the event. This would include the segregation of the involved officers so that no allegations can be made that officers were in a position to discuss the incident.

   B. First Responding Supervisor:

      1) Check on the well-being of involved officer (s),

2) Allow/Assist officer in calling family member(s) Ensure notifications made to officer(s)' family,

3) Immediately assume role of incident commander and utilize the incident command concept until otherwise relieved of incident command,

4) Ensure that notice has been made to surrounding agencies,

5) Ensure that the first responders have completed the above listed duties,

6) Notify hospital of incoming injured,

7) Determine resources necessary for circumstances i.e. community unrest etc.,

8) Assign an officer to document all personnel present and the mission of each person entering the scene,

9) Assign officer (s) to accompany injured officers, suspects and victims to hospital,

10) Notifications to chain of command,

11) Notify and brief surrounding agencies,

12) Brief arriving investigators and ranking personnel,

13) Review all initial reports and supplements,

   a. Secure all weapons, and once the weapon of the involved officer is secured, discreetly provide him/her with a replacement weapon if possible.

C. The preliminary on-scene investigation shall secure all evidence:

1) Secure all recorded information surrounding event:

   a. Mobile Video Recording

   b. Body Camera Tape - Microphone Audio

   c. Dispatch tapes

   d. 911 phone calls

   e. Area business surveillance video

   f. In certain instances, with the approval of the Sheriff or his designee, call for the assistance of an outside agency to conduct the crime scene investigation, either to protect the integrity of the investigation by have a 3rd party conduct said investigation, or if the scope of the scene itself is beyond the department's ability to process properly, adequately, or within a given time frame.

2) Other Evidence:

   a. Photographs

   b. Medical documentation particularly from arriving medical personnel at scene

   c. Diagrams

      **d.** Bullet trajectory including those that missed

      **e.** Shell casings and any expended projectiles

      **f.** Vehicles and location at time of incident particularly is moved before the arrival of on-scene investigators

      **g.** Identification of any locations with DNA and/or latent print potential

      **h.** Area witness canvass

**D.** Officers involved in these critical events shall attend a Critical Incident-Stress Management Team debriefing if available.

**E.** The primary officer in a critical incident or officer involved shooting shall undergo a mandatory psychological clearance before returning to duty.

**F.** Provide all available information to investigators of the incident whether they be from our department or another agency.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

**POLICY: CROWD CONTROL**

I.    **POLICY:** The manner in which law enforcement officers deal with unruly crowds and illegal gatherings has direct bearing on their ability to control and defuse the incident and contain property damage, injury or loss of life. Officers of this Agency confronting civil disturbances will follow the procedures of containment, evacuation, communication, use of force, and command and control as written in this policy.

II.   **DEFINITION:**

A. *Civil Disturbance* - An unlawful assembly that constitutes a breach of the peace or any assembly of persons where there is imminent danger of collective violence, destruction of property, or other unlawful acts. Officers must recognize that most assemblies are protected by First Amendment Principles and the procedures in this policy apply to those assemblies where articulated criminal acts are occurring and enforcement action is directed at those persons for whom there is probable cause to believe are involved in those criminal actions.

B. *Incident Commander (IC)* – The senior officer at the scene or an officer given command of an incident that is experienced in managing this or similar tactical events.

III.  **PROCEDURES:**

A. The first officer to arrive on the scene of a civil disturbance does the following:

a.  Observe the situation from a safe distance to determine if the gathering is currently or potentially violent.
b.  Notify the communications center of the nature and seriousness of the disturbance, particularly, the availability of weapons and approximate number of participants. Request the assistance of a supervisor and any necessary backup and advise as to the present course of action. If approaching the crowd would not present unnecessary risk, instruct the gathering to disperse.
c.  Attempt to identify crowd leaders and any individuals personally engaged in criminal acts.

B. The ranking officer at the scene is *Incident Commander (IC)*. The IC or other highest-ranking officer assuming command at the scene takes the following steps:

a. Assess the immediate situation for seriousness and its potential for escalation. If the disturbance is minor in nature and adequate resources are available, efforts should be made to disperse the crowd.
b. Establish the number of personnel and equipment necessary to contain and disperse the disturbance and relay this information to the communications center.
c. Where necessary, ensure that appropriate notification is made to outside agencies to include the fire department, rescue squads, state and local law enforcement agencies, agency officials, public information officer, the agencies legal advisor, and the local detention center.
d. Establish a temporary command post based on proximity to the scene, availability of communications, available space, and security from crowd participants.
e. Establish an outer perimeter sufficient to contain the disturbance and prohibit entrance into the affected area.
f. Ensure that, to the degree possible, innocent civilians are evacuated from the immediate area of the disturbance. Persons trying to leave the area shall not be impeded unless there is probable cause to arrest the person trying to leave.
g. Ensure that surveillance points are established to identify agitators, leaders and individuals committing crimes, and to document and report on events as they happen. Photographic and videotape evidence of criminal acts and perpetrators is generated whenever possible.
h. Ensure establishment and sufficient staffing of a press area.

## IV.    Command Options:

A. When adequate personnel and resources are in place, the IC establishes communications with leaders of the disturbance and discusses actions necessary to disperse the crowd. Should the crowd fail to disperse in the prescribed manner, the IC should be prepared to implement one of the following options:

a. *Containment and dialogue* - The objective of containment and dialogue is merely to disperse the crowd. In doing so, the IC should:

   i. Establish contact with crowd leader(s) to assess their intentions and motivation and develop a trust relationship; &,
   ii. Communicate to the participants that their assembly is in violation of the law and will not be tolerated, that the agency wishes to resolve the incident peacefully, and that acts of violence will be dealt with swiftly and decisively.

b. *Physical arrest* - When appropriate, the IC orders the arrest of crowd leaders, agitators, or others engaged in unlawful conduct. The decision shall be based on probable cause to believe the individual to be arrested is the person involved in the criminal activity. In doing so, he/she:
   i. Ensures the appropriate use of tactical formations and the availability of protective equipment for officers engaged in arrest procedures;
   ii. Ensures the availability of transportation for arrestees; &,

    iii. Ensures that a backup team of officers is readily available, should assistance be required.

  c. *Non-lethal force* - When physical arrest of identified leaders and agitators fails to disperse the crowd, the IC may use non-lethal force to accomplish these ends. No force shall be used prior to a documented proper warning to all persons which can be heard by the participants and a reasonable amount of time has passed allowing time to disperse. In so doing, the IC ensures that all force used complies with use of force policy:

    i.  A clear path of escape is available for those who wish to flee the area;

    ii.  The use of tear gas, smoke or other non-lethal devices is coordinated and controlled; &,

    iii.  Canine teams are restricted from all enforcement actions, except when their use would aid in the rescue of agency personnel.

  d. *Use of deadly force* - The use of deadly force in the control and disbursement of civil disturbances, as in all other circumstances, is governed by this agency's use-of-force policy. Specifically:

    i.  Officers are permitted to use deadly force to protect themselves or others from what is reasonably believed to be an immediate threat of death or serious bodily injury.

    ii.  Particular caution should be taken when using firearms during civil disturbances. The arbitrary use of return fire in crowds is prohibited, and any return fire should be directed only at an armed suspect using deadly force.

  e. **Mass Arrest:** During the course of civil disturbances, it may be necessary to make arrests of numerous individuals over a relatively short period of time. In order for this process to be handled efficiently, safely and legally, the IC should ensure that:

i.  An arrest team is designated to process all prisoners for purposes of transportation;

ii.  An adequate number of vehicles are made available to remove the prisoners to the detention center;

iii.  An adequate secure area is designated in the field for holding prisoners after initial booking and while awaiting transportation;

iv.  All arrested individuals are searched, photographed individually and with the arresting officer, and properly identified prior to transportation to the detention center for formal booking;

v.  All injured prisoners are provided medical attention prior to being booked;

vi.  All arrested juveniles are handled in accordance with this agency's procedures for the arrest, transportation, and detention of juveniles; &

vii.  All evidence and weapons taken from arrestees are processed in accordance with this agency's policy on the preservation and custody of evidence.

  f. **Deactivation:** When the disturbance has been brought under control, the IC ensures that the following measures are taken:

    i.    All law enforcement officers engaged in the incident are accounted for and an assessment made of personal injuries;

    ii.   All necessary personnel are debriefed, as required;

   iii.   Witnesses, suspects, and others are interviewed or interrogated; &

   iv.   All written reports are completed as soon as possible following the incident to include comprehensive documentation of the basis for the agency's response to the incident.

**i.**  **Debriefing:** Each supervisor conducts a debriefing with their respective squads or personnel. Each supervisor should then brief the Command Staff of their assessments who then have their own internal debriefing for administrative reasons.

**NOTE:** This policy is generally overwritten for our department considering department size. Most of our crowd control situations will be small, and involve local citizens that are known by local law enforcement and will be handled quickly. In the event of a large civil disturbance, our Agency would request the assistance from other nearby departments. During a large scale event, this policy would play more in effect.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

**POLICY: PERSON'S WITH DIMINISHED CAPACITY**

1. **Purpose:** To provide officers with the essential tactical and processing skills necessary to effectively deal with persons of diminished capacities in a manner to provide the required professional assistance these persons need, to protect the community, to safeguard the officers involved in the encounter and to enhance the Agency's risk management.

2. **Policy:** Every community can expect its law enforcement officers to encounter persons of diminished capacities. This group of special needs persons presents field officers with different and often complex issues. These types of persons, whether from intoxication, suicidal potentials, medical complications or mental illness, present field officers with a wide range of behaviors usually different than those exhibited by other members of the community or persons involved in criminal activities. Persons of diminished capacities may display conduct that is bizarre, irrational, unpredictable and threatening. They may not receive or comprehend commands or other forms of communication in the manner that the officer would expect. They often do not respond to authoritative persons or the display of force. It is the primary task of the field officers confronting these special needs persons to resolve the encounter in the safest manner. It is the officer's task to bring these types of persons to professional resources, when necessary. It is not the mission of the field officer to diagnose the root cause for the person's behavior. Every officer can expect to encounter these types of special needs persons while performing their official duties. Officers are expected to control the incident. Proper tactical and intervention techniques can assist in resolving the immediate field implications of the encounter and hasten the intervention by professional resource persons.

3. **Definitions:**

   A. Persons of diminished capacity: This refers to a segment of the community officers will be expected to deal with. It encompasses all persons encountered in the field who exhibit unusual behaviors commonly referred to as irrational, bizarre, unpredictable or weird. These outward observable symptoms could be the result of intoxication, drug use, suicidal indications, mental illness or medical complications.

   B. Mental Illness: This policy does not require officers to make a diagnosis of whether the subject is mentally ill or what form of mental illness the subject may have but rather to use reasonable judgment to recognize behavior which is outside the norm in which a person poses a danger to themselves or others.

   C. "Mentally Ill Person" means a person with substantially impaired capacity to use self-control, judgment, or discretion in the conduct of the person's affairs and social relations, associated with maladaptive behavior or recognized emotional

symptoms where impaired capacity, maladaptive behavior, or emotional symptoms can be related to physiological, psychological or social factors.

D. Professional resources: These sources are those available to the police such as mental health professionals, emergency medical facilities, and detoxification centers.

E. Voluntary and involuntary commitments: These are the provisions within the State in which the agency can use for the civil commitment of persons requiring professional psychological intervention.

F. Prosecution guidelines: It is the policy of this agency to evaluate the necessity for and method of prosecution when dealing with a person of diminished capacity. Normally misdemeanor violations by the person committed during the police control of the incident will not subject the person to a physical arrest. The decision to cite or request a filing by the prosecutor will be determined by the officer. A supervisor will evaluate felony and/or other crimes committed upon non-agency personnel to determine whether a physical arrest is warranted. The ultimate mission of the Agency is to encourage professional resource intervention for the person of diminished capacity. Physical arrest should be considered a last resort.

G. Mentally Ill Dangerous Person: meaning the person is one who presents a substantial risk of serious harm to another person or persons within the near future as manifested by evidence of recent acts or threats of violence or by placing others in reasonable fear of such harm.

4. **Procedure:** Field control tactics: The ultimate mission of law enforcement when encountering a person of diminished capacity is to control the encounter and then determine the best course of action for the subject person. This field tactical response can be segmented into four (4) distinct tactical responses: Containment, Coordination, Communication and Time.

A. Containment: Before any reasonable control and defusing techniques can be used, the subject must be contained:

1) Two (2) officers should be dispatched to an incident involving a person of diminished capacity. Should an officer find him/herself in a situation with such a person, the officer shall request a back-up officer.

2) Responding officers should avoid the use of emergency lights and siren when responding to this type of call for service. Experience has demonstrated that this may agitate the response by the subject of the call or encounter.

3) The officers shall devise a plan that separates the subject from other civilians. This containment should respect the comfort zone of the subject in order to reduce any unnecessary agitation. Officers should convince the subject that they do not have to move. Officers should continuously evaluate this comfort zone and not compress it, unless absolutely necessary.

4) It is important for officers to ensure that on-lookers and family members are not in a position to become involved either verbally or physically in the control methods.

5) Effective containment reduces the elements of agitation, such as large groupings of persons/officers emergency vehicle equipment, loud police radio transmissions, and multiple persons directing communications to the subject. Containment is meant to reduce outside influences and sources of agitation.

6) Officers should move slowly.

7) Officers should utilize all available tactics to de-escalate the situation where possible, however if an officer is faced with a dynamic and violent situation that poses a threat to the officer or other persons present, then officers should utilize their law enforcement control tactics outlined under the "Response to Resistance" policy to gain control.

B. Coordination: This is essential for control of the encounter and is the foundation for the development of an effective plan and use of personnel and resources:

1) One officer at the scene shall be designated or assume the position of being the lead officer.

2) The officer shall attempt to set up a perimeter as best as can be done under the situation, and attempt to control family members don't become involved.

3) Officers shall limit observable indications of force.

4) As soon as practical, intelligence regarding the subject being encountered should be gathered.

5) The lead officer is responsible for determining what resources should be requested including additional police personnel, specialized weapons, professional resources, and staged medical personnel.

6) When warranted, the lead officer will designate the location for a command post and staging area. This should be out of sight of the location of the subject encounter.

C. Communication with the person of diminished capacity should be planned and controlled:

1) Prior to engaging the subject in communication, the initial officer responder should await the arrival of a backup officer if possible. When dealing with subjects armed with edged weapons officers should, maintain a zone of safety that allows for reaction time.

2) One officer shall attempt to assume the duty of being the command voice and other officers should refrain from communicating with the subject if the situation dictates.

3) Verbal communication should be non-threatening. Attempt to use communications skills that draw the subject into a conversation. If the subject does not respond, it may be necessary to change the person designated as the command voice.

4) Sharp, authoritative commands should be avoided. Officers should use calming communicative attempts.

5) It has been found that threats to arrest or use force are not productive when dealing with persons with diminished capacities. Be truthful at all times.

6) Officers should constantly analyze their situation.

7) Normally, family members should not be used in an attempt to establish communications. This frequently exacerbates the situation.

D. Time is the concept of elongating the encounter, rather than hastening it:

1) History has shown that the longer the encounter is allowed to occur, the better the chance for a successful and safe resolution.

2) Increasing the time of the encounter and using defusing techniques allows the subject to reflect upon his/her predicament.

3) Creating time also allows for the field units to be supported by the deployment of additional personnel.

4) Time encourages the ability to communicate and create a relationship between the subject and the command voice.

E. Commitment procedures: The primary purpose for police response to an incident involving a person of diminished capacities is to control the situation and ensure that the person receives the most appropriate form of professional resources.

1) In determining the most appropriate form of professional resource and referral officers should consider the information provided by professional resources persons and family members.

2) It is important for the officers on the scene to determine what, if any, on-going threat potential the subject poses to him or herself, family, community and the officers. This threat potential may necessitate an involuntary commitment procedure rather than simply hand off the subject to the family for a voluntary commitment.

3) Officers shall use the resources of local crisis intervention personnel, if available, when making this commitment decision.

4) A peace officer, without a warrant, may take a person into custody if the officer: has reason to believe and does believe that the person is mentally ill; and because of that mental illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and believes that there is not sufficient time to obtain a warrant before taking the person into custody. A substantial risk of serious harm to the person or others may be demonstrated by: the person's behavior; or evidence of severe emotional distress and deterioration in the person's mental condition to the extent that the person cannot remain at liberty. The peace officer may form the belief that the person meets the criteria for apprehension: from a representation of a credible person; or on the basis of the conduct of the apprehended person or the circumstances under which the apprehended person is found. A peace officer who takes a person into custody under this Section shall immediately transport the apprehended person to: the nearest

appropriate inpatient mental health facility; or a mental health facility deemed suitable by the local mental health authority, if an appropriate inpatient mental health facility is not available. A jail or similar detention facility may not be deemed suitable except in an extreme emergency. A person detained in a jail or a nonmedical facility shall be kept separate from any person who is charged with or convicted of a crime. (Texas Health and Safety Code ß 573.001)

5) A peace officer shall immediately file an application for detention after transporting a person to a facility under Section 573.001. The application for detention must contain: (1) a statement that the officer has reason to believe and does believe that the person evidences mental illness; (2) a statement that the officer has reason to believe and does believe that the person evidences a substantial risk of serious harm to himself or others; (3) a specific description of the risk of harm; (4) a statement that the officer has reason to believe and does believe that the risk of harm is imminent unless the person is immediately restrained; (5) a statement that the officer's beliefs are derived from specific recent behavior, overt acts, attempts, or threats that were observed by or reliably reported to the officer; (6) a detailed description of the specific behavior, acts, attempts, or threats; and (7) the name and relationship to the apprehended person of any person who reported or observed the behavior, acts, attempts, or threats. (Texas Health and Safety Code ß 573.002)

6) Officers shall not use a detention facility as a holding facility for meeting the criteria of this policy unless the person also has criminal charges pending.

7) No officer shall place criminal charges against a person who is mentally ill and need of hospitalization for the purpose of avoiding transporting the person to an appropriate medical or psychiatric facility.

g. Officers are required to prepare or assist in the preparation of all required reports.

F. Use of restraints when dealing with persons of diminished capacities: These types of persons may present officers with conflicting considerations in determining the best means for restraint and transportation. The ultimate mission is to safeguard the interests of the subject and transporting officers. In some cases an ambulance may be required.

G. Reporting requirements: Officers shall prepare all required reports whether the subject of the call is arrested, committed or released. This can provide valuable information for future contacts and, when available, allows the agency to provide information to the statewide data system.

**MARTIN COUNTY SHERIFF'S OFFICE**

**STANTON, TEXAS**

### POLICY: DOMESTIC MISCONDUCT

1. **Purpose:** Law Enforcement Agency employees come from the community. They may become involved in domestic matters. Because they are law enforcement employees, the agency must take positive steps to ensure that these domestic matters do not adversely affect the employee's ability to perform, or compromise the conduct of agency missions, or create morale, operational or efficiency problems for the agency. The agency is dedicated to providing assistance for the employee during these critical times so that the employee may resolve the situation and return to being a productive member of the agency without these types of personal and family concerns.

2. **Policy:** It is the policy of this Agency to deal directly with any employee involved in acts of domestic misconduct. The ultimate mission of the agency is to assist the employee to resolve these family/relationship problems, to ensure that these acts do not adversely affect the employee or the agency during the period of resolution, and to provide the agency with a safe work environment.

3. **Definitions:**

   A. **Domestic misconduct:** The agency defines this type of conduct very broadly. This definition is broader than Texas law, but it is intended to assure the continuation of positive performance within the agency by the involved employee and other members of the agency. A domestic relationship involves any employee who is or has been married to the other party, involves any member of the employee's household, who is living or has lived with the other party, has had a child with the other party, or is or has engaged in an intimate relationship with the other party. Misconduct refers to any physical assault or battery, vandalism, stalking, intimidation, coercion, or criminal act against a party within this form of domestic relationship.

   B. **Collateral misconduct:** Any conduct by another member of the police agency to assist another agency employee in the continuation of the act of domestic misconduct. This would also include any actions designed to shield the employee or impair the ability of the agency to be informed of the domestic misconduct.

   C. **Service of court papers:** Any documents from a judicial proceeding which are designed to assist in inproving the domestic misconduct or curtailing specific actions by the parties involved in the domestic misconduct.

   D. **Self-reporting:** It is the responsibility of the employee to provide the agency with specific notice whenever he/she is involved in any acts of domestic misconduct. This is specifically true whenever the employee is the subject of any judicial proceeding concerning these types of acts, whether the employee is the person complained of or the victim.

**E. Administrative no-contact orders:** These are written orders by the Sheriff or his designee, and served upon an agency employee designed to curtail any further domestic misconduct.

4. **Procedure:** The agency shall take immediate action when notified of any act of domestic misconduct involving an employee of this agency.

   A. When the incident occurs within the jurisdiction of this agency:

      1) Assign the call for response by a uniformed officers and a supervisor. In cases where no supervisor is on duty, a supervisor will be notified and respond.

      2) The supervisor will assure that any violence is curtailed, all parties are protected, and any required medical assistance is provided.

      3) The supervisor shall ensure that all evidence is properly recorded and collected.

      4) The supervisor is responsible for the criminal investigation, if warranted. The Sheriff shall oversee the conduct of the investigation.

      5) The supervisor shall notify the Sheriff at the earliest moment.

      6) The decision to arrest an agency employee involved in domestic misconduct shall be the responsibility of the supervisor. When probable cause exists, the employee shall be arrested and processed the same as any civilian.

   B. The supervisor shall ensure that there is no continuation of the domestic misconduct.

      1) Ensure that victim advocate assistance is offered and provided when necessary.

      2) Ensure that an immediate safety plan is discussed with the victim of the domestic misconduct and assist in any manner to ensure this continued safety.

   C. The Sheriff or his designee shall be responsible for:

      1) Issuing an administrative no-contact order to the agency employee if warranted.

      2) Ensuring that the appropriate assignment decision is made regarding the agency employee.

      3) Ensuring that the criminal investigation has been conducted in a reasonable manner.

      4) Developing and/or implementing any necessary safety plan to ensure employee safety.

      5) Conducting the administrative investigation of the incident and any collateral employee misconduct. The agency shall be listed as the complainant.

   D. When the incident involving domestic misconduct occurs in a jurisdiction other than that of this agency:

1) The agency person notified of this incident shall immediately notify the Sheriff or Chief Deputy in the absence of the Sheriff. The Sheriff and Chief Deputy shall comprise the investigation team in charge of the incident.

2) The Sheriff or Chief Deputy in the absence of the Sheriff, shall make immediate contact with the involved agency to ensure that our agency is kept on notice of the progress of the investigation.

3) The investigation team shall ensure that the employee and the persons involved are aware that the agency will assist them during this process.

4) The investigation team is responsible for determining whether an administrative no-contact order is warranted and will be responsible for serving this upon the agency employee, when necessary.

E. Service of court orders:

1) The investigative team shall facilitate, when requested, the service of any court orders upon agency employees.

2) The investigative team shall be responsible for the determination regarding any assignment limitations involving the employee who is subject to the court order.

F. **Conviction of a crime of domestic violence:** When a sworn employee is convicted or pleas to any crime related to domestic violence that brings in the provisions of 18 U.S.C. 922(g)(9) law, the employee shall be terminated as not being able to function completely within the job classification for which she or he was hired.

MARTIN COUNTY SHERIFF'S OFFICE
STANTON, TEXAS

POLICY:  DUTY TO DISCLOSE

1.  **Purpose:**  An agency and its personnel could be subject to civil liability in court for failing to disclose to a prosecutor any evidence that may be favorable to a defendant.  The purpose of this policy is to ensure that agency personnel are in compliance with the landmark United States Supreme Court decisions of Brady v Maryland (1963) and Giglio v United States (1972) and their progeny.

2.  **Policy:** It is the policy of this agency that all employees be truthful during any investigation, including administrative investigations, and in all written reports.  Failure to adhere to this principle will result in termination.

    It is the policy of this agency to require that law enforcement personnel provide all potentially exculpatory evidence to prosecutors.  Furthermore, it will be the responsibility of the Sheriff or his designee to review all officers' files to determine if any officer has a disciplinary history that might impact the officer's credibility as a witness.  This information should be made available to the prosecutor for a determination of whether the conduct is "Brady" material prior to the officer's appearance. The final determination as to whether information is turned over to defense counsel is determined by the prosecutor.

3.  **Definitions:**

    A.  Duty to Disclose:  The landmark decision of Brady v Maryland (1963) places an affirmative constitutional duty on a prosecutor to disclose exculpatory evidence to a defendant.  This duty has been extended to police agencies through case law, requiring law enforcement agencies to notify the prosecutor of any potential exculpatory information.  It is the prosecutor's responsibility to make the decision whether to disclose this evidence to the defendant.

    B.  Exculpatory Evidence/Brady Material: Evidence in the government's possession that is favorable to the accused and that is material to either guilt or punishment, including evidence that may impact the credibility of a witness, including law enforcement officers.

    C.  Credibility (*Giglio/Kyles*) Evidence:  This normally would include any disciplinary or other sanctions of a law enforcement officer such as false statements or false reports.  Dealing with informants and potential citizen witnesses can create credibility issues when the agency provides payments or assistance to the witness and fails to maintain adequate documentation of this relationship.

4.  Note: The current case law and appeal decisions are not consistent in what constitutes a *GiglioKyles* issue when it applies to law enforcement officers.  Many

decisions indicate that the false statement or report must involve a testimonial activity of the officer rather than a violation of internal procedural matters, such as abuse of sick time or damaging an agency vehicle procedure.

## A. Investigative practices:

1) It is the policy of this agency that all exculpatory evidence will be gathered and turned over the prosecutor.

2) The agency will meet with the prosecutor's office to determine what investigative materials and/or information that office believes might be exculpatory.

3) Officers/investigators are required to document all investigative activity involved in an investigation, including exculpatory information. This will include handwritten notes, any leads even those that are not considered productive and any investigatory activities regarding the specific investigation that might be conducted by agency employees not directly assigned to the specific investigative case.

4) All official reports involving an investigation will be submitted to the prosecuting authority prior to actual prosecution of the case. The prosecutor will determine what information contained in the case file will be provided to defense counsel.

## B. Credibility Evidence:

1) Under the concepts of the *Giglio/Kyles* decisions, witnesses who will be used by the prosecutor must be identified. Any information concerning each witness that might be considered exculpatory must be turned over to the prosecutor for the decision whether it must be disclosed to the defendant. This would include any issues that might affect the witness' credibility.

2) The agency will consult with the prosecution offices normally handling this agency's criminal cases to determine specific guidance for the determination of potential witness credibility issues.[i]

3) With respect to civilian witnesses, any information which may indicate the person has a motivation beyond civic duty must be disclosed. i.e. law enforcement reduces or does not charge the subject with a crime in exchange for information or testimony.

4) Investigators are required to notify the prosecutor of any potential credibility issue involved with any potential witness in the case. This includes any on-going relationship and financial or case alterations with informants.

5) The Sheriff will maintain a list of agency employees who might have disciplinary or other sanctions for false statements and/or reports, including open cases with these types of allegations. The agency will

ensure that the prosecutor's office is aware of this material and can access it whenever a case being prosecuted warrants. It is the responsibility of the prosecutor to determine whether this information is exculpatory and must be disclosed to the defendant. Each agency employee who is placed on this list shall be notified and be allowed an opportunity to discuss the issue with both the IA/designated unit and/or prosecutor.

C. Employee truthfulness:

    a. The credibility of this agency is the foundation of its professional place in our community. The agency and all employees must not tarnish this image even if the employee believes the end result will benefit the community. This agency does not subscribe to the concept of "Noble Cause" in any form. "Noble Cause" is a concept where the law enforcement officer believes that departing from legal and professional constraints in the arrest and prosecution of a suspect is acceptable if the suspect is "factually" rather than "legally" guilty of criminal conduct. An example would be when contraband is illegally seized and the officer writes the reports in a manner to reflect that the seizure was consistent with the current law and Constitutional protections.

    b. All agency employees shall be truthful in all conduct and in the preparation of all reports. This agency will terminate any employee failing to adhere to this absolute principle.

    c. It is incumbent that the agency ensure that final disposition of potential *Giglio/Kyles* allegations are actual integrity failures and not innocent mistakes or oversights by the employee.

    d. Where possible, the agency will not return an employee to an enforcement capacity in a case where the agency has determined the officer to be untruthful but the disciplinary process including the appeal has determined that the officer will be reinstated notwithstanding a finding that the officer was untruthful. This does not include cases where the officer has been exonerated of the untruthfulness. .

    e. The Training Section will ensure that all sworn personnel are familiar with the requirements of this policy and will stress the importance of credibility as an essential requirement of being able to function as a police officer. This will be addressed either in training or written bulletin every year.

---

[1] U.S. Attorney General Janet Reno, during her administration, issued a DOJ guideline to help AUSA personnel to determine exculpatory or impeachment evidence: (1) misconduct that reflects upon truthfulness; (2) past or present pending criminal charges against the involved officer; or (3) credible allegation that reflects upon truthfulness or bias.

## MARTIN COUNTY SHERIFF'S OFFICE
## STANTON, TEXAS

## POLICY: EMPLOYEE NEPOTISM & FRATERNIZATION

1. **Purpose**: The purpose for this directive is to establish Agency policy on personal relationships between Agency employees which give rise to an actual or perceived potential conflict of interest with professional responsibilities and/or which create the potential for an adverse impact on Agency operations, safety, efficiency and morale.

   As an organization that is heavily dependent upon its human resources, the Agency has a vital interest in the maintenance of harmonious, efficient, and productive working relationships between its employees. Personal relationships that cause unrest, lend themselves to the perception of favoritism, adversely affect morale, or otherwise disrupt the good working order of the Agency are undesirable.

2. **Policy:** This Agency is committed to the principle that the most qualified candidates will be selected for positions in the Agency, for promotions and for assignment to specialized positions. Employees who are related to or who are engaged in a romantic relationship with candidates for hiring selection, promotion or assignment to specialized positions must ensure that all reasonable precautions are taken to avert any undue influence in the selection process or even the appearance of impropriety in the process. It further recognizes the rights of employees to become involved in personal relationships with their co-workers. However, it is the policy of the Agency to ensure that its employees carry out their duties with impartiality and fairness so that public and organizational confidence in the actions of our employees is maintained. Public trust, workplace safety, agency operations and Agency morale require that employees avoid the appearance of or actual conflict of interest between their professional responsibilities and any involvement in a romantic or sexual relationship with other employees. In order to promote efficient operation of the Agency and avoid misunderstandings, complaints of favoritism, sexual harassment and/or gender-based discrimination, and other problems of supervision, safety, agency operations, and employee morale, all employees are instructed to avoid situations that give rise to an actual or perceived conflict.

3. **Definitions:**

   A. **Family relationship**: A relationship resulting from family ancestry or marriage. For this policy this includes spouse, parent (including foster, step, and in-law); children (including adoptive, foster, or step); brother or sister; grandparent or grandchild; aunt or uncle; niece or nephew; or any other relative living in the same household as the employee or another individual related by blood, marriage, or

quasi-marriage in the same household as an Agency employee. Relative includes a significant other or domestic partner.

B. **Personal relationship:** For purpose of this policy, personal relationship is a relationship involving employees who are dating, engaged in a romantic relationship or cohabitating.

C. **Supervisor:** An employee who has authority, direct or indirect, over another employee by virtue of their rank or job classification.

D. **Subordinate:** An employee who is answerable to another employee based on their rank or job classification.

E. **Dating:** One or more social meetings between employees under circumstances reasonably intended to lead to a romantic relationship.

4. **Procedure:**

A. **Hiring, promotion and assignment to specialized positions:**

1) Employees who are related to or involved in a romantic relationship with a candidate for hiring selection, promotion or assignment to specialized positions shall not be involved in the selection process. Should an employee related to or involved in a romantic relationship be required to participate in any of these selection processes due to an absence of available alternatives, the final selection decision is subject to approval of the Sheriff or his designee.

2) **Supervisory procedures:** An employee generally shall not directly supervise a relative or another employee where a personal relationship exists. It will be incumbent upon the subordinate to select assignments which will not put them under the supervision or management of a relative or someone with whom they have a personal relationship.

3) **Working conditions:** Relatives or employees who are engaged in a romantic relationship shall not be assigned to the same shift or unit without specific approval of the Sheriff or his designee.

4) **Duty to notify:**

   a. In the event that an employee becomes involved in a romantic relationship with another Agency employee, they shall notify the Sheriff in person as soon as possible. Employees who find themselves working in close proximity to a relative or another employee with whom they have a personal relationship shall notify the Sheriff of the circumstances.

   b. If a supervisor and a subordinate marry or cohabitate, the Sheriff or their designee will review the working relationship of the two employees and determine if it creates a potential conflict of interest or an adverse impact on supervision, safety, operations or morale. The Sheriff or their designee will make reasonable efforts to transfer, reassign, or otherwise resolve the situation so that one of the employees is placed in a position where the

conflict potential no longer exists.  Prior to any reassignment, the Agency will receive input from the involved employees.

c.   The Sheriff or their designee shall take appropriate steps to ensure that involved employees' working conditions are modified to eliminate potential conflicts of interest and adverse workplace performance problems.

d.   As directed by the Sheriff a written report regarding the situation and his/her resolutions.  This report shall be transmitted to the Sheriff.

e.   Failure by an employee to report personal relationships to their superior officer compromises the integrity of the Agency, disrupts the work environment, causes decline in morale and can reduce productivity.  Any failure to report relationships as required by this policy shall constitute misconduct and may subject an employee to disciplinary action.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

## POLICY: ETHICS

I. **Purpose:** Law enforcement employees, representing government, bear the heavy responsibility of maintaining their own conduct, and the honor and integrity of the government entity that they represent. It is the purpose of this policy to provide additional guidance to the standards of conduct embodied in the law enforcement officer's code of ethics, this agency's mission statement and core values so that employees of this agency will better understand prohibitions and limitations pertaining to their conduct and activities while on and off duty.

II. **Policy:** This Agency will maintain the highest standard of integrity by never violating the community's trust. All Agency employees must recognize that they are held to a higher standard than the private citizen because, in addition to representing the Agency, they also represent the law enforcement profession. Conduct, on and off duty, must be beyond reproach. Agency employees must avoid any conduct that might compromise the integrity, morale, operations or efficiency of the Agency. (Texas Ethics Commission, "A Guide to Ethics Laws for State Officers and Employees", revised April 24, 2008)

III. **Definitions:**

   A. Ethical Conduct: In the context of this policy, ethical conduct means the duty of all employees to conduct themselves at all times in a manner that reflects the ethical standards consistent with the rules and values published by this agency.

IV. **Personal Conduct:**

   A. Oath of Office: All sworn employees will take and abide by an oath of office before assuming sworn status. The oath of office is administered by the agency head or his representative.

   B. Ethical Conduct: The Agency will maintain the highest standard of integrity by never violating the community's trust. All Agency employees must recognize that they are held to a higher standard than the private citizen because, in addition to representing the Agency, they also represent the law enforcement profession and their local government. Conduct, on and off duty, must be ethical conduct.

   C. All sworn officers shall abide by the Law Enforcement Code of Ethics.

   D. Abuse of position: Employees shall not use their Agency position, identification card, or badge for:

   a. Personal or Financial gain

   b. Obtaining privileges not otherwise available except in performance of official duty

    c.   Avoiding consequences of illegal acts

    d.   Employees shall not under any circumstance solicit any gifts, service, gratuity, discount, or anything of value where there is any direct or indirect connection between the solicitation and their Agency membership, without the expressed written permission of the agency head.

    e.   Employees shall not accept any gift, service, gratuity, discount or anything of value, the acceptance of which might tend to influence directly or indirectly their actions in any police business; or which might tend to cast an adverse reflection on the Agency or any employee thereof.

V.   **Associating with criminal element:** No employee, except in the discharge of duty, may knowingly associate with persons engaged in unlawful activities.

VI.   **Gifts and Favors.** Each employee of the Agency bears the heavy responsibility of maintaining, in his own conduct, the honor and integrity of all government institutions. He shall, therefore guard against placing himself in a position in which any person can expect special consideration or in which the public can reasonably assume that special consideration is being given. Thus, he should be firm in refusing gifts, favors, or gratuities, large or small, which can, in the public mind, be interpreted as capable of influencing his judgment in the discharge of his duties. In accord with this section, all members of the Agency shall comply and be guided by Chapter 36, Texas Penal Code. Section 36.08 (Gift to Public Servant) and 36.09 (Offering Gift to Public Servant) does not apply to: (6) an item with a value less than $50, excluding cash or a negotiable instrument as described by Section 3.104, Business & Commerce Code.

VII. **Informants:** Employees shall maintain a professional relationship with agency informants and shall not have any social, business or any other relationship beyond that required for purposes of agency business with the informant.

VIII.**Violations of ethical standards:** Ethical conduct violations will be investigated by the appropriate authority to determine the validity of complaints and to report findings as prescribed by existing policies and procedures.

IX.  **Employee responsibilities:** Employees must exercise judgment, initiative, and sound reasoning in all official transactions; strive for efficiency and effectiveness, exercise restraint in difficult situations, seek self-improvement through formal and informal training, and assist fellow officers whenever possible. In situations where no written directive or supervisory guidance is available, employees are expected to analyze the situation and react in accordance with the mission statement and the core values of this agency.

X.   In the performance of their duty, officers are called upon to make difficult decisions and must exercise discretion in situations where rights and liabilities are affected by conduct and judgment. Decisions are not made easily and involve choices which may cause hardship or discomfort. Police Officers must be faithful to their oath of office, the mission statement of this agency, the principles of professional police

service, and the objectives of the Agency.  In the discharge of duty, they must not allow personal motives to govern decisions and conduct.

**XI.  Conduct Unbecoming an Officer:**  The conduct of a public employee, on and off duty, reflects upon the Agency.  Employees must avoid conduct which might discredit themselves or adversely affect the morale, operations or efficiency of the Agency.

**XII. Courtesy:**  Effective law enforcement depends on a high degree of cooperation between the Agency and the public.  While the urgency of a situation might preclude ordinary social amenities, discourtesy under any circumstance is indefensible.  Employees shall be courteous and civil to the public and others, avoiding harsh, violent, profane, or insolent language or manner, and shall maintain objective attitudes regardless of provocation.

**XIII.Attention to duty:**  As most police work is performed without close supervision, responsibility for proper performance of duty lies primarily with the officer.  An officer has a responsibility for the safety of the community and his or her fellow officers, and discharges that responsibility by faithful and diligent performance of duty.

**XIV. Financial Obligations:** Employees should avoid incurring financial obligations which are beyond their ability to satisfy.

**Note:** Training-The Agency will strive to include a component of ethics in all in-service training.  The Agency shall conduct annual in-service training on ethics.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

**POLICY: EXCITED DELERIUM**

I.  **Purpose:** The purpose of this policy is to provide all personnel with knowledge and awareness of excited delirium; its causes; its symptoms; and the proper procedure to be followed when excited delirium is recognized.

II.  **Policy:** It is the policy of this agency to take active steps to recognize and accomplish the safe restraint and turn over to emergency services personnel persons who are in the midst of an excited delirium episode.

III.  **Definitions:**

    A.  **Excited Delirium:** state of extreme mental and physiological excitement, characterized by extreme agitation, hyperthermia, epiphoria, hostility, exceptional strength, and endurance without fatigue.

    B.  **Hypoxia:** an inadequacy in the oxygen reaching the body's tissues.

    C.  **Hyperthermia:** Unusually high body temperature.

    D.  **Hypoglycemia**-lower than normal level of blood glucose

IV.  **Causes of Excited Delirium**

    A.  Drug Use

    B.  Hypoxia

    C.  Hypoglycemia

    D.  Stroke

    E.  Intracranial Bleeding

V.  **Identifying Persons Suffering from Excited Delirium:**

    A.  Irrational Speech/ Speaking in Gibberish

    B.  Shouting, Yelling, or screaming

    C.  Confusion

    D.  Sudden changes in behavior i.e. raging followed by sudden calmness

    E.  Paranoia, believe that someone is after them

    F.  Frightened/Panicky

    G.  Hallucinating/hearing Voices

    H.  Violent/Destroying Property

    I.  Unexplained Strength/Endurance

J.  High level of Pain Tolerance

K.  Sweating Profusely/High Body Temperature

L.  Foaming at mouth

M.  Drooling

N.  Dilated Pupils

O.  Evidence of Self-inflicted injuries

P.  Removing Clothing

Q.  Completely Naked

## VI. Procedures:

### A.  Initial Response (CALMS)

a.  Containment-ensure the subject is contained in a manner which protects all persons including the officer(s) and the subject and that the subject is controlled within the containment area.

b.  Announcement-let the dispatcher know that the officer believes he/she is dealing with an excited delirium subject.

c.  Lots of Backup-even in small agencies, mutual aid should be immediately sought to enable the officers to effectively deal with the subject. Extra officers are necessary to deal with custody procedures which are, as indicated in the cases above, extremely difficult. In situations where the subject is outside, the extra officers will also be necessary for the containment perimeter. If there are specially trained crisis intervention officers, or trained negotiators available, they should be called.

d.  Medical Attention-shall be called to the scene and staged to provide immediate medical attention to the subject once the subject is controlled and it is safe to do so.

e.  Slow down...If safety of public or third parties is not in danger, take your time.

f.  Upon gaining control and restraint, officers shall immediately place the subject in a position which facilitates breathing. i.e. sitting up or on his/her side.

### B.  Tactical Response

a.  Pre-plan with assignments i.e. which officer is going to play what role.

b.  When utilizing a TASER in the probe mode to accomplish restraint, if possible use a single deployment coupled with immediate restraint to decrease the likelihood of a drawn out confrontation which may further diminish the subject's respiration levels.

c.  Remember trigger-touch: persons suffering from excited delirium may become more agitated by some triggering event i.e. close in on body space or touching.

    d. Officer assigned for each limb has been found to be effective for purposes of control during the restraint process.

    e. Officer assigned to protect the head during the restraint process and speak calmly to the subject in an effort to reduce agitation.

    f. A Four Officer Approach contemplates at least one officer for each limb.

    g. Do not take to jail. Get medical help immediately.

    h. Pass to Medical immediately if available upon accomplishing control/restraint.

C. **EMS Response:** The following steps are recommended for EMS personnel:

    a. Follow all local medical protocols;

    b. Consider using a pulse oximeter to determine oxygen levels;

    c. Utilize a cardiac monitor to monitor cardiac condition;

    d. Consider external cooling measures where appropriate;

    e. Conduct a blood-glucose test

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

POLICY:  FILMING OF LAW ENFORCEMENT ACTIVITY

I.  **Purpose:** The purpose of this policy is to direct members of this agency with respect to the proper law enforcement response to citizens who are filming officers.

II.  **Policy:**  It is the policy of this agency to uphold the Constitutional Rights of all persons. This policy includes ensuring the First, Fourth, and Fifth Amendment rights of individuals to document the conduct of members of this agency through video and audio recording are facilitated.

III.  **Definitions:**

    A.  **Legal Presence/Lawful Presence:** Any area where a person has the legal right to be thus, private property owned or occupied with permission of the property owner; public buildings such as stores, malls etc. and public areas such as streets, sidewalks etc.

    B.  **Recording Device:** Any device capable of recording audio or video to include but not limited to cameras (still and video); recorders; cellular devices, PDAs, tablets, or any other device capable of such recording.

    C.  **Enforcement Action:** Includes but is not limited to arrest; detention; seizure of recording equipment; deletion of video/audio; damaging the equipment; threatening, intimidating, discouraging, or coercive conduct aimed at ending the recording; blocking or otherwise obstructing the ability to record without a proper law enforcement objective such as an open air crime scene where it is necessary to block the view for the integrity of the investigation;

    D.  **Designated First Amendment/Safety Zone:** A geographic area designated for demonstrations/protests balancing the right to protest with the right of citizens not involved in the protest to safely travel through the area.  Such areas are sometimes designated for purposes of controlling the safety of all persons during large scale demonstrations/protests.

IV.  **Procedure:**

    A. Members of this agency shall not prohibit the recording of law enforcement activity or take enforcement action under circumstances where the person making the recording has legal presence in the area where they are standing.

    B. Recording law enforcement action from an area where the subject is lawfully present does not constitute an offense.

    C. Officers shall not take enforcement action by way of intimidation or coercion to end the recording; by obstructing the ability to record from an area of lawful presence; or by discouraging the person from continuing the recording.

D. Every person has a First Amendment right to observe and record law enforcement officers in the discharge of their public duties.

E. Recording law enforcement officers engaged in public duties is a form of speech through which private individuals may gather and disseminate information of public concern, including the conduct of law enforcement officers.

F. Members of this agency should be aware that the First Amendment gives no heightened protection to members of the press, thus, members of the public have the same rights to recording as would a member of the press.

G. If someone at a demonstration is filming officer conduct no enforcement action will be taken irrespective of pre-established demonstration/safety zones unless it can be established that they are a threat to security.

H. All persons also have a First Amendment right to verbally challenge and criticize an officer who is making an arrest. Such a challenge includes the right to document the officer's actions through audio and visual recording.

I. Obstruction/Hindering/Interference type charges against a person recording are generally inappropriate except:
   a. When the person, through their actions puts the officers' safety, the suspect's safety, or the public's safety at risk. Some court decisions have indicated that without physical action or a threat toward an officer no arrest will be justified.
   b. The recorder enters a clearly marked crime scene without authorization.
   c. The recorder enters an area which is closed to the public and clearly marked due to an ongoing emergency i.e. SWAT scene; fire scene etc.
   d. The recorder enters private property which is not open to the public without the authorization of the owner/occupier of said property. In such a case, the officer should determine the wishes of the owner/occupier before taking significant enforcement action such as an arrest. Where an arrest is indicated, the officer must follow the legal mandates of arrest, for example a required warning in a trespass case.

J. When confronted with a person who the officer perceives as bordering on a lawful obstruction or hindering charge, the officer shall, where practical and feasible, inform the subject that their actions are interfering with the officer's duties and ask them to move to a less-intrusive position where they can continue to record but will not interfere.

K. When an officer is considering taking enforcement action such as an arrest or the seizure of a recording device, the officer shall call a supervisor for direction. If no supervisor is on-duty, the officer shall make contact with the on-call off-duty supervisor.

L. Seizing, Manipulating, Erasing, Deleting or Inspecting Devices or Recordings:
   a. Officers and supervisors are advised that there is a heightened reasonableness requirement when officers seek to seize items protected by the First Amendment as is the case when dealing with recordings under this policy. Thus, more facts and circumstances and a greater government interest must be present before officers and supervisors should consider such a seizure.

b. Officers shall not erase, delete, or otherwise corrupt a recording held by an individual.

c. The seizure of a recording device or the recording itself constitutes a seizure under the Fourth Amendment and unless one of the warrant exceptions i.e. consent or exigency apply, the seizure must be supported by a warrant.

d. If the officer has reason to believe that the person intends to publicly broadcast the recording, the seizure of the equipment and the tape even with a warrant may violate the Privacy Protection Act. 18 U.S.C. 2000a which provides: 42 U.S.C. sec. 2000 (aa):..."Notwithstanding any other law, it shall be unlawful for a government officer or employee, in      connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce..."

e. In all cases prior to a lawful seizure, officers should consider seeking the consensual cooperation of the individual in possession of the recording and where possible record the consent.

    i. Consent must be voluntary on the part of the individual and must not be the result of duress or coercion.

    ii. Officers should attempt to have the exchange in seeking consent recorded even if it is done on the recording device at issue.

f. An officer considering such action shall notify a supervisor before such action is taken unless there is a life threatening emergency.

g. Exigency for purposes of this section would include:

    i. Recordings of violent criminal acts where the recording is essential to the identification and apprehension of the criminals and law enforcement has no other immediate means of making the identification and

    ii. The officer reasonably believes that a failure to immediately view or preserve the recording will lead to the destruction or loss of this evidence; and

    iii. Cooperation through consent cannot be obtained from the subject in possession of the recording.

M. Supervisory Responsibility: where resources allow a supervisor shall respond to the scene where an officer is considering taking significant enforcement action against a person in possession of a recording of a law enforcement event.

a. As with an officer, a supervisor who reasonably believes that the person's conduct is approaching the level of a criminal offense, the supervisor shall seek the voluntary cooperation of the person to move to a location where their actions will not interfere but they will still be able to record the event.

b. The supervisor will seek the consent of the individual holding the recording/recording device to obtain a copy of the recording or to allow law enforcement to otherwise preserve this recording.

c. In cases where consent cannot be obtained and no life-threatening emergency is on-going, the supervisor shall contact the prosecutor for advice.

  d. A warrant shall be obtained unless an exception to the warrant requirement can be met.

  e. If the person holding a recording indicates an intent to publicly broadcast the recording, the supervisor, in consultation with the prosecutor should consider the impact of the Privacy Protection Act upon any seizure of the recording.

N. Where a seizure of the device or recording is authorized by law the agency shall:

  a. Only maintain custody of the device as long as necessary to seize the necessary recording from the device by a person who has the technical certifications to support the admissibility of the recording into evidence.

  b. The items shall be returned to its lawful possessor within 72 hours, unless otherwise ordered by the prosecutor's office and authorized by the court.

  c. Upon return of the device to its rightful possessor, the recording itself shall be left intact.

O. **Crimes Unrelated to Filming a Law Enforcement Event:** This policy does not impact the ability of officers to seize recordings of evidentiary value when conducting investigations of criminal activities. For example: A subject is arrested for rape where the victim indicates the crime was filmed and when arrested the suspect has a video camera in his backpack. The rules of search incident to arrest or warrant related searches of this camera are unaffected by this policy.

# MARTIN COUNTY SHERIFF'S OFFICE

## JAMES B. "BRAD" INGRAM, SHERIFF





January 23, 2018

EFFECTIVE IMMEDIATELY:

As of this date this office will initiate a new hiring policy for the position of Deputy Sheriff, Dispatcher, Jailer, or any other position that might be created in the future.

PRE-EMPLOYEMENT REQUIREMENT

All persons selected for full time employment with the Martin County Sheriff's Office, and currently hold a license for that position, will be required to have a medical and psychological exam, regardless of the length of the break in their service record.

Unlicensed applicants will be required to have the above mentioned test per TCOLE requirements.

The Martin County Sheriff's Office will Select the service provider and pay for the exams in full.

Reserve or Part Time applicants will be financially responsible for the above testing.

ALL EMPLOYEES MUST PASS DRUG TESTING PRIOR TO STARTING EMPLOYMENT.

M1

301 N. ST. PETER ST / PO BOX 1127, STANTON, TEXAS 79782
OFFICE 432.756.3336 FAX: 432.607.2992
HTTP://CO.MARTIN.TX.US

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

## POLICY: HIRING PRACTICES

I.  **Purpose:** The purpose of this policy is to outline and direct the hiring process and practices for employment as a sworn member of this agency.

II.  **Policy:** The policy of this Agency is to hire only those persons qualified for employment in law enforcement. This Agency seeks the highest level of professionalism and integrity by its members and recognizes that this commitment begins with the selection of candidates for this Agency.

III.  **Procedure:**

    A.  This Agency shall provide each applicant with a step-by-step checklist outlining the process by which this agency selects individuals for employment as a sworn Officer.

    B.  The checklist shall include all requirements that must be met prior to consideration for employment by the agency, i.e. U.S. Citizenship, educational level attained, valid driver's license, TCOLE Certification where applicable pre-application.

    C.  The Office shall provide each applicant with a declaration of anti-discrimination with respect to the hiring process.

    D.  Each applicant must apply in writing using the Agency prescribed application form. All questions on the form must be answered completely and truthfully.

    E.  Any determination by the Agency that an applicant has been deceptive in a response either verbally or in writing during the hiring process shall be immediate grounds for dismissal from the process.

    F.  Any determination by the Agency that a candidate who has been hired was deceptive during the hiring process shall be grounds for termination from the Agency.

    G.  Each applicant must provide documentation of the essential requirements, i.e. driver's license, social security card, high school and college diplomas, DD214, proof of citizenship etc. upon submission of the application.

    H.  Each applicant must sign prescribed waivers with respect to prior medical, psychological, credit, education, & criminal history including sealed and juvenile records.

    I.  Each applicant must sign an affidavit indicating whether they have ever been the subject of a domestic restraining or protective order or whether they have ever been previously convicted of a domestic violence related offense.

    J.  Each applicant who successfully passes will then proceed to the background examination process. This process shall include:

a. Verification of applicant's responses in the written application.

b. Applicant's driving history.

c. Criminal History check of applicant including checks in all former states of residency.

d. Survey law enforcement agencies in locales where applicant has resided or known to frequent. This survey should include a CAD inquiry of the applicant's former residences during the period of the applicant's residency.

e. Credit History report.

f. Check of National Database that registers officers who have been de-certified by a state POST.

g. References listed as well as removed references (background investigator should ask the listed references for the identities of additional persons who know the applicant allowing the investigator to speak to persons who have knowledge of the applicant but who were not listed by the applicant.

h. All former employers, to the extent possible, must be interviewed.

i. Un-named persons known to the applicant, such as neighbors, former neighbors, school officials etc. should be sought out and interviewed.

j. In cases where form letters have been sent out to references but have not been returned, the investigator shall make every effort to contact that individual either face-to-face or by telephone to make an inquiry as to the applicant' suitability for employment by the agency.

k. Following the background investigation, the investigator shall compile a background summary and make a recommendation with respect to the applicant's suitability for employment with the agency. In cases where the investigator is recommending that the applicant not be considered for employment, the investigator shall provide specific, detailed information as to the reasons supporting the recommendation.

K. Following the successful completion of the background investigation each remaining applicant shall undergo an objective interview. Each applicant interviewed shall be asked the same group of specific questions. Follow-up questions for clarification may be asked by the interviewer(s). Additionally, interviewers shall be provided with the applicant's background investigation prior to the interview so that questions relating to the background may be incorporated into the interview process.

L. Once all applicants have been interviewed, the interviewer (s) will make recommendations to the hiring authority with respect to which applicants should be considered for employment.

M. This Agency will not consider persons for hire where the background examination, interview, or any other portion of the application process puts the agency on notice that the candidate has a propensity to engage in conduct that could harm a member of the public.

**N.** Conditional offer of employment-Prior to medical and psychological exams, it is necessary under federal law to make a conditional offer of employment to the candidate. A conditional offer essentially holds that if the candidate passes the medical and psychological exam, they will be hired by the agency.

    **a.** Medical Examination: A licensed medical practitioner who is familiar with the job tasks of a law enforcement officer will conduct this exam.

        **i.** Drug screening shall be conducted of all candidates who have received a conditional offer of employment.

        **ii.** The medical examination will include a review of the candidate's medical history of injury/illness that may impact the candidate's ability to meet the job task of a law enforcement deputy. This review of medical records is limited to review by the doctor who will determine whether the candidate is medically cleared for a position with this Agency.

    **b.** Psychological Testing-Each applicant who has received a conditional offer of employment shall undergo the prescribed psychological testing to determine his or her suitability for the law enforcement profession.

MARTIN COUNTY SHERIFF'S OFFICE
STANTON, TEXAS

POLICY: IDENTIFICATION

1. **Purpose:** The purpose of this policy is to outline the manner in which criminal suspects will be subjected to identification proceedings.

2. **Policy:** The policy of this Agency is to respect the rights of all persons who officers come into contact with during any law enforcement operation in which witness identification will be conducted.

3. **Definitions:**

   A. **Show-Up/Drive-by:** The process by which a complainant or witness is driven to a suspect who has been stopped in the area of the crime for purposes of excluding or verifying the suspect as the person responsible for the crime through recognition by the complainant or the witness

   B. **Photo-Array:** The process by which a complainant or witness is shown a series of photographs which may contain a suspect in the crime for purposes of excluding or verifying the suspect as the person responsible for the crime through recognition by the complainant or the witness.

   C. **Single Photo Verification:** The process by which a complainant or witness is shown a single photograph due to the fact that they have thorough familiarity with the person who is suspected in the criminal activity and law enforcement is simply verifying that the suspect identified by the police is the same subject known to the witness.

   D. **Line-up:** The process by which a complainant or witness is allowed to view a group of individuals, in person, for purposes of excluding or verifying the suspect as the person responsible for the crime through recognition by the complainant or the witness.

4. **Procedure:** In all identification procedures officers should take steps to ensure that the procedure is not suggestive by the manner in which it is carried out. Thus, officers should use caution as to the manner in which suspects are presented such that a suspect may later claim that the officer influenced the witness' identification of the suspect. Each eyewitness who views a lineup or photo spread shall sign a form containing the following information:

   1) The suspect might not be in the lineup or photo spread and the eyewitness is not obligated to make an identification.

   2) The eyewitness should not assume that the person administering the lineup or photo spread knows which person is the suspect in the case.

   A. **The Validity of identification procedures rests on the following considerations:**

1) Witness' opportunity to view suspect at the time of the crime.

2) Witness' focus of attention at time of crime.

3) Accuracy of witness' description of suspect prior to identification procedure.

4) Level of certainty exhibited by the witness in making the identification.

5) The length of time that has passed between the crime and the identification.

6) Note-Police should document the existence/lack of existence of these points when compiling reports on identification procedures

B. **Show-Up/Drive-by Identification-** Although the United States Supreme Court has not affixed a duration of time within which these procedures are to be conducted, generally this type of identification occurs within a short period of the crime and within a reasonable proximity (geographically) from the crime.

1) Unless an extreme emergency exists, the complainant or witness shall be taken to the location where the suspect has been stopped. The movement of the suspect to the witness' location may constitute an arrest for which probable cause is required. To the extent that probable cause is lacking without identification, movement may be determined to have been an unlawful arrest.

2) To the extent that an officer may safely do so, the officer should take steps to minimize the suggestiveness of the identification. The following should be considered:

a. Have suspect standing outside of any law enforcement vehicle rather than in the vehicle.

b. Have the suspect standing without handcuffs or with handcuffs not visible to the witness.

c. The appearance that suspect maintains his or her freedom will undercut suggestiveness.

d. If items taken or used in the crime have been recovered, do not allow the witness to view or become aware of the recovery until after the identification proceeding is complete.

e. The witness' failure to recognize the subject stopped must be documented and included in any materials forwarded to the prosecutor who ultimately handles the case. Such evidence may be exculpatory to the suspect who is charged with the crime. As such it must be forwarded to the prosecutor. Additionally, if the witness identifies a suspect in the future, this failure to identify the first subject presented to them may add credibility to their identification.

C. **Photo-Array/Photo-Pack:**

1) The array must contain at least six photos and include at least some persons who are similar in appearance i.e. facial hair, glasses, age etc.

2) All photos must include persons of the same race and sex as the suspect.

3) Photos should be presented in a way that does not suggest that the subjects in the photos are criminals i.e. mug-shot with numbers (Mug shots may be used, but portions of photo that would indicate that photo is mug-shot should be cropped or hidden from the witness.)

4) Witness instruction. The person viewing the photo-array should be told that the perpetrator may or may not be in the photo-array and that the investigation will continue regardless of whether an identification is made or not.

5) If there are multiple witnesses, the suspect should be placed in a different position in the photo-array for each witness. Witnesses should be segregated before, during and after the procedure and instructed not to discuss the identification process with each other.

6) During the identification process officers shall not, in any way, prompt the witness toward a particular photo.

7) At the time of the identification, the eyewitness should provide a statement in his/her own words indicating their level of confidence in the identification.

8) The presentation/order of presentation must be documented. The witness who selects a photo as the suspect should sign and date the photo they have selected with a full signature and initial and date the other photos presented to them.

9) The witness' selection of a photo that is not the suspect must be documented and included in any materials forwarded to the prosecutor who ultimately handles the case. Such evidence may be exculpatory to the suspect who is charged with the crime. As such it must be forwarded to the prosecutor.

D. **Single-Photo Verification:** This process shall only be used where the witness is thoroughly familiar with the suspect and the officer is merely attempting to ensure that the witness and the officer are both referring to the same person.

E. **Line-Ups:**

1) A line-up must be conducted with at least six persons and include at least some persons who are similar in appearance to the suspect i.e. facial hair, glasses, age etc.

2) All persons in the line-up must be of the same age and sex of the suspect.

3) During the process officers shall not, in any way, prompt the witness toward a particular subject in the line-up.

4) Although suspects do not have a right to refuse to stand in a line-up, a line-up should not be conducted where the suspect's resistant conduct will set him or her apart from the other participants in the line-up.

5) Suspects may be required to speak during a line-up for comparison purposes only. If officers are going to require a suspect to speak, they must require all persons participating to speak the same words in turn.

6) Suspects may be required to put on clothing recovered from the crime for identification purposes. If officers are going to require the suspect to put on the recovered clothing they must require all persons participating in the line-up to put on the clothing in turn.

7) All line-ups must be documented by photographing the line-up as presented to the witness. The photo will document positions of the participants as well as the inclusion of the participants.

8) Attorneys:

   a. A suspect does not have a right to counsel at a line-up which is conducted before the suspect has reached a "critical stage" in the justice process. A critical stage is reached when the suspect is arraigned, indicted or otherwise formally charged with a crime.

   b. A suspect has the right to counsel at a line-up if the suspect has reached a critical stage in the justice process.

   c. If the suspect has an attorney but has not yet reached a critical stage, officers should consider allowing the attorney's presence at the identification proceeding. The presence of an attorney undercuts later claims that the process was somehow suggestive with respect to the suspect.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

POLICY: INVESTIGATION OF CITIZEN COMPLAINTS

I.  **Purpose:** It is imperative that this operates in a degree of transparency and is responsive to complaints alleging employee misconduct and external concerns regarding the operation of the Agency. Members of the public should be provided with a reasonable avenue for any redress of grievances they may have with the service received by Agency employees and the conduct of the Agency. This policy provides members of the Agency with the procedures for the acceptance of complaints, the initiation of the administrative investigative process, the process for conducting a fair and reasonable investigation, the proper methods for adjudication of these administrative investigations, and the methods for the administration of fair, reasonable and defensible discipline.

II.  **Policy:** This Agency will accept and document all complaints alleging employee or Agency misconduct for the following principle reasons:

   A.  To ensure that complaints alleging employee or Agency misconduct are accepted and investigated in a consistent and reasonable manner to uncover the truth of the allegations,

   B.  To identify areas of misunderstanding by the complaining citizen,

   C.  To identify employees whose attitude, behavior and/or performance is in need of correction and supervisory intervention,

   D.  To protect employees and the Office from erroneous complaints, and

   E.  To identify Agency policies, training and/or practices in need of reevaluation, clarification and/or correction.

III.  **Definitions:**

   A.  Complaint of employee misconduct: A complaint is an allegation from any source of an act or omission by an Agency employee, which if proven true, would be considered misconduct or a violation of Agency policies, rules or regulations

   Note: Complaints regarding the validity of traffic citations or parking tickets are not considered complaints for this definition and the party should be referred to the proper court for resolution.

   B.  Complaint of Agency dissatisfaction: A complaint from an external source of dissatisfaction with an Agency policy or practice

   C.  Public concerns regarding law enforcement operations not amounting to a complaint: A concern expressed by a member of the public which does not

meet the Agency's definition of a complaint, but must be documented by the Agency employee receiving the information from the member of the public

IV. **Procedure:**

   A. Sources for complaints: A complaint can originate from any of the following sources:

     a. Individual aggrieved person,

     b. Third party,

     c. Agency employee,

     d. News media,

     e. Governmental agency,

     f. Of civil claim,

     g. Complaints can be made by members of the public:

       i. In person,

       ii. By letter,

       iii. Email

   B. Agency employee responsibilities: Whenever an Agency employee becomes aware of a citizen's complaint meeting the above complaint definition or becomes aware of misconduct of another employee, s/he shall:

     i. Immediately notify the Sheriff to ensure that follow-up to the complaining person will not be delayed

     ii. If Sheriff is not available or the party making the complaint refuses to wait for the Sheriff or his designee, the employee will gather all available information regarding the complaint and contact numbers

     iii. The employee shall ensure that this information is given to the Sheriff at the earliest moment during the employee's duty shift

     iv. Failure to follow these acceptance provisions will result in disciplinary action against the involved employee

   C. Sheriff's responsibilities: Whenever the Sheriff becomes aware of a person requesting to make a complaint or an incident which will likely result in a complaint or administrative investigation, the Sheriff, or Chief Deputy shall conduct an immediate preliminary investigation including:

     i. Conduct an interview with the complaining person attempting to ascertain each and every allegation of misconduct alleged. The complaining person can refuse to be tape-recorded. In these cases the Sheriff or Chief Deputy shall continue to interview the complainant and note the refusal on the completed report. Should the allegations not amount to a complaint consistent with the Agency definition of a

complaint, the Sheriff will advise the party that his/her dissatisfaction will be recorded and discussed with the Chief Deputy,

D. Investigative procedures:

a. The employee assigned to conduct the administrative investigation shall:

    i. Evaluate the allegations contained in the Report, listen to the tape recording of the complainant, if available, and consult with the person accepting the complaint or learning of the allegation(s)

    ii. Obtain all law enforcement reports, communications/dispatch records, MDT transmissions, video recordings, and other law enforcement related documents

    iii. Determine the specific allegations of the complainant and identify any other possible Agency violations, whether alleged by the complainant or not

    iv. Conduct interview normally in the following sequence:

        (a) Complaining person

        (b) Other public witnesses

        (c) Agency witnesses

E. Disposition:

a. The investigating person will prepare the investigative report and submit it through the chain of command for adjudication and disposition. The investigator is a fact finder only and is not expected to make findings or recommendations.

b. The adjudication person will make a recommendation for the disposition findings for each allegation using the following classifications using the burden of proof of a preponderance of the evidence:

    i. Sustained: there was a preponderance of evidence to prove the allegation

    ii. Not Sustained: there was not sufficient evidence to either prove or disprove the allegation

    iii. Exonerated: the actions of the employee were consistent with the law and Agency policies, rules, regulations and practice

    iv. Unfounded: the allegation did not occur

    v. Policy and/or training deficiency: the allegation occurred but was the fault of deficiencies in Agency policy and/or training and cannot be accountable to the employee involved

    vi. These disposition recommendations shall be forwarded through the designated person for review and concurrence. The final authority for

the disposition is the Sheriff or his designee. The Sheriff is responsible to ensure that the investigation and the final recommendation are consistent with the investigation and the practice of the Agency.

c. The Sheriff's Designee shall prepare the letter to the complainant following the conclusion of the investigation and the disposition of the complaint advising the person that the matter has been resolved.

d. The Sheriff's Designee is responsible for the quality control of the complaint and administrative investigation process and shall:

   i. Review all final complaint investigations to ensure that they are consistent with the practices of the Agency

   ii. Alert the Sheriff to any noticeable trends requiring that may require specific supervisory direction, policy review or training evaluation.

F. When criminal allegations involving a member of the Agency are identified the Sheriff shall be notified immediately:

a. The Sheriff or his designee will contact the State and request the Texas Rangers to conduct a third party investigation.

b. The Sheriff or his designee will assist the Texas Rangers with any request made involving the investigation.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

POLICY: MISSING PERSONS

1.  **PURPOSE:** The purpose of this policy is to establish guidelines and responsibilities regarding this Agency's response to reports of missing persons.

2.  **POLICY:**

    A.  It shall be the policy of this agency to thoroughly investigate all reports of missing persons. Additionally this agency holds that every person reported as missing will be considered **at risk** until significant information to the contrary is confirmed.

    B.  Jurisdictional conflicts are to be avoided when a person is reported missing. If a missing person either resides in, or was last seen in this jurisdiction, this agency will immediately initiate the required reporting process. If a missing person legally resides in this jurisdiction and was last seen in another jurisdiction, but the law-enforcement agency covering that jurisdiction chooses not to take a missing-person report, this agency will assume reporting and investigative responsibility.

    C.  Questions concerning parental custody occasionally arise in relation to missing-child reports. It shall be the policy of this agency to accept the report of a missing child even if custody has not been formally established. Reporting parties shall be encouraged to obtain legal custody as soon as possible. This does not include child custody issues when a child has not being returned on time to the managing conservator parent. This Agency will address this problem on a case by case basis through the use of the Texas Penal Code Sec. 25.03, Interfering with Child Custody.

    D.  It must be emphasized that there is no required waiting period for reporting a missing person. A person may be declared "missing" when his or her whereabouts are unknown and unexplainable for a period of time that is regarded by knowledgeable persons as highly unusual or suspicious in consideration of the subject's behavior patterns, plans or routines.

    E.  **Missing Adult:**

        1)  18 years of age or older; and

        2)  Whose absence is contrary to his or her normal patterns of behavior and may be due to one or more of the *unusual circumstances* as defined below

    F.  **Missing Child:**

        1)  Younger than 19 years of age; and

      2)   Whose whereabouts are unknown to his or her parent, guardian, or responsible party

G.   **Unusual Circumstances:**

      1)   A missing child 13 years of age or younger.

      2)   A child or an adult who is missing and believed to be one or more of the items noted below.

          a)   Out of the zone of safety for his or her age and physical and mental condition.

          b)   Mentally diminished.

          c)   Drug dependent. A potential victim of foul play or sexual exploitation.

          d)   In a life-threatening situation

          e)   Absent from home for more than 24 hours before being reported to law enforcement as missing. While some persons may incorrectly assume that 24 hours must pass before law enforcement will accept a missing-person case, a delay in reporting might also indicate the existence of neglect or abuse within the family.

          f)   Believed to be with persons who could endanger his or her welfare.

          g)   Is absent under circumstances inconsistent with established patterns of behavior.

H.   **"At-Risk"** Missing *Person (Adult or Child)*: A missing adult or child will be considered **"at-risk"** when one or more of the **unusual circumstances** as defined above are present.

3.   **PROCEDURES**

A.   General action on determination of "*Unusual Circumstances*"

      1)   If it is determined that "unusual circumstances" are involved in the report of a missing adult or child, the person will be considered "at risk," and an expanded investigation, including the use of all appropriate resources, will immediately commence.

      2)   If appropriate, existing interagency response protocols - including the AMBER Alert system and/or other available immediate community notification methods - should be activated

      3)   There is no required waiting period for reporting a missing person. A person may be declared "missing" when his or her whereabouts are unknown and unexplainable for a period of time that is regarded by knowledgeable persons as highly unusual or suspicious in consideration of the subject's behavior patterns, plans, or routines.

B.   **Communications personnel receiving the report of a missing person shall:**

1) Determine if circumstances of the report meet the definition of a missing child or adult as set forth in Section 3.

2) Dispatch, in a prompt manner, an officer to the scene of the report.

3) Notify the Sheriff and Chief Deputy in which "unusual circumstances" are determined to exist.

4) Transmit the appropriate radio alerts and other notifications.

5) Safeguard all pertinent records.

6) Initiate media contact — including activation of the AMBER Alert system and/or other immediate community-notification methods when appropriate.

C. The **initial officer or first responder assigned to the report of a missing person** shall

1) Respond promptly to the scene of the report.

2) Interview the person(s) who made the initial report.

3) Obtain a description of the missing person. The collection of information about the missing person, including race, height, weight, hair and eye color, clothing, and other noteworthy features, should be done promptly and relayed to other officers who may be assisting in the investigation. Recent photographs and/or videotape should be secured if available.

4) Verify that the person is in fact missing. Confirm custody status.

5) Identify the circumstances of the disappearance. First responders need to ascertain whether the circumstances surrounding a person's disappearance are such that a heightened level of response is warranted. If "unusual circumstances" exist then the decision to employ additional response methods is clear. In other situations where the circumstances are not clear, officers should keep the missing person's safety in mind and act accordingly.

6) Determine when, where, and by whom the missing person was last seen.

7) Interview the individual(s) who last had contact with the missing person.

8) Identify the missing person's zone of safety for his or her age and physical and mental state.

9) Make an initial determination of the type of incident. Note: Officers must be cautious in "labeling" or classifying a missing-person case, since the classification process shall affect the way in which initial information or evidence is gathered. Even if first indications suggest a "less urgent" incident, officers should consider all possibilities until the case category is clearly determined.

10) Obtain a description of the suspected abductor(s) and other pertinent information.

11) Evaluate whether circumstances of the child's disappearance meet existing AMBER Alert and/or other immediate community notification protocols. Discuss plan activation with the appropriate supervisory personnel on the decision to implement an AMBER Alert.

12) Determine the correct NCIC Missing Person File category and ensure that a notification is promptly transmitted.

13) Provide detailed descriptive information to the communications unit for broadcast updates.

14) Identify and interview everyone at the scene.

15) Conduct a thorough search of the scene. Secure and safeguard the area as a potential crime scene.

16) Prepare necessary reports.

D. The **supervisor assigned to the report of a missing person** shall

1) Obtain a briefing from the first responder(s) and other agency personnel at the scene.

2) Determine if additional personnel and resources are needed to assist in the investigation.

3) Consider activation of the **AMBER Alert** system and/or other immediate community notification methods. If circumstances indicate the chances for the child's safe recovery would be increased by immediate public awareness, a supervisor should promptly implement such efforts.

4) Establish a command post if needed.

5) Organize and coordinate search efforts.

6) Ensure that all required notifications have been made.

7) Establish a liaison with the victim family.

8) Manage media relations.

E. The **investigator assigned to the report of a missing person** shall

1) Obtain a briefing from agency personnel at the scene.

2) Verify the accuracy of all descriptive information.

3) Initiate a neighborhood investigation if appropriate. Obtain a brief history of recent family dynamics.

4) Explore the basis for conflicting information.

5) Evaluate the need for additional resources and specialized services.

6) Update descriptive information. **Note:** The National Child Search Assistance Act – enacted in 1990 and amended by the PROTECT Act in 2003 – mandates the entry of descriptive information for all persons, birth

through 20 years of age. These entries are required to be made no more than 60 days after the report is taken.

7) Monitor media relations.

F. **An officer assigned to the report of an unidentified person,** whether living or deceased, shall

1) Obtain a complete description.

2) Enter the unidentified person's description into the NCIC Unidentified Person File.

3) Utilize all available resources to aid in identification of the person.

4) Cancel all notifications after identification is confirmed.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

## POLICY: MOBILE VIDEO RECORDINGS

1. **Purpose:** The purpose of this policy is to direct officers and supervisors in the proper use and maintenance of mobile video recorders (MVR) as well as directing how video will be utilized as a quality control mechanism and evidence.

2. **Policy:** The policy of this Agency is to provide officers with mobile video recording devices in an effort to enhance the officers' ability to detect and prosecute criminals.

3. **Procedure:** It is the intent of this policy that all officers who will be using a vehicle outfitted with MVR equipment shall be trained on the manner in which the MVR shall be tested, maintained and used.

   A. It shall be the responsibility of each individual officer to test the MVR equipment at the beginning of each tour of duty. In the event that the equipment is found to be functioning improperly, the officer shall report the problem immediately to their immediate supervisor so that the information can be documented, and arrangements made for repair.

   B. Except when MVR equipment unforeseeably does not function, all motor vehicle stops or street encounters conducted by patrol officers using department vehicles with MVR equipment shall be recorded by these vehicles, using both the video and audio MVR functions.

   C. The recording shall begin no later than when the officer first signals the vehicle to stop or arrives at the scene of an ongoing motor vehicle stop initiated by another law enforcement officer or when the officer initiates a street encounter or arrives at a street encounter initiated by another officer.

   D. The recording shall continue until the motor vehicle stop or street encounter is completed and the stopped vehicle or the citizen involved in the street encounter departs or until the officer, whose cruiser has MVR equipment discontinues his or her participation in the stop or encounter, by leaving the scene.

   E. The recording shall include searches of any kind, to include; K-9 searches of vehicles, arrests of any persons, operators or occupants of vehicles and the issuance of violations.

   F. All officers involved in pursuits in any capacity shall utilize the MVR throughout the pursuit.

   G. All transports shall be recorded with audio and, to the degree possible, video.

   H. If an officer, whose vehicle has MVR equipment, participates in a transport, pursuit, traffic stop or street encounter is aware that the event was not recorded using the MVR equipment, the officer shall immediately notify the dispatcher that the stop was not recorded and should notify his or her supervisor as to the reasons why the stop was not recorded as soon as practicable. The notification to the

supervisor shall be in writing and shall be forwarded through the chain of command to the commanding officer of the division the officer is assigned.

4. **Supervisory Responsibility – Video Recordings**

    A. It shall be the sole responsibility of the supervisor for the changing and securing of the recording medium removed from police vehicles.

    B. Recordings shall be held for (90) ninety days before being "degaussed" for reuse, unless so ordered for an extended period of time by an order of the court.

    C. Recordings shall be subject to review by first line supervisors.

    D. In cases of median and serious infractions requiring disciplinary actions, the Sheriff or his/her designee, after review of all information regarding the incident, shall determine the proper disciplinary action. In such cases, special MVR review schedule shall be implemented with respect to the particular officer for a set duration in order to ensure compliance with the corrective action.

5. **Use of MVR Recordings as Evidence in Criminal/Motor Vehicle Prosecutions**

    A. In a case where an event is recorded which involves an arrest or any seizure of evidence or property, the officer in charge of the vehicle shall note in the offense report indicating that the event has been recorded.

    B. In misdemeanor or felony cases, the case report shall be delivered to the Chief Deputy. The Chief Deputy shall then review the recording and determine its evidentiary value. If it is determined that the recording should be maintained as evidence, the Chief Deputy shall make a notation on supplemental report so that the incident may be copied and maintained as evidence with the case by following the established procedure. The recording may be disposed of after disposition of the case. All recorded evidence is subject to this Agencies "Duty to Disclose" policy and must be forwarded to the prosecutor with jurisdiction over the case.

6. **Recordings of Field Sobriety Tests; Pursuits and Traffic Stops:** Law enforcement agencies may record digitally, on film or videotape or by other visual and audible means the pursuit of a violator or suspected violator, the traffic stop, or field sobriety tests administered at the scene of an arrest for violation of Texas Law or such tests at a police station, jail, or other suitable facility subject to the following conditions:

    A. The testing is recorded in its entirety (except for blood alcohol analysis testing); and

    B. The entire recording of the field sobriety tests and the entire recording of such portions of the pursuit and traffic stop as were recorded is shown in court unless the defendant waives the showing of any portions not offered by the prosecution; and

    C. The entire recording is available to be shown by the defense at trial if the defendant so desires regardless of whether it was introduced by the State; and

    D. The defendant or his/her counsel is afforded an opportunity to view the entire recording at a reasonable time before the trial in order to prepare an adequate defense; and

**E.** Recordings shall be used for official purposes only, which shall include:

1) Viewing in court;

2) Viewing by the prosecution and defense in preparation for a trial; and

3) Viewing for purposes of administrative reviews and official administrative proceedings. Recordings shall otherwise be considered as confidential records; and

4) MVR recordings shall be maintained for 90 days after the incidents that are recorded except as follows:

   a. Any MVR recording that documents an incident that is the subject of a pending misconduct investigation or a civil or criminal proceeding shall be maintained at least until the misconduct investigation or the civil or criminal proceeding is finally resolved;

   b. Any MVR recording that documents an incident that is the subject of a substantiated misconduct investigation, or an incident that gave rise to any finding of criminal or civil liability, shall be maintained during the employment of the officers whose conduct is recorded by the MVR;

   c. After all appeals have been exhausted arising from any criminal or traffic case filed as a result of the recording;

   d. At the conclusion of any civil case arising from events depicted on the videotape or film; or

   e. At the conclusion of the exhaustion of all appeals arising from any law enforcement agency administrative proceedings arising from events depicted on the videotape or film.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

## POLICY: MOTOR VEHICLE STOPS

1. **Purpose:** The purpose of this policy is to direct officers in their contacts with motor vehicles.

2. **Policy:** The policy of this Agency is to protect and serve the constitutional rights of all citizens when conducting vehicle stops and searches while balancing the needs of law enforcement in solving crime for the protection of the community.

3. **Definitions:**

   A. **Motor Vehicle:** Any motorized vehicle that is capable of movement to include motor homes.

   B. **Probable Cause:** (search): Facts and circumstances based upon observations or information that would lead a reasonable law enforcement officer to believe that evidence of crime exists and that the evidence exists at the place to be searched.

   C. **Probable Cause:** (arrest): Facts and circumstances based upon observations or information that would lead a reasonable law enforcement officer to believe that a crime has been or is being committed and the person to be arrested is the one who is or has committed the crime.

   D. **Reasonable Suspicion** (temporarily detain): Facts and circumstances based upon observations or information, short of probable cause but based upon articulated facts that would lead a reasonable law enforcement officer to believe that criminal activity is afoot.

   E. **Reasonable Suspicion** (frisk): Facts and circumstances based upon observations or information, short of probable cause but based upon articulated facts that would lead a reasonable law enforcement officer to believe that a person who is lawfully stopped is in possession of a weapon.

   F. **Frisk of Vehicle** (weapon): A limited type of search, the limit being to those areas capable of holding a weapon and located within the subject's immediate area of control i.e. passenger compartment.

4. **Procedures:**

   A. **Vehicle Stops-** Vehicles may be lawfully stopped under the following circumstances:

   1) Reasonable Suspicion Based Stop-where an officer has articulated facts that support a belief that criminal activity is occurring and that a vehicle is involved the officer may stop the vehicle to investigate further. The stop may continue as long as the officer diligently investigates to confirm or dispel his or her suspicion that criminal activity is occurring and the occupant(s) of the vehicle are involved.

2) Probable Cause based Stopped-Traffic Violation-where an officer has probable cause to believe that a violation of the Texas Transportation Code has occurred may stop the vehicle and detain the vehicle for a reasonable amount of time while the citation is completed.

3) Probable Cause Based Stop-Arrest/Search-where an officer has probable cause to believe that a person in a vehicle has committed a crime or probable cause to believe that a vehicle contains evidence of a crime or contraband, the officer may stop the vehicle to arrest the occupant (in the arrest situation) or stop the motor vehicle to search the vehicle in the search scenario.

4) Consensual Contact-An officer may approach any stopped vehicle (a vehicle which is stopped by the operator's own volition prior to police contact) and attempt to speak to person(s) in the vehicle. The officer has no power to force compliance with his or her attempt to contact in the consent situation.

5) Community Caretaking- the stopping of a vehicle to determine, based on some objective factors, if the driver is in need of assistance. Objective factors to consider:

   i. The nature and level of the distress exhibited by the individual.

   ii. The location of the individual.

   iii. Whether or not the individual was alone and/or had access to assistance independent of that offered by the officer.

   iv. The extent to which an individual -- if not assisted -- presented a danger to himself or others.

B. **Ordering Persons From a Vehicle:** An officer may order any occupant of a lawfully stopped vehicle to exit the vehicle during a lawful stop.

C. **Frisk of a Vehicle:** An officer who has reasonable suspicion to believe that a lawfully stopped vehicle contains a weapon may search the vehicle subject to the following limitations:

1) The search is limited to subject's immediate area of control which would be the passenger compartment of the vehicle.

2) The search is limited to those areas in the passenger compartment capable of holding a weapon.

D. **Search Incident to Arrest (Vehicle):** Following the lawful arrest of a subject from a vehicle or who had exited the vehicle just prior to arrest, officers may search the vehicle incident to arrest subject to the following limitations:

1) The arrest must be lawful and must be a full-custodial arrest.

2) The search must take place at the time of the arrest.

3) A search incident to arrest may not take place once the arrestee is secured in handcuffs and secured in a law enforcement vehicle unless the officer has reasonable grounds to believe that the vehicle contains evidence of the particular crime for which the subject was arrested.

4) The search incident to arrest is limited to the arrestee's immediate area of control (passenger compartment only) but is a thorough search.

5) Unlocked containers within the vehicle may be searched irrespective of who the containers belong to.

6) The person of other occupants may not be frisked or searched simply because another person in the vehicle has been arrested.

E. **Consent Search of Vehicle:** An officer may ask the person in control of any lawfully stopped vehicle or a vehicle that is not moving at the time of a consensual contact for consent to search the vehicle. Consent searches are subject to the following limitations:

1) The Consent must be voluntary.

2) Written consent is not required; however written authorization or a mobile video recording that documents consent will assist in proving the voluntary nature of the consent.

3) The scope of the search is within the control of the person granting consent, thus, the consenting party can direct the area which an officer is allowed to search as well as how long the search may last.

4) Under the rules of consent there is no requirement that officers inform a person of their right to refuse the officer's request, however a person who is told of their ability to refuse will be less likely to make out a claim that their consent was not voluntary.

5) Officers may not prolong a stop beyond its original justification in order to obtain consent.

F. **Probable Cause Searches of Vehicles:** An officer may, without a warrant, search a motor vehicle when the officer can articulate probable cause to believe that the vehicle contains evidence of a crime or contraband and:

1) In cases where the vehicle was stopped or parked prior to contact by the police, the area where the vehicle is parked is not private property such that officers would have to obtain a warrant to gain access to the property itself.

2) The vehicle is capable of movement. This does not mean that the vehicle is occupied; it simply means that the vehicle could be started and driven off with the turn of a key.

3) Officers may search the entire vehicle where there is probable cause to believe there is evidence or contraband in the vehicle

4) Officers may only search those areas within the vehicle capable of containing the item being sought. For example, an officer looking for stolen stereo equipment would exceed the scope of a probable cause search if he or she were to search the ashtray for the stolen equipment.

G. **Drug Sniffing Canine:** Where officers have a lawfully stopped vehicle, they may utilize a drug-detection canine to sniff the exterior of the vehicle as long as the sniff

occurs within the duration from a time standpoint of the purpose that justified the stop to begin with. For example, if the vehicle was stopped for speeding, the canine would have to arrive and conduct the sniff in the time it would take to write the citation.

1) If the stop must be prolonged beyond its justification to wait for the canine to arrive, the vehicle must be released and the canine cancelled.

2) It is recognized that an officer may develop reasonable suspicion of possession of narcotics during the initial stop which would then justify prolonging the stop for the canine's arrival.

3) If the canine conducts a sniff in accordance with this policy and alerts on the vehicle, the officer has probable cause and may conduct a probable cause search of the vehicle.

4) Putting a canine inside a vehicle is a search for 4th Amendment purposes and must not be done unless the officer can support the search by probable cause to believe the vehicle contains contraband.

H. **Inventory Searches:** An inventory search is not a search for evidence or contraband and is not a search with an investigative purpose. The primary objective of these searches is to protect the property of persons whose vehicles are towed at the direction of law enforcement. These searches also have the objective of protecting law enforcement from false claims with respect to vehicles that are towed at the direction of law enforcement. Inventory searches are subject to the following limitations.

1) All vehicles towed at the direction of an officer of this agency, irrespective of the reason for the tow, shall be inventoried in accordance with this policy.

2) Officers will note in their report any items of value that are within the vehicle.

3) If an item of extreme value is located within the vehicle and is removable, the officer shall take the item for safekeeping and either turn the item over to the owner or, when that is not possible, take the item to the Agency to be held for safekeeping in accordance with the provisions of the property and evidence policy.

4) In cases where an arrest has been made officers shall consider whether alternatives to impoundment are available.

I. **Community Caretaking Search:** Where officers have reason to suspect that a vehicle contains a dangerous item, which, if left unattended will endanger public safety, the officer may search the vehicle to remove the dangerous item for safekeeping. An officer removing such an item should protect the owner's property interest by ensuring that the item is stored in accordance with Agency procedures relating to property and evidence.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

POLICY:  OFF DUTY CARRYING OF FIREARMS

I.    **Purpose:** The purpose of this order is to adopt safety directives and guidelines for dealing with the carrying of firearms while in an off-duty status and for dealing with an officer's duty and responsibility to take action in response to criminal activity while in an off-duty status.

II.   **Policy:**  A member may carry a firearm while off-duty in accordance with state and federal law.

III.  **Procedure:**

   A.   An officer of this department who chooses to carry a firearm off-duty, may carry, any weapon of the officers choosing upon inspection and approval of the Sheriff.

   B.   All officers shall be required to meet the State qualification standards for all firearms carried while off duty as well as on duty.

   C.   Under Federal Law sworn law enforcement officers are allowed to possess a concealed firearm anywhere in the United States 18 U.S.C. §926 (b).  Officers should be aware that while this law exempts them from laws prohibiting such possessions, it does not give them police powers of any type outside of their jurisdiction.  As such, an officer will generally be limited to the self-defense provisions of the state they are traveling through once outside the State of Texas; thus the officers rules of engagement are extremely limited.  State Law gives law enforcement officer's statewide jurisdiction.  All officers are urged to use extreme discretion when outside their own jurisdiction and utilize common sense and request local authorities handle situations that could arise, and show the professional courtesy you would expect an officer from another jurisdiction to exhibit in our county.

   D.   Officers shall refrain from carrying firearms when contemplating the consumption of alcoholic beverages or under other circumstances where the need to carry a firearm is outweighed by safety issues associated with the circumstances that the officer will be undertaking.

IV.  A member of this agency who becomes aware of an incident that poses a threat of serious bodily harm or death to some individual shall take "action" to minimize the risk of serious bodily harm or death. "Action" under this provision is fulfilled by reporting the incident and shall not require the officer to place him or herself in a position of peril. An officer who is faced with such a circumstance should act in accordance with the guidelines as spelled out in this policy.

V.   **Procedure for Off-Duty Action:**

   A.   First, go to a safe location and call 911.

B. Second, when you encounter a situation off-duty that seems to require law enforcement action, you must consciously evaluate whether your involvement is necessary or desirable, given the circumstances. How important and urgent is the need for your intervention?

C. Utilize clothing or any item available that identifies you as a law enforcement officer to responding law enforcement personnel.

D. A number of circumstances may impact your decision to get involved in any situation. First, you may be alone, with family members or other non-law enforcement personnel. Second, it is unlikely that you will have all of the necessary law enforcement service equipment while off-duty, for example; pepper spray, baton, handcuffs or radio. It must be recognized that the force continuum as well as threat assessment is changed due to this lack of equipment. You may be faced with multiple suspects or unaware of hidden suspects. There may also be environmental factors working against you such as: lack of cover, crowds of civilians, darkness, etc. Your intervention may actually spark an escalation of violence. Therefore, your best plan of action may be to:

   a. Gather accurate intelligence like a good witness until uniformed, on-duty officers arrive.

   b. Remember, you have NO LEGAL OR DEPARTMENTAL/OFFICE obligation to get involved, especially if such intervention places you in a position of peril or such intervention requires that you behave recklessly, carelessly or in a suicidal manner.

   c. While agency policy mandates that you "take action" when witnessing a serious crime, calling the on-duty police and monitoring the situation from a SAFE vantage point fulfills that obligation.

   d. Most survival-conscious officers have trained themselves NOT to intervene off-duty UNLESS their life or the life of another innocent party is IMMINENTLY in danger. In other words, you should only consider intervention when deadly force would be justified. You should not intervene just to make an arrest while off-duty. The decision to take action, beyond simply reporting, is a personal one and is not a requirement of this agency.

   e. If you decide you must get involved, attempt to have someone call 911 to advise the operator that an off-duty officer is on scene. Have the caller inform the operator if you are armed. If possible, have them describe you and your clothing. This will affect the mindset of the responding officers. When uniformed law enforcement officers arrive, have your badge out and visible. (If you carry your shield while off-duty, some officers carry only their photo credentials). Do not rely on showing your identification as a means of providing any protection. At a distance, in dim light and under stress, your badge may not be seen. Or, the identification may not be given credibility if the responding law enforcement officers do not recognize you personally.

   f. Some trainers advise officers to hold their badge next to their gun for the best chance of being seen because the eyes of the responding officers are most

likely to go immediately to your drawn firearm. You are probably safer to RE-HOLSTER your gun when other officers arrive, unless doing so would put you and the responding officers or innocent civilians, in jeopardy. Until the responding officers sort out who is who, your gun is your greatest personal liability.

g.  If you have cover, maintain it. You can communicate verbally from there.

h.  Make your hands visible. Having responding officers see that you are unarmed and non-threatening will work to calm them and protect you.

i.  Verbally identify yourself as a police officer —not once and not in a normal tone of voice, but repeatedly and very loud. Keep shouting out: "POLICE! DON'T SHOOT! OFF-DUTY OFFICER!" until you get acknowledgment and directions as to what you should do. Remember, the noise and excitement of the scene, combined with auditory blocking may prevent responding officers from hearing you initially.

j.  When the responding officers issue commands, follow them promptly and completely. Expect to be treated like a suspect until your law enforcement status is verified.

k.  When carrying a firearm off-duty, outside your jurisdiction, it shall be concealed from public view by an outer jacket, shirt, sweater etc., unless you are attending department approved training. Then the firearm may be worn holstered, with your badge in view. If an off-duty officer's firearm is observed and prompts the response of police or security officials, the off-duty officer should respond in a manner consistent with this policy.

l.  Finally, the most important rule of all: If you have a gun in your hand, NEVER, EVER turn toward an on-duty officer.

NOTE: Plainclothes Officers should be aware that the same recognition issues applying to off-duty officers also apply to plainclothes officers and while rules of action are different, the rules with respect to protective steps, i.e. movements, identification etc. remain the same.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

POLICY:  PATROL RIFLE

I.  **Purpose:** The purpose of this policy is to outline the use of patrol rifles within this agency.

II.  **Policy:** The policy of this Agency is to utilize patrol rifles for those operations where the safety of citizens and officers will be enhanced through the use of these firearms.

III.  **Procedure:**

A.  At the outset it is recognized that patrol rifles are no different from a legal perspective than a handgun. Any limitations placed upon the use of patrol rifles in this policy have no bearing on whether a use of deadly force is justified. All uses of deadly force must be consistent with this agency's deadly force policy.

B.  The purpose of the patrol rifle is to enhance the tactical capabilities of law enforcement personnel by augmenting the service pistol and shotgun, as appropriate. It should be recognized that any long gun diminishes weapon retention capability and therefore are used as a stand-off weapon rather than where the deputy is faced with a close quarter tactical encounter.

C.  Officers will utilize only agency issued rifles or officer owned rifles that have been previously approved by the Sheriff on duty.

D.  Patrol rifles will only be carried and used by agency personnel who have successfully completed the instructional and qualification course conducted by a certified firearms instructor and who continue to successfully qualify with the weapon each year thereafter. An exception is allowed only for exigent circumstances in which there is imminent loss of life of an officer or civilian.

E.  In cases where a vehicle is out of service for repair, it shall be the responsibility of the deputy to ensure that the patrol rifle is removed.

F.  Patrol rifles may be deployed only for emergency situations when there is an imminent danger to officers or civilians.

   a.  Patrol Rifles shall be deployed only in situations that the officer may reasonably believe that the tactical advantage afforded by the rifle would be necessary. They are not to be used for routine calls where the deployment of a shoulder arm might otherwise be appropriate, or for calls where the information dispatched is not matched by a clear threat to public safety.

   b.  This order does not seek to articulate the only situations where rifle deployment is appropriate. Officer/supervisor judgment is the first indicator of appropriate deployment.

   c.  Additionally the patrol rifle may be deployed in situations:

      i.  Where the officer believes a suspect he/she may encounter is wearing protective body armor or

     ii. Is believed to be armed with or has immediate access to high powered or shoulder fired weapons or

     iii. Is believed to be armed and situated in a distant or fortified location which affords the suspect a tactically superior position.

     iv. Active Shooter situations; or

     v. Other situations where approval for deployment of patrol rifle is authorized by the Supervisor.

  d. When an officer determines the event has de-escalated and lethal force is not necessary, the rifle should be secured as soon as practical.

G. Under any circumstances concerning this weapon the Response to Resistance Policy/Deadly Force applies and will be adhered to.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

**POLICY: PERSONS WITH DISABILITIES**

1. **Purpose:** The purpose of this policy is to outline mandates with respect to contacts with persons who have disabilities.

2. **Policy:** It is the policy of this Agency to provide law enforcement services in an equal and impartial manner. This policy includes providing law enforcement services to those who have disabilities that officers either observe or become aware of based upon the circumstances presented or information obtained. This Agency shall take steps to protect persons with disabilities from inequitable treatment based on their disability and to avoid furthering any injury or disability based on the law enforcement contact where such accommodation can occur without jeopardizing the safety of all persons involved in the event.

3. **Definitions:**

   A. **ADA (Americans with Disabilities Act):** Federal Civil Rights Law protecting individuals with disability.

   B. **Recognized Disability/Protected Person under ADA:** Any person who has a physical or mental impairment that substantially limits one or more major life activities such as walking, seeing, hearing, speaking, breathing, learning and working. A person who associates with a disabled person is also protected under the act.

   C. **Other disabilities:** Injury, Illness, Mental or Emotional state that would render a person more vulnerable to police actions such as use of force, incarceration or restraint.

4. **Procedure:**

   A. **Arrest-Minor Crimes:** When dealing with a person who suffers from a recognized disability officers should consider whether the suspected conduct is a manifestation of the person's disability. In cases where the conduct is a manifestation of the disability officers should consider a medical or mental health referral as opposed to arrest.

**B. Use of Force:** In determining the appropriate level of force to be used to control a situation involving a person with a recognized or other disability, officers should consider whether the particular control or restraint tactic is more dangerous or unreasonable in light of the particular person's disability.

**C.** In cases where an officer becomes aware, through information or observations, of a disability, officers should take steps to accommodate that disability where they are able to do so without jeopardizing the subject, the officer or any other person present.

1) Handcuffing or other restraints-where handcuffing or other restraints may cause further injury of an existing disability and there is no imminent threat, officers should seek assistance from a supervisor to determine if there is an appropriate method of restraint that will accommodate the disability without jeopardizing safety.

2) Lock-up- in cases where a person indicates that they have some recognized or other disability, officers shall call for a supervisor in order that steps may be taken to verify the disability and determine what steps can be taken to accommodate the disability without jeopardizing the safety of the individual, the officers and the institutional security of the jail.

**D. Mobility:** Standard transport procedures may be dangerous for many people with mobility disabilities. Officers should use caution not to injure the person or damage their wheelchair or other mobility device. The best approach when possible is to ask the person what type of transportation he or she can use, and how to lift or assist him or her in transferring them in or out of the vehicle.

**E. Visually Impaired:** When dealing with a person who is visually impaired it is important for officers to identify themselves verbally and state clearly and completely any directions or instructions including any information that is posted visually which cannot be seen by the person who is visually impaired.

1) Officers should read out loud and fully any document that a visually impaired person is required to sign as the result of a law enforcement action.

2) Before taking photos or fingerprints of a visually impaired person, law enforcement personnel shall describe the activity to the visually impaired person so that they know what to expect.

**F. Hearing Impaired:** Law enforcement is required by the ADA to ensure effective communication with the deaf or hearing impaired.

1) Agencies should have one person capable of sign language on call. In accordance with recommendations by the United States Department of

Justice this may be accomplished by contracting with a sign language interpreter for response on an as needed basis.

2) In jails, hearing impaired prisoners must have access to a TDD phone in the same manner as other persons in custody have access to telephone privileges.

G. Other Disability: In any case where an officer becomes aware of an injury, illness or disability which may render the activity, tactic or restraint to be undertaken more dangerous to the individual, the officer shall notify a supervisor and in conjunction with supervisory support take reasonable steps to accommodate the injury or disability.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

POLICY: PRESCRIPTION DRUGS

1. **Purpose:** Law Enforcement is expected to be delivered by employees who are physically and mentally prepared for whatever might be required to satisfactorily perform assigned police duties. It is essential that all police employees who will or might be called upon to act in an enforcement capacity, control prisoners, or transport persons in an agency vehicle be in a position to act in a professional and competent manner. It is well known that law enforcement employees may be taking prescription drugs which have been legitimately prescribed to them for medical/psychological needs. This policy is designed to ensure that the employee, the community, and other officers are not impacted by the effects of such medication.

2. **Procedure:** Agency employees are divided into two categories for purposes of this policy:

   A. **Enforcement Employees:** those employees who are either in a direct enforcement capacity or who may be called upon to act in an enforcement capacity, are assigned to control prisoners, and employees who may be called upon to transport persons in agency vehicles. This includes all sworn personnel unless the employee is on restricted duty and prohibited from carrying firearms. Non-sworn employees who fit in this category include employees who engage in some form of enforcement duty, detention duties, drive agency vehicles or transport persons being detained.

   B. **Non-Enforcement Employees:** The function of non-enforcement employees does not normally place them in a position where the use of prescription drugs will compromise their own safety, the safety of fellow employees, or the safety of citizens. These employees are not subject to this policy and are not required to notify the agency when they are taking prescribed medications.

   C. **All Employees designated as Enforcement Employees are subject to the provisions of this policy.**

   D. **Enforcement Employees** who have been prescribed drugs by a medical, psychological or other professional resource person which may impact their fitness for duty, shall provide this agency with a document from the person prescribing the medication which:

      1) Identifies the specific drug, and

      2) Expressly concludes whether the drug will or will not impair the employee's ability to perform normal and specifically assigned law enforcement tasks.

      3) The employee shall provide this notice from the professional resource who prescribed the medication and which includes a copy of the prescription drug label to the Sheriff or the chief.

**E. Agency Response:** The designated agency person shall have access to a medical authority who will advise as to whether the particular prescription will impact the officer's ability to perform their law enforcement function.

1) Employees who are prescribed medication which require an alteration of assignment will be advised that they are not authorized to perform enforcement functions. These employees shall be immediately reassigned to a restricted assignment which will not place them in a position to encounter enforcement duties as defined by this policy. During the period in which they are required to take the prescribed medication, their authorization to carry a department issued firearm and operate agency vehicles will be suspended.

The documentation of the medication use will be filed in a secure file specifically for "Employees taking medication," until such time that the medication is no longer being used by the employee and the civil liability statute of limitations has passed. Following that period, all documentation of medication use by the employee shall be destroyed. The designated agency employee shall perform an annual audit of this file to ensure that it is current and that the required purging has been completed

## MARTIN COUNTY SHERIFF'S OFFICE
## STANTON, TEXAS

### POLICY: PROPERTY AND EVIDENCE

1. **Purpose:** The purpose of this policy is to outline the procedure of this Agency with respect to property, contraband or evidence that is seized. All property, with the exception of vehicles, will be dealt with under this policy.

2. **Policy:** The policy of this Agency is to provide for the reasonable safekeeping of all property that comes into the possession of this agency. With respect to evidentiary items, this agency shall maintain a proper chain of custody and secure such items in a manner that will ensure that the evidence is available to be admitted at trial.

3. **General Provisions Applicable To All Evidentiary Items:**

   A. Members of this Agency shall only seize items under the following conditions:

   1) Officer has probable cause to believe that an item is contraband. (Contraband is an item(s) that by their very nature are illegal to possess. E.g. illegal narcotics.)

   2) Officer has probable cause, at the moment of seizure, that the item to be seized is stolen.

   3) Officer has probable cause, at the moment of seizure, to believe that the item is evidence of a crime.

   4) Abandoned items or property held for safe keeping.

   B. When seizing items of value (money/jewelry/precious metals/electronics) officers shall make a handwritten inventory of the items at the scene of the seizure. Two officers shall conduct this inventory of the property if available. If two officers are available, both officers shall then sign the handwritten inventory.

   C. In cases where professional expertise is required to make a proper accounting of the property, the Sheriff or his Designee shall be notified so that the services of an expert may be obtained.

   D. Once an item is seized it shall be transported by the officer to the appropriate agency office.

   E. It is the policy of the Agency that all property which comes into the possession of an officer for any reason will be inventoried as soon as practicable and a written record of the inventory will be made.

   F. Clearly one of the most important aspects of the property and evidence function is security. Security is established by both tangible (i.e. locks, video, double-key, alarms etc.) and intangible mechanisms (i.e. random inspections, audits, proper selection of staff etc.). The officer in charge must limit the access of the property/evidence room. Only those staff members who are necessary to the property/evidence function should be allowed into the storage areas.

G.  In cases where the items relate to a criminal investigation all forms necessary for criminal processing shall be compiled.

H.  Evidence shall be properly marked or tagged with the report number, the date of seizure, the arresting officer's name as well as the suspect's name where applicable.

I.  The item shall then be stored in a secure area. The only exception to this provision shall be cases where the case will be charged by a different agency or cases where a forensic unit has seized the evidence. In cases where the seizing officer will turn a suspect over to a different agency for charging, the evidence shall be turned over to the charging agency along with the suspect.

J.  Seizing officers or their designees shall deliver evidence to the property room.  Each officer shall initial each item on the property form and sign the bottom of the form indicating that all items on the form are accounted for.

K.  In cases where a discrepancy has been found and reported, the seizing officer responsible for that evidence or property shall cause an immediate investigation within his or her unit to resolve the discrepancy at issue. If the discrepancy cannot be explained or resolved, the matter shall be turned over to the Sheriff or Chief Deputy or further investigation.

4.  **Evidentiary Narcotics:**

A.  An officer who seizes drugs shall complete all paperwork that accompanies these arrests. The suspected narcotics should be field tested, where applicable, properly packaged and tagged.  The tag should include the report number, defendant's name, date of seizure, and the seizing officer's name.

B.  **Evidentiary Narcotics:**

1)  Drugs should be removed from unnecessary exterior packaging and a net weight taken and recorded.

2)  Evidence should be properly bagged and tagged and a gross weight should be taken and recorded.

3)  Evidence examination report shall be typed.

4)  Any drugs as well as money which has been seized shall properly secured as evidence and the gross weight of the narcotics; the amount of cash, if any, and any vehicle seized must be recorded.

5)  The tagged and bagged narcotics and any cash seized should then be placed in the designated secure area/locker.

6)  The seizing officer shall then submit the narcotics evidence to a lab for appropriate analysis and preservation or destruction.

7)  The officer shall maintain the receipt to insure that the chain of custody for the evidence is maintained.

8)  Once a toxicology report is received, the officer shall file the report for use in a subsequent criminal prosecution.

9)  When evidence is returned from court it shall be returned to the custody of the officer who shall return the evidence into secured evidence storage and document the return of the drugs.

10) When large amounts of substances are seized and storage is impractical, a law enforcement officer may substitute photographs or videotapes of the substances at trial so long as a representative sample is analyzed for proof of the matter that the substances actually are present. This substitution must be agreed to by the prosecuting attorney. The photographs taken should reasonably depict the total amount of the materials seized and the manner in which the materials were physically arranged or positioned before seizure. When substitutions are used, the Sheriff or his designee may authorize the destruction of the drug evidence in accordance with Health and Safety Code, Chapter 481, Section 481.160.

5. **Non-evidentiary narcotics:** Narcotics that are abandoned and narcotics turned over to law enforcement as articles found:  In these cases the narcotics are not used as evidence in criminal trials thus it is not necessary to have a toxicology exam performed on the drugs.

   A. Article found-drugs turned over to the agency-with no suspect. The officer who initially takes custody of the item must complete a report and a property inventory as well as tagging (officer's name, date of recovery, and report number) and bagging the item. The item shall be weighed for a gross weight prior to placement in the secure area. The tagged item and its property form should then be placed in the designated secure area/locker/pass-thru locker system.

   B. The officer shall verify the gross weight and then secure the item in the narcotics storage area until such time as the items can be delivered for destruction.

   C. Narcotics that are seized as the result of controlled buys.

      1) A toxicologist need not examine these narcotics since they will not be used as evidence in a trial.

6. **Narcotics Disposal:**

   A. **Applies to all narcotics**

      1) Controlled substances seized pursuant to this policy must be inventoried, reported, audited, handled, tested, stored, preserved, or destroyed pursuant to procedures promulgated by the State of Texas.

      2) The chief law enforcement official of the seizing agency, his designee, or the clerk of court, after one year following the conviction, guilty plea, plea by nolo contendere, or other disposition of the criminal case, may order the destruction or other lawful disposition of the substances unnecessary for evidentiary purposes in accordance with procedures promulgated by the division.

      3) The chief law enforcement official of the seizing agency or his designee, after a reasonable period of time following the seizure, may order the destruction or other lawful disposition of substances that do not come within the jurisdiction of court.

      4) On cases involving excess quantities of controlled substances (such as marijuana over 50 lbs), it shall be the policy of the Agency that the submitting officer attempt to obtain authorization from the prosecuting attorney to destroy the excess quantity, in accordance with existing statutes  (HSC 481.160). Prosecutors may utilize photographs or videotapes of the substances at trial so long as a representative sample is analyzed for proof of the matter that the substances actually are present.

      5) In all subsequent court proceedings following the disposition of the case, all evidence presented at the original proceedings is admissible through introduction of the certified record of the case.

6) It is imperative that drug evidence be disposed of as soon as it is no longer needed for prosecution of defendants. It shall be the policy of the Agency that all officers submitting evidence to a laboratory must notify that lab in writing, as soon as possible, when learning that the prosecuting attorney has closed a case and no longer needs the evidence. It shall also be the responsibility of the evidence officer to perform a monthly reconciliation between the drugs within the custody of this Agency and the disposition of cases. The purpose of this reconciliation is to determine those cases where the drugs will no longer be needed as evidence. In cases where the drugs are no longer needed, the drugs will be destroyed in accordance with the procedure set by the State of Texas.

7) A drug destruction sheet indicating which narcotics are ready for destruction shall be prepared by the evidence officer on a monthly basis. This destruction sheet shall include the following information: report number, toxicology number, name of defendant, disposition of the case, gross weight of the narcotics and two open categories for the initials of the officer who ultimately destroys the drugs as well as the outside witnesses and a second open category where the date of destruction will be filled in following destruction.

8) The drug destruction sheet shall be forwarded to a supervisor designated by the Sheriff who will verify the dispositions of the case.

9) A command level officer designated by the chief of police shall review the drug destruction sheet and determine the compliance with the above listed procedure. Once it has been determined that there is compliance the designated officer shall approve the destruction of the narcotics in writing.

10) If it is determined that the destruction sheet does not meet the criteria set forth in this policy, the designated officer shall direct the individuals responsible for compliance on what is necessary to correct the deficiencies. No drugs will be destroyed before there is complete compliance with the above listed procedure.

11) Once the designated command level officer has approved the destruction of drugs, a copy of the destruction sheet shall be forwarded to evidence clerk.

12) Narcotics will then be destroyed in accordance with the procedure set forth by the State of Texas and the procedures outlined above.

7. **Stolen Property:** In addition to the general provisions of this policy the following particular provisions also must be complied with when dealing with stolen property or property for which there is probable cause to believe is stolen. It should be noted that state legislatures set diverse requirements for types of stolen property and for property that has been recovered as stolen from varying crimes. It is the intent of this policy to be broad enough to cover all stolen property irrespective of the crime or type of property that will meet all the requirements of law.

A. When dealing with any type of stolen property officers responsible for that property shall comply with the provisions of the Texas law.

B. Officer shall secure the property believed to be stolen and create an inventory detailing the property taken into custody in accordance with the general provisions of this policy.

C. The evidence officer shall maintain a log of every item brought into the custody of this Agency and verify that the property is assigned a report number.

D. The evidence officer may deliver the stolen property to its rightful owner upon satisfactory proof of ownership after meeting the provisions of state law.

E. Anytime a firearm is returned to a person a criminal history check must be done to determine if the person receiving the firearm has been disqualified by some conviction from possessing a firearm.

F. Prior to the return of a firearm, a check of available databases concerning domestic violence protection, restraining or non-contact orders shall be conducted to determine if the person receiving the firearm is prohibited by law from possessing a firearm.

8. **Other seized property:** In the course of investigating crime it is often necessary to seize what courts refer to as "mere evidence" to establish a connection between a suspect and a crime. This would include items such as wallets with identification, clothing, photographs and any other item that belongs to a suspect, victim or witness to a crime. While some of these items may have no monetary value they may in fact be valuable to the rightful possessor of the property. In addition to the general provisions of this policy which must be followed for all items coming into the custody of this Agency, the following particular provisions shall also be followed:

A. Prior to returning any property to a claimant the following criteria shall be met:

1) A complete photographic record of the items shall be made including at least one photo depicting the claimant and the items shall be made. This photograph shall be tagged by the evidence officer and maintained in the files of the evidence/property unit.

2) The person claiming the property shall complete a signed declaration of ownership of the items under penalty of perjury.

3) No items in the custody of this Agency shall be disposed except in accordance with the provisions of this policy.

B. Firearms: When a firearm comes into the possession of an officer, for any reason, the officer will check with NCIC for a possible report.

1) A firearm seized and held for any reason will have a copy of the NCIC check attached to the form.

2) The property inventory form, will be completed describing the weapon seized with a copy provided to the person or responsible party from whom it was taken

3) The weapon will be tagged

4) After all documentation is completed the weapon will be logged and placed into the firearms locker / vault.

5) All firearms seized for evidentiary purpose pursuant to a criminal offense should be submitted to the appropriate crime laboratory (National Integrated Ballistic Information Network – NIBIN) for forensic testing of the weapon. Once the testing has been completed the firearm will be returned to the submitting officer. The chain of custody shall be properly documented and the weapon logged in and out of the firearms locker / vault.

6) All firearms should be stored with some type of protective covering (i.e. a gun box designed and manufactured for this purpose or some type of brown paper wrapping). Gun boxes are preferred over the wrapping. With DNA always an issue in criminal cases and the likelihood it could exist on a firearm, protection of that evidence should always be a consideration. Long guns, rifles and shotguns pose a storage problem due to their size. Long gun boxes are the recommended method of storage.

7) Safety procedures should be in place and require that any weapon seized by an officer is made "safe" and "inoperable" by physically inspecting the weapon to ensure that the weapon is unloaded and placing some type of device on the weapon to keep it from functioning as designed (i.e. This may be accomplished using a wire-wrap tie down secured through the breach of a firearm to prevent operation/discharge). These weapons should be placed in an individual gun storage box and sealed. Some means of visibly identifying the weapon as inoperable – "SAFE" would increase safety and ensure policy compliance.

8) All documentation pertaining to the seized weapon shall be maintained in Agency records.

9) No firearm held by the Agency will be returned to the rightful owner with or without a court order until a criminal history check and search of civil data bases that contain records related to domestic violence or other restraining orders has been completed. No firearm should ever be returned to the owner who is prohibited from lawful possession.

10) Any firearm which is unlawfully possessed under Texas law shall be confiscated and held until no longer required as evidence.

9. **Disposition of seized and other property held:** Seized property, abandoned property and articles found which come into the custody of this Agency shall be initially handled in accordance with the general provisions of this policy. In addition to the general provisions, the following specific procedures required by Texas law shall be followed:

A. Unless other disposition is specifically provided by law, when property seized or held is no longer required as evidence, it shall be disposed of by the law enforcement agency on such a showing as the law enforcement agency may deem adequate as follows:

1) Property stolen, embezzled, obtained by false pretenses, or otherwise obtained unlawfully from the rightful owner thereof shall be restored to the owner;

2) Money shall be restored to the owner unless it was used in unlawful gambling or lotteries or it was used or intended to be used to facilitate a violation of the narcotics laws in which case the money shall be forfeited and disposed of as

3) Art. 18.17. Disposition of Abandoned or Unclaimed Property states in part: Property which is unclaimed or the ownership of which is unknown shall be sold at a public auction held by the Agency and the net proceeds be disposed of in accord with Texas Law. All unclaimed or abandoned personal property of every kind, other than contraband subject to forfeiture under Chapter 59 of the Texas Criminal Code and whiskey, wine and beer, seized by any officer of this Agency which is not held as evidence to be used in any pending case and has not been ordered destroyed or returned to the person entitled to possession of the same by a magistrate, which shall remained unclaimed for a period of 30 days shall be subject to disposition.

4) This includes unclaimed money.

5) Contraband shall be destroyed unless they may reasonably be returned to a condition or state in which such goods may be lawfully used, possessed, or distributed by the public. In such a case the item(s) must be disposed of by court order.

6) Firearms, explosives, ammunition, bombs, and like devices shall be destroyed. Firearms which may have a lawful use may be held without destruction and disposed of by way of a court order.

7) Animals which are seized and are no longer required as evidence, the animal will be disposed of pursuant to a court order.

8) Any other property shall be disposed of in accord with a court order.

10. **Seized Currency**: Money shall be restored to the owner unless it was used in unlawful gambling or lotteries or it was used or intended to be used to facilitate a violation of the narcotics laws. Currency that comes into the possession of the Agency should be vaulted separately from other items and under enhanced security.  Under Art. 18.183 If money is seized in connection with a violation of Chapter 47, Penal Code, it should be  deposited into an interest-bearing bank account in the jurisdiction of the agency that made seizure or in the county in which the money was seized until a final judgment is rendered concerning the violation.

11. Inspections/Audits:

A. Inspections of the Evidence/Property Storage Areas will be conducted to ensure:

a. Storage areas are clean and orderly
b. Integrity of property is maintained
c. Provisions of agency orders and directives are followed
d. Property is protected from damage and deterioration
e. Accountability procedures are maintained
f. Property having no further evidentiary value is disposed of promptly.

B. Inventories, audits and Inspections will be conducted as follows:

a. Semi-annually, the primary property/evidence manager shall conduct an inspection to determine adherence to procedures used for the control of property. This inspection shall be documented via memorandum directed to the Chief of Police.
b. Whenever the primary property manager is assigned and/or transferred from the property and evidence control function, an inventory of all property/evidence will be conducted, to ensure that records are correct and properly annotated. This inventory will be conducted jointly by the newly designated property manager and the outgoing primary property manager or other person as designated by the Sheriff. This inventory shall be documented via memorandum directed to Sheriff.

C. An annual inventory of property will be conducted by a Supervisor not routinely or directly connected with property control.  The Supervisor will be accompanied by an evidence custodian.  It is highly recommended that this inventory be inclusive of all property held by the Agency; however it may include only a random sample of a sufficient number of property records to ensure proper

accountability. This inventory shall be documented via memorandum directed to the Sheriff.

D.  Annual unannounced inspections and random sample inventories of property storage areas are conducted as directed by the Sheriff or their designee. Unannounced inspections shall be documented via memorandum directed to the Sheriff.

E.  At least quarterly, the person responsible for the property and evidence control function, or his or her designee, conducts an inspection of adherence to procedures used for the control of property;

F.  Whenever the primary property manager is assigned and/or transferred from the property and evidence control function, an inventory of property, to ensure that records are correct and properly annotated, is conducted jointly by the newly designated property manager.

G.  The property officer will conduct and submit an annual audit of property held within his assigned are and will be conducted along with an employee not routinely or directly connected with property control as designated by the Sheriff.

H.  Unannounced inspections of property storage areas are conducted at least twice per year as directed by the Sheriff or their designee.

## MARTIN COUNTY SHERIFF'S OFFICE
## STANTON, TEXAS

**POLICY:  VEHICLE PURSUIT AND EMERGENCY VEHICLE OPERATION**

1.  **Purpose:** The purpose of this policy is to provide guidelines and directions for the establishment of responsibility for the safe operation of agency vehicles during a pursuit; for the initiation or discontinuation of pursuits; for the responsibility of participating officers and supervisor; and to provide the essential balancing of the necessity for the pursuit and more immediate apprehension of the fleeing subject against the risks involved with the pursuit which might include death, injury and/or property damage.

    In these cases, officers should attempt to anticipate flight and utilize tactics to prevent a pursuit. If tactics to prevent a vehicle pursuit fail, tactics should be utilized to minimize the duration of the pursuit, and if possible, to influence the subject vehicle's direction in ways that reduce the risk of harm to others

2.  **Policy:** It is the policy of this agency that officers shall operate agency vehicles with appropriate regard for the safety of all persons.  Officers shall be responsible for the consequences of any reckless disregard for the safety of other persons.

3.  **Definitions:**

    A.  Emergency Vehicle: includes any Law enforcement vehicle.

    B.  Discontinue the pursuit: the law enforcement officer ends his or her involvement in the pursuit by slowing down to the posted speed limit, turning off his or her emergency light and siren and turning off the roadway so as not to follow the suspect.

    C.  Aerial support: the use of aerial surveillance to monitor a pursuit or take over the pursuit.

    D.  Authorization to continue pursuit:  verbal approval, transmitted over the assigned radio channel, by the supervisor and acknowledgment by the dispatcher and the officer driving the primary unit.

    E.  Boxing-in: surrounding a violator's vehicle with emergency vehicles that are then slowed to a stop, forcing the violator's vehicle to do likewise.

    F.  Caravan: operating emergency vehicles in a line or alongside each other in a pursuit.

    G.  Deadly force: force which creates a substantial likelihood of death or serious bodily harm.

    H.  Emergency operation: driving an emergency vehicle according to Texas law and this procedure in response to an emergency call or in pursuit of a fleeing vehicle.

    I.   Inter-Jurisdictional Pursuit: Any vehicle that crosses a state line.

J. Paralleling: operating an emergency vehicle on streets or a route parallel to the pursuit route.

K. Primary unit: The authorized law enforcement vehicle that initiates a pursuit or any other unit, which assumes control of the pursuit.

L. Secondary unit(s): Any authorized law enforcement vehicle that becomes involved as a backup to the primary unit and follows the primary unit at a safe distance.

M. PIT (Precision Immobilization Technique) maneuver: a controlled deliberate contact with the rear of a fleeing vehicle by an agency vehicle with the intention of spinning the vehicle in a predetermined direction to bring it to a stop.

N. Ramming: deliberate contact with a violator's vehicle by an agency vehicle to force the violator's vehicle off the roadway.

O. Roadblock: a barricade or other physical obstruction across a roadway set up to stop or prevent the escape of a fleeing vehicle.

P. Stop Stick/Spike Strip: a rigid column or a strip of belting containing specially designed hollow spikes which when deployed across a lane of roadway, penetrates tires, slowing the pursued vehicle usually to a complete stop.

Q. Supervisor: the supervisor assigned or assuming control of a pursuit situation.

R. Terminate the Pursuit: The decision to discontinue the pursuit.

S. Vehicle Pursuit: an active attempt by a law enforcement officer operating an authorized law enforcement vehicle to apprehend a fleeing suspect who is actively attempting to elude the police.

T. Mobile Video Recording: (MVR): a recording device that records video and/or audio of a police event from a fixed camera mounted in a police vehicle.

4. **Emergency Vehicle Operation:** Under Texas Law:

A. In operating an authorized **emergency vehicle** the operator may:

1) Park or stand, irrespective of state or local regulations.

2) Proceed past a red or stop signal or stop sign, after slowing as necessary for safe operation.

3) Exceed a maximum speed limit, except as provided by an ordinance adopted under Section 545.365, as long as the operator does not endanger life or property. And

4) Disregard a regulation governing the direction of movement or turning in specified directions.

B. These privileges may only be exercised when:

1) Responding to an emergency call.

2) Pursuing an actual or suspected violator of the law.

3) Responding to but not returning from a fire alarm.

4) Directing or diverting traffic for public safety purposes.  Or

5) Conducting a police escort.

C. Except as outlined in the exemptions listed below, a member of this agency who is exercising the listed privileges afforded to emergency vehicles under Texas law shall use, at the discretion of the operator audible or visual signals

D. Exemptions to use of emergency lighting and equipment. A police officer may operate an authorized emergency vehicle for a law enforcement purpose without using the audible or visual signals if the officer is:

1) responding to an emergency call or pursuing a suspected violator of the law with probable cause to believe that:

   a.  knowledge of the presence of the officer will cause the suspect to:

     i.  destroy or lose evidence of a suspected felony;

     ii.  end a suspected continuing felony before the officer has obtained sufficient evidence to establish grounds for arrest; or

     iii.  evade apprehension or identification of the suspect or the suspect's vehicle; or

     iv.  because of traffic conditions on a multilaned roadway, vehicles moving in response to the audible or visual signals may:

       a)  increase the potential for a collision; or

       b)  unreasonably extend the duration of the pursuit; or

E. **Pursuit Restrictions:**

1) When available two emergency vehicles, -- a primary vehicle and a secondary vehicle, shall engage in a pursuit, unless additional emergency vehicles are authorized specifically by the managing supervisor.

2) Mobile Video Recordings: In agency vehicles equipped with mobile video recorders officers shall ensure that the equipment is activated during the pursuit and remains running until a supervisor authorizes the discontinuation of the recording.

3) Officers shall not continue a pursuit or assist in a pursuit unless immediate authorization for the pursuit is received from the managing supervisor – if one is on duty.

4) Officers shall not set up roadblocks, or deploy tire deflation devices without the approval of the supervisor.

5) Officers shall not engage in ramming, boxing-in, caravanning or driving immediately alongside a fleeing vehicle unless authorized by a supervisor.

6) Pursuits shall not be undertaken where the officer is operating a motorcycle unless the officer has reasonable grounds to believe that the suspect has been or is involved in a violent felony.  Once a police vehicle becomes available, the motorcycle shall discontinue its involvement in the pursuit.

7) If a pursuit is discontinued by the primary vehicle, (unless for mechanical reasons), or the supervisor, then all officers shall discontinue the pursuit.

8) Only emergency vehicles or marked police vehicles with emergency warning devices shall initiate a pursuit.

9) Officers engaged in a pursuit shall not drive emergency vehicles the wrong way (against the regular flow of traffic) on a divided highway, interstate, or expressway or any other street or highway designated for one-way traffic, despite allowances in the state vehicular code. When a fleeing vehicle goes the wrong way against traffic, the primary officer shall:

   a. Parallel the vehicle in the correct lane of traffic

   b. Notify dispatch of a wrong way driver

   c. Request assistance from outside agencies to shut down vehicular traffic on the highway coming in the fleeing subject's direction

   d. Have communications notify department of transportation to activate reader boards to advise motorists of a wrong way driver

10) Officers shall not engage in a pursuit when they are transporting prisoners, witnesses, suspects, complainants or any person who is not a member of this Agency.

F. **Environmental Considerations:** Officers shall carefully consider the facts and weigh the seriousness of the offense against the possible consequences of jeopardizing the safety of others by a continuous evaluation of the following at the time of the initiation and continuation of the pursuit:

1) Time of day and day of the week

2) Lighting conditions

3) Vehicular and pedestrian traffic

4) Type of roadway

5) Condition of the roadway (e.g. dry, wet, paved, gravel, icy)

6) Weather conditions (e.g. clear, overcast, rain, fog)

7) Condition of the emergency vehicle and the condition and type of the fleeing vehicle

8) Driving ability of the officer

9) Speeds of the emergency vehicle and the fleeing vehicle

G. **Initiating the Pursuit: Pursuits may initiate where the officer has probable cause to believe one of the following:**

1. **The occupant(s) have committed a violent felony.**

2. **The driver has or is committing acts of reckless driving, prior to officer contact, which poses a threat to the public.**

**H. Responsibilities of the Primary Vehicle Driver:**

1) At the earliest possible moment, activate the vehicle's emergency warning devices from the point of initiation to that of completion.

2) Immediately notify communications of:

   a. His or her unit number

   b. The location

   c. Direction of travel

   d. Speed

   e. Reasons for the pursuit

   f. The description of the vehicle being pursued

   g. The number of occupants

   h. The presence of other law enforcement agencies

   i. Location at the time the pursuit is discontinued

3) Provide updated information regarding direction of travel, speed, and other pertinent details;

4) If available allow the secondary vehicle driver to assume all communications;

5) Abandon the pursuit if any mechanical problems develop in the primary vehicle;

6) Discontinue the pursuit if the hazardous circumstances or environmental factors present an unreasonable risk to public safety.

**I. Responsibilities of the Secondary Vehicle Driver:**

1) The first officer arriving to assist the primary vehicle driver shall notify communications and becomes the secondary vehicle driver;

2) This officer shall receive immediate authorization from the supervisor to assist in the pursuit to the extent that a supervisor is available and monitoring the pursuit.

3) This officer shall activate all warning devices from the point of entry into the pursuit until it is ended while following the primary vehicle at a safe distance and shall assume the radio communications for the primary vehicle driver;

4) This officer shall become the primary vehicle driver if it abandons the pursuit, or shall abandon the pursuit if any mechanical problems develop in the secondary vehicle.

**J. Responsibilities of the Supervisor:**

1) Assert control over the pursuit.

2) Control the number of authorized vehicles in the pursuit.

3) Immediately authorize continuation of the pursuit or orders discontinuation depending on the hazardous circumstances and environmental factors present as communicated by the primary vehicle driver.

4) Order units to clear intersections/roadways in the likely path of the pursuit where appropriate.

5) Ensure that not more emergency vehicles needed, engage in the pursuit unless additional emergency or marked police vehicle are required based on the following circumstances:

   a. The severity of the offense.

   b. The number of occupants in the suspect vehicle.

   c. The likelihood of the suspects being armed.

6) Direct and approve necessary tactics in the pursuit; including authorizing termination of the pursuit through approved use of force tactics.

7) Continuously evaluate the pursuit.

8) Assign additional officers to traffic control, accident investigation, foot pursuit, and/or perimeter security.

9) Order the discontinuation of the pursuit at any time hazardous circumstances or environmental factors present an unreasonable risk to public safety or the pursuing officers.

10) Respond in all situations to the scene of any arrest resulting from the pursuit to control the scene.

K. **Responsibilities of the Communications Center:**

1) Assure that the supervisor of the pursuit is clearly identified and that the approval to initiate or continue the pursuit is broadcast;

2) Assure that pursuing officers (primary and secondary vehicle drivers) request supervisory approval and that all critical information is received from the officers involved and relayed to other units;

3) Keep the supervisor apprised of all relevant traffic problems and other actions that might impact upon the conduct of the pursuit.

4) Record all information received from the pursuing officer

5) Clear the radio channel

6) Conduct an inquiry of the license plate through NCIC

7) Notify adjacent jurisdictions of the pursuit and the potential that it may enter their jurisdiction and seek assistance where no other agency units are available to assist the primary unit.

8) Continue monitoring the pursuit.

L. **Uses of force/Termination of Pursuit:**

1) Remember that roadblocks, the PIT maneuver, and Stop-Sticks or spike strips as well as the firearm, constitute seizures, i.e. a stopping of movement by a means intentionally applied. Roadblocks, the PIT maneuver, and tire deflation devices constitute a use of force. In using these tactics officers should consider:

   a. How serious is the offense that the officer suspects at the time they use the tactic?

   b. Is there a physical threat to the officer or any other person and how significant is that threat?

   c. Is the suspect actively resisting or attempting to evade arrest by flight?

2) Use of firearms:

   a. The use of firearms to affect the apprehension of a fleeing suspect is a use of deadly force.

   b. Officers shall not shoot at or from a moving vehicle unless:

      i. The officer has a reasonable belief that an occupant of the vehicle poses an imminent threat of death or serious bodily injury to the officer or another person, or

      ii. The officer has a reasonable belief that an occupant is using the vehicle in a manner that poses an imminent threat of death or serious physical injury to the officer or another person.

3) Roadblocks: This decision to establish a roadblock shall consider:

   a. The safety of the officers.

   b. The risk of physical injury to the occupants of the pursued vehicle.

   c. The protection of citizens and their property.

   d. That all stationary roadblocks must be clearly visible at a distance sufficient to enable approaching vehicles to stop safely. The officer in charge of the roadblock shall notify communications of the exact location.

4) PIT maneuver: Only officers trained in this particular maneuver will attempt to employ this procedure.

   a. PIT Maneuvers will not be done at speeds greater than 45 mph unless deadly force would be justified and supervisory authorization has been granted.

5) Stop Sticks/spike strips:

   a. Only officers trained in the use of Stop Sticks/spike strips shall deploy them Officers are responsible for making sure that their use is contained in the pursuit report. The deploying officer shall advise pursuing units and all other units that they should distance themselves from the pursued vehicle and be prepared to slow down before entering the deployment site. Other traffic shall be diverted from the site if at all possible.

    **b.** Officers deploying spike strips should be mindful of their own safety during deployment and not take unnecessary risks in their attempt to lay out the spike strip.

**M.** In all cases, officers shall employ felony/high risk traffic stop techniques at the end of pursuits.

**N.** **Reasons for Discontinuation of Pursuit:** Any officer involved in a pursuit shall terminate the pursuit, and immediately notify communications of his point of discontinuation under any of the following conditions:

    1) When ordered by a supervisor, or any other higher-ranking member of the Agency;

    2) When the officer believes the level of danger created by the pursuit outweighs the necessity for immediate apprehension;

    3) When the risk conditions have increased and the subject's identity has been established to the point where later apprehension can be accomplished and there is no longer any need for immediate apprehension;

    4) When the location of the pursued vehicle is no longer known;

    5) When motorists/pedestrians are involved in an accident as a result of the pursuit, immediate assistance shall be given. If there is only one agency vehicle, then this vehicle must stop to provide assistance.

    6) Discontinuation of a pursuit requires the officer(s) to abandon all active attempts to stop and/or follow the suspected vehicles and officer(s) shall turn off all emergency equipment.

**O.** **Inter-jurisdictional Pursuits:**

    1) Pursuits from this jurisdiction into another jurisdiction:

        a. Notify, through communications, the other jurisdiction as soon as possible of the reasons for the pursuit, the vehicle description and if assistance is requested.

        b. Officers who pursue across state lines may not have the same privileges afforded to peace officers within the State of Texas.

    2) Pursuits from another jurisdiction into this jurisdiction:

        a. The communications staff should determine the number of police vehicles from the other jurisdiction that are involved in the pursuit, find out the circumstances of the pursuit to include the offense, vehicle description and if assistance is requested.

        b. Supervisors will only approve assistance from this jurisdiction if the pursuit is consistent with the policies of this Agency. If the pursuit does not conform to this policy, officers shall not engage in the pursuit but may attempt to control intersections/roadways to promote the safety of innocent persons in the vicinity.

    **c.** A supervisor from this jurisdiction will proceed to the point of completion of the pursuit as quickly as possible.

**P.** **Report and Review Process:** The on-duty supervisor conducts an immediate investigation of the circumstances of the pursuit and shall submit a written report regardless of whether the pursuit was discontinued or terminated, or the subject was apprehended. The Agency Pursuit Report shall be completed after any pursuit. In addition to providing the required information on the form, the supervisor will indicate in the narrative section the following:

1) The reason or probable cause for engaging in the pursuit;

2) An account of all violations committed during the course of the pursuit;

3) A summary of tactics employed to apprehend the subject;

4) The exact point of the discontinuation, apprehension, or termination of any pursuit.

5) If the subject is apprehended, there should be an account of the officer's involvement in that arrest.

6) The supervisor's report additionally will include the following:

    **a.** Officers assigned to the pursuit and the assignment of all those involved in the pursuit in various roles;

    **b.** A summary of any accidents or other incidents arising from or related to the pursuit;

    **c.** A complete evaluation on the adherence of the pursuit's conduct to the Agency pursuit policy;

    **d.** If the supervisor discontinued the pursuit, the time and location that the pursuit was ordered terminated.

    **e.** Furthermore the supervisor will:

        **i.** Collect copies of reports and police vehicle video from all officers involved in the pursuit.

        **ii.** Order and include a copy of the communications/dispatch tapes.

        **iii.** Review each report to ensure that all required information is present;

        **iv.** Conduct an analysis of the pursuit and complete the appropriate section of the Pursuit Report.

        **v.** Attach copies of the officers' reports, including his report and forward the packet to the Sheriff or their designee.

7) The Sheriff of their designee will determine compliance with all statutes and policies and make a recommendation for further action (various forms of discipline, suspension, letter, verbal reprimand, and/or retraining.

**Q.** **Training:**

    1) Officers shall not be authorized to utilize any equipment or tactic during a pursuit unless the officer has received proper training and/or certification with respect to that equipment or tactic.

    2) Officers and dispatchers shall receive training on this policy.

5. An officer designated by the Sheriff shall prepare an annual report evaluating the pursuit history and frequency during that year and then report to the Sheriff. This report shall access the adequacy of the written policy, training and field implementation of the Agency's pursuit policy.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

POLICY:  RESPONSE TO RESISTANCE

1. **Purpose:**  The purpose of this policy is to direct members in the appropriate response to resistance.

2. **Policy:** The policy of this Agency is to protect and serve all citizens, while at the same time respecting the rights of suspects, and balancing the need for member safety in response to resistance events.   It is the policy of this agency that members will use only objectively reasonable force to bring an incident or event under control.   Objectively reasonable force is only that force which is necessary to accomplish lawful objectives.  All responses to resistance must be objectively reasonable.

3. **Definitions:**

   A. **Deadly Force:** Any force that creates a substantial likelihood of causing serious bodily harm or death.

   B. **Non-Deadly Force:** All uses of force other than those that is likely to cause serious bodily harm or death.

   C. **Imminent:** Impending or about to occur.

   D. **Objectively Reasonable:** The amount of force that would be used by other reasonable and well-trained members when faced with the circumstances that the member using the force is presented with.

   E. **Reasonable Belief:** Reasonable belief means that the person concerned, acting as a reasonable person believes that the prescribed facts exist.

   F. **Serious Bodily Harm/Injury:** Serious bodily injury shall mean bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body.

   G. **Active resistance:** A subject actively resists when they take affirmative action to defeat a member's ability to take them into custody.

   H. **Passive resistance:** A subject who takes no affirmative action to defeat the member's ability to make an arrest but who does not respond to verbal commands and presents a refusal to move by sitting down or acting as dead weight.

   I. **Electronic Control Device:** Electronic Control Devices, TASER,™ or stun-guns (electronic control weapons) that disrupt the central nervous system of the body. (See Electronic Control Device Policy)

4. **Procedure:**

A. **Force Options:** Members have several force options that will be dictated by the actions of the suspect upon the appearance of the member. Members may be limited in their options due to the circumstances and actions of the subject. For example, a member who immediately observes a subject with a firearm unjustifiably threatening another may immediately respond with deadly force without considering other force options.

   1) **Command Presence:** Visual appearance of member where it is obvious to the subject due to the member's uniform or identification that the member has the authority of law.

   2) **Verbal Commands:** Words spoken by the member directing the subject as to the member's expectations.

   3) **Soft Empty Hand Control:** Member's use of hands on the subject to direct the subject's movement; Techniques that have a low potential of injury to the subject.

   4) **Chemical Spray:** Where subject exhibits some level of active resistance, members may use chemical spray to temporarily incapacitate the subject.

   5) **Electronic Control Devices:** Where subject exhibits some level of active resistance a member may use an electronic control device to temporarily incapacitate the subject.

   6) **Hard Hand Control:** Punches and other physical strikes, including knees, kicks and elbow strikes that have the possibility of creating mental stunning and/or motor dysfunction.

   7) **Impact Weapons:** Batons, ASP/Expandable Baton may be utilized in cases where the member believes the use of these weapons would be reasonable to bring the event under control. Examples would be where other options have been utilized and failed or where based on the member's perception at the time, the other options would not be successful in bringing the event to a successful conclusion.

   8) **Canine:** Use of canine to bite and hold subject to prevent escape or to gain control of a subject who is actively aggressing toward member(s). Prior to deployment of a canine, a warning in the form of an announcement shall be made when feasible.

   9) **Deadly Force:** Any force that creates a substantial likelihood of causing serious bodily harm or death

B. In determining the appropriate force options available to overcome a subject's resistance the member should consider:

   1) How serious is the offense the member suspected at the time the particular force used?

   2) What was the physical threat to the member or others?

   3) Was the subject actively resisting or attempting to evade arrest by flight?

C. Under Texas State Statutes an officer is authorized in using force while making arrests:

1) A peace officer, or a person acting in a peace officer's presence and at his direction, is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making an arrest or search, or to prevent or assist in preventing escape after arrest, if:

    a.    the actor reasonably believes the arrest or search is lawful or, if the arrest or search is made under a warrant, he reasonably believes the warrant is valid; and

    b.    before using force, the actor manifests his purpose to arrest or search and identifies himself as a peace officer or as one acting at a peace officer's direction, unless he reasonably believes his purpose and identity are already known by or cannot reasonably be made known to the person to be arrested.

2) Under Texas State Statues deadly force is justified under the following circumstances:

    a.    A peace officer is justified in using deadly force against another when and to the degree the peace member reasonably believes the deadly force is immediately necessary to make an arrest, or to prevent escape after arrest, if the use of force would have been justified under Subsection (a) and:

    b.    the actor reasonably believes the conduct for which arrest is authorized included the use or attempted use of deadly force; or

    c.    the actor reasonably believes there is a substantial risk that the person to be arrested will cause death or serious bodily injury to the actor or another if the arrest is delayed.

D. **Deadly Force:** In accord with these statutes and the Fourth Amendment of the United States Constitution the use of deadly force is objectively reasonable when:

1) The member is faced with an imminent threat of serious bodily harm or death to him/herself, or some other person who is present, or;

2) To prevent the escape of an individual in cases where the member has probable cause to believe that the subject has committed a violent felony involving the infliction or threatened infliction of serious bodily harm or death AND by the subject's escape they pose an imminent threat of serious bodily harm or death to another.

3) Members should warn the subject prior to using deadly force where feasible.

E. Once the subject's active resistance has ceased and control has been gained a member is no longer authorized to use force. Members should immediately

provide any necessary medical assistance to the subject to the degree to which they are trained and provide for emergency medical response where needed.

F. Discharge of Firearms Restrictions:

1) Warning shots are prohibited.

2) Discharge of firearms is prohibited when the member is presented with an unreasonable risk to innocent third parties.

3) When a moving vehicle is involved, use of deadly force by discharging a firearm is dangerous, can be ineffective, and should not occur when there is an unreasonable risk to the safety of persons other than the subject. Whenever possible, members should avoid placing themselves in a position where use of deadly force is the only alternative.

4) Even when deadly force is justified, firearms shall not be discharged at a vehicle unless:

   a. The member has a reasonable belief that an occupant of the vehicle poses an imminent threat of death or serious physical injury to the member or another person, or

   b. The member has a reasonable belief that an occupant is using the vehicle in a manner that poses an imminent threat of death or serious physical injury to the member or another person, and there is no avenue of escape.

   c. Members shall consider the potential threat to innocent third parties under such circumstances.

G. **Less-Lethal Weapons/Tactics:** Prior to deployment of any less-lethal weapon, members must be trained and certified in the proper use of the weapon from both the technical and legal aspects. All deployments must be consistent with this Agency's use of force training and policy.

1) **Chemical Spray:**

   a. Chemical Spray shall not be deployed as a compliance technique for a person who is passively or verbally non-compliant. Active resistance shall be required.

   b. Chemical Spray shall never be used as a punitive measure.

   c. Members should never spray from a pressurized can directly into a subject's eyes from a close distance due to the potential for eye injury as a result of the pressurized stream. Members should never spray directly into a subject's eyes from closer than three feet or the distance recommended by the manufacturer of the spray (whichever is shorter) unless deadly force would be justified.

   d. Members shall consider alternatives to chemical spray when attempting to control a subject in a crowded-enclosed area due to the innocent over-spray that may cause the onset of panic.

e.  Members shall consider alternatives to chemical spray when the event is inside a building, particularly where the building has a closed-ventilation system due to the potential impact on innocent persons who may have to be evacuated (temporarily) from the locations.

f.  Once control is gained, members should immediately provide for the decontamination of the subject.

g.  If the person shows any signs of physical distress or does not recover in a reasonable amount of time, members should immediately direct an emergency medical response and render first-aid at the degree for which they are trained.

2)  **Impact Weapons:** Batons, ASP/Expandable Baton

a.  Impact weapons may be utilized in cases where the member concludes based on the surrounding events that the use of these weapons would be reasonable to bring the event under control.

b.  Examples would be where other options have been utilized and failed or where based on the member's perception at the time, the other options would not be successful in bringing the event to a successful conclusion.

c.  Members shall not intentionally strike a person in the head with an impact weapon unless deadly force would be justified.

d.  Impact tools as non-impact weapons: Member may use impact tools for non-impact strike techniques such as come-alongs and restraint holds in accordance with agency training.

3)  **Immediate measure of defense** - Where necessary member may take action or use any implement to defend the member's life or safety, or the life or safety of another, with implements or devices not normally intended to be weapons or issued as public safety equipment.

## MARTIN COUNTY SHERIFF'S PFFICE
## STANTON, TEXAS

## POLICY: SECONDARY EMPLOYMENT

I.    **Purpose:** The purpose of this policy is to establish guidelines governing Extra Duty Details and Outside employment by employees of this Agency.

II.   **Policy:** It is the policy of this Agency to allow employees the opportunity to perform extra duty details within the scope of their job classifications and to allow them to engage in outside employment which does not conflict with their official duties.

III.  **Definitions:**

    A.   **Extra Duty Details:** Performance of law enforcement duties not within regularly scheduled hours provided to any business, person, or enterprise which has been approved by the Sheriff. These services will be compensated according to a contractual agreement established by the Sheriff and the business, person or enterprise in need of services.

    B.   **Outside Employment:** Employment of a non-law enforcement nature in which vested law enforcement powers are not a condition for employment. The work provides no real or implied law enforcement service to the employer and is not performed during assigned hours of duty.

IV.   **Procedures**

    A.   **Extra Duty Details:** Performance of law enforcement duties not within regularly scheduled hours provided to any business, person, or enterprise which has been approved by the Sheriff. These services will be compensated according to a contractual agreement established by the Sheriff and the business, person or enterprise in need of services.

    B.

        a.   **Permit Process:** The Agency will establish guidelines that will ensure compliance with all elements of this policy concerning Extra Duty Details. The request must be approved by the Sheriff or Chief Deputy prior to members of this Agency accepting a detail. The process will include the following:

            i.   A fee schedule will be agreed upon before any work is done. The schedule, including hours worked will be pre-determined for each job.

            ii.   The Sheriff and business, person, or enterprise will be in agreement regarding the number of Officers required to safely perform the service requested.

            iii.   All fees paid in connection with Extra-Duty Details will be paid directly to the officer performing the work.

b. **Appearance:** Officers shall comply with all Agency regulations concerning uniform standards and personal appearance during any Extra Duty Detail.

c. **Schedule:** The Agency will assign a supervisor to coordinate the Extra Duty Detail program. The supervisor will ensure that all Officers interested in working are provided an equal opportunity for assignment via a rotating list or other mechanism to ensure fairness in the assignments.

d. **Limitations:** The following are examples of limitations upon Extra Duty Details that would not be approved:

    i. Officers are not permitted to work more than 24 additional hours per week unless approved in writing by the Sheriff.

    ii. Officers shall not be eligible while on sick leave or within (8) eight hours of a sick leave.

    iii. Officers who have not completed the FTO program are not eligible for assignment.

e. **Prohibitions:** Extra Duty Details will not be allowed for the following:

    i. Private security agencies or private investigation agencies.

    ii. Any Adult Entertainment establishment.

    iii. Any use of Agency personnel that is not in the best interest of the Agency

    iv. .Any other detail not approved by the Sheriff.

**C. Outside Employment:** Employment of a non-law enforcement nature in which vested law enforcement powers are not a condition for employment. The work provides no real or implied law enforcement service to the employer and is not performed during assigned hours of duty. Officers shall be required to furnish the following:

f. Description of the type of work to be performed, i.e. teaching, sales, construction, etc. and information concerning the potential employer.

g. Maximum number of hours per week employee will engage in the outside employment, (no more than 24 hours will be approved).

h. Acknowledgement indicating that no aspect of the employment could be considered questionable in nature such as placement in compromising situations, use of law enforcement powers, or have the potential to bring discredit to the Agency.

i. Acknowledgement indicating the services rendered will not be connected with security work, investigations, or collection or repossession of property and will not involve any law enforcement duties.

C. **Approval:** Approval to engage in any outside employment will be submitted through the employee's chain of command, requiring final approval by the Sheriff. Permission can be withdrawn at any time.

## MARTIN COUNTY SHERIFF'S OFFICE
## STANTON, TEXAS

## POLICY: SEXUAL HARRASSMENT

I.  **Purpose:** The purpose of this policy is to prohibit sexual harassment and discrimination within this Agency. The policy also provides for the reporting and department response to sexual harassment or discrimination.

II.  **Policy:** It is the policy of this agency to prohibit sexual harassment or sexual discrimination in any form and to provide employees with a mechanism for reporting and resolving allegations of sexual harassment and discrimination.

III.  **Definitions:**

A.  **Sexual Harassment** - Unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct when:

a.  submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

b.  submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or

c.  such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

B.  **Two Types of Sexual Harassment:**

a.  **Quid Pro Quo Harassment:** A circumstance by which an employee is afforded a favorable employment action in exchange for a sexual favor. Examples:

i.  submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

ii.  submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or

iii.  Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

b.  **Hostile Work Environment:** A circumstance by which an employee is confronted with an environment involving sexually explicit language, photos, or conduct. Examples:

i.  submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

  ii. submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or

  iii. such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

C. **Sexual Harassment Progression:**

 a. Non-Physical

  i. Pressure for Dates

  ii. Sexual Jokes

  iii. Teasing

  iv. Remarks

  v. Questions

  vi. Suggestive Looks/Gestures

 b. **Physical/Non-Physical Intimidation:**

  i. Sexual Favors

  ii. Pinching

  iii. Touching

  iv. Phone Calls

  v. Blocking

  vi. Cornering

  vii. Sending Materials of Sexual Nature

 c. **Physical/Bodily Harm**

  i. Sexual Assault

  ii. Attempted Sexual Assault

D. **Sexual Discrimination:** The disparate treatment of an employee with respect to work benefits, conditions, assignments, promotions, etc. based upon the gender of the employees unless such disparate treatment is necessary based upon some bona-fide occupational qualification i.e. undercover assignment where a male is necessary due to the nature of the infiltration.

IV. **Procedure:** Supervisors and all employees have an obligation to provide a work environment free of all harassment. This includes taking steps to insure that the agency is in a position to control prohibited harassment whether it is done by supervisors, co-workers or non-employees (such as vendors working with the agency or supplying services).

A. **Reporting Requirements:** All employees within the agency have an obligation to promptly report violations of this policy. This would include sexual harassment,

sexual discrimination or indicators of a hostile, offensive work environment that the employee experiences, witnesses, or otherwise has knowledge of.

B. The department shall promptly investigate all complaints regarding harassment or discrimination regardless of their origin.

C. Complaints should be made to an employee's immediate supervisor. If the immediate supervisor is involved in the allegation or the employee is uncomfortable with making a report to their immediate supervisor, they may by-pass the chain of command in order to report the harassment or discrimination.

D. Once an allegation is made steps should be taken to separate the involved employees while an investigation into the allegations is conducted. The separation should be undertaken in an equitable manner which is non-punitive in nature. In no case will the complaining employee be forced to change assignments against his/her choice. The supervisor is required to immediately stop any conduct which might continue or aggravate the allegation(s).

E. All allegations of sexual harassment or sexual discrimination shall be documented and forwarded up the chain of command to the Sheriff or their designee.

F. All complaints of sexual harassment or discrimination shall be immediately and thoroughly investigated.

G. The alleged victim of the sexual harassment shall be kept informed of the progress of the investigation.

H. At the conclusion of the investigation, the alleged victim and the accused employee should be informed of the conclusions reached by the investigation.

I. Where evidence is established to sustain a violation of this policy, immediate disciplinary action shall be taken against the offending employee, up to and including termination from employment with this agency.

J. No employee shall be retaliated against for reporting allegations of sexual harassment or discrimination.

## MARTIN COUNTY SHERIFF'S OFFICE
## STANTON, TEXAS

## POLICY: SEXUAL MISCONDUCT

I. **Purpose:** Law enforcement officers are empowered with authority by their government to protect the public from criminal activity. When an officer abuses this authority for sexual purposes, and violates another person, the officer not only commits a crime against the victim, but also damages the credibility and trust of the entire law enforcement community with the public. The purpose of this policy is to caution all Officers that any violation of the public trust involving sexual misconduct will result in severe consequences including prosecution to the fullest extent possible.

II. **Policy:** It is the policy of this Office to train all Officers concerning the potential for criminal sexual misconduct within law enforcement, how to recognize it, and the requirements for reporting any violation to the appropriate authorities.

III. **Definitions:**

    A. Criminal Sexual Misconduct: The abuse of authority by a law enforcement officer for sexual purposes that violate the law.

    B. Sexual Misconduct: Any sexual activity while on-duty or stemming from official duty. Sexual misconduct includes but is not limited to use of official position and official resources to obtain information for purposes of pursuing sexual conduct.

    C. Intimate Part: Genital area, inner thigh, groin, buttocks, or breasts of a person.

    D. Actor: The person accused of sexual assault

    E. Sexual Contact: Any contact for the purpose of sexual gratification of the actor with the intimate parts of a person not married to the actor.

IV. **Procedure:**

    A. Sexual activity of any nature while on duty is prohibited.

    B. Sexual Misconduct is prohibited and shall be disciplined up to and including termination.

    C. Any contact for the purpose of sexual gratification of the actor with the intimate parts of a person while on duty is prohibited.

    D. Officers shall not engage in sexual contact with another person who is in custody and such deputy has supervisory or disciplinary authority over such other person.

    E. Reporting Requirements: Any employee of this Office, who is made aware of any violation of this policy, is required to report the violation to their supervisor. The supervisor will immediately contact his/her supervisor, or the command level personnel having Internal Affairs responsibility who will immediately initiate an

investigation in accordance with their established investigative policy. The investigation will involve other investigative elements of the Agency as necessary and any forensic evidence will be protected and processed immediately. The accused Officer's supervisor will not attempt to resolve a complaint of this nature with the complainant, and is required to make immediate contact with the command level personnel having Internal Affairs responsibility.

V.  **Discipline:**

   A.  Any Officer found to be in violation of the provisions of this policy shall be disciplined up to and including termination and criminal charges where established.

   B.  Any employee having knowledge of a violation of this policy, who fails to report said violation should also be disciplined up to and including dismissal and criminal charges if appropriate. If the violation involves supervisory personnel, the reporting Officer will notify the appropriate command level officer and will not be strictly held to his or her chain of command.

**MARTIN COUNTY SHERIFF'S OFFICE**
**STANTON, TEXAS**

## POLICY: SOCIAL NETWORKING

I. **Purpose:** The purpose of this policy is to direct the employees of this Agency with respect to the use of the Internet, the worldwide web, and social networking as a medium of communication impacting this department. It is essential for every employee of this Agency to recognize that the proper functioning of any law enforcement department relies upon the public's confidence and trust in the individual officers and this department to carry out the law enforcement function. Therefore, any matter that brings individual employees or the Agency into disrepute has the corresponding effect of reducing public confidence and trust in our Agency, thus, impeding our ability to work with and serve the public. Professionalism is the most significant factor in high-level performance that in turn builds the public confidence and trust. While employees have the right to use personal/social networking pages or sites, as employees of this Agency, they are public servants who are held to a higher standard than the general public with regard to standards of conduct and ethics.

II. **Policy:** It is the policy of this Agency to maintain a level of professionalism in both on-duty and off-duty conduct that fulfills the mission of our Agency. Any publication through any medium which is potentially adverse to the mission, operation, morale, or efficiency of this Agency will be deemed a violation of this policy. As such, reasonable limitations are placed upon the personal use of social media by Agency employees. The internet, blogs, twitter, the worldwide web, social networking sites and any other medium of electronic communication shall not be used in a manner which is detrimental to the mission and function of this Agency. The Agency understands that its employees may use internet accounts and sites for reasonable personal, family, recreational and community purposes and in no manner is attempting to limit this use.

III. **Definitions:**

A. For the purpose of this policy "social networking website" means an internet-based service that allows individuals to:

a. Construct a public or semi-public profile within a bounded system, created by the service;

b. Create a list of other users with whom they share a connection within the system;

c. View and navigate their list of connections and made by others within the system.

## IV. Procedure:

A. Employees of this agency are prohibited from using agency computers for any unauthorized purpose including surfing the internet or participating in social networking sites.

B. Employees of this agency are prohibited from posting, or in any other way broadcasting, without prior agency approval, information on the internet, or other medium of communication, the business of this agency to include but not limited to:

    a. Photographs/images relating to any investigation of this agency.

    b. Video or audio files related to any investigation of this agency

    c. Video, audio, photographs, or any other images etc. which memorialize a law enforcement related action of this agency.

    d. Logos/Uniforms/Badges or other items which are symbols associated with this agency.

    e. Any other item or material which is identifiable to this agency.

C. Employees of this agency who utilize social networking sites, blogs, twitter or other mediums of electronic communication in their off-duty time shall maintain an appropriate level of professionalism and appropriate conduct so as not to broadcast in a manner which is detrimental to the mission and function of this agency.

    a. Employees shall not use references in these social networking sites or other mediums of communication that in any way represent themselves as an employee of this agency without prior agency approval. This shall include but not be limited to:

        i. Text which identifies this agency.

        ii. Photos that depict the logos, patches, badge or other identifying symbol of this agency.

        iii. Accounts of events which occur within this agency.

        iv. Any other material, text, audio, video, photograph, or image which would be identifiable to this agency.

    b. Employees shall not use a social networking site or other medium of internet communication to post any materials of a sexually graphic nature.

    c. Employees shall not use a social networking site or other medium of internet communication to post any materials which promote violence or weaponry.

    d. Employees shall not use a social networking site or other medium of communication to post or broadcast any materials which would be detrimental to the mission and function of this agency.

D. Employees of this agency are prohibited from using their title as well as any reference to this agency in any correspondence to include emails, postings, blogs,

twitter, social network sites such as Facebook, unless the communication is of an official nature and is serving the mission of this agency. This prohibition also includes signature lines in personal email accounts. An employee may seek agency approval for such use.

E. No member of this agency will request or require any employee or prospective employee to provide any password or other related account information in order to gain access to the employee's or prospective employee's account or profile on a social networking website or to demand access in any manner to an employee's or prospective employee's account or profile on a social networking website. Nothing in this policy shall limit this agency's right to:

    a. Promulgate and maintain lawful workplace policies governing the use of the "employer's / agency's" electronic equipment, including policies regarding Internet use, social networking site use, and electronic mail use; and

    b. Monitor usage of the "employer's / agency's" electronic equipment and the "employer's / agency's" electronic mail without requesting or requiring any employee or prospective employee to provide any password or other related account information in order to gain access to the employee's or prospective employee's account or profile on a social networking website.

F. This agency is not prohibited from obtaining information about a prospective employee or an employee that is in the public domain.

G. Administrative Investigations: Employees who are subject to administrative investigations may be ordered to provide the agency with access to the social networking site when the subject of the investigation is directly, narrowly, and specifically related to the employee's performance or ability to perform his or her function within the agency or when the subject of the investigation is potentially adverse to the operation, morale, or efficiency of the agency.

## MARTIN COUNTY SHERIFF'S OFFICE
## STANTON, TEXAS

## POLICY: STOP/SEARCH/ARREST/PERSON

1. **Purpose:** The purpose of this policy is to direct the members of this agency on the lawful limits of authority with respect to contacts with persons.

2. **Policy:** The policy of this Agency is to protect and serve the constitutional rights of all citizens when stopping, arresting or searching individuals while balancing the needs of law enforcement in solving crime for the protection of the community.

3. **Definitions:**

   A. **Probable Cause: (search):** Facts and circumstances based upon observations or information that would lead a reasonable law enforcement officer to believe that evidence of crime exists and that the evidence exists at the place to be searched.

   B. **Probable Cause: (arrest):** Facts and circumstances based upon observations or information that would lead a reasonable law enforcement officer to believe that a crime has been or is being committed and the person to be arrested is the one who is or has committed the crime.

   C. **Reasonable Grounds:** As used in this policy reasonable grounds shall have the same meaning as probable cause.

   D. **Reasonable Suspicion (temporarily detain):** Facts and circumstances based upon observations or information, short of probable cause but based upon articulated facts that would lead a reasonable law enforcement officer to believe that criminal activity is afoot.

   E. **Reasonable Suspicion (frisk):** Facts and circumstances based upon observations or information, short of probable cause but based upon articulated facts that would lead a reasonable law enforcement officer to believe that a person who is lawfully stopped is in possession of a weapon.

   F. **Frisk (weapon):** A limited type of search where an officer may only conduct a search for weapons. With respect to a person such a search is limited to a pat-down of the subject's outer-clothing.

   G. **Strip search:** The removal or rearrangement of clothing that results in the exposure or observation of a portion of the genitals, the buttocks or the breasts of a female.

   H. **Consensual Contact:** An interaction between a member of law enforcement and the public that is voluntary in nature. The law enforcement member has shown no authority that would cause a reasonable person to believe that they had no choice but to respond or comply with the officer's efforts. Under this type

of contact an officer has no power to detain an individual who chooses not to participate in the contact.

I.  **Arrest:** An arrest is the taking of a person into custody so that he may be held to answer for the alleged commission of a public offense.

J.  **Fresh pursuit** means a pursuit without unreasonable delay by a peace officer of a person the officer reasonably suspects has committed a felony.

4.  **Procedures:**

A.  Consensual Contact - An officer may approach anyone and attempt a consensual contact.

1)  Officers are not required to have reasonable suspicion for this type of contact.

2)  Officers may not take any steps through words or conduct to stop the person's movement under this type of stop.

3)  A person cannot be compelled in any way to participate in the stop.

B.  Reasonable Suspicion Based Stops/Terry Stops-An officer who is aware of facts and circumstances that would lead a reasonable police officer to conclude that criminal activity is afoot, may stop a person, using reasonable force short of deadly force, and detain the person for a reasonable amount of time to investigate further.

C.  Reasonable Suspicion Based Frisk - An officer may conduct a limited frisk/pat-down of a person's outer clothing when the officer has reasonable suspicion to believe that a person who has been lawfully stopped is in possession of a weapon that poses a danger to the officer or others present.

1)  Items that may support reasonable suspicion:

a.  The type of crime for which the stop is based is one that would lead a reasonable officer to conclude generally involves a weapon.

b.  The officer observes a bulge in the subject's clothing that has the appearance of a weapon.

c.  The officer has information (anonymous tip merely providing description and location is not enough) indicating that a person is armed.

d.  The officer is aware of the subject's history of carrying weapons.

e.  The officer observes the subject reach as if reaching for, or reaching to hide a weapon (furtive movements).

2)  Plain feel: an officer may retrieve items which the officer feels during the frisk under the following circumstances:

a.  The officer is conducting a valid frisk; and

b.  The officer feels an item which the officer knows is not a weapon;

    c. The officer immediately recognizes the item as evidence or contraband without making a further intrusion. Squeezing or manipulating the item during the frisk would constitute a further intrusion under this section and would therefore invalidate the seizure.

3) The frisk is limited to a pat-down of the outer-clothing and does not include reaching into pockets etc. unless the officer feels an item during the frisk that the officer reasonably believes is a weapon.

D. Arrest: An officer may arrest an individual if the officer has probable cause to believe that a crime has been committed and probable cause to believe that the person to be arrested is the person who committed that crime. Once probable cause is established an officer may take custody of the subject and involuntarily transport the subject.

1) A peace officer commissioned and authorized by another state to make arrests for felonies who is in fresh pursuit of a person for the purpose of arresting that person for a felony may continue the pursuit into this state and arrest the person.

E. Under Texas Law:

1) Any peace officer may arrest, without warrant:

    a. Persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony, violation of Title 9, Chapter 42, Penal Code, breach of the peace, or offense under *Section 49.02, Penal Code*, or threaten, or are about to commit some offense against the laws;

    b. Persons who the peace officer has probable cause to believe have committed an assault resulting in bodily injury to another person and the peace officer has probable cause to believe that there is danger of further bodily injury to that person;

    c. Persons who the peace officer has probable cause to believe have committed an offense defined by *Section 25.07, Penal Code* (violation of Protective Order), or by *Section 38.112, Penal Code* (violation of Protective Order issued on basis of sexual assault), if the offense is not committed in the presence of the peace officer;

    d. Persons who the peace officer has probable cause to believe have committed an offense involving family violence;

    e. Persons who the peace officer has probable cause to believe have prevented or interfered with an individual's ability to place a telephone call in an emergency, as defined by *Section 42.062(d), Penal Code*, if the offense is not committed in the presence of the peace officer; or

    f. A person who makes a statement to the peace officer that would be admissible against the person under Article 38.21 and establishes probable cause to believe that the person has committed a felony.

g. A peace officer shall arrest, without a warrant, a person the peace officer has probable cause to believe has committed an offense under *Section 25.07, Penal Code* (violation of Protective Order), or *Section 38.112, Penal Code* (violation of Protective Order issued on basis of sexual assault), if the offense is committed in the presence of the peace officer.

h. If reasonably necessary to verify an allegation of a violation of a protective order or of the commission of an offense involving family violence, a peace officer shall remain at the scene of the investigation to verify the allegation and to prevent the further commission of the violation or of family violence.

i. A peace officer who is outside his jurisdiction may arrest, without warrant, a person who commits an offense within the officer's presence or view, if the offense is a felony, a violation of Chapter 42 or 49, Penal Code, or a breach of the peace. A peace officer making an arrest under this subsection shall, as soon as practicable after making the arrest, notify a law enforcement agency having jurisdiction where the arrest was made. The law enforcement agency shall then take custody of the person committing the offense and take the person before a magistrate in compliance with Article 14.06 of this code.

j. The justification for conduct provided under *Section 9.21, Penal Code,* applies to a peace officer when the peace officer is performing a duty required by this article.

k. In this article, "family violence" has the meaning assigned by *Section 71.004, Family Code.*

l. A peace officer listed in Subdivision (1), (2), or (5), Article 2.12, who is licensed under Chapter 1701, Occupations Code, and is outside of the officer's jurisdiction may arrest without a warrant a person who commits any offense within the officer's presence or view, other than a violation of Subtitle C, Title 7, Transportation Code.

m. A peace officer listed in Subdivision (3), Article 2.12, who is licensed under Chapter 1701, Occupations Code, and is outside of the officer's jurisdiction may arrest without a warrant a person who commits any offense within the officer's presence or view, except that an officer described in this subdivision who is outside of that officer's jurisdiction may arrest a person for a violation of Subtitle C, Title 7, Transportation Code, only if the offense is committed in the county or counties in which the municipality employing the peace officer is located.

n. A peace officer making an arrest under this subsection shall as soon as practicable after making the arrest notify a law enforcement agency having jurisdiction where the arrest was made. The law enforcement agency shall then take custody of:

o. The person committing the offense and take the person before a magistrate in compliance with Article 14.06; and

     **p.** Any property seized during or after the arrest as if the property had been seized by a peace officer of that law enforcement agency.

2) Warrantless Arrest for Offense Within View

     **a.** A peace officer or any other person, may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against the public peace.

     **b.** A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view.

3) Felony Arrest: Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused.

**F.** Search Incident to Arrest of a Person:

1) When an officer arrests a person on the street, the officer may conduct a thorough search of the subject's person (not strip search) and the subject's immediate area of control.

2) Cross-gender pat-downs and searches are restricted to those circumstances where exigent circumstances are present and no officer of the subject's gender is available to conduct the search.

3) The purpose of this search is the following:

     **a.** Protecting the officer from attack;

     **b.** Preventing the person from escaping;

     **c.** Discovering or seizing the fruits of the crime for which the person has been arrested; or

     **d.** Discovering or seizing any instruments, articles, or things that are being used or which may have been used in the commission of the crime for which the person has been arrested.

4) This search may include the subject's pockets as well as any items they are in possession of at the time of the arrest.

**G.** Privilege from Arrest:

1) Voter's Privilege: A voter may not be arrested during the voter's attendance at an election and while going to and returning from a polling place except for treason, a felony, or a breach of peace.

2) Witness' Privilege: A witness is privileged from arrest while attending, going to, and returning from court.

    a. The privilege provided by this section extends for a period computed by allowing one day of travel for each 150 miles of the distance from the courthouse to the witness's residence.

    b. This section does not apply to an arrest for a felony, treason, or breach of the peace.

3) Military Privilege:

    a. A member of the state military forces may not be arrested, except for treason, felony, or breach of the peace, while the person is going to or coming from a place that the person was required to be for military duty.

    b. This section does not prevent a peace officer from issuing a traffic summons or citation to appear in court at a later date that does not conflict with the member's duty hours.

4) Diplomatic and Consular Immunity

    a. Background. Diplomatic immunity is a principle of international law by which certain foreign government officials are not subject to the jurisdiction of local courts and other authorities for both their official and, to a large extent, their official and, to a large extent, their personal activities. It should be emphasized, however, that even at its highest level, diplomatic immunity does not exempt diplomatic officers from the obligation of conforming with national and local laws and regulations.

    b. Categories of persons entitled to diplomatic immunity are as follows:

      i. Diplomatic Agent: Enjoys the highest degree of privileges and immunity. Diplomatic Agents may not be handcuffed (except in extraordinary circumstances), arrested or detained for any criminal offense. Generally, they are immune from any civil suits, but are not immune from receiving a citation/summons. Family members of these persons enjoy the identical privileges and immunity.

      ii. Diplomatic Administrative and Technical Staff: Enjoy privileges and immunity similar to Diplomatic Agents. Diplomatic Administrative and Technical Staff may not be handcuffed, arrested or detained for any criminal offense. They enjoy immunity from civil suits arising in connection with the performance of their official duties. Officers may issue a citation for a motor vehicle violation. Family members enjoy identical privileges or immunity.

      iii. Diplomatic Service Staff: They are accorded few privileges and immunities. Diplomatic Service Staff may be arrested or detained for criminal offenses. They enjoy immunity from civil suits arising in connection with the performance of their official duties. Officers may issue a citation for traffic violations. Family members enjoy no privileges or immunities.

      iv. Consular Officers: Enjoy privileges and immunity from criminal and civil matters arising from their performance of official duties. Consular Officers may be arrested or detained, pursuant to an arrest warrant,

for felony offenses. They may be prosecuted for misdemeanors, but may not be arrested or detained prior to trial or other disposition of charges. Officers may issue a citation for traffic violations. Generally, family members enjoy no privileges or immunity.

    **v.** Consular Employees: Enjoy privileges and immunity from criminal and civil matters arising from their performance of official duties. Consular Employees may be arrested or detained for criminal offenses. Officers may issue a citation for traffic offenses. Family members enjoy no privileges or immunity.

    **vi.** Honorary Consuls: Enjoy privileges and immunity from criminal and civil matters arising from their performance of official duties. Honorary Consuls may be arrested or detained for criminal offenses. Officers may issue a citation for a traffic offense. Family members enjoy no privileges and immunity.

**5)** Procedure for Notification When a Foreign National is arrested.

    **a.** Determine the foreign national's country. In the absence of other information, assume this is the country on whose passport or other travel documents the foreign national travels.

    **b.** All foreign nationals must be told of their right to Consular notification.

    **c.** If the foreign national's country is not on the mandatory notification list:

        **i.** Offer, without delay, to notify the foreign national's consular officials of the arrest/detention.

        **ii.** If the foreign national asks that consular notification be given, notify the nearest consular officials of the foreign national's country without delay.

    **d.** If the foreign national's country is on the list of mandatory notification countries:

        **i.** Notify that country's nearest consular officials, without delay, of the arrest/detention. Tell the foreign national that you are making this notification

    **e.** Keep a written record of the provision of notification and actions taken.

**B.** Strip Search: In order to conduct a strip search of an individual two threshold issues must be met:

    **1)** The person must first be arrested based upon probable cause to believe that person has or is committing a crime.

    **2)** Field: The officer must have <u>probable cause to believe</u> that the arrestee is concealing evidence, contraband or weapons on their person. These searches shall be conducted at an agency facility or jail, unless exigent circumstances exist that make the search necessary to protect the officer or others from serious bodily harm or death. In such a case, the officer shall

obtain supervisory authorization before making this search, unless no supervisor is available. In all cases the officer must seek a private area to conduct the search which is out of view of the public and other persons.

C. Booking: Strip searches during the booking process may only be conducted when officers can articulate <u>reasonable suspicion</u> to believe that the subject is concealing weapons or contraband.

1) All strip searches conducted shall be performed by persons of the same sex as the arrested person, in a professional manner, and on premises where the search cannot be observed by persons not physically conducting the search.

2) Officers performing strip searches must obtain the written permission of a supervisor for the purpose of authorizing the strip search.

3) In all cases where a strip search has been conducted, the officer will document the following:

   a. The name of the person searched;

   b. The person who conducted the search;

   c. The supervisor who authorized the search;

   d. The offense the suspect was arrested for;

   e. Facts and circumstances that led the officer to believe that the suspect was hiding weapons or contraband on his or her person;

   f. The manner in which the search was conducted;

   g. The persons who were present during the search;

   h. The location where the search occurred;

   i. The items that were recovered as a result of the search.

D. Body Cavity Searches: No search of any body cavity other than the mouth shall be conducted without a duly executed search warrant. Any warrant authorizing a body cavity search shall specify that:

1) The search must be performed under sanitary conditions;

2) The search must be conducted by or under the supervision of a physician licensed to practice medicine in all branches in this state.

## MARTIN COUNTY SHERIFF'S OFFICE
## STANTON, TEXAS

## POLICY: TRANSPORTATION AND RESTRAINT OF PRISIONERS

1. **Purpose:** To establish guidelines for the reasonable and safe transportation and restraint of prisoners.

2. **Policy:** Transportation and restraint by law enforcement agencies of persons who are in custody is a constant requirement and a frequent activity. Two general time periods are involved. The first is immediately after arrest, when the arrestee is taken to the agency's holding facility for booking, processing and short-term holding. The second concerns the movement of prisoners from the holding facility to a hospital or other medical facility; to court; and for other reasons. Regardless of the reason for the transportation of prisoners, potential hazards are always present. Therefore, it is the policy of this Agency to establish uniform procedures that provide adequately for the safety and security of prisoners, transporting officers, and the public during prisoner transport.

3. **DEFINITIONS:**

    A. **CONTRABAND** – Articles or substances prohibited from the possession of prisoners.

    B. **HANDICAPPED PRISONER**-A prisoner with an anatomical, physiological, or mental impairment that hinders mobility.

    C. **PRISONER** – A persons who has been arrested and taken into custody.

    D. **PROPER SEARCH** – The physical inspection of a prisoner's person, clothing, and effects for weapons or potentially hazardous articles to be used against law enforcement personnel. This search shall also have consideration for contraband, such as narcotics, narcotic paraphernalia and implements which may facilitate an escape from custody or confinement. All searches shall be conducted in accordance with this agency's policy on search of persons.

    E. **RESTRAINING DEVICES** – Equipment such as handcuffs, flex-cuffs, leather restraint belts, leg irons, hobble devices, and maximal restraint tools, used to restrain the movement of the prisoner.

    F. **SECURITY HAZARD** – Any threat to the security of the prisoner, to the facility in which he/she is held, or to others with whom the prisoner may come into contact. Estimations of the degree of security hazard will govern the means of transport, the kinds of restraining devices to be used, and other actions to be taken by agency personnel to provide proper protection for and security of the prisoner.

    G. **TRANSPORTING OFFICER** – an agency employee who is responsible for transporting a prisoner from one point to another.

**H. TRANSPORTATION OPERATIONS:**

1) **VEHICLE INSPECTION:** At the beginning and end of each shift, all vehicles regularly used for prisoner transport, shall be inspected by the agency member assigned to that vehicle to determine that all safety devices are in working order and that the interior is free of weapons and contraband.

2) Prior to placing a prisoner in a vehicle for transport or detention, the officer shall inspect the interior for weapons and contraband. An additional inspection shall be conducted after the prisoner has been delivered to the detention facility or other destination.

3) Officers shall utilize audio and video recording devices throughout the entire transport where such equipment is available.

**I. RESTRAINING DEVICES:**

1) Officers shall use only those restraining devices for which they have been trained.

2) With few exceptions, all prisoners shall be handcuffed, double locked and checked for proper application, with their hands behind their back.

3) Officers shall document, in their report that at the time of arrest the "subject was handcuffed, checked for fit and double-locked."

4) Officers may use discretion in restraining persons or using other restraining devices in specific cases such as:

   a. Obvious state of pregnancy;

   b. Prisoner has a physical handicap;

   c. Prisoner has injuries that could be aggravated by standard handcuffing procedures;

   d. Elderly; and very young persons.

   e. All prisoners shall be secured with seatbelts. No prisoner shall be handcuffed to any part of the police vehicle.

   f. When deemed necessary by transporting officer, leg irons, hobbles or flex-cuffs may be applied to the ankles of a prisoner who violently resists arrest, is an escape risk, is prone to violent behavior, or manifests mental disorders that pose a threat to the prisoner, the transporting officer, or the public.

**J.** The Sheriff or Chief Deputy shall be notified under special circumstances: The transporting officer shall make notification prior to the transport if the transport officers feel the need exists for the notification. This would include a risk considered to be higher than a normal transport. If the transport officer feels the circumstances of the transport have not elevated the risk factor, notification after the transport is permissible.

1) The officer is transporting a person who is handicapped;

2) The officer is transporting a person known to be mentally ill;

3) The officer is transporting a person with an injury;

4) The officer is transporting a person known to have a communicable disease.

5) In all such cases the officer shall, **where resources allow**, obtain necessary clearances from an appropriate mental health or medical professional as to the proper restraint and care of these individuals. Always remember, officer safety comes first, and if the person transporting feels the need for any/and or all methods of restraints available are needed, that transport officer is justified in using any and all restraint methods at his disposal.

6) All transports involving the special circumstances outlined above shall be documented as to the occurrence as well as the action taken.

7) In any case where the prisoner exhibits signs of a serious medical need, the prisoner shall be transported to a medical facility.

K. Escape: In the event of an escape during transport,

1) The transporting officer shall:

a. Immediately notify the dispatcher, Sheriff, and Chief Deputy.

b. Immediately coordinate with responding officers to establish a perimeter

c. Brief responding supervisory personnel.

2) The Sheriff or Chief Deputy shall:

a. Take command of the perimeter and search operation

b. Determine the need for additional agency/inter-agency resources

c. Ensure that all proper notifications are made

d. Ensure that the events surrounding the escape and search operation are properly documented through a report from each officer involved in the event.

L. TRANSPORT:

1) Prior to transport, the officer shall thoroughly search all prisoners for any weapons, tools of escape, or contraband.

2) The transporting officer shall conduct a pat-down frisk for the purpose of seizing any weapons or tools of escape. The officer shall conduct a further search incident to the arrest for the purpose of seizing weapons, contraband or evidence of the crime.

3) In the event that the transporting officer and prisoner are of the opposite sex, the transporting officer may conduct a limited pat-down frisk for the purpose of seizing any weapons, tools of escape or contraband. This search should be observed, if possible, by a witness or in front of the vehicle video camera, and

the officer is advised to use the back of his/her hand or some object such as a pen.

4) When possible and practicable, an agency member of the same sex should be requested for these types of searches.

5) Any search shall be documented by the transporting officer.

6) Prior to transporting a prisoner, the transporting officer shall notify the dispatcher:

   a. Identity of the prisoner;

   b. Arrest location and destination; and

   c. Vehicle odometer mileage; and

   d. Vehicle odometer mileage at time of arrival at the intended destination.

7) Prisoners shall be transported in the following manner:

   a. If the transport vehicle is equipped with a safety barrier, the prisoner shall be placed in the rear, right-side seat. The transporting officer(s) shall be positioned in the front seat. If no safety barrier is available, the prisoner may be placed in the rear, right-side seat or the front, right-side seat.

   b. If the transport vehicle is equipped with a safety barrier, and two prisoners are being transported, the prisoners shall be placed in the rear seat. The transporting officers shall be positioned in the front seat. If no safety barrier is available, the transporting officer may place both prisoners in back seat, or place one prisoner in the right rear seat and one in the right front seat.

   c. Up to three prisoners may be transported in a vehicle equipped with a safety barrier. It is preferred that two officers make the transport. The prisoners shall be placed in the rear seat. The transporting officers shall be positioned in the front seat. Three prisoners may be transported in a vehicle without a safety barrier, and by one officer. It will be up to the officer's discretion to determine the seating on transports of this nature.

   d. All prisoners being transported shall wear properly fastened seat belts.

   e. Prisoners shall not be transported in a reclined position.

   f. Any wheelchairs, crutches, prosthetic devices, and medication shall be transported with, but not in the possession of, the prisoner.

   g. Prisoners shall not be left unattended while being transported.

   h. Unless an extreme emergency, no stops will be made while transporting a prisoner.

   i. A transporting officer shall not respond to the need for law enforcement services or back-up unless the risk to other citizens or law enforcement officers is both clear and serious and the risk to the prisoner(s) is minimal. When the need for these services is of a non-serious nature, the officer shall notify dispatch.

j.  Prisoners of the opposite sex shall not be transported in the same vehicle unless extraordinary circumstances exist, and only when approved by the Sheriff.

k.  If a prisoner is to be transported to court or any other facility, the prisoner is believed to be a security hazard, the transporting officer(s) shall inform the receiving court of law enforcement personnel in order that they may prepare to accept custody of the prisoner.

8)  SPECIAL TRANSPORT SITUATIONS

a.  If a prisoner becomes sick or injured incidental to arrest, the transporting officer, when possible, shall summons emergency medical support to examine the prisoner prior to transport.

b.  If emergency hospital treatment is necessary, the prisoner and at least one officer shall be transported by the rescue to the hospital. The officer shall remain with the prisoner (unless prevented by emergency circumstances or treatment needs) until the hospital personnel release the prisoner or until appropriate security can be arranged.

c.  Prisoners with physical handicaps may be transported in agency vehicles. All reasonable precautions shall be taken by the transporting officer to ensure the security and reasonable comfort of the prisoner, without compromising the safety of the transporting officer(s).

d.  Appropriate measures for the security and control of prisoners in medical facilities shall be taken. Whenever an officer transports a prisoner, or is transported with a prisoner, to a medical facility, the officer shall:

(a)  Maintain a constant view of the prisoner;

(b)  Ensure that proper restraints are applied to the prisoner until the medical staff needs them removed for medical treatment. Once treatment is completed, proper restraints shall be reapplied;

(c)  Guard against any injury to the officer and all medical staff;

(d)  Officers shall avoid using pepper spray or other chemical restraint due to the potential for secondary impact on hospital personnel and other patients.

(e)  If required to guard the prisoner, and when possible, rotate guarding assignments at regular intervals to avoid complacency;

(f)  Ensure that the prisoner does not have contact with visitors;

(g)  Notify hospital security, if available, and the law enforcement agency within the jurisdiction of the medical facility of the presence of a prisoner within the hospital;

(h)  If the prisoner is admitted to the medical facility, and cannot be arraigned by a magistrate or appropriate official, or issued a summons, notify the Sheriff or Chief Deputy to arrange for 24 hour guard coverage;

(i) Upon the prisoner's release from the medical facility, and prior to transport, the prisoner shall be thoroughly searched; and

(j) Upon the prisoner's release from the medical facility, the transporting officer shall ensure that all medical records and instructions for future treatment are in the prisoner's possession and are provided to the detention facility.

e.  Whenever a prisoner is to be transported and has been involved in the following types of incidents special safety considered shall be adhered to:

(a) When the prisoner:

(i)  Was involved in a violent struggle during apprehension,

(ii) Was subjected to the use of a chemical agent, Taser, neck restraint hold, multiple body weight control, or impact strikes to the body,

(iii) Is highly intoxicated on either alcohol or drugs or a combination.

(iv) Is secured by maximal restraints, four point restraints, TARP devices, or a hobble tool, or

(v) Evidences a difficulty in breathing, **the transporting officers shall:**

- Ensure that the prisoner remains in a seated, upright position.

- One officer shall maintain constant visual and audible observation of the prisoner.

- If there is any indication that the prisoner is in medical distress the officer(s) shall administer emergency medical attention consistent with his/her level of training and shall immediately summon emergency medical support, and

- Shall advise the detention staff accepting the prisoner of all of the above circumstances



WARRANT NO. 23FEL2-00079

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE JUSTICE COURT |
| | § | |
| v. | § | PRECINCT NO. 2 & 4 |
| | § | |
| HAMBLIN, AUSTIN EUGENE | § | MARTIN COUNTY, TEXAS |

## ARREST WARRANT

**TO ANY PEACE OFFICER OF THE STATE OF TEXAS: GREETINGS**

WHEREAS, I find that the verified facts stated by Affiant in the Affidavit show that Affiant has probable cause for the belief expressed therein and establish the existence of proper grounds for the issuance of this Warrant; now, therefore, you are

COMMANDED to arrest HAMBLIN, AUSTIN EUGENE, the above-named Defendant, described as follows: WHITE / MALE, DOB 12/10/1990, with known address of 3700 Hamilton Street, Big Spring, TX if they are found in your county, and bring Defendant before me, Justice of the Peace, in and for Precinct 2 & 4 of Martin County, Texas at my office located at 301 N St. Peter Street, Stanton, Texas 79782, INSTANTER, or before another magistrate of the state as provided by Art. 15.16 of the Code of Criminal Procedure, then and there to answer the State of Texas for an offense against the laws of the State:  THEFT OF PROPERTY > $2500 < $30,000, TEXAS PENAL CODE 31.03 (e)(4)(A) A STATE JAIL FELONY , of which offense Defendant is accused by the written complaint, under oath of DEPUTY ANDERS DAHL, MARTIN CO. S.O. , filed before me;

HEREIN FAIL NOT, but return this Warrant, showing how you have executed the same.

ISSUED AND SIGNED on this the 16th day of May, 2023 to certify which witness my hand this day.

*Nancy Bradshaw*
JUDGE NANCY BRADSHAW
JUSTICE OF THE PEACE, PRECINCT 2 & 4
MARTIN COUNTY, TEXAS

RECOMMENDED BOND AMOUNT: $30,000.00

**DISCOVERY**

## RETURN AND INVENTORY



THE STATE OF TEXAS
COUNTY OF MARTIN

The undersigned Affiant, being a Peace Officer under the laws of the State of Texas and being duly sworn, on oath certifies that the foregoing Warrant came to hand on the day it was issued and that it was executed on the May 17, 2023, by making the search directed therein and seizing during such search the following described property.

1. SEE ATTACHMENT A

_____
AFFIANT

SUBSCRIBED AND SWORN to and before me, the undersigned authority, on this the 23rd day of May, 2023


_____
NOTARY PUBLIC
IN AND FOR THE STATE OF TEXAS

**BRAD INGRAM**
Notary Public, State of Texas
Notary ID# 12693030-2
My Commission Expires 12-19-2026



DEPOSITION
EXHIBIT

PENGAD 800-631-6989

 Outlook

Inventory

From Anders Dahl <adahl@co.martin.tx.us>
Date Fri 8/25/2023 3:10 PM
To

1 attachment (14 KB)
HAMBLIN SW INVENTORY.docx;

Chief Deputy Anders Dahl
Martin County Sheriff's Office
3522 Interstate 20
Stanton, Texas 79782
432-756-3336
adahl@co.martin.tx.us

 Outlook

**Re: Inventory**

From ~~Kiska Hamblin~~

Date Mon 9/18/2023 1:05 PM

To    Anders Dahl <adahl@co.martin.tx.us>

Mr Dahl,
I would like to include the things that were taken are:
harbor freight surface prep tool
Dremmil tool and tool set.
Other harbor freight tools
And everything I have provided receipts for twice.

I'm very disappointed in the way this is being handled.
With that being said I'd like a copy of the police report. If I need to file a request formally, please let me know.

Along with the total amount of hand tools, power tools and other items that were disputed when the search was conducted. I was informed by you and Jesse metcalf that it was going to be processed and that we would receive a copy in the form of a final count. However seeing as I haven't received any response to the request, I'd like to ask one more time on the record as to receiving it.
Thank you.
Kiska Hamblin

> On Aug 25, 2023, at 2:31 PM, ~~Kiska Hamblin kiskahamblin@hotmail.com~~ wrote:
>
> Thank you. However, I'd like the list of the hand tools, power tools and etc that was taken also.
>
> Sent from my iPhone
>
> > On Aug 25, 2023, at 2:10 PM, Anders Dahl <adahl@co.martin.tx.us> wrote:
> >
> >
> > Chief Deputy Anders Dahl
> > Martin County Sheriff's Office
> > 3522 Interstate 20
> > Stanton, Texas 79782
> > 432-756-3336
> > adahl@co.martin.tx.us
> > <HAMBLIN SW INVENTORY.docx>



























 3700 Hamilton St



Imagery ©2023 CNES / Airbus, Maxar Technologies, Map data ©2023     50 ft



# 3700 Hamilton St
Building

     

Directions     Save     Nearby     Send to     Share
                                    phone

3700 Hamilton St, Big Spring, TX 79720

## Photos

5/17/23, 5:40 AM

3798 Hamilton St - Google Maps

 3798 Hamilton St



Image capture: Jul 2022    © 2023 Google

https://www.google.com/maps/@32.2133374,-101.4865474,3a,75y,250.19h,84.68t/data=!3m7!1e1!3m5!1svw.IIVCxkrODr0iAiafouSAI2o0!6shttp...  1/1

5/17/23, 5:41 AM

3798 Hamilton St - Google Maps



3798 Hamilton St



Image capture: Jul 2022    © 2023 Google



https://www.google.com/maps/@32.2131574,-101.4864909,3a,75v,300.78h,71t/data=!3m6!1e1!3m4!1sSz!97Yl_kzleivArA3FwVRAl2e0!7i16384!8i8192    1/1

5/17/23, 5:40 AM                                                    3798 Hamilton St - Google Maps

 **Google** Maps    3798 Hamilton St







**SNELLGROVE MESSAGES TO BRAD INGRAM**
**7 SCREENSHOTS.**
**PRODUCED BY SNELLGROVE**



**New iMessage**    Cancel

To: Brad Ingram

iMessage
May 15, 2023 at 8:28 AM

If it's ok I would like to visit about timing of all that needs to go down.

Brian

Let me check and see where we are

May 15, 2023 at 2:29 PM

We will be ther in 15 to 20 if that works for you

May 17, 2023 at 6:57 PM

Brian. How are you doing after you hopefully have had a chance to slow



**New iMessage**    Cancel

To: Brad Ingram

Brian. How are you doing after you hopefully have had a chance to slow down for the day? If you are not tired I want some of what you take.

Jun 7, 2023 at 3:21 PM

Hamblin arrested.

Thx

👍

Jun 29, 2023 at 4:17 PM



**New iMessage**    Cancel

To: Brad Ingram

Can I get a copy of report on Austin
He has filed unemployment and I need it to dispute his claims

Yes sir

I'll have someone print off a copy

Thank you

It will be ready in the morning

👍



**New iMessage**    Cancel

To: Brad Ingram

Thu, Jul 24 at 12:35PM

Did you get to talk to Josh Hamby the other day? He had just finished a big murder case.

Thu, Jul 24 at 2:49PM

No. I missed him

Thu, Jul 24 at 4:43PM

*I think you got there just as everything was wrapping up.*

With everything that has happened since October I strongly suspect your





---



**New iMessage**    Cancel

To: Brad Ingram

With everything that has happened since October I strongly suspect your *current sheriff has a hand* in this. I'm surprised he drug a commissioner into it.

He spent his first 6 months looking for something I had done wrong that he could file charges on me. He bragged about that in the office from what I hear.

When Hamby dropped the case, which is not uncommon, all of a



---



**New iMessage**    Cancel

To: Brad Ingram

When Hamby dropped the case, which is not uncommon, all of a sudden there is a law suit and he put in the paper he was trying to get the Rangers and DA to pick up the case. They both said it was civil.

Just sorry you got drug into this. This is not something the courts want to start where the bad guy sues the victim of a crime.

Yah. Feels backwards

I know

I don't think he will get

---



**New iMessage**    Cancel

To: Brad Ingram

Just sorry you got drug into this. This is not something the courts want to start where the bad guy sues the victim of a crime.

Yah. Feels backwards

I know

I don't think he will get very far with you. The odd thing is Metcalf did nearly all the legwork on this case and he was not sued.



Read 7/24/25



**SNELLGROVE MESSAGES TO DAHL**
**11 SCREENSHOTS**
**PRODUCED BY SNELLGROVE**









10:07

**New Message**    Cancel

To: Anders Dahl

May 17, 2023 at 10:06 AM

Grandparents are asking me if kids are at the house And if they need to come get them

The kids are inside with their mom

Ok

May 17, 2023 at 4:24 PM



Text Message · SMS

---



10:07

**New Message**    Cancel

To: Anders Dahl

This pickup was just at my diesel tank on one of my farms.
Sped at like crazy when we found him

Text Message · SMS

---

10:07

**New Message**    Cancel

To: Anders Dahl

Tomorrow I will find out who that truck is registered to

Kiska is now Trying to harass one of my employees wife.
Just drive up there.
Kiska isnaustin wife

I called and reported t

Yes sir. Dealing with criminals is not pleasant

May 18, 2023 at 6:41 AM

I have inventoried $17500 at retail so far.
I will be be back by 9:30 to

Text Message · SMS

---

10:08

**New Message**    Cancel

To: Anders Dahl

I have inventoried $17500 at retail so far.
I will be be back by 9:30 to 10

Yes sir

May 18, 2023 at 9:48 AM

I am back at warehouse Edgar the assistant is here if you want to interview

Will be there shortly

May 18, 2023 at 3:05 PM

I just emailed u a list.
$283,445

Text Message · SMS



**New Message**    Cancel

To: Anders Dahl

Thank you sir. Dispatch is entering the arrest warrant on Hamblin. Theft $150k - $300k with a $100,000 recommended bond amount

> Thx

May 18, 2023 at 7:35 PM

> Got a tip that they also may have a storage unit

Yes sir. I am working on it. I heard the same thing

> They able to pick him up?

Not that I've heard

Text Message · SMS



**New Message**    Cancel

To: Anders Dahl

> Did u call?

May 22, 2023 at 9:52 AM

> Give me a call when you have time

May 26, 2023 at 10:57 AM

Text Message · SMS



**New Message**    Cancel

To: Anders Dahl

> Got tip this was pawned by Austin in odessa Permian pawn 1229 east 8th.

I will check it out. Thanks!!!

Text Message · SMS



**New Message**    Cancel

To: Anders Dahl

> Austin is trying it sell the enclosed trailer that was in his driveway
> Been contacting some of our customers

Jun 29, 2023 at 4:14 PM

> Can I get police report on Austin's situation
> He has filed to get unemployment
> I need it to dispute his claims

Call either the sheriff or my Chief deputy as they are the ones that can release that information

Text Message · SMS

# EXHIBIT E



## APPENDIX TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Video Footage

1.  Axon_Body_3_Video_2023_05_17_0803_X60A00444 ............ Warrant Execution Video
    May 17, 2023
    8:02 a.m.–8:49 a.m.

2.  Axon_Body_3_Video_2023_05_17_1045_X60A00444 ............ Warrant Execution Video
    May 17, 2023
    10:44 a.m.–11:01 a.m.

(Attached on USB Flash Drive)

MSJ Appendix—Exhibit E



# RANDY COZART
# SHERIFF OF MARTIN COUNTY

3522 INTERSTATE 20 / P.O. BOX 1127, STANTON, TEXAS 79782
OFFICE: 432-756-3336          FAX: 432-607-2992
http://www.co.martin.tx.us/



**DEPOSITION EXHIBIT**
16

PENGAD 800-631-6989

Date: 04/14/2025
To: Hon. Josh Hamby 118th District Court
From: Chief Deputy Billy Reynolds

The Martin County Sheriff's Office received several emails and telephone calls from a Kiska Hamblin in regards to property taken from her residence by the previous Sheriff and his Deputies. I have been communicating with the Hamblins and on 03/06/2025 I had them come in and give me a written statement of the facts that transpired, which are as follows. On 05/11/2023 a Deputy Weston Phelps with the Martin County Sheriff's Office took a theft report from a Brian Snellgrove. Snellgrove claimed he believed one of his employees had been stealing from him and listed that he was missing a plasma cutter a mig welder and a aircompressor. Snellgrove believed these items were taken by his employee Austin Hamblin. The report number is 23-0135. A search warrant was issued for these items and the Martin County Sheriff's Office served the warrant. Note that The Sheriff's Office did not find any of the items listed in the search warrant, however there were a lot of snap on tools located in the residence of Austin Hamblin. Hamblin claimed to have receipts for 90% of the tools. Hamblin did provide the Sheriff's Office with receipts for snap on tools to Anders Dahl with the Martin County Sheriff's Office. Martin County Sheriff's Office Deputies on site for the search warrant were Sheriff Bad Ingram, Chief Deputy Jessie Metcalf, Sergeant Anders Dahl, Deputy Kelsey Brown, and Deputy Chris Mahurin. Body Camera footage shows Deputies going through the Hamblin Home with Austin Hamblin. Brian Snellgrove is then brought into the home and tells Martin County Sheriff's Office that everything in the home that has snap on on it belongs to him. Martin County Sheriff's Office take all snap on items out of the home, along with tools and car parts that are not snap on and place them in Snellgroves vehicle along with the Martin County Sheriff's Office units. These tools were then taken to Snellgrove's residence and were never logged in as evidence. An inventory list from the search warrant lists 51 items taken from the Hamblin's residence. According to the Hamblin's there were more items taken from their home than 51 items. Martin County Sheriff's Office's previous administration did not list all of the items taken and only put into the report that $283,000.00 worth of snap on tools were seized. The Hambiln's state that that of that $120,000.00 worth of tools that they personally owned were taken from them and that they want them back. The case against Austin Hamblin was dismissed. Martin County Sheriff's Office does not have any of these items in their possession. There are no receipts or even a written complaint from Snellgrove showing he owns the tools he claims Austin Hamblin took, in the possession of Martin County Sheriff's Office. Martin County Sheriff's Office believes that this issue should be resolved by allowing someone that is unbiased to look into this matter. The previous Sheriff is no longer here, and the complainant in this matter is a current sitting Martin County Commissioner. The Martin County Sheriff's Office is respectfully requesting the 118th District Attorney's Office to have the Texas Rangers investigate this matter so that this matter can be resolved. The original video in this case is with the case file here at the Martin County Sheriff's Office and is available upon request.



# RANDY COZART
# SHERIFF OF MARTIN COUNTY

3522 INTERSTATE 20 / P.O. BOX 1127, STANTON, TEXAS 79782
OFFICE: 432-756-3336          FAX: 432-607-2992
http://www.co.martin.tx.us/



DEPOSITION
EXHIBIT

17

Date: 11/4/2025
To: 118th District Attorney Josh Hamby
From: Chief Deputy Billy Reynolds

On 10/20/2025 A male by the name of Gabriel Alvarado came to the office to report a theft at 2100 West Side Drive at Brian Snellgrove's residence. Alvarado stated that someone broke into Snellgrove's garage which is attached to his residence, located a laptop and took the laptop apart. Alvarado stated this person took the hard drive out of the laptop and then put the laptop back together. Alvarado stated he was working on the computer the day before, and that the laptop was working fine. Alvarado said when he came in the next morning he could not get the laptop to turn on and after further investigation found that the hard drive was missing from the laptop. Alvarado stated that everything that exonerated Snellgrove, and Martin County was on that hard drive. I asked Alvarado who owned the lap top. Alvarado stated Snellgrove. I asked who's property was broken into where the lap top was? Alvarado stated Snellgrove. I told Alvarado that Snellgrove would have to come in because he was the victim to make the report. Alvarado departed.

On 10/21/2025 Snellgrove came into the office to file a burglary report. Snellgrove brought the laptop with him that was already taken apart. A report for burglary was taken report 25-0313, Snellgrove claims that he still retains all of the information on the hard drive, but the hard drive has been stolen. Due to the fact that this report of stolen property includes a list of property seized by the Martin County Sheriff's Office on a search warrant back in 2023 in which the case was dismissed and the suspect Austin Hamblin is now considered the victim and is asking for his property back, and has filed a federal lawsuit. I am asking the 118th District Attorney's Office to have the Texas Ranger's look into this incident.

On 10/27/2025 I received a call from Kiska Hamblin one of the victim's in this incident, wanting to know if I took a report for a stolen hard drive. I asked Kiska how she knew this. Kiska stated that she had asked for discovery and it was granted by a Federal District Court, and Snellgrove claimed that he reported the hard drive stolen. Martin County Sheriff's Office feels it is being used as a pawn in this litigation, and this lawsuit is from a previous administration and does not need to include this administration. Since a Federal Court is involved and discovery was granted to the plaintiff, this information will also be sent to the Federal Bureau of Investigation for review, as Snellgrove claimed to us that he had the data but not the hard drive. Martin County is transparent and will stay neutral in this process, and will cooperate fully with any investigation that may unfold. Thank you for your time and consideration in this matter.

_____

Chief Deputy Billy Ray Reynolds