1

**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND / ODESSA DIVISION**

AUSTIN HAMBLIN and KISKA HAMBLIN    §
                                    §
VS.                                 §
                                    §    NO.    7:25-cv-00245
MARTIN COUNTY, TEXAS                §
                                    §
BRAD INGRAM,                        §
                                    §
ANDERS DAHL,                        §
                                    §
KELSEY BROWN,                       §
                                    §
RORY GAMMONS,                       §
                                    §
WESTON PHELPS, and                  §
                                    §
BRIAN SNELLGROVE                    §

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANT BRIAN SNELLGROVE**

1.  Plaintiffs Austin Hamblin and Kiska Hamblin file this Motion for Partial Summary Judgment

    against Defendant Brian Snellgrove pursuant to Federal Rule of Civil Procedure 56 and Local

    Rule CV-7.

2.  Plaintiffs seek summary judgment establishing, as a matter of law: (i) that Snellgrove was a state

    actor under 42 U.S.C. § 1983 with respect to the conduct alleged in Counts 1, 2, and 3; (ii) that

    Snellgrove personally violated the Fourth Amendment as a matter of law (merits of Count 1);

    (iii) that Snellgrove personally violated the Fourteenth Amendment's procedural due process

    guarantee as a matter of law (merits of Count 2); (iv) that Snellgrove is liable for conversion

    (Count 5); (v) that Snellgrove is liable for abuse of process (Count 7); and (vi) that Snellgrove is

    liable under the Texas Theft Liability Act (Count 8).

3.  Damages on each cause of action remain for the jury.

**INTRODUCTION**

4.  Snellgrove's sworn deposition testimony, the Sheriff's Department's verified discovery responses, and the documentary record foreclose any genuine dispute on five interrelated liability questions presented by this Motion. Snellgrove is a state actor not only by operation of the joint-action doctrine but by Investigator Dahl's own sworn admission that he "conscripted" Snellgrove into the warrant-execution team.

5.  Once cloaked with the authority of the State, Snellgrove personally engaged in conduct that, on these undisputed facts, violated the Fourth and Fourteenth Amendments as a matter of law: he entered the Hamblin residence (including a child's bedroom) after the two items described in the warrant had already been located; he directed the seizure of property he could not conceivably have owned, including non-Snap-On items his business does not even sell; he caused the seized property to be transported across county lines, in violation of Texas Code of Criminal Procedure Article 18.10, to his own private barn; and he then stored disputed evidence in a facility he had personally admitted was inadequately secured, having recently been the victim of an unsolved theft notwithstanding seven existing cameras and with eleven employees freely accessing the same space.

6.  On those facts, no reasonable jury could find that Snellgrove was a private actor; that the seizure he directed was reasonable under the Fourth Amendment; that the deprivation of property was accomplished with constitutionally adequate process; that his exercise of dominion was anything other than wrongful; or that he used a two-item criminal-investigation warrant for its proper purpose, rather than as a substitute for the civil repossession suit he never filed. Partial summary judgment is appropriate on each.

## SUMMARY JUDGMENT EVIDENCE

7.  In support of this Motion, Plaintiffs rely on the following evidence, attached or filed concurrently:

    **Exhibit A** Oral and Videotaped Deposition of Brian Snellgrove, taken April 10, 2026 (cited herein as "Snellgrove Dep.")

    **Exhibit B** Sworn Statement of Investigator Anders Dahl, in which Dahl admits that he "conscripted" Brian Snellgrove to aid in the execution of the search warrant

    **Exhibit C** Defendant Snellgrove's Verified Answers to Plaintiffs' Requests for Admission

    **Exhibit D** Defendants Martin County Sheriff's Department's Verified Answers to Plaintiffs' Requests for Admission

    **Exhibit E** Search Warrant issued May 16, 2023, by 118th District Judge Shane R. Seaton

    **Exhibit F** Notarized Affidavit of Warren Kniepkamp dated February 11, 2024 (Snellgrove Dep. Ex. 5)

    **Exhibit G** Text Messages between Brian Snellgrove and Brad Ingram (Snellgrove Dep. Ex. 8)

    **Exhibit H** Snellgrove Inventory List (Snellgrove Dep. Ex. 3)

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Pre-Search Coordination Between Snellgrove and Sheriff Ingram

8.  Snellgrove and Sheriff Brad Ingram were personally acquainted before the search. Snellgrove testified that the two are "Acquaintances, small town friends," that they "know each other," and that they "attended some Bible study classes together." Snellgrove Dep. 81:2-4.

9.  On May 15, 2023, two days before the search, Snellgrove sent a text message to Sheriff Ingram stating: "If it's ok I'd like to visit about timing of all that needs to go down. Brian." Sheriff Ingram replied: "Let me check and see where we are." Snellgrove Dep. 122:14 to 123:2; Ex. G.

### B.    The Warrant Authorized the Seizure of Two Specific Items

10.  On May 16, 2023, 118th District Judge Shane R. Seaton issued a search warrant authorizing the search of the Hamblins' residence in Howard County for, and the seizure of, two specifi-

cally described items: a Snap-On Plasma Cutter Model 301 and a Snap-On Air Compressor. Ex. E; Snellgrove Dep. 46:23 to 47:5.

11. Snellgrove never reviewed the warrant before, during, or in any meaningful way after the search. He testified: "Q. Prior to or during the search, did you review the search warrant? A. No, sir." Snellgrove Dep. 45:14-16.

### C.    The Government's Own Admission: Investigator Dahl "Conscripted" Snellgrove

12. Defendant Investigator Anders Dahl has admitted under oath in this litigation that he "conscripted" Brian Snellgrove to aid in the execution of the search warrant. Ex. B; Third Am. Compl. ¶ 37. The verb is the government's own. "Conscript" is not the language of arms-length witness cooperation; it is the language of state recruitment of a private actor into the State's own enterprise. In its ordinary sense, to "conscript" is to "enroll into service by compulsion." Webster's Third New International Dictionary 482 (2002).

13. Snellgrove's own deposition testimony confirms the operational reality of that conscription. Snellgrove was telephoned the morning of May 17, 2023, was informed that more property had been found than the officers had anticipated, and was asked to come to the scene. Snellgrove Dep. 39:10-18. The officers told him "they did not have a, anything to haul off any large items so they asked if I could bring trailers or truck or something that things could be, could possibly be loaded in." Snellgrove Dep. 39:19 to 40:1.

14. In response, Snellgrove brought two different trailers, an older truck he had "converted to more of a toolbox type showing deal," and a pickup truck. He also brought additional Snellgrove Enterprises personnel, including Randy Jones, who drove one of the seizure vehicles at his direction. Snellgrove Dep. 40:1-8; 111:23 to 112:11.

15. Once on scene, Snellgrove acted under direct on-scene supervision of the officers. He testified, in unequivocal terms:

Q.      What did they direct you to do?

A.      After Austin said that most of those, that all those things in our area there did belong to me and not him, then I was directed by the officers to begin to load those items up.

Snellgrove Dep. 50:2-6; see also id. 50:1 ("Whatever the officers directed me to do."); id. 49:11-12

("I only did what I was directed to do by the,"); id. 49:17 ("only as I was directed by the deputies to,

to help identify").

16.     Snellgrove's employees physically lifted, carried, and loaded the Hamblins' toolboxes, equipment, and tools onto Snellgrove's private vehicles, also under the deputies' direction: "they gave us all directions." Snellgrove Dep. 112:8-16

**D.      The Search Continued After the Warrant Items Were Located**

17.     Snellgrove admits that the warrant items, including the air compressor, were located before he and the officers entered the Hamblin home:

Q.      You saw the items that you were told that the police were looking for. Including the air compressor?

A.      Yes.

Q.      After that time, what did you do next?

A.      Oh, as we identified items, at some point we did go into the house, like I said, only as I was directed by the deputies to, to help identify.

Snellgrove Dep. 48:7-17.

18.     Snellgrove personally entered a child's bedroom and directed the seizure of a toolbox located there:

Q.      Was there a toolbox that belonged to Hamblin's son in his son's bedroom? Do you recall that?

A.      There was a toolbox in the bedroom.

Q.      Did you direct that that item be taken?

A.      Yes.

Q.      And what was your basis for taking that particular item?

A.      Because it said Snap-On on it and, to my knowledge, it belonged to me.

Snellgrove Dep. 108:11-21. Snellgrove acknowledged that this toolbox was not unique but a "standard" black toolbox. Snellgrove Dep. 108:22 to 109:8.

19.    Snellgrove never inspected serial numbers on any of the seized property at the scene, did not record the serial numbers of the seized items, and performed no trace or look-up of the seized items' serial numbers prior to seizure. Snellgrove Dep. 57:6 to 58:25.

### E.    Non-Snap-On Items Were Taken Despite Snellgrove's Lack of Any Conceivable Ownership Claim

20.    The seizure included items not manufactured or distributed by Snap-On, including a Harbor Freight tool and other personal property. Snellgrove acknowledges that his Snap-On franchise business does not deal in Harbor Freight tools:

Q.    Were Harbor Freight Tools something that your business dealt in?

A.    Yeah, I'm not even aware if there was a Harbor Freight tool in there. I'm just saying it is a possibility.

Snellgrove Dep. 116:11-15. The point is dispositive: Snellgrove's sole asserted ownership claim to any of the seized property rests on his status as a Snap-On franchisee. He has no conceivable ownership claim to non-Snap-On property, yet his admitted role in identifying and directing the seizure caused such property to be taken.

### F.    The Cross-County Transport and Storage at Snellgrove's Private Barn

21.    Following the seizure, Snellgrove transported the property in his own vehicles, with his own employees, to his private commercial premises at 2100 Westside Drive in Stanton, Texas (Martin County), located 20 to 25 miles from the Hamblin residence in Howard County. Snellgrove Dep. 113:3-9. The property was transported across county lines.

22.     No magistrate order directing the manner of safekeeping or approving cross-county removal of the property was ever produced or shared with Snellgrove, and no court order issued authorizing the cross-county transport of the property or its release to him. Snellgrove Dep. 112:18 to 113:1. The Sheriff's Department has admitted in its verified discovery responses that the seized property was "removed from Plaintiffs' home and given to Snellgrove without a court order, without notice to Plaintiffs, and without any judicial determination that Snellgrove was the owner of the property." Ex. D; Third Am. Compl. ¶¶ 76-77.

### G.     Snellgrove's Admittedly Inadequate Custody and Storage of the Seized Property

23.     At the barn, the seized property was stored alongside Snellgrove Enterprises' ongoing Snap-On business inventory. Approximately eleven Snellgrove Enterprises employees had free access to the barn during the relevant period because Snellgrove "continued to operate our normal business operations out of the rest of the warehouse." Snellgrove Dep. 55:2-12.

24.     No lock was installed by the Sheriff's Office on the barn; the Sheriff's Office had no independent access; and Snellgrove gave only oral, in-person instructions to his employees "not to touch any of it or move any of it." Snellgrove Dep. 55:13-18.

25.     Snellgrove's own testimony establishes that he knew his facility was inadequately secured against theft, having previously been the victim of an unsolved theft at the same warehouse:

Q.     I was curious, because you said that your barn had been a victim of theft before, what additional security measures, if any, did you take in response to this theft? Did you put up more cameras? More sensors?

A.     Yeah, we put up different camera system.

Snellgrove Dep. 12:19 to 13:1. He further admitted that, at the time of the prior theft, the warehouse was already monitored by seven cameras viewing the interior and exterior, and that none of those cameras captured any information relating to the prior theft. Snellgrove Dep. 13:7 to 13:23.

26. Despite this admitted knowledge of inadequate security, Snellgrove's only post-theft remedial measure was to install additional cameras of the same kind that had already failed to capture the prior theft. He took no other measures to control access, segregate disputed property, or document chain-of-custody. The seized property remained accessible at all relevant times to all eleven of his employees during ordinary business operations. Snellgrove Dep. 55:2-18.

## H.       The Items Were Never Returned and Were Disposed of by Snellgrove

27. Plaintiffs furnished to law enforcement a notarized affidavit dated February 11, 2024, executed by Warren Kniepkamp, an independent Snap-On franchisee and Kiska Hamblin's stepfather, establishing that Kniepkamp had given specific Snap-On tools to the Hamblins prior to the May 2023 search. Ex. F. Snellgrove acknowledged at deposition that he had seen the Kniepkamp affidavit and testified, under oath, that he has no reason to dispute its truth or accuracy. Snellgrove Dep. 104:13 to 105:1.

28. The items seized on May 17, 2023, including those identified by the Kniepkamp affidavit, were never returned to the Hamblins. Snellgrove Dep. 105:2-4 ("Q. … to your knowledge were they ever returned to Austin and Kiska? A. No, sir.").

29. Snellgrove testified that he was told he "could resell those items" approximately "a couple months after" the May 17, 2023 search, in "summer, late summer" of 2023, and that "all those items eventually made it to an end user somewhere." Snellgrove Dep. 86:1-10; 96:25 to 97:2. The disposition therefore began well before the Kniepkamp affidavit was executed on February 11, 2024, and well before the criminal indictment against Austin Hamblin was dismissed on November 13, 2024.

30. The criminal indictment against Austin Hamblin was dismissed by the State of Texas on November 13, 2024, for insufficient evidence. No court ever held a hearing or entered any

order awarding ownership of the seized property to Snellgrove or to Snellgrove Enterprises. Snellgrove Dep. 86:11 to 87:8.

## I.        The Post-Search Paycheck Cancellation

31.    On May 18, 2023, the day after the search, Snellgrove canceled or placed a stop payment on Austin Hamblin's paycheck dated May 16, 2023. Snellgrove Dep. 90:16-19.

32.    Snellgrove gave the following sworn explanation:

Q.    Why did you do that?

A.    Because I had just discovered that he had a whole lot of my merchandise and it was very frustrating honestly to be paying someone who had just stolen a lot of stuff from me.

Snellgrove Dep. 90:20 to 91:1. Snellgrove was subsequently found to have violated the Texas Payday Law and was ordered to, and did, pay Austin the wages owed. Snellgrove Dep. 91:2-7.

## LEGAL STANDARD

33.    Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A fact is "material" if it might affect the outcome under the governing law, and a dispute is "genuine" only if a reasonable jury could return a verdict for the nonmovant. Anderson, 477 U.S. at 248; Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007).

34.    Where, as here, the movant bears the ultimate burden of persuasion at trial, he must come forward with evidence that, if uncontroverted, would entitle him to a directed verdict. Calbillo v. Cavender Oldsmobile, Inc., 288 F.3d 721, 725 (5th Cir. 2002); Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986). The nonmovant cannot defeat a properly supported

motion with conclusory assertions or unsupported speculation. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). And a party's sworn deposition testimony is binding upon him: he may not manufacture a fact issue by contradicting his own clear admissions. Doe ex rel. Doe v. Dall. Indep. Sch. Dist., 220 F.3d 380, 386 (5th Cir. 2000); S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996).

## ARGUMENT

**I.      The Court Should Hold, As a Matter of Law, That Snellgrove Was a State Actor for Purposes of Counts 1, 2, and 3.**

    **A.      The Joint-Action Test**

35.     To state a claim under 42 U.S.C. § 1983, a plaintiff must show that the defendant deprived him of a federal right while "acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); Cornish v. Corr. Servs. Corp., 402 F.3d 545, 549 (5th Cir. 2005). A private party may be treated as a state actor when his conduct is "fairly attributable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). Under the joint-action or willful-participation test, a private party becomes a state actor where he is "a willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27-28 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970). The Fifth Circuit has applied that test to private actors who coordinated with state officials to effect a deprivation. Cinel v. Connick, 15 F.3d 1338, 1343 (5th Cir. 1994); Mylett v. Jeane, 879 F.2d 1272, 1275 (5th Cir. 1989); Bass v. Parkwood Hosp., 180 F.3d 234, 241-42 (5th Cir. 1999).

36.     A particularly direct route to joint-action status, and the one squarely presented here, is the "conscription" scenario in which an officer affirmatively recruits a private actor into the execution of a warrant. The Supreme Court has long recognized that "the Fourth Amendment imposes limits on search-related conduct … by [those acting] under color of authority," and that officers violate the Fourth Amendment by bringing third parties into a home for purposes unrelated to the objectives of the authorized intrusion. Wilson v. Layne, 526 U.S. 603,

614 (1999). When the officer recruits the third party into the warrant team, that party is "cloaked with the authority of the state" and acts under color of law for § 1983 purposes. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296 (2001); Daniel v. Ferguson, 839 F.2d 1124, 1130 (5th Cir. 1988) (private actor who acts in concert with officers to effect a seizure is a state actor).

**B.      Dahl's Sworn Admission That He "Conscripted" Snellgrove Resolves the Question.**

37.    The state-actor inquiry in this case is supported by a defendant officer's own sworn statement. Investigator Dahl has admitted under oath that he "conscripted" Snellgrove to aid in the execution of the search warrant. Ex. B; Third Am. Compl. ¶ 37. That admission is evidence of joint action. The verb "conscript" was not chosen by Plaintiffs; it was chosen by the officer. It carries with it the unmistakable inference that the State drafted Snellgrove into a state function: the execution of state-authorized process.

**C.      Snellgrove's Own Admissions Independently Establish Joint Action.**

38.    Even setting Dahl's admission aside, Snellgrove's own sworn testimony satisfies every formulation of the joint-action test. The relationship between Snellgrove and the law-enforcement defendants is not the arms-length encounter of a victim and his investigators. It is a record of integrated, coordinated, and pre-planned conduct in which the private actor assumed an indispensable operational role at the State's express invitation:

   a.  **Pre-search coordination.** Two days before the search, Snellgrove texted the Sheriff: "I'd like to visit about timing of all that needs to go down." Snellgrove Dep. 122:14 to 123:2.

b. **Officer-initiated recruitment.** On the morning of the search, officers telephoned Snellgrove, told him there was more property than they had anticipated, and asked him to come help. Snellgrove Dep. 39:10-18.

c. **Provision of state-requested resources.** At the officers' express request, because the Sheriff's Office "did not have anything to haul off any large items," Snellgrove brought two trailers, a converted box truck, a pickup, and Snellgrove Enterprises personnel. Snellgrove Dep. 39:19 to 40:8.

d. **Direction by officers on scene.** "Whatever the officers directed me to do." Snellgrove Dep. 50:1. "I was directed by the officers to begin to load those items up." Snellgrove Dep. 50:5-6.

e. **Officer direction of Snellgrove's personnel.** Snellgrove brought Randy Jones and additional employees who drove the seizure vehicles and loaded the property. The deputies "gave us all directions." Snellgrove Dep. 112:8-16.

f. **State-authorized custody and transport.** The Sheriff personally approved Snellgrove's transport of the property to his private barn for storage; no court order or magistrate order directing safekeeping or approving removal accompanied the transfer. Snellgrove Dep. 112:18 to 113:9.

39.    Those undisputed facts compel a finding of joint action. The Fifth Circuit has held private actors to be state actors on far thinner records. See Cinel, 15 F.3d at 1343; Mylett, 879 F.2d at 1275. A private complainant who is summoned by name by the officers, told what to bring, told what to do on scene, told what to load, and entrusted with cross-county transport and continuing custody of the disputed property is the paradigm of a private actor acting jointly with the State. Snellgrove cannot evade this conclusion by characterizing himself as a mere bystander; in Lugar, the Supreme Court treated as a state actor a private party who had merely "made use of state procedures with the overt, significant assistance of state officials." 457 U.S. at 941. Snellgrove did far more. Nor does Snellgrove's own framing of his conduct as obedient compliance with officer direction insulate him; that compliance is precisely what triggers joint-action liability under Lugar and Dennis. The doctrine exists to reach a private actor who acts at, or in concert with, the State's direction.

40.    The Fifth Circuit's rejection of "mere bystander" defenses in this very context is instructive. In Creamer v. Porter, 754 F.2d 1311 (5th Cir. 1985), the court considered whether a deputy who accompanied a search team but did not lead it could escape liability under a "bystander" theory. The court held the bystander label "clearly erroneous" where the deputy "had read the warrant and was familiar with its limited scope," "personally seized at least one item, recorded serial numbers from other items that were seized, and remained with the … investigators throughout the search." Id. at 1318. If a sworn officer with that comparatively passive role cannot escape § 1983 liability as a "mere bystander," Snellgrove (a private actor who summoned the haul-off equipment, walked the property identifying "merchandise," directed the seizure of items in a child's bedroom, supplied the labor force, drove the property to his own facility, and ultimately resold it) cannot do so a fortiori.

41.    Although the Fifth Circuit has cautioned that proof of joint action ordinarily requires "evidence of an agreement" or a "meeting of the minds," Priester v. Lowndes County, 354 F.3d 414, 420 (5th Cir. 2004), the agreement need not be express; it may be inferred from coordinated conduct. Adickes, 398 U.S. at 158-59. The pre-search text exchange, the day-of telephone summons, Snellgrove's admitted direction-taking, and the Sheriff's personal facilitation of cross-county transport, together with Dahl's sworn use of the word "conscripted," more than satisfy that standard.

42.    Accordingly, summary judgment should be entered establishing that Snellgrove was a state actor for purposes of Counts 1, 2, and 3.

## II.    Snellgrove's Personal Conduct Violated the Fourth Amendment as a Matter of Law (Count 1).

### A.    A State Actor Who Personally Participates in an Unreasonable Seizure Is Personally Liable Under § 1983.

43.  Section 1983 imposes personal liability on any person who, acting under color of state law, personally participates in a constitutional violation. Anderson v. Creighton, 483 U.S. 635, 638 (1987); James v. Texas Collin Cnty., 535 F.3d 365, 373 (5th Cir. 2008). The Fifth Circuit has held that "personal involvement is an essential element of a civil rights cause of action" and that liability lies where the defendant's own conduct caused the deprivation. Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983); Anderson v. Pasadena Indep. Sch. Dist., 184 F.3d 439, 443 (5th Cir. 1999). Once Snellgrove is recognized as a state actor, his own admitted conduct is therefore actionable to the same extent as that of the law-enforcement defendants.

**B.      The Seizure Exceeded the Two-Item Scope of the Warrant.**

44.  The criminal indictment against Austin Hamblin was dismissed by the State of Texas on November 13, 2024, for insufficient evidence. No court ever held a hearing or entered any order awarding ownership of the seized property to Snellgrove or to Snellgrove Enterprises. Snellgrove Dep. 86:11 to 87:8.

45.  A warrant's reach is defined by its terms. "The scope of a search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Terry v. Ohio, 392 U.S. 1, 19 (1968); Maryland v. Garrison, 480 U.S. 79, 84 (1987) ("The Fourth Amendment requires that the scope of every authorized search be particularly described."). Officers who exceed the warrant's scope without independent justification (such as plain view) act unreasonably as a matter of law. Horton v. California, 496 U.S. 128, 140 (1990); Bailey v. United States, 568 U.S. 186, 200-01 (2013).

46.  The Fifth Circuit's decision in Creamer v. Porter, 754 F.2d 1311 (5th Cir. 1985), is directly on point and disposes of the core legal question. In Creamer, officers obtained a warrant authorizing the seizure of two specifically described items (two stolen televisions). After the

two televisions were located and seized, the officers continued searching the plaintiff's premises for an additional period and seized numerous additional items. The Fifth Circuit affirmed a judgment against the officers under § 1983, holding that "the extended search and seizure of objects at random falls far short of being justified" under either the plain-view or nexus exceptions. Id. at 1316 (citing Garland v. Maggio, 717 F.2d 199, 206 (5th Cir. 1983), and United States v. Kane, 450 F.2d 77 (5th Cir. 1971)). The court further rejected the officers' qualified immunity defense, finding that the extensive search "greatly exceeded the officers' discretionary scope of authority" and that the violations of clearly established Fourth Amendment law foreclosed qualified immunity. Id. at 1316-17.

47.    The factual parallel to this case is striking. Like the Creamer officers, Snellgrove and the law-enforcement defendants operated under a warrant authorizing the seizure of two specifically described items. Like the Creamer officers, they located those two items (the Snap-On Plasma Cutter and the Snap-On Air Compressor). Snellgrove Dep. 48:7-13. And like the Creamer officers, they continued searching after the warrant items had been located, ultimately seizing more than fifty additional items, including a toolbox in a child's bedroom whose only asserted basis for seizure was that it bore a Snap-On logo. Snellgrove Dep. 48:14-17; 108:11-21. If the conduct in Creamer was "objects at random" conduct unjustified by any warrant exception, the conduct here is materially indistinguishable. And the considerations that led the Creamer court to reject qualified immunity for sworn officers apply a fortiori to a private actor who has no claim to qualified immunity at all.

48.    Here the warrant authorized the seizure of two specifically described items: a Snap-On Plasma Cutter Model 301 and a Snap-On Air Compressor. Ex. E. Snellgrove admits that those two items were located in the Hamblin tool trailer and shed before any entry into the residence proper. Snellgrove Dep. 48:7-13. He further admits that, after the warrant items had been located, he and the deputies entered the residence to identify and remove additional items, including a toolbox in a child's bedroom whose only asserted basis for seizure was

that it bore a Snap-On logo. Snellgrove Dep. 48:14-17; 108:11-21. That conduct extended the seizure far beyond the two items the magistrate had authorized.

49.    The plain-view doctrine cannot rescue the additional seizures. To qualify, the incriminating character of an item must be "immediately apparent." Horton, 496 U.S. at 136-37; Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971); United States v. Buchner, 7 F.3d 1149, 1154 (5th Cir. 1993). A toolbox in a child's bedroom with a manufacturer's logo is not "immediately apparent" evidence of criminality, particularly when Snellgrove acknowledges that the toolbox was not unique but "standard," Snellgrove Dep. 109:7-8, and that he ran no serial-number check or trace before identifying it as his. Snellgrove Dep. 57:14 to 58:25. By Snellgrove's own admission, the basis for seizure of the bedroom toolbox was the brand on the label and his subjective belief that it belonged to him. Snellgrove Dep. 108:20-21. That is precisely the "general, exploratory rummaging" the Fourth Amendment forbids. Andresen v. Maryland, 427 U.S. 463, 480 (1976). Fourth Amendment reasonableness is measured objectively; the "subjective intent of the officer is irrelevant." Wren v. United States, 517 U.S. 806, 813 (1996); Brigham City v. Stuart, 547 U.S. 398, 404 (2006). Snellgrove's subjective belief that the property belonged to him therefore cannot rescue the seizure even if it were credited.

### C.    Snellgrove Directed the Seizure of Items He Could Not Possibly Own.

50.    Snellgrove's sole asserted ownership theory rests on his status as a Snap-On franchisee. Yet his admitted conduct caused the seizure of items not manufactured or distributed by Snap-On, including a Harbor Freight tool. Snellgrove Dep. 116:5-15. His business does not deal in Harbor Freight tools. Id. On those undisputed facts, Snellgrove had no conceivable ownership claim to the non-Snap-On items. Their seizure cannot have rested on Snellgrove's on-scene identification of property as his; nor can it have rested on the warrant, which author-

ized the seizure of two specifically described Snap-On items. The seizure of items Snellgrove could not possibly own falls squarely within Creamer's description of "objects at random" seized after the warrant items have been located: such conduct "falls far short of being justified" under the plain-view or nexus exceptions and is unreasonable as a matter of law. Creamer, 754 F.2d at 1316. See also Horton, 496 U.S. at 136-37. The point applies a fortiori to non-Snap-On items: even if a Snap-On logo could conceivably justify a plain-view seizure (it cannot, for the reasons in Subsection B), no logo, color, or characteristic of a Harbor Freight tool could conceivably support a good-faith plain-view inference that the tool belonged to Snellgrove's Snap-On franchise.

### D.    The Cross-County Transport Without a Magistrate's Order Was Statutorily Unauthorized and Therefore Unreasonable.

51.    Texas Code of Criminal Procedure Article 18.10 expressly governs the post-seizure handling of property taken under a search warrant. The statute provides that, upon returning the warrant, the officer shall deliver to the magistrate a copy of the inventory of the property taken into his possession under the warrant; that "[t]he officer who seized the property shall retain custody of it until the magistrate issues an order directing the manner of safekeeping the property"; and that, except as otherwise provided by subsection (b), "the property may not be removed from the county in which it was seized without an order approving the removal, issued by a magistrate in the county in which the warrant was issued." Tex. Code Crim. Proc. art. 18.10. The undisputed evidence is that the property was seized in Howard County and transported across the county line into Martin County. Snellgrove Dep. 113:3-9. No magistrate's order authorizing the cross-county removal was ever issued. Snellgrove Dep. 112:18 to 113:1.

52.    Where state law specifically circumscribes the manner in which officers may handle seized property, a flagrant departure from those procedures, particularly one that diverts custody

from the State to a private claimant, supports the unreasonableness of the seizure and post-seizure handling. See Soldal v. Cook County, 506 U.S. 56, 67-68 (1992) (Fourth Amendment seizure protections apply with full force where the seizure benefits a private interest under color of law). On this record, Snellgrove personally caused the post-seizure transport that contravened Article 18.10, by supplying the vehicles, the personnel, and the destination, after the officers had told him they had no means to haul the property. Snellgrove Dep. 39:19 to 40:8.

### E. Article 18.10 Imposed a Ministerial Custody Duty, Not a Discretionary Evidence-Handling Option.

53. Article 18.10 is written in mandatory, non-discretionary terms. The executing officer "shall retain custody" of property seized pursuant to a warrant until the magistrate issues an order directing the manner of safekeeping, and the property "may not be removed" from the county of seizure without an order approving removal issued by the magistrate in the county in which the warrant was issued. Tex. Code Crim. Proc. art. 18.10. Under Texas law, acts are ministerial when the law defines the duty with such precision and certainty as to leave nothing to the exercise of discretion or judgment; ministerial acts require obedience to orders or the performance of a duty regarding which the actor has no choice. City of Lancaster v. Chambers, 883 S.W.2d 650, 654 (Tex. 1994); Kassen v. Hatley, 887 S.W.2d 4, 9 (Tex. 1994). Article 18.10 fits that definition: once property is seized pursuant to a search warrant, the officer retains custody until the magistrate issues the safekeeping order, and removal from the county requires the specified magistrate order.

54. That matters here because Defendants cannot recast the transfer to Snellgrove as a discretionary evidence-handling choice. The statute did not authorize officers to choose a private claimant's barn as an alternate evidence facility, to transfer custody to the private claimant, or to permit cross-county removal absent the required magistrate order. The undisputed facts

are that the property was seized in Howard County, placed on Snellgrove's private vehicles, transported to Snellgrove's private commercial premises in Martin County, and never accompanied by any magistrate order directing safekeeping or approving removal. Snellgrove Dep. 112:18 to 113:9. Because Article 18.10 imposed a ministerial custody duty, the unlawful transfer was not an exercise of lawful discretion; it was a departure from the statutory authority governing the warrant. That statutory departure further supports Fourth Amendment unreasonableness, procedural due process liability, and the wrongfulness of Snellgrove's dominion over the property.

### F.    Snellgrove Continued the Search Over the Express Objection of a Co-Occupant.

55.    Plaintiffs' Third Amended Complaint and the Department's discovery responses establish that, when officers entered the property, Kiska Hamblin asked to see the warrant, was refused, and asserted her right to privacy and ordered the officers to leave. Third Am. Compl. ¶ 36; see also Tex. Code Crim. Proc. art. 18.06(b) (officers shall, upon request, give a copy of the warrant to the person from whom or from whose premises the property is taken). After the warrant's authorized objects had been located, continued searching required some independent justification. To the extent Defendants contend that continued entry or searching after that point rested on occupant consent or acquiescence, the Supreme Court has held that the express refusal of a physically present co-occupant defeats consent under Georgia v. Randolph, 547 U.S. 103, 120 (2006). Snellgrove's personal participation in entering the home and identifying additional property after the warrant items had been located took place against this backdrop of unrebutted, present-occupant objection. Snellgrove Dep. 48:14-17.

56.    In sum, summary judgment is appropriate establishing that Snellgrove's personal conduct on May 17, 2023, violated the Fourth Amendment.

III.    **Snellgrove's Conduct Violated Procedural Due Process as a Matter of Law (Count 2).**

     A.    **The Hamblins Had Constitutionally Protected Property Interests.**

57.    The Fourteenth Amendment forbids the deprivation of property without due process of law. Mathews v. Eldridge, 424 U.S. 319, 332 (1976). A possessory interest in personal property is unquestionably a constitutionally protected interest. Fuentes v. Shevin, 407 U.S. 67, 86 (1972); Soldal, 506 U.S. at 65-66. Snellgrove has admitted that he has no reason to dispute the Kniepkamp affidavit, which establishes that specific Snap-On tools among the seized property were in fact the Hamblins' property. Snellgrove Dep. 104:19 to 105:1; Ex. F. Whatever the merits of any larger ownership dispute, Plaintiffs unquestionably had protected interests in those items at minimum.

     B.    **Snellgrove Caused a Property Deprivation Without Constitutionally Adequate Process.**

58.    Where state law provides a pre-deprivation procedure to resolve disputed claims to seized property, the deliberate bypass of that procedure by authorized decision makers constitutes a due process violation. Zinermon v. Burch, 494 U.S. 113, 138 (1990). Texas Code of Criminal Procedure Article 47.01a provides a judicial procedure for resolving claims to allegedly stolen property when no criminal action relating to the property is pending. Tex. Code Crim. Proc. art. 47.01a. The undisputed facts are that no such judicial determination occurred. Snellgrove Dep. 86:11 to 87:8. The Sheriff's Department has admitted that the seized property was "removed from Plaintiffs' home and given to Snellgrove without a court order, without notice to Plaintiffs, and without any judicial determination that Snellgrove was the owner of the property." Ex. D.

59.     The deprivation here was neither random nor unauthorized. It was deliberate, planned, and accomplished with Snellgrove's active and indispensable participation. Snellgrove personally identified property for seizure (Snellgrove Dep. 49:11-19, 50:5-6); supplied the vehicles and labor by which the property was carried away (Snellgrove Dep. 39:19 to 40:8); transported the property across county lines to his own facility (Snellgrove Dep. 113:3-9); and ultimately resold the property to end users (Snellgrove Dep. 96:25 to 97:2). Each step was taken without notice to the Hamblins, without a hearing, and without any judicial determination of ownership. Because Snellgrove and his co-defendants used their authority to bypass an available pre-deprivation remedy, post-deprivation tort remedies do not satisfy due process. Zinermon, 494 U.S. at 138-39; Augustine v. Doe, 740 F.2d 322, 328-29 (5th Cir. 1984).

### C.     Snellgrove's Admittedly Inadequate Custody and Storage Compounded the Deprivation.

60.     Snellgrove's custody and storage further demonstrate the inadequacy of the process afforded to Plaintiffs. The undisputed facts show that the disputed property was placed in a private commercial facility under conditions that allowed loss, commingling, and disposition without any judicial determination of ownership.

61.     Snellgrove's testimony establishes, on undisputed facts, the inadequacy of the custody he voluntarily assumed:

   a.   **Prior unsolved theft.** Snellgrove's warehouse had previously been a victim of an unsolved theft. Snellgrove Dep. 12:19 to 13:1.

   b.   **Pre-existing camera coverage that failed.** At the time of the prior theft, the warehouse already had seven cameras viewing the interior and exterior. None captured the prior theft. Snellgrove Dep. 13:7 to 13:23.

   c.   **Insufficient remedial response.** Snellgrove's only post-theft response was to install additional cameras of the same kind that had already failed to capture the prior theft. He

took no other measures to control access, segregate disputed property, or document chain-of-custody. Snellgrove Dep. 13:1; 55:13-18.

d. **Eleven employees with free access.** Approximately eleven Snellgrove Enterprises employees had free access to the barn during ordinary business operations. Snellgrove Dep. 55:2-12.

e. **No lock and no independent law-enforcement access.** No lock was installed by the Sheriff's Office on the barn; the Sheriff's Office had no independent access. Snellgrove Dep. 55:13-18.

f. **No segregation, marking, or chain-of-custody.** The seized property was stored alongside Snellgrove's ongoing Snap-On business inventory; no segregation, marking, or chain-of-custody documentation was performed. Snellgrove Dep. 55:2-18.

62. On those facts, no reasonable jury could find that Snellgrove's custody of the disputed property comported with constitutionally adequate process. He took custody knowing his facility had been the victim of an unsolved theft notwithstanding seven cameras; he took no meaningful additional security measures; he allowed eleven employees free access; and he commingled the disputed property with his own inventory. The predictable result, that the property would be (and indeed was) sold off to end users, Snellgrove Dep. 96:25 to 97:2, follows directly from the deficient process Snellgrove afforded.

63. Summary judgment should therefore be entered establishing that Snellgrove's personal conduct violated the Fourteenth Amendment's due process guarantee.

## IV. Snellgrove Is Liable for Conversion as a Matter of Law (Count 5).

### A. Elements

64. Under Texas law, conversion is the wrongful exercise of dominion and control over the personal property of another, in denial of or inconsistent with the owner's rights. Waisath v. Lack's Stores, Inc., 474 S.W.2d 444, 446-47 (Tex. 1971); United Mobile Networks, L.P. v.

Deaton, 939 S.W.2d 146, 147 (Tex. 1997). The plaintiff need only establish: (1) ownership, possession, or the right to immediate possession of the property; (2) the defendant's wrongful exercise of dominion and control over it; (3) demand for return; and (4) refusal. Smith v. Maximum Racing, Inc., 136 S.W.3d 337, 341 (Tex. App. Austin 2004, no pet.). Demand and refusal are unnecessary where the defendant's use of the property is wholly inconsistent with the plaintiff's rights, for example, where he has sold or disposed of it. Loomis v. Sharp, 519 S.W.2d 955, 958 (Tex. Civ. App. Texarkana 1975, writ dism'd). Good-faith belief in superior title is no defense. Waisath, 474 S.W.2d at 447.

**B.        Each Element Is Established by Snellgrove's Own Admissions.**

**Element 1: Plaintiffs owned, possessed, or had the right to immediate possession.**

65.    The notarized affidavit of Warren Kniepkamp dated February 11, 2024, furnished to law enforcement, establishes that Kniepkamp gave specific Snap-On tools to the Hamblins prior to May 2023. Ex. F. Snellgrove acknowledged at deposition that he had seen the affidavit and testified, under oath, that he has no reason to dispute its truth or accuracy. Snellgrove Dep. 104:13 to 105:1. That admission alone establishes Plaintiffs' ownership of, at minimum, the Kniepkamp tools. Beyond Kniepkamp, Snellgrove acknowledges that the seizure swept up non-Snap-On items, including a Harbor Freight tool, that his business does not handle and to which he therefore has no conceivable ownership claim. Snellgrove Dep. 116:5-15.

**Element 2: Snellgrove exercised dominion and control over the property.**

66.    Snellgrove admits that the seized property was loaded onto his private vehicles, transported to his private commercial barn at 2100 Westside Drive in Stanton, Texas, stored there alongside his ongoing Snap-On business inventory, and accessible to approximately eleven of his employees. Snellgrove Dep. 50:5-6; 55:2-12; 113:3-9. The Sheriff's Office had no independ-

ent access. Snellgrove Dep. 55:13-18. He took video and photographs of the property and inventoried it. Snellgrove Dep. 54:18 to 56:11. He has admitted that he was "told he could resell those items," and that they "eventually made it to an end user somewhere." Snellgrove Dep. 96:25 to 97:2. Sale or disposition of converted property is paradigmatic dominion and control. Loomis, 519 S.W.2d at 958.

**Element 3: The exercise of dominion was wrongful.**

67.     Wrongfulness is established as a matter of law because no court ever entered an order awarding the property to Snellgrove. Snellgrove Dep. 86:11 to 87:8; 112:18 to 113:9. The Sheriff's Department has admitted in its verified discovery responses that the property was given to Snellgrove without a court order, without notice to Plaintiffs, and without any judicial determination of ownership. Ex. D. Texas law forecloses self-help repossession of disputed personal property even by a person with a colorable competing claim. See Tex. Bus. & Com. Code § 9.609(b)(2) (self-help permitted only without breach of the peace and only as to true collateral); Stallings v. Stallings, 177 S.W.2d 793, 794 (Tex. Civ. App. Galveston 1944, writ ref'd). The cross-county transport itself violated Texas Code of Criminal Procedure Article 18.10, which independently bars removal of seized property from the county of seizure without a magistrate's order. Compounding this, Texas Code of Criminal Procedure Article 47.01a provides a judicial procedure for resolving claims to allegedly stolen property when no criminal action relating to the property is pending; no such judicial determination occurred.

**Element 4: Demand was refused, or the property was disposed of.**

68.     Plaintiffs' demand for return is established by Kiska Hamblin's repeated email and telephone requests beginning in 2023 and continuing into 2024 after the criminal case was dismissed.

Third Am. Compl. ¶¶ 73, 78. Snellgrove's response was unequivocal: the property was never returned. Snellgrove Dep. 105:2-4. Independently, demand and refusal are unnecessary because Snellgrove has admitted that he disposed of the property. Snellgrove Dep. 96:25 to 97:2; Loomis, 519 S.W.2d at 958.

69.    No genuine dispute remains. Summary judgment on liability for conversion (Count 5) is appropriate, with the value of the converted property reserved for the jury.

## V.    Snellgrove Is Liable for Abuse of Process as a Matter of Law (Count 7).

### A.    Elements

70.    Texas abuse of process requires: (1) the defendant made an illegal, improper, or perverted use of process, neither warranted nor authorized by the process; (2) the defendant had an ulterior motive in such use; and (3) damage resulted. Bossin v. Towber, 894 S.W.2d 25, 33 (Tex. App. Houston [14th Dist.] 1994, writ denied); RRR Farms, Ltd. v. Am. Horse Prot. Ass'n, Inc., 957 S.W.2d 121, 133-34 (Tex. App. Houston [14th Dist.] 1997, pet. denied); Detenbeck v. Koester, 886 S.W.2d 477, 480 (Tex. App. Houston [1st Dist.] 1994, no writ). The classic case is the misuse of regularly issued criminal process to coerce a private commercial result obtainable, if at all, only through civil litigation. Tandy Corp. v. McGregor, 527 S.W.2d 246, 247-48 (Tex. Civ. App. Texarkana 1975, writ ref'd n.r.e.); Hunt v. Baldwin, 68 S.W.3d 117, 130 (Tex. App. Houston [14th Dist.] 2001, no pet.) ("It is the use of process for an end other than that which it was designed to accomplish that gives rise to the tort.").

### B.    Snellgrove's Misuse of the Two-Item Warrant

71.    The search warrant authorized the seizure of two specifically described items: a Snap-On Plasma Cutter Model 301 and a Snap-On Air Compressor. Ex. E; Snellgrove Dep. 46:23 to

47:5. Snellgrove's admitted conduct converted that narrow criminal-investigation tool into a private repossession dragnet:

a. **Resource provision.** He brought trailers, an older converted box truck, and a pickup truck because the Sheriff's Office "did not have anything to haul off any large items." On a two-item warrant, that equipment had no proper purpose. Snellgrove Dep. 39:19 to 40:8.

b. **Identification beyond warrant scope.** Without ever reading the warrant, Snellgrove walked the Hamblin property identifying "merchandise" he believed belonged to him, untethered from the warrant's descriptors. Snellgrove Dep. 45:14-16; 49:11-19.

c. **Personal entry into the home and a child's bedroom after the warrant items were found.** Snellgrove entered the residence after the air compressor and other warrant items were located, and personally directed the seizure of a toolbox from a child's bedroom on the bare basis that it bore a Snap-On logo. Snellgrove Dep. 48:14-17; 108:11-21.

d. **Loading at officers' direction.** "I was directed by the officers to begin to load those items up." Snellgrove Dep. 50:5-6.

e. **Capture of property he could not own.** Snellgrove's admitted role in the on-scene identification caused non-Snap-On items, including a Harbor Freight tool his business does not handle, to be carried off. Snellgrove Dep. 116:5-15.

f. **Cross-county transfer in violation of Article 18.10.** The property was transported in his vehicles to his private barn rather than to a Howard County or Martin County evidence facility, and was stored alongside his ongoing Snap-On business inventory, all in violation of Texas Code of Criminal Procedure Article 18.10. Snellgrove Dep. 113:3-9; 55:2-18.

g. **Disposition without judicial process**. Snellgrove resold the items to end users; the Hamblins were never afforded any judicial determination of ownership; no court ever entered an order awarding ownership to Snellgrove. Snellgrove Dep. 96:25 to 97:2; 86:11 to 87:8.

72. That conduct is paradigmatic abuse of process. A two-item criminal-investigation warrant was deployed as a private repossession order, a function it was not designed to perform. Hunt, 68 S.W.3d at 130. "It is the malicious perversion of a regularly issued process whereby a result not lawfully or properly obtainable under it is sought to be secured …." Tandy, 527 S.W.2d at 248.

### C.    Snellgrove's Ulterior Motive Is Established by His Own Words.

73. Snellgrove's sworn testimony establishes that he did not view the operation as a neutral criminal investigation in which the State would adjudicate ownership. He viewed it as a recovery of his merchandise from a man he had decided was a thief. He executed a stop-payment on Austin Hamblin's lawfully earned paycheck the day after the search and explained, on the record:

> "Because I had just discovered that he had a whole lot of my merchandise and it was very frustrating honestly to be paying someone who had just stolen a lot of stuff from me."

Snellgrove Dep. 90:20 to 91:1.

74. That admission demonstrates exactly the ulterior motive Texas requires. Snellgrove was using the criminal process to extract a private, commercial recovery without ever having to litigate ownership in a civil tribunal. He filed no civil suit, sought no replevin, made no application under Texas Code of Criminal Procedure Article 47, and presented no evidence to a magistrate concerning the disputed Kniepkamp items. See Tandy, 527 S.W.2d at 247-48 (use of criminal complaint to recover possession of disputed personalty in lieu of civil suit). His later finding of liability under the Texas Payday Law for the very paycheck cancellation he justified by the alleged theft, Snellgrove Dep. 91:2-7, only underscores the ulterior character of his conduct.

### D.    Damages

75.    The third element, damages, is satisfied for liability purposes by the unrebutted fact that Snellgrove resold or otherwise disposed of the Hamblins' property and that the items were never returned. Snellgrove Dep. 96:25 to 97:2; 105:2-4. The precise quantum of damages, including the value of the property, the loss of use, and any exemplary award, is properly reserved for the jury. See generally Tex. Civ. Prac. & Rem. Code § 41.003.

## VI.    Snellgrove Is Liable Under the Texas Theft Liability Act as a Matter of Law (Count 8).

### A.    Elements

76.    Texas Theft Liability Act creates a civil cause of action for any person who has sustained damages as a result of theft. Tex. Civ. Prac. & Rem. Code §§ 134.001 to 134.005. "Theft" is defined by reference to Chapter 31 of the Texas Penal Code, including § 31.03. Id. § 134.002(2). The civil plaintiff must prove the elements of theft by a preponderance of the evidence.

77.    Under Texas Penal Code § 31.03(a)-(b), theft requires (1) unlawful appropriation of property, (2) without the owner's effective consent, (3) with intent to deprive the owner. "Deprive" includes "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner" and "to dispose of property in a manner that makes recovery of the property by the owner unlikely." Tex. Penal Code § 31.01(2)(A), (C). "Appropriate" means "to acquire or otherwise exercise control over property other than real property." Id. § 31.01(4)(B). A prevailing TTLA plaintiff is entitled to actual damages, statutory damages of up to $1,000, and reasonable and necessary attorney's fees and costs. Tex. Civ. Prac. & Rem. Code §§ 134.005(a)(1), (b).

**B.      Each Element of Theft Is Established as a Matter of Law.**

78.    **Snellgrove appropriated the property.** Snellgrove acquired and exercised control over the seized property by directing officers regarding what to take, by transporting the property in his own vehicles to his own private barn, by storing it alongside his own business inventory, and by ultimately reselling it. Snellgrove Dep. 50:5-6; 55:2-12; 96:25 to 97:2; 113:3-9. That is the textbook definition of "appropriation" under Tex. Penal Code § 31.01(4)(B).

79.    **The appropriation was without effective consent.** Plaintiffs never consented to Snellgrove's exercise of dominion over their property. Snellgrove Dep. 105:2-4. The Sheriff's Department has admitted in verified discovery that the property was "removed from Plaintiffs' home and given to Snellgrove without a court order, without notice to Plaintiffs, and without any judicial determination that Snellgrove was the owner of the property." Ex. D. Effective consent must come from "the owner" or someone "legally authorized to act for the owner." Tex. Penal Code § 31.01(3). Officers acting under a two-item warrant have no authority to consent on behalf of the owner to the disposition of fifty additional categories of property. The cross-county transport itself was independently unauthorized by Texas Code of Criminal Procedure Article 18.10, which forbids removal of seized property from the county of seizure without a magistrate's order.

80.    **Snellgrove acted with intent to deprive.** Texas Penal Code § 31.01(2)(C) defines "deprive" to include "dispos[ing] of property in a manner that makes recovery of the property by the owner unlikely." Snellgrove's sworn testimony establishes that disposition with chilling clarity: he was "told he could resell those items", and "all those items eventually made it to an end user somewhere." Snellgrove Dep. 96:25 to 97:2. Sale to anonymous "end user[s] somewhere" is the paradigm of "dispos[al] in a manner that makes recovery … unlikely." See Daugherty v. State, 387 S.W.3d 654, 660 (Tex. Crim. App. 2013) (intent to deprive may be inferred from disposition that practically forecloses return). Independently, § 31.01(2)(A) is satisfied because Snellgrove has now permanently withheld the property: the

criminal indictment was dismissed on November 13, 2024, and as of the date of this Motion the items have not been returned. Snellgrove Dep. 105:2-4.

**C.      Any "Mistake of Fact" Defense Fails as a Matter of Law on This Record.**

81.   Snellgrove may attempt to argue that he believed in good faith that the seized items were his own merchandise and that this belief negates the intent to deprive. The argument fails on this record for three independent reasons.

82.   First, as to the items identified by the Kniepkamp affidavit, Snellgrove is bound by his sworn deposition admission that he has no reason to dispute its truth or accuracy. Snellgrove Dep. 104:13 to 105:1; Ex. F. He therefore cannot now contest that those specific Snap-On tools were gifted to the Hamblins by an independent franchisee and were the Hamblins' property at the time of the May 17, 2023 search. Disposition of property the defendant has admitted under oath belonged to another is intent to deprive as a matter of law.

83.   Second, as to the non-Snap-On items, no good-faith ownership theory is conceivable at all. Snellgrove's entire asserted ownership claim rests on his Snap-On franchise. He has admitted that his business does not deal in Harbor Freight tools. Snellgrove Dep. 116:11-15. He cannot have believed in good faith that he owned a Harbor Freight tool he did not sell, did not stock, and did not even know was on the property until the seizure.

84.   Third, Snellgrove's admitted course of conduct independently forecloses any good-faith mistake-of-fact defense. He took possession knowing that Kiska Hamblin disputed his ownership claim on the day of the search. Snellgrove Dep. 102:6-8. He admitted at deposition that he had no understanding of any "process for contesting property ownership," Snellgrove Dep. 104:1-8, and no understanding of Chapter 47 or Article 18.10 of the Texas Code of Criminal Procedure as they relate to seizure and inventory of property, Snellgrove Dep. 105:6-10. He then disposed of the disputed property approximately "a couple months after" the search, in the summer of 2023, on nothing more than a verbal release from Sheriff In-

gram and Deputy Dahl, Snellgrove Dep. 73:21 to 74:1; 86:1-10; 96:25 to 97:2, without any judicial determination of ownership, without notice to the Hamblins, without a hearing, and while the underlying criminal case remained pending. A defendant who knowingly disposes of disputed property through self-help, without resort to any available ownership-resolution procedure, cannot invoke a good-faith mistake-of-fact defense to intent to deprive.

### E.      Damages, Statutory Damages, and Uncapped Exemplary Damages

85.     TTLA liability triggers actual damages, statutory damages of up to $1,000, and reasonable and necessary attorney's fees and costs. Tex. Civ. Prac. & Rem. Code § 134.005. The aggregate value of the seized property, which Plaintiffs allege exceeds $283,000, places Snellgrove's conduct within third-degree felony or higher under Tex. Penal Code § 31.03(e)(5)-(7). Because theft punishable as a felony of any degree is an enumerated predicate under Tex. Civ. Prac. & Rem. Code § 41.008(c)(13), any exemplary damages awarded against Snellgrove are not subject to the statutory cap of § 41.008(b). The precise quantum of these damages, including the value of the property, statutory damages, attorney's fees, and exemplary damages, is properly reserved for the jury.

### CONCLUSION AND PRAYER

86.     Snellgrove's sworn deposition testimony, the Sheriff's Department's verified discovery responses, and Investigator Dahl's sworn admission that he "conscripted" Snellgrove into the warrant-execution team place beyond genuine dispute the threshold and merits liability questions presented. Plaintiffs respectfully request that the Court enter partial summary judgment establishing:

   a.   that Defendant Brian Snellgrove was a state actor under 42 U.S.C. § 1983 with respect to the conduct alleged in Counts 1, 2, and 3 of the Third Amended Complaint;

b.  that Defendant Brian Snellgrove personally violated the Fourth Amendment as alleged in Count 1, leaving damages for trial;

c.  that Defendant Brian Snellgrove personally violated the Fourteenth Amendment's procedural due process guarantee as alleged in Count 2, leaving damages for trial;

d.  that Defendant Brian Snellgrove is liable to Plaintiffs for conversion (Count 5), leaving damages for trial;

e.  that Defendant Brian Snellgrove is liable to Plaintiffs for abuse of process (Count 7), leaving damages for trial; and

f.  that Defendant Brian Snellgrove is liable to Plaintiffs under the Texas Theft Liability Act (Count 8), leaving the calculation of actual damages, statutory damages, attorney's fees, and any exemplary damages for trial,

g.  and granting Plaintiffs such other and further relief, at law and in equity, to which they may show themselves justly entitled.

Respectfully submitted,

THE KURT MUELLER LAW FIRM, PLLC

By: /s/ Kurt Mueller
Kurt Mueller
Texas Bar No. 24133133
565 S Mason Rd PMB 223
Katy, Texas 77450
Tel: (713) 360-2110
Email: kurt@kurtmuellerpllc.com

ATTORNEY FOR PLAINTIFFS
AUSTIN AND KISKA HAMBLIN

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule CV-7(g), counsel for Plaintiffs conferred with counsel for Defendant Brian Snellgrove regarding the relief sought in this Motion. Counsel for Defendant Snellgrove is opposed to the relief requested.

/s/ Kurt Mueller
Kurt Mueller

**CERTIFICATE OF SERVICE**

I certify that on the date reflected by the CM/ECF date stamp, I filed the foregoing document and that it is available for viewing and downloading from the Court's CM/ECF system, and that those participants in the case who are registered CM/ECF users will be served via the CM/ECF system.

/s/ Kurt Mueller
Kurt Mueller