IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

AUSTIN HAMBLIN and KISKA          *
HAMBLIN                           *
                                  *
                                  *
vs.                               *
                                  *
MARTIN COUNTY, TEXAS;             *
                                  *
BRAD INGRAM, IN HIS               *
INDIVIDUAL AND OFFICIAL           *
CAPACITY;                         *
                                  *
ANDERS DAHL, IN HIS               *
INDIVIDUAL AND OFFICIAL           *  NO:  7:25-cv-00245
CAPACITY;                         *
                                  *
KELSEY BROWN, IN HIS              *
INDIVIDUAL AND OFFICIAL           *
CAPACITY;                         *
                                  *
RORY GAMMONS, IN HIS              *
INDIVIDUAL AND OFFICIAL           *
CAPACITY;                         *
                                  *
WESTON PHELPS, IN HIS             *
INDIVIDUAL AND OFFICIAL           *
CAPACITY; AND                     *
                                  *
BRIAN SNELLGROVE                  *

**********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF BRIAN SNELLGROVE
Taken April 10, 2026

**********************************************************

BRIAN SNELLGROVE

ORAL AND VIDEOTAPED DEPOSITION of BRIAN SNELLGROVE, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on Friday, April 10, 2026, from 9:04 a.m. to 1:49 p.m., in the offices of Permian Court Reporters at 605 West Texas, Midland, Texas, before Stephanie J. Blair, Certified Shorthand Reporter Number 6819 in and for the State of Texas, pursuant to the Federal Rules of Civil Procedure.

                      A P P E A R A N C E S

For the Plaintiffs:

        Mr. Kurt Mueller
        The Kurt Mueller Law Firm, PLLC
        565 South Mason Road PMB223
        Katy, Texas 77450
        (713) 360-2110
        kurt@kurtmuellerpllc.com


For the Defendant, Brian Snellgrove:

        Mr. Robert J. Perez
        Attorney at Law
        221 North Kansas, Suite 1103
        El Paso, Texas 79901
        (915) 542-1222
        rjperezlaw1@gmail.com


For all Martin and Howard County Defendants:

        Mr. Benjamin Petty
        Kelly, Morgan, Dennis, Corzine & Hansen, P.C.
        4840 East University, Suite 200
        Odessa, Texas 79760
        (432) 367-7271
        bpetty@kmdfirm.com


Also Present:  Austin Hamblin and Kiska Hamblin

**4**

I N D E X

Witness:                                                          Page

BRIAN SNELLGROVE

Examination by Mr. Mueller                               5

Reporter's Certificate                                 151


E X H I B I T S

1   Snap-on Tools Quote                                  55
2   Search Warrant                                       62
3   Inventory list                                       63
4   E-mail string 5/16/23                                66
5   Warren Kniepcamp's list                             104
6   Management Report 2021                              120
7   Management Report 2022                              121
8   Text messages                                       122
9   Facebook post 2/4/24                                127
10  Facebook post 5/24/23                               128
11  Facebook post 6/7/23                                129
12  Text messages                                       129
13  Martin County Commissioner's Court Regular          133
    Meeting Minutes 1/27/26
14  Martin County Commissioner's Court Regular          137
    Meeting Minutes 9/9/25
15  Photographs                                         148

MR. MUELLER:  All right.  Good morning. My name is Kurt Mueller.  I'm here with my client [sic], Kiska and Austin Hamblin.  Our court reporter is here, and your attorney is here as well.

Would you state your appearance for the record, please.

MR. PEREZ:  Robert Perez on behalf of Mr. Snellgrove.

MR. MUELLER:  And yours.

MR. PETTY:  Ben Petty on behalf of the Martin County and Howard County defendants.

BRIAN SNELLGROVE, testified as follows:

EXAMINATION

BY MR. MUELLER:

Q.    Okay.  Good morning.  This is a deposition in pursuant of a civil suit.  I'm going to be asking you questions under oath.  Your answers here can be used in the civil proceeding.

A.    Okay.

Q.    If you need a break at any time, let me know.

Just to let you know under court rules, you're not permitted to speak to your attorney regarding the substance of your testimony during the deposition.

A.    Okay.

**6**

Q. So if you, you know, want to have a break, that's fine, but you can't speak to him regarding your testimony, just to make sure you understand that.

A. Sure, okay.

Q. Okay. Do you have any questions regarding procedure before we start?

A. No.

Q. Okay.

A. First -- first time doing it so we'll learn as we go.

Q. Okay. Very well --

MS. HAMBLIN: Is it recording?

Yes. Okay, just wanted to make sure.

MR. MUELLER: Yeah. Okay. Would you please swear him.

(Witness sworn.)

Q. (BY MR. MUELLER) Please state your full name for the record.

A. Brian Lewis Snellgrove.

Q. Okay. And where do you live, sir?

A. At 2100 Westside Drive in Stanton, Texas.

Q. Okay. And how long have you lived at that location?

A. Since 2002.

Q. All right. How are you employed?

BRIAN SNELLGROVE

A.   I'm self-employed.

Q.   Could you be more specific.

A.   Currently?

Q.   Yes.

A.   Own -- I still own one Snap-on franchise.  I'm a self-employed cotton farmer and part owner of some other oil and -- oil-related businesses.

Q.   Okay.  And do you hold any other positions?

A.   In -- in the county or in the -- yes, I'm a commissioner in Martin County.

Q.   Okay.  How long have you held that position?

A.   Since January of 2- -- 2025.

Q.   And what is your role in that capacity?  What do you do?

A.   As a commissioner?

Q.   Yeah.

A.   We oversee the -- the tax base and how the tax base is spent to upkeep -- upkeep roads, all things that pertain to tax monies for the county.

Q.   All right.  Let's talk about your various businesses.

How many businesses do you have?

A.   Part owner in probably four or five different businesses.

Q.   Okay.  Can we go through your LLCs.

**8**

How many LLCs are you a member of or operator of?

A.   One, two, three, four, five -- probably six -- six I can recall right off the top of my head.

Q.   All right.  Let's just go through them briefly.

What are they?

A.   Snellgrove Enterprises, B&J Ag, Flat -- yes, sir.

Q.   Just give me a brief description of what they are --

A.   Oh.

Q.   -- as you give me the names.

A.   Snellgrove Enterprises is what I operate the Snap-on franchise is under.  B&J Ag is a farming corporation that we farm in Martin County.  Flat Farms is another farming corporation that we farm some land in Martin County.  Part of American Truck & Equipment Painting, LLC, which is an industrial coating and paintings company.  Part of a Snelly Squad, which is a -- family members that we own some rent property.  Part of QA Enterprises, which is a small -- small investments with some friends.

Okay.  Then the -- oh, there's a Room Dog Enterprises, which is me and another friend, just small

BRIAN SNELLGROVE

**9**

investments.  And one called QA Lee, which is me and three other men as well.  It's all small -- just small investment things.

Q.   Okay, very well.

Now, those -- the Snellgrove Enterprises is officially -- the business address of that is the same as your home address.  Is that correct?

A.   Correct.

Q.   For the other LLCs, is that the case as well?

A.   Yes.

Q.   Okay.  And your property, is your property separated or segregated in any way to separate the business from your personal home?

A.   My home is at the front of the property.  My warehouse for Snellgrove Enterprises is at the back of the property.

Q.   Okay.  And this warehouse, can you describe it roughly its size.

A.   Well, it's -- man, we've added on to it a few times as we grew.  I would say it's in the 10,000 square foot range.  Don't know exactly.

Q.   Okay.  And what sort of things do you typically keep there?

A.   All the inventory for Snap-on tools.  Of

10

course, there's a few personal items stored in -- in there as well but...

Q.    Okay.  How -- what is the security that you have there?

A.    There's locks on every entrance and -- with a key pad to enter and there's a ADT Security system.

Q.    Is there any video cameras?

A.    Yes.

Q.    Okay.  How many times has that property been the subject of a crime such as theft?

A.    Two that I'm aware of.

Q.    Okay.  And what were those occasions?

A.    One there was a crime committed in the middle of the night, and it was, I believe, September of 2022. Someone came across the field from behind our property and took things and exited back across the field.

Q.    Okay.  And the other occasion?

A.    The other occasion was specifically just things being taken over a long period of time.

Q.    Okay.  So there was an ongoing theft?

A.    It is my belief that there was, yes.

Q.    Okay.  Were you able, using your video surveillance system or other means, to determine who was conducting the theft?

A.    Not at the time, no.

BRIAN SNELLGROVE

11

Q.   Okay.   At -- at -- how about now?

A.   No.

Q.   Okay.   There was also a hard drive that was stolen from you?

A.   Yes.

Q.   Okay.   Could you describe the circumstances of that, please.

A.   There was a computer that was in the warehouse, don't know exactly -- we went in to turn it on one morning and it didn't boot up properly so that's when we discovered that there'd been some kind of manipulation to the computer.   Other than that, we were never able to discover exactly how that happened --

Q.   Okay.

A.   -- so...

Q.   The video surveillance was unable to determine who did that?

A.   The computer was sitting in a spot where the camera did not -- could not see.

Q.   Okay.   And there aren't like cameras that are facing the entrances?

A.   There was cameras, yes.   Did not catch anyone going in or out of that that was out of the ordinary honestly so...

Q.   Okay.

A.    It was a mys- -- quite a mystery to figure out why but...

Q.    Okay.  All right.  And what is the result of that investigation to the best of your knowledge?

A.    I -- there was no -- the concern of that -- reason that har- -- that we were concerned about is because there was an inventory list on that computer of things that had been missing that pertained to this case and we were just worried about the manipulation of the dates that that inventory had been taken.  That was the only really issue that we were concerned about what might have been taken.  Other than that there was nothing on the computer of any value.

Q.    I understand.

But to the best of your knowledge, is the investigation into that crime still ongoing?

A.    I believe it's been dropped because there was no -- nothing else going on.

Q.    Okay.  I was curious, because you said that your barn had been a victim of theft before --

A.    Uh-huh.

Q.    -- what additional security measures, if any, did you take in response to this theft?

Did you put up more cameras?  More sensors?

**13**

A.    Yeah, we put up different camera system. There was an opening -- there was a outside opening where we parked some of the store -- the trucks that was -- that was accessible that was not locked up so all that was enclosed with locked garage doors and everything after that.

Q.    Okay.  But -- so how many different cameras are there on the warehouse?

A.    Oh, there's probably -- I don't know.  I can look on my app and tell you.  Would you like me to look on my --

Q.    Sure.

A.    -- app?

Q.    And I'd also appreciate if you could describe what the cameras are viewing.

A.    Sure.

There is one, two, three, four, five, six, seven -- seven cameras that view interior, exterior of that warehouse location.

Q.    Okay.  And none of those cameras were able to capture anything relating to the theft of the hard drive?

A.    No.

Q.    Okay.  You said that there was an inventory list on the hard drive when it was stolen.  Was there

**14**

any other information relating to this case that was on the drive?

A. No.

Q. Okay. It had previously been noted that the hard drive was being used to compile data relating to this case. So there was no other information relating to the case other than the inventory list?

A. No.

Q. That inventory list that was on the hard drive --

A. Uh-huh.

Q. -- do you have another copy of it?

A. Yes, we do.

Q. Okay. And that's been turned over in discovery?

A. Yes, sir.

Q. Okay. So there's been no information that's been lost?

A. No, none was lost.

Q. Okay. The farmers co-op, who is your partner in that?

A. I'm not a partner in that. I've used the farmers co-op as the place to -- that gins my cotton.

Q. Okay. In the -- okay. And do you know who the managing member of the co-op is?

A.    Yes, and I am on the board of directors of that co-op, but the manager is Tommy Montgomery.

Q.    All right.  How much revenue annually do you get as a result of that?

A.    About -- we get paid $50 every time we meet.

Q.    Okay.  And you also have an LLC relating to farming for yourself at your home.  Right?

A.    Yes, two.

Q.    Does eggs and dairy, I believe.

A.    No.

Q.    What does it do?

A.    It's strictly cotton farming, farming of just -- there's nothing to do with any kind of dairy.

Q.    Okay.  You don't have any sort of dairy-related or egg-related LLCs that are at your home?

A.    No.

Q.    Okay.  Let's talk about the Snellgrove Enterprises and the Snap-on --

A.    Okay.

Q.    -- franchises?

A.    Okay.

Q.    You have a franchise now, you said --

A.    Yes.

Q.    -- still today.

BRIAN SNELLGROVE

A.    One.

Q.    Have you ever had other franchises?

A.    I've -- I've had up to five, yes, sir.

Q.    Okay.  And can you briefly describe how those franchises came to be.

A.    Yes, sir.  In 2001 I purchased a franchise that I owned and operated, and then over the period of the next few years, I was able to purchase additional franchises in the area.

Q.    Okay.  When did you first become a franchise owner?

A.    2001.

Q.    Okay.  And why did you become a franchise owner of Snap-on?

A.    Just in -- looking to change careers and decided to try that.

Q.    Okay.  What were you doing at the time?

A.    I was farming.

Q.    Okay.  So what is a Snap-on franchise?

A.    Snap-on franchise is a retail distribu- -- distributor of tools that we buy from Snap-on Incorporated where the retail end of the -- of their line of tools.

Q.    Okay.  And are the franchises geographically bound?

**17**

A.   They're bound by list of calls is what they would -- they would say.  So you have -- when you purchase a franchise, there's places that that franchise is assigned to do business with and so you purchase that ability to -- to sell to those locations.

Q.   Were each of those franchises a separate LLC?

A.   No, they all operated under Snellgrove Enterprises.

Q.   So as you acquired them, they were all folded into the same LLC?

A.   They operate under that, but they each had their individual operating number.

Q.   Okay.  The franchise that Austin worked under, when did you first acquire that?

A.   I believe it was in 2021.

Q.   Okay.  Do you still own that franchise?

A.   No, sir.

Q.   And when did you stop owning that franchise?

A.   2024.

Q.   Okay.  Who owns the franchise now?

A.   I sold it to Ed -- Jose Dominguez.

Q.   All right.  What was your reason for sale?

A.   Just they were having operational problems, employee -- struggles to find the right person to run it

BRIAN SNELLGROVE

**18**

so it was -- seemed like a good time to exit out of that one.

Q.   Okay.  And the franchise you still have remaining, have you had similar problems?

A.   No, I've just decided to liquidate out of the business entirely so...

Q.   Out of the business entirely?

A.   Yes.

Q.   But you said you still own a franchise.

A.   I do.  As of today I still do, but as of next week I will not.

Q.   Okay.  So there's a sale in place?

A.   Returning of merchandise to Snap-on Incorporated and closing the door.  There's not a sale in place.

Q.   Okay.  So you're planning on, I guess for lack of better description, forfeiting your enter- -- your franchise back to Snap-on?

A.   Correct.

Q.   Okay.  As part of that process -- how does that process work?

A.   Right.  To go back to Snap-on?

Q.   Yeah.

A.   They send out a corporate representative and we return inventory back to them that I've purchased

from them and then they give me credit based off of, you know, new and used, truck worn, just -- they have a system of how they value it.

Q.   Okay.  So in forfeiting your franchise, you'll presumably lose access to data relating to that -- that enterprise.  Right?

A.   Yes, I will not have access to their -- to their computer systems anymore.

Q.   All right.  Let's talk about how you acquire inventory for the Snap-on business.

What is the process of doing that?

A.   We place orders through our Chrome software system or through our business manager and they place or- -- it all ends up getting placed electronically.

Q.   Is there a process by which you decide what inventory to purchase?

A.   Uh-huh.

Q.   And how is that pro- -- what is that process?

A.   It's strictly up to me as the owner of the franchise what gets purchased either through sales meetings or you can just go online and you can enter -- the sales software's set up that as we sell things, we can either put it back in the computer and reorder it or we can not, so it can go back on to a list of things

**20**

that we want to -- to submit to Snap-on to be purchased again.

Q.   What i- -- what kind of items have serial numbers on them?

A.   I -- of Snap-on's?

Q.   Yes.

A.   Toolboxes, electric tools, air-powered tools, if it's -- probably diagnostic type, electronic type tools, most of all those things would have serial numbers.

Q.   And when those items are sold, they -- the serial number is part of that bill of sale.

A.   It should be, yes, sir.

Q.   Okay.  How do the sale of those tools take place to the customer?

A.   They take place -- the truck -- our trucks are basically a mobile store.  We don't have a storefront that's like a brick and mortar store.  So that store goes to the customer, and they usually come onto the truck and the -- whoever's running that store has opportunity to show them the things that we have for sale.  And then when they sell it, it's entered into the computer and either they're paid for at that time or a payment system -- a payment plan is set up to pay for those tools.

BRIAN SNELLGROVE

21

Q.    Okay.  So the individual truck is the point of sale.

A.    Correct.

Q.    So Austin would have been a point of sale, for example.

A.    Yes, he was.

Q.    Okay.  Can you -- first of all, when did you first hire Austin?

A.    It was in 2019, I believe.

Q.    Okay.  And what was the process of hiring?  How di- -- how did he come to your attention?

A.    His cousin worked for me and he told me that he had a cousin that was interested in getting out of actual technician automotive work and wanted to try something different so we interviewed him and hired him.

Q.    Okay.  You hired him to drive a route?

A.    No, at the time he was hired to be what we called a sales assistant, to be a sales helper on a -- on one of the trucks.

Q.    All right.  How long did he hold that position?

A.    My recollection would have been a year -- year, year and a half --

Q.   All right.

A.   -- time frame.

Q.   And what happened after that?

A.   I had the opportunity to buy the franchise that ultimately Mr. Hamblin ran for me and so we -- I promoted him into being a store manager.

Q.   Was that enter- -- or was that franchise referred to as 5F?

A.   Yes.

Q.   Okay.

A.   Uh-huh.

Q.   And -- and so he drove a route.

How long did he do that for?

A.   Oh, my -- over a year, I believe, year, year and a half time frame.  I don't remember exactly.

Q.   Can you describe the compensation structure for him.

A.   Yes, he was paid a -- a weekly salary and he was paid monthly commissions based off sales on his truck.

Q.   What was the salary?

A.   When he took over the store manager, I -- probably a thousand a week --

Q.   Okay.

A.   -- base salary, I -- that's ge- -- that was

the general --

Q.   Okay.

A.   -- range.

Q.   And was commission a set percentage?

A.   Yes.

Q.   Do you happen to know that percentage?

A.   Let me think.  It's been a while.

We -- we based the commission off of sales made or collections and -- made after the trucks broke even, so after they paid for their overhead, paid the salary of the trucks, paid for all the things that -- then we had a break-even point.  Past that point, then the store manager got the -- the significant amount of income off of that -- those commissions -- I mean a percentage of those sales.

Q.   Okay.  And how -- how was Austin as an employee in terms of his sales?

A.   He was probably absolutely the best employee I ever had as far as sales.

Q.   Okay.  So he was bringing in a lot of money for you.

A.   Yes, sir, he was a great employee.

Q.   Okay.  So when did you first become suspicious that inventory was being lost?

A.   January-ish of '23.

**24**

Q.   Okay.  And how did that come to your attention?

A.   By another -- other employees suspecting that there might be something going on.

Q.   Who were they?

A.   The one that brought it to my attention was Andrew Nichols.

Q.   Okay.  And who is Andrew Nichols?

A.   He was an employee of mine.

Q.   All right.  And what was his role or capacity at the time?

A.   He was a sales assistant as well.

Q.   Was he a sales assistant that worked directly with Mr. Hamblin?

A.   No, he worked on a different truck.

Q.   Okay.  So what was Mr. Nichols -- to your knowledge what was Mr. Nichols' belief or basis for belief that there was theft going on?

A.   I don't know if either he had seen it personally or had been told that he had -- that there was merchandise not at the warehouse where it was supposed to be.

Q.   Okay.  So you say "merchandise at the warehouse where it was supposed to be."  He loaded merchandise onto trucks --

A.    Uh-huh.

Q.    -- so what merchandise would have been at the warehouse that wasn't [sic] supposed to be?

A.    All merchandise is either at the warehouse, in my trucks, or sold to an end user.

Q.    I understand.

But you say you thought merchandise was missing from your warehouse --

A.    Uh-huh.

Q.    -- so what merchandise did you believe to be missing from your warehouse?

A.    I's -- at the time we knew there -- suspected there was a -- like air compressor, some welding equipment.

Q.    Okay.  As part of your suspicions, did you review any video footage or surveillance footage?

A.    No, because the actual transfer of that merchandise went onto the normal -- it went through its normal process of -- of being loaded onto trucks or dis- -- or vans that we went to distribute products in.

Q.    Okay.  So it was loaded onto trucks like it was supposed to be.

A.    Yes.

Q.    So there was no merchandise that was missing

from the warehouse.

A.    It didn't return to the warehouse like it was supposed to.

Q.    All right.  Let's discuss that then.

What is the process for which merchandise is supposed to be returned to the warehouse?

A.    Every night if it's not sold to end -- end user, it comes back to the warehouse.

Q.    Okay.  So every day the trucks are supposed to be unloaded?

A.    No, but they come and they are parked at the warehouse.

Q.    Okay.  Do -- do your people in your route ever keep the trucks at their home?

A.    Only with permission to like clean or something, to do -- to do some tasks that they want to do in the evening, I allow them to do it and then bring the truck back.

Q.    All right.  Did -- to your knowledge did any of your employees like, for example, pick up a truck on, like say, a Monday and then keep the truck through the week and then only return it on a Friday?

A.    No.  I have an employee, Jason Ramos, who lived in Midland.

Q.    Uh-huh.

**27**

A.    He would come to the warehouse and he would get the merchandise.  His route was in Midland, he lived in Midland so I allowed him to park his truck there and he would ta- -- he would distribute it and come back to the warehouse two or three times a week.  So that --

Q.    Okay.

A.    -- that was an exception to returning to the warehouse.

Q.    All right.  Did Austin return the truck to the warehouse every evening?

A.    Yes --

Q.    Okay.

A.    -- as a general rule.

Q.    As a general rule.

And to the extent he didn't, did he have permission to not do that?

A.    To not do it?

Q.    Yeah.

When he didn't return the truck to the warehouse in the evening --

A.    Uh-huh.

Q.    -- was it with your permission?

A.    I don't remember him ever not bringing it back to the truck -- to the warehouse because the actual logistics of where Austin lived and where my warehouse

was and where his route were, there was no benefit to him having the truck in Big Spring because his route was past Stanton and over to the west.  So it made no sense to take a truck further away from where he was gonna be selling tools.

Q.   Okay.  Perhaps I'm not understanding something about the logistics here or --

A.   Uh-huh.

Q.   -- why you were suspicious in the first place.

Because you say that the trucks were supposed to be brought every day and he brought them back every day --

A.   Uh-huh.

Q.   -- like you wanted.

A.   Uh-huh.

Q.   So why did you believe that merchandise wasn't being returned to the warehouse like it was supposed to?

A.   I was told that it was -- that someone had seen merchandise at his residence.

Q.   Okay.  Saw merchandise at his residence.

He was a Snap-on distributor.

A.   Uh-huh.

Q.   Correct?

A.   Yeah -- no, he was an employee of mine.  He

BRIAN SNELLGROVE

29

was not --

Q.   Fair enough.

A.   -- a Snap-on distributor.

Q.   He was not a distributor.  He was an employee of yours.  Fair enough.

A.   Uh-huh.

Q.   To your knowledge did he ever purchase Snap-on tools?

A.   Prior to him working for me, yes, he did purchase Snap-on tools.

Q.   Okay.  So it wouldn't be inherently suspicious that he had Snap-on equipment at his residence.

A.   It would be if it was a brand-new compressor or new welding machines or something that was brand new.  Yes, that would be suspicious.

Q.   Okay.  Why would that be suspicious?

A.   Because he had been working for me at the time since 2019.  He would not have a brand-new tool at his house because he had no -- he -- it would not have been purchased at that -- during that time.

Q.   Well, did you -- how did you determine that it wasn't purchased?

Did you look at his sales records to determine that he didn't purchase it?

A.   Yeah, he didn't purchase large items from me

when he had worked for me.

Q.   Yeah, but my question is how did you know that?

How did you know that he didn't purchase those?

Because he could have just purchased it from his own truck.  Right?

A.   I may not have access to all those records, right --

Q.   That --

A.   -- but all that stuff belongs to me, not him.

Q.   I understand, but that's what I'm asking.

Did you review sales records to determine what he did or did not purchase?

A.   Uh-huh.  Yes, I looked at his -- at the computer.  Yes.

Q.   Okay.  And from your review of it, what did you see that he had purchased from you?

A.   I didn't see he purchased anything from me.

Q.   He had never purchased any tools from you?

A.   He might have purchased some small things that he put on his own personal account from time to time, but nothing large.  I don't -- you know, small items I don't recall actually, but I know that from time to time

employees would buy small items that they wanted for their personal use --

Q.   Uh-huh.

A.   -- and I allowed that to happen, all employees.  So it was not something that I monitored heavily because I trusted them.  If they wanted to do that, to buy something small, then I allowed them to do it.

Q.   Okay.  So he might have purchased hand tools, sockets, screwdrivers, wrenches, that kind of thing.

A.   If he did, it was in a very small -- it was very minor purchases if he did, nothing of any value --

Q.   Okay.

A.   -- of lar- -- nothing of large value, I shou- -- guess I should say.

Q.   All right.  Were you aware that his father-in-law was a Snap-on distributor?

A.   Absolutely, yes, sir.

Q.   Okay.  Did you wonder if perhaps he purchased items from hi- -- him?

A.   I think he did prior to working for me, yes.

Q.   Yeah, but in addition -- in addition to the -- prior to the time of working with you --

A.   Uh-huh.

Q.   His father-in-law is still a Snap-on

BRIAN SNELLGROVE

distributor today, is he not?

A.   No, he's not.

Q.   Oh, that's true, he isn't.

Before he stopped being a Snap-on distributor, is it possible that Austin purchased or acquired items from his father-in-law?

A.   In theory it could be possible, yeah.

Q.   Okay.  The reason I ask is because you -- he may not purchased it from you, but he had another source from which -- that could be purchased [sic] that wouldn't be available to you in your records?

A.   It is in theory possible.

Q.   Okay.  So he could have potentially purchased these larger pieces of equipment from a different Snap-on distributor.  That would be possible.

A.   Highly unlikely, but possible.

Q.   Why do you say it's unlikely?

A.   Well, why would he -- why would he go to purchase from someone who lives -- even though it -- why would he go 200 miles or 150 miles away to purchase a large item that I would have allowed him to purchase from me at a discount if he -- if he really wanted it.

Q.   Okay.  Do you think that his father-in-law may have also offered him a discount?

A.   It -- it's possible, yes --

Q.   Okay.

A.   -- in theory.

Q.   All right.  Okay.  So Mr. Nichols was the first person to suggest that Austin was potentially taking things?

A.   To my recollection, yes.

Q.   Okay.  What was your process of investigating that?

A.   I began to just try to internally figure out if -- if there was something going on.  It was actually very surprising to me that it might be so because Mr. Hamblin was such a good salesman and did such a good job that I really was caught very by surprise by the accusation.  So just began to do some internal checking of my own to see if that might be a possibility.

Q.   Okay.  And what were the -- what were the things you looked at, and what processes did you go [sic] as a result?

A.   Well, at the time we were moving a high volume of merchandise.  We had the five trucks.  Mr. Hamblin was moving a large volume of merchandise himself so just began to try to track back through some of the promotions we'd done, the bigger -- some of those bigger items that, begin to try to figure out did they end up in an end user's place.  I could not -- I couldn't find

**34**

where they had and -- but they were not present at my warehouse anymore either.

Q. Okay. Were there any other witnesses that you were aware of other than Mr. Nichols?

A. Not at that time, no.

Q. How about at a different time?

A. Later on, yes.

Q. And who was that?

A. There was a young lady, I'm not aware of her name, don't recall, but that had seen stuff that had re- -- relayed those -- that information to Mr. Nichols.

Q. Okay. Do you know how Mr. Nichols knew that person?

A. I do not.

Q. Okay. When did you first go to the police?

A. Don't specifically remember. Probably would have been March of '23, somewhere in that time frame.

Q. Okay. And -- and what was the process by which you brought to the police?

Did you -- did you call them?

Did you go to their office?

A. Probably both. I'm sure I did have a -- communication over the phone probably. I do know at one point, I did go visit with -- in their office with

them.

Q.    Okay.  As part of your investigation, did you ever speak to Mr. Hamblin?

A.    We had conversations every day, but I did not specifically accuse him of anything --

Q.    Okay.

A.    -- or anything like that, no.

Q.    Did you ask him whether he had any of the particular equipment you thought was missing?

A.    We had discussions about where things were.

Q.    Okay.  Do you -- can you recall what those conversations were?

A.    No, not specifically.  I mean I -- every day I had conversations with each employee about large items, things that were -- you know, we -- at -- at the time that all this happened, like I say, we were having some really large promotions, using some of the corporate sales aids that they give us --

Q.    Uh-huh.

A.    -- so we had high volumes of bigger equipment coming in and out of the -- of our warehouse.  And so, yeah, we were trying to keep track of all those things so I had conversations with each one about the -- you know, "Who -- did we sell this?  Did we take trades? Did we do that," you know, all that so...

36

Q.    Okay.   But Mr. Nichols had brought to your attention that he might -- that -- that there were specific items that he might have that weren't supposed to [sic], like the compressor, for example?

A.    Yes.

Q.    Did you ever ask Mr. Hamblin if he had a compressor?

A.    No, I did not.

Q.    Okay.   What -- why not?

A.    Just felt like it was better for me to know than to -- I needed to find out for sure.

Q.    Okay, fair enough.

So when you went to the police, what -- what records or documentation did you present to them?

A.    Mainly just suspicions, and then, I did not have the documentation, but Mr. Nichols had more evidence of sus- -- suspected issues than I did.  So, I told them what I knew and then allowed the police to do their -- their part after that to investigate.

Q.    To your knowledge did Mr. Nichols talk directly to the police?

A.    Yes.  I know he probably did, yes.

Q.    Okay.

(A discussion was had off the stenographic record.)

Q. (BY MR. MUELLER) Okay. So at some point the police decided to do a -- to obtain a search warrant. Were you aware of when they applied for a search warrant?

A. Don't believe so, no, sir.

Q. Okay. When did you first become aware that the police were going to do a search of my client's residence?

A. They notified me the evening prior to.

Q. Evening prior to, okay.

What -- what exactly did they tell you?

A. That they had gained a search warrant and they planned to execute it.

Q. Okay. Did they ask you to do anything for them?

A. No.

Q. Okay. Did they ask you at that time to -- that they were gonna use your warehouse to store any property?

A. No, absolutely not. We didn't know. They were just gonna execute a search warrant --

Q. Yeah.

A. -- is all I know.

Q. Okay. Did they -- any -- at that evening, did they ask for you to participate?

A.    No.

Q.    So as of that evening, the evening before the search --

A.    Uh-huh.

Q.    -- your knowledge simply was that they were going to do a search.

A.    Uh-huh.

Q.    And you had no expectation that you personally were gonna participate.

A.    No.

Q.    Okay.  When did that change?

A.    During the morning of the search, I don't know exactly what time.  Going about our day normally, I received a call saying that they had executed a search warrant and that there was a much larger amount of merchandise that -- marked with Snap-on branding there than they had anticipated and then said -- asked if I could assist in identifying at that point.

Q.    Okay.  All right.

          MR. MUELLER:  Can we just take a short break.

          (Recess.)

Q.    (BY MR. MUELLER)  Okay.  Now, earlier you had said Austin might have worked for you for a year, year and a half.  I believe he might have started working

in -- for you around 2019.  Does that date sound correct?

A.    Yes, sir, it was in 2019, I believe.

Q.    Okay.  And the search was in 2023 --

A.    Yes, sir.

Q.    -- so he would have worked for you for about four years.

A.    Correct.

Q.    Okay.  All right.  So let's go back to the -- the day of the search.

You got a call in the morning saying there was more stuff than they anticipated and they wanted you -- your help in looking around the property.

A.    Uh-huh.

Q.    Okay.  So what did you do at that point?

A.    I complied with what they asked me to do, to come identify merchandise if possible.

Q.    Okay.  What did you bring with you?

A.    They asked -- they said -- they said -- asked if I could bring -- they did not have a -- anything to haul off any large items so they asked if I could bring trailers or truck or something that things could be -- could possibly be loaded in.

Q.    Okay.  And so what was the truck trailer that

**40**

you brought?

A. So we have couple of different trailers that we use for dis- -- delivering merchandise, and I had a older truck that we converted to more of a toolbox type showing deal. We cleared out of the some of the shelving so it had more open floor space. So -- so I brought those two items, a pickup and a trailer and a older truck.

Q. Okay. So when you arrived at the property --

A. Uh-huh.

Q. -- who did you first speak to?

A. Ooo, I don't know if it was Deputy Dahl or Deputy Metcalf maybe. I don't remember exactly which one I saw first.

Q. And what did they -- what did -- in -- did they tell you at that time?

A. Specifically I don't know except they star- -- said there's merchandise. They -- we were -- I believe I was in the front -- in front of Austin and Kiska's house. I remember the first place they took me was into Austin's personal trailer to see -- to see some merchandise in there.

Q. Okay. And what did you observe in there?

A. Oh, if I remember correctly, there was a toolbox, a trad- -- a -- an older trade-in toolbox. I

BRIAN SNELLGROVE

41

don't remember what else was in there.  There was some other items in the trailer, but I don't recall.

Q.    Did the toolbox have a serial number on it?

A.    They all do, yes.

Q.    Okay.  Did you inspect that serial number?

A.    No, sir, not at that time.

Q.    Okay.

A.    But it was a very unique-colored trade-in box that was easily recognizable.

Q.    Okay, I understand.

Did you see any other tools in there that might have belonged to you?

A.    I think so.  I don't remember what else was in the trailer.

Q.    Okay.  Where else -- where -- where did you go next?

A.    I'm not sure if we went into the house or into their backyard.  I don't remember the exact order --

Q.    Okay.

A.    -- which way we did it.

Q.    And what did you do when you were there?

A.    I was asked to identify and see if merchandise possibly belonged to me.

Q.    Okay.  So there wa- -- in his tool shed there was quite a lot of Snap-on related equipment that you

BRIAN SNELLGROVE

**42**

saw.  Was that true?

MR. MUELLER:  I'm sorry for the leading question.  I'll rephrase.

A.    Uh-huh.

Q.    (BY MR. MUELLER)  What -- when you went into the back -- when you went into that back shed, what did you observe there?

A.    Inside the back shed were at -- at least a couple of toolboxes, one very large -- one of our larger capacity style.  There was -- had some different tool-holding devices mounted up on the walls.

Q.    Okay.

MR. MUELLER:  Kiska, the battery just died.

MS. HAMBLIN:  Oh, no.

MR. MUELLER:  One second, please.

(Recess.)

Q.    (BY MR. MUELLER)  Okay. So you -- would you just mind repeating your previous answer about what you observed when you were in the shed.

A.    Yes, sir.  I recall that there was a large toolbox along one side from my -- if I remember correctly, at least one other toolbox, tool storage unit on the wall.  I remember there being a -- it's kind of a cabinet that holds different styles of pullers and

**43**

things.  It's very small -- pret- -- fairly small space, but it was really packed with different things in there.

Q.  Did you open any drawers?

A.  Yes, I did.

Q.  Okay.  When you opened the drawers, what did you see?

A.  Just a lot of hand tools --

Q.  Okay.

A.  -- lot of small tools.

Q.  Okay.  By -- what process did you -- what was your process of determining which equipment was yours?

A.  Well, as I looked around, all of it -- the larger items were much easier to identify because of the colors and stuff so that was easy to say, "Yeah, I know that was something that we had ordered."

And then as we begin to go looking more and more, per Mr. Hamblin's response during that time -- he -- he said, "Yes, all this belongs to Mr. Snellgrove. It's not mine."  So at that point I began to assume that probably most of that was mine since he told me that.

Q.  Okay.  Did you go into the house?

A.  Yes, I did.

Q.  Okay.  What rooms in the house did you go into?

BRIAN SNELLGROVE

**44**

A.    Probably all of them maybe except the restroom at some point.

Q.    When you went into the bedroom, the main bedroom --

A.    Uh-huh.

Q.    -- master bedroom, what did you do when you were in there?

A.    I don't recall which bedrooms were which honestly, just remember knowing that there was a -- two or three different tool storage units inside the house.

Q.    What is a tool storage unit?

A.    Like a toolbox.

Q.    Okay.  Did you open any closets?

A.    I don't recall opening any closets.

Q.    Did you open any dresser drawers?

A.    No.  If I opened anything, it would have just been the tool storage unit drawers.

Q.    Okay.  Did you open tool storage drawers?

A.    There's a good possibility.  I honestly don't specifically remember, but there is a very good possibility, yes.

Q.    Okay.  And what did you observe inside the tool storage drawers?

A.    The -- inside there there was personal stuff,

yeah, not -- best I remember.  Honestly I don't remember the specifics, just I'm sure I did open them because there were tool- -- toolboxes.

Q.    When you were opening these items, were -- was there an officer there as well?

A.    I believe there was an officer present at all times, yes, sir.

Q.    Okay.  Do you recall which officer was with you?

A.    I know Officer Dahl was present through probably most of it.  Not sure if he was present 100 percent of the time, but he was the main officer that was present during the identifying of merchandise.

Q.    Prior to or during the search, did you review the search warrant?

A.    No, sir.

Q.    Have you reviewed the search warrant any time since then?

A.    Not to my recollection specifically, no.  I'm sure I was made aware possibly, but I'm -- no, I don't.

Q.    Were you aware of the specific items that they were looking for according to the search warrant?

A.    Yes, I was told that on the search warrant they were looking for, from my recollection, the air

compressor, maybe the -- some welding equipment.

Q.   Okay.  Did you find that equipment?

A.   Yes, sir.

Q.   After you found those items --

A.   Uh-huh.

Q.   -- what other searches did you do or what --

A.   Did I do?

Q.   Yeah.

What other -- did you go into the house after that point?

A.   I was only -- I only did what I was directed to do by the --

Q.   I understand.  I'm just trying to -- I'm just trying to get the timeline right.

A.   Uh-huh.

Q.   So after those --

A.   Uh-huh.

Q.   -- items were found --

A.   Uh-huh.

Q.   Okay.  Let's -- let's start over.

When did you find the -- the last of the items that was on the search warrant?

Was it in the -- was it in the tool van, the -- the -- the trailer?

Was it in the --

**47**

A.    No, those --

Q.    -- backyard?

A.    -- those were in the backyard.  The -- those -- those items, I think, were under just a covered thing in his backyard.

Q.    So you -- after the tool trailer, you went into the backyard and at that time you saw the items that were on the search warrant?

A.    Yes.  Not fully aware of exactly what was on the search warrant, but, yes, that's when I was --

Q.    But the items that you had been told --

A.    Yes.

Q.    -- that they were looking for?

A.    Yes.  Yes sir.

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  Okay.  So let's just go back to make sure that we get this correct on the record.

A.    Uh-huh.

Q.    You went to the tool trailer --

A.    Uh-huh.

Q.    -- and looked inside.  You found a tool cabinet that you believed might be yours.

A.    Correct.

Q.    Okay.  After that time, you went into the

backyard.

A.    Probably.  I don't -- yes, I'm --

Q.    And --

A.    -- thinking.

Q.    -- you went into the tool shed.

A.    At some point, yes, sir.

Q.    You saw the items that you were told that were -- that the police were looking for.

A.    Yes.

Q.    Including the air compressor?

A.    Yes.

Q.    After that -- after that time --

A.    Uh-huh.

Q.    -- what did you do next?

A.    Oh, as we identified items, at some point we did go into the house, like I said, only as I was directed by the deputies to -- to help identify.  I --

Q.    I understand.

So you went into the house.

A.    Uh-huh.

Q.    And you went into all the rooms in the house except for the bathroom.

A.    Most likely.  I don't recall specifically.

Q.    And you were looking for additional items that might be yours.

A.   I was told by the deputies that there were items in those rooms that had Snap-on on them, right, were branded so they -- they were asking me about those items.

Q.   Okay.  Do you have any joint defense agreement with the county?

A.   No, sir.

Q.   Okay.  Have you ever spoken directly with Mr. Dennis or -- or his associates?

A.   No, sir.

Q.   Okay.  Have you ever had a conversation that included them?

A.   Only possibly when you -- when we were all on the Zoom call.

Q.   Okay.

A.   That would be the only time I've ever seen him.

Q.   Has Mr. Dennis or his associate ever been present at a county commissioner meeting?

A.   No, sir.

Q.   Okay.  All right.  So on the day of the search, you -- okay.  After you located the items that you believed to be yours, what was your next step?

A.   My next step?

Q.   Yes.

A.    Whatever the officers directed me to do.

Q.    Okay.  What did they direct you to do?

A.    After Austin said that most of those -- that all those things in that -- in our area there did belong to me and not him, then I was directed by the officers to begin to load those items up.

Q.    Okay.  And how did you go about loading the items up?

A.    Just physically picking them up, yes.

Q.    Okay.

A.    Yes, sir.

Q.    Some of the items were fairly heavy.

A.    Yes, very heavy.

Q.    Okay.  Did you use any sort of equipment in moving them?

A.    No, we didn't have any equipment.  We just used muscles, as best I recall.  I mean I don't -- if there was any kind of a -- I don't know, we might have used a jack to get over the door frame, door seal or something, but I -- no, no big equipment.

Q.    Did you use a winch?

A.    Not to my recollection.

Q.    All right.  Did you -- did you load items personally onto your truck?

A.    Yes, I did.

BRIAN SNELLGROVE

51

Q.    Did the officers also load items onto your truck?

A.    Yes, they did.

Q.    Were any items loaded in any other place other than on your truck?

A.    Not that I'm aware of.

Q.    Okay.  So after the items were located -- were put on your truck, what did you do next?

A.    I was told to transport them back to my warehouse and quarantine them off in a section because the county did not have a place big enough to hold all the items.

Q.    Okay.  Were you asked, or were you told?

A.    I don't -- I don't know.  Asked if I had the ability to do that probably, and then when it was agreed to that I had a place that I could quarantine those items -- items separate from everything else --

Q.    Okay.  So you drove to your barn after that.

A.    Correct.

Q.    Who from the police department were -- drove with you?

A.    My recollection that it would have been probably Officer Dahl, maybe Officer Metcalf or Officer Brown.  I remember all those people being parts of -- of that time frame.

Q.   Okay.  When you got to your barn, how did you go about setting up the space where this would be -- these items would be placed?

A.   There's two -- basically two large garage door openings so we sequestered off one bay basically in that area and all those things were left in that -- specifically in that section of the warehouse.

Q.   Prior to your arrival that day, was that space empty?

A.   It was made empty -- I don't know if we -- we probably moved some more items when we got back to make sure we had ample room.  No, I don't -- it's all used all the time so...

Q.   Yeah, that's -- that's why I'm asking, because I'm trying to determine how the -- the space was segregated.

A.   Yeah.  Well, it -- when -- when we came -- showed back up with the stuff, anything that was in that section, then we moved to other sections of the warehouse so there would not be any question about what was there and what was just brought in.

Q.   Okay.  So you moved various items from that portion of the warehouse to a different place and then unloaded the truck onto this empty space that you created.

**53**

A.    Correct.

Q.    Who from the sheriff's department assisted you in that process?

A.    Like I said, I don't remember which officers were present all the time.  Officer Dahl, Officer Metcalf, and Officer Brown were the ones that I mainly remember seeing throughout this process.

Q.    Was Ingram there?

A.    I remember Mr. -- Sheriff Ingram being at the Hamblins' residence.  Sheriff Ingram was present at times at my warehouse as well, don't remember specific times.  Like it was -- I mean you understand it was a little bit crazy and hairy just because of the moving of multiple items -- multiple large items, having to handle all that so more concerned about moving items without getting hurt or damaging them versus exactly who's standing around me.

Q.    Okay.  But to your knowledge Mr. Ingram was there the day of the search at your barn?

A.    Yes, sir, I believe he came back to my warehouse.

Q.    Okay.  Once the items were unloaded, what did you do?

A.    I left -- left them alone separated until further instruction was given.

BRIAN SNELLGROVE

54

Q.   And when was further instruction given?

A.   I was asked if I could inventory those items because the only way to -- to inventory them would be -- would be to use our part numbering system, which is only in our sales software.  So I was asked if I could do an inventory of that so that next morning we began to start itemizing all the things that were there.

Q.   Okay.  And who assisted you in the inventory process?

A.   I had probably three employees assist me in that, I -- best of my recollection.

Q.   Okay.  And you prepared an inventory?

A.   Yes, sir.

Q.   Okay.

          (A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  Did you take any pho- -- videos or photographs?

A.   Yes, I did.

Q.   Could you describe the videos and photographs you took.

A.   Basically the merchandise was set up in a U-shaped by the larger items establishing the boundary. I videoed those items to -- so there would be some clarification as to what was just brought into the

**55**

warehouse.

Q.    All right.  After they were inventoried, who had access to the barn?

A.    Well, all my employees had access because we continued to operate our normal business operations out of the rest of the warehouse.

Q.    Okay.  How many employees did you have at the time?

A.    Oh, there would have been probably 11.

Q.    Okay.  So you and 11 other people had access to the barn?

A.    Yes.

Q.    What instructions did you give relating to the seized property to your employees?

A.    They were not -- to not touch any of it or move any of it.

Q.    And how did you give them that instruction?

A.    Verbally in person.

Q.    Okay.

        MS. HAMBLIN:  There's that one.

        MR. MUELLER:  Thanks.

Q.    (BY MR. MUELLER)  All right.  I'm going to hand you what I will mark as Exhibit 1.

        (Exhibit 1 marked.)

Q.    (BY MR. MUELLER)  Do you recognize this

**56**

document?

A.   Yes, sir, this is the listing of tools that we inventoried.

Q.   Okay.  Does it indicate how many total items there are?

A.   Oh, man, let me see.

I don't see the actual number.  There -- there's 13 pages, but I don't see...

Q.   Okay.

A.   Is -- is it on here?

Q.   No, it's not.

We counted 607.

A.   Okay.

Q.   Just wanted to see if there was a number on there.

Can you tell me the date and time of that according to the document.

A.   5/17/23 at 3:04, I guess is when this document was started.

Q.   Okay.  5/17 was the date of the search.

A.   Okay.

Q.   So you started doing inventory that evening?

A.   Yes, sir, we did.

Q.   Okay.

A.   Okay.

Q.   And -- all right, thank you.

Now, as you mentioned, some of the items on this list -- larger items would have had individual serial numbers.

A.   Yes, sir.

Q.   Did you document those serial numbers anywhere?

A.   I believe they're on there, are they not?

Q.   Well, you can correct me if I'm wrong.  I see part numbers, but not serial numbers.

A.   Oh, you're -- you're correct, yes, sir.

Q.   So did you document the serial numbers for the serial numbered items that were seized?

A.   Not in this inventory list, no, sir.

Q.   Did you document it in any other document?

A.   It would have just been recorded in our purchase history through Snap-on.

Q.   Okay.  Did you perform any sort of trace or look-up for those serial numbers for the serial-numbered items?

A.   No, sir.

Q.   Okay.  So to your -- so to your knowledge, those serial-numbered items, you don't know specifically like who they were last sold to before they were in Austin Hamblin's possession.

BRIAN SNELLGROVE

**58**

A.   By part number -- most of those things are very specific by -- like toolboxes are specific by color and things so they're very easily noticeable within our inventory because we probably would only have one that would look like that.

Q.   Yeah.

A.   So they're very easy -- easily identifiable through our inventory system.

Q.   I understand that.

But serial-numbered items are uniquely identifiable by serial number.

A.   Yes, when they're sold to the end user, the -- the serial number's put with them so they're -- so if they have -- so they have a traceable --

Q.   Did you look up those serial numbers to determine who they were last sold to?

A.   They were not sold to anyone.  That -- those -- these items I looked up in our -- in the -- in the other sales software computers to see if those items had been sold to anyone so we could see if they'd gone to an end user, and they were not.

Q.   Okay.  So what -- what did your records reflect in terms of the serial-numbered items?

A.   Well, all -- all those items should have still been just in our inventory somewhere, not -- they

BRIAN SNELLGROVE

**59**

weren't -- they were in an inventoried -- they weren't in an end user's receipt anywhere.

Q.   Okay.  Do you have any records or documentation relating to those individual items, the serial-numbered items?

A.   Every -- the vast majority of those items are all traceable through invoicing from Snap-on or inside our inven- -- or inside our inventory.

Q.   Okay.  In our request for production dated September 6th, 2025, as request for production number 1, we requested -- or request for production number 2, we request the production of all inventories, logs, receipts, vouchers or other list of items seized including a copy provided to the plaintiffs.

Do you have a list of the items including the serial numbers for the things that were seized?

A.   I'm not sure that I understand your question.

Q.   Yeah.

Do you -- for the serial-numbered items --

A.   Uh-huh.

Q.   -- do you have a list of those serial-numbered items that were seized?

A.   Well, I have this list of inventory is what I

have.

Q.   Okay.  But you don't have a serial -- the list including serial numbers?

A.   No, sir.

Q.   With respect to request for production number 7, we requested all documents relating to sale, auction, destruction or other disposition of any seized property.

What is the -- what was the fate of the inventory that was seized?  What happened to it?

A.   Eventually?

Q.   Yeah.

A.   I was told that I could put it back into the inventory where it came from --

Q.   Uh-huh.

A.   -- and that I was able to sell it.

Q.   Okay.  With respect to the serial-numbered items that were sold, do you have any documentation relating to those particular sales?

A.   I'm sure they are recorded in those -- when they went through the sales software system, they were, yes, sir.

Q.   And you still have access to that system.  Correct?

A.   No, sir, I do not.

Q.   Are you not a Snap-on franchisee as of

today?

A.    I am, but, like -- as I stated earlier, I own one that's left operating and when I sell the franchise, I have access to that -- to those records for 30 days. I have -- I have the printed overall picture for that for my tax purposes of what happened during those years, but I no longer have access -- I can't go back and access a closed store.

Q.    Okay.  So you no longer have access to records relating to those particular items.

A.    Not to particular customers, no, sir.

Q.    Okay.  What communication -- okay.

When did you close the stores that had the records?

A.    We closed -- we've been closing stores since -- closed -- in '24 we closed one and then in 2025 I closed -- sold two more.  Those were sold.  And then -- then in '26, we're closing the last two.

Q.    Okay.  With respect to franchise 5, which was Austin's franchise --

A.    Uh-huh.

Q.    -- when did you sell that franchise?

A.    It would have been August or September of '24.

Q.    Okay.  What was the reason for the sale of

that franchise?

A.    Just needed to -- it was time to start downsizing, a business decision.

Q.    Fair enough.

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  I'm going to hand you what's been marked Exhibit Number 2.

(Exhibit 2 marked.)

Q.    (BY MR. MUELLER)  Do you recognize this document?

A.    I don't recall ever seeing or reading this document specifically.  I may have seen it at some point.  Looks like this is the search -- I guess the search warrant.  I'm not really familiar with all of these kinds of things but...

Yeah, I don't remember actually ever reading this document, no, sir.

Q.    Okay.  And so this a copy of the search warrant, and so you don't remember ever reviewing this document?

A.    Well, no.  I mean, I'm sure I was told some things about it, but I don't remember specifically reviewing it, no, sir.

Q.    Okay.  Okay.  On this document that I handed

you previously, this is still Exhibit Number 2 --

A.    Uh-huh.

Q.    -- I want you to draw your attention to line 12.

What is line 12?

A.    Says:  For the Plasma Cutter 30i the serial numbers are...

And it has many serial numbers listed.

Q.    Okay.  Were any of those serial-numbered items seized from the Hamblin's residence, those particular serial numbers?

A.    I don't know that off the top of my head.

Q.    Okay.  Did you verify at the time that the items that you took matched those particular serial numbers?

A.    Like I said, I was not aware of this document at that point --

Q.    Okay.

A.    -- or those numbers.

Q.    I'm gonna hand you what's been marked as Exhibit Number 3.

(Exhibit 3 marked.)

Q.    (BY MR. MUELLER)  This was the inventory list that the police produced as part of the seizure that they produced to the court.  Just take you a look at

that list.

A.    Uh-huh.

Okay.

Q.    Does that list of items seem correct to you?

A.    Yes.  I mean there's several items on here that were part of what we inventoried at my warehouse, yes, sir.

Q.    Okay.  Item number 45 is a Porto Cool -- Porto Cool Jetstream.

A.    Uh-huh.

Q.    Do you know what that is?

A.    Uh-huh.

Q.    What is it?

A.    It's a portable unit used in shops and warehouses.  It's like an evaporative cooler.

Q.    Okay.  Was that a Snap-on branded item?

A.    No, but it's purchased through -- we have -- we have a what they call a supplemental catalog that we can order through our sales software system other branded items that come to us.

Q.    Okay.  This particular item has a specific serial number.  Did you at any point match that serial number to your items for your business?

A.    No, sir.

Q.    Okay.  Were there items seized that were not

Snap-on other than, you know, your -- the iPhone that was issued to you?

Were there other items that were seized that were not Snap-on branded?

A.    It's very possible, yes, sir.

Q.    Okay.  You would have loaded those items onto your truck?

A.    Yes, sir.

Q.    Why did you load those particular items that were not Snap-on branded onto the truck?

A.    There -- there were many items bought through the supplemental catalog that would have been purchased through our sales software, and if there was any other items that were taken, it was because they were inside of tool cabinets that had already been -- by Mr. Hamblin's admission, they should have been in my warehouse.  So if something was taken that was inside of that, we were loading the big toolbox if i- -- so...

Q.    Were there any items that were Craftsman or Harbor Freight?

A.    Could have been, yes, sir.

Q.    Would those items have belonged to you?

A.    Probably not, no, sir.

Q.    Okay.

A.    Like I said, if they were loaded, it was

66

because they were inside something that Mr. Hamblin already admitted belonged to me.  That's the only reason they would have been picked up.

Q.   Okay.  After the police told you the case was over, for those items, what did you do with them?

A.   I don't recall what happened to those items or if they were there.  They would have been -- I'll say this.  Other branded items could have easily -- after I was told to put items back into my inventory, we -- it's not that uncommon to have taken trade-ins of other -- other brands of merchandise when we sell things.

Q.   Uh-huh.

A.   So it's probably a fairly common thing that inside my warehouse there are other items branded particularly maybe Craftsman or something that we took in trade as we sold other items.

Q.   All right.  I'm gonna hand you what's been marked as Exhibit Number 4.

A.   Okay.

(Exhibit 4 marked.)

Q.   (BY MR. MUELLER)  Do you recognize this?

A.   Yeah, this is from our previous business manager looking up items that we had seriali- -- serialized numbers -- ooo -- items that had serial numbers that were purchased through our sales

software.

Q.   Okay.  These reflect particular serial numbers of particular items.

A.   Yes, sir.

Q.   Did you match these serial numbers to any items that were taken from the Hamblins?

A.   Did I do that?

Q.   Yes.

A.   Not the day of -- of when they were picked up, no, sir.

Q.   How about a different time?

A.   We did go through there and compare items.  I don't recall exactly -- there's so many different serial numbers, I don't -- I don't remember the exact days or processes.

Q.   Let's talk about damaged items or warranty items that were processed by Snellgrove Enterprises.

How does Snellgrove Enterprise [sic] deal with equipment previously sold to customers that is damaged or for which there's a warranty claim?  What's the process on that?

A.   If it's smaller items, they -- Snap-on has a couple different categeries -- categories of how you return warrantied items.  If we warranty out smaller items, it's -- goes back through just a system and we

**68**

inventory what we're sending back to them and they give us credit for those items.

Q.    Okay.

A.    If it's larger items that are not easily shipped back, then it's -- then you contact the corporate side of that and they either come and pick them up or they're taken out of circulation and -- with a certificate of destruction based on someone making them not for sale anymore.

Q.    Okay.  Were items that were warranty replacements that were supposed to be destroyed, were those items ever repaired and resold by Snell- -- Snapgrove (sic) -- by your business?

A.    Only if they were not -- not if they -- only if they were not fully warrantied.  If they were fully warrantied and -- then it was -- then it was out of circulation.

Q.    Okay.  And --

A.    If they were -- if they were partially warrantied and we could repair them and s- -- and put them back into circulation of some level, yes.

Q.    Okay.  And so what is the difference between a fully warrantied and a partially warrantied item?

A.    So like if we had something that was damaged and the Snap-on corporate would give us ad- -- an

additional discount off of their pricing for us to go ahead and put it into circulation, then we could do it that way if.  Or if there was something damaged that was -- you could repair the damaged part of the -- of the item and then put it back into circulation, we could do that.  But if they gave you a destruction on the whole toolbox, per se, then it was not to be put back -- not to be sold again.

Q.    Okay.  Who did the repairs for those items?

For items that were partially warrantied that were repaired and then resold, who did the repairs?

A.    It just depends on -- I mean multiple employees.  So someone could have -- it could have been traded between franchises, could have been done by my warehouse guy that -- that works in the warehouse for me.

Q.    Did Austin ever do repairs for you?

A.    I'm sure he did.

Q.    Okay.

A.    He was one of the employees.

Q.    Okay.  And did he ever do repairs of -- of damaged equipment at his home?

A.    Not to my knowledge.

Q.    Okay.  Where were these repairs done to your knowledge?

BRIAN SNELLGROVE

A.   At -- at my warehouse --

Q.   Okay.

A.   -- or at the end user.  Like if it was on site with an end user retail customer, we could have repaired there.

Q.   Okay.  Were -- to your knowledge were employees ever repairing items at their own personal property or personal facilities?

A.   At times when they would go through an inventory list of what was being -- needed to be warrantied, yes.

Q.   Okay.  So it was -- it was standard practice at the time that employees would repair things for your business at their own home or at their own locations.

A.   No, not standard practice, no, sir.  I'm -- in speci- -- in specific situations if they asked permission to do that, like if it was in the evening or on a Saturday and they wanted to -- to -- to do that, then I would allow them to do it then return the truck or return the items.

Q.   Okay.  So items that were to be marked as destroyed and -- and not resold, how did -- how did you go about destroying those items?

A.   Most of the time they're turned back over to the corporate people and sometimes they're just stacked

71

at my warehouse until -- till they either come get them or they tell me to destroy them somehow.

Q. Okay. Did employees ever keep items at their -- that -- that -- at their own place and those were -- would be the place at which those items were recovered from?

A. No, sir, not -- not -- they did not have permission to do that. If it was done, it was out -- without my knowledge.

Q. For items that were to be marked as destroyed, those items would have no value. Is that -- is that your understanding?

Or what value would they have?

A. The value would have been that -- that Snap-on corporate would have given me credit for it.

Q. Yeah.

A. So it had no retail value, again, but it was to not be back in the market.

Q. Okay. Did you use the service Got Junk to -- or did the -- Snap-on use Got Junk to get equipment?

A. It was something I think Snap-on corporate uses, but Got Junk never would service our area --

Q. Okay.

A. -- to my knowledge.

Q. So at your warehouse you would have this

equipment that was derelict, just piled up and just sitting in a corner consuming space?

A.    Sometimes, yes, sir.

Q.    So how -- how often would Snap-on get their equipment back?

A.    Based on their schedule.  Out of my control.

Q.    All right.  But that was consuming your warehouse space?

A.    At times, yes, sir.

Q.    Okay.  Items that were be- -- were to be destroyed, did you ever allow employees to keep those items for their own personal use?

A.    Don't recall ever letting anybody, no, sir.

Q.    Sometimes items were sold for a penny.  Can you describe what circumstances that would be under.

A.    Yes, sir.  When we would go to our tool shows or our sales meetings, if we agreed to buy large groupings of items, then Snap-on would -- as a sales incentive to us, would allow us to purchase either a -- an additional tool or some kind of, what we would call, a BA merchandise, some marketing merchandise at a penny because they have to account for it in their system so then we could use it as a sales aid to our end -- to our retail customer.

Q.    Okay.  Would employees ever directly purchase

BRIAN SNELLGROVE

73

those items?

A.   I mean I would allow them at times if they wanted -- if there was something that they wanted, yes. I allowed my employees to buy small items.  If there was memorabilia type things that -- that they wanted, then we would make an agreement, yeah, you know.

Q.   Okay.  While the items that were seized were kept at your warehouse, did you have any ongoing inventory?

Did you periodically recheck the items to see if they were still there, for example?

A.   Yeah, they were on constant camera video and they were not touched until we were told we could.

Q.   Okay.  Those -- are those video recordings of the items still available?

A.   I do not know that because I'm not a- -- they were not -- I did not download those to a specific separate device.  And so since it's been two years, I doubt they're still on a cloud somewhere.  Probably not.

Q.   Okay.  Okay.  What was the circumstances under which you were told that the items were released?

How did you learn that?

A.   I was notified by Sheriff Ingram and/or Deputy Dahl, maybe both, that it was okay to take those items

and put them back into my sellable inventory.

Q. Do you recall the date on which that occurred?

A. Not specifically, no, sir.

Q. Okay. So when you put them back into your inventory, did you create like new records for those items to reflect that they were in your inventory?

A. The way that our sales system works is like since we had the five different operating numbers and it's underneath the one Snellgrove Enterprises canopy, items were traded between trucks quite often and so specific items were not reentered into computers every time. So there's not a specific trail for every single item that goes from one truck to another truck. It comes out of the warehouse and then was just sold off of -- off of trucks.

Q. Your role as county commissioner, what is -- what is your oversight role with respect to Martin County Sheriff's Department as -- as a county commissioner?

A. Just their budget.

Q. So how do you go about determining their budget?

What's the process for that?

A. They -- the -- they submit their budget to the

BRIAN SNELLGROVE

**75**

county and -- along with all other departments in the county and it's approved once a year.

Q. When did you say you first became a county commissioner?

A. January of '25.

Q. Of '25.

For your Snap-on franchises that you've been divesting yourself of, has Snap-on ever contacted you saying that your franchises were in jeopardy?

A. No, sir.

Q. Has fran- -- has Snap-on ever said that you were in breach of contract with them?

A. No, sir.

Q. Is your relationship with Snap-on in any way hostile for --

A. No, sir.

Q. Have you ever had any communications with Snap-on corporate relating to route performance issues?

A. We have annual reviews the whole time I've always been an owner, yes, sir.

Q. And what are the -- what are the results of those reviews?

A. We just go over sales trends, an- -- anything that a normal business would do. You look at your sales

trends, your costs, you look at if your business is growing or declining, and then you -- they would assist in allowing us to try to figure out ways to grow even more or whatever.  Just a general business review.

Q.   Have you ever had communications with Snap-on related to past due balances?

A.   As far as owed to me or to them, or what are your --

Q.   Either way.

A.   Yes, that's a -- that's a fairly regular occurrence.  Yes, sir.

Q.   Okay.  So you have, from time to time, been past due with respect to balances owed to Snap-on?

A.   Myself?

Q.   Yeah, or your enterprises.

A.   Yes, at times.  Yes, sir.

Q.   Okay.  Has there ever been any risk of disenfranchisement from Snap-on?

A.   No, sir.

Q.   With respect to Snap- -- Snellgrove Enterprises, do you have any business partners?

A.   No, sir.

Q.   Who is Jay Edwards?

A.   He is a friend of mine that I have -- we are -- we do have some LLCs together, some C -- S corps

**77**

together.

Q.   Okay.   And with respect to the accounting between the corporations, how do you segregate the funds with respect to one corporation from another?

Does each corporation have a -- its own bank accounts or --

A.   Uh-huh.

Q.   -- how's that work?

A.   Uh-huh, each cor- -- each -- each entity has its own bank account.

Q.   Okay.   Do you ever transfer money from one corporate entity to different corporate entity?

A.   No, it goes from one corporate entity to maybe my personal.

Q.   What specific role did Andrew Nichols play in your business operations?

A.   He was a sales assistant.

Q.   Did he ever have a route?

A.   Yes, he did.   At one point we allowed him to run a store.

Q.   Okay.   And what -- did his employment end at some point?

A.   Yes.

Q.   And why was that?

A.   He chose to go to try some other type of

employment.  I'm not sure where he went.

Q.  Okay.  Other than Austin Hamblin, have you ever had -- ever fired an employee for theft?

A.  Don't remember if there's actually a discussion, but Joe Espino left my employment because of suspected theft.

Q.  Okay.  And with respect to his theft, did you ever confront him directly?

A.  Probably.  Don't re- -- recall exact conversations.

Q.  Okay.  Prior to May of 2023, did you have underperforming rigs?

A.  I don't know that I would ever say they were underperforming, no.

Q.  Okay.  Austin was your best performing rig.

A.  Yes, sir, he was.

Q.  How much money did your corporation lose in revenue as a result of Austin leaving your employment?

A.  I don't know how to exactly put a number on that.

Q.  I mean he -- he was -- he was earning quite a bit of money for you and -- I mean was it thousands, tens of thousands, hundreds of thousands of dollars per year --

A.  That --

BRIAN SNELLGROVE

Q.    -- I mean ballpark?

A.    That what?

Q.    That you lost as a result of him leaving your employment.

A.    I mean probably several thousand because as -- because he was such a good salesman.

Q.    Okay.  Why did you -- why did you fire him?

A.    Because we discovered he had quite a bit of inventory that belonged to Snellgrove Enterprises that -- not at -- where it was supposed to be.  It was at his personal residence and not at the warehouse.

Q.    Okay.  At any point did you ask for the stuff back?

A.    Not sure what you --

Q.    I mean --

A.    -- mean by that.

Q.    -- did you ever ask him for any property that was at his house, did you ever ask him to return it?

A.    No, sir, because I will say it was not supposed to be there.

Q.    Can you descri- -- discuss your telematics or tracking systems that you have on Snap-on trucks and trailers.

A.    Yeah, at the time I believe we had a service through AT&T that had tracking by phone signal.

80

Q.   Okay.  Did you utilize that system to track Austin Hamblin's movements?

A.   I tracked every truck.

Q.   Do you utilize social media such as Facebook to promote your business or communicate with customers?

A.   Very seldom.  I don't know that I ever personally did.  I might have had employees that did.

Q.   Have you ever discussed this theft with any of your other employees?

A.   In what respect?

Q.   Asking them whether they participated in the theft, asking them whether they observed anything, asking whether they had any knowledge that -- of the thefts?

A.   As I was trying to decide -- figure out if there was thefts or not --

Q.   Sure.

A.   -- yes, I did pose questions to all the employees.

Q.   And what information did you get back relating to this matter?

A.   Speci- -- I don't remember specifics, but just some suspicions.

Q.   What is the nature of your relationship with

Sheriff Ingram?

A.   Acquaintances, small town friends, you know. I mean we know each other.  We -- he attended -- we've attended some Bible study classes together.  Yeah.

Q.   Did you ever socialize?

A.   No, I don't -- the only time I ever remember being with Sheriff Ingram outside of official duties is when we -- we went to Bible study class that we're both a part of.

Q.   Did you ever contribute to his campaign?

A.   No, sir.

Q.   Did you ever participate in, you know, getting out the vote or helping him promote himself, pounding in yard signs?

A.   No, sir.

Q.   Have you ever made public statements relating to this case on social media or otherwise?

A.   I have not.

Q.   Okay.  Were -- to -- to the best of your knowledge are any of the items that were seized from Austin, are they -- any of those items still in your possession?

A.   No, sir.

Q.   Were any of the items that were seized transferred, given, gifted, sold to the sheriff's

82

office?

A.    No.

Q.    To Mr. Ingram?

A.    No.

Q.    Did Mr. Ingram or any other member of the sheriff's department ever suggest that they could get some of the stuff --

A.    No, sir.

Q.    -- that was taken?

Austin's base salary, was that $750 a week?

A.    When he started, it probably was, yes, sir.

Q.    How were individual performance commission checks calculated?

A.    When the store manager trucks -- commission checks were calculated off of their specific stores. The sales assistants' commission checks were calculated off of the business as an entirety.

Q.    Okay.  And when were those payable?

A.    Monthly.

Q.    Was -- did Mr. Hamblin have a written employment agreement?

A.    No, sir.

Q.    Was he ever provided a policy manual?

A.    No, sir.

BRIAN SNELLGROVE

83

Q.   Did a policy manual ever exist?

A.   Not at that time, no, sir.

Q.   Was any portion of his employment with you in writing?

A.   His employment application probably was it.

            (A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  Give me a second.

            For his pay stubs, he receives -- what kind of documentation did he receive for his pay?

A.   They were all checks.

Q.   Were those checks from the enterprise?

A.   Well, each -- I had a Snellgrove Enterprise account and I had a checking account for each store as well.  So those checks came from that store.

Q.   Did you actually like physically write a check?

A.   Yes, I do.

Q.   Old school?

A.   Yes, sir.

Q.   What metrics or -- did you use to determine Mr. Hamblin's performance during his tenure?

A.   As far as commission is related?

Q.   Yeah.

A.   Yeah, like I explained earlier, once the truck

**84**

met a break-even goal, then he got a percentage of sales above that.

Q. Did he ever achieve any special awards, special statuses?

A. Yes.

Q. What were those awards?

A. Don't recall the specifics, but he was recognized for outstanding sales multiple times.

Q. Did he ever achieve platinum elite status?

A. Yes.

Q. Did he ever achieve top 100 nationally status?

A. Yes.

Q. Did -- was he ever the subject of customer complaints?

A. Yes.

Q. Okay. What were the nature of those complaints?

A. Just the general stuff you get on -- nothing out of the ordinary. We get it from all customers, maybe disgruntled with the way they talked or something like that so...

Q. Yeah.

MR. MUELLER: Let's go off the record for just a second.

(Recess.)

Q.  (BY MR. MUELLER)  All right.  So Austin -- Austin wa- -- when was he officially fired by your corporation?

A.  Did you start the recording?

Q.  Yes.  Yes, I did.

A.  Okay, sorry --

Q.  No worries.

A.  -- didn't want to...

I guess the day of discovering the search warrant was executed, it was --

Q.  Okay.  How --

A.  -- over.

Q.  How was he informed that his employment was terminated?

A.  I don't know, except that when I was there, his plea to me was, "I" -- basically, "I know I'm not gonna have a job, but please don't send me to jail," and, "This is all your stuff."

Q.  Okay.  So did you actually tell him that he was fired, or did he just sort of infer it?

A.  I don't recall.

Q.  Okay, fair enough.

I'd like to try to see if we can pin down exactly when you were informed that the property could

**86**

be released.  So could you try to pin down like when roughly that happened?

A.    I'm gonna guess it was a couple months after that day.  I -- it was a while.  I mean, I remember the merchandise sitting there for a pretty long time.  Might have been longer than that, I don't know.

Q.    Okay.  Do you -- do you recall what time of year that -- that it was, like --

A.    Oh, it would have been summer, late summer, something like that.

Q.    Okay.  The criminal case wasn't disposed of until November so is it possible that you didn't get notified until then?

A.    I don't -- honestly don't recall it being that long --

Q.    Okay.

A.    -- no, sir.

Q.    Do you have any phone records or any sort of other way of trying to pin down when that was?

A.    Man, I feel like it was a phone call so I don't know that I have ability to retrieve that myself.

Q.    Okay.  Did you ever receive anything in writing?

A.    No, sir.

Q.    Did -- did you ever receive anything in writing relating to the criminal case at all?

A.    Not to -- not to my knowledge, no, sir.

Q.    Did you ever receive like an e-mail requesting records or a text that was keeping you apprised of the process of the criminal case, anything like that?

A.    No.  Once I knew this -- well, no, I don't know of anything, no, sir, because all this was prior to me hiring Mr. Perez so...

Q.    What was your understanding of why the criminal case was disposed of?

A.    Tha- -- I still did not ever get a very sure answer of that honestly so...  The inconsistencies of evidence was about as clear of a answer as I received --

Q.    Okay.

A.    -- or maybe the mis- -- I don't know.  Yeah, that'd be probably the --

Q.    Did you ever suspect that there was any sort of nefarious or ulterior motive in dismissing the case?

A.    Man, that's not mine to judge so I don't know.

Q.    Okay.  Did Mr. Hamblin ever utilize his personal vehicle in the operation of your business such as making deliveries or hauling equipment?

A.   Yes, he did.

Q.   How frequently did that occur?

A.   It happened quite a bit there right at -- in the last couple of months because of the high volume of stuff that he was moving, but that was on -- under his choice to use his own personal vehicle because I had vehicles to do it with.

Q.   Did you ever compensate him for mileage or fuel?

A.   No, because it was his choice to do that while I was providing the alternative.

Q.   Okay.

A.   I would say -- this has nothing to do with him distributing merchandise, but I did allow him to use my personal vehicles for like six months when he did not have a vehicle that was running to go back and forth to work at no charge to him.

Q.   Okay.  Was Mr. Hamblin separately compensated for things like monthly meetings, working weekends?

A.   No, sir.

Q.   Prior to May 2023, did you ever issue any sort of warning, oral or written, relating to his employment?

A.   No, sir.

Q.   Did you have any performance complaints

**89**

related to Mr. Hamblin's employment?

A.   No, sir.

Q.   Okay.  Who took control of Mr. Hamblin's route when he left your employment?

A.   I did.

Q.   You personally drove the route?

A.   Yes.

Q.   How did your performance compare to that of Mr. Hamblin's?

A.   We had pretty good success for a few weeks.

Q.   Okay.

A.   Yeah.

Q.   And then after that?

A.   I -- it was not in- -- I did not intend for me to continue to be that long term so we began to try to hand it off to another store manager we thought would work, and it was okay for a while, but it just seemed to be the best decision to get -- to downsize.

Q.   Was Mr. Hamblin's name -- did it appear on any Snap-on paperwork or in your system after his date of firing?

A.   It probably did, yes, sir.

Q.   Why would that be?

A.   Because the store -- particular store that he managed was assigned to him and be- -- and -- or the

name was assigned to him so then when -- so when orders come in, it's able -- able to distinguish between which -- which store those items were -- had been ordered under and so it's not an immediate transfer of those names.  It -- it has to be filed, "Okay, this is gonna be the new name under which we operate this particular store, particular franchise," so...

Q.    So as far as the Snap-on paperwork showed, he -- it was still his route for some period of time after he was fired.

A.    Well, it's never his route.  It belongs to Snellgrove Enterprises.  He operated the store with which -- with which he was employed to do.

Q.    But it was in his name.

A.    The operation of the store was in his name.

Q.    Okay.  Did you cancel or place a stop payment on Mr. Hamblin's paycheck that was dated May 16th of 2023?

A.    Yes, I did.

Q.    Why did you do that?

A.    Because I had just discovered that he had a whole lot of my merchandise and it was very frustrating honestly to be paying someone who had just stolen a lot of stuff from me.

Q.    Okay.  And that case eventually went to

worker's compe- -- compensation board.

A.    Yes, sir, and I did -- he did get -- receive that money.

Q.    Okay.  And there was a decision on a -- his behalf.  Did you pay it as soon as the decision came down?

A.    Yes, I did.

Q.    All right.  Did you appeal the decision of the -- of the Workplace -- Workforce Commission?

A.    I don't recall doing that, no.

Q.    Are there any other pending wage disputes relating to his employment?

A.    No, not that I'm aware of.

Q.    Are there wage -- were there ever wage disputes from other employees?

A.    Not that I'm aware of.

Q.    With respect to his pay records, have you produced complete copies of his pay records including the taxes withheld and commissions?

A.    Produced it for who?

Q.    For hi- -- Mr. -- Mr. Hamblin.

A.    He has, yeah, copies of -- he -- anything he requested, he received.

Q.    Did your business realize any sort of financial benefit from continuing to use his name --

**92**

A.    No.

Q.    -- on the paperwork?

A.    No.

Q.    Did you contact customers to discuss any unfilled orders or missing paperwork?

A.    Yes, I was in contact with nearly all customers to see what needed to be done.

Q.    Okay.  And what were the results of those conversations?

A.    Continued to fill orders as things had been placed for them and to try to take care of the customer.

Q.    Okay.  In calculating the value of the items that were stolen --

A.    Uh-huh.

Q.    -- in your inventory --

A.    Uh-huh.

Q.    -- were these numbers based on new items?

A.    They were based on what was in the sales software at the time.

Q.    Were all the items new that were taken?

A.    No, I'm sure there was probably some -- some used, some that he had used for personal use.

Q.    Did you make any attempt to calculate the value of those items?

93

A.    No, sir, I made no adjustment.

Q.    Okay.  With respect to the photos that you took of the inventory, have all those photos been turned over in discovery?

A.    Yes, sir.

Q.    With respect to receipts, do you have like specific receipts relating to the particular items that were sold -- I apologize -- that were seized?

A.    Do I have receipts --

Q.    Yeah.

A.    -- of where I purchased them from Snap-on?

Q.    Yeah.

A.    Yes, there's -- the vast majority of those you can line up with those specific item numbers --

Q.    Okay.

A.    -- or part numbers.

Q.    And is there documentation beyond their initial purchase by Snellgro- -- Snellgrove Enterprises about what happened to those items?

A.    Well, then if they were sold through our sales software, those same part numbers would appear in the re- -- on the customer's invoice.

Q.    Okay.  I wanted to make sure that I understood your prior answer on the serial numbers for serial-numbered items.

**94**

A.    Uh-huh.

Q.    So for the items that were seized that had serial numbers, did you at any point document those specific serial numbers?

Did you write down the serial numbers?

A.    I went into the -- our software system to try to track if any of those made it to end users --

Q.    Okay.

A.    -- in that direction, yes.

Q.    And for those particular serial numbers, what did your system reflect?

A.    Some had made it to end users and some had not.

Q.    Okay.  For items that made it to end users --

A.    Uh-huh.

Q.    -- so they were no longer your property. They -- they -- they had gone to an end user.

A.    Correct.

Q.    So if they weren't your items, did you make any attempt to return them to their rightful owner?

A.    They were the rightful owner if they purchased them.

Q.    Yes, I understand that, but they were in your -- they were in your possession because they were part of the seized items.

BRIAN SNELLGROVE

**95**

A.    No, I'm saying the ones that are on the list you provided where they had looked at the ones that we had purchased through Snap-on, I tracked those numbers to see if those had made it to end users.  That's -- that's the answer to the question you -- I thought you were asking.

Q.    Right.

So for these seized items -- for those serial numbers that were seized --

A.    Yes, they never showed to be to an end user, no, sir.

Q.    None of those were ever shown as --

A.    The ones that we seized?

Q.    Yeah.

A.    Not to my knowledge, no, sir.

Q.    Okay.  So they -- the records that you showed simply reflected that they were purchased by Snellgrove Enterprises --

A.    And not --

Q.    -- there were no records beyond that?

A.    Not -- yeah, not delivered to an end user, correct.

Q.    Okay.  Are those records that reflect that available?

A.    In what respect?  I'm not following you,

sir.

Q.   Well, for -- for discovery purposes are -- are -- is there records that you can produce that reflects those seized items that shows the thing that you're saying?

A.   That shows that they did not go somewhere?

Q.   Yeah.

A.   No, because the proof is that they didn't, so I don't know how you --

Q.   Well --

A.   -- how to --

Q.   -- presum- --

A.   -- (indiscernible) that.

Q.   -- presumably you -- the record would show that it was purchased by Snellgrove Enterprises and then it would be like end of record, there'd be no further information.  So I'm won- -- what I'm asking for is --

A.   Uh-huh.

Q.   -- is there a copy of those records that reflect that?

A.   That it's still sitting in my inventory?

Q.   Ye- -- that it was -- yeah, that the last thing that happened to those items was that it was purchased by Snellgrove Enterprises.

A.   Yeah, but those items were eventually -- after

I was told I could resell those items, then all those items eventually made it to an end user somewhere.

Q.   Okay, fair enough.

So are there copies of those records that are available?

A.   Probably not because those stores are closed down.

Q.   Okay.  Were the serial numbers that you e-mailed to the police -- did they match the serial numbers of the items that were taken?

A.   I don't remember specifically right at this moment.

Q.   Okay.  Were you able to verify any of the information with Snap-on corporate, or did you ask them to verify any information?

A.   In what respect?

Q.   By asking them to verify any records relating to the seized items.

A.   No, because they would not have any idea of those items.  I proved -- we proved back through the purchasing history that we had the items.

Q.   Okay.  Is there any documentation that reflects the serial numbers of the items that were seized so that we can perform a trace on those items?

A.   Not -- no longer, no, sir.

**98**

Q.   Okay.  Did any person other than yourself perform traces of serial numbers?

A.   I had employees helping me look up documentation so possibly, yes.

Q.   But you don't have any specific memory of any particular items that -- who looked them up?

A.   Gabe Alvarez was -- helped me research purchasing histories.

Q.   After the search warrant, did you undertake efforts to interview customers relating to Austin's route?

A.   I had many discussions with his customers just to make sure we were taking care of them.

Q.   And what did they report to you?

A.   Well, I mean there was just -- we tried to continue customer relations with them.

Q.   Okay.  Did any of them have any specific allegations beyond the general kind that you referred to earlier?

A.   None that I could -- none that I have proof of.

Q.   Did you contact Austin's father-in-law relating to the search warrant?

A.   Yes, I did.

Q.   When did you contact him?

A.    I believe the -- the day it was happening, I believe.

Q.    And what was the purpose of your contacting him?

A.    I had concern for their children and there were going to be a search warrant going on in the house, just thought they -- out of respect I wanted them to know.

Q.    Okay.  Did you have any particular relationship with him?

Was he your friend or --

A.    Just a business acquaintance and friend.

Q.    Okay.  When you made the call to him, did you have any concern that he might, you know, alert Austin or Kiska?

A.    My only concern in alerting him was for the protection of the children and that the -- that -- that they might not need to be involved in that.  And so I had no ulterior motive but the welfare of those kids.

Q.    Okay.  What communications did you have with Anders Dahl on the day of the search first via phone and then in person?

A.    He was the main deputy that was conducting the -- the search and identification of -- of tools.

Q.    Okay.  So when he first contacted you, were

you surprised to receive a call from him?

A.    I'm not sure if I received a call from him or from -- I think it was from Sheriff Ingram --

Q.    Okay.

A.    -- notifying me that -- that they had found more than they thought and could I assist in identifying merchandise.

Q.    Did you have any text messages between yourself and any of the police department?

A.    Don't specifically remember, but I mean as much as we use phones, it's possible, yes.

Q.    And how about e-mails, did you have any e-mails relating to this between yourself and the sheriff's department?

A.    I don't recall any.

Q.    As part of your participation in the search, were you provided any particular instruction what they -- what -- what exactly did they say to you?

A.    They just asked if I could identify items.

Q.    Did you ever express any doubts to your wife or employees about the allegations after you reported them?

A.    Any doubts --

Q.    Yeah.

A.    -- about them?

BRIAN SNELLGROVE

Q.   Yeah.

A.   What do you mean by that?

Q.   Did you ever, for example, say, you know, "I think that this might not be true," or that, you know, "I think -- you know, I think that he -- some of this stuff isn't mine?"  Did you ever express any concerns?

A.   No.

Q.   Do you recall what time you arrived approximately at the Hamblins' residence on the day of the search?

A.   Late morning.

Q.   And approximately how long were you there?

A.   A good part of the day.  I -- I don't know, two, three hours, four hours.

Q.   Okay.  Do you recall approximately what time you left?

A.   Mid-afternoon possibly.  I don't remember exactly.

Q.   And do you recall what time everything was finished at the barn and the police left -- what time of day that was?

A.   I don't exactly, no, sir.

Q.   Was it still daylight outside?

A.   Most likely, yes, sir.  That time of day was lots of daylight so...

BRIAN SNELLGROVE

Q. Did -- during the search, did you ever state, "It's all mine. I don't care what they say."

A. Don't recall saying that, but also I would say that in the height of that emotion, yeah, you know...

But I don't remember saying that.

Q. Did either Kiska or Austin ever assert ownership of any of the items that you were seizing?

A. Yes.

Q. Okay. So -- and with respect to those particular items --

A. Uh-huh.

Q. -- what was your basis for taking them?

A. Austin's admission that all that stuff belongs to Snellgrove Enterprises.

Q. But at some point he specifically said that particular items were his.

A. No, he didn't. Kiska s- -- did.

Q. Okay, Kiska did.

Did you hear Kiska ever tell the police to leave?

A. I -- she was very angry so she probably did tell them to leave.

Q. Did she -- did you ever hear her ask for a copy of the search warrant?

A. Don't specifically remember that.

Q.   Okay.  Did you ever hear Kis- -- did ever -- Kiska ever tell you personally to leave?

A.   She may have.  I don't remember specifically her telling me to leave.

Q.   Okay.  Do you ever recall her telling any particular officer to -- to leave her house?

A.   Not specifically, no.

Q.   Okay.  But you -- but you did hear her make statements that the police should leave?

A.   I could not say under oath that I remember those specific words were said, no, but I knew she was very angry.

Q.   Okay.  There were some miscellaneous non-branded tools that were seized during the search. Why did you seize those items?

A.   Yeah, if -- if they were seized, it was because they were inside of one of the tool cabinets that -- that would have already been admitted to belonged to me.

          (A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  What was your understanding of how disputes over the claim of property was supposed to take place?

          Were you -- were you told that there was

BRIAN SNELLGROVE

a process for contesting property ownership?

A.    The day of?

Q.    Any time.

A.    No, not particularly, just that Austin admitted it should -- we -- I was going under the understanding that they had talked to Austin, Austin admitted to me that it belonged to me, and so we took what he said belonged to me.

MR. MUELLER:  This is Exhibit 5.  Right?

Q.    (BY MR. MUELLER)  Okay.  I'm gonna hand you Exhibit 5.

(Exhibit 5 marked.)

Q.    (BY MR. MUELLER)  Do you recognize this document?

A.    Yes, I remember seeing this.

Q.    And what is this document?

A.    It's a document from Warren Kniepkamp that he had sold these tools to Austin.

Q.    Okay.  Do you dispute the accuracy or truth of this?

A.    I have no reason to know whether he did or didn't.

Q.    Okay.  Well, but you have no reason specifically to dispute that this is true.

A.    No.

Q.    Okay.  So with respect to these particular items, to your knowledge were they ever returned to Austin and Kiska?

A.    No, sir.

Q.    Okay.  Thank you.

Do you have any understanding of Chapter 47 or Article 18.10 of the Texas Code of Criminal Procedure as it relates to seizure and inventory of property?

A.    No, sir.

Q.    What was your interaction with Deputy Kelsey Brown on the day of the search?

A.    Specifically just remember her being present.

Q.    Okay.  Did she personally remove items and put -- place them on the truck?

A.    Very likely.  I don't specifically remember her doing it, but she was there so it's possible.

Q.    Do you ever -- did you ever with her look at any of the property?

Did you -- were you with her inventorying the property?

A.    Both.  I believe she was present at their house, and I believe that she was present at times at my warehouse.

**106**

Q.   Was she with you in the house itself?

A.   Probably so, yes, sir.

Q.   Did you ever observe her opening drawers or looking in cabinets or opening dressers?

A.   Not to my knowledge.  I don't specifically remember that.

Q.   Okay.  How about with respect to Mr. Dahl, what was -- what was your interactions with him that day beyond the briefings that you said?

What did you do in terms of searching, looking at the property?

A.   He was present on many of the things that we looked at, toolboxes we did open to see what was in and all that.

Q.   So you -- you saw him open toolboxes?

A.   I don't know if he opened them, but I did.

Q.   Okay.

A.   I don't know.

Q.   All right.  With respect to Sheriff Ingram --

A.   Uh-huh.

Q.   -- what was his role in searching and looking up things?

A.   Very limited to -- to my remembrance.  He was there part of the time, but I -- I don't think he was there for a big part of the day.

Q.   What was your knowledge relating to a seized firearm that was seized during the search?

A.   I was told there was one seized.  I didn't see it.

Q.   Did you ever make any statements threatening to contact any law enforcement officers or ATF relating to the firearm?

A.   No, sir.

Q.   Did Sheriff Ingram ever leave the search scene prior to you driving all together to -- towards the barn?

A.   I think he did.  I don't remember him being there for part of the loading out of merchandise.

Q.   To -- did he make any purchases such as, for example, a dolly to help move equipment?

A.   Yes, he did.  I remember he did go get something, yes.

Q.   Did he bring back pizza?

A.   I believe he might have.

Q.   Did Mr. Hamblin object to the removing of any items?

A.   Not -- he may have initially, but when I was there, he did not.

Q.   Describe your observations or any interactions with the Hamblins' children.

BRIAN SNELLGROVE

A.    The day of the warrant?

Q.    Yes.

A.    I recall them being in a bedroom, but I don't -- other than seeing them there, I don't re- -- recall anything else.

Q.    What was their mood?

Were they afraid?  Terrified?  Happy?

What -- what was their --

A.    I'm sure they were probably scared.  It was a -- it was a pretty intense situation.

Q.    Was there a toolbox that belonged to Hamblin's son in his son's bedroom?

Do you recall that?

A.    There was a toolbox in the bedroom.

Q.    Okay.  Did you -- did you direct that that item be taken?

A.    Yes.

Q.    And what was your basis for taking that particular item?

A.    Because it said Snap-on on it and it's -- to my knowledge it belonged to me.

Q.    Did -- was the toolbox a unique toolbox?

Like, for example, you referred to the toolbox that was in the trailer as --

A.    Uh-huh.

BRIAN SNELLGROVE

Q.    -- being fairly unique?

A.    Uh-huh.

Q.    Was this similarly unique?

A.    My recollection it was a black toolbox --

Q.    So --

A.    -- that.

Q.    -- so standard?

A.    Would be more of a standard, yes, sir.

Q.    So other than it being labeled Snap-on, did you have any particular reason to believe that that's -- that toolbox was yours?

A.    Just Mr. Hamblin's admittance that all these things belonged to me.

Q.    Did he specifically say that toolbox belonged to you?

A.    I don't recall that.

Q.    Okay.  When he made that statement, were you -- that was when he was in the tool shed.  Correct?

A.    Yes, we were outside.  Either in the tool shed or outside, yes.

Q.    At -- at any other point did he say that other items belonged to you?

         Did he make similar statements relating other items?

BRIAN SNELLGROVE

110

A.    I took that as a blanket statement when he told me that because it was like, "All these things belong," so it was -- that's how I took the statement.

Q.    You -- you took it as all the things that would be located anywhere on the property?

A.    Yes --

Q.    Okay.

A.    -- because there were items inside the house that did belong to us for sure, and the one in the bedroom, I'm assuming that all those were because there were multiple items in there.

Q.    Okay.

A.    So they would have been kind of under the blanket of, yeah, "All this belongs to Brian."

Q.    When the toolbox was seized or when the -- when -- when you took possession of the toolbox, did anyone object?

A.    Kiska.

Q.    Did -- did Kiska ever object to any other specific items being taken?

A.    I don't remember specific items.

Q.    What were your interactions with Deputy Jesse Metcalf?

A.    I remember Deputy Metcalf being at the front of the house when I arrived.  Don't remember much after

**111**

that.

Q.   Were there physical receipts or physical papers that were taken as part of the search?

A.   I don't recall.

Q.   Did Kiska or Austin ever present you any documents or papers that they purported to show ownership or receipts?

A.   I don't recall that being shown to me.

Q.   Did you, during the search, see any papers or receipts or anything else that might indicate purchases?

A.   Not at that time, no, sir.

Q.   Were you told anything about the firearm that was seized?

A.   (Witness indicates.)

Q.   Okay.

A.   No specifics.

Q.   Did any employees or associates assist you at the -- at the search location in loading --

A.   Yes.

Q.   -- items?

A.   Yes.

Q.   Who participated?

A.   Randy Jones.

Q.   And how did Mr. Jones get there?

A.    He drove one of the vehicles.  I drove one and he drove one.

Q.    Di- -- you asked him to come?

A.    Yes.

Q.    And what -- did he load equipment onto --

A.    Yes.

Q.    Okay.  And he did this at your direction?

A.    Well, under the direction of the deputies.

Q.    Yeah.

So the em- -- you saw the em- -- the deputies give him directions?

A.    Well, they gave us all directions, right.  That's --

Q.    Okay.  And how about at the barn, which employees helped you in the unloading of items?

A.    Mr. Jones.  I don't recall anybody else specifically being there when we unloaded.

Q.    Did you ever receive a copy of the magistrate-approved inventory from the Martin County Sheriff's Office?

Did they ever send you a copy of the inventory that was given to the court?

A.    Not to my recollection.  Maybe I did, I don't know.  Some of those words I'm not --
"magistrate-approved," I'm not sure what that would look

BRIAN SNELLGROVE

like exactly.

Q.   I understand.

What county is your property located in?

A.   Martin County.

Q.   And what property -- what county is the Hamblin property located in?

A.   Howard.

Q.   How far away do you live from the Hamblins?

A.   20 to 25 miles.

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  What post -- what event -- what communications have you had with Snap-on corporate relating to this matter?

A.   Very few.  I mean, I'm sure I made the corporate management right above me aware that there was some stuff going on.

Q.   Can you elaborate a little bit more on those communications.

A.   I'm sure I told them that Austin was no longer working with us and we had picked up a lot of property, but other than that -- I wouldn't know what I would have communicated besides that.

Q.   Have you provided to Mr. Perez a copy of every text message, e-mail, and documents that was requested

BRIAN SNELLGROVE

as -- as part of our request for production?

A.    Yes.  To my knowledge, yes, sir.

Q.    And it -- all copies of photographs that you might have taken as part of the inventory process, those have been pro- -- provided to Mr. Perez?

A.    Yes, sir.

Q.    Have you ever reviewed the bodycam footage that was taken by the police in response to this case?

A.    Yes, sir.

Q.    Does the footage accurately reflect your participation as -- as far as the video itself goes?

A.    Best I could tell, yes, sir.

Q.    To your knowledge did anyone other than Dahl have a body camera on?

A.    I'm not aware of that, no, sir.

Q.    What -- what inter- -- what statements did you make to the media, if any, relating to this case?

A.    None.

Q.    Did you make any statements to the Martin County Messenger relating to this case?

A.    No.

Q.    Did you have phone calls with Deputy Jesse Metcalf in the days following the seizure?

A.    It's possible.  Don't recall specific ones, though.

BRIAN SNELLGROVE

**115**

Q.    Is your property covered by insurance?

A.    Yes.

Q.    And -- and your businesses are covered by insurance?

A.    Yes.

Q.    Have you made notification to your insurance companies related to this lawsuit?

A.    No -- no, not officially, I don't think.

Q.    Okay.  In September there was a bid that was approved by the commissioner relating to insurance for the county.  Are you aware of that?

A.    For like a general liability?

Q.    Yes.

A.    Not specifically, no.

Q.    Do you have any documentation relating to the chain of custody for the particular items that were taken?

A.    No, just word of mouth.

Q.    To your knowledge was any property that was seized taken to or stored in any location other than your barn?

A.    No, sir.

Q.    There was a firearms [sic] that was seized.  Was that stored at your barn?

A.    No, sir, I had -- only things that -- so, yes,

BRIAN SNELLGROVE

**116**

I'll back that up.  Those things, if they were seized -- they were not seized to my knowledge, I did not know about them, but none -- only things at my -- my warehouse would be something pertaining to Snap-on.

Q.    And there were Harbor Freight Tools as well. Correct?

A.    Yes, if they were picked up -- like I stated earlier, if they were inside a tool cabinet, they could have gotten picked up that away, yes, sir, but that's the only way.

Q.    Were Harbor Freight Tools something that your business d- -- dealt in?

A.    Yeah, I'm not even aware if there was a Harbor Freight tool in there.  I'm just saying it is a possibility.

Q.    Were you ever made aware of policies and procedures of the county -- Martin County in relation to search and seizure?

A.    No, sir.

Q.    Did you ever have communications with the district attorney?

A.    I did after being notified that I had been named in a lawsuit.

Q.    What were the nature of those communications?

BRIAN SNELLGROVE

**117**

A.    I was curious as to why the charges had been dropped.

Q.    And what did they tell you?

A.    I did not get a very clear explanation except that it just -- they -- inconsistencies in the presenting of the evidence.

Q.    Okay.  Why did you call the district attorney after being noticed as a defendant in a civil lawsuit?

A.    I just -- out of curiosity as to why the -- what seemed like an overwhelmingly noted case of things being taken from my property that were -- that belonged to me, how did it happen that -- that none of that was ever taken to -- to a trial.  So just curiosity question.

Q.    Fair enough.

How did you first come to meet Mr. Perez?

A.    Mr. Perez was known by Gabe Alvarez, who is an employee of mine, and he -- they had a relationship, friendship, so I inquired if he would be willing to be my representation at that point.

Q.    Okay.  Who is paying your legal bills?

A.    I am.

Q.    Is any other -- is anyone else paying this, like indemnified you?

Is an insurance company paying any part of this?

Has -- Mr. Dennis paying any part of this?

Is the county paying any part of this?

A.   No, sir.

Q.   So all the legal fees that you've paid are coming out of your pocket?

A.   Yes, sir.

Q.   Did you have any other attorneys in this matter at --

A.   No, sir.

Q.   -- any point?

A.   No, sir.

Q.   With respect to Rory Gammons, what was your interactions with him on the day of the search?

A.   If I had met or know Mr. Gammons, I'm not -- unaware.  I don't know who he is.

Q.   Okay.  With to Weston Phillips, what were your interactions with him?

A.   I believe Mr. Phelps --

MS. HAMBLIN:  Phelps.

Q.   (BY MR. MUELLER)  Phelps, sorry.  That is my fault, Mr. Phelps.

A.   I believe Mr. Phelps might have been the

BRIAN SNELLGROVE

**119**

initial contact -- one of the initial contacts at the sheriff's office maybe.

Q.   Okay.  Did he participate in the search or seizure?

A.   I'm not sure of that.  I couldn't verify.

Q.   Okay.

MR. MUELLER:  It's noon.  Do you guys want to break for lunch, or do you guys want to wait?

THE WITNESS:  I'm fine con- -- forging through is.

MR. PEREZ:  I don't typically eat lunch so I am fine.

MS. HAMBLIN:  We would like lunch.

MR. MUELLER:  All right.

MS. HAMBLIN:  So we can go to lunch.

MR. MUELLER:  We'll take a half hour for lunch then, if that's okay with you guys.

THE WITNESS:  It's your meeting.

MR. MUELLER:  All right.  We'll take a break.

(Recess.)

Q.   (BY MR. MUELLER)  All right.  I want to go through some of the documentation that was turned over in discovery.

MR. MUELLER:  Where are we on exhibits?

BRIAN SNELLGROVE

6?

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  This will be Exhibit Number 6?

MR. PEREZ:  Exhibit 6.

(Exhibit 6 marked.)

Q.   (BY MR. MUELLER)  Okay.  Do you recognize these documents?

A.   Yes, they're Management Reports.

Q.   Okay.  Can you please describe what they are to me.

A.   This is a week-by-week analysis of each -- in particular the truck that -- the store that Austin was managing.

Q.   Okay.  And this re- -- this report is for what time period?

A.   This one is, looks like, week through -- this is for year 2021, the full year of 2021.

Q.   Okay.  So this contains sales for his truck for the full year?

A.   Yes.

Q.   Okay.  And generally speaking, what does it reflect in terms of sales?

A.   You mean like volume of sales?

**121**

Q.   Yeah.

A.   Yeah, looks like year-to-date statistics are $909,000 and change and RA, which is accounts receivable collection -- or sales, 928- in collections, EC sales of 536,000, total sales for the year of 1.4 million.

Q.   Does this reflect payments to Austin?

A.   No.

Q.   Okay.  But could -- could his commissions be calculated based on these numbers?

A.   Potentially, yes.

Q.   Okay.  All right, thank you.

This'll be Exhibit Number 7.

(Exhibit 7 marked.)

Q.   (BY MR. MUELLER)  Again, just please describe what this document is.

A.   This is also a Management Report for 2022.

Q.   Okay.  So the same thing but for the following year?

A.   Correct.

Q.   And, again, shows the sales from his truck?

A.   Uh-huh.

Q.   And generally speaking, what does it reflect in terms of volume?

A.   Very similar volume.

Q.   Okay, thank you.

Okay.  I'm gonna hand you what I am going to be marking as Exhibit Number 8.

A.    Okay.

(Exhibit 8 marked.)

Q.    (BY MR. MUELLER)  Take a look through these, please.

A.    Okay.

Q.    Okay.

A.    Yes, sir.

Q.    What are these documents?

A.    Text messages between Brad Ingram and myself.

Q.    Okay.  All right.  So these -- this first message is dated May the 15th, 2023.

A.    Uh-huh.

Q.    Okay.  And so these reflect text messages that you were -- that you were making to Brad Ingram in the immediate run-off to the search --

A.    Okay.

Q.    -- because I believe it was on the 17th.  Is that correct?

A.    Okay.

Q.    So I'll read them.

(Reading)  If it's ok I'd [sic] like to visit about timing of that all needs to go down.  Brian.

BRIAN SNELLGROVE

**123**

(Reading) Let me check see [sic] where we are.

So you need -- you were asking him to coordinate on timing of the search?

A. No.

Q. What is that reflecting?

A. I was asking where he was in the -- in the procession of getting search warrants.

Q. Okay. Then on May 15th again at 2:29 p.m., it says: We'll be there [sic] in 15 to 20 if that works for you.

A. The same day?

Q. Yes.

A. Yeah, I'm not sure what that --

Q. Okay.

A. -- is about.

Q. On May 17th: Brian. How are you doing after you have [sic] a chance to -- to slow down for the day? If you're -- are not tired I want some of what you take.

Do you know -- did you see that message?

A. (Reading) ...some of what you take.

Yeah, I didn't respond to that so I don't know what that meant.

Q. Okay. But you do agree that this appears to be a message from Brad Ingram and it appears to say from

BRIAN SNELLGROVE

Brian Ingram --

A.    Uh-huh.

Q.    -- (Reading)  If you're [sic] not tired I want some of what you take.

I did read that correctly.

A.    Yeah, but it doesn't even make sense so --

Q.    Okay.

A.    -- I'm not sure what that --

Q.    On June 7th, "Hamblin arrested," from Ingram.

You say:  Thanks.

He says:  Thumbs up.

On the 29th:  Can I get a copy of the report on Austin.  He's filed unemployment.  I need to dispute some of his claims [sic].

He says:  Yes, sir.  I'll have a copy -- I'll -- I'll have someone print off a copy.

To which you say:  Thank you.

To which he says:  It'll [sic] be ready in the morning.

A.    Okay.

Q.    Okay.  On the 24th from Brad Ingram:  Did you get to talk to Josh the other day?  He just finished a big murder case [sic].

What was that message reflecting to you?

A.    (Speaking sotto voce.)

BRIAN SNELLGROVE

**125**

What year is this, do we know?

Q.   No, it doesn't seem to indicate what year. Presumably the same -- it's 2023 presumably.

MS. HAMBLIN:  No, these are from 2025.

MR. MUELLER:  Oh, 2025.

MS. HAMBLIN:  This is the end.

A.   Oh, I know -- I -- I remember in 2025, yes.  I went to try to speak with -- with Mr. Hamby.  When I walked into the courthouse, they were -- there was a big case going on and Brad Ingram was in the lobby.

Q.   (BY MR. MUELLER)  Okay.

A.   And I ran across him and -- and he asked me if I had gotten to meet with Hamby because he knew Hamby was busy inside.

Q.   Okay.  So you text back:  No.  I miss [sic] him.

He text back you:  I think you got there just as everything was wrapping up.

A.   Uh-huh.

Q.   (Reading)  With everything that's happened since October, I strongly suspect your current sheriff has a hand in this.  I'm surprised he dug into -- drug a commissioner into this [sic].

What is Mr. Ingram referring to, to the best of your knowledge?

A.    Just the mess of this case, I guess.  I didn't write that text.

Q.    Okay.

(Reading)  He spent his first 6 six months looking for something I had done wrong they could file charges on me.  He bragged about that in the office from what I hear.

(Reading)  When Hamby dropped the case, which is not uncommon, all a sudden there's a lawsuit and he put a paper [sic] he was trying to get the Rangers and DA to pick up the case.  They both said it was civil.

(Reading)  Just sorry you got drug into this.  This is not something the courts want to start where the bad guy sues the victim as [sic] a crime.

And you said:  Yah.  Feels backwards.

He says:  I know.  I don't think he'll get very far with you.  The odd thing is Mescalf did nearly all the legwork on this case and was not sued [sic].

What is he referring to in that message to your understanding?

A.    Yeah, he's frustrated, I guess, with the current sheriff and what he feels like is vindictive behavior.

BRIAN SNELLGROVE

Q.   Okay.

MR. MUELLER:   For you.

Q.   (BY MR. MUELLER)   Then I'll hand you what we'll mark as Exhibit Number 9.

(Exhibit 9 marked.)

Q.   (BY MR. MUELLER)   This is a Facebook post to which Julie Todd Snellgrove commented.  I just want you to take a look at that.

A.   Uh-huh.

Okay.

Q.   Who is Julie Todd Snellgrove?

A.   My wife.

Q.   Okay.  Have you ever seen this Facebook page before?

A.   Yes.

Q.   Okay.  And did you have any reaction to this page?

A.   No.

Q.   Okay.  Is Jody Robinson [sic] a Snap-o- -- is he a Snap-on employee?

A.   He was a previous employee of mine, yes.

Q.   Okay.  And this message appears to refer to Jody Robinson struggling with alcohol and getting [sic] his life around.  Is that something you were aware of at the time he was in your employ?

BRIAN SNELLGROVE

A.    It was previous to him working for me, yes, I was fully aware.

Q.    Okay.  All right.  Thank you.

A.    I tend to try to not hold that against somebody if they need a...

Q.    Okay for now.

I'm gonna hand you what I'll be marking as Exhibit 10.

(Exhibit 10 marked.)

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  Take a look at this post on Facebook.

A.    Uh-huh.

Okay.

Q.    Okay.  The photographs that are in those --

A.    Uh-huh.

Q.    -- in that Facebook post of the tools, do you know who took those photographs?

A.    Not sure.  Maybe Mr. Ingram.

Q.    Okay.  This Facebook post was tagged with your name.  Did you see this Facebook post?

A.    I did.

Q.    Okay, thank you.

Exhibit Number 11.

(Exhibit 11 marked.)

Q.   (BY MR. MUELLER)  Now, this is another Facebook post from Brad Ingram county [sic] sheriff's office to which Julie Todd Snellgrove commented.

A.   Okay.

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  All right.  So did you see this te- -- this Facebook post?

A.   I was -- don't remember seeing that one.

Q.   All right.

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  All right.  I'm gonna hand you what's been marked as Exhibit Number 12.  These are various text message screenshots between yourself and -- and An- -- Anders Dahl.

(Exhibit 12 marked.)

A.   Okay.

(A discussion was had off the stenographic record.)

A.   Okay.

Q.   (BY MR. MUELLER)  Were these text messages that you wrote?

A.   Yes --

BRIAN SNELLGROVE

**130**

Q.    Okay.

A.    -- appears to be so.

Q.    So these are text messages May 17th, 2023, and appears to -- there's a picture of what appears to be a tool cabinet -- 75th anniversary tool cabinet.

A.    Uh-huh.

Q.    Was that one of the items that was seized from the property?

A.    This one here?

Q.    Yeah.

A.    Yes, sir.

Q.    Okay.  And there are also some other pictures of Snap-on tool cabinets here and then some with some glass that's exposed where you can see the tools inside of them.

A.    Uh-huh.

Q.    Did you seize those items?

A.    Yes, I believe those were seized as well.

Q.    Okay.  Okay.  In these text messages Mr. Dahl contacts you and -- or you wrote -- you wrote to Mr. Dahl rather:  He told another employee that he wouldn't be at work until 9 [sic].

(Reading)  He just tried to call me on his phone [sic].

(A discussion was had off the

stenographic record.)

Q.   (BY MR. MUELLER)   He -- you text him:  He told another employee that [sic] they wouldn't be at work till around 9.

(Reading)  He just tried to call me on his personal phone.

To which he texted you a copy a picture of the tool cabinet to which you wrote:  That might have been his personal or a trade-in he took (sic) and didn't tell me about.  Is that what you wrote?

A.   Yes.

Q.   Okay.  Did you ever do any research into who -- or into who the -- the trailer was registered to that was -- that was stored -- that had the items stored?

A.   I did not.  I was told by Austin it was his.

Q.   Okay.

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  All right.  In this text message from you, this appears to be on, I think, May 17th, 2023, maybe May 18th, 2023, it's hard to tell, but it appears that you texted:  Kiska is now Trying to harass one of my employee's wife.  Just drive up there. Kiska is Austin's [sic] wife.

BRIAN SNELLGROVE

**132**

(Reading)  I called and reported it.

Is that something you texted?

A.   Uh-huh.

Q.   Who did you believe that she was harassing?

A.   One of my other employees lives just outside the edge of town, and they -- they believed it to be her or someone that she was with.

Q.   And what was that employee's name?

A.   Christian Campbell.

Q.   Okay.  And what -- how did you follow up on that?

A.   I just -- that right there.  I asked the sheriff to see if they could send someone to see what was going on.  Kiska or not Kiska, there was someone acting crazy around the property where I had some diesel storage and a house, so just wanted them to check it out.

Q.   All right.  I want to go through some of the county commissioner minutes.

A.   Okay.

Q.   Now, the minutes -- I'll use this one as an exemplar.

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  This is Exhibit Number --

BRIAN SNELLGROVE

**133**

MR. MUELLER: Oh, I need more stickers.

Thank you.

Q. (BY MR. MUELLER) This will be Exhibit Number 13.

(Exhibit 13 marked.)

Q. (BY MR. MUELLER) Okay. This is a copy of the meeting minutes and the agenda from January 26th -- apologize, January 27th of 2026 at 9:00 a.m. and contains numerous items.

It also, at the bottom says: Pursuant to authority grant in Government Code, Chapter 50- -- 551, the Commissioners Court may convene a closed session discuss any of the above agenda items [sic].

Take a look at this.

A. Okay.

Q. Okay. Does the agenda items reflect any discussions relating to any lawsuits or other litigation involving the county?

A. I don't believe so.

Q. Okay. Is -- is it possible that such matters were discussed despite not being on the agenda?

A. No, sir.

Q. Okay. So there would have been no discussion relating to any lawsuit where litigation [sic] during the January 27th, 2026, meeting.

**134**

A.   Correct.

Q.   Okay.  Were -- to the best of your knowledge, has there been any meetings in which litigation or lawsuits concerning the county have been discussed?

A.   No, sir, the only reference to any lit- -- litigation that's ever been discussed is I made the other commissioners aware that I had been named in a lawsuit that the county was also named in, and that was the extent of the conversation.

Q.   Okay.  Is the county commission the one that hires -- that hired Mr. Dennis?

A.   I don't know exactly how that works.  I don't know if we hire him or if the organization -- legal organization that works with counties assigns that or has a contract with Mr. Dennis' offices for work with -- with legal issues.  I'm not sure.

Q.   Okay.  Martin County is obviously the client.

A.   Uh-huh.

Q.   So who is -- to your knowledge who is actually making the decisions on behalf of the county?

A.   We have a county attorney that advises us on any legal matters, but then it's my understanding that if -- if something goes into litigation of any cou- -- kind, the county attorney doesn't do it, but Mr. Dennis' office represents employees and/or officials of the

BRIAN SNELLGROVE

**135**

county.

Q.   Okay.  Mr. Dennis is working on behalf of the county so I suppose my questions are who is he actually getting instructions from?

Who -- who is telling him how they want to handle the matter and how they want to pursue litigation?

A.   It's not the commissioners.

Q.   Not the commissioners court?

A.   Not in any way.

Q.   Is the commissioners court the organization that would make a decision whether to settle?

A.   I have not specifically been a part of any of those decisions before.  I assume that it could come to that.

Q.   Okay.  Does the county attorney attend any -- or does the county attorney or any other attorney attend any of the closed session meetings of the county?

A.   District -- the county attorney Jay Napper has been in some closed sessions.  Like I said, I've never even met anyone from Mr. Dennis' offices.

Q.   What was generally the topics that were discussed in those executive sessions?

A.   Not sure that I'm at liberty to say that.

Q.   Well, if your cl- -- if your lawyer wishes to

object of privilege, that's his prerogative, but otherwise I'm posing the question.

MR. PEREZ:  Well, I'm gonna object on privilege.

MR. MUELLER:  Okay.

MR. PEREZ:  I mean I don't know what -- you know, I -- I guess they have --

A.  I'm just not gonna break any laws here.

MR. PEREZ:  I guess, I mean, if we have to go to the magistrate to ask specifically, but, yeah, I mean I don't want to get him in trouble with anything that's been discussed because I'm sure they discuss other things in the executive session.

A.  I could answer the fact that this case has never been discussed in closed session, if that's -- if that answers what you want.

Q.  (BY MR. MUELLER)  I'll take it for the moment.

But the topics that were -- would have been discussed in executive session wouldn't have been listed in the agenda.

A.  No, sir.

Q.  No, the topics themselves would not be listed on the agenda?

A.  They don't have to be, no, sir.

Q.  Okay.

BRIAN SNELLGROVE

**137**

A. They can be taken up with agenda items, but also if there's personnel issues, or other things can be discussed that don't have to be listed on the agenda.

Q. All right. Okay. I'd like to ask about this one. This will be Exhibit Number 14.

(Exhibit 14 marked.)

Q. (BY MR. MUELLER) This is a meeting agenda and minutes from September 9th, 2025.

As part of the minutes, it reflects there was a motion that was seconded to accept the bid for Eiland & Associates for county vehicle, property and liability insurance.

(Reading) Handout was given to commissioners. Cost $650,154. All voted yes. 4 to 0. Specifics on file...

A. Okay.

Q. Okay. What was the -- was this part of a standard policy renewal?

A. Yes.

Q. Okay. Was the amount of insurance changed, or was there an increase in policy limits from previously?

A. Not to my knowledge, no, sir.

Q. So that amount reflected approximately what the county had paid in the past?

A.    Uh-huh.

Q.    Okay, thank you.

      Then also on this as a list of checks, one of the item at the bottom is Texas Association of Counties.

A.    Uh-huh.

Q.    What is that line item?

A.    In what respect?

      It's $275.

Q.    What is the Texas Association of Counties?

A.    That is a group that, I guess, we're a part of.  Probably legal stuff to some point.  I'm not exactly sure of there all [sic].

Q.    Okay.  All right.  I'd like to review --

      (A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  All right.  I'd like to go over some of the business records that you had.

      (A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  Okay.  So this is a copy of the -- the various business records that you turned over.  That's a clean copy.

A.    Uh-huh.

Q.    I brought a thing to help you if you need a

BRIAN SNELLGROVE

magnifier.  I don't know if you need it, but I thought I'd bring it.

A.    Okay.

MS. HAMBLIN:  It's a lot of paper.

Q.    (BY MR. MUELLER)  It's a lot of paper --

A.    What am I specifically looking for?

Q.    I know.

I'm gonna turn to some pages and ask you some questions about it.

A.    Okay.

Q.    I just want to make sure that you have a clean copy for your records as well.

A.    Okay.

Q.    So there's this picture here of this Snap-on tool.  What is this item?

A.    It is a welding helmet and it's either -- like a TIG machine of some sort.  I can't see the part number right there.

MR. PEREZ:  For the record can we refer to the page number?

MR. MUELLER:  They're not individually marked as -- numbered.

MS. HAMBLIN:  They're -- they're in his group pages.

A.    Yeah, it's -- it's some sort of --

BRIAN SNELLGROVE

**140**

MR. MUELLER:  It's in group 1, but it was your discovery so I'm just --

MR. PEREZ:  Well, I'm just --

MR. MUELLER:  -- (indiscernible) --

MR. PEREZ:  -- so you can make -- just so we know --

MR. MUELLER:  (Indiscernible.)

MR. PEREZ:  -- when we look at the record, we can have an idea.

MR. MUELLER:  Yeah.

Q.   (BY MR. MUELLER)  Yeah, this is gonna be awkward.  I'll try to do my best to identify them --

A.   Okay.  So may- --

Q.   -- by looking at them?

A.   Okay.  It's a MIG -- a MIG 160.  It's listed right there --

Q.   Okay.

A.   -- o- -- on the picture.

Q.   All right.  So that is a used item -- used trade-in item according to the markings?

A.   Yes.

Q.   Okay.  And so that would have been an item that would have gone to a consumer?

A.   That was an item that was traded in from a consumer --

BRIAN SNELLGROVE

**141**

Q.    Yeah.

A.    -- on something pur- -- other -- purchased.

Q.    Okay.  And does that particular item have a serial number?

A.    Yes, it would.

Q.    And that -- is that serial number reflected in any of these documents?

A.    No.

Q.    Okay.  Okay.  This is in group 2.  This is two inventory transfers that appear to reflect transfers of inventory.  Can you describe what these two items are, please.

A.    CTCG 8850 is a cordless tool of some sort.  Not exactly sure which particular item that is.

And then the other one, CDR 30 -- or 90, it's also a cordless tool of some sort.  That's a small drill, if I remember correctly.

Q.    Okay.  And what does the records reflect in -- what is the nature of the transfer?

A.    Transfer between trucks probably.

Q.    Okay.  But doesn't say specifically?

A.    Well, hang on.  See which documents we're looking at.

This is what -- when we go to -- oh, okay.  I know -- this is -- doesn't say it's been

transferred between trucks, but it shows it's available to be transferred between trucks.  So we can look in the inventory and go this part number, there's this many of them within the body of Snellgrove Enterprises.

Q.   Okay, thank you.

All right.  Again, we are still in group 2.  This is labeled Snap-on Franchise Statements Invoice Detail Invoices.  The invoice date is November the 4th of 2023.  It's this left-hand one --

A.   Uh-huh.

Q.   -- here?

A.   Okay.

Q.   Is that correct on the date, November of 2023?

A.   Yeah, that's the date that they -- they would have put on it, not me.

Q.   Who -- who would have put on it?

A.   That the -- Snap-on when we ordered these things.

Q.   Okay.  So this was ordered after the date of the search and seizure?

A.   This particular one's dated, yeah, for that.

Q.   Okay.

A.   Yeah.

Q.   Okay.  Does -- are these specific items --

were they ordered because they were to replace items that were stolen or -- no?

A. Well, that -- that's impossible to say. I mean they were ordered because they were either in a -- a -- a package of in- -- stuff we ordered or stuff we ordered specifically to restock trucks.

Q. Okay. We're still in group 2. This is Snap-on Franchise Statements Invoice Detail Invoices. This is dated August the 25th of 2023 and August the 30th of 2023.

We [sic] just curious. Again, these are from after the date of the search. I'm curious if they have any particular relevance to the theft or items stolen.

A. I -- not to my knowledge. I'm sure the bulk of trying to find all these part numbers and proof of it that sometimes we pulled off the wrong dates of numbers but -- yeah.

Q. Okay. This is from group 3, Snap-on Franchise Statements. This is December the 6th of 2023.

And, same question, do these items reflect anything that has any particular relevance to this case, to the theft, to items that replaced from the theft?

A. Probably just misprinted, right. So many

thousands of pages, we misprinted a few.

Q.   That's fine.  I'm just trying to establish --

A.   Yeah.

Q.   -- whether or not they have relevance that I was missing.  That's why I'm asking.

This is, again, from group 3, Snap-on Franchise Statements.  This is September the 20- --

(A discussion was had off the stenographic record.)

Q.   (BY MR. MUELLER)  This one is dated September the 22nd of 2021.  It appears to reflect that an item that was sent to a Larry Thurhopper -- Hooper?

(A discussion was had off the stenographic record.)

A.   Okay.  What's the que- -- what's the question?

Q.   (BY MR. MUELLER)  I was just -- question, does that reflect a -- a sale or item that was sent directly to a particular consumer?

A.   It was ordered for a consumer.  Doesn't mean it's been delivered.  It means it was ordered under that customer's name.

Q.   Okay.  Snap-on Franchise Statements from May 26th, 2023.  Again, just trying to establish whether or not this list of items has any particular relevance to the case or theft.

A.    Not to my knowledge.

Q.    Okay.

(A discussion was had off the stenographic record.)

Q.    (BY MR. MUELLER)  Okay.  This is from group 5. Invoice number appears to end in 373.  The invoice date is November 14th, 2022.  This is shipped to 2F.

So you had said earlier that Austin's truck was 5F --

A.    Right.

Q.    -- so I was curious that it doesn't reflect a transfer to Austin, does it?

A.    No, it means it was delivered into our warehouse.

Q.    Okay.  And so this wouldn't have any particular relevance to this case, would it?

A.    Oh, yes, it would.

Q.    Okay.  What's the nature of the relevance?

A.    Because every item within that warehouse is accessible to all five trucks at some point.

Q.    So 2F reflects the warehouse?

A.    2F is the second franchise.  All orders are shipped to the warehouse, including 5F.

Q.    Okay.

A.    All items not needed directly on the truck are

stocked in the warehouse, then accessible to any truck to be sold.

Q.   Okay.  Then when -- so -- so here when it says that it's shipped to 2F --

A.   Uh-huh.

Q.   -- 2F wouldn't be Austin's franchise.

A.   No.

Q.   Okay.  So why was it shipped to 2F as opposed to, you know, any other franchise if they're all equally available?

A.   Why would that matter?

It's shipped to the warehouse.  I mean, the point is that it's in -- it's in the warehouse and available to whoever needs to sell it.

Q.   Yeah, I -- I -- I guess my question is why -- why write 2F at all?

Why not just say Snellgrove Enterprises at this address?

Why -- why specify 2F if it's equally available for all trucks?

A.   Every order has to be placed under one of the trucks so it has to be placed under one of the five franchises.

Q.   Okay.  And is the choice of which to place it under arbitrary?

**147**

A.    It's generally up to me as the owner.

Q.    Okay.  So how do you decide which of the five franchises to order under?

Is it with any sort of, you know, pattern or --

A.    Yeah, in general it's -- it's directly related to the amounts sold, so as that truck sells that big volume of merchandise, then the order under that truck would be bigger.  So directly related to the volume sold mostly.

Q.    Okay.  So it is meant to replace inventory that was sold from that particular truck?

A.    In general, yes, but it's meant to replace the inventory overall for the entire company as well so...

Q.    Okay.

A.    Not sure where -- not sure what the misunderstanding is.

Q.    No, I -- I understand better now than I did before.

A.    Okay.

Q.    Sometimes I ask because I don't know.

A.    I -- perfectly fine.  Just making sure I'm clear on what I'm saying.

(A discussion was had off the stenographic record.)

BRIAN SNELLGROVE

Q.   (BY MR. MUELLER)   Okay.   This is from group 9. This invoice date is November 29th, 2023.   It's -- same question, whether or not this has any parti- -- this one here --

A.   All right.

Q.   -- whether or not has any particular relevance to this case?

A.   Yeah, just mistakenly printed wrong date.

Q.   Okay.   Okay.   I think those were all the ones I'd flagged so it took less time that I imagined.   Yay.

(A discussion was had off the stenographic record.)

MR. MUELLER:   I need a 10-minute break.

(Recess.)

Q.   (BY MR. MUELLER)   I am handing you Exhibit Number 15.

(Exhibit 15 marked.)

Q.   (BY MR. MUELLER)   This is a series of photographs.   Do you recognize these photographs?

A.   It appears to be the Hamblins' property.

Q.   Do you know who took these photographs?

A.   No idea.

Q.   Did you take any photographs at the Hamblins' property?

A.   No, I did not.

BRIAN SNELLGROVE

**149**

Q.   Okay, thank you.

The W-2 transaction reports for Austin Hamblin --

A.   Uh-huh.

Q.   -- do you still have those?

A.   I should have them filed, yes, sir.

Q.   Okay.  We'd appreciate if we could get a copy of all those because we seem to be missing them from our records --

A.   Okay.

Q.   -- so --

A.   Is it not something y'all can get from the IRS?

Q.   I probably could.

MS. HAMBLIN:  Not for the commissions and all that stuff.

A.   It's all listed on there.  I mean your total W-2, total compensation, it's gotta be on there.

Q.   (BY MR. MUELLER)  Okay.

A.   Yeah, there was normal withholdings and everything off the com- -- commissions and everything so it's all -- it's all reported on the same -- same thing.

Q.   Okay.

(A discussion was had off the

BRIAN SNELLGROVE

**150**

stenographic record.)

Q.   (BY MR. MUELLER)  So, yeah, these are transaction journals from like 2020 so --

A.   Uh-huh.

Q.   -- this kind of -- this kind of thing.

A.   Yeah, that was something that my accountant sent to me when he requested it at some point.

Q.   Okay.  Do you -- do you have this in the same format for the other years --

A.   No --

Q.   -- (indiscernible)?

A.   -- I do not.

Q.   Okay.  I can't think of anything else to ask for now so I guess I'll turn it over to (indiscernible) counsel.

MR. PETTY:  I'll pass the witness.

MR. PEREZ:  I reserve any questions.

(Deposition concluded, 1:49 p.m.)

BRIAN SNELLGROVE

151

CHANGES AND SIGNATURE

WITNESS NAME:   BRIAN SNELLGROVE

DEPOSITION DATE:  April 10, 2026

PAGE LINE    CHANGE OR CORRECTION   REASON FOR CHANGE

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

_____-_____  -_____-  _____

I, BRIAN SNELLGROVE, have read the foregoing deposition and hereby affix my signature that the same is true and correct, except as noted above.

_____
BRIAN SNELLGROVE

THE STATE OF TEXAS )

COUNTY OF _____)

Before me, _____, on this day personally appeared BRIAN SNELLGROVE, known to me (or proved to me under oath through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, _____.

_____
NOTARY PUBLIC

My Commission expires: _____

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

AUSTIN HAMBLIN and KISKA          *
HAMBLIN                           *
                                  *
                                  *
vs.                               *
                                  *
MARTIN COUNTY, TEXAS;             *
                                  *
BRAD INGRAM, IN HIS               *
INDIVIDUAL AND OFFICIAL           *
CAPACITY;                         *
                                  *
ANDERS DAHL, IN HIS               *
INDIVIDUAL AND OFFICIAL           *  NO:  7:25-cv-00245
CAPACITY;                         *
                                  *
KELSEY BROWN, IN HIS              *
INDIVIDUAL AND OFFICIAL           *
CAPACITY;                         *
                                  *
RORY GAMMONS, IN HIS              *
INDIVIDUAL AND OFFICIAL           *
CAPACITY;                         *
                                  *
WESTON PHELPS, IN HIS             *
INDIVIDUAL AND OFFICIAL           *
CAPACITY; AND                     *
                                  *
BRIAN SNELLGROVE                  *
_____

REPORTER'S CERTIFICATE
DEPOSITION OF BRIAN SNELLGROVE
Taken April 10, 2026

_____

I, Stephanie J. Blair, Certified Shorthand Reporter in and for the State of Texas, do hereby certify to the following:

That the witness, BRIAN SNELLGROVE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the amount of time used by each party at the deposition is as follows:

Mr. Kurt Mueller -  3 hours, 21 minutes;

Mr. Robert Perez -  0 minutes;

Mr. Benjamin Petty -  0 minutes.

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

For the Plaintiffs:

Mr. Kurt Mueller
The Kurt Mueller Law Firm, PLLC
565 South Mason Road PMB223
Katy, Texas 77450
(713) 360-2110
kurt@kurtmuellerpllc.com

For the Defendant, Brian Snellgrove:

Mr. Robert J. Perez
Attorney at Law
221 North Kansas, Suite 1103
El Paso, Texas 79901
(915) 542-1222
rjperezlaw1@gmail.com

For all Martin and Howard County Defendants:

    Mr. Benjamin Petty
    Kelly, Morgan, Dennis, Corzine & Hansen, P.C.
    4840 East University, Suite 200
    Odessa, Texas 79760
    (432) 367-7271
    bpetty@kmdfirm.com


            I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

            Further certification requirements pursuant to Rule 203 of the Texas Rules of Civil Procedure will be certified to after they have occurred.

            Certified to by me this 23rd day of April, 2026.

_Stephanie Blair_

_____
Stephanie J. Blair
CSR No. 6819, Expires 10/31/27
Firm Registration No. 155
Permian Court Reporters, Inc.
605 W. Texas
Midland, Texas 79701
(432) 683-3032

**156**

FIRM'S CERTIFICATION UNDER RULE 203, TRCP

The deposition transcript was submitted on April 23, 2026 to the witness at briansnellgrove@gmail.com, for examination, signature and return to me by May 25, 2026.

The original deposition (was/was not) returned to the deposition officer;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered in accordance with Rule 203.3 to MR. KURT MUELLER, Custodial Attorney, and $_____ is the deposition officer's charges to MR. KURT MUELLER for preparing the original deposition transcript and any copies of exhibits;

A copy of the Reporter's Certificate and this certificate were served on all parties shown herein and filed with the Clerk.

Certified to by me this _____ day of _____, 2026.

_____
Permian Court Reporters, Inc.
Firm Registration No. 155
Expires 12-31-2026
605 W. Texas
Midland, Texas 79701
(432) 683-3032