IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND / ODESSA DIVISION

| | | |
|---|---|---|
| AUSTIN HAMBLIN and KISKA HAMBLIN | § | |
| | § | |
| VS. | § | |
| | § | NO.    7:25-cv-00245 |
| MARTIN COUNTY, TEXAS | § | |
| | § | |
| BRAD INGRAM, | § | |
| | § | |
| ANDERS DAHL, | § | |
| | § | |
| KELSEY BROWN, | § | |
| | § | |
| RORY GAMMONS, | § | |
| | § | |
| WESTON PHELPS, and | § | |
| | § | |
| BRIAN SNELLGROVE | § | |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST MARTIN COUNTY AND THE INDIVIDUAL LAW ENFORCEMENT DEFENDANTS

## INTRODUCTION

1. Plaintiffs Austin Hamblin and Kiska Hamblin respectfully move, under Federal Rule of Civil Procedure 56, for partial summary judgment on the issue of liability on Counts 1, 2, and 3 of the Third Amended Complaint against Defendants Brad Ingram, Anders Dahl, Kelsey Brown, Weston Phelps, and Rory Gammons (collectively, the "Individual Defendants"), and on Count 4 against Defendant Martin County. Plaintiffs do not move on this motion against Defendant Brian Snellgrove, against whom a separate motion has been filed.

2. Three features of the summary judgment record make this case extraordinary: (1) the warrant authorized seizure of exactly two specifically described, serial-numbered items, but officers seized 51 categories of property valued at $283,445 - much of it not even arguably within the warrant's ambit (a Harbor Freight surface-prep tool, a Dremel set, a popcorn maker, promotional chairs, Snap-On bicycles, and ordinary household tools); (2) the Defendants have largely admitted the case through sworn deposition testimony and binding responses to Requests for Admission; and (3) virtually every Texas statutory and departmental safeguard against precisely this type of abuse was disregarded.

3. Sheriff Ingram admits he never read the warrant and chose not to wear a body camera because he "didn't want to" and "didn't have to." Investigator Dahl admits in sworn discovery responses that he "conscripted" the complaining witness, Brian Snellgrove, into the warrant-execution team-the precise word the federal courts use to describe what Wilson v. Layne and Bills v. Aseltine condemn. Snellgrove admits under oath that he was "directed by the officers to begin to load those items up." Deputy Brown admits she only "looked over" the warrant at a pre-search briefing and refused to display it when Kiska Hamblin requested to see it. Deputy Gammons admits that Plaintiffs objected to the seizure of specific items and asserted ownership of those items as they were being seized. The Department admits that no internal investigation, no audit, no discipline, and no corrective action of any kind has ever been taken regarding the events of May 17, 2023.

4. Against this admitted record stands a wall of clearly established Fourth and Fourteenth Amendment authority-much of it more than four decades old. The Fifth Circuit's decision in Creamer v. Porter, 754 F.2d 1311 (5th Cir. 1985), is materially indistinguishable: officers obtained a warrant for two stolen televisions, found those two items, continued searching the

premises for nearly three hours, seized additional property at random, and were held individually liable-with qualified immunity rejected-for the resulting Fourth Amendment violation. Creamer has stood unaltered for forty-one years. Maryland v. Garrison, 480 U.S. 79 (1987); Horton v. California, 496 U.S. 128 (1990); Arizona v. Hicks, 480 U.S. 321 (1987); Wilson v. Layne, 526 U.S. 603 (1999); and Groh v. Ramirez, 540 U.S. 551 (2004), each independently foreclose qualified immunity on this record. Taylor v. Riojas, 592 U.S. 7 (2020) (per curiam) also serves as a reminder from the Supreme Court that qualified immunity precedent should not be read hyper narrowly.

5.  Liability is also established on Plaintiffs' procedural due process claim. Defendants seized $283,445 worth of property whose ownership they knew was disputed, then transported it across county lines without the magistrate's order required by Texas Code of Criminal Procedure Article 18.10, delivered it directly to the complaining witness, bypassed judicial process for determining the right to possess disputed property, never sought or provided the Article 47.01a hearing once no criminal action was pending, and watched as Snellgrove resold the property in the summer of 2023. None of the property has ever been returned. Zinermon v. Burch, 494 U.S. 113 (1990), and Soldal v. Cook County, 506 U.S. 56 (1992), each independently foreclose any Parratt-Hudson defense: pre-deprivation process was available and statutorily prescribed, and the deprivation was effected by the County's admitted final policymaker.

6.  Finally, Martin County is liable on every Monell pathway. Sheriff Ingram is, as a matter of Texas law and on the County's own sworn admissions, the final policymaker for execution of search warrants and the handling of seized property. His decisions to permit Snellgrove's conscription, to authorize the cross-county transport, to release the property to Snellgrove for

storage, to ignore Articles 18.10 and 47.01a, and to disregard every relevant provision of the Department's own written manual constitute the County's official policy under Pembaur v. City of Cincinnati, 475 U.S. 469 (1986). The County's complete post-event inaction-no investigation, no audit, no discipline - supplies the ratification piece. And the admitted failure to perform any of the policy-required annual audits, inspections, or training compliance reports establishes deliberate indifference under City of Canton v. Harris, 489 U.S. 378 (1989).

7. The Court should grant partial summary judgment on liability and reserve damages for the jury.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

8. The following facts are established by the parties' sworn deposition testimony, by binding responses to Requests for Admission under Federal Rule of Civil Procedure 36, by the verified interrogatory responses of the Martin County Sheriff's Department and the Individual Defendants, by the documentary record produced in discovery (text messages, the search warrant, the offense reports, the body-worn camera footage produced, and the Department's written manual), and by the affidavits and inventories filed with this motion. Where the record contains both an admission and a contrary denial, the admission controls. *Fed. R. Civ. P.* 36(b); *Am. Auto. Ass'n v. AAA Legal Clinic*, 930 F.2d 1117, 1120 (5th Cir. 1991) (matters admitted under Rule 36 are "conclusively established" and may not be contradicted).

9. Plaintiffs attach as **Exhibit A** the certified transcript of the Oral and Videotaped Deposition of James Bradley Ingram, taken January 15, 2026 (cited herein as "Ingram Dep. ___:___"), and incorporate the exhibits identified within that transcript. Plaintiffs attach as **Exhibit B** the

Martin County Sheriff's Office Policy Manual produced by Defendants in discovery (cited herein as "MCSO Policy Manual, Ex. B at [PDF page]"). Plaintiffs further attach as **Exhibits C, D, E, F, G, and H** the verified discovery responses (Interrogatories, Requests for Production, and Requests for Admission) of, respectively, Defendant Brad Ingram, Defendant Anders Dahl, Defendant Kelsey Brown, Defendant Weston Phelps, Defendant Rory Gammons, and the Martin County Sheriff's Department (through its current Sheriff). Citations herein take the form "[Defendant] RFA No. ___ (Ex. ___)" for Requests for Admission, "[Defendant] Interrog. No. ___ (Ex. ___)" for Interrogatories, and "[Defendant] RFP No. ___ (Ex. ___)" for Requests for Production. **Exhibit I** provides the seizure list produced by the Government that reflects the 51 categories of items seized (although this list is incomplete, as it does not include individual tools and other items that were located within tool boxes or other containers). **Exhibit J** is the warrant related to this matter. **Exhibit K** is the affidavit of Dahl in which he admits to "conscripting" Snellgrove.

A.  **Pre-Search Coordination Between Snellgrove and Sheriff Ingram**

10. Defendant Brad Ingram was the elected Sheriff of Martin County, Texas, during all events relevant to this action. Ingram Dep. 5:8-13 (Ex. A). The Martin County Sheriff's Department has admitted in its sworn responses to Plaintiffs' Requests for Admission that Sheriff Ingram was the final policymaker for the Department regarding the execution of search warrants and the handling of seized property in May 2023. Sheriff RFA No. 6 (Ex. H) (admitting same). Sheriff Ingram has himself confirmed that admission under oath: "When I was the sheriff, I was." Ingram Dep. 7:21-24.

11. Defendant Brian Snellgrove is a private citizen who owns and operates Snellgrove Enterprises, a Snap-On tools franchise located at 2100 Westside Drive, Stanton, Texas. Plaintiff Austin Hamblin was formerly employed by Snellgrove Enterprises.

12. Sheriff Ingram has admitted under oath that he had a personal relationship with Defendant Snellgrove outside of official law-enforcement business: "I went to a Bible study that was about three or four months long at the Snellgroves' residence . . . ." Ingram Dep. 46:14-20. The Martin County Sheriff's Department has independently admitted that it "is aware of a personal relationship or prior dealings between Brad Ingram and Snellgrove outside of official law-enforcement business." Sheriff RFA No. 26 (Ex. H) (admitting same).

13. Sheriff Ingram has further admitted under oath that the Sheriff's Office had been communicating with Snellgrove about his inventory suspicions for "several months" before the formal report was filed on May 11, 2023: "We had been talking for several months." Ingram Dep. 9:23-25. Ingram has also admitted that Snellgrove "was sending a - a team to help load any seized evidence" and that, before the search, the Department "told him we might need some help with that much property, and he . . . agreed to be there." Ingram Dep. 9:11-13; 10:2-6.

14. On or about May 15, 2023, two days before the search, Defendant Snellgrove sent a text message to Sheriff Ingram stating: "If it's ok I'd like to visit about timing of all that needs to go down." Sheriff Ingram responded: "Let me check and see where we are." The text exchange was marked as Deposition Exhibit 13, was authenticated by Sheriff Ingram during his deposition ("I must be" familiar with these messages), and was read into the record. Ingram Dep. 113:19-114:12 (citing Ex. 13).

**B. The Initial Investigation, the Affidavit, and the Two-Item Warrant**

15. On May 11, 2023, Defendant Snellgrove and his employee Andrew Nichols met with Defendant Weston Phelps at the Martin County law enforcement center to file a theft complaint against Plaintiff Austin Hamblin.

16. Defendant Phelps opened Martin County Sheriff's Office Case No. 23-0135 based on Snellgrove's uncorroborated allegations. Phelps did not, at any point before the seizure: (a) interview Austin or Kiska Hamblin; (b) contact the customer identified in the "zeroed-out" tickets to which Snellgrove referred; (c) request or review Snap-On corporate records to verify Snellgrove's inventory claims; or (d) examine independent financial records. Phelps recorded the value of the alleged stolen property as $283,000 based solely on Snellgrove's representations and listed Snellgrove Enterprises as the sole victim.

17. On May 15, 2023, Defendant Dahl interviewed Snellgrove. Snellgrove represented that the value of missing products was approximately $200,000. On May 16, 2023, Dahl received three emails from Snellgrove containing more than ten serial numbers for items allegedly missing from Snellgrove Enterprises.

18. On May 16, 2023, Defendant Dahl drafted and swore an affidavit in support of a search warrant for the Hamblin marital residence at 3700 Hamilton, Big Spring, Howard County, Texas. The affidavit was based primarily on Snellgrove's uncorroborated representations and the three emails of unverified serial numbers. Dahl performed no independent verification with Snap-On corporate, no review of Plaintiffs' financial records, and no interview of either Plaintiff.

19. On May 16, 2023, the Honorable Shane R. Seaton, 118th District Judge, issued a search warrant. The warrant was strictly and unambiguously limited in scope. It authorized law enforcement to search for and seize exactly two specifically described, serial-numbered

items: (1) a Snap-On Plasma Cutter, Model 301; and (2) a Snap-On Air Compressor. Sheriff Ingram confirmed under oath, reading from the warrant: "Snap-on plasma cutter model 301, a Snap-on air compressor, 'to seize the same and bring before me.'" Ingram Dep. 36:22-25 (Ex. A & Dep. Ex. 4).

### C. The May 17, 2023 Search and the Conscription of Snellgrove

20. On the morning of May 17, 2023, Sheriff Ingram, Investigator Dahl, Deputy Brown, Chief Deputy Metcalf, and a deputy from Howard County (Defendant Gammons) arrived at the Hamblin residence in Howard County to execute the warrant. Sheriff Ingram has admitted: "I was there - I - I was not there at the very start, but I was there soon after it started. Jesse Metcalf, Anders Dahl, Kelsey Brown, and then there was a deputy from Howard County." Ingram Dep. 8:19-22. The operation began around 8:00 a.m. and continued through the afternoon. Ingram Dep. 36:4-6.

21. Sheriff Ingram has admitted in his sworn responses to Plaintiffs' Requests for Admission and Interrogatories that he never personally read the warrant before, during, or after the search. Ingram RFA No. 4 (Ex. C) (admitting that "before the Search began, you did not personally read the Warrant in its entirety"); Ingram Interrog. No. 2 (Ex. C) ("No. I have never personally read the warrant."). Corroborative deposition testimony shows the same fact: when shown the warrant as Deposition Exhibit 4 at his January 15, 2026 deposition, Ingram could not recall its contents, testifying "I thought the - the warrant was several pages, more pages than that," and conceding he did not know how many items the warrant listed for seizure. Ingram Dep. 36:10-13; 10:11-19.

22. Deputy Brown has admitted in her sworn interrogatory responses that she only "looked over" the warrant at the pre-search briefing and did not read it in full. Brown Interrog. No. 2 (Ex. E) ("Yes, I looked over the warrant at the pre-search briefing in Howard County."). Deputy Gammons has likewise admitted that he was only "briefed" on the warrant and did not personally read it. Gammons RFA No. 4 (Ex. G) (admitting he did not personally read the Warrant in its entirety); Gammons Interrog. No. 2 (Ex. G) ("No[,] I was informed by other officers. I was briefed regarding search at Howard County Sheriff's office."). Deputy Phelps has admitted that he did not read the warrant. Phelps Interrog. No. 2 (Ex. F) ("I did not read the Search Warrant . . . .").

23. Defendants located the two items specifically described in the warrant-the Plasma Cutter Model 301 and the Air Compressor-inside a shed and a trailer on the premises, before they entered the main residence. Defendant Snellgrove has admitted under oath that both items were located in outbuildings, not inside the home.

24. Plaintiff Kiska Hamblin was physically present at the residence during the search. Kiska Hamblin requested that Deputy Brown produce a copy of the warrant. Deputy Brown refused to display or produce the warrant. Kiska Hamblin then expressly asserted her right to privacy and instructed the officers to leave the property. Deputy Brown corroborates that contemporaneous instruction in her sworn interrogatory responses, admitting that "Kiska Hamblin said be quiet or leave because children were present." Brown Interrog. No. 6 (Ex. E). Officers did not leave.

25. After the two warrant-listed items were located, and rather than concluding the search, officers telephoned Defendant Snellgrove and asked him to come to the Hamblin residence. Snellgrove has admitted under oath that officers told him they had discovered a larger

volume of Snap-On branded merchandise than anticipated and that they needed his assistance in identifying the property.

26. Snellgrove has admitted that officers asked him to bring trailers, trucks, and personnel because, in the officers' own words, the Sheriff's Office "did not have anything to haul off any large items." Snellgrove brought to the scene: two trailers, an older truck converted for cargo, and three to four Snap-On franchise employees.

27. In his sworn responses to Plaintiffs' Requests for Admission and in an affidavit produced in discovery, Defendant Dahl has admitted that he "conscripted" Defendant Snellgrove to aid in the execution of the search warrant. The Dahl affidavit was read into the record at Sheriff Ingram's deposition: "I conscripted Brian Snellgrove to . . . warrant by requesting him to appear at the location . . . until my control and supervision." Ingram Dep. 27:22-28:7 (reading Dahl affidavit). Dahl has admitted that he requested Snellgrove to (a) appear at the location, (b) identify the property subject to the warrant, and (c) subsequently store the property at Snellgrove's private place of business under Dahl's control and supervision. *Id.* Dahl has further admitted, in his Rule 36 responses, the substance of that conscription: that Snellgrove was "permitted to walk through Plaintiffs' property during the Search and point out items he claimed belonged to him," and that "officers seized items based in whole or in part on Snellgrove's identification." Dahl RFA Nos. 3, 7 (Ex. D) (admitting both). Sheriff Ingram and Deputy Brown have each independently admitted the same. Ingram RFA Nos. 3, 7 (Ex. C); Brown RFA Nos. 3, 7 (Ex. E).

28. Snellgrove has admitted under oath that, during the search, he was "directed by the officers to begin to load those items up" and that officers personally assisted him in loading items

onto his private vehicles. Snellgrove's Snap-On employees physically carried Plaintiffs' personal tool cabinets, boxes, and equipment from the residence to Snellgrove's vehicles.

29. Sheriff Ingram has admitted under oath that he personally participated in the search; that more items were seized than were on the warrant ("Probably"); that the basis for seizure of items not listed on the warrant was "they were plain view and statements were made that they belonged to Mr. Snellgrove"; and that the only verification of ownership at the scene came from on-scene statements by either Snellgrove or Hamblin. Ingram Dep. 10:20-22; 37:7-12; 39:2-11; *accord* Ingram RFA No. 5 (Ex. C) (admitting items not listed in the Warrant were seized); Ingram RFA No. 11 (Ex. C) (admitting items of Seized Property were loaded onto Snellgrove's truck). Dahl, Brown, and Gammons have each independently admitted that items not listed in the Warrant were seized. Dahl RFA No. 5 (Ex. D); Brown RFA No. 5 (Ex. E); Brown RFA No. 6 (Ex. E) (admitting Brown personally seized at least one item not listed in the Warrant). Ingram has further admitted under oath that during the operation, the officers used a "hand truck" to remove "the heavier stuff" because "it - some of the stuff was hard to get loaded." Ingram Dep. 44:2-9.

30. Sheriff Ingram has admitted under oath that he chose not to activate or wear a body-worn camera during the search, notwithstanding the Department's written policy that body-worn cameras "are to be worn and turned on." Ingram Dep. 31:19-22 (departmental policy); 33:7-16. Asked why he was not wearing a body camera, Ingram's sworn answers were: "I didn't want to," and "I didn't have to." Ingram Dep. 33:13-16; *see also* Ingram RFA No. 18 (Ex. C) (admitting he did not activate his body-worn camera during the search). Deputy Brown, who was on scene throughout the search, has likewise admitted that she did not activate her body-worn camera during the search, notwithstanding that she had access to one. Brown RFA Nos.

17, 18 (Ex. E). The MCSO Body Worn Video Recording Policy expressly requires recording during, among other events, "[s]earches of any kind" and "[s]eizure of any evidence," and prohibits officers "from turning off the BWV during any citizen contact or law enforcement event." MCSO Policy Manual, Ex. B at 00014 (Body Worn Video Recording, §§ IV.B.d, IV.D.b-c).

31. Investigator Dahl wore a body-worn camera. The only footage produced from the May 17, 2023 search is a partial recording captured by Dahl. That recording contains an unexplained gap of approximately two hours immediately before Snellgrove's arrival. Dahl deactivated his camera shortly after Snellgrove's arrival, before the bulk seizure, loading, and cross-county transport of property took place. The recording produced ends with Dahl audibly stating that he is going to "turn off my body camera." No body-worn camera footage from any other officer at the scene has been produced. The Department has admitted that it cannot account for the location or status of footage from the other officers. Ingram RFA No. 20 (Ex. C); Brown RFA No. 20 (Ex. E); Gammons RFA No. 20 (Ex. G) (each admitting that he or she does not know the current location or status of all body-worn camera and vehicle camera footage from the search). The current Sheriff has further verified that "[t]here was no evidence related to this lawsuit in evidence at the Martin County Sheriff's Department." Sheriff Interrog. No. 12 (Ex. H).

32. Defendant Gammons has admitted in his sworn responses to Plaintiffs' Requests for Admission that either Kiska Hamblin or Austin Hamblin objected to the seizure of one or more specific items during the search and asserted that those items belonged to them. Gammons RFA No. 10 (Ex. G) (admission). This admission is conclusively established

under Federal Rule of Civil Procedure 36(b) and contradicts any defense theory that the on-scene ownership of the seized property was "immediately apparent" for plain-view purposes.

33. Defendants seized 51 separate categories of personal property valued in excess of $283,445. Sheriff Ingram confirmed under oath that the property log "lists 51 specific items, and then it says it's a total value of $283,445." Ingram Dep. 48:3-8. By Ingram's own admission, that means at least "49 items that are not on the search warrant" were seized in addition to the two warrant-listed items. Ingram Dep. 49:22-23. The inventory of seized items includes massive roll cabinets and tool chests, multiple welders, specialty automotive tools, tool organizers, Snap-On branded bicycles, promotional chairs, a popcorn maker, a Harbor Freight surface-prep tool, a Dremel tool set, and ordinary household tools. None of these items, other than the original Plasma Cutter Model 301 and Air Compressor specifically described in the warrant, were authorized for seizure by the warrant.

34. Sheriff Ingram has admitted under oath that the Department did **not** subpoena business records from Snap-on corporate to verify the inventory claims (Ingram Dep. 31:2-5), did **not** speak with Snap-on corporate about the serial numbers (Ingram Dep. 50:17-19), did **not** perform any independent research to verify the valuation ("No, not that I'm aware of." Ingram Dep. 68:2-4), and acknowledged that the $283,445 valuation was "provided by Mr. Snellgrove." Ingram Dep. 67:23-25. Ingram further admitted that Snellgrove provided serial numbers but "had no - no receipt or an- - of" corroborating documentation. Ingram Dep. 29:7-12.

35. Defendant Snellgrove has admitted under oath that he did not inspect any serial numbers on the property at the scene and that no trace or lookup of the serial-numbered items was performed before seizure.

36. Austin Hamblin informed officers during the search that he had legally purchased the Snap-On products over the course of his career as a master automotive technician. Investigator Dahl and Chief Deputy Metcalf instructed Austin to provide receipts so they could be forwarded to the District Attorney. This contemporaneous request for receipts establishes that, at the moment of seizure, the officers were subjectively aware that the ownership of the property they were seizing was disputed.

### D.  Cross-County Transport and Release to Snellgrove

37. After loading, Plaintiffs' seized property was transported by Snellgrove's private vehicles from Howard County (the place of seizure) directly to Snellgrove's private commercial business at 2100 Westside Drive in Stanton, Martin County, Texas.

38. Sheriff Ingram has admitted under oath that he personally made the final decision to allow Snellgrove to transport the seized property, and personally made the final decision to allow Snellgrove to store the property at Snellgrove's private barn. Ingram Dep. 58:25-59:6 ("Q. Who made the final decision to transport the . . . items? A. I did. Q. And who made the final decision to allow Mr. Snellgrove to store the items? A. I did."); *accord* Ingram RFA No. 14 (Ex. C); Dahl RFA No. 14 (Ex. D) (both admitting that, after the search, Seized Property was transported to and stored at a barn located at or near Snellgrove's residence rather than at a law-enforcement evidence facility). Ingram further admitted that he did not consider "marking a segregated area with police tape or otherwise showing it to be owned by or controlled by the county." Ingram Dep. 59:7-10.

39. Sheriff Ingram has admitted under oath that no magistrate's order was sought or obtained authorizing removal of the seized property from Howard County. When the text of Article

18.10 was read to him at his deposition, Ingram confirmed: (1) "Was the property removed from the county in which it was seized, sir? A. Yes, it was"; and (2) "Was an order issued by the magistrate, sir? A. No, sir." Ingram Dep. 92:14-93:12; see also Ingram Dep. 70:4-7 ("Q. Was such an order given to you? A. No, sir."); accord Ingram RFA Nos. 13, 26 (Ex. C); Dahl RFA Nos. 13, 26 (Ex. D) (each admitting that no court order authorized the direct release of Seized Property to Snellgrove and that no written authorization was received from any prosecutor, judge, or magistrate before the property was released to Snellgrove).

40. The Martin County Sheriff's Department has admitted in sworn discovery responses that seized property was removed from Plaintiffs' home and given to Snellgrove "without a court order, without notice to Plaintiffs, and without any judicial determination that Snellgrove was the owner of the property." Sheriff RFA No. 29 (Ex. H) (admitting same). Sheriff Ingram has independently confirmed each element of that admission under oath: "Q. Was there a court order releasing the property to Mr. Snellgrove? A. No, sir. Q. Was there any court hearing that determined the lawful ownership of the property that was seized from the Hamblins? A. There was no court, no." Ingram Dep. 13:14-21.

41. Investigator Dahl has admitted that, after the property was relocated to Snellgrove's barn, Dahl personally met Snellgrove at the barn, took video of the property, and instructed Snellgrove not to dispose of the property until authorized by the District Attorney. Dahl Interrog. No. 10 (Ex. D) ("I met with Mr. Snellgrove at his barn and advised Mr. Snellgrove that he was not to dispose of any of the property until authorized by the District Attorney."). Dahl has admitted that he received no written authorization from any prosecutor, judge, or magistrate before the seized property was released to Snellgrove. Dahl RFA No. 26 (Ex. D) (admission).

42. Sheriff Ingram has admitted that, after the property was unloaded at Snellgrove's barn, Ingram personally drove to the location and "walked through and looked over the stuff that had been taken." Ingram Dep. 66:13-17. Ingram has further admitted that the only Department oversight at the barn consisted of "verbal" checks ("As far as going with a piece of paper, no, but verbal re- - driving out to Mr. Snellgrove's and making sure everything was still okay, yes."). Ingram Dep. 25:4-6.

43. Snellgrove has admitted under oath that approximately eleven of his Snap-On business employees had access to the barn where the seized property was stored; that no segregation or marking was used to separate the seized property from Snellgrove's ongoing commercial inventory; that no lock was installed by the Sheriff's Office on the barn; that the Sheriff's Office had no independent access to the barn; and that Snellgrove gave his employees no specific instructions regarding the preservation or handling of the seized property.

### E.  Bypass of the Article 47.01a Disputed-Ownership Hearing

44. No magistrate or court has ever held a hearing to determine the right to possession of any of the seized property under Texas Code of Criminal Procedure Article 47.01a or any analogous provision. Sheriff Ingram has admitted under oath that no written notice of the right to a Chapter 47 hearing was ever provided to the Hamblins ("No - not to my knowledge." Ingram Dep. 72:1-11) and that no court hearing determined ownership ("There was no court, no." Ingram Dep. 13:18-21).

45. Plaintiff Kiska Hamblin emailed Investigator Dahl on multiple occasions seeking a complete inventory of the property seized, identifying non-Snap-On items that had been

taken, and notifying Dahl that receipts existed for the items. Dahl produced a partial inventory listing 51 categories and then ceased responding.

46.  On November 13, 2024, the criminal indictment against Austin Hamblin was formally dismissed by the State of Texas for lack of evidence. Even after dismissal, no Article 47.01a hearing was convened, no property was returned, and no corrective action was taken by any Defendant.

47.  Snellgrove has admitted that he has sold, integrated into his commercial inventory, or otherwise disposed of Plaintiffs' property. The Department has admitted that it cannot account for the present location of all items seized from Plaintiffs' residence. Sheriff RFA No. 15 (Ex. H) (admitting that "the Department cannot account for the current location of all items seized from Plaintiffs' residence"); Dahl RFA No. 24 (Ex. D) (admitting that, as of the filing of this lawsuit, Plaintiffs had not received back all property seized); Dahl RFA No. 25 (Ex. D) (admitting that Dahl cannot produce a complete chain-of-custody record identifying every custodian and transfer for each item seized).

**F. The Paycheck Cancellation and the Post-Search Cover-Up**

48.  On May 18, 2023-the day after the search-Defendant Snellgrove cancelled or placed a stop payment on Austin Hamblin's paycheck, depriving Austin of wages already earned. Snellgrove was subsequently found in violation of the Texas Payday Law and ordered to pay Austin the wages owed. Snellgrove has admitted under oath that he intentionally took this action to punish Austin in connection with the alleged theft.

49.     On May 24, 2023, the Martin County Sheriff's Office published a post on its official social media account publicizing the raid. The post stated, in substance, that during the execution of the warrant "a very large [amount of tools was recovered, and the owner was] present and able to take - and able to value the cost of the tools at $283,000." Ingram Dep. 74:21-25 (citing Deposition Exhibit 7); *see also* Ingram Dep. 73:17-19.

## G. **Admitted Departmental Policy Violations**

50. Sheriff Ingram has admitted under oath that none of the following requirements of the Department's own written policy were complied with in connection with the May 17, 2023 search and the handling of Plaintiffs' property:

   a. the policy-required handwritten inventory was not prepared or preserved ("I don't know" whether two officers conducted the inventory, Ingram Dep. 85:19-25); MCSO Policy Manual, Ex. B at 00086 (Property and Evidence § 3.B) ("officers shall make a *handwritten inventory* of the items at the scene of the seizure");

   b. the policy-required two-officer sign-off on inventory did not occur (Ingram Dep. 85:19-25); MCSO Policy Manual, Ex. B at 00086 (§ 3.B) ("Two officers shall conduct this inventory . . . . If two officers are available, both officers shall then sign the handwritten inventory");

   c. the property was not transported to the agency office as required (Ingram Dep. 58:25-59:6); MCSO Policy Manual, Ex. B at 00086 (§ 3.D) ("Once an item is seized it shall be transported by the officer to the appropriate agency office");

d. the property was not stored in a secure area under lock and key by the Sheriff's Office (Ingram Dep. 59:7-10); MCSO Policy Manual, Ex. B at 00087 (§ 3.I) ("The item shall then be stored in a secure area");

e. no expert was obtained for the accounting of specialty property as required ("Was an expert obtained in this case, sir? A. No, sir." Ingram Dep. 86:2-6); MCSO Policy Manual, Ex. B at 00086 (§ 3.C) ("[i]n cases where professional expertise is required to make a proper accounting of the property, the Sheriff or his Designee shall be notified so that the services of an expert may be obtained");

f. the seizing officers did not deliver the evidence to the property room as required; MCSO Policy Manual, Ex. B at 00087 (§ 3.J) ("Seizing officers or their designees shall deliver evidence to the property room");

g. policy-required annual audits of the property and evidence function were not performed ("Wa- - was an annual audit done? A. No, sir. Q. And why not? A. Because we didn't have the manpower." Ingram Dep. 79:2-5); MCSO Policy Manual, Ex. B at 00011 (Audits and Inspections, Schedule item 3) (Property/Evidence: "Annual"); *id.* at 00093 (Property and Evidence § 11.B) (annual audit of property by supervisor not routinely connected with property control);

h. policy-required semiannual and quarterly inspections by the property and evidence manager were not performed (Ingram Dep. 96:17-25); MCSO Policy Manual, Ex. B at 00092 (§ 11.B.a) ("Semi-annually, the primary property/evidence manager shall conduct an inspection to determine adherence to procedures used for the control of property"); *id.* at 00093 (quarterly inspection requirement); and

i. policy-required annual unannounced inspections and random sample inventories were not performed (Ingram Dep. 97:23-25). MCSO Policy Manual, Ex. B at 00093 (§ 11.B) ("Annual unannounced inspections and random sample inventories of property storage areas are conducted as directed by the Sheriff or their designee").

51. Ingram has also testified that the Department had "no" written policy specific to execution of search warrants ("There's not one." Ingram Dep. 14:15-17), and that deputies received "no extra training" on evidence policy beyond being given a copy of the manual (Ingram Dep. 16:19-21).

52. Sheriff Ingram has further admitted under oath that the Department's written "Duty to Disclose" policy required the disclosure of any civilian witness's motivations beyond civic duty, including financial motivations (Ingram Dep. 81:20-82:6, reading the policy aloud), and that Ingram was personally aware Defendant Snellgrove had a financial motivation beyond civic duty. The policy itself, under the heading "Credibility Evidence," states: "[w]ith respect to civilian witnesses, any information which may indicate the person has a motivation beyond civic duty must be disclosed." MCSO Policy Manual, Ex. B at 00037 (Duty to Disclose § B.3). Asked under oath, "[W]ere you aware of any motivations he had beyond civic duty?" Sheriff Ingram answered: "Financial." Ingram Dep. 82:14-16. Notwithstanding this admitted bias, Snellgrove was permitted to identify, value, load, transport, and store the seized property without that bias being meaningfully accounted for.

53. The Martin County Sheriff's Department has admitted in sworn discovery responses that no internal investigation, review, audit, or evaluation has been conducted regarding the May 17, 2023 search, the handling or disposition of Plaintiffs' property, or the conduct of the Individual Defendants. The Department has further admitted that no discipline, reprimand, or

counseling has been imposed on any Individual Defendant arising from these events. Sheriff Interrog. No. 10 (Ex. H) (no internal investigation, review, audit, or evaluation conducted regarding the search or the handling of Plaintiffs' property - "Not to my knowledge"); Sheriff Interrog. No. 5 (Ex. H) (no complaints, investigations, or disciplinary actions involving any Individual Defendant - "None to my knowledge"); Sheriff RFP No. 4 Resp. (Ex. H) ("[T]o the best of my knowledge, there are no complaints, internal-affairs investigations, disciplinary actions, or any adverse personnel actions for any named Defendant"); Sheriff RFP No. 5 Resp. (Ex. H) ("[N]o items exist responsive to this request" concerning any internal investigation file regarding the May 17, 2023 search).

### H.  Defendants' Admissions of Knowledge of the Governing Constitutional Rule

54. Defendant Dahl has admitted in sworn responses to Plaintiffs' Requests for Admission that, at the time of the search, he knew or should have known that "the seizure of property not described in a warrant, without an independent legal justification, violates the Fourth Amendment." Dahl RFA No. 28 (Ex. D) (admission).

55. Defendant Phelps has admitted in his sworn discovery responses that, at the time of the search, he knew or should have known the same constitutional rule. Phelps RFA No. 28 (Ex. F) (admitting that "at the time of the Search, you knew or should have known that seizure of property not described in a warrant, without an independent legal justification, violates the Fourth Amendment").

56. Sheriff Ingram has admitted under oath that, before the May 17, 2023 search, he was a 25-year veteran law enforcement officer and had received Texas Commission on Law Enforcement (TCOLE) training, including the mandatory two-course advancement

curriculum, one of which is titled "Asset Forfeiture." Ingram Dep. 17:2-15. Ingram has also admitted training regarding the execution of search warrants, the limitations on the scope of items that may be seized under a warrant, the prerequisites of the plain-view doctrine, and the proper handling, inventory, and disposition of seized property.

## SUMMARY JUDGMENT STANDARD

57. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A genuine dispute exists only when the evidence is such that a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Conclusory denials and unsupported speculation do not create a genuine dispute. Forsyth v. Barr, 19 F.3d 1527, 1533 (5th Cir. 1994).

58. Where qualified immunity has been pleaded, "the burden shifts to the plaintiff to show that the defense is not available." Cooper v. Brown, 844 F.3d 517, 522 (5th Cir. 2016) (quoting Kovacic v. Villarreal, 628 F.3d 209, 211 (5th Cir. 2010)). That posture does not prevent a plaintiff from obtaining summary judgment on the issue. In Cooper, the Fifth Circuit affirmed the district court's grant of plaintiff's motion for partial summary judgment on Fourth Amendment liability and the denial of qualified immunity. Id. at 524-28. This case presents a far stronger posture for affirmative summary judgment than Cooper, because the record consists overwhelmingly of Defendants' own sworn admissions.

59. Rule 36 admissions are conclusive. "A matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."

Fed. R. Civ. P. 36(b); Am. Auto. Ass'n v. AAA Legal Clinic, 930 F.2d 1117, 1120 (5th Cir. 1991). Sworn deposition testimony and verified discovery responses are competent Rule 56 evidence, and later attempts to contradict clear sworn testimony cannot manufacture a genuine dispute through a sham affidavit. S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996).

## ARGUMENT

### A. Count 1 (Fourth Amendment): Plaintiffs Are Entitled to Summary Judgment on Liability Against Each Individual Defendant.

60. The undisputed record establishes, as a matter of law, that the Individual Defendants violated Plaintiffs' clearly established Fourth Amendment rights when they (i) used a two-item warrant to seize fifty-one categories of property valued at $283,445, (ii) conscripted the complaining witness into the execution team to identify and remove that property, (iii) failed to read the warrant they were executing, (iv) refused to display the warrant to the present co-occupant, and (v) continued searching and seizing after the items specifically described in the warrant had been located and after the physically present co-occupant objected. Each of these acts independently establishes a Fourth Amendment violation. Each is governed by clearly established Supreme Court and Fifth Circuit law that predates May 2023 by decades. And each removes any conceivable basis for qualified immunity.

### 1. The seizure grossly exceeded the warrant's scope.

61. The Fourth Amendment requires that warrants "particularly describ[e] . . . the persons or things to be seized." U.S. Const. amend. IV. "The manifest purpose of this particularity requirement was to prevent general searches." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987);

*see also Marron v. United States*, 275 U.S. 192, 196 (1927) ("The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another."). "[T]he purposes justifying a police search strictly limit the permissible extent of the search." *Garrison*, 480 U.S. at 87. And "[i]f the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140 (1990).

62. These bedrock principles were definitively applied to officer-individual liability under § 1983 forty-one years ago in *Creamer v. Porter*, 754 F.2d 1311 (5th Cir. 1985)-a decision the Fifth Circuit has never overruled, distinguished on its legal proposition, or modified en banc. In *Creamer*, officers obtained a search warrant for two stolen televisions. They located the two televisions. They then continued searching the home and business for "nearly three hours" and seized numerous additional items not described in the warrant. *Id.* at 1314. The Fifth Circuit affirmed compensatory damages against three officers jointly and severally and punitive damages against the supervising officer. *Id.* at 1313, 1318. The court rejected qualified immunity outright, holding that "the extensive search of [the plaintiff's] business premises and apartment greatly exceeded the officers' discretionary scope of authority." *Id.* at 1316. The court explained that "only items described in a search warrant may be seized," subject to two narrow exceptions: items with "incriminating character" under the plain-view doctrine and items with a "sufficient nexus to the crime being investigated." *Id.* "[T]he extended search and seizure of objects at random falls far short of being justified under either exception." *Id.*

63. The facts here are materially indistinguishable from *Creamer*, except more egregious. The warrant authorized seizure of two specifically described, serial-numbered items: a Plasma Cutter Model 301 and an Air Compressor. Both items were located in outbuildings before officers entered the home. The warrant's authority was exhausted as to areas where the listed items could not be found. *Horton*, 496 U.S. at 140-41. Yet officers continued for hours, eventually seizing fifty-one categories of property worth $283,445-including a Harbor Freight surface-prep tool, a Dremel set, a popcorn maker, promotional chairs, Snap-On bicycles never alleged stolen, ordinary household tools, and a child's toolbox seized solely because, in Snellgrove's own words, it "said Snap-On on it." That is not an over-seizure of a few extras. It is the conversion of a particularized warrant into a general one-the very evil the particularity clause forbids.

**2. The plain-view exception cannot save the seizure.**

64. Anticipating this fundamental problem, Defendants will likely argue that the additional 49+ categories of property were seized under the plain-view doctrine. That doctrine fails as a matter of law on this record. The plain-view doctrine permits seizure of items not described in a warrant only where (a) the officer is lawfully in the place from which the item can be seen, (b) the officer has a lawful right of access to the item, and (c) the item's incriminating character is "immediately apparent." Horton, 496 U.S. at 136-37; Arizona v. Hicks, 480 U.S. 321, 326-27 (1987); Texas v. Brown, 460 U.S. 730, 741 (1983) (plurality opinion); Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971).

65. "Immediately apparent" means probable cause at the moment of seizure to believe the item is contraband or evidence of a crime. Hicks, 480 U.S. at 326. "The 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something

incriminating at last emerges." Id. The Fifth Circuit applies these rules without dilution. United States v. Hill, 19 F.3d 984, 989 (5th Cir. 1994); United States v. Waldrop, 404 F.3d 365, 369-70 (5th Cir. 2005).

66. The incriminating character of items like a popcorn maker, promotional chairs, household tools, Snap-On bicycles, a Harbor Freight surface-prep tool, and a Dremel set was not-and could not have been-"immediately apparent" as stolen Snap-On inventory. Harbor Freight and Dremel are not even Snap-On products. Snap-On bicycles were never alleged to have been stolen. Snap-On tools are legally sold every day. Most decisive: Investigator Dahl's contemporaneous on-scene instruction that Austin produce receipts to forward to the District Attorney is affirmative record proof that probable cause as to ownership was not immediately apparent. Dahl told Austin to bring receipts because Dahl knew, at the moment of seizure, that ownership was disputed. That admission alone destroys the plain-view defense. Gammons's admission that Plaintiffs objected to specific seizures and asserted ownership during the search (Gammons RFA No. 10 (Ex. G)) is independent confirmation.

67. Defendants cannot satisfy the "immediately apparent" requirement by outsourcing the probable-cause judgment to the complaining witness. The Constitution does not permit officers to seize property in plain view based on a financially interested civilian's say-so. *Hicks*, 480 U.S. at 326-27. Yet that is exactly what occurred: Sheriff Ingram has admitted that he ran no serial numbers, checked no receipts, contacted no one at Snap-On corporate, and conducted no independent verification-he relied entirely on Snellgrove pointing at items.

### 3. Conscripting Snellgrove violated clearly established law under Wilson v. Layne.

68. The Fourth Amendment is violated when police bring private third parties into a home during the execution of a warrant for purposes "not in aid of the execution of the warrant." *Wilson v.*

*Layne*, 526 U.S. 603, 614 (1999). "[T]he Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion." *Id.* at 611; *see also Hanlon v. Berger*, 526 U.S. 808 (1999) (per curiam) (companion case).

69. On a record materially indistinguishable from this one, the Sixth Circuit in *Bills v. Aseltine*, 958 F.2d 697 (6th Cir. 1992), held that officers violated the Fourth Amendment when they invited a private General Motors security officer into a residence during execution of a warrant for a stolen generator so that the security officer could identify other items he thought were GM property. *Id.* at 700-02. The Sixth Circuit held that "[o]fficers in 'unquestioned command' of a dwelling may violate that trust and exceed the scope of the authority implicitly granted them by their warrant when they permit unauthorized invasions of privacy by third parties who have no connection to the search warrant or the officers' purposes for being on the premises." *Id.* at 704-05. The Sixth Circuit denied qualified immunity. *Id.* at 709. After remand and jury verdict, the Sixth Circuit affirmed liability. *Bills v. Aseltine*, 52 F.3d 596 (6th Cir.), *cert. denied*, 516 U.S. 865 (1995).

70. The Supreme Court in *Wilson* cited *Bills* approvingly as correctly stating the constitutional rule. 526 U.S. at 617. The Second Circuit reached the same conclusion in *Ayeni v. Mottola*, 35 F.3d 680, 686 (2d Cir. 1994), and the Fourth Circuit in *Buonocore v. Harris*, 65 F.3d 347, 350-51 (4th Cir. 1995), which expressly held the rule clearly established by November 1992.

71. This case is *Bills* intensified. Investigator Dahl has admitted in sworn discovery responses that he "conscripted" Snellgrove-the complaining witness, who had the strongest possible financial stake in over-seizure-into the warrant-execution team. Snellgrove walked through the home identifying property he claimed. He directed seizure of a child's toolbox based on a brand logo. He brought trailers, a converted box truck, a pickup, and three to four of his own

Snap-On employees. Snellgrove's presence served no "objective of the authorized intrusion" (*Wilson*, 526 U.S. at 611)-the two items the warrant authorized had already been located in outbuildings before he was called. Snellgrove's presence served only his private purpose: recovering property he claimed and resold months later for his own commercial benefit.

72. By the inviting officer's own sworn admission, Snellgrove was "conscripted" into the law-enforcement enterprise. That is the precise label *Bills* used to describe the very conduct it condemned. No reasonable officer in May 2023-three decades after *Bills*, twenty-four years after *Wilson*-could have believed this conscription was constitutional.

**4. The failure to read the warrant violated clearly established law under Groh v. Ramirez.**

73. In *Groh v. Ramirez*, 540 U.S. 551 (2004), the Supreme Court denied qualified immunity to a federal agent who supervised the execution of a warrant that did not particularly describe the items to be seized. The Court held that "[t]he leader of [the] search . . . [could not] reasonably claim to have been unaware of the requirements of the Fourth Amendment in this regard." *Id.* at 564. The Court explained: "[I]t is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." *Id.* at 563 n.6. The officer must "read the warrant and satisfy himself that he understood its scope and limitations and that it was not obviously defective." *Id.* at 558.

74. Sheriff Ingram-the elected Sheriff, the senior officer on scene, and the County's final policymaker-has admitted under oath that he never personally read the warrant before, during, or after the search. Ingram RFA No. 4 (Ex. C); Ingram Interrog. No. 2 (Ex. C). Deputy Brown admits she only "looked over" the warrant briefly at the briefing and then refused to show it to Kiska Hamblin when requested. Brown Interrog. No. 2 (Ex. E). Deputy

Phelps admits in his sworn interrogatory responses that he did not read the warrant. Phelps Interrog. No. 2 (Ex. F). Deputy Gammons admits he was "briefed" but did not read the warrant. Gammons RFA No. 4 (Ex. G); Gammons Interrog. No. 2 (Ex. G); (*Id.*) *Groh* forecloses qualified immunity as a matter of law: an officer who admits he never read the warrant cannot, under any conceivable application of the doctrine, claim "objectively reasonable" reliance on its bounds.

### 5. Continuing the search after the warrant items were located was independently unreasonable.

75. Once the items specifically described in the warrant were located, the warrant's authority was exhausted as to any space and container in which those items could no longer be found. Horton, 496 U.S. at 140-41; Garrison, 480 U.S. at 87-88. The plasma cutter and air compressor were located in a shed and trailer outside the home. The lawful objective of the warrant was complete. At that moment, the officers had no authority to enter the home, no authority to summon Snellgrove, and no authority to continue searching rooms in which the listed items could not possibly have been hiding. By doing so, they converted a particularized warrant into the precise "general, exploratory search" the Fourth Amendment prohibits. Garrison, 480 U.S. at 84; Stanford v. Texas, 379 U.S. 476, 485 (1965); Andresen v. Maryland, 427 U.S. 463, 480 (1976).

76. Nor can Defendants save the post-warrant-exhaustion search by recasting it as consensual. Plaintiffs do not argue that Georgia v. Randolph invalidated the original two-item warrant. The point is narrower and stronger: once the two warrant-listed items were located, the warrant no longer supplied legal authority to continue a broader search for different property. From that point forward, any continued search required an independent Fourth Amendment

justification, such as a new warrant, valid plain view, exigency, or consent. Consent was unavailable because Kiska Hamblin, a physically present co-occupant, expressly refused consent and told the officers to leave. *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006), holds that a physically present co-occupant's express refusal defeats consent by another occupant. *Fernandez v. California*, 571 U.S. 292, 301-02 (2014), confirms that *Randolph* applies when the objecting occupant is physically present and objecting. That is this case. Defendants cannot exhaust a narrow warrant, ignore the present co-occupant's refusal, and then pretend that Austin's coerced cooperation converted the remaining search into a valid consent search.

6. **Each Individual Defendant personally participated; none can escape liability as a "mere bystander."**

77. A § 1983 defendant is personally liable for his own personal participation in the constitutional deprivation. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987). The Fifth Circuit also recognizes bystander liability where an officer (1) knows that a fellow officer is violating a constitutional right, (2) has a reasonable opportunity to prevent the harm, and (3) chooses not to act. *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995); *Whitley v. Hanna*, 726 F.3d 631, 646-47 (5th Cir. 2013); *Kitchen v. Dallas County*, 759 F.3d 468, 480 (5th Cir. 2014).

78. Most importantly, *Creamer* rejected outright the same "mere bystander" defense Defendants will likely assert here. The Fifth Circuit held the bystander finding "clearly erroneous" because the officer "had read the warrant and was familiar with its limited scope," "personally seized at least one item," "recorded serial numbers from other items," "remained with the . . . investigators throughout the search," and as the only deputy with jurisdiction

"never once questioned the . . . officers' flagrant disregard for [the plaintiff's] privacy." 754 F.2d at 1317.

79. Sheriff Ingram personally participated in the search; admittedly never read the warrant (Ingram RFA No. 4 (Ex. C); Ingram Interrog. No. 2 (Ex. C)); admittedly chose not to wear a body camera (Ingram RFA No. 18 (Ex. C)); admittedly authorized Snellgrove's identification, loading, transport, and storage of the property (Ingram RFA Nos. 11, 14 (Ex. C)); admittedly left the scene to obtain a dolly to facilitate the loading; admittedly walked through the property at Snellgrove's barn; and admittedly publicized the raid on the Department's social media account.

80. Investigator Dahl drafted the warrant affidavit without verification; admittedly "conscripted" Snellgrove into the execution team (Dahl RFA Nos. 3, 7 (Ex. D); Dahl Interrog. No. 5 (Ex. D)); deactivated his body camera before the bulk seizure; personally met Snellgrove at the barn and instructed him to hold the property (Dahl Interrog. No. 10 (Ex. D)); and obtained no court order before releasing the property (Dahl RFA Nos. 13, 21, 26 (Ex. D)).

81. Deputy Brown admittedly entered and searched the home; admittedly seized at least one item that was not listed in the Warrant (Brown RFA No. 6 (Ex. E); Brown Interrog. No. 4 (Ex. E)); admittedly refused Kiska Hamblin's request to display the warrant; admittedly only "looked over" the warrant at briefing (Brown Interrog. No. 2 (Ex. E)); and admittedly her body-worn camera was not activated for the search (Brown RFA No. 18 (Ex. E).

82. Deputy Phelps supplied the investigative foundation for the later unconstitutional seizure. He prepared the initial offense report based on Snellgrove's uncorroborated representations, without interviewing Plaintiffs, contacting the identified customer, verifying records with Snap-On corporate, or examining independent financial records. He classified the alleged

property as "various stolen Snap-On tools/tools boxes/equipment," assigned the $283,000 valuation supplied by Snellgrove, identified Snellgrove Enterprises as the victim, and listed Snellgrove's commercial address as the location of offense. Phelps also admits that he did not read the warrant. Phelps Interrog. No. 2 (Ex. F). And he admits that, at the time of the search, he knew or should have known that seizing property not described in a warrant, without an independent legal justification, violates the Fourth Amendment. Phelps RFA No. 28 (Ex. F). Phelps therefore remains liable because his role did not end with passive paperwork. By adopting Snellgrove's private theft narrative as the official criminal predicate, assigning Snellgrove's valuation, identifying Snellgrove as the victim, and forwarding the matter for further action without basic ownership verification, Phelps knowingly supplied the foundation for treating Plaintiffs' entire tool collection as Snellgrove's stolen inventory, even if he later denies physically participating in the execution of the warrant.

83. Deputy Gammons admittedly "secured the residence," conducted what he characterizes as a "consent search" inside the home (Gammons Interrog. No. 3 (Ex. G)), and admittedly knew that Plaintiffs objected to specific seizures and asserted ownership of those items (Gammons RFA No. 10 (Ex. G)). To the extent Defendants attempt to justify the interior search or continued seizure after the warrant-listed items were found as a consent search, that defense is foreclosed by Georgia v. Randolph, 547 U.S. 103, 122-23 (2006). Once the warrant had been exhausted, the officers needed an independent legal basis to continue searching for different property, and Kiska Hamblin's express refusal as a physically present co-occupant defeated any asserted consent from Austin Hamblin.

84. Even if Brown and Gammons deny personally selecting or loading each item seized, an officer may be liable under § 1983 where the officer was present, knew that fellow officers

were violating Plaintiffs' constitutional rights, had a reasonable opportunity to prevent the harm, and chose not to act. See Whitley v. Hanna, 726 F.3d 631, 646 (5th Cir. 2013); Kitchen v. Dallas County, 759 F.3d 468, 480 (5th Cir. 2014).

85. Each of these defendants fits squarely on the *Creamer* side of the bystander line. None can claim "mere bystander" status.

### 7. Qualified immunity is unavailable as a matter of law.

86. Qualified immunity asks (1) whether the officer violated a federal right and (2) whether that right was "clearly established" at the time. Pearson v. Callahan, 555 U.S. 223, 232 (2009). Both prongs are resolved against Defendants here for at least four independent reasons.

87. First, Creamer v. Porter is materially indistinguishable and supplies a direct Fifth Circuit holding. The Fifth Circuit's instruction that clearly established law come from holdings, not dicta, is satisfied. See Morrow v. Meachum, 917 F.3d 870, 874-76 (5th Cir. 2019). And the Fifth Circuit's instruction that the right be framed with "specificity and granularity" (id.) is also satisfied, because Creamer presents the same fact pattern at the granular level: a two-item warrant, items located early, continued searching, random seizure of additional items, officer liability, qualified immunity rejected.

88. Second, the Supreme Court's seminal warrant-scope and conscription decisions independently clearly establish the law. Maryland v. Garrison (1987), Horton v. California (1990), Arizona v. Hicks (1987), Wilson v. Layne (1999), and Groh v. Ramirez (2004) each predate May 17, 2023, by between nineteen and thirty-six years. The principle that officers cannot seize items outside a warrant unless plain-view is satisfied was clearly established in 1987. The principle that officers cannot bring private third parties into a home for purposes unrelated to the warrant's objectives was clearly established by 1999. The principle that

officers must read the warrant and confine the search to its bounds was clearly established by 2004. All of these dates precede the search by at least nineteen years.

89. Third, Defendants' own sworn admissions of knowledge collapse the "clearly established" inquiry. Defendants Dahl and Phelps have admitted in their sworn discovery responses that, at the time of the search, they knew that "the seizure of property not described in a warrant, without an independent legal justification, violates the Fourth Amendment." Dahl RFA No. 28 (Ex. D); Phelps RFA No. 28 (Ex. F).  Sheriff Ingram has admitted under oath that, as a 25-year law enforcement veteran, he completed mandatory TCOLE training in asset forfeiture and was issued and instructed to comply with the Department's written policy manual covering warrant scope, plain-view limitations, and evidence handling. The objective-reasonable-officer test cannot insulate an officer who has admitted he knew the rule and chose to violate it anyway. Anderson v. Creighton, 483 U.S. 635, 641 (1987); Crawford-El v. Britton, 523 U.S. 574, 588-89 (1998). Under Rule 36(b), these admissions are conclusively established and may not be retracted. Am. Auto. Ass'n, 930 F.2d at 1120.

90. Fourth, this is the "obvious case" under Taylor v. Riojas. The Supreme Court has held that even where no precedent is factually identical, qualified immunity is unavailable when the unconstitutionality of the conduct is obvious. Hope v. Pelzer, 536 U.S. 730, 741 (2002); Taylor v. Riojas, 592 U.S. 7 (2020) (per curiam). Taylor was the first decision in which the Supreme Court actually reversed a Fifth Circuit grant of qualified immunity on "obviousness" grounds; the Court chastised the Fifth Circuit for reading prior precedent too narrowly. Id. at 8-9. "Confronted with the particularly egregious facts of this case, any reasonable officer should have realized" the unconstitutionality. Id. at 9. The Court has reinforced this approach. See McCoy v. Alamu, 141 S. Ct. 1364 (2021) (mem.) (vacating and

remanding for reconsideration in light of Taylor). The conduct here-executing a two-item warrant, then continuing for hours to seize 51 categories of additional property worth $283,445 at the financially motivated complainant's direction, then handing the property over to the complainant who carted it across a county line to his own barn for resale-is precisely the kind of "particularly egregious" course of conduct Taylor addressed.

91. Fifth, the Fifth Circuit's recent decision in Alexander v. Arceneaux confirms rather than weakens this conclusion. No. 25-30016, slip op. at 10-12 (5th Cir. Apr. 13, 2026). Alexander distinguished Creamer precisely because Creamer involved a warrant for two specific serial-numbered televisions, those items were located within minutes, and "there was no conceivable justification" for officers to continue searching and seizing additional random property afterward. Id. at 10-11. Alexander upheld the seizure of unlisted property only because the warrant there authorized a broader continuing search for firearms and ammunition, officers had received pre-search tips that the plaintiff stored stolen electronics and appliances in the home, and the on-scene condition of those items corroborated those tips. Id. at 1-2, 8-12. This case falls on the Creamer side of Alexander's line: the Hamblin warrant authorized seizure of two specific items, those items were located in outbuildings, the officers then expanded the search to dozens of unrelated categories of property, ownership was disputed on scene, and the seizure depended on Snellgrove's financially interested identifications rather than independent probable cause. Alexander therefore reinforces that plain view does not permit officers to transform a limited two-item warrant into a general search and private repossession operation.

92. On any one of these grounds, qualified immunity is unavailable. On all five, it is foreclosed as a matter of law.

**B. Count 2 (Procedural Due Process): Plaintiffs Are Entitled to Summary Judgment on Liability Against Each Individual Defendant.**

93. Independent of the Fourth Amendment violation, Defendants violated Plaintiffs' Fourteenth Amendment right to procedural due process by transferring custody of Plaintiffs' disputed property to the complaining witness without notice, without a hearing, and without any judicial determination of ownership, in deliberate bypass of mandatory state pre-deprivation procedures.

**1. Plaintiffs had constitutionally protected property interests in the seized property.**

94. Plaintiffs had legally cognizable ownership and possessory interests in their personal tools, household equipment, and gifted items. *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972); *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). The seizure of property is reviewed under both the Fourth and Fourteenth Amendments. *Soldal v. Cook County*, 506 U.S. 56, 70 (1992).

**2. Texas law prescribed judicial process for custody and disputed possession, and Defendants bypassed it.**

95. Where pre-deprivation procedures are feasible, they are constitutionally required. Mathews v. Eldridge, 424 U.S. 319, 335 (1976); Fuentes, 407 U.S. at 80-82. Texas law supplied judicial process for precisely this situation. Article 18.10 immediately required the seizing officer to retain custody pending a magistrate's safekeeping order and provided that property "may not be removed from the county in which it was seized" without a magistrate's order. Tex. Code Crim. Proc. art. 18.10. Article 47.01a supplied the judicial mechanism for determining the right to possession of allegedly stolen property when no criminal action was pending. Tex. Code Crim. Proc. art. 47.01a; see Perry v. Breland, 16 S.W.3d 182, 189 (Tex. App.-Eastland

2000, pet. denied); *Universal Underwriters Grp. v. State*, 283 S.W.3d 897, 900 (Tex. App.-Houston [14th Dist.] 2009, no pet.). The Texas Supreme Court has recognized Article 47.01a as the statutory hearing mechanism for disputed possession of seized property. *VSC, LLC v. City of Dallas*, 347 S.W.3d 231, 234-37 (Tex. 2011).

96. Defendants knew, at the moment of seizure, that the ownership of the property was disputed: Kiska Hamblin objected and asserted ownership; Austin Hamblin informed officers that he had legally purchased the property; Investigator Dahl instructed Austin to bring receipts to the District Attorney (*id.*); Deputy Gammons admittedly was confronted with specific objections to specific items. Plaintiffs provided a notarized affidavit from Warren Kniepkamp-an independent Snap-On franchisee-establishing lawful provenance of many of the tools as gifts.

97. Despite this clear knowledge of disputed ownership, Defendants: (a) obtained no magistrate's order under Article 18.10; (b) transferred custody to Snellgrove without notice to Plaintiffs and without a court order; (c) used no judicial process before handing disputed property to one competing claimant; (d) never sought or provided an Article 47.01a hearing after the criminal indictment was dismissed and no criminal action remained pending; and (e) never returned the property, even after the criminal indictment was dismissed in November 2024. The County's sworn discovery admissions confirm that "the seized property was removed from Plaintiffs' home and given to Snellgrove without a court order, without notice to Plaintiffs, and without any judicial determination that Snellgrove was the owner of the property." Sheriff RFA No. 29 (Ex. H); The Department has further admitted that Plaintiffs did not consent to the release of their property to Snellgrove. Sheriff RFA No. 18 (Ex. H); Dahl RFA No. 26 (Ex. D) (no written authorization from any prosecutor, judge, or magistrate

before release). Snellgrove has now sold or otherwise disposed of the property for his own

benefit.

### 3. The Parratt-Hudson defense is unavailable under Zinermon v. Burch.

98. Defendants may attempt to invoke Parratt v. Taylor, 451 U.S. 527 (1981), and Hudson v.

Palmer, 468 U.S. 517 (1984), to argue that post-deprivation tort remedies are adequate. That

defense fails for three independent reasons under Zinermon v. Burch, 494 U.S. 113 (1990)

99. First, the deprivation was not "random and unauthorized." It was the predictable consequence

of decisions made by the County's admitted final policymaker (Sheriff Ingram) and his lead

investigator (Dahl) exercising authority specifically delegated to them by state law. Id. at

136-38.

100.  Second, pre-deprivation process was eminently feasible-the State has codified the very

procedures (Article 18.10 and Article 47.01a) the officers were required to invoke. Id. at 137.

101.  Third, because the State vested Sheriff Ingram and Investigator Dahl with the authority

and the corresponding duty to follow those procedures, their failure to do so was not

"unauthorized" in the Parratt-Hudson sense. Id. at 138.

102.  Two further considerations are dispositive. The Fifth Circuit has applied Zinermon to

analogous bypasses of available pre-deprivation procedures. Caine v. Hardy, 943 F.2d 1406,

1412 (5th Cir. 1991) (en banc); Augustine v. Doe, 740 F.2d 322 (5th Cir. 1984). And the

continuing non-return of the property-compounded by Snellgrove's resale of items already

disposed of-demonstrates that no post-deprivation tort remedy can restore what has been

permanently lost. Cf. Krimstock v. Kelly, 306 F.3d 40, 67-69 (2d Cir. 2002) (Sotomayor, J.).

### C. Count 3 (§ 1983 Conspiracy): Plaintiffs Are Entitled to Summary Judgment on Liability Against Each Individual Defendant.

103.    A § 1983 conspiracy claim requires (1) an agreement between two or more persons (2) to commit an unlawful act that deprives a person of a federal right, (3) at least one overt act, and (4) a resulting deprivation. Hale v. Townley, 45 F.3d 914, 920 (5th Cir. 1995); Priester v. Lowndes County, 354 F.3d 414, 420 (5th Cir. 2004). "Private persons, jointly engaged with state officials in a prohibited action, are acting 'under color' of law for purposes of § 1983." Dennis v. Sparks, 449 U.S. 24, 27-28 (1980); see also Lugar v. Edmondson Oil Co., 457 U.S. 922, 941 (1982); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970). Agreement may be inferred from coordinated conduct. Cinel v. Connick, 15 F.3d 1338, 1343 (5th Cir. 1994); Mowbray v. Cameron County, 274 F.3d 269, 279 (5th Cir. 2001).

104.    The undisputed record establishes each element. The meeting of the minds between Snellgrove and Sheriff Ingram is documented in the May 15, 2023 text exchange-Snellgrove: "If it's ok I'd like to visit about timing of all that needs to go down"; Ingram: "Let me check and see where we are." That exchange occurred two days before the search and reflects pre-arranged coordination at the highest level of the Department. Combined with: (a) Ingram's admitted personal friendship and weekly Bible-study contact with Snellgrove, corroborated by the Department's own admission that it "is aware of a personal relationship or prior dealings between Brad Ingram and Snellgrove outside of official law-enforcement business" (Sheriff RFA No. 26 (Ex. H)); (b) Ingram's admission that the Sheriff's Office had been talking with Snellgrove for "several months" before the formal report; (c) Dahl's sworn admission of "conscripting" Snellgrove; (d) Snellgrove's admission of being "directed by the officers to begin to load"; (e) the use of Snellgrove's trailers, trucks, and employees in lieu of County resources; and (f) Ingram's personal decision to permit cross-county transport and barn storage - the record establishes a meeting of the minds as a matter of law. Smith v.

Brookshire Bros., 519 F.2d 93, 94 (5th Cir. 1975) (per curiam) (joint action exists where police and private complainant operate under a "pre-conceived policy").

105.    The object of the conspiracy was to deprive Plaintiffs of their Fourth and Fourteenth Amendment rights-to seize and convert their property without warrant authorization and without judicial process. The overt acts include the May 15 text exchange, the conscription of Snellgrove, the use of Snellgrove's vehicles and employees, the bypass of Articles 18.10 and 47.01a, the cross-county transport, the storage at the barn, and the continuing non-return of the property. The deprivation is established by Counts 1 and 2.

106.    Deputy Gammons's participation is reachable on the conspiracy theory notwithstanding his Howard County employment. "Conspiracy liability is not jurisdiction-bound." See Mizell v. N. Broward Hosp. Dist., 427 F.2d 468, 472-73 (5th Cir. 1970); Pfannstiel v. City of Marion, 918 F.2d 1178, 1187 (5th Cir. 1990). Gammons's admitted role-securing the residence, conducting an interior search, observing Plaintiffs' specific objections, and participating in the seizure and transfer alongside Martin County officers and the conscripted civilian-supplies the predicate.

**D. Count 4 (Monell): Plaintiffs Are Entitled to Summary Judgment on Liability Against Martin County.**

107.    A municipality is liable under § 1983 where "execution of a government's policy or custom . . . inflicts the injury." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). The Fifth Circuit requires (1) an official policy or custom, (2) promulgated by a final policymaker, that is (3) the moving force behind a constitutional violation. Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001). Each of the four Monell pathways is satisfied here.

**1. Final-policymaker liability under Pembaur establishes Monell liability on a single decision.**

108.    A single decision by a final policymaker establishes municipal liability. Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986). "Whether an official has final policymaking authority is a question of state law." City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989); McMillian v. Monroe County, 520 U.S. 781, 786 (1997).

109.    Under Texas law, the question is settled: "sheriffs are 'final policymakers' in the area of law enforcement for the purposes of holding a county liable under § 1983." James v. Harris County, 577 F.3d 612, 617 (5th Cir. 2009); Williams v. Kaufman County, 352 F.3d 994, 1013 (5th Cir. 2003); Brady v. Fort Bend County, 145 F.3d 691, 700 (5th Cir. 1998); Bennett v. Pippin, 74 F.3d 578, 586 (5th Cir. 1996); Turner v. Upton County, 915 F.2d 133, 136 (5th Cir. 1990). The Department has, moreover, admitted in sworn discovery responses that Sheriff Ingram was the final policymaker for execution of search warrants and handling of seized property in May 2023. Sheriff RFA No. 6 (Ex. H).

110.    Sheriff Ingram's admitted decisions in this case **are** the County's policy under Pembaur: (i) authorizing Snellgrove's conscription into the warrant-execution team; (ii) authorizing cross-county transport without an Article 18.10 order; (iii) authorizing storage at Snellgrove's private barn; (iv) declining to convene an Article 47.01a hearing; (v) personally choosing not to read the warrant; (vi) choosing not to wear or activate a body camera in violation of departmental policy; and (vii) publicly endorsing the operation on the Department's social media. Each is a single act that, under Pembaur, constitutes official County policy. This is the most direct and decisive route to Monell liability on the record.

**2. Ratification by complete institutional inaction independently establishes Monell liability.**

111. Ratification is established when an authorized policymaker, with knowledge of the violation, approves a subordinate's conduct and the basis for it. Praprotnik, 485 U.S. at 127; Grandstaff v. City of Borger, 767 F.2d 161, 171 (5th Cir. 1985); Bennett v. City of Slidell, 728 F.2d 762, 767-68 (5th Cir. 1984) (en banc).

112. This case is on the Grandstaff side of the line. The County has admitted: (a) no internal investigation, review, audit, or evaluation has been conducted regarding the May 17, 2023 search or the handling of Plaintiffs' property (Sheriff Interrog. No. 10 (Ex. H)); (b) no discipline, reprimand, or counseling has been imposed on any Individual Defendant (Sheriff Interrog. No. 5 (Ex. H); Sheriff RFP No. 4 Resp. (Ex. H)); (c) Sheriff Ingram personally went to Snellgrove's barn after the search, walked through the property, and photographed it; (d) the Department posted social-media praise of the operation on May 24, 2023; and (e) no Article 47.01a hearing was convened-ever, even after the criminal indictment was dismissed in November 2024. "[S]ubsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy." Grandstaff, 767 F.2d at 171.

113. The Fifth Circuit's caution against easy ratification findings in Peterson v. City of Fort Worth, 588 F.3d 838, 848 (5th Cir. 2009), is inapposite. Peterson warned that a policymaker who merely "defends" a subordinate's conduct does not necessarily ratify it. Here, by contrast, the policymaker himself was the actor-Ingram personally participated in and made the decisions challenged. Peterson's concerns do not arise where, as here, ratification is established not by post-event defense alone but by the policymaker's own contemporaneous and post-event conduct.

### 3. Failure to enforce written policies establishes deliberate indifference.

114. Failure to train or enforce can constitute deliberate indifference where the inadequacy is so obvious as to amount to a deliberate choice. City of Canton v. Harris, 489 U.S. 378, 388-89 (1989); Connick v. Thompson, 563 U.S. 51, 62 (2011); Brown v. Bryan County, 219 F.3d 450, 462 (5th Cir. 2000).

115. The Department's written manual required every safeguard whose absence in this case caused the deprivation: BWC activation during warrant execution (MCSO Policy Manual, Ex. B at 00014); two-officer handwritten inventory (id. at 00086, § 3.B); transport to the agency office (id. at 00086, § 3.D); lock-and-key storage in a secure area (id. at 00087, § 3.I); evidence marking (id. at 00087, § 3.H); expert accounting for specialty property (id. at 00086, § 3.C); property-room delivery (id. at 00087, § 3.J); annual audits (id. at 00011 & 00093); semiannual and quarterly inspections (id. at 00092-00093, § 11.B); unannounced inspections (id. at 00093); and disclosure of civilian financial motivations (id. at 00037, § B.3). Sheriff Ingram admits none of these requirements was followed in this case.

116. Ingram further admits that the policy-required annual audits, inspections, and accountability procedures were never performed at all-not just in this case, but as a department-wide pattern. (Id.) This is not a single-incident failure to follow a written policy; it is the chronic non-enforcement of an entire system of evidence safeguards. Combined with the County's admitted failure to investigate or discipline after the fact, the record establishes deliberate indifference under Canton and Estate of Davis.

### 4. Custom or practice of nonenforcement.

117. A "persistent, widespread practice" that fairly represents municipal policy supplies a fourth pathway. Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984) (en banc); Pena v. City of Rio Grande City, 879 F.3d 613 (5th Cir. 2018). The admitted department-wide noncompliance with the written manual-audits never performed, inspections never conducted, accountability procedures never maintained-is precisely the kind of pattern that fairly represents the County's actual policy: a de facto practice of non-enforcement that left line officers free to do what they did here.

### 5. The Body-Worn Camera Failures Confirm Objective Unreasonableness, Bad Faith, and Monell Deliberate Indifference.

118. Sheriff Ingram has admitted that he chose not to activate his body-worn camera in violation of the Department's written policy because, in his own words, he "didn't want to" and "didn't have to." Investigator Dahl deliberately ceased recording before the bulk seizure, and his footage contains an unexplained two-hour gap immediately before Snellgrove's arrival. No body-worn camera footage from any other officer at the scene has been produced. (Id.)

119. Under Guzman v. Jones, 804 F.3d 707, 713 (5th Cir. 2015), and King v. Illinois Central Railroad, 337 F.3d 550, 556 (5th Cir. 2003), bad-faith spoliation can support an adverse inference that missing evidence would have been unfavorable to the spoliating party. Federal Rule of Civil Procedure 37(e)(2) also permits adverse-inference relief when electronically stored information is lost with intent to deprive another party of its use. Plaintiffs preserve their right to seek such relief. But the Court need not draw any plaintiff-favorable inference to grant this motion. The relevant facts are themselves admitted: the Department's policy required recording; Ingram chose not to record because he "didn't want to" and "didn't have

to"; Dahl stopped recording before the bulk seizure and transport; and no other officer footage has been produced.

120.    Three doctrinal consequences follow. First, Defendants should not be permitted to manufacture a factual dispute by relying on evidentiary gaps created by their own admitted failure to record and preserve required footage. Second, the deliberate non-recording and deactivation are probative of consciousness of unlawfulness. A reasonable officer who believed his conduct was lawful would have no legitimate reason to disable or avoid the recording device his department's written policy required for warrant execution, searches, and evidence seizure. Third, the Department's admitted failure to enforce its BWC policy supplies institutional evidence of deliberate indifference for Monell purposes.

### CONCLUSION

121.    On the most fundamental Fourth Amendment principles, articulated in decisions ranging from Marron (1927) to Taylor v. Riojas (2020) and embracing nearly four decades of binding Fifth Circuit precedent on materially indistinguishable facts in Creamer v. Porter, the Individual Defendants violated Plaintiffs' clearly established constitutional rights when they exceeded a two-item warrant to seize fifty-one categories of property valued at $283,445, conscripted the complaining witness into the execution team, failed to read the warrant, and transferred custody of disputed property to the complainant's private barn across county lines without the magistrate's order required by Texas law. Defendants' own sworn admissions establish every element of the violations. Defendants' sworn admissions reinforce that no reasonable officer could have believed the seizure of property outside the warrant, without independent legal justification, was lawful.

122. Procedural due process was violated by the deliberate, policymaker-authorized bypass of mandatory pre-deprivation procedures codified in Articles 18.10 and 47.01a of the Texas Code of Criminal Procedure-foreclosing any *Parratt-Hudson* defense under *Zinermon v. Burch*. The conspiracy to accomplish those violations is documented in the May 15, 2023 text exchange and in defendants' own sworn admissions of coordinated action. And Martin County is liable on every Monell pathway through the decisions of its admitted final policymaker, through its complete post-event ratification, and through its admitted chronic non-enforcement of the very policies promulgated to prevent this deprivation.

123. For the foregoing reasons, Plaintiffs respectfully request that the Court:

124. **GRANT** partial summary judgment in favor of Plaintiffs and against Defendants Brad Ingram, Anders Dahl, Kelsey Brown, Weston Phelps, and Rory Gammons on the issue of liability on Count 1 (§ 1983 Unreasonable Seizure / Execution Beyond Scope), Count 2 (§ 1983 Procedural Due Process), and Count 3 (§ 1983 Conspiracy);

125. **GRANT** partial summary judgment in favor of Plaintiffs and against Defendant Martin County, Texas on the issue of liability on Count 4 (Monell);

126. **RULE** that the affirmative defense of qualified immunity is unavailable to the Individual Defendants on Counts 1, 2, and 3 as a matter of law;

127. **RESERVE** for trial all issues of damages, including compensatory, punitive, and exemplary damages; and

128. **GRANT** such further relief, at law or in equity, as the Court deems just and proper, including reasonable attorneys' fees and costs under 42 U.S.C. § 1988 upon entry of final judgment.

Respectfully submitted,

/s/ Kurt Mueller

_____

**Kurt Mueller**
Texas Bar No. 24133133
The Kurt Mueller Law Firm PLLC
565 S Mason Rd PMB 223
Katy, Texas 77450
(713) 360-2110
kurt@kurtmuellerpllc.com

**ATTORNEY FOR PLAINTIFFS**