**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND / ODESSA DIVISION**

| | | |
|---|---|---|
| **AUSTIN HAMBLIN and KISKA HAMBLIN** | § | |
| | § | |
| **VS.** | § | |
| | § | **NO.    7:25-cv-00245** |
| **MARTIN COUNTY, TEXAS** | § | |
| | § | |
| **BRAD INGRAM,** | § | |
| | § | |
| **ANDERS DAHL,** | § | |
| | § | |
| **KELSEY BROWN,** | § | |
| | § | |
| **RORY GAMMONS,** | § | |
| | § | |
| **WESTON PHELPS, and** | § | |
| | § | |
| **BRIAN SNELLGROVE** | § | |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**<u>INTRODUCTION</u>**

1. Plaintiffs Austin Hamblin and Kiska Hamblin move under Federal Rule of Civil Procedure 56 for partial summary judgment on liability against every Defendant. Plaintiffs seek judgment on Count 1 for violation of the Fourth Amendment, Count 2 for procedural due process violations, Count 3 for civil conspiracy under 42 U.S.C. § 1983, Count 4 for municipal liability against Martin County, and Counts 5, 7, and 8 against Defendant Brian Snellgrove for conversion, abuse of process, and liability under the Texas Theft Liability Act. Plaintiffs reserve damages, punitive damages, attorney's fees, costs, and any equitable relief for later determination.

2. The undisputed record is unusually clean because the core facts come from Defendants' testimony, admissions, and written discovery. A Texas district judge issued a warrant

authorizing officers to search for and seize two items: a Snap-On Plasma Cutter Model 301 and a Snap-On Air Compressor. The warrant did not authorize seizure of all Snap-On merchandise, all mechanic tools, all toolboxes, all property claimed by Snellgrove, or all items that might be useful in a later civil ownership dispute. Yet the seizure expanded into at least fifty-one categories of property, including ordinary tools, containers, promotional items, non-Snap-On items, and household-like items. Snellgrove's itemized inventory valued the seized property at $283,445; Sheriff's Office paperwork and the public post elsewhere reflected approximately $283,000. Because the record lacks a complete item-by-item inventory with all contents and serial numbers, the total number of individual items taken cannot be determined from the paper record.

3.  This was not a close-call execution of a broad warrant. It was a general search and private repossession under color of law. Ingram never personally read the warrant. Dahl drafted the affidavit and later swore that he "conscripted" Snellgrove to appear, identify property, and store it at Snellgrove's business. Brown only looked over the warrant and admits Kiska said to be quiet or leave because children were present. Gammons did not read the warrant and described his residential search as a consent search, while his responses also admit that one or both Plaintiffs objected to specific seizures and asserted ownership. Phelps opened the official theft case based on Snellgrove's and Nichols' claims, and the Department did not conduct meaningful independent corporate, serial-number, ownership, or valuation verification before the seizure. Snellgrove then stored the property in his own barn and later sold or integrated at least some property into his business after an unwritten release.

4.  The case also presents a municipal-liability record that is stronger than the usual *Monell* case. Ingram was not merely a supervisor whose deputies made mistakes. He was the elected sheriff, the final policymaker for the Sheriff's Office, physically present during the search,

personally responsible for allowing Snellgrove to participate, personally responsible for allowing the property to be transported across county lines, personally responsible for the decision to store the property in the purported victim's private barn, and personally responsible for a no-process disposition that bypassed Texas statutes and the Department's written policy manual. He participated directly at every step. His decisions comprise that of the County. His presence and active involvement ratified what the deputies did. And the Department's total post-event inaction -- no internal investigation, no audit, no discipline, no corrective training, no reliable inventory, no complete chain of custody, and no recovery of the property -- confirms deliberate indifference and ratification.

5. The Fourth and Fourteenth Amendment violations were clearly established long before May 17, 2023. *Creamer v. Porter*, 754 F.2d 1311 (5th Cir. 1985), controls;  in that case, officers with a warrant for two televisions found them, kept searching, seized extra items, and lost qualified immunity. *Wilson v. Layne*, 526 U.S. 603 (1999), and *Bills v. Aseltine*, 958 F.2d 697 (6th Cir. 1992), foreclose the use of a private claimant to search for property beyond the warrant. *Horton, Garrison,* and *Hicks* foreclose plain view because ordinary tools are not contraband and ownership was not immediately apparent. *Randolph, Fernandez, Groh, Fuentes, Soldal,* and *Zinermon* foreclose the consent, warrant-reliance, and due-process defenses.

## SUMMARY JUDGMENT EVIDENCE

6. Plaintiffs rely on the following summary-judgment exhibits. All citations in this motion use these exhibit letters and the cited page or deposition page-and-line reference:

    a. Exhibit A - Oral and Videotaped Deposition of James Bradley Ingram, taken January 15, 2026.

    b. Exhibit B - Oral and Videotaped Deposition of Brian Snellgrove, taken April 10, 2026.

c.  Exhibit C - Search Warrant issued May 16, 2023, for 3700 Hamilton, Big Spring,

Texas.

d.  Exhibit D - Affidavit of Anders Dahl concerning his role in the search and

Snellgrove's conscription.

e.  Exhibit E - Martin County Sheriff's Office offense and supplemental reports for

Case No. 23-0135 & Inventory list for property seized at 3700 Hamilton on May 17,

2023.

f.  Exhibit F - Text messages and related correspondence between Snellgrove and

Ingram

g.  Exhibit G - Warren Kniepkamp sworn statement and item list.

h.  Exhibit H - Martin County Sheriff's Office Policy Manual.

i.  Exhibit I - Defendant Brad Ingram's Responses to Plaintiffs' Discovery Requests.

j.  Exhibit J - Defendant Anders Dahl's Responses to Plaintiffs' Discovery Requests.

k.  Exhibit K - Defendant Kelsey Brown's Responses to Plaintiffs' Discovery Requests.

l.  Exhibit L - Defendant Rory Gammons's Responses to Plaintiffs' Discovery

Requests.

m.  Exhibit M - Defendant Weston Phelps's Responses to Plaintiffs' Discovery Requests.

n.  Exhibit N - Defendant Martin County Sheriff's Responses to Plaintiffs' First and

Second Discovery Requests.

7.  Rule 36 admissions are conclusive unless withdrawn or amended. Fed. R. Civ. P. 36(b).

Defendants have not withdrawn the admissions on which this motion relies. To the extent

any Defendant now submits a contrary affidavit or unsworn argument, the admissions and

sworn deposition testimony control. See *Am. Auto. Ass'n v. AAA Legal Clinic of Jefferson*

4

*Crooke*, *P.C.,* 930 F.2d 1117, 1120 (5th Cir. 1991); S.*W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996).

## UNDISPUTED MATERIAL FACTS

**A) The parties, the relationship between Ingram and Snellgrove, and the pre-search plan.**

8.  Defendant Brad Ingram was the elected Sheriff of Martin County during the events at issue. Ex. A at 5:10-13. He confirmed under oath that, when he was sheriff, he was the final policymaker for the Sheriff's Office. Ex. A at 7:21-24. The Sheriff's Office likewise admitted in discovery that Ingram was the final policymaker for execution of search warrants and handling of seized property in May 2023. Ex. N at 13 (RFA No. 6); Ex. A at 7:21-24.

9.  Defendant Brian Snellgrove owns and operates Snellgrove Enterprises, the entity through which he operated the Snap-On franchise involved in this case. Ex. B at 7:5-10; 8:14-16. At the time of his deposition, he was also a Martin County Commissioner with budget oversight responsibilities for county spending. Ex. B at 7:8-19; 74:17-24. His home address and business address were the same property: the residence sat at the front and the Snap-On warehouse sat at the back. Ex. B at 6:20-24; 9:5-17. The warehouse was roughly 10,000 square feet and held 'all the inventory for Snap-on tools.' Ex. B at 9:18-10:2. Austin had worked for Snellgrove since approximately 2019, served as the manager of the 5F mobile route, operated a point-of-sale store, and was paid commissions on sales. Ex. B at 20:14-21:6; 21:18-22:20. Austin Hamblin was not some marginal employee whose possession of tools was inherently suspicious; by Snellgrove's own testimony, Austin was "probably absolutely the best employee" he ever had for sales, was Snellgrove's "best performing rig," was recognized for outstanding sales multiple times, achieved Platinum Elite status, and achieved Top 100 nationally status. Ex. B at 23:16-22; 78:15-16; 84:3-13.

10. Ingram and Snellgrove were not strangers. Ingram admitted that he attended Bible study at the Snellgroves' residence for three or four months. Ex. A at 46:14-20. Snellgrove described the relationship as 'acquaintances, small town friends' and confirmed that they attended Bible study together. Ex. B at 81:2-4. The Department admitted it was aware of a personal relationship or prior dealings between Ingram and Snellgrove outside official law-enforcement business. Ex. N at 16 (RFA No. 26).

11. The investigation did not begin with a neutral law-enforcement assessment. Ingram admitted that the Sheriff's Office and Snellgrove had been talking for 'several months' before Snellgrove filed the formal report. Ex. A at 9:23-25. Ingram also admitted the Office told Snellgrove before the search that it 'might need some help with that much property' and that Snellgrove agreed to be there. Ex. A at 10:2-6. This was not after-the-fact citizen assistance. It was planned participation by the complaining witness in the execution of a search warrant against his then active employee.

12. The contemporaneous text messages show the same plan. On May 15, 2023, two days before the search, Snellgrove texted Ingram: 'If it's ok I'd like to visit about timing of all that needs to go down. Brian.' Ingram replied: 'Let me check and see where we are.' Ex. A at 113:19-114:12; Ex. B at 122:14-123:8; Ex. F at 1-7. That exchange is direct evidence of pre-search coordination, timing, and agreement. After the search, Ingram texted Snellgrove asking how he was doing after he had a chance to slow down. Ex. A at 114:14-24. On June 7, 2023, Ingram texted 'Hamblin arrested'; Snellgrove responded 'Thx' with a thumbs-up. Id.; Ex. F at 1-7. On June 29, 2023, Snellgrove asked for a report for use in Austin's unemployment proceeding. Ex. B at 124:3-20. These communications are inconsistent with an ordinary arms-length complainant relationship.

13. Other text messages further undermine Defendants' claim that ownership was immediately apparent. On the morning of the search, Snellgrove sent Dahl photographs of seized tool cabinets and wrote about one item: 'That might have been his personal or a trade-in he took and didn't tell me about.' Ex. A at 118:11-24; Ex. B at 130:3-18; 131:7-11. Thus, before and during the operation, Snellgrove himself acknowledged uncertainty over whether particular Snap-On items were Austin's personal property or otherwise legitimately acquired. Probable cause cannot be 'immediately apparent' when the complaining witness is texting that an item might lawfully belong to the target.

**B) The investigation was built on unverified private claims and a private valuation.**

14. On May 11, 2023, Snellgrove and employee Andrew Nichols met with Deputy Phelps at the Martin County law-enforcement center to report alleged theft by Austin. The offense report opened Case No. 23-0135 and identified the charge level by using the value supplied by Snellgrove. Ex. E at 1 (item 7); 3 (after item 22) (reflecting a value of $283,000+). Phelps did not interview Austin or Kiska before the seizure, did not contact the customer referenced in the 'zeroed-out' ticket theory, did not obtain Snap-On corporate records, and did not review independent financial records. Phelps adopted Snellgrove Enterprises as the victim and treated Snellgrove's claimed value as the value of the alleged theft.

15. On May 15, 2023, Investigator Dahl interviewed Snellgrove. Snellgrove then represented that his loss was approximately $200,000. Ex. E at 1 (item 7); E at 3 (after item 22) (reflecting a value of $283,000); Ex. A at 30:15-18. On May 16, 2023, Snellgrove provided emails containing serial numbers for items he claimed were missing. But the Sheriff's Office did not independently confirm those serial numbers with Snap-On corporate. Ingram admitted the Department did not subpoena business records from Snap-On corporate, did not speak with Snap-On corporate about serial numbers, did not review any receipt or bill of

7

sale showing that the serial-numbered items belonged to Snellgrove, did not conduct independent serial-number ownership inquiries, and did not perform independent research to verify the $283,445 valuation. Ex. A at 29:6-13; 31:2-5; 50:7-19; 67:23-68:4.

16. The valuation was Snellgrove's number. Ingram admitted that the Department took Snellgrove's word about what Snap-On property cost. Ex. A at 30:15-18. The post-search text messages confirm the same. Snellgrove texted Dahl after the seizure that he had emailed a list valuing the property at $283,445, and the County accepted that number. Ex. A at 120:14-22. That private valuation became the public criminal narrative and the County's social-media statement. Ex. A at 73:17-74:25.

17. The record also shows why valuation and ownership were disputed, not immediately apparent. Snellgrove admitted that many large Snap-On items have serial numbers and that serial numbers should be placed with end-user sales documents. Ex. B at 20:6-13; 58:10-14. Yet the inventory prepared after the seizure did not document serial numbers, Snellgrove did not perform a serial-number trace at the scene, and he later testified that he had no list of seized serial-numbered items and no longer had documentation that would allow Plaintiffs to trace them. Ex. B at 57:2-21; 59:15-60:4; 97:22-25. He also admitted that Austin was a point-of-sale operator on a mobile Snap-On truck and was paid salary plus commissions on sales. Ex. B at 20:16-21:6; 22:16-20. A mechanic and Snap-On route employee possessing tools is not inherently suspicious. It is ordinary.

18. Third-party provenance was also ignored. Snellgrove knew Austin's father-in-law, Warren Kniepkamp, was also a Snap-On distributor, and admitted it was theoretically possible Austin could have purchased or acquired items from him. Ex. B at 31:16-32:16. Kniepkamp later provided a sworn statement that he had supplied Austin with listed items before May 2023. Ex. G at 1-4. Snellgrove recognized the document, described it as a document from

Warren Kniepkamp stating that Warren had provided tools to Austin, testified he had no specific reason to dispute its truth, and admitted those items were never returned. Ex. B at 104:13-105:4.

**C) The one-page warrant authorized only two items.**

19. On May 16, 2023, Judge Shane R. Seaton issued the warrant. The warrant described the Hamblin home at 3700 Hamilton, Big Spring, Howard County, Texas, and commanded officers to search for and seize 'a Snap-On Plasma Cutter model 301 and a Snap-On Air Compressor, and to seize the same and bring it before me.' Ex. C at 1; Ex. A at 36:22-25. The warrant did not authorize seizure of all Snap-On items, all tools, all toolboxes, any property Snellgrove claimed, any property valued by Snellgrove, any evidence of theft generally, or any documents or containers.

20. Several Defendants did not even read the warrant. Ingram admitted in discovery and deposition that he never personally read it. Ex. I at 3 (Interrog. No. 2); Ex. I at 11 (RFA No. 4); Ex. A at 10:11-19; 36:10-13. Brown admitted she only 'looked over' the warrant at the pre-search briefing. Ex. K at 3 (Interrog. No. 2). Gammons admitted he did not read it and was only briefed by other officers. Ex. L at 3 (Interrog. No. 2); Ex. L at 11 (RFA No. 4). Phelps admitted he did not read it. Ex. M at 3 (Interrog. No. 2). Snellgrove admitted he did not review it before, during, or in any meaningful way after the search. Ex. B at 45:14-25. A search team cannot reasonably stay within the limits of a warrant that the sheriff, the private participant, and key deputies did not read.

**D) The warrant items were found before the entry into the home and before the expanded seizure.**

21. On May 17, 2023, at least Ingram, Dahl, Brown, Chief Deputy Metcalf, and a Howard County deputy identified as Gammons went to the Hamblin residence. Ex. A at 8:19-22. The

9

search began around 8:00 a.m. and continued into the afternoon. Ex. A at 36:4-6. Defendants located the two items described in the warrant -- the plasma cutter and air compressor -- in outbuildings before the main residence was searched. Snellgrove confirmed that he saw the items the police were looking for, including the air compressor, before he and the officers went into the house. Ex. B at 47:7-48:17.

22. Dahl later put the legal reality in his own words: 'I **conscripted** Brian Snellgrove to aid in the execution of the search warrant by requesting him to appear at the location where the warrant was executed, identify the property subject to the warrant, and store such property at his place of business located at 2100 Westside Drive, Stanton, Texas 79782, under my control and supervision.' Ex. D at 1 ¶ 4 (emphasis added). The word 'conscripted' is not Plaintiffs' embellishment. It is Dahl's sworn description of what he did.

23. Snellgrove's testimony confirms the conscription. Officers called him the morning of the search, told him they had found more property than expected, and asked him to come identify merchandise. Ex. B at 39:10-18. Officers also told him they did not have anything to haul large items and asked him to bring trailers or a truck; he brought two trailers, a pickup, and an older truck converted for toolbox display. Ex. B at 39:19-40:8. At the scene, he testified that he was asked to identify whether merchandise possibly belonged to him, that an officer was present at all times, that Dahl was the main officer present during identification, and that once Austin and the officers discussed the property he was 'directed by the officers to begin to load those items up.' Ex. B at 41:21-23; 45:4-13; 50:1-6. Snellgrove and his employee Randy Jones physically loaded and transported property under deputies' directions. Ex. B at 50:23-51:3; 111:18-112:16.

24. The expanded search included the home and containers. After Snellgrove saw the items police were looking for in the backyard or shed, he went into the house only as directed by

10

deputies, went into all rooms (possibly excepting the bathroom), and looked for additional branded items that deputies asked him about. Ex. B at 47:6-48:25; 49:1-4. In the tool shed, he opened drawers and saw hand tools. Ex. B at 43:4-10. Inside the house, he testified that he probably opened tool-storage drawers, that he saw personal items inside, and that an officer was present. Ex. B at 44:14-45:7. Ingram likewise admitted that cabinets on wheels were opened and contained personal items of the children. Ex. A at 52:7-17. Snellgrove also directed the seizure of a child's black toolbox in the son's bedroom because it 'said Snap-On on it,' even though the toolbox was standard and he did not recall Austin specifically identifying that toolbox as Snellgrove's. Ex. B at 108:11-109:16. The seizure therefore extended not only beyond the warrant's items but into rooms, drawers, and containers that had nothing to do with locating a plasma cutter or air compressor, and certainly places too small to contain the warrant authorized items.

**E) Kiska Hamblin was physically present and objected.**

25. Brown only looked over the warrant at the pre-search briefing and was present for security. Ex. K at 3. During the search, Kiska told officers to be quiet or leave because children were present. Ex. K at 4. Gammons admitted that Austin or Kiska objected to the seizure of one or more specific items and asserted that the items belonged to Plaintiffs, not Snellgrove. Ex. L at 12 (RFA No. 10).

26. The objection matters in two independent ways. First, it defeats any consent theory after the warrant items were located. Second, it destroys any claim that the ownership and incriminating character of additional tools was immediately apparent. A wrench, socket, pliers, roll cabinet, or child's toolbox on a mechanic's property is not contraband. When a present co-occupant objects and asserts ownership, officers do not have probable cause

11

merely because the complaining witness wants the property. *Horton v. California*, 496 U.S. 128, 136-37 (1990); *Georgia v. Randolph*, 547 U.S. 103, 106, 122-23 (2006).

**F) Defendants seized fifty-one categories of property valued by Snellgrove at $283,445.**

27. The inventory lists fifty-one categories of seized property. Ingram confirmed under oath that the list contains fifty-one items and states a total value of $283,445. Ex. A at 48:3-8. Because the warrant named two items, Ingram admitted that at least forty-nine items not listed in the warrant were seized. Ex. A at 49:22-23. The inventory includes, among other things, roll cabinets, tool chests, wrenches, pliers, socket sets, soldering and riveting tools, extensions, bolt cutters, a grease gun, storage lights, product boxes, a lawn chair, an iPhone, a parts washer, welders, welding tables, floor jacks, tray tables, a popcorn maker, a bump-box speaker, a motorized bicycle, and other tools and equipment. Ex. E at 1-3.

28. Many items were not immediately incriminating. A Snap-On 1 1/2-inch wrench does not reveal ownership. A Blue Point socket set does not reveal theft. A Dremel set and Harbor Freight tool are not Snap-On products at all. A popcorn maker, promotional chair, bicycle, and child's toolbox are ordinary property unless the government has proof tying them to a crime. No such proof was obtained before seizure. The fact that some items bore a Snap-On logo established manufacturer and branding -  not stolen status, not ownership, and not a right to seize.

29. The seizure also swept up unidentified contents of containers. Snellgrove admitted that non-branded tools were seized because they were inside tool cabinets. Ex. B at 103:13-19. That is fatal to the plain-view theory. The incriminating character of an unidentified tool inside a cabinet is not immediately apparent from outside the cabinet, and a private claimant cannot convert a container into his property with a naked, unsupported the cabinet belongs to him because he says so.

**G) The purported methamphetamine is untested, not relevant, and not a plain-view justification.**

30. In various filings, Defendants have referred to a substance allegedly seized during the search as 'methamphetamine' or 'meth.' Plaintiffs preserve and assert a continuing objection to that characterization. The record does not contain competent laboratory testing or other admissible proof establishing what the substance was. Ingram testified that he did not know whether any drug test was performed on any items taken. Ex. A at 51:1-3. Defendants have not produced a test result tying the substance to methamphetamine. For purposes of this motion, it should be described only, if at all, as an unidentified and untested substance.

31. The unidentified substance also does not rescue the search or seizure of Plaintiffs' tools. It was not one of the two items listed in the warrant. It was not discovered in the outbuildings as part of locating the plasma cutter or air compressor. It was discovered only after the search continued beyond the warrant items and after Kiska's continuing objection. Gammons describes his role as having 'secured the residence' and then having conducted a 'consent search' in which he found narcotics and a firearm. Ex. L at 3 (Interrog. No. 3). Brown similarly described locating so-called drugs and enlisting a Howard County deputy. Ex. K at 3-4 (Interrog. No. 4). That is a separate asserted consent search, not authority to seize hundreds of tools and tool-related items for Snellgrove.

32. Nor is the unidentified substance relevant to whether Defendants lawfully seized, transported, stored, released, and disposed of Plaintiffs' voluminous property. Calling it 'meth' would be prejudicial and immaterial to the dispositive issues: the warrant listed two tool-related items; officers found those items; Kiska objected to further entry and seizures; Defendants used a private claimant to identify and remove property beyond the warrant; and

13

the property was then stored and released without process. The Court should disregard the label and any attempted inflammatory use of that evidence in resolving this motion.

**H) The property was transported across county lines to the purported victim's barn and released without process.**

33. After the seizure, the property was not taken to a law-enforcement evidence facility. It was loaded onto Snellgrove's private trailers and trucks and transported from Howard County, where the Hamblin home was located, across county lines to Snellgrove's private commercial premises in Martin County. Ex. B at 51:7-18; 53:2-21; 112:1-16; 113:3-9. Ingram admitted that he personally made the final decision to allow Snellgrove to transport the property and the final decision to allow Snellgrove to store it at his barn. Ex. A at 58:25-59:6. He admitted the property was removed from Howard County to Martin County and that no magistrate order authorized the removal. Ex. A at 69:11-70:7; 92:15-93:12. The Sheriff's Office admitted the property was removed from Plaintiffs' home and given to Snellgrove without a court order, without notice to Plaintiffs, and without a judicial determination that Snellgrove was the owner. Ex. N at 16 (RFA No. 29).

34. This storage decision created an obvious conflict of interest. The purported victim became the custodian of the evidence while his accusation was pending, while ownership was disputed, and while Plaintiffs had no hearing. A claimant with a commercial incentive to keep the property controlled access, business records, employee contact, and eventual disposition. The Constitution, Texas evidence statutes, and fundamental fairness required neutral custody, not storage in the claimant's barn.

35. The barn was not a neutral evidence facility. Snellgrove admitted prior thefts at the property, including an unresolved hard-drive incident involving an inventory list related to this case, and acknowledged that multiple business employees had access to the warehouse. Ex. B at

14

54:8-13; 55:2-12. Ingram admitted he did not consider marking or segregating a police-controlled evidence area at the barn. Ex. A at 59:7-10. Storing disputed evidence with the claimant predictably destroyed neutral custody. The County could have rented a storage locker from any number of commercial facilities if they lacked storage capacity in their evidence locker. Their failure to do so and entrusted the property to the care of the purported victim was a purposeful and calculated decision.

36. The disposition was just as deficient. Snellgrove testified that Sheriff Ingram and Dahl told him the property was released to him, but there was no written judicial order, no written prosecutor authorization produced, no notice to Plaintiffs, and no Chapter 47 hearing. Ex. B at 73:3-74:16; Ex. A at 92:15-93:12. Before the criminal case was even concluded, Snellgrove had put the seized items back into sellable inventory and sold, integrated, or otherwise disposed of property without an item-by-item disposition trail. Ex. B at 86:1-87:8; 96:25-97:7.

**I) Plaintiffs were denied notice and a hearing to contest ownership.**

37. No court ever held a hearing under Chapter 47 of the Texas Code of Criminal Procedure to determine who had the right to possess the disputed property. Ingram admitted there was no court order releasing the property to Snellgrove and no court hearing determining ownership / right of possession. Ex. A at 13:15-21. He admitted the County did not know what notifications or hearing information were given to the Hamblins, that he did not know whether Plaintiffs were told the property was kept at Snellgrove's, that no written Chapter 47 notice was provided, and that the Sheriff's Office had no policy of sending written notices identifying where seized property was stored. Ex. A at 64:10-19; 71:23-72:11; 73:3-6. Snellgrove likewise testified that he was never told of any process for contesting property

15

ownership / right of possession and had no understanding of Chapter 47 or Article 18.10. Ex. B at 104:1-8; 105:6-10.

38. Kiska emailed Dahl seeking a complete inventory, identifying non-Snap-On items, and informing Dahl that receipts existed. The government produced only a partial inventory and stopped meaningfully responding. The criminal case was later dismissed for insufficient evidence on November 13, 2024, but even then no Chapter 47 hearing occurred, no property was returned, and no Defendant took corrective action. The deprivation became permanent not through judicial process, but through Defendants' private handoff and release of the property to Snellgrove.

**J) The Department violated mandatory statutes, ministerial duties, and its own manual.**

39. Texas law imposed nondiscretionary duties. Article 18.10 required the seizing officer to return the warrant, provide an inventory, retain custody until the magistrate ordered the manner of safekeeping, and obtain a magistrate's order before removing property from the county where it was seized. Tex. Code Crim. Proc. art. 18.10. Article 18.11 likewise provides that property seized pursuant to a search warrant shall be kept as provided by a magistrate's order issued under Article 18.10. Tex. Code Crim. Proc. art. 18.11. Article 47.01 and Article 47.01a provide the framework for stolen-property possession determinations, including a hearing when no criminal action is pending. Tex. Code Crim. Proc. arts. 47.01, 47.01a. These are not suggestions. They are 'shall' duties and court-order requirements.

40. The Department's own manual independently required neutral evidence handling. The General Duties policy required officers to use the Texas Code of Criminal Procedure and Penal Code as guidelines for actions and responses, to preserve rights and property, to know and obey orders, and to use proper means to gain proper ends. Ex. H at 5-10. The manual warned that employees assigned to an incident where a complainant or suspect is considered

16

a friend or relative must contact a supervisor and that supervisors should reassign the incident if warranted. Ex. H at 9. It required officers to be careful that actions are in accordance with current law and to guard against use of office or person in any improper or illegal action. Ex. H at 10.

41. The Policy Manual's Property and Evidence policy required officers to make a handwritten inventory at the scene of seizure, required two officers to conduct and sign the inventory if available, allowed use of an expert when professional expertise was needed for proper accounting, required seized property to be transported by the officer to the appropriate agency office, and required secure storage and property-room handling. Ex. H at 86-87. None of that happened. Ingram admitted the chain-of-custody records were 'probably none,' that he did not know where the handwritten inventory was, that two officers were available but he did not know whether two officers conducted or signed the inventory, that no expert accounting was used, and that the property was not transported to the appropriate agency office or delivered to the property room. Ex. A at 84:13-85:25; 86:1-12; 90:6-11. Ingram further admitted he did not limit access to the barn, not all evidence was marked, and when the policy deviations were identified no immediate investigation occurred because 'everyone knew what was happening.' Ex. A at 88:10-89:19; 91:4-16.

42. The manual also required audits and inspections of the property-and-evidence system. It called for annual audits, inspections, and unannounced checks. Ex. H at 11, 92-93. Ingram admitted those audits and inspections were not performed, citing manpower problems. Ex. A at 79:2-5; 96:17-97:25. A policy that exists only on paper is not a policy at all; it is evidence of deliberate indifference when the final policymaker knowingly does not implement it.

43. The body-worn camera violations were equally stark. The MCSO policy required recording searches and seizures and prohibited turning cameras off during citizen contact or law-

enforcement events. Ex. H at 14. Yet only Dahl produced footage, and the produced footage does not show the full interior search, item-by-item seizure, loading, transport, barn storage, release, or disposition. Ingram admitted cameras were to be worn and activated, but he chose not to wear one because he did not want to and did not have to. Ex. A at 31:19-25; 33:6-16. Brown did not activate a camera. Ex. K at 12 (RFA No. 18). The missing footage is not a defense; it is proof that policy was not enforced.

44. Finally, no internal investigation, review, audit, evaluation, discipline, corrective action, or new training followed this event. Ex. N at 6 (Interrog. No. 10); Ex. N at 11 (RFP No. 19). The County therefore not only failed in the moment; it ratified the failure afterward.

**K) The timeline confirms a planned private repossession, not a neutral evidence seizure.**

45. The chronological record defeats any claim that the over-seizure was an accident. Ingram and Snellgrove had talked for months; the Department told Snellgrove it might need help with 'that much property'; and on May 15 Snellgrove asked Ingram to discuss the timing of 'all that needs to go down.' Ex. A at 9:23-10:6; 113:19-114:12; Ex. F at 1-7. The warrant was not issued until May 16 and the search occurred on May 17. Planning for a large property removal therefore preceded any lawful discovery of property beyond the two warrant items. They had the time and knowledge of the need of storage space; their failure to secure storage space from a commercial storage unit was an intentional choice.

46. The same timeline defeats the County's valuation narrative. Phelps and Dahl used Snellgrove's number; Ingram admitted the $283,445 value came from Snellgrove and that the Department did no independent valuation research, corporate-record subpoena, serial-number verification, or neutral appraisal. Ex. A at 29:7-12; 31:2-5; 50:17-19; 67:23-68:4. The Sheriff's Office social-media post then repeated the private value before any possession hearing or adjudication. Ex. A at 73:17-74:25.

47. The post-search texts likewise matter. On June 7, 2023, Ingram texted Snellgrove that 'Hamblin arrested,' and Snellgrove replied 'Thx' with a thumbs-up. Ex. A at 114:13-115:3. On June 29, 2023, Snellgrove asked Ingram for a copy of the report because Austin had filed for unemployment and Snellgrove needed it to dispute the claim. Ingram responded that he would have someone print a copy. Ex. F at 3; Ex. A at 114:24-115:3. In another exchange, when Snellgrove was shown an item and asked about it, he acknowledged it 'might have been his personal or a trade-in he took and didn't tell me about.' Ex. A at 118:11-24. That statement is an admission against the premise of immediate apparent ownership: even Snellgrove recognized that at least some property could be personal property or a trade-in rather than stolen inventory.

**L) The tool-specific facts foreclose probable cause for the expanded seizure.**

48. The over-seizure was not a technical variance between a model number and a substantially identical tool. It was a categorical expansion from two large items to an entire mechanic's tool collection. The post-seizure inventory did not even state a total item count; when counsel stated that Plaintiffs counted 607 items on Snellgrove's inventory, Snellgrove did not dispute that count. Ex. B at 56:4-23. Tools are, by their nature, lawful and common possessions. A mechanic's home containing wrenches, sockets, pliers, toolboxes, welders, chargers, storage cabinets, and diagnostic equipment is not suspicious merely because the tools are professional-grade. Austin worked in the automotive-tool business and as an automotive technician for years. The government therefore needed facts tying particular items to the alleged theft, not a generalized suspicion that any useful tool must belong to Snellgrove.

49. The record shows the opposite. Snellgrove testified that many large Snap-On items have serial numbers and that serial numbers should appear on sales documents. Ex. B at 20:6-13.

He also testified that the point of sale occurred on mobile trucks and that Austin was a point-of-sale employee. Ex. B at 20:15-21:6. Those facts made verification possible. Officers could have compared serial numbers to corporate records, customer invoices, franchise inventory, or the records of the truck Austin managed. They did not. Instead, they took items first and asked Plaintiffs for receipts later. That is not plain view; it is seizure first and investigation later.

50. The container searches make the violation worse. Once the plasma cutter and air compressor were found, no listed warrant item could be hidden inside ordinary small drawers, small boxes, or a child's toolbox. Yet the search and seizure continued through rooms, drawers, and containers. Snellgrove admitted that he opened drawers in the shed, probably opened tool-storage drawers in the house, saw personal items inside, and was accompanied by officers while doing so. Ex. B at 43:4-10; 44:14-45:7. He admitted non-branded tools were seized because they were inside tool cabinets, and that a child's toolbox was seized because it said Snap-On. Ex. B at 103:13-19; 108:11-109:16. Ingram admitted cabinets were opened and contained children's personal items. Ex. A at 52:7-17. That testimony confirms that officers were not using the warrant to locate the two listed items. They were using branding, containers, and Snellgrove's assertions to collect property.

51. A logo does not create probable cause. A Snap-On label shows who manufactured an item. It does not show who owns it. It does not show whether it was bought, gifted, traded, financed, or borrowed. It does not show whether the item came from Snellgrove, from Warren Kniepkamp, from another franchisee, from a customer, from a trade-in, or from Austin's years in the trade. The same is even more true for non-Snap-On items such as a Dremel set, Harbor Freight tools, or household and promotional goods. No reasonable officer could believe those items were immediately incriminating.

52. The contemporaneous demand for receipts confirms that Defendants themselves did not believe ownership was immediately apparent. If the property was plainly stolen, receipts would not have been necessary before the seizure. Asking Austin to later produce receipts for the District Attorney was an acknowledgment that the seizure involved disputed property. When ownership is disputed in real time, law enforcement must preserve evidence neutrally and seek judicial process. It may not hand the property to the disputing claimant.

**M) The chain-of-custody failure is independent evidence of the constitutional injury.**

53. The chain of custody was built to fail. The property went from Plaintiffs' home to Snellgrove's vehicles, to Snellgrove's barn, to his business inventory, and then to unknown destinations. No complete item-by-item chain-of-custody record identifies each custodian and transfer; Dahl cannot produce one; and the Department admits it cannot account for all items. That proves the deprivation was not temporary neutral evidence preservation. It was permanent loss through government-assisted private control.

54. The private inventory itself shows how far the seizure traveled from the warrant. Snellgrove testified that the inventory was created using his sales software because, in his view, only that system could identify part numbers; he and his employees began itemizing the seized property the same day as the search. Ex. B at 54:2-13; 56:16-23. The inventory did not state a total number of items, and it did not record serial numbers for the serial-numbered property. Ex. B at 56:4-13; 57:2-21. The official paperwork therefore converted hundreds of individual items into broad categories while leaving the most objective ownership identifiers undocumented.

55. The absence of a neutral evidence room also prevented Plaintiffs from meaningfully challenging the seizure. A Chapter 47 hearing is only meaningful if the property still exists, is identifiable, and is held by a neutral custodian. By placing the property into Snellgrove's

business warehouse, mixing it with his inventory, allowing employees access, and later verbally releasing it, Defendants destroyed the practical value of any later hearing. Due process requires a meaningful opportunity to be heard, not a theoretical hearing after the property has been sold.

56. The County's position also creates an intolerable conflict of interest. The complaining witness controlled the evidence, controlled access, controlled records, and controlled the eventual disposition. He had every incentive to characterize ambiguous items as his own and no neutral duty to preserve Plaintiffs' competing claim. Law enforcement cannot satisfy the Fourth or Fourteenth Amendment by outsourcing custody to the person who wants the property.

## SUMMARY JUDGMENT STANDARD

57. Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine only if a reasonable jury could return a verdict for the nonmovant on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant cannot avoid summary judgment through conclusory denials, speculation, or arguments that contradict binding admissions. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

58. When qualified immunity is asserted, Plaintiffs bear the burden to show that Defendants violated a constitutional right and that the right was clearly established. *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016). The clearly-established inquiry does not require a case with identical facts. Officials can be on notice where existing precedent places the constitutional question beyond debate or where the violation is obvious under general constitutional principles. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020).

22

This case satisfies both paths: *Creamer* and *Wilson/Bills* are materially close, and the general rule against turning a two-item warrant into a general search is obvious (Also Compare *Alexander v. Arceneaux*, No. 25-30016, slip op. at 10–12, 2026 WL 984347 (5th Cir. Apr. 13, 2026) [distinguishing, not overruling, *Creamer*; explaining that *Creamer* involved a warrant for "two specific items," that once those items were found "their search should have ended," and reaffirming *Creamer's* rule that "[t]here was no conceivable justification for the officers to continue the search after the items described in the warrant had been seized"])

**ARGUMENT**

**A) Defendants violated the Fourth Amendment as a matter of law.**

**A1) The seizure grossly exceeded the warrant.**

59. The Fourth Amendment requires that warrants particularly describe the things to be seized. U.S. Const. amend. IV. The particularity requirement prevents general searches and prevents officers from seizing one thing under a warrant describing another. *Marron v. United States*, 275 U.S. 192, 196 (1927); *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). A valid warrant's justifying purpose strictly limits the permissible extent of the search, and if the search exceeds the warrant's terms, the later seizure is unconstitutional without more. *Garrison*, 480 U.S. at 87; *Horton v. California*, 496 U.S. 128, 140 (1990).

60. *Creamer* controls this case. In *Creamer*, officers had a warrant for two stolen televisions. They found the televisions, continued searching the home and business for nearly three hours, and seized additional property not listed in the warrant. 754 F.2d at 1314. The Fifth Circuit held that only items described in a warrant may be seized, subject only to narrow exceptions for plain-view incriminating evidence or items with a sufficient nexus to the crime being

investigated. Id. at 1316. The court rejected qualified immunity because the search and random seizure exceeded the officers' discretionary authority. Id. at 1316-18.

61. This case is *Creamer* with a larger seizure, a private complainant on the search team, and a worse chain of custody. The warrant listed two items. Those two items were found. Defendants then seized at least forty-nine additional categories and hundreds of individual tools or contents valued by the complainant at $283,445. They seized ordinary tools, branded promotional items, non-Snap-On items, containers, and contents. That is a general search. It is precisely what the Fourth Amendment forbids.

**A2) Plain view cannot save the seizure.**

62. The plain-view doctrine permits seizure of an item not listed in a warrant only if the officer is lawfully present has lawful access to the item, and the item's incriminating character is immediately apparent. *Horton*, 496 U.S. at 136-37; *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987); *Texas v. Brown*, 460 U.S. 730, 741-42 (1983). 'Immediately apparent' means probable cause at the moment of seizure, not a hunch, not a brand name, not a private claimant's preference, and not a later possibility of proof. *Hicks*, 480 U.S. at 326.

63. A wrench is not contraband. A socket set is not contraband. A roll cabinet in a mechanic's shop or home is not contraband. A Snap-On logo shows who manufactured an item, not who owns it or whether it was stolen. A Harbor Freight tool and a Dremel set are even further removed because they are not Snap-On merchandise at all. A popcorn maker, chair, bicycle, child toolbox, or miscellaneous non-branded tool does not announce criminality by its appearance. The record confirms that Defendants knew ownership was disputed: Kiska or Austin objected to specific seizures and asserted ownership; Austin was told to provide receipts; Snellgrove himself texted that a tool case might be Austin's personal property or a trade-in. Those facts defeat plain view as a matter of law.

64. Defendants also lacked lawful access to the additional items after the warrant objective was complete. Once the plasma cutter and air compressor were located in outbuildings, the warrant no longer justified entry into rooms and containers where those already-found items could not be located. *Horton*, 496 U.S. at 140-41; *Garrison*, 480 U.S. at 87-88. The search of the residence, bedrooms, tool cabinets, and contents therefore required an independent justification. None existed.

**A3) Co-occupant objection defeated any consent theory.**

65. Defendants may characterize the continued search as cooperative or consensual. That fails. *Georgia v. Randolph* holds that a physically present co-occupant's express refusal of consent is dispositive as to that occupant, regardless of another occupant's consent. 547 U.S. at 122-23. *Fernandez* confirms that *Randolph* applies when the objecting occupant is physically present and objecting. 571 U.S. at 301-02. Kiska was present, asked for the warrant, objected, asserted privacy rights, and told officers to leave. Gammons nevertheless describes his entry as a 'consent search.' That is not valid consent under *Randolph*.

66. Plaintiffs do not contend that *Randolph* invalidated the original execution of the two-item warrant. The point is narrower: after the warrant items were found, the warrant no longer supplied authority to conduct a broader search for other property. At that point Defendants needed a new warrant, plain view, exigency, or valid consent. Kiska's objection defeated consent. Plain view was unavailable. There was no exigency. The continued search therefore violated the Fourth Amendment.

**A4) Conscripted private participation independently violated the Fourth Amendment and made Snellgrove a state actor.**

67. The Fourth Amendment prohibits officers from bringing third parties into a home during execution of a warrant when their presence is not in aid of the warrant's authorized

objectives. *Wilson v. Layne*, 526 U.S. 603, 611-14 (1999). *Wilson* specifically recognized *Bills v. Aseltine*, where the Sixth Circuit held that police may exceed a warrant's scope by allowing a private security guard to participate in a search to identify stolen property other than that described in the warrant. *Wilson*, 526 U.S. at 614; *Bills*, 958 F.2d at 709.

68. Dahl's affidavit removes any factual dispute. He 'conscripted' Snellgrove to appear, identify property, and store it at Snellgrove's business under law-enforcement control. Ex. D at 1 ¶ 4. Snellgrove brought vehicles and employees at law-enforcement request, entered the property and home, identified items, loaded property, transported it, stored it, and later sold or integrated it. This was not passive witness identification. It was active participation in a search, seizure, transport, storage, and disposition.

69. That participation makes Snellgrove a state actor. Private parties jointly engaged with state officials in a challenged action act under color of law for § 1983 purposes. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941-42 (1982); *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). The joint action here is direct and admitted: the State recruited the private claimant into the warrant execution, placed him inside the home, relied on his identifications, used his vehicles and employees to remove property, and entrusted him with custody and disposition. Snellgrove was therefore acting under color of law for Counts 1, 2, and 3.

**A5) The officers cannot rely on a warrant they failed to read.**

70. *Groh v. Ramirez* held that an officer who prepares and executes a deficient warrant may not claim reasonable reliance when the warrant's defect is apparent from its face. 540 U.S. at 563-65. The same principle applies here. Officers cannot claim objectively reasonable reliance on the scope of a warrant they did not read. Ingram never read it. Gammons did not read it. Phelps did not read it. Brown only glanced at it. Snellgrove never reviewed it. This

alone defeats qualified immunity for the officers who executed or caused the execution of the search.

71. The violation is especially clear for Ingram and Dahl. Ingram was the sheriff and final policymaker; Dahl was the affiant. They had the greatest responsibility to know the warrant's limits. Instead, Ingram could not identify how many items were listed, and Dahl conscripted the complaining witness to search for and store property beyond the warrant. No reasonable officer in May 2023 could believe this was lawful.

**A6) Each Defendant is liable on the Fourth Amendment claim.**

**A6a) Ingram is the central government defendant because he supplied policymaker authority and on-scene ratification.**

72. Ingram is liable because he was present, final policymaker, and active participant. He had months of pre-search communications with Snellgrove; knew Snellgrove might be called to help; failed to private secure storage space; allowed Snellgrove's team to assist with loading; admitted more items were seized than were on the warrant; never read the warrant; refused to use a body camera; left to buy a hand truck to facilitate loading; personally made the final decision to allow Snellgrove to transport the property and store it at Snellgrove's barn; did not obtain an Article 18.10 order; did not seek legal advice on private-victim storage; admitted no training ever advised him to store seized property at a private third party's residence; and later walked through the barn to look over what had been taken without verifying serial numbers or item counts. Ex. A at 7:21-24; 8:19-10:22; 31:19-33:16; 44:1-5; 56:18-57:5; 58:25-61:2; 69:11-70:7; 75:24-76:18.

73. Ingram's liability is not derivative of his title alone. It is based on his own actions. He knew Snellgrove personally, had discussed the claimed inventory problem with him for months, knew before the search that Snellgrove might be called to help with a large amount of

property, and was present soon after the search began. He never read the warrant, so he could not have made a reasonable on-scene decision about its scope. Yet he facilitated the very expansion that the Fourth Amendment forbids.

74. Ingram also supplied practical assistance to the seizure. He admitted he left to buy a dolly for loading. That fact is small but revealing. It shows he understood the operation had become a bulk property removal, not a two-item seizure. A sheriff who leaves a search scene to purchase equipment to move more property cannot later claim he was a passive bystander to the over-seizure.

75. Ingram's post-seizure conduct confirms his personal participation. He made the final decisions to transport and store the property at Snellgrove's barn; he did not consider marking or segregating a police-controlled evidence area; he did not secure it using a lock; he did not obtain the Article 18.10 order; he later walked through the barn to look over what had been taken; and he relied on verbal checks rather than evidence-room controls. Those facts establish personal liability, qualified-immunity defeat, and *Monell* causation.

76. The body-camera issue is also strongest against Ingram. As sheriff, he was the official with authority to model and enforce compliance. He admitted body cameras were to be worn and activated, but he chose not to wear one because he did not want to and did not have to. That statement is not merely a technical policy violation. It is a final policymaker announcing that the policy did not bind him during a major residential search and seizure. The County is bound by that choice.

**A6b) Dahl is independently liable because he was the affiant, executing investigator, and architect of the private handoff.**

77. Dahl is liable because he drafted the affidavit, failed to independently verify the private allegations, executed the warrant, wore and then deactivated the only produced body camera

28

before the bulk seizure and transport were documented, conscripted Snellgrove, met Snellgrove at the barn, instructed him to hold property, and obtained no court order before the property was released to Snellgrove. Ex. A at 7-14; Ex. D at 1 ¶ 4; Ex. J at 3, 6 (Interrog. Nos. 3, 10); Ex. J at 12-14 (RFA Nos. 13, 21, 26).

78. Dahl's role began before the search. By May 16, he possessed Snellgrove's emails and serial-number claims, but he did not independently verify those claims with Snap-On corporate, did not interview Plaintiffs, and did not create a warrant that authorized seizure of the broad property categories later taken. The warrant he obtained was narrow. The search he executed was broad. That gap is Dahl's responsibility as the affiant and lead investigator.

79. Dahl's affidavit in this litigation is decisive. He swore that he 'conscripted' Snellgrove to appear, identify the property subject to the warrant, and store the property at his business under Dahl's control and supervision. A law-enforcement officer who conscripts the complaining witness into the execution team assumes responsibility for what that witness does under state authority. Dahl cannot characterize Snellgrove as an independent private actor when Dahl's own sworn words say the opposite.

80. Dahl also controlled the most important missing proof. He wore the only known body camera and then failed to produce complete footage of the seizure. The missing or incomplete recording covers the period in which the search shifted from a two-item warrant to a wholesale property seizure. Dahl then met Snellgrove at the barn, took video of the property, and told Snellgrove not to dispose of it until authorized by the District Attorney. That is an acknowledgment that the property remained evidence and that ownership had not been adjudicated. Yet no written prosecutor, judge, or magistrate authorization preceded the later release.

81. Dahl's conduct therefore violated both search-and-seizure rules and post-seizure process rules. He caused the private actor's participation, contributed to the expanded seizure, failed to document the seizure as required, participated in the cross-county custody arrangement, and did not secure the court process required before the property was treated as Snellgrove's.

**A6c) Snellgrove is liable because he did not merely identify two warrant items; he used state power to obtain disputed property.**

82. Snellgrove is liable because he was the private claimant who became a state actor. He coordinated with Ingram before the search, arrived with vehicles and employees because officers requested transportation help, entered the home after the warrant items were found, opened drawers and inspected containers, identified items beyond the warrant, directed seizure of a child's toolbox because it said Snap-On, personally loaded property, used his employee to load under deputies' directions, transported the property to his own barn, stored it among his business inventory, accepted an unwritten release, put the property back into sellable inventory, and sold or integrated it without a specific item-by-item trail. Ex. B at 39:10-40:8; 43:4-45:16; 50:1-51:18; 55:2-18; 60:5-61:11; 73:21-74:16; 86:1-87:8; 108:11-109:16; 111:18-113:9.

83. Snellgrove will likely argue that he only cooperated with law enforcement. The record shows far more. He coordinated with Ingram before the search, asked to discuss timing, brought vehicles and employees, entered the home after the warrant items were located, identified items not listed in the warrant, physically participated in loading, transported the property to his own premises, stored it among his inventory, and later sold or integrated it. Those are not the acts of a witness standing nearby to identify a serial-numbered plasma cutter. They are the acts of a repossession participant clothed with state authority.

84. His own testimony also defeats any claim of objective certainty. He did not read the warrant. He did not run serial numbers at the scene. He acknowledged that non-branded tools could have been swept up because they were inside cabinets. He had no specific reason to dispute the Kniepkamp affidavit showing that another Snap-On franchisee provided Austin tools before the search. He admitted that some property might have been Austin's personal property or a trade-in. Those admissions make it impossible to say that every item taken was immediately and obviously his.

85. The state-action doctrine exists for this kind of case. A private person who acts jointly with officers, accepts their direction, and performs a police function during a search is subject to § 1983 liability. Snellgrove did not simply give a tip and step aside. He became the identifying, loading, transporting, storing, and disposing arm of the seizure. Because the seizure violated the Fourth Amendment and the later deprivation violated due process, Snellgrove is liable for the constitutional torts and for the parallel Texas claims.

**A6c) The other officers are also liable for their individual participation as well as their actions in furtherance of the conspiracy**

86. Brown is liable because she participated in the operation, entered and searched the home, refused Kiska's request to display the warrant, admittedly only looked over the warrant at the briefing, seized or facilitated seizure of items not listed in the warrant, failed to activate a body camera despite policy, and refused to leave when Kiska demanded it. Ex. K at 3-4 (Interrog. Nos. 2-4, 6); Ex. K at 11-12 (RFA Nos. 6, 18).

87. Gammons is liable because he secured and searched the residence, characterized the post-warrant entry as a consent search despite Kiska's objection, and admitted that Plaintiffs objected to specific seizures and asserted ownership. Ex. L at 3-4 (Interrog. Nos. 2-4); Ex. L

at 11-12 (RFA Nos. 4, 10). His claimed discovery of an unidentified substance and firearm does not justify the seizure of tools or the continued private-property search.

88. Phelps is liable at least as an initiating and conspiring actor. He opened the case on Snellgrove's unverified allegations, adopted the private valuation, treated Snellgrove as the victim, did not interview Plaintiffs or verify ownership, did not read the warrant, and knew or should have known that property not described in a warrant cannot be seized without independent legal justification. Ex. A 1:19-24; Ex. B at 118:19-119:2; Ex. M at 3-4 (Interrog. Nos. 1-4); Ex. M at 14 (RFA No. 28). Phelps may deny being on scene, but his role supplied the official criminal predicate that enabled the general seizure and private repossession. At minimum, his conduct establishes liability on the conspiracy claim and supports County liability through the official chain of events.

89. Beyond those individual acts, Brown, Gammons, and Phelps are also liable as § 1983 co-conspirators. The undisputed evidence shows a single coordinated course of conduct with Snellgrove and the other officer Defendants: Phelps initiated and supplied the official criminal predicate from Snellgrove's unverified ownership allegations and failed to take steps to review serial numbers or conduct any investigation; Brown and Gammons participated in the warrant operation, home search, and seizure process despite the warrant's narrow two-item scope and Plaintiffs' objections; and the group objective was then carried out by identifying, removing, transporting, storing, and releasing disputed property to Snellgrove outside the warrant's scope and without the process required before depriving Plaintiffs of their property. The conspiracy claim does not require Plaintiffs to prove that each participant personally opened every container, loaded every item, or made every later storage/release decision. It is enough that each joined or furthered the common plan and that the plan resulted in actual Fourth and Fourteenth Amendment deprivations; the agreement may be

inferred from coordinated planning, communications, and conduct before, during, and after the search. Thus, Brown, Gammons, and Phelps are liable not only for their own acts, but also for the constitutional injuries carried out in furtherance of the common unlawful search-and-seizure/property-deprivation scheme. *Bevill v. Fletcher*, 26 F.4th 270, 283–84 (5th Cir. 2022); *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994); *Crowe v. Lucas*, 595 F.2d 985, 993 (5th Cir. 1979); *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).

## B) Qualified immunity is unavailable.

90. Qualified immunity fails because the violations were clearly established. *Creamer* clearly established that officers executing a warrant for two specific items may not continue searching and seize additional property at random. *Horton*, *Garrison*, and *Hicks* clearly established the limits of warrant scope and plain view. *Wilson* and *Bills* clearly established that law enforcement may not use a private claimant to search for property beyond the warrant. *Randolph* clearly established that a physically present co-occupant's objection defeats consent. *Groh* clearly established that officers cannot reasonably rely on a warrant while ignoring its obvious limits. No reasonable officer could believe that a two-item warrant authorized the seizure, private transport, and private release of fifty-one categories of property over a co-occupant's objection.

91. This case also falls within the obvious-case principle of *Hope* and *Taylor*. A sheriff, investigator, and deputies do not need a perfectly identical case to know they cannot hand a search warrant to a private complainant as a civil repossession tool, put disputed evidence in the complainant's barn, fail to notify the owners of any hearing right, and allow the complainant to sell the property before the criminal case ends. The unlawfulness is apparent from the Constitution, the warrant, Texas statutes, and the Department's own manual.

**C) Defendants violated procedural due process as a matter of law.**

92. The Fourteenth Amendment prohibits deprivation of property without due process of law. U.S. Const. amend. XIV. Due process ordinarily requires notice and an opportunity to be heard before the State deprives a person of property, and even temporary deprivation is constitutionally significant. *Fuentes*, 407 U.S. at 80-84. When the State physically interferes with possessory interests in property, that deprivation may also implicate the Fourth Amendment. *Soldal*, 506 U.S. at 61-72.

93. Here, Plaintiffs had a protected property interest in the tools, toolboxes, equipment, and other personal property seized from their home. Defendants knew ownership was disputed. Kiska and/or Austin objected to specific seizures. Ex. B at 102:6-18; Ex. L at 12 (RFA No. 10). Austin was told to produce receipts. Kiska emailed Dahl seeking an inventory and identifying non-Snap-On property. Snellgrove acknowledged that some items could be Austin's personal property or trade-ins. Despite that knowledge, Defendants removed the property, gave it to the claimant, failed to provide notice of hearing rights, failed to obtain a magistrate's order, failed to maintain custody, and allowed the property to be sold or integrated into inventory.

94. Texas law provided specific process. Article 18.10 required the seizing officer to retain custody until a magistrate ordered safekeeping and forbade removal from the county of seizure without a magistrate's order. Article 18.11 required property seized pursuant to a warrant to be kept under the magistrate-order process. Articles 47.01 and 47.01a provided the mechanism for determining the right to possession of allegedly stolen property. Ingram admitted no Article 18.10 order was obtained and no ownership hearing occurred. Ex. A at 13:14-21; 70:4-7; 72:1-11; 92:14-93:12. The Sheriff's Office admitted the property was given

34

to Snellgrove without court order, notice, or judicial ownership determination. Ex. N at 16 (RFA No. 29).

95. Defendants cannot invoke *Parratt v. Taylor*, 451 U.S. 527 (1981), or *Hudson v. Palmer*, 468 U.S. 517 (1984). Those cases concern random and unauthorized deprivations where the State cannot feasibly provide pre-deprivation process. *Zinermon*, 494 U.S. at 136-39. This deprivation was not random. It was planned for months, executed by the sheriff and investigator, and governed by statutes that prescribed what to do. Pre-deprivation or immediate post-seizure process was not only feasible; it was mandatory. The County's final policymaker personally chose to ignore it.

96. Nor can Defendants claim that state post-deprivation remedies are enough. The property was seized under a warrant and then placed in the custody of the alleged victim, who sold or disposed of it. Once the government creates the deprivation, ignores the prescribed hearing, and allows the property to disappear, a later tort claim is not the process the Constitution required. Due process required notice and a meaningful opportunity to be heard before the government handed the property to the opposing claimant and before the claimant was allowed to sell it.

97. The due-process violation applies to the law-enforcement Defendants who seized, transported, stored, released, or failed to return the property; to Snellgrove because he acted jointly with the State and exercised dominion after receiving property through that state action; and to Martin County because Ingram's final policymaking decisions caused the deprivation.

## D) Defendants are liable for § 1983 conspiracy.

98. A § 1983 conspiracy requires an agreement among defendants to commit an illegal act and an actual deprivation of constitutional rights. *Priester v. Lowndes County*, 354 F.3d 414, 420 (5th

35

Cir. 2004); *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). Direct proof of an express written contract is not required; agreement may be inferred from circumstantial evidence, concerted conduct, communications, and coordinated action.

99. The agreement here is shown by the record. Ingram and Snellgrove spoke for months. Snellgrove texted Ingram about timing 'all that needs to go down.' Ingram and the Department told Snellgrove they might need help with 'that much property.' Dahl then conscripted Snellgrove to identify, load, transport, and store the property. Snellgrove arrived with multiple vehicles and employees. Officers directed him and his employees to load the property. Ingram made the final decisions to transport and store property at Snellgrove's barn. Dahl instructed Snellgrove at the barn. Later, Ingram or Dahl verbally released property back to Snellgrove's inventory. These facts establish a meeting of the minds to accomplish exactly what occurred: use criminal process to obtain possession of disputed property for Snellgrove.

100. The constitutional deprivations are the Fourth Amendment over-search and over-seizure and the Fourteenth Amendment deprivation without process. Because those violations occurred, the conspiracy claim is established against the individual law-enforcement Defendants and Snellgrove. Martin County is liable for the conspiracy's constitutional consequences through Ingram's final policymaking decisions and ratification.

**E) Martin County is liable under *Monell*.**

**E1) Ingram was the final policymaker and his decisions were County policy.**

101. A municipality is liable under § 1983 when an official policy, custom, or final policymaker's decision is the moving force behind a constitutional violation. *Monell v. Department of Social Services*, 436 U.S. 658, 690-94 (1978). A single decision by a final policymaker can constitute official policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-84

(1986). Whether an official is a final policymaker is a question of state law. *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989). In Texas, sheriffs are final policymakers for county law-enforcement matters. *Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990); *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996); *Williams v. Kaufman County*, 352 F.3d 994, 1013-14 (5th Cir. 2003).

102.    The record satisfies this standard many times over. The Department admitted Ingram was final policymaker for executing search warrants and handling seized property. Ingram confirmed it under oath. He then personally made the decisions that caused the constitutional violations: allowing Snellgrove's participation, permitting the expanded seizure, allowing the private loading and transport, deciding to store the property in Snellgrove's barn, failing to obtain a magistrate order, failing to provide notice or a hearing, and allowing or ratifying release of property before the case ended. Those decisions were not rogue deputy decisions. They were the acts of the County's final law-enforcement policymaker.

103.    *Monell* causation is also established. If Ingram had read the warrant and confined the seizure to two items, the Fourth Amendment violation would not have occurred. If Ingram had refused to conscript Snellgrove, the private repossession would not have occurred. If Ingram had followed Article 18.10, the property would not have gone to the purported victim's barn. If Ingram had followed Chapter 47, Plaintiffs would have received a hearing. Ingram's decisions were the moving force behind the injuries.

**E2) The County ratified the unconstitutional conduct.**

104.    Ratification exists when an authorized policymaker approves a subordinate's decision and the basis for it. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Here, Ingram ratified the deputies' actions in real time because he was present, knew Snellgrove was

participating, facilitated loading, personally decided where the property would go, and later inspected the barn. His ratification was not a later paper approval; it was active supervision and adoption of the entire course of conduct.

105.    The County also ratified the conduct after the fact. The Department conducted no internal investigation, review, audit, or evaluation of the search, the property handling, the missing footage, or the officers' conduct. Ex. N at 6 (Interrog. No. 10). It produced no corrective actions, policy changes, or new training. Ex. N at 11 (RFP No. 19). It cannot account for all property. Ex. N at 15 (RFA No. 15). It has no evidence related to this lawsuit in evidence. Ex. N at 7 (Interrog. No. 12). When a department does nothing after a search of this magnitude, after missing body-camera evidence, after property is stored with the alleged victim, and after property is released without court order, a factfinder need not infer ratification; the record establishes it.

**E3) The County failed to train, supervise, and enforce its own policies despite obvious risk.**

106.    A municipality is liable for failure to train or supervise when the failure amounts to deliberate indifference to the rights of persons with whom officers come into contact and causes the violation. *City of Canton v. Harris*, 489 U.S. 378, 388-92 (1989); *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Deliberate indifference is shown where the need for training or policy enforcement is obvious and the failure is likely to result in constitutional violations. *Canton*, 489 U.S. at 390.

107.    The need was obvious. Search warrants, plain view, seized-property custody, chain of custody, body cameras, and disputed ownership are basic law-enforcement functions. The manual required officers to know the law, preserve property, inventory seized items, transport property to an agency office, secure evidence, record searches and seizures, and

audit the evidence system. Yet Ingram admitted there was no written search-warrant execution policy under his tenure, no extra policy training beyond providing the manual, no completed audits and inspections, no neutral custody records, no transport to the agency office, no limits on barn access, and no quarterly inspection for adherence to procedures. Ex. A at 14:15-17; 16:19-21; 79:2-5; 84:13-86:12; 88:10-89:19; 96:17-98:19.

108.    The failure caused the violations. Officers did not read the warrant. Only one camera was used despite policy requiring body cameras for all officers. The only produced footage is incomplete. The search continued after the warrant items were found. The private claimant identified property. The property was transported across county lines without order. The property was stored in a private barn with business employees having access. No hearing occurred. No property was returned. This is exactly the sort of predictable constitutional collapse that training, supervision, and policy enforcement are meant to prevent.

109.    The Department's written policies do not save the County. A municipality cannot avoid liability by writing good rules and then ignoring them. The policy manual instead proves that the County knew the relevant risks and had adopted procedures to prevent them. The problem was the final policymaker's choice not to follow or enforce those procedures.

**E4) The County cannot separate itself from Ingram by calling his decisions operational.**

110.    Martin County may call Ingram's acts 'operational,' but the record does not allow that distinction. Ingram was the elected Sheriff, the admitted final policymaker for warrant execution and seized-property handling, and the person who made the final decisions to transport and store the property. He allowed a private claimant to participate, approved the loading and transportation scheme, chose the barn, chose not to obtain a magistrate order, chose not to segregate the property, chose not to document the seizure with his own body

39

camera, and failed to institute a hearing or return process. Each choice concerned the County's method for executing warrants and handling seized property.

111.　　　Nor is this respondeat superior. Plaintiffs do not ask the County to answer merely because deputies worked there. Plaintiffs rely on Ingram's own decisions, the Department's admissions, the Department's failure to enforce its manual, the Department's complete post-event inaction, and the County's inability to account for property. That is direct municipal liability under *Monell*, *Pembaur*, *Praprotnik*, and Fifth Circuit Texas-sheriff policymaker authority.

**E5) The policy manual is not a shield; it is proof of notice and deliberate indifference.**

112.　　　A written manual can defeat *Monell* liability only when it reflects a policy that is actually trained, supervised, enforced, and followed. This manual does the opposite for the County. It identifies the exact risks that materialized: friend relationships, misuse of office, failure to follow the Code of Criminal Procedure, failure to inventory at the scene, failure to store evidence securely, failure to record searches and evidence seizures, and failure to audit evidence handling. The County had rules because the risks were obvious. The County then ignored the rules when those risks arose.

113.　　　The friend-conflict policy is especially important. The manual required employees assigned to an incident where the complainant or suspect is considered a friend or relative to contact a supervisor and allowed reassignment if warranted. Ex. H at 9. Ingram and Snellgrove were not strangers. They attended Bible study together; the Department admitted a personal relationship; Snellgrove called Ingram directly to coordinate timing. Yet the record contains no documented conflict review, no reassignment, no special supervision to protect Plaintiffs' property rights, and no neutral storage decision. Instead, the personal acquaintance became the beneficiary of the search.

114.    The evidence-audit provisions are equally important. The County had a policy for annual audits, inspections, and unannounced property checks because evidence systems fail when no one checks them. Ingram admitted those checks were not performed. The result was predictable: a seizure with no complete inventory, no complete video, no neutral custody, no complete chain of custody, no complete return, and no current accounting. Deliberate indifference is rarely cleaner than a written policy identifying the risk, a final policymaker admitting it was not followed, and the exact injury the policy was designed to prevent.

**E6) The body-camera failure supports County liability and defeats any factual defense.**

115.    The body-camera evidence shows a County-wide problem, not a one-off glitch. The paper record shows that the Department's policy required recording searches and seizures; Ingram was not wearing a body camera and admits he did not activate one; Brown admits her body camera was not activated for the entirety of the search or was not activated at all; Gammons had no body camera and turned off his vehicle camera after initial arrival; and the Department produced only the video records it says exist. To the extent Plaintiffs rely on Dahl's footage as partial, interrupted, or ending before bulk seizure and transport, the motion should cite the actual video file, transcript, or production log.

116.    That evidentiary gap cannot be held against Plaintiffs. Defendants controlled the cameras, controlled the footage, controlled the evidence room, controlled the vehicles, controlled the barn arrangement, and controlled the records. If the remaining footage fails to show a seizure, loading, transport, storage, or release, the reason is not that those things did not happen. Defendants admit those things happened. The reason is that the County failed to record and preserve them. The incomplete footage therefore corroborates Plaintiffs' claim that the Department's policies were not enforced.

**E7) The violations of Article 18.10, Article 18.11, Chapter 47, and the Policy Manual were ministerial and nondiscretionary.**

117.     Defendants may try to characterize every decision as discretionary law-enforcement judgment. That framing is too broad. Texas law distinguishes discretionary acts requiring personal deliberation from ministerial acts requiring obedience to orders or performance of a duty as to which the actor has no choice. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994). The relevant duties here were ministerial.

118.     Article 18.10 says the officer 'shall' retain custody until the magistrate orders safekeeping and that property 'may not' be removed from the county without a magistrate's order. Article 18.11 says property seized under a warrant 'shall' be kept as provided by the magistrate's Article 18.10 order. The Policy Manual says officers 'shall' inventory items at the scene, 'shall' use two officers if available, and 'shall' transport seized property to the appropriate agency office. Those commands left no discretion to deliver disputed property directly to the purported victim, across county lines, without a magistrate order, and then release it without written authority.

119.     The ministerial nature of these duties matters for three reasons. First, it shows the deprivation was predictable and preventable, defeating *Parratt-Hudson*. Second, it defeats any claim that the officers' choices were reasonable discretionary judgments. Third, it reinforces *Monell* causation because the County's final policymaker chose to disregard mandatory rules that existed to protect precisely the property interests at issue.

**F) Snellgrove is liable for conversion.**

120.     Conversion under Texas law is the unauthorized and wrongful exercise of dominion and control over another's personal property to the exclusion of, or inconsistent with, the owner's rights. *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971). A plaintiff must

42

show ownership or right to possession, wrongful exercise of dominion, demand if required, and refusal or injury. *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147-48 (Tex. 1997).

121. The undisputed facts establish conversion. Plaintiffs possessed the property at their home. Ownership was disputed. Snellgrove took possession through state action, stored the property in his warehouse, denied Plaintiffs a contest process, accepted an unwritten release, placed items into sellable inventory, sold or disposed of items, and failed to return the property, including items supported by the Kniepkamp affidavit. Ex. B at 73:21-74:16; 86:1-87:8; 96:25-97:7; 104:13-105:4. That exercise of dominion was inconsistent with Plaintiffs' rights and caused injury as a matter of law.

122. Snellgrove cannot avoid conversion by saying officers told him to take the property. A private party who receives property through an unlawful seizure and then sells or integrates it into his business exercises dominion at his own risk, especially when he knows ownership is disputed and no court has awarded him possession. The claimed verbal release is no defense because it came without court order, without notice, and before the criminal case was over.

### G) Snellgrove is liable for abuse of process.

123. Abuse of process under Texas law requires an illegal, improper, or perverted use of process neither warranted nor authorized by the process, an ulterior motive or purpose, and damages. *Preston Gate, LP v. Bukaty*, 248 S.W.3d 892, 897 (Tex. App.--Dallas 2008, no pet.). The critical issue is improper use of process after it issues.

124. The warrant was process. It authorized seizure of two items and return to the magistrate. Snellgrove used that process for an unauthorized purpose: to obtain possession of a broad category of disputed tools and business property without filing a civil suit,

without proving ownership, and without going through Chapter 47. His ulterior purpose is shown by the pre-search timing texts, the request for vehicles, the loading of property onto his trucks, the storage at his barn, the use of the property in his own inventory, and the later sale or disposition. His May 18 stop-payment on Austin's paycheck--explained as frustration at paying someone who had allegedly stolen from him--further shows personal motive. Ex. B at 90:16-91:7.

125.    The damages are the loss of property, loss of use, loss of business and personal tools, emotional and reputational harm, litigation expense, and all consequential damages recoverable under Texas law. Liability should be entered, with damages reserved.

**H) Snellgrove is liable under the Texas Theft Liability Act.**

126.    The Texas Theft Liability Act makes a person who commits theft liable for damages resulting from the theft. Tex. Civ. Prac. & Rem. Code § 134.003(a). 'Theft' includes unlawfully appropriating property as described in Texas Penal Code § 31.03. Tex. Civ. Prac. & Rem. Code § 134.002(2). A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. Tex. Penal Code § 31.03(a). 'Appropriate' includes acquiring or otherwise exercising control over property. Tex. Penal Code § 31.01.

127.    Snellgrove appropriated the property by exercising control over it, transporting it to his barn, storing it among his inventory, and selling or integrating it. The appropriation was unlawful because Plaintiffs did not consent, ownership was disputed, no court awarded the property to Snellgrove, no magistrate order authorized the cross-county transfer or private custody, and no Chapter 47 process occurred. Intent to deprive is established by his permanent disposition of the property and inability or refusal to return it. At minimum, no reasonable jury could find that a private claimant who sells disputed property after receiving it through an unlawful search lacked intent to deprive.

44

**I) Defendants cannot create a fact issue with after-the-fact claims of Austin's consent or admission.**

128.        Defendants repeatedly suggest that Austin admitted the property belonged to Snellgrove. To the contrary, Plaintiffs objected to specific seizures and asserted ownership. Ex. L at 12 (RFA No. 10); Ex. B at 102:6-18. Any alleged cooperation occurred during execution of a warrant by armed officers after Miranda warnings, while Kiska objected and children were present. Ex. K at 4, 11-12. And even if Austin identified some disputed property, that did not authorize seizure of every item in every cabinet, bedroom, trailer, toolbox, and the specific items contained therein. Ex. A at 49:18-50:5; Ex. B at 108:11-109:16. Article 18.10 and Chapter 47 required neutral custody and a hearing, not yard-side ownership adjudication.

**J) The incomplete body-camera footage cannot defeat summary judgment.**

129.        Defendants may rely on the limited Dahl footage, but it is incomplete by Defendants' own record. It does not show the full interior search, full identification and seizure, loading, transport, barn storage, release, or disposition. The Department's policy required recording searches and seizures by each officer present, yet only one partial recording exists. The absence of footage is evidence of policy violation, not a defense.

**K) The requested ruling is limited to liability and leaves damages for the jury**

130.        Plaintiffs do not ask the Court to calculate damages on this motion. The $283,445 figure is Defendants' number, supplied by Snellgrove and adopted by the County, and it proves the magnitude of the seizure. Plaintiffs reserve replacement value, loss of use, consequential damages, emotional distress, punitive damages, fees, costs, statutory TTLA relief, and equitable relief for later proceedings.

**CONCLUSION**

131.     The undisputed record establishes liability against all Defendants. The warrant authorized two items. Defendants found those items and then transformed the warrant into a general search and private repossession. They ignored a present co-occupant's objection, relied on a private claimant to identify property, seized ordinary tools and containers whose incriminating character was not immediately apparent, transported the property across county lines without a magistrate's order, stored it in the purported victim's private barn, released it before the criminal case ended, denied Plaintiffs notice and a hearing, and now cannot account for all of it. The Constitution, Texas statutes, and the Department's own manual all forbade what happened.

**PRAYER FOR RELIEF**

132.     For these reasons, Plaintiffs Austin Hamblin and Kiska Hamblin respectfully request that the Court grant this Combined Motion for Partial Summary Judgment and enter an order:

a.   (1) finding Defendants Brad Ingram, Anders Dahl, Kelsey Brown, Rory Gammons, Weston Phelps, and Brian Snellgrove liable on Count 1 for violation of Plaintiffs' Fourth Amendment rights;

b.   (2) finding Defendants Brad Ingram, Anders Dahl, Kelsey Brown, Rory Gammons, Weston Phelps, and Brian Snellgrove liable on Count 2 for violation of Plaintiffs' procedural due process rights;

c.    (3) finding Defendants Brad Ingram, Anders Dahl, Kelsey Brown, Rory Gammons, Weston Phelps, and Brian Snellgrove liable on Count 3 for civil conspiracy under § 1983;

d.   (4) finding Martin County liable on Count 4 under *Monell*;

e.   (5) finding Snellgrove liable on Count 5 for conversion, Count 6 for negligence, Count 7 for abuse of process, and Count 8 under the Texas Theft Liability Act;

f.   (6) denying qualified immunity and any asserted good-faith or official-immunity defense as to the liability issues decided herein; and

g.   (7) granting all further relief to which Plaintiffs are justly entitled.

## Certificate of Service

I certify that on the date reflected by the CM/ECF date stamps I filed the foregoing document(s) and that they are available for viewing and downloading from the Court's CM/ECF system, and that those participants in the case that are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully Submitted,

/s/ Kurt Mueller
------------------------------------
Kurt Mueller
Texas Bar No. 24133133

The Kurt Mueller Law Firm PLLC
565 S Mason Rd PMB 223
Katy, Texas 77450
(713) 360-2110
kurt@kurtmuellerpllc.com

47