IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| AUSTIN HAMBLIN and KISKA HAMBLIN,<br>    Plaintiffs and Counter Defendants,<br><br>v.<br><br>MARTIN COUNTY, TEXAS, BRAD INGRAM,<br>ANDERS DAHL, KELSEY BROWN, RORY<br>GAMMONS, WESTON PHELPS, each in their<br>individual capacities,<br>    Defendants,<br><br>v.<br><br>BRIAN SNELLGROVE,<br>    Defendant and Counter Plaintiff. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br>7:25-CV-00245-RCG |

**DEPOSITION TESTIMONY EXPECTED TO BE PRESENTED**

Defendants Martin County, Texas, Brad Ingram, Anders Dahl, Kelsey Brown, Rory Gammons, and Weston Phelps, each in their respective capacities as pleaded (collectively, the "Martin County Defendants"), do not presently expect to present testimony by deposition in lieu of live testimony for any witness who is available to appear live at trial, except as permitted under Federal Rule of Civil Procedure 32, the Federal Rules of Evidence, and any ruling of the Court. The Martin County Defendants reserve the right to designate counter-designations, completeness designations, impeachment excerpts, and Rule 32 testimony depending upon witness availability and opposing-party designations.

| Witness | Use | Page/Line Designations |
|---|---|---|
| Austin Hamblin | May be offered if witness is unavailable, for impeachment, or under Rule 32 | Dep. May 1, 2026, including but not limited to: 12:9–17; 15:1–13; 26:15–27:18; 32:7–24; 35:9–36:13; 37:1–6; 37:20–24; 41:5–25; 42:13–19; 43:11–18; 75:23–76:3; 76:11–20; 77:6–19; 78:1–7; 92:14–93:16; 95:15–96:8; 97:10–20; 104:1–106:12; |

| Witness | Use | Page/Line Designations |
|---|---|---|
| | | 107:7–108:4; 108:20–109:25; 113:9–25; 115:23–25; 138:9–21; 139:3–16; 149:1–150:22; 152:3–17; 163:19–164:7; 175:19–176:6; 177:16–178:2; 186:12–19; 192:9–193:3; 193:13–22; 194:1–7; 194:17–25; 195:21–196:1. See Exhibit A, highlighted excerpts of the Austin Hamblin deposition transcript. The Martin County Defendants preserve the use of Hamblin deposition exhibit 8. |
| Kiska Hamblin | May be offered if witness is unavailable, for impeachment, or under Rule 32 | Dep. May 1, 2026, including but not limited to: 11:21–12:16; 12:17–14:25; 14:6–15:9; 69:14–70:15; 34:20–35:19; 42:13–18; 50:1–17; 51:1–16; 52:11–53:14; 65:13–20; 66:9–67:10; 67:15–21; 68:6–17; 72:16–22; 77:19–79:19. See Exhibit B, highlighted excerpts of the Kiska Hamblin deposition transcript. The Martin County Defendants preserve the use of Hamblin deposition exhibit 8. |
| Brian Snellgrove | May be offered if witness is unavailable, for impeachment, or under Rule 32 | Dep. April 10, 2026, including but not limited to: 16:19–17:13; 20:3–13; 20:16–21:6; 23:16–24:7; 25:4–14; 26:5–12; 28:16–29:15; 29:21–31:15; 33:19–34:2; 36:13–22; 37:11–38:18; 39:17–24; 40:17–22; 41:21–43:21; 45:4–13; 48:15–49:4; 50:1–6; 51:8–17; 52:17–53:1; 53:22–54:7; 55:3–18; 56:16–23; 58:17–59:8; 65:11–66:3; 71:3–18; 72:11–13; 73:7–13; 73:21–74:16; 79:5–20; 81:19–82:8; 85:10–19; 89:19–90:15; 93:6–16; 93:17–22; 95:8–22; 100:16–101:7; 102:6–17; 102:12–14; 104:4–8; 111:3–12; 114:7–12; 117:1–13; 117:22–118:9; 122:10–18; 123:3–8; 133:16–134:9; 135:3–10; 136:14–16; 145:17–147:14. See Exhibit C, highlighted excerpts of the Brian Snellgrove deposition transcript. |

Respectfully submitted,

*/s/ Denis Dennis*
DENIS DENNIS
State Bar No. 05655566
BENJAMIN PETTY

State Bar No. 24105934

OF

KELLY, MORGAN, DENNIS,
CORZINE & HANSEN, P.C.
P.O. Box 1311
Odessa, Texas 79760-1311
(432) 367-7271 / FAX: (432) 363-9121
ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on the date of filing, July 21, 2026, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

*/s/ Denis Dennis*
DENIS DENNIS

# EXHIBIT A

## AUSTIN HAMBLIN DEPOSITION EXCERPT SCREENSHOTS

Oral Deposition of Austin Hamblin, May 1, 2026

The following pages contain highlighted transcript excerpts corresponding to the page-and-line designations identified for Exhibit A.

## 1. Austin Hamblin Dep. May 1, 2026, at 12:9-17

**Austin Hamblin Dep. May 1, 2026, at 12:9-17**

Q.    Okay.  As you acquired tools starting in the
20-teens when you first started acquiring them, did you
keep lists of what you had, inventories or you just --
A.    No.
Q.    -- acquired them?
A.    When you're a mechanic and you buy tools, you
don't write down everything you have.  I mean, you kind
of just know because it's in your toolbox and you know
when something's missing.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 2. Austin Hamblin Dep. May 1, 2026, at 15:1-13

**Austin Hamblin Dep. May 1, 2026, at 15:1-13**

equipment, did you keep the receipts?
A.   Yes, I did.
Q.   Where would you store those?
A.   Man, in a folder until, you know, I didn't
need them, I guess.
Q.   What's the purpose of keeping the receipt?
A.   Showing proof of ownership, I guess.  I don't
know.  See what your balance is.
Q.   Do you have receipts for every Snap-On item
you've ever purchased?
A.   No, I do not.
Q.   What made you get rid of receipts, if you did?
A.   Getting rid of clutter.  I mean, fact of life.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

### 3. Austin Hamblin Dep. May 1, 2026, at 26:15-27:18

**Austin Hamblin Dep. May 1, 2026, at 26:15-27:18**

Q.   Did you go in the warehouse every day?
A.   Every day, yeah.
Q.   What did you do in the warehouse?
A.   Go to my shelf, get customer orders for that particular day, or if I had a set of sockets that I know I sold out of the previous day and we had some in the warehouse, I'd grab a set of sockets and throw it in the truck.
Q.   Okay.  You said your shelf.  What's your shelf?
A.   We had individual shelves for each truck that

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 26:15-27:18**

had our names on them that our stock order and customer orders, we would put them on those shelves.
Q.   Okay.  What all -- who all had access to the safe?
A.   Everybody that worked for Snellgrove.
Q.   And what did you put in it?
A.   Our end-of-the-day paperwork.
Q.   If you just grab a set of sockets like you said, would you put that through the computer system --
A.   No.
Q.   -- or tell anything?
A.   No.
Q.   How would Snellgrove Enterprises know that you had taken that to sell?
A.   I have no earthly idea.
Q.   Okay.  But would they eventually get a record of it upon your end-of-the-day paperwork?
A.   By the sale ticket, yeah.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 4. Austin Hamblin Dep. May 1, 2026, at 32:7-24

**Austin Hamblin Dep. May 1, 2026, at 32:7-24**

Q.    Okay.  Did Edgar have his own set of keys?
A.    Yes, he did.
Q.    Did you both bring your -- each set every time you left the office?
A.    Yes, we did.
Q.    Would there then still be a spare at the office?
A.    Yes, there was.
Q.    So there was three sets for every vehicle?
A.    There was probably more than that.
Q.    For every vehicle?
A.    Uh-huh.
Q.    Would you ever stop and audit all of the tools that you had in your truck?
A.    No.
Q.    Did you ever do an inventory count reconciliation the whole time you worked there?
A.    No.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 5. Austin Hamblin Dep. May 1, 2026, at 35:9-36:13

**Austin Hamblin Dep. May 1, 2026, at 35:9-36:13**

Q.   Did you go through that warranty process with every single one of your tools?
A.   Not every single one.  As they broke.
Q.   Just as they broke?
A.   Uh-huh.
Q.   Okay.  Is this a majority of the tools you had were warrantied, or just a fraction of them?
A.   Majority of sockets and wrenches and hammers.
Q.   Okay.  How many big or larger items did you have before -- this is before the seizure, you're working with Snellgrove, how many larger items did you warranty out and replace?
A.   I didn't warranty any of mine at that point in time.
Q.   Okay.  And what did you own that -- that you would consider a larger item?
A.   Several toolboxes and a few carts.

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 35:9-36:13**

Q.   Okay.  Anything else?
A.   I'm sure I had a jack and some battery chargers, stuff like that.
Q.   Okay.  And all of these, you acquired from?
A.   Just over the years.  I couldn't tell you exactly who.
Q.   Did you ever buy a larger item directly from Mr. Snellgrove?
A.   Yeah, actually I did.
Q.   Okay.  What was that?
A.   A workbench.
Q.   Okay.  Anything else?
A.   No.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 6. Austin Hamblin Dep. May 1, 2026, at 37:1-6

**Austin Hamblin Dep. May 1, 2026, at 37:1-6**

A.   I mean, I sold all of my stuff, so -- and then
I bought a box off of a customer.
Q.   Okay.  A toolbox off a customer?
A.   Uh-huh.
Q.   When was that?
A.   I couldn't tell you.  I don't recall.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 7. Austin Hamblin Dep. May 1, 2026, at 37:20-24

**Austin Hamblin Dep. May 1, 2026, at 37:20-24**

```
37:20  Q.   Okay.  And do you remember the customer you
37:21  purchased that from?
37:22  A.   No, I don't.
37:23  Q.   Was it an Odessa customer?
37:24  A.   All of my customers were in Odessa.
```

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 8. Austin Hamblin Dep. May 1, 2026, at 41:5-25

**Austin Hamblin Dep. May 1, 2026, at 41:5-25**

A.   So the toolbox I put rivets in was a
replacement toolbox for a customer.  He got a new one, I
took the old one to the house to put rivets in it and
that was it.
Q.   Okay.  What were you going to -- what was the
end goal for that toolbox?  Where was it going to end
up?
A.   To somebody else to get sold.
Q.   Okay.
A.   That needed a road chest.
Q.   A road chest?
A.   Yeah, that's what it was.
Q.   Okay.  What was the typical process for a road
chest like that?  Should it have been at your house or
should it have been at Mr. Snellgrove's location?
A.   You know, I don't know because they would sit
at the warehouse and then they would just disappear.
Q.   Other tools would?
A.   No, damaged toolboxes would sit at the
warehouse, then they would disappear.  Somebody would
take it and sell it.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0009

## 9. Austin Hamblin Dep. May 1, 2026, at 42:13-19

**Austin Hamblin Dep. May 1, 2026, at 42:13-19**

42:13 Q.   Okay.  How many large tool cabinets did you
42:14 have at your home before the seizure?
42:15 A.   I do not remember.
42:16 Q.   Okay.  What other large items of equipment
42:17 were at your home that were yours before the seizure?
42:18 A.   I had a popcorn maker, a few other things.  I
42:19 don't exactly recall what was all at my house.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 10. Austin Hamblin Dep. May 1, 2026, at 43:11-18

**Austin Hamblin Dep. May 1, 2026, at 43:11-18**

```
43:11 Q.    Okay.  How many Snap-On accounts did you have
43:12 in 2023, the year of the seizure?
43:13 A.    I did have a Snap-On account.
43:14 Q.    So you didn't have a credit account anymore?
43:15 A.    No.
43:16 Q.    Okay.  When did you close your last Snap-On
43:17 account?
43:18 A.    I believe it was 2020.
```

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0011

## 11. Austin Hamblin Dep. May 1, 2026, at 75:23-76:3

G - 0012

**Austin Hamblin Dep. May 1, 2026, at 75:23-76:3**

Q.   Okay.  Did you ever ask the -- or tell the officers they could take something?
A.   In a state of confusion and -- what's the

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 75:23-76:3**

word -- coercion, I guess.  I mean, they were going to take it all anyways.  And I believe I said, "Fuck it. Y'all are going to take it anyways."

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 12. Austin Hamblin Dep. May 1, 2026, at 76:11-20

G - 0013

**Austin Hamblin Dep. May 1, 2026, at 76:11-20**

Q.   Okay.  But they left that same day.  Did they take anything that wasn't a Snap-On item?
A.   Several things.
Q.   What were those?
A.   I had a bunch of knock-off tools that were not Snap-On that they were taken, I realized were missing later on.
Q.   Okay.  Do you remember what those were specifically?
A.   Not off the top of my head, no.

### 13. Austin Hamblin Dep. May 1, 2026, at 77:6-19

**Austin Hamblin Dep. May 1, 2026, at 77:6-19**

Q.  Okay.  Did you ever see an inventory of the property taken that day?
A.  I do not think I did.
Q.  Okay.  Did you take any of your own photographs or videos of that day?
A.  No, I did not.
Q.  Okay.  Did you ever make -- did you ever see anybody making an inventory while doing that seizure?
A.  I believe Kelsey was starting one.
Q.  Okay.
A.  And then Dahl, I guess, finished it.
Q.  Okay.  And how were they making that inventory?  Just --
A.  On a yellow note pad.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0014

## 14. Austin Hamblin Dep. May 1, 2026, at 78:1-7

**Austin Hamblin Dep. May 1, 2026, at 78:1-7**

A.   It depends on how you look at it.  I mean, if
you group all the hand tools together, that's probably
the majority of it.
Q.   Okay.  What's a ballpark market value for all
those hand tools?
A.   I couldn't tell you.  Well over 150,000.
Q.   Okay.  And where did you get all those hand

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0015

### 15. Austin Hamblin Dep. May 1, 2026, at 92:14-93:16

**Austin Hamblin Dep. May 1, 2026, at 92:14-93:16**

Q.    Okay.  What's the -- has he given you advice?
A.    He's written a sworn affidavit for us.
Q.    Okay.  What was in that?
A.    I don't remember.
Q.    Okay.  When was it dated?
A.    Here recently, it's within this last six months.
Q.    Okay.  Did you ever file a petition for a property hearing?
A.    I had no idea that's what I had to do.
Q.    Did Billy Reynolds ever suggest something like that?

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 92:14-93:16**

A.    I don't know.
Q.    Have you ever reached out to Mr. Snellgrove directly --
A.    No.
Q.    -- asking about your property?
A.    Nope.
Q.    The last time you had any kind of substantive communication with him, was it the day of the seizure?
A.    That is correct.
Q.    Okay.  How about anyone else from Snellgrove Enterprises?
A.    No.
Q.    Just clean break, you haven't talked to anybody?
A.    I mean, that worked with him while -- or worked there when I worked there?  No, I have not.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0016

## 16. Austin Hamblin Dep. May 1, 2026, at 95:15-96:8

G - 0017

**Austin Hamblin Dep. May 1, 2026, at 95:15-96:8**

Q.   What is this?
A.   Well, the first sheet is an inventory of stuff that my father-in-law had given me, and the other portion of it is stuff that I remember that was taken from my house on the day of the seizure.
Q.   Okay.  Do these -- does this cover sheet, the affidavit, belong to this whole list?
A.   No.
Q.   Okay.  What specifically does the cover sheet refer to?
A.   All of number one.

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 95:15-96:8**

Q.   Okay.
A.   And I mean, there's other stuff that he had given me over the years that would be added to that because it was just a hurry-up-and-get-this-done type of deal.
Q.   Okay.  So who made the inventory that's on pages 2 through 4?
A.   That would have been me and my wife.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0017

## 17. Austin Hamblin Dep. May 1, 2026, at 97:10-20

**Austin Hamblin Dep. May 1, 2026, at 97:10-20**

```
Q.   Where were they stored if you remember?
A.   In a toolbox.
Q.   Do you remember specifically which one or just
one of them?
A.   No, I don't.  Just one of them.
Q.   Would these have been in your house or in the
laundry room?
A.   Probably the laundry room.
Q.   Okay.  What's the value of 2, A through D --
or A through E?
A.   I couldn't tell you.
```

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 18. Austin Hamblin Dep. May 1, 2026, at 104:1-106:12

**Austin Hamblin Dep. May 1, 2026, at 104:1-106:12**

A.    Stuff that I had bought to replace the stuff that was seized from my house.

Q.    Okay.  All of these invoices on here, do they correspond to a tool that you had to specifically replace?

A.    Yeah.

Q.    Every single one of them?

A.    I mean, it's not the exact same brand, but yes.

Q.    Are all of these entries Snap-On entries?

A.    No.

Q.    Okay.  So which ones of these correspond to an item that was taken in the seizure?

A.    So, like, there's one that says KDT8123, for example.  I know off the top of my head that's a Knipex part number.

Q.    KDT81230T?

A.    Uh-huh.

Q.    Okay.

A.    If I'm not mistaken, the LIS numbers are Lisle, which you can get through Snap-On as well.

Q.    Okay.  And you're looking at the back page.  I see, starting at the top, under the name column -- one, two, three, four, five, six -- seven LIS entries; is that correct?

*Continuation on next screenshot.*

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

**Austin Hamblin Dep. May 1, 2026, at 104:1-106:12**

A.    Yes.
Q.    And you're telling me all of these are replacement items for seizure property?
A.    Yeah.
Q.    And what are they?
A.    The brand would be, like, a Lisle, which you can get through Snap-On's supplemental catalog.
Q.    Okay.  Can you tell from these numbers the actual type of tool it is?
A.    Not off the top of my head, no.
Q.    Okay.  Anything else on this list a direct replacement of a tool that was taken in the seizure?
A.    It wasn't the exact same thing as what was taken, but yeah.
Q.    What else -- what else is a replacement tool?  Like, what else is a replacement purchase?
A.    All of this is replacement stuff.
Q.    Okay.  How do you know?
A.    Because I have bought it to use to do my job.  Even if it's not Snap-On, it's a replacement for a Snap-On tool.
Q.    Okay.
A.    Just a different brand.
Q.    And if you've purchased this as a replacement, have you kept a record of the replacement referenced to

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 104:1-106:12**

the tool that was taken?
A.    No, I have not.
Q.    Can you point out which ones of these correspond to which ones of these tools that are in this list in Exhibit 1?
A.    Just the -- from my father-in-law or --
Q.    Any of these.  You said all of this was taken.  Right?
A.    Yeah.
Q.    Okay.
A.    I can't tell exactly which ones are what because it doesn't tell you what the tool is.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0020

**19. Austin Hamblin Dep. May 1, 2026, at 107:7-108:4**

**Austin Hamblin Dep. May 1, 2026, at 107:7-108:4**

A.   I mean, like I said, it's all replacements from everything that was taken, just not the same brand.
Q.   Every single entry?
A.   Well, there's one that says gloves, I think. Yeah, like this AMX is a box -- a case of gloves.
Q.   So that's not one?
A.   Yeah.
Q.   Not related.  Okay.  Anything else not related?
A.   Not that I'm aware of.
Q.   What would you do in order to get more information to do a better reconciliation on this?
A.   Try to look up the part numbers.
Q.   Part numbers, are they on this name column?
A.   Yes.
Q.   Okay.  And you said Doug was a general tools dealer.  Are all of these prefixes brand names or are they just part --
A.   From my experience, it looks like some part

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 107:7-108:4**

numbers, and then some are prefixes.
Q.   Okay.  So this list isn't all one manufacturer, it could be all different manufacturers?
A.   Exactly.

**20. Austin Hamblin Dep. May 1, 2026, at 108:20-109:25**

**Austin Hamblin Dep. May 1, 2026, at 108:20-109:25**

> Q.   (BY MR. PETTY) So is it true that all of the products sold in this list are in this product number column?
> A.   Yes.
> Q.   Okay.  So each of these strings of letters and numbers are first to a tool?

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 108:20-109:25**

> A.   Yes.
> Q.   Okay.  You said you -- these are all tools you've received from Mr. Kniepkamp.  Correct?
> A.   And it looks like there was a credit section at the end of it, yes.
> Q.   What does that credit section mean?
> A.   Through Snap-On credit.
> Q.   Okay.  What does that show, then, that's different?
> A.   It doesn't show that it's different.  It's just stuff that I had bought from -- essentially, I could have bought it from any -- a different dealer that I saw at that time.
> Q.   Are any of the tools shown in this entire exhibit, were they taken in the seizure?
> A.   Yes.
> Q.   Which ones?
> A.   All of it.
> Q.   All of these?
> A.   Yes.
> Q.   So every single product number was something that was taken?
> A.   Essentially, yes.
> Q.   Okay.  How do you know that?
> A.   Because I do not have any of it anymore.  I've

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 21. Austin Hamblin Dep. May 1, 2026, at 113:9-25

**Austin Hamblin Dep. May 1, 2026, at 113:9-25**

Q.   And did you have a credit account directly with Warren?
A.   No, actually through Snap-On credit.
Q.   Okay.  How did it -- okay.  So this is the -- how did it get Warren's name at the top, then?
A.   I asked him to print it because he looked up my EC number and printed the credit side of it all, and then the items that I bought off of him.
Q.   Okay.  So there's kind of two reports in here?
A.   Yeah.
Q.   What's an "EC" stand for?
A.   Extended credit.
Q.   Okay.  And Warren printed your personal EC account?
A.   Yes.
Q.   Okay.  And he was just able to do that because he's a dealer?

## 22. Austin Hamblin Dep. May 1, 2026, at 115:23-25

G - 0024

**Austin Hamblin Dep. May 1, 2026, at 115:23-25**

Q.   Okay.  Is this a complete list of everything you got from Mr. Kniepkamp?
A.   No, because there's stuff that he gave me that

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

### 23. Austin Hamblin Dep. May 1, 2026, at 138:9-21

G - 0025

**Austin Hamblin Dep. May 1, 2026, at 138:9-21**

Q.   Okay.  Have you told me everything on this particular list that you believe belongs to you?
A.   Yes.
Q.   Okay.  In your opinion, is this a complete list of everything that was taken?
A.   No.
Q.   Okay.  What's missing?
A.   It is not detailed at all about anything. Assorted hand tools, power tools contained in roll cabinet drawers and tool chest.  That could be 15 different sets of sockets or whatever you may have. I've looked at -- I mean, there is -- there was a lot more than 51 items taken.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0025

## 24. Austin Hamblin Dep. May 1, 2026, at 139:3-16

**Austin Hamblin Dep. May 1, 2026, at 139:3-16**

Q.   Do you recognize that Exhibit 8?
A.   Yes, I do.
Q.   What is that?
A.   That is Mr. Snellgrove's inventory that he made.
Q.   Do you believe this inventory is complete?
A.   No.
Q.   What do you think is missing?
A.   I don't think anything's missing.  I think it's inflated on some things.
Q.   Oh, you think there's too much property listed?
A.   No, I think there's stuff that he alleges I had that I did not have and I know I didn't have.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

### 25. Austin Hamblin Dep. May 1, 2026, at 149:1-150:22

**Austin Hamblin Dep. May 1, 2026, at 149:1-150:22**

start on that medication in '23?
A.   Yes.
Q.   Okay.  Were you on that medication before the seizure?
A.   I was on a lower dosage of it.
Q.   Same three?
A.   Two.
Q.   Two?  Okay.
A.   Uh-huh.
Q.   So there's one new medication since?
A.   Well, it went away, I think.  Yeah.
Q.   So how many medications are you on today?
A.   Two.
Q.   Okay.  The same two from before?
A.   Increase in dosage.
Q.   Right.  Okay.  How long have you taken the two that you're on now prior to the --
A.   Like, maybe a month or two.
Q.   A month or two before the seizure?
A.   Uh-huh.
Q.   Were you on any kind of anti-depressant in Lubbock?
A.   No, it's anxiety medicine.  It's not a depression medicine.
Q.   Anxiety medication?

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 149:1-150:22**

A.   Uh-huh.
Q.   Okay.  Did you take any of that medication in Lubbock?
A.   No.
Q.   Oklahoma?
A.   No.
Q.   New Mexico?
A.   No.
Q.   Okay.  Only in Big Spring?
A.   Yes.
Q.   Okay.  And why were you put on it before the seizure?
A.   I was extremely stressed out with work --
Q.   Okay.
A.   -- and everything else, and yeah.
Q.   Okay.  Was it before you knew anything about the --
A.   Yes.
Q.   -- the events --
A.   Yes.
Q.   -- that this lawsuit were based on?
A.   Yes.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

**26. Austin Hamblin Dep. May 1, 2026, at 152:3-17**

G - 0029

**Austin Hamblin Dep. May 1, 2026, at 152:3-17**

that those were yours.  Do you have the receipts for
those items?
A.   They are in -- most of it's in the exhibit,
yes.  Some of it is not.
Q.   Some of it -- some of it you do not have proof
it was yours?
A.   I do not have receipts for.
Q.   Okay.  So you're saying that that is yours,
and if somebody has receipts for them, then they're
incorrect?
A.   This ain't a receipt.  This is an inventory
list.
Q.   Well, I'm talking about -- you do not have
receipts for those things in that inventory, do you?
A.   Not everything, no.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

**27. Austin Hamblin Dep. May 1, 2026, at 163:19-164:7**

**Austin Hamblin Dep. May 1, 2026, at 163:19-164:7**

Q.   You talked about you would do the books for
your particular truck or store.  Correct?
A.   I would do the end-of-the-day report from my
truck.
Q.   Okay.  And you said that Mr. Snellgrove did
the "book books"?
A.   Yes.

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 163:19-164:7**

Q.   Correct?
A.   That is correct.
Q.   What's the difference between the book books
as you stated and the inventory that you did?
A.   It's -- I didn't do an inventory.  I did the
end-of-the-day register count for the most part is what
you could call it.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0030

## 28. Austin Hamblin Dep. May 1, 2026, at 175:19-176:6

**Austin Hamblin Dep. May 1, 2026, at 175:19-176:6**

Q.    Okay.  And that's all on video.  Right?
A.    Yes, it is.
Q.    Okay.  Is the video correct?
A.    Yeah.
Q.    And you've seen the video.  Right?
A.    I have.
Q.    Okay.  And the video that you've seen, did you

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 175:19-176:6**

think any of that was altered in any way, shape, or
form?
A.    No.
Q.    Okay.  So what we're seeing on that video is
actually what happened that morning; isn't that correct?
A.    Yeah.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

### 29. Austin Hamblin Dep. May 1, 2026, at 177:16-178:2

**Austin Hamblin Dep. May 1, 2026, at 177:16-178:2**

Q.   You mentioned after you were let go by
Snellgrove Enterprises -- first of all, how did you come
to learn that you were let go by Snellgrove Enterprises?
A.   I was told by Officer Dahl that I was
essentially fired.
Q.   To your knowledge, is Officer Dahl an employee
of Snellgrove Enterprises?
A.   Not that I'm aware of, no.
Q.   So did anyone who is an employee or agent of
the Snellgrove Enterprises ever inform you that you were

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 177:16-178:2**

terminated?
A.   No.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0032

## 30. Austin Hamblin Dep. May 1, 2026, at 186:12-19

**Austin Hamblin Dep. May 1, 2026, at 186:12-19**

Q.   Okay.  The items that you believed to be Snellgrove's, where were those items kept?
A.   There was some in my truck and in my trailer and outside in the laundry room.
Q.   Okay.  And when the police came, you identified the items you believed to be Snellgrove's?
A.   That's correct.
Q.   Okay.  After that time, did the police

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0033

### 31. Austin Hamblin Dep. May 1, 2026, at 192:9-193:3

**Austin Hamblin Dep. May 1, 2026, at 192:9-193:3**

Q.   Are those records necessarily complete?  In other words, is it possible that you own items that are not on any of the records that you have reviewed?
A.   Very much so, yes.
Q.   Okay.  Generally speaking, can you give a description of items that you believe that you own that were not on any of the documents that you have reviewed?
A.   You want me to give you an item number or something?
Q.   Sure.  Take your time.
A.   Let's say the vice grip C-clamp with pads, it's a VSG11SP, which is a pair of locking pliers.
Q.   Okay.  But that item is on that list.  So I'm asking about items that might not be on the list.  So can you describe what items might not be on the list?
A.   Oh, I know for a fact that I had just bought a Harbor Freight prep tool that was taken.  I had a bunch

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 192:9-193:3**

of hydraulic wrenches that were short stubby ones that are not on that list that were taken.  I couldn't even tell you what else is missing.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 32. Austin Hamblin Dep. May 1, 2026, at 193:13-22

**Austin Hamblin Dep. May 1, 2026, at 193:13-22**

```
Q.   With respect to Exhibit A, the thing that --
from your father-in-law, that was during the middle of
the criminal proceedings; is that correct?
A.   Yes, it is.
Q.   And so at that time, you didn't have as much
information as you do now?
A.   Exactly.
Q.   So that information was true and accurate at
the time, but may not necessarily be complete?
A.   That's correct.
```

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

## 33. Austin Hamblin Dep. May 1, 2026, at 194:1-7

**Austin Hamblin Dep. May 1, 2026, at 194:1-7**

194:1 for that to happen, you'd have to have a complete list
194:2 of items in order to reconcile it against.  Would that
194:3 be correct?
194:4 A.   That would be correct.
194:5 Q.   And you don't have a full list because you
194:6 don't know everything that was taken?
194:7 A.   That is correct.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

G - 0036

### 34. Austin Hamblin Dep. May 1, 2026, at 194:17-25

G - 0037

**Austin Hamblin Dep. May 1, 2026, at 194:17-25**

A.   Fifty-one.
Q.   Were 51 items, in fact, taken from your house?
A.   No.
Q.   How many items were probably taken from your
house?
A.   A whole lot more than 51.
Q.   Do you think it could be reasonably be into
the several hundreds?
A.   Very well could be.

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

### 35. Austin Hamblin Dep. May 1, 2026, at 195:21-196:1

**Austin Hamblin Dep. May 1, 2026, at 195:21-196:1**

```
Q.   And everything that you see, you believe to be
true?
A.   Uh-huh.
Q.   So as for the portions you've seen, you
believe those to be authentic?
```

*Continuation on next screenshot.*

**Austin Hamblin Dep. May 1, 2026, at 195:21-196:1**

```
A.   That is true.
```

Exhibit A — Austin Hamblin Deposition Excerpt Screenshots

# EXHIBIT B

## KISKA HAMBLIN DEPOSITION EXCERPT SCREENSHOTS

Oral Deposition of Kiska Hamblin, May 1, 2026

The following pages contain highlighted transcript excerpts corresponding to the page-and-line designations identified for Exhibit B.

**1. Kiska Hamblin Dep. May 1, 2026, at 11:21-12:16**

---

**Kiska Hamblin Dep. May 1, 2026, at 11:21-12:16**

Q.    Sure, sure.  Did you own any tools that you kept at your residence that were solely yours?
A.    I had a pink set of tools.  It was pink screwdrivers and pink -- a smaller impact, and a -- just some other -- like, I think there was some pink pliers

---

*Continuation on next screenshot.*

---

**Kiska Hamblin Dep. May 1, 2026, at 11:21-12:16**

and stuff like that.
Q.    Okay.  What brand were those?
A.    Snap-On.
Q.    Snap-On?  Were they taken in the seizure?
A.    Yes.
Q.    Okay.  I believe Austin said the popcorn maker was yours?
A.    Yes.
Q.    Anything else other than the pink tools and a popcorn maker?
A.    The fish tank that seems not to be on any list anywhere.
Q.    Okay.
A.    That was ours.  And then the bump box speaker that was taken.  The tray tables the -- I mean, I think that's all I can think top of off the top of my head.

---

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

## 2. Kiska Hamblin Dep. May 1, 2026, at 12:17-14:25

**Kiska Hamblin Dep. May 1, 2026, at 12:17-14:25**

Q.    Okay.  The pink tools, who did you get those from?
A.    From my stepdad.
Q.    And those were a gift.  You didn't buy them?
A.    Right.
Q.    The fish tank, where did you get the fish tank from?
A.    I don't really remember where the fish tank came from.  It was one of -- one of my stepdad's friends

*Continuation on next screenshot.*

**Kiska Hamblin Dep. May 1, 2026, at 12:17-14:25**

had found it and he had given it to us because he was, like, I don't need a fish tank.  It was just, like, one of those novelty items.
          I mean, it wasn't -- kind of don't think that they even knew they took -- what it was whenever they took it because you couldn't tell it was a fish tank.  So, I mean, it was a gift from a long time ago.
Q.    Was it Snap-On branded?
A.    Uh-huh.
Q.    Okay.  What's a bump box?
A.    It's a speaker.
Q.    Okay.
A.    It's -- it was -- it's, like, this big, and it just came -- well, it came from Snap-On because they had, I guess, a brand deal with them.  And so that's why it was a Snap-On one.
Q.    Okay.  And you got that from your stepdad, too?
A.    Uh-huh.
Q.    And what were the tray tables?
A.    Like, the TV tray table.
Q.    Okay.
A.    Yeah.  It was a set of four.  And then it had a stand for them, and they were Snap-On also.
Q.    Okay.  Also from your stepdad?

*Continuation on next screenshot.*

**Kiska Hamblin Dep. May 1, 2026, at 12:17-14:25**

A.    Yes.
Q.    Okay.  And all of these -- popcorn maker, pink
tools, fish tank, bump box, tray tables were all taken
in the seizure?
A.    Yes.
Q.    Okay.  Do you have any kind of inventory for
the property that was taken?
A.    Do I have -- like, other than the receipts
and --
Q.    Obviously, we've got all these exhibits here.
A.    Right.
Q.    Is there anything else you've created -- any
other list that you have anywhere that you created?
A.    I do, but it's just a compilation of all of
the receipts and stuff.
Q.    Okay.  Do you have receipts for -- for
example, I know some of these you probably don't because
you said it was an old gift, but do you have receipts
for the popcorn maker, tools, fish tank --
A.    I'm not -- I didn't purchase them from him,
and he gave them to me, so he would be the one that
would have those receipts.
Q.    Okay.
A.    Well, except for the fish tank that he got
from somebody else.

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

G - 0042

### 3. Kiska Hamblin Dep. May 1, 2026, at 14:6-15:9

**Kiska Hamblin Dep. May 1, 2026, at 14:6-15:9**

Q. Okay. Do you have any kind of inventory for the property that was taken?
A. Do I have -- like, other than the receipts and --
Q. Obviously, we've got all these exhibits here.
A. Right.
Q. Is there anything else you've created -- any other list that you have anywhere that you created?
A. I do, but it's just a compilation of all of the receipts and stuff.
Q. Okay. Do you have receipts for -- for example, I know some of these you probably don't because you said it was an old gift, but do you have receipts for the popcorn maker, tools, fish tank --
A. I'm not -- I didn't purchase them from him, and he gave them to me, so he would be the one that would have those receipts.
Q. Okay.
A. Well, except for the fish tank that he got from somebody else.

*Continuation on next screenshot.*

**Kiska Hamblin Dep. May 1, 2026, at 14:6-15:9**

Q. Sure. The tools that you-all purchased out of your joint account, did you keep receipts for those purchases?
A. Most of them. I mean, when he would bring them -- bring the receipts home from stuff that he purchased, I kept them. But I mean, we've moved from New Mexico to Oklahoma to Texas and been married for a really long time. So I mean, there's many things that could have gotten shuffled around and --

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

## 4. Kiska Hamblin Dep. May 1, 2026, at 69:14-70:15

G - 0044

**Kiska Hamblin Dep. May 1, 2026, at 69:14-70:15**

Q.    This woman that lived at your house.
Approximately how long was she at your house from
beginning to end?
A.    Six months maybe.
Q.    Okay.  And during the six months, typically
when was she at your house?  Like, in the day, in the
evening, was it varied?
A.    Sporadic.
Q.    When she was in your house, did she have
essentially free access to your house?  Could she go
anywhere in the house that she wanted to?
A.    I mean, yeah.

*Continuation on next screenshot.*

**Kiska Hamblin Dep. May 1, 2026, at 69:14-70:15**

Q.    Okay.  Did you ever know her to go to the
laundry room outside your house?
A.    Sometimes.
Q.    Okay.  And did you ever know her to go inside,
like, your dresser drawers or, like, your closets, that
kind of thing?
A.    I mean, she -- there would be times where she
would be at the house and Austin and I wouldn't be there
because I would be with him or I was, you know, at the
grocery store or whatever.  So she was at the house
frequently with the kids at least.
Q.    But she would have had the availability to
observe, like, Snap-On Tools and other items that were
at your house?
A.    Right.

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

**5. Kiska Hamblin Dep. May 1, 2026, at 34:20-35:19**

G - 0045

**Kiska Hamblin Dep. May 1, 2026, at 34:20-35:19**

Q.    Okay.  And you're aware of the body cam video.
Correct?
A.    Of the body cam segments?
Q.    The segments is fine.
A.    Yes.
Q.    Have you viewed those segments?

*Continuation on next screenshot.*

**Kiska Hamblin Dep. May 1, 2026, at 34:20-35:19**

A.    Yes.
Q.    Are they -- do they accurately reflect what
happened at least as far as the segment goes?
A.    I can't say that for certain because I wasn't
in them.  Like, I --
Q.    So are you in any of the segments, I guess is
a good question?
A.    I am very, very briefly.
Q.    Okay.
A.    Very briefly I'm in there, and from that
little part that I'm in, yes.
Q.    Okay.
A.    The rest of it, I mean, I'm assuming that it's
fine.
Q.    Sure, that's fine.  Did you record anything on
your own device during the seizure?
A.    I did not.
Q.    Okay.  Nothing audio, video?
A.    No.

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

**6. Kiska Hamblin Dep. May 1, 2026, at 42:13-18**

**Kiska Hamblin Dep. May 1, 2026, at 42:13-18**

Q.   What did you do from August to, I guess, November of the next year with regard to seeking your property?
A.   I wasn't trying to impact the criminal case at all.  And so I was -- I was relying on the criminal defense attorney to make those communications.

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

**7. Kiska Hamblin Dep. May 1, 2026, at 50:1-17**

G - 0047

**Kiska Hamblin Dep. May 1, 2026, at 50:1-17**

Q.   -- affidavit and then the inventory?
A.   It probably needs a new one because this one's
definitely expired.
Q.   No, it's okay.  Do you have anything to add
about this or any statement to make about it?
A.   No.  I mean -- no.
Q.   Did you help create this list or did this come
directly from him?
A.   No.  Austin and I create -- I worked on it
with Austin.
Q.   Put it together?
A.   Yeah.
Q.   And his --
A.   His portion.
Q.   His portion of this, is -- it's correct that
it really is just applicable to 1, A to M?
A.   Yes.

## 8. Kiska Hamblin Dep. May 1, 2026, at 51:1-16

**Kiska Hamblin Dep. May 1, 2026, at 51:1-16**

A.    Replacement items that we've had to replace since the -- well, since he started working for Fate Fleet especially, but -- that's about it.

Q.    Do these -- all of these entries -- are each one of these entries a replacement item or just some of them actual replacement items?

A.    To the best of my knowledge.  I mean, other than -- you know, I don't know part numbers very well.

Q.    That's okay.  So to the best of your knowledge yes or no?

A.    Yes, to the best of my knowledge.

Q.    Okay.  Do you help Austin with his Fate Fleet work every now and then?  I know you did a temporary job, but regularly?

A.    I mean, no, not really because that's above my pay grade.

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

## 9. Kiska Hamblin Dep. May 1, 2026, at 52:11-53:14

**Kiska Hamblin Dep. May 1, 2026, at 52:11-53:14**

Q.   And to the best of your knowledge, is what Austin stated about it correct?
A.   Yes.  The only thing that I would have to add to that is the ATM withdrawals -- so my understanding at the time, they were for truck account payments.
Q.   Okay.
A.   To Snap-On.
Q.   And what is a truck account?
A.   It would be a -- it would be a -- it would be a revolving credit account, but it's not tracked like the revolving credit accounts, if that makes sense.
Q.   Uh-huh.  So the payment here, or the withdrawal, is that -- would that be for tools or would that be for gas, would it be for --
A.   No, it would -- it would be payment to the --

*Continuation on next screenshot.*

**Kiska Hamblin Dep. May 1, 2026, at 52:11-53:14**

whoever at the time.  Austin would pay part of it on -- out of account, and then he would pay part of it on -- in cash.
Q.   Okay.
A.   It would be up to the franchisee however they would take payment because essentially -- giving away all the trade secrets -- if they purchase things for -- like, if Austin would go on a truck and purchase things that that person had for cash, that cash wouldn't necessarily be tracked in Snap-On's system.  Does that makes sense?
Q.   Right.  Okay.
A.   So it would -- that's what the ATM withdrawals are and stuff.

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

## 10. Kiska Hamblin Dep. May 1, 2026, at 65:13-20

G - 0050

**Kiska Hamblin Dep. May 1, 2026, at 65:13-20**

```
Q.    Okay.  But was there meth?
      MR. MUELLER:  I'll object to relevance,
but you can answer.
A.    I don't know if that's what it was or not.
Q.    Okay.  Were there meth pipes?
      MR. MUELLER:  I'll object to relevance,
but you can answer.
A.    From my understanding, yes.
```

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

**11. Kiska Hamblin Dep. May 1, 2026, at 66:9-67:10**

**Kiska Hamblin Dep. May 1, 2026, at 66:9-67:10**

A.   Okay.  So the only thing that I have marked on there is I know that there's pieces of this that is -- that is grouped into this --
Q.   Okay.
A.   -- that are ours.
Q.   I'm just going to read it out.  It's the line -- it's the row on page 1, CG2000SB.  Correct?
A.   Yes.
Q.   And what part of that line item is yours?
A.   There's pieces in that -- this set that are ours.
Q.   Okay.  And would those pieces, would they be hammers screwdrivers, sockets?
A.   Just different pullers.
Q.   Pullers?
A.   Yes.
Q.   Okay.  Oh, yes, it says a puller set.  Okay.

*Continuation on next screenshot.*

**Kiska Hamblin Dep. May 1, 2026, at 66:9-67:10**

How many pullers would be in there?
A.   In the master set?
Q.   Uh-huh.
A.   I have no idea.
Q.   Okay.
A.   I think that there's -- I don't know.  I couldn't even guess.
Q.   Okay.  That's fine.
A.   But I do know that the stuff that was taken encompasses ours that we have -- that were ours.

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

## 12. Kiska Hamblin Dep. May 1, 2026, at 67:15-21

G - 0052

**Kiska Hamblin Dep. May 1, 2026, at 67:15-21**

67:15 A.   The only other thing that I -- was on page 7.
67:16 Q.   Okay.
67:17 A.   It is the -- about halfway down -- or a little
67:18 bit more than halfway down, BMPL1000.
67:19 Q.   Uh-huh.
67:20 A.   Which is ten-piece mini plier set.  I know
67:21 those were mine because they were pink.

### 13. Kiska Hamblin Dep. May 1, 2026, at 68:6-17

**Kiska Hamblin Dep. May 1, 2026, at 68:6-17**

> After all of this was complete, have you sought any medical attention or medical services for --
> A.   No.
> Q.   -- any of it?  Not gone to a counselor or anything like that?
> A.   No, because I don't have insurance.  And I haven't had insurance.
> Q.   Okay.  Have you taken any medications or anything to help with anxiety, something like that?
> A.   No.
> Q.   Okay.  Do you plan to?
> A.   I don't know.

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

## 14. Kiska Hamblin Dep. May 1, 2026, at 72:16-22

G - 0054

**Kiska Hamblin Dep. May 1, 2026, at 72:16-22**

```
A.   Because we couldn't take care of them.  We had
no income and we had no -- you know, we were facing all
of our bills still with nothing to provide for.
Q.   Okay.  So it was -- it was financial,
principally?
A.   Uh-huh.
Q.   Were there reasons other than financial?
```

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

G - 0054

## 15. Kiska Hamblin Dep. May 1, 2026, at 77:19-79:19

**Kiska Hamblin Dep. May 1, 2026, at 77:19-79:19**

Q.  Did he conduct any investigation after you made your statement internally?
A.  To my knowledge, he -- he reviewed the case file and he reviewed the body cam footage, but I don't know if he had done any further investigation of that. Just whatever he had written in his letters.
Q.  Have you had phone calls with him?

*Continuation on next screenshot.*

**Kiska Hamblin Dep. May 1, 2026, at 77:19-79:19**

A.  Numerous.
Q.  Some of those phone calls were recorded?
A.  Yes.
Q.  And you recorded them yourself?
A.  Yes.
Q.  And when you did so, you were in Texas?
A.  Yes.
Q.  What was the substance of those calls?
A.  Keeping him informed of what -- where the status was of the case.  He had -- I mean, he had follow-up questions for me about certain aspects of what happened or tell me about this or tell me about that, just whatever it is that he had come across, I guess, in his investigation.
        I mean, he -- I don't want to say he was trying to do everything he can, but he just wanted to figure out what went wrong.
Q.  Did there ever come a time when he told you what went wrong or otherwise expressed an opinion about what happened?
A.  Numerous.
Q.  And generally speaking, what was the substance of those communications?
A.  He had spoken to me about -- well, when we were in his office, we went through the affidavit for

*Continuation on next screenshot.*

**Kiska Hamblin Dep. May 1, 2026, at 77:19-79:19**

the warrant and -- that Dahl had written.
        And he read it and he inserted his --
this is how this is -- like, I guess, the way that it's
supposed to be versus the way how it was actually done.
And he didn't understand why there was such a
discrepancy in what normal policy and procedure would
have been and what was actually depicted in the
affidavit.
        And there's been several times that I've
talked to him and he's told me that, you know, I know
that this is wrong and this shouldn't have gone down
this way.  So --
Q.   Has he ever prepared any sort of declaration
or affidavit at your or your attorney's request?
A.   To my knowledge, it was -- we had a
conversation about him doing that.
Q.   Okay.  And what is the status of that at this
time?
A.   I'm not quite sure.

Exhibit B — Kiska Hamblin Deposition Excerpt Screenshots

# EXHIBIT C

## BRIAN SNELLGROVE DEPOSITION EXCERPT SCREENSHOTS

Oral Deposition of Brian Snellgrove, April 10, 2026

The following pages contain highlighted transcript excerpts corresponding to the page-and-line designations identified for Exhibit C.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0057

## 1. Brian Snellgrove Dep. Apr. 10, 2026, at 16:19-17:13

**Brian Snellgrove Dep. Apr. 10, 2026, at 16:19-17:13**

Q.   Okay.  So what is a Snap-on franchise?
A.   Snap-on franchise is a retail distribu- --
distributor of tools that we buy from Snap-on
incorporated where the retail end of the -- of their
line of tools.
Q.   Okay.  And are the franchises geographically
bound?

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 16:19-17:13**

A.   They're bound by list of calls is what they
would -- they would say.  So you have -- when you
purchase a franchise, there's places that that franchise
is assigned to do business with and so you purchase that
ability to -- to sell to those locations.
Q.   Were each of those franchises a separate
LLC?
A.   No, they all operated under Snellgrove
enterprises.
Q.   So as you acquired them, they were all folded
into the same LLC?
A.   They operate under that, but they each had
their individual operating number.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 2. Brian Snellgrove Dep. Apr. 10, 2026, at 20:3-13

**Brian Snellgrove Dep. Apr. 10, 2026, at 20:3-13**

Q.   What i- -- what kind of items have serial numbers on them?
A.   I -- of Snap-on's?
Q.   Yes.
A.   Toolboxes, electric tools, air-powered tools, if it's -- probably diagnostic type, electronic type tools, most of all those things would have serial numbers.
Q.   And when those items are sold, they -- the serial number is part of that bill of sale.
A.   It should be, yes, sir.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0059

### 3. Brian Snellgrove Dep. Apr. 10, 2026, at 20:16-21:6

**Brian Snellgrove Dep. Apr. 10, 2026, at 20:16-21:6**

A.   They take place -- the truck -- our trucks are basically a mobile store.  We don't have a storefront that's like a brick and mortar store.  So that store goes to the customer, and they usually come onto the truck and the -- whoever's running that store has opportunity to show them the things that we have for sale.  And then when they sell it, it's entered into the computer and either they're paid for at that time or a payment system -- a payment plan is set up to pay for those tools.

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 20:16-21:6**

Q.   Okay.  So the individual truck is the point of sale.
A.   Correct.
Q.   So Austin would have been a point of sale, for example.
A.   Yes, he was.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0060

## 4. Brian Snellgrove Dep. Apr. 10, 2026, at 23:16-24:7

G - 0061

---

**Brian Snellgrove Dep. Apr. 10, 2026, at 23:16-24:7**

Q.    Okay.  And how -- how was Austin as an
employee in terms of his sales?
A.    He was probably absolutely the best employee I
ever had as far as sales.
Q.    Okay.  So he was bringing in a lot of money
for you.
A.    Yes, sir, he was a great employee.
Q.    Okay.  So when did you first become suspicious
that inventory was being lost?
A.    January-ish of '23.

---

*Continuation on next screenshot.*

---

**Brian Snellgrove Dep. Apr. 10, 2026, at 23:16-24:7**

Q.    Okay.  And how did that come to your
attention?
A.    By another -- other employees suspecting that
there might be something going on.
Q.    Who were they?
A.    The one that brought it to my attention was
Andrew Nichols.

---

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 5. Brian Snellgrove Dep. Apr. 10, 2026, at 25:4-14

**Brian Snellgrove Dep. Apr. 10, 2026, at 25:4-14**

A.   All merchandise is either at the warehouse, in
by trucks, or sold to an end user.
Q.   I understand.
     But you say you thought merchandise was
missing from your warehouse --
A.   Uh-huh.
Q.   -- so what merchandise did you believe to be
missing from your warehouse?
A.   I's -- at the time we knew there -- suspected
there was a -- like air compressor, some welding
equipment.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0062

## 6. Brian Snellgrove Dep. Apr. 10, 2026, at 26:5-12

**Brian Snellgrove Dep. Apr. 10, 2026, at 26:5-12**

What is the process for which merchandise is supposed to be returned to the warehouse?
A.   Every night if it's not sold to end -- end user, it comes back to the warehouse.
Q.   Okay.  So every day the trucks are supposed to be unloaded?
A.   No, but they come and they are parked at the warehouse.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 7. Brian Snellgrove Dep. Apr. 10, 2026, at 28:16-29:15

**Brian Snellgrove Dep. Apr. 10, 2026, at 28:16-29:15**

Q.   So why did you believe that merchandise wasn't being returned to the warehouse like it was supposed to?
A.   I was told that it was -- that someone had seen merchandise at his residence.
Q.   Okay.  Saw merchandise at his residence.
He was a Snap-on distributor.
A.   Uh-huh.
Q.   Correct?
A.   Yeah -- no, he was an employee of mine.  He

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 28:16-29:15**

was not --
Q.   Fair enough.
A.   -- a Snap-on distributor.
Q.   He was not a distributor.  He was an employee of yours.  Fair enough.
A.   Uh-huh.
Q.   To your knowledge did he ever purchase Snap-on tools?
A.   Prior to him working for me, yes, he did purchase Snap-on tools.
Q.   Okay.  So it wouldn't be inherently suspicious that he had Snap-on equipment at his residence.
A.   It would be if it was a brand-new compressor or new welding machines or something that was brand new.  Yes, that would be suspicious.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0064

## 8. Brian Snellgrove Dep. Apr. 10, 2026, at 29:21-31:15

G - 0065

**Brian Snellgrove Dep. Apr. 10, 2026, at 29:21-31:15**

Q.   Well, did you -- how did you determine that it
wasn't purchased?
     Did you look at his sales records to
determine that he didn't purchase it?
A.   Yeah, he didn't purchase large items from me

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 29:21-31:15**

when he had worked for me.
Q.   Yeah, but my question is how did you know
that?
     How did you know that he didn't purchase
those?
     Because he could have just purchased it
from his own truck.  Right?
A.   I may not have access to all those records,
right --
Q.   That --
A.   -- but all that stuff belongs to me, not
him.
Q.   I understand, but that's what I'm asking.
     Did you review sales records to determine
what he did or did not purchase?
A.   Uh-huh.  Yes, I looked at his -- at the
computer.  Yes.
Q.   Okay.  And from your review of it, what did
you see that he had purchased from you?
A.   I didn't see he purchased anything from me.
Q.   He had never purchased any tools from you?
A.   He might have purchased some small things that
he put on his own personal account from time to time,
but nothing large.  I don't -- you know, small items I
don't recall actually, but I know that from time to time

*Continuation on next screenshot.*

*Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots*

**Brian Snellgrove Dep. Apr. 10, 2026, at 29:21-31:15**

employees would buy small items that they wanted for their personal use --

Q.    Uh-huh.

A.    -- and I allowed that to happen, all employees.  So it was not something that I monitored heavily because I trusted them.  If they wanted to do that, to buy something small, then I allowed them to do it.

Q.    Okay.  So he might have purchased hand tools, sockets, screwdrivers, wrenches, that kind of thing.

A.    If he did, it was in a very small -- it was very minor purchases if he did, nothing of any value --

Q.    Okay.

A.    -- of lar- -- nothing of large value, I shou- -- guess I should say.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0066

## 9. Brian Snellgrove Dep. Apr. 10, 2026, at 33:19-34:2

**Brian Snellgrove Dep. Apr. 10, 2026, at 33:19-34:2**

A. Well, at the time we were moving a high volume of merchandise. We had the five trucks. Mr. Hamblin was moving a large volume of merchandise himself so just began to try to track back through some of the promotions we'd done, the bigger -- some of those bigger items that, begin to try to figure out did they end up in an end user's place. I could not -- I couldn't find

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 33:19-34:2**

where they had and -- but they were not present at my warehouse anymore either.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 10. Brian Snellgrove Dep. Apr. 10, 2026, at 36:13-22

G - 0068

**Brian Snellgrove Dep. Apr. 10, 2026, at 36:13-22**

So when you went to the police, what -- what records or documentation did you present to them?

A.    Mainly just suspicions, and then, I did not have the documentation, but Mr. Nichols had more evidence of sus- -- suspected issues than I did.  So, I told them what I knew and then allowed the police to do their -- their part after that to investigate.

Q.    To your knowledge did Mr. Nichols talk directly to the police?

A.    Yes.  I know he probably did, yes.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0068

## 11. Brian Snellgrove Dep. Apr. 10, 2026, at 37:11-38:18

**Brian Snellgrove Dep. Apr. 10, 2026, at 37:11-38:18**

What -- what exactly did they tell you?
A.   That they had gained a search warrant and they planned to execute it.
Q.   Okay.  Did they ask you to do anything for them?
A.   No.
Q.   Okay.  Did they ask you at that time to -- that they were gonna use your warehouse to store any property?
A.   No, absolutely not.  We didn't know.  They were just gonna execute a search warrant --
Q.   Yeah.
A.   -- is all I know.
Q.   Okay.  Did they -- any -- at that evening, did they ask for you to participate?

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 37:11-38:18**

A.   No.
Q.   So as of that evening, the evening before the search --
A.   Uh-huh.
Q.   -- your knowledge simply was that they were going to do a search.
A.   Uh-huh.
Q.   And you had no expectation that you personally were gonna participate.
A.   No.
Q.   Okay.  When did that change?
A.   During the morning of the search, I don't know exactly what time.  Going about our day normally, I received a call saying that they had executed a search warrant and that there was a much larger amount of merchandise that -- marked with Snap-on branding there than they had anticipated and then said -- asked if I could assist in identifying at that point.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0069

## 12. Brian Snellgrove Dep. Apr. 10, 2026, at 39:17-24

**Brian Snellgrove Dep. Apr. 10, 2026, at 39:17-24**

A.   I complied with what they asked me to do, to
some identify merchandise if possible.
Q.   Okay.  What did you bring with you?
A.   They asked -- they said -- they said -- asked
if I could bring -- they did not have a -- anything to
haul off any large items so they asked if I could bring
trailers or truck or something that things could be --
could possibly be loaded in.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0070

### 13. Brian Snellgrove Dep. Apr. 10, 2026, at 40:17-22

**Brian Snellgrove Dep. Apr. 10, 2026, at 40:17-22**

A.   Specifically I don't know except they star- --
said there's merchandise.  They -- we were -- I believe
was in the front -- in front of Austin and Kiska's
house.  I remember the first place they took me was into
Austin's personal trailer to see -- to see some
merchandise in there.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 14. Brian Snellgrove Dep. Apr. 10, 2026, at 41:21-43:21

G - 0072

**Brian Snellgrove Dep. Apr. 10, 2026, at 41:21-43:21**

Q.   And what did you do when you were there?
A.   I was asked to identify and see if merchandise possibly belonged to me.
Q.   Okay.  So there wa- -- in his tool shed there was quite a lot of Snap-on related equipment that you

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 41:21-43:21**

saw.  Was that true?
        MR. MUELLER:  I'm sorry for the leading question.  I'll rephrase.
A.   Uh-huh.
Q.   (BY MR. MUELLER)  What -- when you went into the back -- when you went into that back shed, what did you observe there?
A.   Inside the back shed were at -- at least a couple of toolboxes, one very large -- one of our larger capacity style.  There was -- had some different tool-holding devices mounted up on the walls.
Q.   Okay.
        MR. MUELLER:  Kiska, the battery just died.
        MS. HAMBLIN:  Oh, no.
        MR. MUELLER:  One second, please.
        (Recess.)
Q.   (BY MR. MUELLER)  Okay.  So you -- would you just mind repeating your previous answer about what you observed when you were in the shed.
A.   Yes, sir.  I recall that there was a large toolbox along one side from my -- if I remember correctly, at least one other toolbox, tool storage unit on the wall.  I remember there being a -- it's kind of a cabinet that holds different styles of pullers and

*Continuation on next screenshot.*

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

**Brian Snellgrove Dep. Apr. 10, 2026, at 41:21-43:21**

things.  It's very small -- pret- -- fairly small space, but it was really packed with different things in there.

Q.  Did you open any drawers?

A.  Yes, I did.

Q.  Okay.  When you opened the drawers, what did you see?

A.  Just a lot of hand tools --

Q.  Okay.

A.  -- lot of small tools.

Q.  Okay.  By -- what process did you -- what was your process of determining which equipment was yours?

A.  Well, as I looked around, all of it -- the larger items were much easier to identify because of the colors and stuff so that was easy to say, "Yeah, I know that was something that we had ordered."

And then as we begin to go looking more and more, per Mr. Hamblin's response during that time -- he -- he said, "Yes, all this belongs to Mr. Snellgrove. It's not mine."  So at that point I began to assume that probably most of that was mine since he told me that.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 15. Brian Snellgrove Dep. Apr. 10, 2026, at 45:4-13

**Brian Snellgrove Dep. Apr. 10, 2026, at 45:4-13**

Q.    When you were opening these items, were -- was
there an officer there as well?
A.    I believe there was an officer present at all
times, yes, sir.
Q.    Okay.  Do you recall which officer was with
you?
A.    I know Officer Dahl was present through
probably most of it.  Not sure if he was present 100
percent of the time, but he was the main officer that
was present during the identifying of merchandise.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0074

### 16. Brian Snellgrove Dep. Apr. 10, 2026, at 48:15-49:4

G - 0075

**Brian Snellgrove Dep. Apr. 10, 2026, at 48:15-49:4**

A.    Oh, as we identified items, at some point we did go into the house, like I said, only as I was directed by the deputies to -- to help identify.  I --

Q.    I understand.

So you went into the house.

A.    Uh-huh.

Q.    And you went into all the rooms in the house except for the bathroom.

A.    Most likely.  I don't recall specifically.

Q.    And you were looking for additional items that might be yours.

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 48:15-49:4**

A.    I was told by the deputies that there were items in those rooms that had Snap-on on them, right, were branded so they -- they were asking me about those items.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 17. Brian Snellgrove Dep. Apr. 10, 2026, at 50:1-6

**Brian Snellgrove Dep. Apr. 10, 2026, at 50:1-6**

A.   Whatever the officers directed me to do.
Q.   Okay.  What did they direct you to do?
A.   After Austin said that most of those -- that
all those things in that -- in our area there did belong
to me and not him, then I was directed by the officers
to begin to load those items up.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0076

## 18. Brian Snellgrove Dep. Apr. 10, 2026, at 51:8-17

G - 0077

**Brian Snellgrove Dep. Apr. 10, 2026, at 51:8-17**

Q.   Okay.  So after the items were located -- were put on your truck, what did you do next?

A.   I was told to transport them back to my warehouse and quarantine them off in a section because the county did not have a place big enough to hold all the items.

Q.   Okay.  Were you asked, or were you told?

A.   I don't -- I don't know.  Asked if I had the ability to do that probably, and then when it was agreed to that I had a place that I could quarantine those

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

### 19. Brian Snellgrove Dep. Apr. 10, 2026, at 52:17-53:1

**Brian Snellgrove Dep. Apr. 10, 2026, at 52:17-53:1**

A.   Yeah.  Well, it -- when -- when we came -- showed back up with the stuff, anything that was in that section, then we moved to other sections of the warehouse so there would not be any question about what was there and what was just brought in.

Q.   Okay.  So you moved various items from that portion of the warehouse to a different place and then unloaded the truck onto this empty space that you created.

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 52:17-53:1**

A.   Correct.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0078

### 20. Brian Snellgrove Dep. Apr. 10, 2026, at 53:22-54:7

**Brian Snellgrove Dep. Apr. 10, 2026, at 53:22-54:7**

Q.    Okay.  Once the items were unloaded, what did you do?
A.    I left -- left them alone separated until further instruction was given.

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 53:22-54:7**

Q.    And when was further instruction given?
A.    I was asked if I could inventory those items because the only way to -- to inventory them would be -- would be to use our part numbering system, which is only in our sales software.  So I was asked if I could do an inventory of that so that next morning we began to start itemizing all the things that were there.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0079

## 21. Brian Snellgrove Dep. Apr. 10, 2026, at 55:3-18

**Brian Snellgrove Dep. Apr. 10, 2026, at 55:3-18**

Q.   All right.  After they were inventoried, who had access to the barn?
A.   Well, all my employees had access because we continued to operate our normal business operations out of the rest of the warehouse.
Q.   Okay.  How many employees did you have at the time?
A.   Oh, there would have been probably 11.
Q.   Okay.  So you and 11 other people had access to the barn?
A.   Yes.
Q.   What instructions did you give relating to the seized property to your employees?
A.   They were not -- to not touch any of it or move any of it.
Q.   And how did you give them that instruction?

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 22. Brian Snellgrove Dep. Apr. 10, 2026, at 56:16-23

**Brian Snellgrove Dep. Apr. 10, 2026, at 56:16-23**

Can you tell me the date and time of that according to the document.

A.   5/17/23 at 3:04, I guess is when this document was started.

Q.   Okay.  5/17 was the date of the search.

A.   Okay.

Q.   So you started doing inventory that evening?

A.   Yes, sir, we did.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 23. Brian Snellgrove Dep. Apr. 10, 2026, at 58:17-59:8

**Brian Snellgrove Dep. Apr. 10, 2026, at 58:17-59:8**

A.   They were not sold to anyone.  That -- those -- these items I looked up in our -- in the -- in the other sales software computers to see if those items had been sold to anyone so we could see if they'd gone to an end user, and they were not.

Q.   Okay.  So what -- what did your records reflect in terms of the serial-numbered items?

A.   Well, all -- all those items should have still been just in our inventory somewhere, not -- they

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 58:17-59:8**

weren't -- they were in an inventoried -- they weren't in an end user's receipt anywhere.

Q.   Okay.  Do you have any records or documentation relating to those individual items, the serial-numbered items?

A.   Every -- the vast majority of those items are all traceable through invoicing from Snap-on or inside our inven- -- or inside our inventory.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0082

## 24. Brian Snellgrove Dep. Apr. 10, 2026, at 65:11-66:3

G - 0083

**Brian Snellgrove Dep. Apr. 10, 2026, at 65:11-66:3**

A.    There -- there were many items bought through the supplemental catalog that would have been purchased through our sales software, and if there was any other items that were taken, it was because they were inside of tool cabinets that had already been -- by Mr. Hamblin's admission, they should have been in my warehouse.  So if something was taken that was inside of that, we were loading the big toolbox if i- -- so...

Q.    Were there any items that were Craftsman or Harbor Freight?

A.    Could have been, yes, sir.

Q.    Would those items have belonged to you?

A.    Probably not, no, sir.

Q.    Okay.

A.    Like I said, if they were loaded, it was

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 65:11-66:3**

because they were inside something that Mr. Hamblin already admitted belonged to me.  That's the only reason they would have been picked up.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 25. Brian Snellgrove Dep. Apr. 10, 2026, at 71:3-18

**Brian Snellgrove Dep. Apr. 10, 2026, at 71:3-18**

Q.   Okay.  Did employees ever keep items at their -- that -- that -- at their own place and those were -- would be the place at which those items were recovered from?

A.   No, sir, not -- not -- they did not have permission to do that.  If it was done, it was out -- without my knowledge.

Q.   For items that were to be marked as destroyed, those items would have no value.  Is that -- is that your understanding?

     Or what value would they have?

A.   The value would have been that -- that Snap-on corporate would have given me credit for it.

Q.   Yeah.

A.   So it had no retail value, again, but it was to not be back in the market.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 26. Brian Snellgrove Dep. Apr. 10, 2026, at 72:11-13

**Brian Snellgrove Dep. Apr. 10, 2026, at 72:11-13**

72:11 destroyed, did you ever allow employees to keep those
72:12 items for their own personal use?
72:13 A.   Don't recall ever letting anybody, no, sir.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0085

## 27. Brian Snellgrove Dep. Apr. 10, 2026, at 73:7-13

**Brian Snellgrove Dep. Apr. 10, 2026, at 73:7-13**

Q.    Okay.  While the items that were seized were
kept at your warehouse, did you have any ongoing
inventory?
        Did you periodically recheck the items to
see if they were still there, for example?
A.    Yeah, they were on constant camera video and
they were not touched until we were told we could.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0086

## 28. Brian Snellgrove Dep. Apr. 10, 2026, at 73:21-74:16

**Brian Snellgrove Dep. Apr. 10, 2026, at 73:21-74:16**

Q.   Okay.  Okay.  What was the circumstances under which you were told that the items were released?

How did you learn that?

A.   I was notified by Sheriff Ingram and/or Deputy Dahl, maybe both, that it was okay to take those items

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 73:21-74:16**

and put them back into my sellable inventory.

Q.   Do you recall the date on which that occurred?

A.   Not specifically, no, sir.

Q.   Okay.  So when you put them back into your inventory, did you create like new records for those items to reflect that they were in your inventory?

A.   The way that our sales system works is like since we had the five different operating numbers and it's underneath the one Snellgrove Enterprises canopy, items were traded between trucks quite often and so specific items were not reentered into computers every time.  So there's not a specific trail for every single item that goes from one truck to another truck.  It comes out of the warehouse and then was just sold off of -- off of trucks.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0087

## 29. Brian Snellgrove Dep. Apr. 10, 2026, at 79:5-20

**Brian Snellgrove Dep. Apr. 10, 2026, at 79:5-20**

A.    I mean probably several thousand because as --
because he was such a good salesman.
Q.    Okay.  Why did you -- why did you fire him?
A.    Because we discovered he had quite a bit of
inventory that belonged to Snellgrove Enterprises
that -- not at -- where it was supposed to be.  It was
at his personal residence and not at the warehouse.
Q.    Okay.  At any point did you ask for the stuff
back?
A.    Not sure what you --
Q.    I mean --
A.    -- mean by that.
Q.    -- did you ever ask him for any property that
was at his house, did you ever ask him to return it?
A.    No, sir, because I will say it was not
supposed to be there.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0088

### 30. Brian Snellgrove Dep. Apr. 10, 2026, at 81:19-82:8

**Brian Snellgrove Dep. Apr. 10, 2026, at 81:19-82:8**

Q.   Okay.  Were -- to -- to the best of your knowledge are any of the items that were seized from Austin, are they -- any of those items still in your possession?

A.   No, sir.

Q.   Were any of the items that were seized transferred, given, gifted, sold to the sheriff's

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 81:19-82:8**

office?

A.   No.

Q.   To Mr. Ingram?

A.   No.

Q.   Did Mr. Ingram or any other member of the sheriff's department ever suggest that they could get some of the stuff --

A.   No, sir.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0089

## 31. Brian Snellgrove Dep. Apr. 10, 2026, at 85:10-19

**Brian Snellgrove Dep. Apr. 10, 2026, at 85:10-19**

I guess the day of discovering the search warrant was executed, it was --

Q.   Okay.  How --

A.   -- over.

Q.   How was he informed that his employment was terminated?

A.   I don't know, except that when I was there, his plea to me was, "I" -- basically, "I know I'm not gonna have a job, but please don't send me to jail," and, "This is all your stuff."

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0090

## 32. Brian Snellgrove Dep. Apr. 10, 2026, at 89:19-90:15

G - 0091

**Brian Snellgrove Dep. Apr. 10, 2026, at 89:19-90:15**

Q.   Was Mr. Hamblin's name -- did it appear on any
Snap-on paperwork or in your system after his date of
firing?
A.   It probably did, yes, sir.
Q.   Why would that be?
A.   Because the store -- particular store that he
managed was assigned to him and be- -- and -- or the

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 89:19-90:15**

name was assigned to him so then when -- so when orders
come in, it's able -- able to distinguish between
which -- which store those items were -- had been
ordered under and so it's not an immediate transfer of
those names.  It -- it has to be filed, "Okay, this is
gonna be the new name under which we operate this
particular store, particular franchise," so...
Q.   So as far as the Snap-on paperwork showed,
he -- it was still his route for some period of time
after he was fired.
A.   Well, it's never his route.  It belongs to
Snellgrove Enterprises.  He operated the store with
which -- with which he was employed to do.
Q.   But it was in his name.
A.   The operation of the store was in his name.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

### 33. Brian Snellgrove Dep. Apr. 10, 2026, at 93:6-16

**Brian Snellgrove Dep. Apr. 10, 2026, at 93:6-16**

Q. With respect to receipts, do you have like specific receipts relating to the particular items that were sold -- I apologize -- that were seized?

A. Do I have receipts --

Q. Yeah.

A. -- of where I purchased them from Snap-on?

Q. Yeah.

A. Yes, there's -- the vast majority of those you can line up with those specific item numbers --

Q. Okay.

A. -- or part numbers.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0092

## 34. Brian Snellgrove Dep. Apr. 10, 2026, at 93:17-22

**Brian Snellgrove Dep. Apr. 10, 2026, at 93:17-22**

```
Q.   And is there documentation beyond their
initial purchase by Snellgro- -- Snellgrove Enterprises
about what happened to those items?
A.   Well, then if they were sold through our sales
software, those same part numbers would appear in the
re- -- on the customer's invoice.
```

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 35. Brian Snellgrove Dep. Apr. 10, 2026, at 95:8-22

**Brian Snellgrove Dep. Apr. 10, 2026, at 95:8-22**

So for these seized items -- for those serial numbers that were seized --

A. Yes, they never showed to be to an end user, no, sir.

Q. None of those were ever shown as --

A. The ones that we seized?

Q. Yeah.

A. Not to my knowledge, no, sir.

Q. Okay. So they -- the records that you showed simply reflected that they were purchased by Snellgrove Enterprises --

A. And not --

Q. -- there were no records beyond that?

A. Not -- yeah, not delivered to an end user, correct.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 36. Brian Snellgrove Dep. Apr. 10, 2026, at 100:16-101:7

**Brian Snellgrove Dep. Apr. 10, 2026, at 100:16-101:7**

Q. As part of your participation in the search, were you provided any particular instruction what they -- what -- what exactly did they say to you?

A. They just asked if I could identify items.

Q. Did you ever express any doubts to your wife or employees about the allegations after you reported them?

A. Any doubts --

Q. Yeah.

A. -- about them?

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 100:16-101:7**

Q. Yeah.

A. What do you mean by that?

Q. Did you ever, for example, say, you know, "I think that this might not be true," or that, you know, I think -- you know, I think that he -- some of this stuff isn't mine?" Did you ever express any concerns?

A. No.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

### 37. Brian Snellgrove Dep. Apr. 10, 2026, at 102:6-17

**Brian Snellgrove Dep. Apr. 10, 2026, at 102:6-17**

Q.    Did either Kiska or Austin ever assert ownership of any of the items that you were seizing?

A.    Yes.

Q.    Okay.  So -- and with respect to those particular items --

A.    Uh-huh.

Q.    -- what was your basis for taking them?

A.    Austin's admission that all that stuff belongs to Snellgrove Enterprises.

Q.    But at some point he specifically said that particular items were his.

A.    No, he didn't.  Kiska s- -- did.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0096

## 38. Brian Snellgrove Dep. Apr. 10, 2026, at 102:12-14

G - 0097

**Brian Snellgrove Dep. Apr. 10, 2026, at 102:12-14**

```
102:12  Q.   -- what was your basis for taking them?
102:13  A.   Austin's admission that all that stuff belongs
102:14  to Snellgrove Enterprises.
```

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

### 39. Brian Snellgrove Dep. Apr. 10, 2026, at 104:4-8

**Brian Snellgrove Dep. Apr. 10, 2026, at 104:4-8**

104:4  A.   No, not particularly, just that Austin
104:5  admitted it should -- we -- I was going under the
104:6  understanding that they had talked to Austin, Austin
104:7  admitted to me that it belonged to me, and so we took
104:8  that he said belonged to me.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0098

## 40. Brian Snellgrove Dep. Apr. 10, 2026, at 111:3-12

**Brian Snellgrove Dep. Apr. 10, 2026, at 111:3-12**

Q.   Were there physical receipts or physical papers that were taken as part of the search?

A.   I don't recall.

Q.   Did Kiska or Austin ever present you any documents or papers that they purported to show ownership or receipts?

A.   I don't recall that being shown to me.

Q.   Did you, during the search, see any papers or receipts or anything else that might indicate purchases?

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0099

## 41. Brian Snellgrove Dep. Apr. 10, 2026, at 114:7-12

G - 0100

**Brian Snellgrove Dep. Apr. 10, 2026, at 114:7-12**

Q.   Have you ever reviewed the bodycam footage
that was taken by the police in response to this case?
A.   Yes, sir.
Q.   Does the footage accurately reflect your
participation as -- as far as the video itself goes?
A.   Best I could tell, yes, sir.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 42. Brian Snellgrove Dep. Apr. 10, 2026, at 117:1-13

G - 0101

**Brian Snellgrove Dep. Apr. 10, 2026, at 117:1-13**

A.    I was curious as to why the charges had been
dropped.
Q.    And what did they tell you?
A.    I did not get a very clear explanation except
that it just -- they -- inconsistencies in the
presenting of the evidence.
Q.    Okay.  Why did you call the district attorney
after being noticed as a defendant in a civil lawsuit?
A.    I just -- out of curiosity as to why the --
what seemed like an overwhelmingly noted case of things
being taken from my property that were -- that belonged
to me, how did it happen that -- that none of that was
ever taken to -- to a trial.  So just curiosity

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

### 43. Brian Snellgrove Dep. Apr. 10, 2026, at 117:22-118:9

**Brian Snellgrove Dep. Apr. 10, 2026, at 117:22-118:9**

Q.   Okay.  Who is paying your legal bills?
A.   I am.
Q.   Is any other -- is anyone else paying this,
like indemnified you?

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 117:22-118:9**

Is an insurance company paying any part
of this?
Has -- Mr. Dennis paying any part of
this?
Is the county paying any part of this?
A.   No, sir.
Q.   So all the legal fees that you've paid are
coming out of your pocket?
A.   Yes, sir.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 44. Brian Snellgrove Dep. Apr. 10, 2026, at 122:10-18

**Brian Snellgrove Dep. Apr. 10, 2026, at 122:10-18**

Q.    What are these documents?
A.    Text messages between Brad Ingram and myself.
Q.    Okay.  All right.  So these -- this first message is dated May the 15th, 2023.
A.    Uh-huh.
Q.    Okay.  And so these reflect text messages that you were -- that you were making to Brad Ingram in the immediate run-off to the search --

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

**45. Brian Snellgrove Dep. Apr. 10, 2026, at 123:3-8**

**Brian Snellgrove Dep. Apr. 10, 2026, at 123:3-8**

So you need -- you were asking him to coordinate on timing of the search?
A.   No.
Q.   What is that reflecting?
A.   I was asking where he was in the -- in the procession of getting search warrants.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 46. Brian Snellgrove Dep. Apr. 10, 2026, at 133:16-134:9

**Brian Snellgrove Dep. Apr. 10, 2026, at 133:16-134:9**

Q.   Okay.  Does the agenda items reflect any discussions relating to any lawsuits or other litigation involving the county?
A.   I don't believe so.
Q.   Okay.  Is -- is it possible that such matters were discussed despite not being on the agenda?
A.   No, sir.
Q.   Okay.  So there would have been no discussion relating to any lawsuit where litigation [sic] during the January 27th, 2026, meeting.

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 133:16-134:9**

A.   Correct.
Q.   Okay.  Were -- to the best of your knowledge, has there been any meetings in which litigation or lawsuits concerning the county have been discussed?
A.    No, sir, the only reference to any lit- -- litigation that's ever been discussed is I made the other commissioners aware that I had been named in a lawsuit that the county was also named in, and that was the extent of the conversation.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

## 47. Brian Snellgrove Dep. Apr. 10, 2026, at 135:3-10

**Brian Snellgrove Dep. Apr. 10, 2026, at 135:3-10**

County so I suppose my questions are who is he actually getting instructions from?
Who -- who is telling him how they want to handle the matter and how they want to pursue litigation?
A.   It's not the commissioners.
Q.   Not the commissioners court?
A.   Not in any way.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0106

**48. Brian Snellgrove Dep. Apr. 10, 2026, at 136:14-16**

G - 0107

**Brian Snellgrove Dep. Apr. 10, 2026, at 136:14-16**

136:14  A.   I could answer the fact that this case has
136:15  ever been discussed in closed session, if that's -- if
136:16  that answers what you want.

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0107

### 49. Brian Snellgrove Dep. Apr. 10, 2026, at 145:17-147:14

**Brian Snellgrove Dep. Apr. 10, 2026, at 145:17-147:14**

A.   Oh, yes, it would.
Q.   Okay.  What's the nature of the relevance?
A.   Because every item within that warehouse is accessible to all five trucks at some point.
Q.   So 2F reflects the warehouse?
A.   2F is the second franchise.  All orders are shipped to the warehouse, including 5F.
Q.   Okay.
A.   All items not needed directly on the truck are

*Continuation on next screenshot.*

**Brian Snellgrove Dep. Apr. 10, 2026, at 145:17-147:14**

stocked in the warehouse, then accessible to any truck to be sold.
Q.   Okay.  Then when -- so -- so here when it says that it's shipped to 2F --
A.   Uh-huh.
Q.   -- 2F wouldn't be Austin's franchise.
A.   No.
Q.   Okay.  So why was it shipped to 2F as opposed to, you know, any other franchise if they're all equally available?
A.   Why would that matter?
     It's shipped to the warehouse.  I mean, the point is that it's in -- it's in the warehouse and available to whoever needs to sell it.
Q.   Yeah, I -- I -- I guess my question is why -- why write 2F at all?
     Why not just say Snellgrove Enterprises at this address?
     Why -- why specify 2F if it's equally available for all trucks?
A.   Every order has to be placed under one of the trucks so it has to be placed under one of the five franchises.
Q.   Okay.  And is the choice of which to place it under arbitrary?

*Continuation on next screenshot.*

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0108

**Brian Snellgrove Dep. Apr. 10, 2026, at 145:17-147:14**

A.    It's generally up to me as the owner.
Q.    Okay.  So how do you decide which of the five
branches to order under?
        Is it with any sort of, you know, pattern
or --
A.    Yeah, in general it's -- it's directly related
to the amounts sold, so as that truck sells that big
volume of merchandise, then the order under that truck
would be bigger.  So directly related to the volume sold
mostly.
Q.    Okay.  So it is meant to replace inventory
that was sold from that particular truck?
A.    In general, yes, but it's meant to replace the
inventory overall for the entire company as well so...

Exhibit C — Brian Snellgrove Deposition Excerpt Screenshots

G - 0109