IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| AUSTIN HAMBLIN and KISKA HAMBLIN, *Plaintiffs*, | § § § § | |
| v. | § § | MO:25-CV-00245-RCG |
| BRAD INGRAM, ANDERS DAHL, KELSEY BROWN, RORY GAMMONS, WESTON PHELPS, each in their individual capacity; MARTIN COUNTY, TEXAS; and BRIAN SNELLGROVE; *Defendants*. | § § § § § § § § § | |

## OMNIBUS ORDER

BEFORE THE COURT are Defendants Martin County, Brad Ingram, Anders Dahl, Kelsey Brown, Rory Gammons, and Weston Phelps' Motion for Summary Judgment (Doc. 26) and Plaintiffs Austin Hamblin and Kiska Hamblin's Partial Motion for Summary Judgment (Doc. 78).[1] This case is before the Court pursuant to the consent of the parties in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Docs. 9, 10, 38). After due consideration of the briefs and the relevant case law, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 26) and **DENIES** Plaintiffs' Partial Motion for Summary Judgment (Doc. 78).

## I.    BACKGROUND

On May 6, 2025, Plaintiffs Austin Hamblin ("Plaintiff Austin") and Kiska Hamblin ("Plaintiff Kiska") (collectively, "Plaintiffs"), initially proceeding *pro se*, commenced this action in the 118th Judicial District, Martin County, Texas, against Defendants Martin County,[2] Brad

---

1. All citations are to CM/ECF generated pagination unless otherwise noted.

2. The Court notes that up until Plaintiffs' Third Amended Complaint, Martin County Sheriff's Department was a named Defendant. (Docs. 2-3, 15, 46). In the Third Amended Complaint, which is the live pleading before the

Ingram, Anders Dahl, Kelsey Brown, Rory Gammons,[3] and Weston Phelps (collectively, "Martin County Defendants") (excluding Martin County, "Martin County Officers"). (Doc. 2-3). On May 22, 2025, Martin County Defendants removed the action to this Court and subsequently filed an Answer. (Docs. 1, 2, 3). On June 18, 2025, an attorney appeared on behalf of Plaintiffs and moved to amend their Complaint, which the Court granted. (Docs. 12, 14). In the Amended Complaint, Plaintiffs brought suit against an additional defendant, Brian Snellgrove ("Defendant Snellgrove"). (Doc. 15).

Six months before the dispositive motion deadline, on October 2, 2025, Martin County Defendants filed a Motion for Summary Judgment as to all claims (Doc. 26) and a Motion to Stay Discovery until the immunity questions were resolved (Doc. 27). The Court granted in part the Motion to Stay, allowing discovery on all claims without an immunity defense and narrowly tailoring discovery on claims with immunity defenses. (Doc. 37). Additionally, the Court allowed the Parties to supplement their briefing on the Motion for Summary Judgment after the close of discovery. *Id*.

On May 19, 2026, Plaintiffs filed their Third Amended Complaint, the live pleading before the Court, bringing the following causes of action: (1) violation of the Fourth Amendment under 42 U.S.C. § 1983 against Martin County Officers and Defendant Snellgrove; (2) violation of the Fourteenth Amendment under § 1983 against Martin County Officers and Defendant Snellgrove; (3) civil rights conspiracy under § 1983 against Martin County Officers and

---

Court, Plaintiffs replaced the Sheriff's Department with Martin County, Texas. (Doc. 74). The Court considers this a distinction without a difference. *Ford v. Brown*, No. 25-CV-0015, 2026 WL 757560, at *3 (N.D. Tex. Feb. 19, 2026) ("Suing a county's sheriff office is equivalent to suing the county itself." (citing *Sheffield v. Doe*, No. A-11-CA-300, 2012 WL 5198089, at *7 (W.D. Tex. Oct. 18, 2012))).

3. The Court recognizes Rory Gammons is employed by the Howard County Sheriff's Department, rather than Martin County, but for ease and simplicity, the Court will refer to Martin County and each of the individual officers collectively as Martin County Defendants. (*See* Doc. 15 at 3).

Defendant Snellgrove; (4) municipal liability under § 1983 against Martin County; (5) conversion against Defendant Snellgrove; (6) negligence against Defendant Snellgrove; (7) abuse of process against Defendant Snellgrove; (8) Texas Theft Liability Act ("TTLA") against Defendant Snellgrove; and (9) unjust enrichment against Defendant Snellgrove. (Doc. 74 at 19–34). One month later, the Court allowed Plaintiffs to file a Partial Motion for Summary Judgment. (Doc. 78). Plaintiffs seek summary judgment on the following claims: (1) Fourth Amendment violation; (2) Fourteenth Amendment violation; (3) civil rights conspiracy; (4) municipal liability; (5) conversion; (6) abuse of process; and (7) TTLA. *Id*.

The undisputed factual background is as follows. Defendant Snellgrove owned a Snap-On tools franchise. (Doc. 78-2 at 7). Plaintiff Austin began working for Defendant Snellgrove in 2019. *Id*. at 21. In January 2023, Defendant Snellgrove became suspicious that Snap-On inventory was going missing from his warehouse. *Id*. at 23–24. On May 11, 2023, Defendant Snellgrove made a theft report to Defendant Phelps, a Martin County Deputy Sheriff, alleging Plaintiff Austin was involved in the theft of Snap-On products or the diversion of sales proceeds. (Doc. 78-5 at 1). On May 15, 2023, Defendant Dahl, a Martin County Sheriff's Investigator, interviewed Defendant Snellgrove, who told him his financial loss was approximately $200,000. *Id*. On May 16, 2023, a magistrate judge issued a search warrant for Plaintiffs' residence to seize two-items: Snap-On plasma cutter model 30I and a Snap-On air compressor. (Doc. 26-1 at 4).

The Martin County Sheriff's Department executed the search warrant the next day, led by Defendant Dahl. (Doc. 78-5 at 1). Defendants Brown and Gammons accompanied Defendant Dahl in executing the warrant. *Id*. Defendant Ingram, Martin County's Sheriff, arrived shortly after the search began. (Doc. 78-1 at 8). Plaintiffs Austin and Kiska and their two young children were present in Plaintiffs' residence during the search. (Doc. 81-1 at 227). Defendant Dahl told

Plaintiff Austin the purpose of the search was to see what Snap-On products he had and determine whether there was anything stolen. AXON Body 0803 at 04:48–05:10. Roughly three hours into the search, Defendant Snellgrove arrived at the residence to do a "walkthrough." AXON Body 1045 at 00:30. The search continued late into the afternoon and ultimately resulted in the seizure of 51 items, including an unspecified number of hand and power tools. (Doc. 26-1). All the items seized were loaded onto Defendant Snellgrove's truck and unloaded at his warehouse. (Doc. 78-1 at 61, 94, 108). Martin County Defendants "released" the seized Snap-On property to Defendant Snellgrove for storage purposes and to assess the total dollar value of the "stolen property recovered." (Doc. 78-5 at 2). Defendant Snellgrove valued his loss at $283,445, and Martin County Defendants "took Mr. Snellgrove's word" for it. (Doc. 78-1 at 30, 120). Shortly after, Plaintiff Austin was indicted for theft of more than $150,000 but less than $300,000. (Doc. 26-1 at 17–18). In November 2024, the indictment was dismissed. *Id*. at 15.

The Court will consider Martin County Defendants' Motion for Summary Judgment and Plaintiffs' Partial Motion for Summary Judgment together.[4] Each Motion has been fully briefed. (Docs. 26, 35, 36, 51, 78, 81, 82, 84, 85). Accordingly, this matter is ripe for disposition.

## II.    LEGAL STANDARD

Summary judgment is appropriate if, viewing facts and drawing reasonable inferences in the light most favorable to the nonmoving party, the movant shows that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Jackson v. Cal–Western Packaging Corp.*, 602 F.3d 374, 377 (5th Cir. 2010). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the

---

4. "Rule 56 of the Federal Rules of Civil Procedure requires a court to consider the whole record when ruling on a motion for summary judgment." *United States v. Houston Pipeline Co*., 37 F.3d 224, 227 (5th Cir. 1994). The record includes "depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] admissions, interrogatory answers, or other materials" FED. R. CIV. P. 56(c).

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and drawing all justifiable inferences in favor of the nonmovant. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence or evaluate the credibility of witnesses, save one exception. *Id.*

"Where video evidence is available, there is an exception to the materiality/genuineness rule cited above." *Bailey v. Ramos*, 125 F.4th 667, 675 (5th Cir. 2025). "Because video evidence is available, we are required to view the facts in the light depicted by the videotape." *Boyd v. McNamara*, 74 F.4th 662, 665 (5th Cir. 2023); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Thus, "we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Bailey*, 125 F.4th at 675.

Under the ordinary summary judgment standard, the movant bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020). If the movant demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. FED. R. CIV. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

But this standard changes with qualified immunity. *Bailey*, 125 F.4th at 674. "When a public official makes a good-faith assertion of qualified immunity, that alters the usual summary-judgment burden of proof, shifting [the initial burden] to the plaintiff to show that the defense is not available. In other words, to shift the burden to the plaintiff, the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law." *Joseph*, 981 F.3d at 329–30 (internal quotations omitted). When the burden shifts to the plaintiff, they must show there is a genuine dispute of material fact, a jury could return a verdict entitling the plaintiff to relief for a constitutional injury, and the injury is a violation of clearly established law. *Id*.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Importantly, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Id*.

### III.    DISCUSSION

Martin County Defendants summarize this case best: "The record presents competing accounts concerning what Austin Hamblin and Kiska Hamblin said and did during the search;

whether any consent was given, limited, or withdrawn; what property was visible to officers; what Snellgrove identified as stolen; what officers reasonably understood at the scene; whether Plaintiffs owned the property seized; whether Plaintiffs invoked available post deprivation remedies; whether any Defendant personally participated in a constitutional deprivation; and whether any Martin County policy was the moving force behind any violation." (Doc. 81 at 2). With the record before the Court, there are more facts disputed than undisputed.

### A.  Constitutional Claims against Martin County Defendants

Plaintiffs brings various constitutional claims under 42 U.S.C. § 1983 against Martin County Defendants. (Doc. 74 at 19–29). "Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights." *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003) (citing *Albright v. Oliver*, 510 U.S. 266 (1994)). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Martin County Officers argue they are entitled to the affirmative defense of qualified immunity as to each cause of action. (Docs. 26 at 12; 81 at 10). "The doctrine of qualified immunity shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005). Because qualified immunity is an immunity from suit, these questions must be resolved at the earliest possible stage in litigation. *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009).

Qualified immunity works under a burden shifting framework. *Cherry Knoll, LLC v. Jones*, 922 F.3d 309, 318 (5th Cir. 2019). Defendant officials bear the initial burden to establish

their entitlement to the defense. *Castelan v. Villarreal*, No. 23-CV-1394, 2025 WL 424538, at *20 (W.D. Tex. Feb. 6, 2025) ("[M]ere invocation [of qualified immunity] is not enough."); *Barker v. Norman*, 651 F.2d 1107, 1120 (5th Cir. 1981) ("The immunities of state officials that we have recognized for purposes of [§] 1983 are the equivalents of those we have recognized at common law, and the burden is on the official claiming immunity to demonstrate his entitlement." (internal citations omitted) (quoting *Dennis v. Sparks*, 449 U.S. 24, 29 (1980))).

To satisfy this burden, defendant officials must demonstrate their conduct was within the scope of their discretionary authority. *Sweetin v. Texas City*, 48 F.4th 387, 392 (5th Cir. 2022) ("To even get into the qualified-immunity framework, the government official must 'satisfy his burden of establishing that the challenged conduct was within the scope of his discretionary authority.'" (quoting *Cherry Knoll*, 922 F.3d at 318)). Officials act pursuant to discretionary authority when they perform non-ministerial acts within the scope of their official responsibilities. *Cherry Knoll*, 922 F.3d at 318. Non-ministerial acts are those that involve personal deliberation and judgment, while ministerial acts are those that require obedience or the performance of a duty to which the actor had no choice but to perform. *Anders v. Rumfield*, No. 25-40387, 2026 WL 625638, at *2 (5th Cir. Mar. 5, 2026).

Even if the defendants demonstrate their actions were non-ministerial, they must also show they were within the scope of their official responsibilities. *Diaz v. Cantu*. 123 F.4th 736, 748–49 (5th Cir. 2024); *see Barker*, 651 F.2d at 1121 n.18 ("It should be clear from our prior case law that an official's actions may be so far removed from the ordinary course of his duties, so outside even his discretionary authority to act, that the official cannot establish his entitlement to claim immunity in the first instance . . . ."). To determine whether officials were acting within

8

the scope of their official duties, courts look primarily to state law. *Anders*, 2026 WL 625638, at *2 (citing *Sweetin*, 48 F.4th at 392).

Here, Martin County Officers presuppose they are entitled to qualified immunity. (Doc. 26 at 12). But qualified "immunity is not automatically available to every [§] 1983 defendant merely by virtue of his status as a government employee." *Williams v. Treen*, 671 F.2d 892, 896 (5th Cir. 1982). Martin County Officers fail to cite to any state law or policy to show their actions fall within their discretionary authority, and instead, shift the burden immediately to Plaintiffs. But Martin County Officers misunderstand that they are the ones who bear the initial burden of demonstrating their entitlement to qualified immunity. *Sweetin*, 48 F.4th at 392.

To meet their burden, Martin County Officers would have had to point to specific authority vesting them with discretionary authority to engage in the acts Plaintiffs challenge. In each of its recent decisions involving this burden, the Fifth Circuit has held that the lack of specific authority authorizing and narrowly tailored to the defendant's discrete acts made qualified immunity inapplicable. *Diaz*, 123 F.4th at 749 (holding a county judge could not assert qualified immunity because he failed to meet his burden of showing state law gave him authority to issue contempt orders); *Sweetin*, 48 F.4th at 392 (holding an ambulance permit officer could not assert qualified immunity because state law did not give him authority to conduct seizures); *Cherry Knoll*, 922 F.3d at 318–19 (holding a city manager could not assert qualified immunity because he failed to meet his burden of showing state law gave him authority to file plats). Imposing this burden "provides greater protection to the public and is consistent with the common law burden of proof rule with respect to official immunity." *Douthit v. Jones*, 619 F.2d 527, 534 (5th Cir. 1980).

But it is unclear the extent to which defendant officials' burden is automatically satisfied in cases where the facts alone obviously demonstrate that the official was engaged in an activity within the ambit of their discretionary authority.[5] *Dalia v. United States*, 441 U.S. 238, 257 (1979) ("[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant . . . ."); *City of Robstown v. Ramirez*, 17 S.W.3d 268, 271–72 (Tex. App.—Corpus Christi 2000, pet. dism'd w.o.j.) (holding that obtaining and executing a search warrant for investigation crimes are considered discretionary duties of a peace officer's authority under Texas law). Some courts have held that their burden is not met in such circumstances. *Castelan*, 2025 WL 424538, at *20; *Williams v. East Baton Rouge City/Parish*, No. 23-01581, 2024 WL 4241627, at *8 (M.D. La. Sept. 19, 2024). But here, given that courts often hold police acted under discretionary authority in similar circumstances, and the Fifth Circuit recognizes this burden "often gets overlooked," the Court will treat Martin County Defendants' burden of demonstrating entitlement to qualified immunity as satisfied. *Sweetin*, 48 F.4th at 392.

Because Martin County Officers' conduct was within the scope of their discretionary authority, Plaintiffs must show the defense is not available. To overcome the defense of qualified immunity, a plaintiff must demonstrate "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *McLin v. Ard*, 866 F.3d 682, 689 (5th Cir. 2017). To determine whether a right was clearly established, courts looks to cases decided before the time of the violation. *Grishman v. Valenciano*, 93 F.4th 903, 908 (5th Cir. 2024). "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior

---

5. The Court does not consider whether Martin County Officers were within their discretionary authority in regards to committing the acts Plaintiffs argue constitute a Fourteenth Amendment violation because the Court finds below that no such violation was committed.

decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id*. at 909. Because a plaintiff's § 1983 claim must overcome both prongs of qualified immunity, district courts have the discretion to analyze the two prongs in either order and can grant qualified immunity by addressing one or both steps. *Pearson*, 555 U.S. at 236.

### 1. Fourth Amendment

Plaintiffs bring a Fourth Amendment claim against Martin County Officers and Defendant Snellgrove for the execution of a search warrant beyond its lawful scope and an unreasonable seizure. (Doc. 74 at 19). The Fourth Amendment protects "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. "The prohibition against general searches and general warrants serves primarily as a protection against unjustified intrusions on privacy." *Horton v. California*, 496 U.S. 128, 141 (1990). As a general rule, only items described in a search warrant may be seized. *Creamer v. Porter*, 754 F.2d 1311, 1318 (5th Cir. 1985). "A search warrant describing particular items to be seized cannot be used as an admission ticket to a general search of the premises." *Id*. at 1319. "If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton*, 496 U.S. at 140. "A general, exploratory search through personal belongings is the precise evil sought to be eliminated by the Fourth Amendment's requirement that things to be seized and places to be searched be described with particularity." *Creamer*, 754 F.2d at 1318.

As an initial matter, because there is no dispute as to the validity of the warrant, the Court will assume the same. (Docs. 26 at 10; 36 at 1–3; 81 at 6; 84 at 3). Additionally, Martin County Defendants assert Defendant Phelps was not present and did not participate in the search and

seizure (Docs. 78-13; 81 at 7)—a fact Plaintiffs do not dispute (Doc. 78 at 32). Thus, the Court finds Defendant Phelps is not liable for violating the Fourth Amendment. Finally, it is undisputed that the search warrant did not describe the vast majority of items seized. "But the Fourth Amendment's warrant requirement is subject 'to a few specifically established and well-delineated exceptions.'" *Alexander v. Arceneaux*, 172 F.4th 455, 460 (5th Cir. 2026) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Here, Martin County Defendants argue the relevant exceptions include consent and the plain view doctrine.

The Court will note at the outset that it is unclear how the execution of a two-item search warrant evolved into an eight-hour search and seizure of fifty-one items, including an unspecified number of hand tools. (Doc. 26-1 at 12–13). From the very beginning, Martin County Officers seem intent on conducting a general search of Plaintiffs' residence with no regard for the items listed in the search warrant. *See* AXON Body 0803 at 04:48–05:10 (referring to Snap-On tools, Defendant Dahl told Plaintiff Austin, "we are here to see what [Snap-On products] you have, I want you to show me what you have to determine that what you have is what you are supposed to have and there is nothing stolen here"). Around six minutes into the search, Defendant Dahl asks Plaintiff Austin to walk him around and show him "what he's got." *Id.* at 05:57. Plaintiff Austin leads Defendant Dahl to an outbuilding and within a minute, Defendant Dahl opens two narrow drawers on a Snap-On toolbox. *Id.* at 07:33–07:47. When a residence is being searched pursuant to a validly issued search warrant, any container on the premises may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant. *United States v. GIWA*, 831 F.2d 538, 543–44 (5th Cir. 1987).

12

The Court finds it to be a question of fact best left to the jury as to whether Defendant Dahl could have reasonably thought the Snap-On plasma cutter model 30I could have fit in those drawers.[6]

Within fifteen minutes of arriving at Plaintiffs' residence, Defendant Dahl locates the Snap-On plasma cutter and Snap-On air compressor listed in the search warrant. *Id*. at 11:30 (finding air compressor); 13:34 (finding two plasma cutters); 17:35 (acknowledging he already found the plasma cutters); 29:02 (telling Defendant Snellgrove he found the search warrant items when they first arrived); 30:30 (confirming he found the plasma cutter and air compressor). Beyond this moment, Martin County Officers needed an exception to the Fourth Amendment warrant requirement to continue their search. *Horton*, 496 U.S. at 141 ("Indeed, if the . . . items named in the warrant had been found at the outset—or if petitioner had them in his possession and had responded to the warrant by producing them immediately—no search for weapons could have taken place.").

### a. Consent Exception

In Martin County Defendants' Motion for Summary Judgment briefing, they originally argued Plaintiffs consented to the entirety of the search, but their tune has since changed. (Doc. 36 at 3). They now acknowledge and assert there is a genuine dispute of material fact surrounding the issue of consent that precludes a finding of liability for either side. (Doc. 81 at 7). The Court agrees. To start, in her deposition, Plaintiff Kiska said that fairly early in the search she "told [the officers] that they needed to get out of my house because kids were asleep" and "I asked them again to leave" in the afternoon. (Doc. 81-1 at 221, 235)[7]; *id*. at 192 (Q: "[Y]ou heard

---

6. The Court finds it is not reasonable to believe the Snap-On air compressor could have fit in the drawers.

7. Plaintiffs object to Martin County Defendants' reliance on Plaintiffs' deposition transcript. (Doc. 84 at 1 n.1). Plaintiffs argue they timely preserved their right to review and correct the transcripts, and Martin County Defendants' exhibits appear to be the initial uncorrected transcripts, so the Court should disregard any citations to the transcripts. However, Plaintiffs could have submitted their errata sheets for the Court to also consider. Because they did not, the Court **OVERRULES** Plaintiffs' objection. *See Simmons v. Tex. Water Dev. Bd.*, No. A-05-CA-

your wife object to the presence of these people? Plaintiff Austin A: "Numerous occasions."). In contrast, Defendants Ingram, Dahl, and Gammons stated that during the search Plaintiffs never told them to leave, they did not hear another officer being told to leave, and Plaintiffs never objected to their presence. (Docs. 78-9 at 4; 78-10 at 5); (Doc. 78-12 at 3–4) ("I performed a consent search . . . ."). Defendant Brown had a different response, offering that Plaintiff Kiska "said be quiet *or* leave because children were present." (Doc. 78-11 at 4) (emphasis added).

The Supreme Court has explicitly held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Georgia v. Randolph*, 547 U.S. 103, 120 (2006). Similarly, "it is clearly established that a consent which waives Fourth Amendment rights may be limited, qualified, or withdrawn," and thus "a physically present co-occupant may revoke or withdraw the consent given by another occupant."[8] *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 426 (5th Cir. 2008). As applied here, it is clearly established Plaintiff Kiska could have objected to the search that occurred beyond the scope of the warrant, even if Plaintiff Austin had unequivocally consented. But the problem lies whether she gave an "express refusal of consent." *Randolph*, 547 U.S. at 120. Plaintiff Kiska said she did; Defendants Ingram, Dahl, and Gammons said she did not; and Defendant Brown's recollection falls somewhere in the middle, but short of an express refusal.

---

432, 2005 WL 4440406, at *3 (W.D. Tex. July 24, 2006) ("The Court will consider all of the summary judgment evidence, so Plaintiff's errata sheets will be included in the Court's evaluation of her deposition testimony.").

8. "The reliance on a co-tenant's information instead of disputed consent accords with the law's general partiality toward 'police action taken under a warrant [as against] searches and seizures without one'; 'the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers.'" *Georgia v. Randolph*, 547 U.S. 103, 116–17 (2006) (quoting *United States v. Ventresca*, 380 U.S. 102, 107 (1965) and *United States v. Lefkowitz*, 285 U.S. 452, 464 (1932)).

An additional consent issue exists, as Martin County Defendants argue, that the timing of potential objections is also unknown or disputed. (Doc. 81 at 7). And to the extent Martin County Defendants based their seizure of certain items on consent by Plaintiff Austin, as opposed to maybe plain view, the timing of an objection by Plaintiff Kiska is material. Further to that point, there is a dispute as to whether Plaintiff Austin consented to the seizure of every item that was taken. (Docs. 78 at 45; 81 at 7); *see, e.g.*, AXON Body 1045 at 06:20 (Defendant Dahl: "They're all [Defendant Snellgrove's]?" Plaintiff Austin: "No, they're not."); (Doc. 78-12 at 12) (Defendant Gammons admitted that Plaintiffs "objected to the seizure of one or more specific items during the Search, asserting that the items belonged to" them). And as Plaintiffs address and can be seen in the videos, Martin County Officers and Defendant Snellgrove open toolbox drawers after the search warrant items are found, so consent is the only relevant exception that prevents that action from being an unlawful search. (Docs. 78 at 20; 78-2 at 43, 106); AXON Body 1045 at 07:29. Accordingly, the Court finds there is a genuine issue of material fact over whether there was any express refusal of consent made by Plaintiff Kiska and any objections Plaintiff Austin made to specific seizures. The Court therefore cannot grant summary judgment in favor of either party on Plaintiffs' Fourth Amendment claim.

Further, as it relates to qualified immunity, there is a genuine dispute of material fact, assuming Plaintiffs did object, as to which defendants heard the objections and what the remaining officers understood about the nature of consent given. *Romano v. City of San Marcos*, No. 15-CV-839, 2017 WL 3996427, at *3 (W.D. Tex. Sept. 11, 2017) ("Although the parties dispute whether consent was given, there is no dispute in the evidence that Harris told the other officers that Soechting provided consent. While not dispositive of whether Plaintiffs' Fourth Amendment rights were violated, the issue bears on whether the other officers are entitled to

qualified immunity."). Officers are permitted to rely on information given to them by other officers. *Gates*, 537 F.3d at 430 ("[T]he Supreme Court has held that police officers may act on the basis of information known by their colleagues in conducting searches and seizures." (citing *United States v. Hensley*, 469 U.S. 221, 230–31 (1985))); *Smith v. Lee*, 73 F.4th 376, 383 (5th Cir. 2023) ("Barker's alleged statement is material because Lee is entitled to reasonably rely on information provided to him by other officers.").

Thus, a situation could conceivably exist where Plaintiffs objected to the search or seizure of an item in front of one or several officers, but the remaining officers did not become aware of it and thought they were still operating under consent. In that case, the officers that heard the objection would not be entitled to qualified immunity. *Smith*, 73 F.4th at 382 ("However, there is a crucial fact issue with respect to Lee . . . . Namely, whether Lee reasonably believed the other officers asked for consent before entering Smith's house."). But because a fact issue exists as to who heard any objections and what the officers reasonably relied on regarding consent, the Court must deny summary judgment.

### b. Plain View Doctrine

In addition to the consent exception, Martin County Defendants rely extensively on the plain view doctrine. (*See* Doc. 81 at 7). Under this doctrine, officers can seize items without a warrant if "(1) the officers lawfully entered the area where the items were located; (2) the items were in plain view; (3) the incriminating nature of the items was 'immediately apparent'; and (4) the officers had a lawful right of access to the items." *Alexander*, 172 F.4th at 460. Probable cause is required to invoke the plain view doctrine. *Arizona v. Hicks*, 480 U.S. 321, 326 (1987) ("No reason is apparent why an object should routinely be seizable on lesser grounds, during an unrelated search and seizure, than would have been needed to obtain a warrant for that same

object if it had been known to be on the premises."). "The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband." *Alexander*, 172 F.4th at 461. The Fifth Circuit has also recognized an adjacent exception that property with a "sufficient nexus to the crime being investigated may be seized at the time officers are properly executing a warrant authorizing a search for other items." *Creamer*, 754 F.2d at 1318.

In arguing the applicability of the plain view doctrine, Plaintiffs and Martin County Defendants each point to a different Fifth Circuit case that they say resembles the situation here—Plaintiffs direct the Court to *Creamer*, 754 F.2d 1311, while Martin County Defendants say *Alexander*, 172 F.4th 455, is materially closer to this case. (Docs. 78 at 23; 81 at 9). The Fifth Circuit decided *Alexander* over 40 years after *Creamer*, coming out differently but distinguishing the factually similar case. The Court finds *Creamer* to be more analogous here.

In *Creamer*, the police obtained a search warrant for a used merchandise business. 754 F.2d at 1314. The warrant listed two television sets described by size, color, and serial number, and no additional property. *Id*. Within the first 15 minutes, both television sets were seized, but the officers continued to search the premises, questioning an individual present about other items the owner of the television sets had reported stolen. *Id*. at 1315. After nearly three and a half hours, the officers ended their search, seizing a total of 29 items from the premises. *Id*. There, the Fifth Circuit held that the plain view doctrine did not justify "the extended search and seizure of objects at random." *Id*. at 1318. The court reasoned that just because used merchandise businesses inherently contain some stolen items, every item cannot be "automatically endowed with incriminatory character." *Id*. Finally, the opinion concluded that "we cannot accept under an objective test that any police officer's reasonable understanding of the law would be that any

17

item located anywhere on the premises was fair game, or that a search could continue once items described in the warrant had been seized." *Id*. at 1319.

As the Fifth Circuit themselves explained, *Alexander* is distinguishable from *Creamer*. *Alexander*, 172 F.4th at 462. In *Alexander*, officers obtained an arrest warrant for the plaintiff and a warrant to search his residence for "any and all firearms, ammunition, ammunition clips, ammunition boxes, firearm storage boxes, spent projectiles, spent cartridges, firearms or ammunition paperwork." *Id*. at 458. Additionally, the complaining witnesses told the officers the plaintiff kept stolen items in his house, including electronics and furniture, and they provided written lists of these purportedly stolen items. *Id*. When the officers executed the search warrant, they observed electronics and household appliances throughout the house in plain view. *Id*. The officers observed many of the items were new, unopened in their original packaging, and stacked up next to each other; while other items were wrapped in plastic, covered with pillowcases, or placed on top of blankets. *Id*. Further, the officers saw new furniture sets stacked against the wall and not in use, which they believed was "indicative of how people house stolen property." *Id*. After arriving at the house, the officers called one of the complaining witnesses to ask about the electronics and appliances and the witness reaffirmed the plaintiff told her he kept stolen items in his house. *Id*. The officers seized the electronics and appliances but only photographed the furniture; ultimately, the officers obtained a second and third search warrant to seize the furniture. *Id*. at 458–59.

In *Alexander*, the Fifth Circuit held "the incriminating character of the items was immediately apparent, so the officers were justified in seizing them under the plain view doctrine." *Id*. at 462. The Circuit reasoned the officers had received tips the plaintiff kept stolen items, specifically those that were found, at his residence and the items were packaged and

18

stored in such a way that indicated to the officers they were stolen. *Id*. at 461. Based on these facts, the court found "a reasonable officer could have believed that there was a 'practical, nontechnical probability' that the items in the residence were stolen property." *Id*. at 462 (quoting *Texas v. Brown*, 460 U.S. 730, 738 (1983)). The plaintiff argued the officers impermissibly took additional investigative steps by calling the witness to ask about the stolen items to establish probable cause, but the court explained "[g]iven the earlier reports and the officers' observations on the scene, the officers already had probable cause to believe the items were stolen before" the officers called the witness. *Id*. at 462.

The Fifth Circuit distinguishes *Creamer* and *Alexander* in two ways. *Id*. First, the Circuit emphasizes the warrant in *Creamer* "listed two specific items, and when police seized them, their search should have ended." *Id*. In contrast, in *Alexander*, the warrant authorized a much broader search for any and all firearms, ammunition, etc., so, even after the officers found two pellet rifles, "they still had reason to believe they might find other firearms or ammunition on the property, and the warrant authorized them to search for such items." *Id*. at 462–63. Second, in *Creamer*, the officers' only justification for believing the seized items were stolen was the owner of the television sets had also reported them stolen and they were found in the same store. *Id*. at 463. But in *Alexander*, the officers received tips that the plaintiff possessed stolen electronics and appliances, and when they entered the residence, they saw items that corroborated those tips being stored in a way that further supported the officers' reasonable belief that the items were stolen. *Id*. The Fifth Circuit concluded that given the additional context the officers had in *Alexander*, there was a stronger indication that the items were stolen than was present in *Creamer*. *Id*.

The Court finds the facts here to be much closer to *Creamer*. As in *Creamer*, the search warrant here listed two specific items: "a Snap-On Plasma Cutter model 30I and a Snap-On Air Compressor." (Doc. 26-1 at 10). In both situations, the officers vaguely stated they had a warrant for the entire house, not specifically the two items listed, and implied they were there to do a broad search.[9] AXON Body 0803 at 04:48–05:10; *Creamer*, 754 F.2d at 1315 ("Porter did not reveal to Creamer the purpose of the warrant, i.e., that it had been issued for the limited purpose of searching for two television sets, but rather conveyed to Creamer that he had a valid warrant to search his house and that that was what he intended to do."). In both *Creamer* and here, the two search warrant items were found within 15 minutes, but in each situation, the search continued for hours afterwards. 754 F.2d at 1315; AXON Body 0803 at 0:00, 11:30, 13:34 (starting the search at 8:03 a.m.); (Doc. 81-1 at 79) (Q: "When did [the officers] leave? . . . A: "If I was guessing, probably 4:00 or 5:00 o'clock").

Additionally, as the Court explains in *Creamer*, it is "an unavoidable occupational hazard" for a used merchandise business to have some stolen items, "[b]ut this does not mean that every item is automatically endowed with incriminatory character." 754 F.2d at 1318. Similarly, here, Plaintiff Austin was a Snap-On employee and was a mechanic for 12 years; the presence of Snap-On products at his house is not immediately incriminating. AXON Body 0803 at 07:12 (Plaintiff Austin: "I had a lot of tools because I was a mechanic for 12 years." Defendant Dahl: "So some of this [referring to the Snap-On tools] is yours? Plaintiff Austin:

---

9. In this case, Plaintiff Kiska states she asked to see a copy of the search warrant. (Doc. 81-1 221) (Plaintiff Kiska: "I demanded to see the warrant and she said that she didn't have to show it to me, it was for the whole house . . . ."); *id*. at 192 (Plaintiff Austin: "I heard Kiska asking for the warrant on numerous occasions."). The Court notes that, unfortunately, whether the executing officer must serve the warrant on the owner before commencing the search is an unanswered question, and therefore it would not be a clearly established violation of law for the officers not to produce it at the beginning. *Groh v. Ramirez*, 540 U.S. 551, 562 n.5 (2004) ("Whether it would be unreasonable to refuse a request to furnish the warrant at the outset of the search when, as in this case, an occupant of the premises is present and poses no threat to the officers' safe and effective performance of their mission, is a question that this case does not present.").

"Yeah 90% of it yeah."). And unlike in *Alexander*, the items were not stored and packaged in such a way that suggest they were stolen. 172 F.4th at 461.

In fact, it is clear from the small segment of video evidence available that Martin County Officers did not find the items' incriminating character to be "immediately apparent" because they had to ask Plaintiff Austin what many items were and whether they were his to keep. AXON Body 0803 at 10:00 ("What is this thing? . . . "Doesn't this go back to Snap-On?"); *id*. at 12:24 ("Are you authorized just to keep it or does it need to go back to [Defendant Snellgrove]?"); *id*. at 12:41 (referring to a Snap-On toolbox, Q; "What is that?"). Defendant Snellgrove's actions also further discredit Martin County Defendants' argument that the plain view doctrine justifies the seizures. As Defendant Dahl explains, Defendant Snellgrove was "conscripted . . . to aid in the execution of the search warrant by requesting him to appear at the location where the warrant was executed [and] identify the property subject to the warrant . . . ." (Doc. 78-4 at 2). Unlike in *Alexander*, where the Fifth Circuit found the officers already had probable cause to believe the items were stolen before they called the complaining witness, here, Martin County Officers seemingly brought Defendant Snellgrove to the search to establish probable cause as to each item, meaning it was not immediately apparent to the officers that the items were stolen.[10] 172 F.4th at 462. While the Court could see a plausible argument that the items with specific serial numbers listed in Defendant Dahl's affidavit—but not in the search warrant—could have been seized if they were found in plain view, there is still an issue of fact at

---

10. A fact issue exists over whether Plaintiff Austin asked or consented to Defendant Snellgrove coming to search or whether he simply wanted to talk to him on the phone. *Compare* (Doc. 81-1 at 69) (Q: "Did you ask Mr. Snellgrove to come over?" Plaintiff Austin A: "No." Q: "Did you ask the officers to have him come over?" A: "No.") *with* (Doc. 81 at 9) ("Snellgrove's presence at the scene was not random or independently contrived; Austin specifically requested that Deputy Dahl call Snellgrove . . . ." (citing AXON Body 0803 at 26:50 "Would you [Defendant Dahl] start calling [Defendant Snellgrove] for me [Plaintiff Austin]?") *and* (Doc. 78-1 at 9) (Q: "How did Mr. Snellgrove come to be at the scene?" Defendant Ingram A: "[Plaintiff Austin] asked . . . for us to call him to get him there.").

21

this stage as to when those items were found, whether they were moved to find the serial numbers, and how consent played a role.

The Court further questions whether probable cause existed to seize at least some of the items, even assuming the officers were lawfully permitted to be searching and found the items in plain view. Although Defendant Snellgrove identified items he claims to be his, he has nothing to substantiate his claims of ownership, seems unsure about several items, and Plaintiff Austin actively disputes some of his claims. *See, e.g.*, AXON Body 1045 at 01:14 (Defendant Snellgrove pointing to a toolbox: "I feel like that is probably a trade-in box."); *id*. at 05:01 (Defendant Snellgrove pointing to another toolbox: "I don't know about that one."); *id*. at 14:00 (Defendant Snellgrove: "He supposedly said we got credit for that, and that was to replace that, but I . . . I don't know that that happened . . . I don't think he sold those used boxes."). And rather than ensuring there was a "practical, nontechnical probability" that these items are stolen property, Defendant Ingram implies they should just take all the Snap-On items and sort it out later. AXON Body 1045 at 15:54 (Defendant Ingram: "My thinking is it's kinda like if we run on a drug dealer and he has cash and we take all the cash and then we have a property hearing, it's almost like you [Defendant Snellgrove] have claim to every Snap-On thing here. We take it, then if [Plaintiff Austin] wants to try to fight it in a property hearing . . . .")[11]; *Alexander*, 172 F.4th at 462.

In addition to the immediately apparent incriminating character issue, this doctrine also requires the officers to have lawfully entered the area where the item was found in plain view. *Alexander*, 172 F.4th at 460. The doctrine allows seizure "where a police officer has a warrant to

---

11. In response to Defendant Ingram's statement, Defendant Dahl comments, "But he just said that he agreed that none of this should be here, it should be in the warehouse." AXON Body 1045 at 16:10. The Court finds this to be a confusing statement given that just a few minutes ago, Plaintiff Austin was disputing ownership of several items. *See, e.g.*, *id*. at 06:22, 08:49, 09:33.

search a given area for specified objects and in the course of the search comes across some other article of incriminatory character." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005). But "[o]nce items in a search warrant are found, any search occurring thereafter is, as a practical matter, a warrantless search." *Creamer*, 754 F.2d at 1321 (Garwood, J. dissenting). Thus, once the officers located the items described in the search warrant, they were not free to wander about the house, looking for other items to seize and earmarking them under the plain view doctrine.[12] *See Berger v. State of N.Y.*, 388 U.S. 41, 57 (1967) ("Under [the plain view doctrine] the officer could not search unauthorized areas; likewise, once the property sought, and for which the order was issued, was found the officer could not use the order as a passkey to further search."). But again, because there are material fact issues as to what items were seized under plain view, where they were seized, and there is the looming issues of consent, the Court finds granting summary judgment on the Fourth Amendment violation as to either party is inappropriate.

### c. Snellgrove

Plaintiffs ask the Court to find Defendant Snellgrove was acting under color state of law as to their Fourth Amendment claim. (Doc. 78 at 26). As the Court explained, a defendant named in a § 1983 action must be a state actor who has deprived plaintiff of a right under the Constitution or federal law. *See Moody v. Farrell*, 868 F.3d 348, 351 (5th Cir. 2017); *see also Cruz v. Hopper*, 73 F. App'x 62, 63 (5th Cir. 2003). A private citizen or entity may be held liable under § 1983 where plaintiff alleges the citizen conspired with or acted in concert with state actors. *Glotfelty v. Karas*, 512 F. App'x. 409, 414 (5th Cir. 2013). For a private actor or entity to

---

12. (Doc. 81 at 189–90) (Q: "And when the police came, you identified the items you believed to be Snellgrove's?" Plaintiff Austin A: "That's correct." Q: "Okay. After that time, did the police continue searching?" A: "They never stopped." Q: "Okay. So they found the items -- the air compressor, and the other item that was on the warrant. They found those items in the laundry room that is outside your house?" A: "That is correct." Q: "Okay. From that time forward, what additional steps did the police take in searching to the best of your knowledge?" A: "They went and look at everything. In the house, outside, didn't matter.").

be held liable under § 1983 for state action, the challenged conduct must be "fairly attributable to the State." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 241 (5th Cir. 1999) (citation omitted). This means "the plaintiff must show: (1) that the deprivation was caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state, or by a person for whom the state is responsible, and (2) that the party charged with the deprivation may fairly be said to be a state actor." *Priester v. Lowndes County*, 354 F.3d 414, 423 (5th Cir. 2004). "One way a private citizen may be a state actor is if [he] 'is involved in a conspiracy or participates in joint activity with state actors.'" *See Moody*, 868 F.3d at 352 (quoting *Ballard v. Wall*, 413 F.3d 510, 518 (5th Cir. 2005); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970) ("Private persons, jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of the statute."). This requires a showing that the private citizen was a "willful participant in joint activity with the State or its Agents" and where there was also "(1) an agreement between private and public defendants to commit an illegal act and (2) a deprivation of constitutional rights." *Priester*, 354 F.3d at 420.

"It is well-established that a private party does not act under color of state law when [he] merely elicits but does not join in an exercise of official state authority." *Moody*, 868 F.3d at 353 (internal quotations omitted). And the Fifth Circuit has explained that a private citizen simply reporting criminal activity or signing a criminal complaint is not sufficient to show state action. *Id*. Instead, in the context of effecting an arrest, the Circuit has said the plaintiff must "show that the police in effecting the arrest acted in accordance with a 'preconceived plan' to arrest a person merely because he was designated for arrest by the private party, without independent investigation." *Id*. For example, in *Smith v. Brookshire Bros., Inc.*, the plaintiffs showed there was a prearranged agreement where the defendant grocery store could call the police and have

24

individuals arrested for shoplifting "without independently establishing that there was probable cause to do so [and] without a valid complaint having been filed and without knowing the facts to believe that a crime had been committed." 519 F.2d 93, 94 (5th Cir. 1975). In contrast, in *Moody*, the Fifth Circuit found a complaining witness was not a state actor because there was evidence of an independent investigation, including filing investigative reports, independently reviewing evidence, receiving a warrant from a judicial officer, and a substantial amount of time passing between the complaint and the arrest. 868 F.3d at 353–54.

As discussed below, the Court here finds sufficient evidence to send the question of whether a § 1983 conspiracy existed between Defendants Ingram, Dahl, and Snellgrove to a jury. *Jackson v. City of Hearne*, No. 18-CV-00015, 2018 WL 11515017, at *3 (W.D. Tex. Sept. 17, 2018) ("A private citizen may be a state actor if [he] is involved in a conspiracy or participates in joint activity with state actors."). And as further evidence that Defendant Snellgrove was acting under color of state law in joint activity with the state, the Court finds this case to be closer to *Smith* than *Moody*. As in *Smith*, there was very little independent investigation: when Defendant Snellgrove made his initial report, he provided nothing to prove ownership over the items before the warrant was issued and the officers did not do any independent verification; the officers did not verify the status of any tools with Snap-On corporate; the officers did not make any independent inquiry based on the serial numbers of tools they seized at the house to determine who owned them; Defendant Snellgrove did not provide Defendant Ingram any business documents relating to the serial numbers of the items seized; Defendant Snellgrove claimed his financial loss and the officers took his word for it; and the officers did not independently research or verify the valuation of the seized goods. (Doc. 78-1 at 29–31, 50, 67–68); 519 F.2d 93.

25

As a final piece of evidence that Defendant Snellgrove was a willful participant in joint activity with the state, the Court looks to Defendant Dahl's Affidavit. In it, Defendant Dahl swore that he "*conscripted* Brain Snellgrove to aid in the execution of the search warrant by requesting him to appear at the location where the warrant was executed, identify the property subject to the warrant, and store such property at his place of business . . . ." (Doc. 78-4 at 1) (emphasis added). In response, Defendant Snellgrove states he "complied with what they asked me to do, to come identify merchandise if possible." (Doc. 78-2 at 39). Accordingly, the Court finds there is evidence to support the notion Defendant Snellgrove was a state actor for purposes of § 1983 liability. Defendant Snellgrove has not attempted to assert qualified immunity (*See* Doc. 80), so the Court will not pontificate as to whether he would be eligible to assert it in the first place. *Perniciaro v. Lea*, 901 F.3d 241, 251 (5th Cir. 2018) ("Private actors may, under some circumstances, be liable under § 1983, but it does not necessarily follow that they may assert qualified immunity." (internal citations omitted)).

Lastly, the Court addresses Plaintiffs' argument regarding Defendant Snellgrove's presence at their residence. Plaintiffs point to the Supreme Court's decision in *Wilson v. Layne*, stating the Fourth Amendment prohibits officers from bringing third parties into a home during execution of a warrant when their presence is not in aid of the warrant's authorized objectives. 526 U.S. 603, 611–12 (1999); (Doc. 78 at 25–26). In fact, Martin County Defendants also use this case for the proposition that "[w]here the police enter a home under the authority of a warrant to search for stolen property, the presence of third parties for the purpose of identifying the stolen property has long been approved by this Court and our common-law tradition." *Wilson*, 526 U.S. at 611–12; (Doc. 81 at 12). Both statements are true.

In *Wilson*, the United States Marshals and local police officers had a valid warrant to enter the plaintiff's home to execute an arrest. 526 U.S. at 611. As part of the Marshals Service ride-along policy, the team was accompanied by a reporter and a photographer from the Washington Post. *Id*. at 607. At no time, however, were the reporters involved in the execution of the arrest warrant; instead, they were there working on a story for their own purposes. *Id*. at 608, 613. The Supreme Court held that "although the presence of third parties during the execution of a warrant may in some circumstances be constitutionally permissible, the presence of *these* third parties was not" because their presence did not "directly aid[] in the execution of the warrant." *Id*. at 611, 613.

If the Court assumes Plaintiffs' version of events is true, the holding in *Wilson* poses yet another avenue in which Martin County Defendants' conduct may have violated the Fourth Amendment. *See Brown v. Wilson County*, No. 97-CA-1473, 1999 WL 33290666, at *11 (W.D. Tex. Mar. 31, 1999) ("No objectively reasonable law-enforcement officer could have concluded that inviting any third party to participate in a search and seizure who was not named in the warrant and who was not aiding in the execution of the warrant accorded with Fourth Amendment requirements."). Based on the evidence before the Court, Martin County Officers identified the two items in the warrant within the first fifteen minutes of the search. AXON Body 0803 at 0:00, 11:30, 13:34. So when Defendant Snellgrove arrived nearly three hours later, it would appear the execution of the warrant was complete and for his presence to be constitutionally permissible, he would need to be there under different authority, such as consent. AXON Body 1045 at 0:00.

**d. In Sum**

27

Finally, the Court considers whether Plaintiffs offered sufficient proof of each Martin County Officers' conduct to make them individually liable. *See Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007) (holding that each officer's individual actions should be considered in determining whether qualified immunity applies). The Court finds there is sufficient evidence to deny qualified immunity as to Defendants Ingram, Dahl, Brown, and Gammons and send the question of whether they violated Plaintiffs' Fourth Amendment rights to a jury. Each of these Defendants admits to being present at the search; Defendant Ingram waivers only in that he was not there at the start.[13] (Docs. 78-9, 78-10, 78-11, 78-12). Plaintiff Austin testified "[e]veryone that was there" loaded the seized items into trucks to be taken from the house, but a fact issue exists because each defendant claimed they did not seize or load any items, excluding the alleged drugs and gun. *Id*.; (Doc. 81-1 at 80). Each Defendant was also present while Defendant Snellgrove was at the residence, even though Defendant Gammons claims not to know him. (Docs. 78-9, 78-10, 78-11, 78-12); *Hopgood v. Gunnlaugsson*, 284 F. App'x 190, 190 (5th Cir. 2008) (affirming a district court's denial of qualified immunity because there was a genuine issue of material fact regarding the extent of the officer's knowledge of and acquiescence to a third party's presence in entering the plaintiff's home).

While the Court believes these facts alone are sufficient to individually deny qualified immunity, additional evidence exists tying each Defendant to factually-disputed Fourth Amendment violations. For example, Defendant Dahl is seen in the body camera video opening drawers where arguably the search warrant items would not fit without a valid warrant exception. *See* AXON Body 0803 at 07:33–07:47. Plaintiff Kiska testified that she asserted her right to privacy to Defendant Brown and asked Defendant Brown to show her the warrant or leave.

---

13. (Doc. 78-1 at 8) (Q: "[N]ame all the persons who were present for the sheriff's office during the search that occurred at the Hamblin residence." Defendant Ingram A: "I was not there at the very start, but I was there soon after it started. Jesse Metcalf, Anders Dahl, Kelsey Brown, and then there was a deputy from Howard County.").

(Doc. 81-1 at 223). Defendant Gammons stated he performed a consent search of the house and conceded Plaintiffs objected to the seizure of one or more specific items during the search. (Doc. 78-12). Finally, Defendant Ingram testified he "facilitated" bringing Defendant Snellgrove to the search. (Doc. 78-1 at 9). Accordingly, the Court denies qualified immunity as to Defendants Ingram, Dahl, Brown, and Gammons for Plaintiffs' Fourth Amendment claim under § 1983.

Based on the foregoing discussion, the Court **GRANTS** Martin County Defendants' Motion for Summary Judgment (Doc. 26) as to Plaintiffs' Fourth Amendment claim against Defendant Phelps. But the Court **DENIES** Martin County Defendants' Motion for Summary Judgment (Doc. 26) as to Plaintiffs' Fourth Amendment claim against Defendants Ingram, Dahl, Brown, and Gammons. Further, the Court **DENIES** Plaintiffs' Partial Motion for Summary Judgment (Doc. 78) as to the same claim against Defendants Ingram, Dahl, Brown, Gammons, Phelps, and Snellgrove.

### 2. Fourteenth Amendment

Plaintiffs bring a Fourteenth Amendment claim for deprivation of property without procedural due process against Martin County Officers and Defendant Snellgrove. (Doc. 74 at 21). Plaintiffs argue they had a protected property interest in all the personal property seized from their home. (Doc. 78 at 34). Further, Plaintiffs assert Martin County Officers knew ownership in the property was disputed, and, despite that, removed the property, gave it to Defendant Snellgrove, failed to provide notice of his rights to a hearing, failed to obtain a magistrate's order, failed to maintain custody, and allowed the property to be sold or integrated into Defendant Snellgrove's inventory. *Id*. Finally, Plaintiffs claim pre-deprivation process was mandatory in this case because the deprivation was not random, but instead planned for months. *Id*. at 35. Martin County Defendants counter that Plaintiffs' failure to invoke the available post-

deprivation remedies defeats any contention that they are liable as a matter of law for procedural due process. (Doc. 81 at 11–12). While the Court agrees with Plaintiffs that many Texas state statutes regarding the return of a search warrant and disposition of stolen property may have been ignored by Martin County Defendants, ultimately, Plaintiffs had adequate notice and a meaningful opportunity to be heard. Thus, no Fourteenth Amendment violation exists.

"To state a Fourteenth Amendment due process claim under § 1983, a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest." *Greene v. Greenwood Pub. Sch. Dist.*, 890 F.3d 240, 242 (5th Cir. 2018). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* (internal quotations omitted). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). But the Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

The Fourteenth Amendment right to a hearing prior to a deprivation has long been recognized by the Supreme Court. *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972). But, in that same case, the Court explained that "our decision today in no way implies that there must be opportunity for an adversary hearing before a search warrant is issued." *Id.* at 93 n.30. Further, the "Court has held that a random and unauthorized intentional deprivation of property does not violate the Due Process Clause if the State provides an adequate post-deprivation remedy." *Reliford v. Craig*, No. 16-CV-482, 2017 WL 6372634, at *6 (S.D. Tex. Nov. 22, 2017) (citing *Hudson v. Palmer*, 468 U.S. 517, 534–35 (1984); *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir.

30

1996)). "A claimant must either take advantage of the available remedies or show that the available remedies are inadequate." *Id*. (citing *Hudson*, 468 U.S. at 534–35).

Here, Plaintiffs had adequate post-deprivation remedies but failed to take advantage of them. Immediately following the seizure, Plaintiffs could not and did not attempt to recover their property because a criminal action relating to the allegedly stolen property was pending. (Doc. 81-1 at 247). But once the indictment against Plaintiff Austin was dismissed in November 2024, Texas Code of Criminal Procedure 47.01a was available. *Id*. Article 47.01a(a) provides that "upon the petition of an interested person" a judge "may hold a hearing to determine the right to possession of the property." As Martin County Defendants point out, the statute does not require the county to petition for a property hearing, but instead requires interested persons, such as Plaintiffs, to petition the appropriate judge for a hearing. (Doc. 26 at 11). Plaintiffs asking Martin County officials, including the officers or the district attorney, does not satisfy this statute or trigger a property hearing. The Court is sympathetic to Plaintiffs' argument that, even if they had asked a judge for a hearing, it would not have been a meaningful process because Martin County Defendants had already placed the property in Defendant Snellgrove's warehouse. (Doc. 84 at 9). But the Due Process Clause requires only that Plaintiffs receive notice and have an opportunity to heard; had Plaintiffs petitioned for a hearing, this issue could have been taken up then. *Greene*, 890 F.3d at 242.

Further, Martin County Defendants had no obligation to information Plaintiffs of the available post-deprivation remedies. "When the police seize property for a criminal investigation . . . due process does not require them to provide the owner with notice of state-law remedies." *City of W. Covina v. Perkins*, 525 U.S. 234, 240 (1999). The Supreme Court reasoned that as long as the owners have notice that the officers have taken the property "individualized notice of

31

state-law remedies which, like those at issue here, are established by published, generally available state statutes and case law," is not required. *Id*. at 241 ("Once the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him. . . . In prior cases in which we have held that postdeprivation state-law remedies were sufficient to satisfy the demands of due process and the laws were public and available, we have not concluded that the State must provide further information about those procedures." (citing *Hudson v. Palmer*, 468 U.S. 517 (1984)); *City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 235 (Tex. 2011) ("We . . . hold that because VSC had actual knowledge of the vehicles' seizure—VSC knew the cars were seized from its lot, and it knew who seized them—it was required to pursue the chapter 47 proceedings."). And Plaintiffs made no argument that they were unable to petition a judge for a property hearing. Although Plaintiffs do mention not receiving an inventory of the items at the scene of the seizure, because they were present for a majority of the search, the Court finds Plaintiffs still had adequate notice that property was taken by the Martin County Sheriff's Department. (Doc. 78 at 17).

While the Court recognizes there are, at best, fact issues as to whether Martin County Defendants provided a copy of the inventory seized,[14] returned the search warrant to the magistrate after execution, received an order from the magistrate directing safekeeping of the property,[15] and turned the property immediately over to the complaining witness,[16] this does not

---

14. TEX. CODE CRIM. PRO. art. 18.06 ("Before the officer takes property from the place, he shall prepare a written inventory of the property to be taken. He shall legibly endorse his name on the inventory and present a copy of the inventory to the owner or other person in possession of the property.").

15. TEX. CODE CRIM. PRO. art. 18.10 ("Not later than three whole days after executing a search warrant, the officer shall return the search warrant. . . . The officer shall also deliver to the magistrate a copy of the inventory of the property taken into his possession under the warrant. . . . The officer who seized the property shall retain custody of it until the magistrate issues an order directing the manner of safekeeping the property.").

16. TEX. CODE CRIM. PRO art. 47.01(a) ("[A]n officer who comes into custody of property alleged to have been stolen shall hold it subject to the order of the proper court only if the ownership of the property is contested or

affect the fact that Plaintiffs had notice and a meaningful opportunity to be heard if they had followed Texas's post-deprivation procedures. Neither Defendant Snellgrove nor Martin County Defendants violated Plaintiffs' Fourteenth Amendment rights to due process. Accordingly, the Court **GRANTS** Martin County Defendants' Motion for Summary Judgment (Doc. 26) as to Plaintiffs' Fourteenth Amendment procedural due process claim against all Defendants and, conversely, **DENIES** Plaintiffs' Partial Motion for Summary Judgment (Doc. 78) as to the same claim.

### 3. Civil Rights Conspiracy

Plaintiffs bring a civil rights conspiracy claim under § 1983. (Doc. 74 at 24). Plaintiffs assert the Martin County Officers and Defendant Snellgrove conspired to deprive Plaintiffs of their Fourth and Fourteenth Amendment rights. (Doc. 78 at 36). Conspiracy claims brought through § 1983 for deprivations of constitutional rights "are unique" in that the plaintiff must not only prove facts that (1) establish the existence of a conspiracy involving state action, but also (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019); *Tripathi v. St. Edward's Univ.*, No. 25-CV-01203, 2025 WL 2629968, at *3 (W.D. Tex. Aug. 27, 2025) (stating the elements do not differ when the conspiracy is between private and public actors). A § 1983 conspiracy cannot exist in a vacuum; there must be a surviving constitutional claim for it to be actionable. *Shaw*, 918 F.3d at 419. They thus "act as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act" that caused the constitutional deprivation. *Bevill v. Fletcher*, 26 F.4th 270, 283 (5th Cir. 2022).

---

disputed."); *id*. art. 47.03 ("When an officer seizes property alleged to have been stolen, he shall immediately file a schedule of the same, and its value, with the court having jurisdiction of the case, certifying that the property has been seized by him, and the reason therefor. The officer shall notify the court of the names and addresses of each party known to the officer who has a claim to possession of the seized property.").

Here, the Court found no Defendant violated Plaintiffs' Fourteenth Amendment rights, thus there necessarily could not have been a conspiracy to violate these rights. But Plaintiffs have established genuine issues of fact as to whether Defendant Snellgrove and Martin County Officers, save Defendant Phelps, deprived Plaintiffs of their rights under the Fourth Amendment. Thus, assuming a Fourth Amendment violation is found,[17] the Court must consider whether Plaintiffs sufficiently established the existence of a connected conspiracy involving state action. *See Morales v. Carrillo*, 625 F. Supp. 3d 587, 598 (W.D. Tex. 2022).

"On a claim for civil conspiracy, a plaintiff must prove that the defendants agreed to commit an illegal act." *Id*. at 599. "A private party may be held liable under § 1983 if he or she is a 'willful participant in joint activity with the State or its agents.'" *Donahue v. Smith*, No. 15-6036, 2017 WL 3990713, at *4 (E.D. La. Sept. 11, 2017) (quoting *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)). The existence of an agreement is often "shown by circumstantial evidence, because 'conspirators rarely formulate their plans in ways susceptible of proof by direct evidence.'" *Id*. (quoting *Thomas v. New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982)). "Conspiracy" often "conjures images of under-the-table handshakes and back-alley meetings under the cover of night[,]" but that is not how people conspire. *Bevill v. City of Quitman*, No. 19-CV-406, 2025 WL 2306849, at *22 (E.D. Tex. Aug. 11, 2025). "They do so over time, in text messages, over lunch meetings, and during phone calls." *Id.* Consequently, "there is rarely a smoking gun" or a "room where [the conspiracy] happened." *Id.* As Stringer Bell has taught us all to never take notes on a conspiracy, Plaintiffs cannot be expected to prove one so explicitly. Thus, "the determination of whether a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the behavior of the alleged conspirators." *Imani v. City*

---

17. Because the Court did not grant summary judgment in Plaintiffs' favor as to their Fourth Amendment claim, it follows that summary judgment cannot be granted in Plaintiffs' favor as to their § 1983 conspiracy claim.

*of Baton Rouge*, 614 F. Supp. 3d 306, 374 (M.D. La. 2022) (quoting *Mack v. Newton*, 737 F.2d 1343, 1350 (5th Cir. 1984)). "The circumstances must be such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Id*.

Plaintiffs assert Defendants Snellgrove, Ingram, Dahl, Brown, Gammons, and Phelps conspired and agreed to violate Plaintiffs' Fourth Amendment rights by over-searching and over-seizing. (Doc. 78 at 36). The Court finds sufficient evidence that a reasonable jury could infer Defendants Snellgrove, Ingram, and Dahl participated in a conspiracy to search Plaintiffs' residence and seize all Snap-On products that Defendant Snellgrove believed to be his, regardless of the parameters of the search warrant.

To start, "the relationship between alleged co-conspirators is among the factors a fact finder may consider in inferring a conspiracy." *Morales*, 625 F. Supp. 3d at 600 (internal quotations omitted); *United States v. Harris*, 932 F.2d 1529, 1523 (5th Cir. 1991) ("[E]vidence of a pre-existing relationship between parties is relevant in determining whether they were engaged in a conspiracy."). It is undisputed Defendants Snellgrove and Ingram were friends. Defendant Ingram testified he went to a Bible study for three or four months at the Snellgroves' residence (Doc. 78-1 at 46), and Defendant Snellgrove confirmed the two were "acquaintances, small town friends." (Doc. 78-2 at 81). Further, in his deposition, Defendant Ingram explained he and Defendant Snellgrove "had been talking for several months" about the potential theft before Defendant Snellgrove filed his report. (Doc. 78-1 at 9–10). The two also exchanged text messages about the case, including Defendant Ingram asking Defendant Snellgrove how he was doing after the search was complete. (Doc. 78-6 at 2) ("Brian. How are you doing after you

hopefully have had a chance to slow down for the day? If you are not tired I want some of what you take.").

While there is no evidence Defendants Snellgrove and Dahl knew each other outside of this case, they were in communication in the early hours of the search before Defendant Snellgrove arrived, as well as the day after. (Doc. 78-1 at 118–20). Specifically, Defendant Dahl called Defendant Snellgrove roughly a half hour into the search, and after the search warrant items had been found, saying the officers were going through the Snap-On products Plaintiff Austin has, they had a lot to sort through, and they would be there a while. AXON Body 0803 at 28:00–29:16. Defendant Dahl then texted Defendant Snellgrove a picture of a toolbox, and Defendant Snellgrove responded he didn't know who that belonged to. (Doc. 78-1 at 118).

Plaintiffs also provide evidence that would allow a reasonable jury to infer these Defendants were committed to the common end of seizing as many Snap-On products as they could. *Imani*, 614 F. Supp. 3d at 374 ("At a minimum, their actions, to support a finding of a conspiracy, must suggest a commitment to a common end."). Two days before the search and one day before the search warrant was issued, Defendant Snellgrove texted Defendant Ingram: "If it's ok I would like to visit about timing of all that needs to go down." (Doc. 78-6 at 1). Defendant Ingram responded, "Let me check and see where we are." *Id*. Several hours later that day, Defendant Snellgrove texted Defendant Ingram, "We will be ther[e] in 15 to 20 if that works for you." *Id*. While an argument could be made these Defendants believed at this point the search warrant was going to authorize the seizure of a much larger number of items, Plaintiffs point to evidence that their tune never changed.

In Defendant Ingram's deposition, which was obviously completed after the fact, he explained that "we . . . told [Defendant Snellgrove] we might need some help with *that much*

36

*property*, and he . . . agreed to be there." (Doc. 78-1 at 9–10) (emphasis added). Similarly, when Defendant Ingram was asked why he came to the search, he responded, "Because I knew it was going to be a large case . . . ." (Doc. 78-1 at 40). Further, in Defendant Ingram's deposition he was asked, "So Mr. Snellgrove was planning to come [to the search] regardless of my client's request." (Doc. 78-1 at 9). Defendant Ingram responded that Defendant Snellgrove "knew there was a possibility he would be called." *Id*. These statements are arguably inconsistent with the execution of a search warrant to seize two items but rather point to an intent to seize a much larger number of items.

Finally, the Court finds Defendant Dahl's investigative report further ties him to the conspiracy. In his report, he wrote "Judge Shane R. Seaton issued a search warrant authorizing the search of the Austin Hamblin property . . . for stolen Snap On products." (Doc. 78-5). While this is not necessarily a false statement, it is lacking the specificity he exhibits in other parts of the report, talking explicitly about Snap-On MIG Welders, TIG Welders, Plasma Cutters, and Air Compressors. *Id*. As further evidence Defendant Dahl was executing the search warrant to look at all Plaintiffs' Snap-On products, he wrote in the report: "Inv. Dahl requested Mr. Hamblin show Inv. Dahl all the Snap On products at his property. Mr. Hamblin complied and took Inv. Dahl through his property pointing out the Snap On tools and property." *Id*. This is consistent with Defendant Dahl's statements to Plaintiff Austin when he initially executed the warrant the officers were there to seize Snap-On products, generally. AXON Body 0803 at 04:45–05:10. The search then concluded with Defendants Snellgrove, Ingram, and Dahl at Defendant Snellgrove's barn, offloading all the items they seized from Plaintiff Austin's house. (Doc. 78-2 at 53). Defendants Ingram and Dahl then allowed Defendant Snellgrove to determine

37

the value of the property seized and did not verify the financial loss claimed by Defendant Snellgrove. (Doc. 78-1 at 30, 120).

Overall, the Court finds there is evidence to suggest there was a "preceding agreement" among Defendant Snellgrove, Ingram, and Dahl, rather than "merely parallel conduct that could just as well be independent action." *Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013). And because finding a conspiracy here will "involve questions of motive or intent, summary judgment is . . . inappropriate." *Morales*, 625 F. Supp. 3d at 599 (quoting *Montgomery v. Hughes*, 716 F. Supp. 261, 263 (S.D. Miss. 1988)). "Of course, the Court expresses no opinion on the merits of Plaintiffs' conspiracy claim; it simply finds that the inference of conspiracy is not 'so tenuous' that the Court must withdraw it from the jury." *Morales*, 625 F. Supp. 3d at 605. In sum, considering all the evidence, a reasonable juror could find an agreement between Defendants Snellgrove, Ingram, and Dahl to deprive Plaintiffs of their constitutional right to be free from unreasonable searches and seizures.

As to the question of qualified immunity, "when a defendant faces conspiracy claims under § 1983, the qualified immunity analysis that applies to the underlying § 1983 claims resolves the qualified immunity analysis for the conspiracy." *Id*. at 607; *Bevill*, 26 F.4th at 283. Thus, "[i]t is clearly established that a defendant may be liable for their participation in a conspiracy to violate a constitutional right, regardless of whether or not that defendant's actions alone actually caused a constitutional violation." *Morales*, 625 F. Supp. 3d at 607.

Accordingly, the Court **DENIES** Martin County Defendants' Motion for Summary Judgment as to Plaintiffs' civil rights conspiracy claim against Defendants Ingram and Dahl. (Doc. 26). But the Court **GRANTS** Martin County Defendants' Motion for Summary Judgment as to the civil rights conspiracy claim against Defendants Phelps, Brown, and Gammons.

38

(Doc. 26). Further, the Court **DENIES** Plaintiffs' Motion for Summary Judgment as to the civil rights conspiracy claim against each Defendant. (Doc. 78).

### 4. Municipal Liability

Plaintiffs' § 1983 claim against Martin County must be analyzed as a *Monell* claim. For § 1983 purposes, local governments are considered "persons." *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id*. Such entities may also be sued for constitutional violations "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id*. at 691. However, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id*. A municipality may be held liable only "where 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Hicks-Fields v. Harris County*, 860 F.3d 803, 808 (5th Cir. 2017) (quoting *Monell*, 436 U.S. at 690).

"Municipal liability under section 1983 requires proof of . . . a *violation of constitutional rights* whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578 (emphasis added). "A plaintiff cannot recover for municipal liability if they have not suffered a deprivation of their constitutional rights." *Harmon v. City of Arlington*, 478 F. Supp. 3d 561, 622 (N.D. Tex. 2020). In other words, with no underlying constitutional violation, there can be no *Monell* claim. And to hold a municipal entity, such as Martin County, liable for constitutional

39

violations committed by municipal officers under *Monell*, a plaintiff must prove three elements: "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018) (quoting *Hicks-Fields*, 860 F.3d at 808).

An official policy can be demonstrated "through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority" or by showing the existence of a "persistent, widespread practice." *Sanchez*, 283 F. Supp. 3d at 533–34 (quoting *Valle v. City of Houston.*, 613 F.3d 536, 541–42 (5th Cir. 2010); *Piotrowski*, 237 F.3d at 579). Alleging a policy by showing there was a widespread practice "requires the plaintiff to allege facts demonstrating a 'pattern of abuses that transcends the error made in a single case.'" *Bright v. City of Killeen*, No. 20-CV-431, 2021 WL 1226560, at *3 (W.D. Tex. Mar. 31, 2021) (quoting *Piotrowski*, 237 F.3d at 582). However, an exception applies—"a single unconstitutional action by a municipal actor may give rise to municipal liability if that actor is a final policymaker." *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008).

Plaintiffs allege four separate bases for Martin County's municipal liability: (1) Defendant Ingram—as a final policymaker—violated their constitutional rights; (2) Defendant Ingram ratified the officers' unconstitutional acts; (3) Martin County failed to train and supervise its officers; and (4) Martin County failed to enforce its own polices or lacked necessary polices. (Doc. 74 at 25–29). Because the only surviving underlying constitutional violation is Plaintiffs' Fourth Amendment right to be free from unreasonable search and seizure, the Court will consider each basis for *Monell* liability under that framework.

### a. Single Act of Final Policymaker

"A single decision may constitute municipal policy in rare circumstances, when the official or entity possessing final policymaking authority for an action performed the specific act that forms the basis of the § 1983 claim." *St. Maron Props., LLC v. City of Houston*, 78 F.4th 754, 760 (5th Cir. 2023). This case fits the bill for that narrow exception. "[I]n Texas, the county sheriff is the county's final policymaker in the area of law enforcement . . . ." *Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990). In fact, the Fifth Circuit has explained that "Texas sheriffs are policymakers as a direct result of state statute; their constitutional violations result in county liability even if contrary to other state law or policy." *Bolton*, 541 F.3d at 550 n.4. Here, Martin County admitted Defendant Ingram, as the sheriff, was the final policymaker for the County regarding the execution of search warrants and the handling of seized property in May 2023. (Doc. 78-14 at 13). Thus, any illegal or unconstitutional actions taken by Defendant Ingram with respect to the potential unlawful search and seizure of Plaintiffs' residence, if proven, would be considered the actions of Martin County and would be sufficient to impose liability on the County. *See Turner*, 915 F.2d at 136–37; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986). The same is true for Defendant Ingram's participation in the conspiracy, as well as the actions of his alleged co-conspirators. *Turner*, 915 F.2d at 137–38 ("The sheriff's and the district attorney's alleged participation in the conspiracy, if proven, will suffice to impose liability on the county. . . . [T]he county could be held liable not only for the sheriff's participation in the conspiracy, but could be held directly or vicariously liable as well for the actions of his alleged coconspirator . . . .").

### b. Ratification

The ratification theory provides that if "authorized policymakers approve a subordinate's decision and the basis for it, their ratification [is] chargeable to the municipality because their

41

decision is final." *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009). However, in the Fifth Circuit, this theory "has been limited to 'extreme factual situations.'" *Id*. (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009)); *compare Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) (finding ratification in case in which officers "poured" gunfire onto a truck and killed innocent occupant) *with Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (refusing to find ratification in case in which officer shot fleeing suspect in the back). While the evidence shows Defendant Ingram, as the final policymaker, was present at the search and seizure and, if Plaintiffs' version of the facts is proven, his deputies violated the Fourth Amendment, the conduct here was not sufficiently extreme to qualify for a finding of ratification. *See Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010) (finding no ratification when the municipality defended the actions of officers that executed an invalid search warrant violating the Fourth Amendment); *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017) (holding the plaintiff stated claims for clearly established violations of his First and Fourth Amendment rights but the unconstitutional conduct of arresting the plaintiff for his speech was not sufficiently extreme to qualify for a finding of ratification).

### c.   Failure to Train or Supervise

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A failure to train or supervise theory of municipal liability requires a showing that (1) the municipality failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiffs' rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiffs' constitutional rights." *Sligh*

*v. City of Conroe*, 87 F.4th 290, 303 (5th Cir. 2023). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61.

"[B]ecause the standard for municipal fault is a stringent one, a pattern of similar constitutional violations by untrained employees is ordinarily required to show deliberate indifference." *Peña*, 879 F.3d at 623 (quoting *Connick*, 563 U.S. at 62) (cleaned up). Plaintiffs do not point to a pattern of constitutional conduct outside of the incident here.[18] Thus, Plaintiffs' failure to train theory can only proceed under the single-incident exception. The Fifth Circuit has expressly stated that plaintiffs cannot avail themselves of the single-incident exception unless they show the government actor was provided "no training whatsoever." *Hutcheson v. Dallas County*, 994 F.3d 477, 483 (5th Cir. 2021); *Brown v. Bryan County*, 219 F.3d 450, 455 (5th Cir. 2000) (finding a failure to train claim when the officer testified "he received no training through Bryan County," and, specifically, "he testified that he received no formal training"). Plaintiffs fail to even allege this, let alone provide evidence to support it. For instance, in their Complaint, Plaintiffs allege that "[t]he County's policymaker, Ingram, had training concerning warrant scope, plain-view limitations, and evidence handling . . . ." (Doc. 74 at 26); (*see* Docs. 78-9, 78-10, 78-11, 78-12) (showing each officer received some level of formal training). Accordingly,

---

18. Plaintiffs provide no argument or evidence regarding their failure to supervise theory, so the Court quickly discards it.

the Court finds summary judgment for Martin County appropriate on Plaintiffs' failure to train or supervise claim.

### d. Failure to Enforce

Lastly, Plaintiffs attempt to establish municipal liability by arguing both that Martin County did not have certain necessary written polices and that it failed to follow the policies it does have. (Docs. 74 at 26; 78 at 39). "Failure to adopt a policy may serve as the basis for liability only when the omission amounts to an intentional choice, not merely an unintentionally negligent oversight, and such an omission is equivalent to an intentional choice only where the entity has acted with deliberate indifference." *E.A.F.F. v. United States*, 955 F. Supp. 2d 707, 757 (W.D. Tex. 2013) (citing *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 217 (5th Cir. 1998); *Evans v. City of Marlin*, 986 F.2d 104, 108 (5th Cir. 1993)). Plaintiffs provide no evidence that the lack of written search-warrant execution policy was an intentional choice.

Regarding Martin County's failure to follow policies it has, Plaintiffs argue that "[a] municipality cannot avoid liability by writing good rules and then ignoring them." (Doc. 78 at 39). But that is exactly the law. A municipality is not liable for individual employees diverting from the written policy. *See Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). A municipality is only liable if a policymaker has adopted a policy or custom that resulted in a constitutional violation. *Id*. Thus, this theory in isolation fails; instead, Plaintiffs must show, for instance, the municipality failed to train its employees on the valid policies or that the policymaker himself committed or ratified the violation, which the Court discusses above.

Accordingly, the Court **GRANTS** Martin County Defendants' Motion for Summary Judgment on the issue of municipal liability under the theories of ratification, failure to train or supervise, and failure to enforce. (Doc. 26). But the Court **DENIES** Martin County Defendants'

Motion for Summary Judgment on the issue of municipal liability under the theory of a single act by a policymaker. (Doc. 26). And because the question of an underlying constitutional violation is being left to a jury, the Court also **DENIES** Plaintiffs' Motion for Summary Judgment on the same issue, finding it appropriate to submit to a jury the municipal liability theory of a single act by a policymaker. (Doc. 78).

### B. Texas Tort Claims Act and Official Capacity Claims

Martin County Defendants spend a majority of their Motion for Summary Judgment arguing they are not liable under the Texas Tort Claims Act and are entitled to immunity under Texas law. (Doc. 26 at 5–12). This, however, is a moot issue as Plaintiffs, in their live pleading before the Court, have dropped the Texas Tort Claims Act causes of action against Martin County Defendants and are only pursuing claims against Martin County Officers in their individual capacity. (*See* Doc. 74). And to the extent Martin County Defendants argue the individual officers should be dismissed because of the irrevocable election under the Tort Claims Act, the Court finds the state law tort claims were pleaded in the alternative to Plaintiffs' § 1983 claims. (*See* Docs. 26 at 5–6; 35 at 14).

Accordingly, the Court **DENIES AS MOOT** Martin County Defendants' Motion for Summary Judgment as to the issue of the Texas Tort Claims Act and official capacity claims. (Doc. 26).

### C. State Law Claims Against Defendant Snellgrove

Finally, Plaintiffs move for summary judgment on three Texas state law claims against Defendant Snellgrove. (Doc. 78 at 42–44). The Court discusses each in turn.

#### 1. Conversion

Under Texas law, "[c]onversion is the unauthorized and unlawful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights." *Cypress Creek EMS v. Dolcefino*, 548 S.W.3d 673, 684 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex. 1971)). To prove their claim for conversion, Plaintiffs must show (1) they owned, had legal possession of, or were entitled to possession of the items; (2) Defendant Snellgrove unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, Plaintiffs' rights as owners; (3) Plaintiffs demanded return of the property; and (4) Defendant Snellgrove refused to return the property. *Remington Sherman Auto., LLC v. FMG N. Tex., LLC*, No. 05-22-01366, 2023 WL 8918047, at *2 (Tex. App.—Dallas 2023, pet. denied); *Big Thirst, Inc. v. Donoho*, 657 F. Supp. 3d 914, 922 (W.D. Tex. 2023).

Plaintiffs' own argument precludes granting summary judgment. Plaintiffs state they possessed the property at their home but that ownership was disputed. (Doc. 78 at 43). And Defendant Snellgrove agrees. (Doc. 82 at 9) ("This case presents an absolute factual dispute about the ownership of the property that was seized . . . ."). The record therefore does not show Plaintiffs owned, had legal possession of, or were entitled to possession of the items but rather that a fact question exists. Accordingly, the Court **DENIES** Plaintiffs' Motion for Summary Judgment as to their conversion claim against Defendant Snellgrove. (Doc. 78).

### 2. Abuse of Process

"Abuse of process is the malicious misuse or misapplication of a regularly issued civil or criminal process to obtain a result not lawfully warranted or properly attainable by the process." *Kjellvander v. Citicorp*, 156 F.R.D. 138, 142 (S.D. Tex. 1994) (citing *Tandy Corp. v. McGregor*,

527 S.W.2d 246, 249 (Tex. App.—Texarkana 1975, writ ref'd n.r.e.)). "Process has been broadly interpreted to encompass the entire range of procedures incident to litigation." *Martin v. Trevino*, 578 S.W.2d 763, 769 (Tex. App.—Corpus Christi 1978, writ ref'd n.r.e.)). There are three elements for an abuse of process claim: "(1) the defendant made an illegal, improper or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process; and (3) damage to the plaintiff as a result of such illegal act." *Cooper v. Trent*, 551 S.W.3d 325, 333–34 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). "To constitute an abuse of process, the process must be used to accomplish an end which is beyond the purview of the process, and which compels a party to do a collateral thing which he would not be compelled to do." *Detenbeck v. Koester*, 886 S.W.2d 477, 479 (Tex. App.—Houston [1st Dist.] 1994, no writ). "The critical aspect of this tort is the improper use of the process after it has been issued." *RRR Farms, Ltd. v. Am. Horse Prot. Ass'n*, 957 S.W.2d 121, 133 (Tex. App.—Houston [14th Dist.] 1997, pet. denied).

Plaintiffs argue the warrant in this case was the process, and Defendant Snellgrove used the process for the unauthorized purpose of obtaining possession of a broad category of disputed tools and business property without proving ownership. (Doc. 78 at 43–44). This claim rests on many of the same factual issues present throughout this case, such as whether the search and seizure was conducted with consent and what the intentions or motives of the defendants were. Accordingly, the Court **DENIES** Plaintiffs' Motion for Summary Judgment as to their abuse of process claim against Defendant Snellgrove. (Doc. 78).

### 3. Texas Theft Liability Act

47

"The TTLA provides for civil suits against those who commit theft, as defined by the Texas Penal Code." *Orange Coast Title Co. of N. Ca. v. Greater Comm. Missionary Baptist Church*, 815 F. Supp. 3d 489, 497 (N.D. Tex. 2005). Theft is defined as unlawfully appropriating property with intent to deprive the owner of property. *In re Minardi*, 536 B.R. 171, 185 (Bankr. E.D. Tex. 2015) (citing TEX. PEN. CODE § 31.03(a)). To establish a TTLA claim, a plaintiff must demonstrate that "(1) the plaintiff had possessory right to the property in question, (2) the defendant unlawfully appropriated the property with intent to deprive the plaintiff of the property, and (3) the plaintiff sustained damages as a result of the theft." *Halo Mining Ltd. v. NorthData Holdings, Inc.*, No. 24-CV-00090, 2026 WL 810038, at *6 (N.D. Tex. Mar. 24, 2026). The Court finds the same issues exists here as did with Plaintiffs' conversion claim: Plaintiffs have not shown they have a possessory right to the property in question. Accordingly, the Court **DENIES** Plaintiffs' Motion for Summary Judgment as to their TTLA claim against Defendant Snellgrove. (Doc. 78).

## IV.    CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Martin County Defendants' Motion for Summary Judgment. (Doc. 26).

The Court **GRANTS** Martin County Defendants' Motion for Summary Judgment as to Plaintiffs' Fourth Amendment claim against Defendant Phelps; as to Plaintiffs' Fourteenth Amendment procedural due process claim against all Defendants; as to Plaintiffs' civil rights conspiracy claim against Defendants Phelps, Brown, and Gammons; and as to Plaintiffs' municipal liability claim against Martin County under the theories of ratification, failure to train or supervise, and failure to enforce. (Doc. 26).

But the Court **DENIES** Martin County Defendants' Motion for Summary Judgment as to Plaintiffs' Fourth Amendment claim against Defendants Ingram, Dahl, Brown, and Gammons; as to Plaintiffs' civil rights conspiracy claim against Defendants Ingram and Dahl; and as to Plaintiffs' municipal liability claim against Martin County under the theory of a single act by a policymaker. (Doc. 26).

Further, the Court **DENIES AS MOOT** Martin County Defendants' Motion for Summary Judgment as to the issue of the Texas Tort Claims Act and official capacity claims. (Doc. 26).

Finally, the Court **DENIES** Plaintiffs' Partial Motion for Summary Judgment on all claims. (Doc. 78).

It is so **ORDERED**.

SIGNED this 24th day of July, 2026.

RONALD C. GRIFFIN
UNITED STATES MAGISTRATE JUDGE