**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND / ODESSA DIVISION**

| | | |
|---|---|---|
| **AUSTIN HAMBLIN and KISKA HAMBLIN** | § | |
| | § | |
| **VS.** | § | |
| | § | **NO.   7:25-cv-00245** |
| **MARTIN COUNTY, TEXAS** | § | |
| | § | |
| **BRAD INGRAM,** | § | |
| | § | |
| **ANDERS DAHL,** | § | |
| | § | |
| **KELSEY BROWN,** | § | |
| | § | |
| **RORY GAMMONS,** | § | |
| | § | |
| **WESTON PHELPS, and** | § | |
| | § | |
| **BRIAN SNELLGROVE** | § | |

**FOURTH AMENDED COMPLAINT**

1. Austin Hamblin and Kiska Hamblin find themselves stripped of their possessions due to the coordinated and unconstitutional actions of Austin's former employer, Brian Snellgrove, and local law enforcement.

2. Despite Austin Hamblin's innocence and the eventual dismissal of all criminal charges for lack of evidence, Defendant Snellgrove manipulated law enforcement into an unwarranted raid on the Hamblin marital home.

3. The raid far exceeded the narrow scope of a strictly limited search warrant.

4. This abuse of authority led to the unconstitutional seizure of the Hamblins' personal property and the unjust enrichment of Snellgrove.

5.  The law enforcement defendants' blatant disregard for clearly established constitutional boundaries and mandatory state procedures violated the Hamblins' fundamental rights and inflicted significant personal and financial harm.

6.  This case seeks to rectify these injustices, ensuring that the misuse of state police power for private civil repossession is held to account in the eyes of the law.

## JURISDICTION AND VENUE

7.  This Court possesses subject matter jurisdiction over the federal claims presented in this complaint pursuant to 28 U.S.C. Section 1331, as the claims arise under the Constitution and laws of the United States, specifically the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

8.  This Court possesses supplemental jurisdiction over the related state law claims asserted exclusively against Defendant Snellgrove under 28 U.S.C. Section 1367, as those claims form part of the same case or controversy under Article III of the United States Constitution.

9.  This Court possesses personal jurisdiction over the parties in this case, as the defendants committed the acts giving rise to these claims within the Western District of Texas. The events and omissions occurred within this district, establishing sufficient minimum contacts with this forum to satisfy constitutional due process requirements.

10. Venue is proper in the Western District of Texas under 28 U.S.C. Section 1391 because a substantial part of the events and omissions that give rise to the claims occurred in this district, and the defendants are subject to personal jurisdiction in this district concerning the actions in question.

**PARTIES**

11. Plaintiffs Austin Hamblin ("Austin") and Kiska Hamblin ("Kiska") are individuals domiciled in the State of Texas and are collectively referred to herein as "Plaintiffs" unless otherwise specified.

12. Defendant Martin County, Texas, is a government entity and a political subdivision of the State of Texas.

13. Defendant Brad Ingram ("Ingram") is an individual who, at all times relevant to the causes of action detailed in this complaint, was employed as the elected Sheriff of Martin County, Texas. In this role, he served as the final policymaker for county law enforcement operations.

14. Defendant Anders Dahl ("Dahl") is an individual who, at all times relevant, was employed by Martin County as an Investigator for the Sheriff's Office.

15. Defendant Kelsey Brown ("Brown") is an individual who, at all times relevant, was employed by Martin County through the Sheriff's Office.

16. Defendant Rory Gammons ("Gammons") is an individual who, at all times relevant, was employed by Howard County, Texas, through the Howard County Sheriff's Office.

17. Defendant Weston Phelps ("Phelps") is an individual who, at all times relevant, was employed by Martin County through the Sheriff's Office.

18. Defendant Brian Snellgrove ("Snellgrove") is a private individual domiciled in the State of Texas.

19. All individual defendants are sued in their personal capacity.

## FACTUAL ALLEGATIONS

20.  Defendant Brian Snellgrove employed Plaintiff Austin Hamblin. Snellgrove owns and operates Snellgrove Enterprises, a Snap-On tools franchise located at 2100 Westside Drive, Stanton, Texas.

21. Austin's employment with Snellgrove followed a multi-year tenure of experienced automotive and heavy machinery repair, in which he was required to furnish his own tools. Prior to Austin's employment beginning as well as during the course of the employment, Plaintiffs accumulated a substantial, personal collection of various tools and equipment to facilitate this trade, among other purposes. Among the items acquired were Snap On tools that Plaintiffs purchased with joint marital funds, as well as tools gifted to them. These items were seized in the unconstitutional raid on Plaintiffs home.

22. Specifically, the unconstitutional seizure also included many gifts from Kiska's Stepfather, Warren Kniepkamp, who is a separate independent Snap-On franchisee. A notarized inventory dated February 11, 2024 states that Kniepkamp had provided Plaintiffs with a specific list of tools well prior to the events of May 2023. Defendant Snellgrove has conceded under oath in this litigation that he has no basis to dispute the accuracy or truth of the Kniepkamp affidavit.

23. The Plaintiffs maintained their personal tool collection and related equipment at their marital residence located at 3700 Hamilton, Big Spring, Howard County, Texas.

24. On May 11, 2023, Defendant Snellgrove and his employee, Andrew Nichols, met with Defendant Deputy Weston Phelps at the Martin County law enforcement center. Snellgrove related that he believed Austin had been involved in the theft of products from Snellgrove Enterprises.

25. Prior to the May 11, 2023, report to the Martin County Sheriff's Office, Defendant Snellgrove participated in ongoing communications with Defendant Ingram regarding what Snellgrove

characterized as a problem with the inventory at Snellgrove Enterprises. Ingram has admitted under oath that the sheriff's office had been talking with Snellgrove for "several months" before the formal May 11, 2023, report.

26. In the days leading up to the raid, law enforcement and Snellgrove engaged in a meeting of the minds to seize a large volume of property. Despite the warrant for two items, Snellgrove furnished transportation for the property which included Snap-On box van, 2 Pick-ups and a trailer. Snellgrove also brought employees to assist in the unconstitutional removal of property.

27. Deputy Phelps initiated an official investigation based on these accusations. However, Phelps did not interview Austin or Kiska Hamblin, did not contact the specific customer identified in the zeroed-out tickets, and did not verify the claims with Snap-On corporate records or independent financial records before opening Martin County Sheriff's Office Case No. 23-0135. In his initial offense report, Phelps listed "various stolen Snap-On tools/tools boxes/equipment" as stolen property with an estimated total value of 283,000 dollars, identifying Snellgrove Enterprises as the sole victim.

28. That same day, Phelps recorded that Snellgrove's employee, Nichols, had provided images and video of Snap-On equipment allegedly located at the Hamblin home. The offense report prepared by Phelps explicitly noted that the case would, upon approval, be forwarded to Investigator Anders Dahl, Chief Deputy Jesse Metcalf, and Sheriff Brad Ingram, thereby involving the highest levels of the Martin County Sheriff's Office in the decision of whether and how to proceed on Snellgrove's accusations.

29. On May 15, 2023, Defendant Dahl formally interviewed Snellgrove. During this interview, Snellgrove claimed the value of the missing products or proceeds was approximately 200,000 dollars. Additionally, Dahl recorded that a babysitter for the Hamblin family had reported seeing a Snap-On MIG welder, a TIG welder, a plasma cutter, and an air compressor at the residence

within the past several weeks. Also on May 15, 2023, Chief Deputy Metcalf spoke with Snellgrove regarding Snap-On inventory records and documented Snellgrove's claim that one specific plasma cutter and one specific air compressor were missing from the warehouse, and that one air compressor sale ticket had been "zeroed out".

30. The Martin County Sheriff's Department has admitted in its sworn responses to Plaintiffs' Requests for Admission that it is aware of a personal relationship or prior dealings between Sheriff Brad Ingram and Defendant Brian Snellgrove outside of official law-enforcement business. The Department has further answered under oath, through its sworn interrogatory responses, that it is aware Brian Snellgrove and Brad Ingram were friends. Defendant Ingram has himself confirmed under oath that he attended an ongoing Bible study at Snellgrove's residence during the relevant time and had regular communication with Snellgrove throughout the period leading up to the search.

31. In text messages exchanged between on or about May 15, 2023, Defendant Snellgrove and Defendant Ingram in connection with these events, Snellgrove wrote to Ingram, "If it's ok I'd like to visit about timing of all that needs to go down." Ingram responded, "Let me check and see where we are." The exchange reflects the coordinated and pre-arranged character of the operation, in which the private complainant and the county's final law-enforcement policymaker were in direct communication about the timing and execution of the search and seizure.

32. On May 16, 2023, Dahl met with Snellgrove and was provided with more than ten serial numbers sent to Snellgrove of products that had been sent to him. Relying solely on three emails with unverified serial numbers supplied by the complaining witness, his employee, and not interviewing the accused, Defendant Dahl drafted and swore an affidavit for a search warrant on May 16, 2023. Based upon Dahl's affidavit, 118th District Judge Shane R. Seaton issued a search warrant authorizing the search for the Plaintiffs' residence in Howard County.

33. Crucially, the search warrant issued by the magistrate was strictly limited in its scope. The warrant authorized law enforcement to search for and seize exactly two specific serial numbered items: a Snap-On Plasma Cutter model 301 and a Snap-On Air Compressor.

34. On May 17, 2023, Defendants Dahl, Ingram, Brown, and Phelps of Martin County, alongside Defendant Gammons of Howard County, arrived at Plaintiffs marital residence to execute the search warrant.

35. During the search, officers identified the two items similar to the items they were searching for, Defendant Deputies had no further justification to be on Plaintiffs property. The warrant did not authorize a general search and seizure of all tools or all Snap-On branded items on the premises.

36. At this time Defendant Deputies had no probable cause to continue searching and furthermore, Plaintiff Kiska, had requested to see the warrant to which Brown declined. Kiska then asserted her right to privacy and told the officers to leave. Law enforcement is required to present the warrant and not doing so creates a well-established Fourth Amendment violation, defeating qualified immunity.

37. Instead of leaving Plaintiffs home, Defendant Deputies invited Snellgrove to the home. Snellgrove arrived with the explicit knowledge and at the direct request of the government defendants. Defendant Dahl has admitted in a sworn statement that he "conscripted" Brian Snellgrove to aid in the execution of the search warrant. Dahl requested that Snellgrove appear at the location, identify the property subject to the warrant, and subsequently store such property at Snellgrove's private place of business under Dahl's supervision.

38. Defendant Snellgrove has admitted under oath that he was contacted by law enforcement during the morning of the search; that officers told him they had executed a search warrant, that they had discovered a larger volume of Snap-On branded merchandise at the Hamblin residence than

anticipated, and that they needed his assistance in identifying property; and that officers specifically asked him to bring trailers, trucks, and personnel because the sheriff's office "did not have anything to haul off any large items." Snellgrove complied with request, brought two trailers, an older truck he had converted for cargo, and three to four of his Snap-On employees to the Hamblin residence.

39. By conscripting Snellgrove in this manner, Dahl and the accompanying officers intentionally made the complaining witness a part of the law enforcement team executing the warrant. They cloaked Snellgrove with state authority and caused him to act jointly with the deputies in identifying, seizing, transporting, and storing property taken from the Hamblin residence. By virtue of this conscription and joint action, Snellgrove became a state actor acting under color of law for the purposes of 42 U.S.C. Section 1983.

40. Defendant Snellgrove has admitted under oath that, during the search, he was "directed by the officers to begin to load those items up." Snellgrove has further admitted that officers personally assisted him in loading the seized items onto his private vehicles. These sworn admissions confirm that Snellgrove did not act independently in identifying, handling, or removing the property, but instead acted jointly with the law enforcement defendants to deprive Plaintiffs of their property.

41. On the date of the incident, Plaintiffs Kiska and Austin Hamblin were physically present at their residence when law enforcement officers, accompanied by their conscripted private participant, Defendant Snellgrove, initiated a sweeping search and seizure operation. At no point prior to, during, or following this intrusion did any defendant present, serve, or display a valid search warrant to either physically present co-occupant.

42. Defying these clear refusals and abandoning any pretense of a targeted investigation, the defendants conducted an unconstitutional, general exploratory search. Ignoring the knowledge

of Austin's previous profession as a master automotive technician, defendants arbitrarily presumed all Snap-On branded items were stolen. Consequently, acting without presenting legal authority or independent probable cause, defendants unlawfully seized over 51 major items of personal property valued in excess of $283,445.00.

43. Any defense planning on asserting Plaintiff Austin Hamblin "consented" to this search or seizure is legally invalid. His submission was an involuntary acquiescence to a claim of lawful authority under intensely coercive circumstances. Defendant Snellgrove admitted rummaging through Plaintiffs property, while claiming every Snap-On branded item as well as items unrelated to the Snap-On brand.

44. Furthermore, any purported consent by Austin Hamblin is rendered legally moot by the contemporaneous, active objections of his physically present co-occupant, Kiska Hamblin. The defendants' failure to present a warrant, combined with the co-occupants' express refusals to permit the search, renders the sweeping seizure of these 51 categories of items fundamentally unreasonable and a blatant violation of both Plaintiffs' Fourth Amendment rights.

45. On May 18, 2023, the day after the search of the Hamblin residence, Defendant Snellgrove cancelled or placed a stop payment on Austin Hamblin's paycheck, depriving Austin of payment for work already performed. Snellgrove has admitted under oath "it was frustrating… to be paying someone who had just stolen a lot of my stuff" and he took this action intentionally to punish Austin related to the alleged theft. This post search economic harm Defendants inflicted on Plaintiffs through deprived Austin of lawfully earned wages.

46. Snellgrove, through text messages on or around June 23, 2023, solicited Dahl and Ingram to further interfere with Austin's protected right of filing a wage claim for the check stopped by Snellgrove. Snellgrove rebutted the claim and subsequently was found to be in violation of Texas Payday Law and was ordered to pay Austin the wages owed.

47. Before the May 17, 2023 search, Defendant Ingram had received law-enforcement training through the South Plains Association of Governments Academy regarding execution of search warrants, limitations on the scope of items that may be seized under a warrant, the prerequisites of the plain-view doctrine, and the proper handling, inventory, and disposition of seized property.

48. Notwithstanding that training, Ingram has admitted that he never personally read the warrant before or during the May 17, 2023, search.

49. Ingram has admitted that he personally participated in the May 17, 2023, search of Plaintiffs' residence and that Brian Snellgrove was present during the search.

50. During the operation, Ingram visually watched the search in the shed and left to obtain a dolly for loading property being removed from the premises, thereby facilitating the loading and transport of seized items.

51. Ingram has admitted that during the search Snellgrove was permitted to walk through Plaintiffs' property and point out items he claimed belonged to him, and that officers seized items based in whole or in part on Snellgrove's identification.

52. Ingram has also admitted that during the search, one or more items of property were seized that were not listed or described in the warrant.

53. The inventory of items seized included massive roll cabinets, tool chests, multiple welders, specialty automotive tools, tool organizers, Snap -On branded bicycles, promotional chairs, and a popcorn maker. The true number of individual items seized, when counting each distinct socket and wrench inside the cabinets, numbers in the several hundred. The defendants also seized property that was not manufactured by Snap -On, including a Harbor Freight surface prep tool, a Dremel tool set, and common household tools belonging to the Plaintiffs.

54. The defendants lacked independent probable cause to seize the items beyond the scope of the limited warrant. The incriminating nature of the tools was not immediately apparent to the officers. Defendant Sheriff Ingram has admitted under oath that he personally ran no serial numbers, spoke with no one at Snap-On corporate, examined no receipts, and made no independent investigation of ownership beyond Defendant Snellgrove's representation. Ingram further admitted that Snellgrove provided the $283,445 valuation assigned to the seized property and was not independently verified by the department.

55. Defendant Snellgrove has likewise admitted under oath that he did not inspect any serial numbers on the property at the scene and that no trace or lookup of the serial-numbered items was performed before seizure. The law enforcement defendants seized the property in bulk because Snellgrove pointed to items and claimed them, and because Austin Hamblin—questioned on scene under Miranda warnings and without counsel—made statements that were treated by officers as a blanket concession of Snellgrove's ownership of all Snap-On branded property on the premises.

56. During the search, Austin explicitly informed Dahl and the other deputies that he had legally purchased the Snap -On products over several years. Dahl and Chief Deputy Metcalf instructed Austin to provide receipts for his purchases so they could be forwarded to the district attorney. This instruction demonstrates that the officers were subjectively aware that the ownership of the seized property was highly disputed at the exact moment they were seizing it for Snellgrove's benefit.

57. Gammons has admitted that he was not merely present during the operation. He states that he secured the residence and personally conducted what he characterizes as a consent search inside the home. These admissions establish that Gammons personally searched the premises and personally seized non-warrant items during the operation.

58. Further confirming that ownership of the seized property was openly disputed during the search itself, Defendant Rory Gammons admitted in discovery that either Kiska Hamblin or Austin Hamblin objected to the seizure of one or more specific items during the search and asserted that those items belonged to Plaintiffs. This admission confirms that officers on scene were confronted in real time with specific ownership objections to items they were taking, yet the seizure preceded anyway.

59. Upon information and belief, and based on video produced in this case by Defendants, aligning with the pre-arranged plan, Defendants Dahl and Ingram directed that the heavy roll cabinets, tool chests, and equipment be loaded directly into private vehicles owned or controlled by Snellgrove and his business, rather than into official government evidence transport vehicles. Defendants Brown, Gammons, and Phelps actively and physically participated in lifting, carrying, and loading the Plaintiffs' personal tool cabinets, boxed items, and equipment from the residence into the waiting private vehicles.

60. Defendant Snellgrove admitted under oath that officers personally loaded items onto his private vehicles during the search, and that he was directed by officers to begin loading. While the actions of the officers' loading property are missing on video, they can be seen in agreement and orchestrating a plan to remove the property, with no justification other than Snellgrove's word before Dahl "turn(s) off my body camera".

61. Snellgrove's sworn admissions directly contradict the discovery denials of Defendants Ingram and Dahl, who have each denied personally helping to load any items onto Snellgrove's truck. Snellgrove has further admitted that he did not know the names of all of the Snap-On employees he brought to the search location, and that those employees carried Plaintiffs' property from the residence to Snellgrove's vehicles.

62. Following the loading of the property, the vehicles carrying the seized items did not travel to a secure Martin County or Howard County law enforcement evidence facility. Instead, the vehicles transported the Plaintiffs' property directly to Snellgrove's private commercial business at 2100 Westside Drive in Stanton, Texas.

63. Ingram has admitted that no supervisor or officer obtained a court order authorizing the direct release of seized property to Snellgrove at the scene and that, after the search, seized property was transported to and stored at a barn or storage facility controlled by Snellgrove rather than at a law-enforcement evidence facility.

64. Defendant Ingram has admitted under oath that he personally made the final decision to allow Defendant Snellgrove to transport the seized property, and that he personally made the final decision to allow Snellgrove to store the seized property at Snellgrove's private barn. Ingram has further admitted that he was present at the barn at or shortly after the time the seized property was unloaded, that he walked through the property there, and that he took photographs of the property at the barn, the current location of which photographs he cannot confirm.

65. Dahl has admitted that, after the seized property had been relocated to Snellgrove's barn, Dahl met Snellgrove there, took video of the property, and instructed Snellgrove not to dispose of any of it until authorized by the District Attorney. This admission establishes Dahl's personal knowledge that the property had already been transferred to and was being held at Snellgrove's private facility rather than a government evidence room.

66. Defendant Snellgrove has admitted under oath that approximately eleven of his Snap-On business employees had access to the barn where the seized property was stored, that no segregation or marking was used to separate the seized property from Snellgrove's business inventory, that no lock was installed by the sheriff's office on the barn, that the sheriff's office

had no independent access to the barn, and that Snellgrove gave his employees no specific instructions regarding the preservation or handling of the seized property.

67. Defendant Ingram has admitted that the sheriff's office conducted no written inventory, audit, or inspection of the property at the barn, and that the sheriff's office maintained no chain-of-custody or tracking records while the property was stored there.

68. This cross-county transfer of seized property was conducted in blatant violation of Texas Code of Criminal Procedure Article 18.10. Article 18.10 explicitly mandates that property seized under a warrant may not be removed from the county in which it was seized without an explicit order approving the removal issued by a magistrate. The defendants sought no such order. They possessed no legal authority to remove the property from Howard County and transfer it to a private business in Martin County.

69. Dahl has also admitted that no written inventory, receipt, acknowledgment, or chain-of-custody form was prepared at the barn documenting what property was stored there or transferring custody to Snellgrove. This complete lack of transfer paperwork further confirms that the handoff to Snellgrove occurred outside normal evidence controls and without basic accountability.

70. Sheriff Ingram has sworn in an affidavit that Martin County did not have the means to transport the property and did not have a facility equipped to store the property safely. In light of these limitations, Ingram and his deputies made the conscious policy decision to utilize a private citizen's vehicles and facilities, effectively transferring custody and control of disputed evidence directly to the complaining witness before any judicial determination of ownership could occur, rather than seek the assistance of Howard County for storage or utilize secure private storage facilities under their direct control.

71. Defendant Phelps subsequently prepared and approved an offense report that listed the location of the offense as 2100 Westside Drive (Snellgrove's business), described the seized items as stolen inventory, and valued them at 283,000 dollars, treating the seized property entirely as Snellgrove's retrieved inventory rather than as disputed evidence.

72. On May 24, 2023, while the seized tools were sitting in Snellgrove's possession, Ingram utilized the official Martin County Sheriff's Office social media account to publicize the raid. He posted that a very large amount of new tools were recovered and that the owner was present to value the cost of the tools. Members of the Snellgrove family publicly commented on the post, thanking the Sheriff's Office for coming to their rescue, demonstrating that all parties understood the police power of the state had been utilized for the private benefit of Snellgrove.

73. Throughout the remainder of 2023, the Plaintiffs repeatedly sought information about and the return of their property. Plaintiff Kiska Hamblin emailed Defendant Dahl multiple times, requesting a complete inventory of the hand tools and power tools taken, specifically identifying the non-Snap -On items that had been seized. She notified Dahl that she had provided receipts for the items multiple times. Dahl responded by sending incomplete inventory document containing 51 categories of items, but there was no further response. Kiska emailed Dahl again clarifying that she "was told they would count all the hand tools, power tools, etc. and provide a complete list". No further communication was returned.

74. Government Defendants failed to schedule a property hearing, initiate any procedure to return the property, or correct the designation of the tools as Snellgrove's stolen property. Under Texas Code of Criminal Procedure Article 47.01a, when the ownership of allegedly stolen property is contested or disputed, the property must be held subject to the order of the proper court, and a magistrate must hold a hearing to determine the right to possess.

75. Despite being presented with receipts and a notarized inventory from a separate Snap -On dealer proving the Plaintiffs' lawful ownership, Defendants entirely bypassed this mandatory due process procedure based on "Snellgrove's word." At no time did any court or magistrate hold a hearing or award ownership of the seized tools to Snellgrove.

76. The Department has now admitted that Plaintiffs did not consent to the release of their property to Snellgrove, and the Department has further admitted that seized property was removed from Plaintiffs' home and given to Snellgrove without a court order, without notice to Plaintiffs, and without any judicial determination that Snellgrove was the owner of the property. Dahl has likewise admitted that the Sheriff's Department or its agents released or transferred possession of seized property to Snellgrove without a court order or judicial authorization, and that Dahl himself received no written authorization from any prosecutor, judge, or magistrate before seized property was released to Snellgrove.

77. The Martin County Sheriff's Department has further admitted in its sworn responses to Plaintiffs' Requests for Admission that it is now aware that the seized property was removed from Plaintiffs' home and given to Defendant Snellgrove without a court order, without notice to Plaintiffs, and without any judicial determination that Snellgrove was the owner of the property.

78. On November 13, 2024, the criminal indictment against Austin Hamblin was formally dismissed by the State of Texas due to insufficient evidence. In November 2024, following the dismissal of the criminal case, Plaintiff Kiska returned to calling the Department to ask for the property. Numerous messages were left for Dahl to return her call. Despite establishing that there was no lawful basis to retain the property, none of the Law Enforcement Defendants took any action to retrieve the property from Snellgrove or return it to the Plaintiffs.

79. Instead, the Law Enforcement Defendants swore in affidavits that Snellgrove was the "last known owner" of the property, relying on their own flawed and unconstitutional initial delivery of the property to justify abandoning it in his possession.

80. Snellgrove admits he has subsequently sold, integrated into his inventory, or otherwise disposed of the Plaintiffs' tools and equipment for his own personal financial gain.

81. The Department has now also admitted that it cannot account for the current location of all items seized from Plaintiffs' residence. This admission confirms that not all property taken under color of law was preserved, tracked, or returned, and it is consistent with Plaintiffs' allegation that some or all the property was sold, lost, transferred, or otherwise disposed of.

82. Ingram has admitted that he cannot produce a complete chain-of-custody record identifying every custodian and transfer for each item seized.

83.  Defendant Brad Ingram, as the elected Sheriff of Martin County, was the final policymaker for the county regarding the execution of warrants and the handling of evidence. His personal participation in the raid, his authorization of cross -county transport, and his decision to release the property to a private citizen without a judicial hearing represent the official policy and custom of Martin County.

84. The Martin County Sheriff's Department has admitted in its sworn responses to Plaintiffs' Requests for Admission that Defendant Brad Ingram, as Sheriff, was the final policymaker for the Department regarding the execution of search warrants and the handling of seized property in May 2023. That admission, combined with Ingram's sworn concession that he personally made the final decision to allow the seized property to be transported in and stored with Defendant Snellgrove, establishes that the deprivation of Plaintiffs' property occurred by direct act of the County's final policymaker.

85. The Department has further stated that no vehicle-mounted camera footage of the May 17, 2023, search or the transport of the seized property has ever existed, to the best of its knowledge. The absence of any dash-camera or other vehicle-camera record further impeded accountability for the transport and offsite transfer of Plaintiffs' property.

86. The only body-worn camera footage the defendants have produced from the May 17, 2023, search is a partial recording captured by Defendant Dahl, which itself contains an unexplained gap of nearly two hours prior to the arrival of Snellgrove. The recorded segments depict Snellgrove's arrival; Dahl intentionally ceases the recording minutes before the bulk seizure, loading, and cross-county transport of the property occurred. Defendant Ingram has admitted under oath that he chose not to activate or wear a body-worn camera during the search because, in his words, he "didn't want to" and "didn't have to," notwithstanding the Department's own written policy requiring officers to wear and activate body-worn cameras during the execution of search warrants and throughout the seizure of evidence. No body-worn camera footage from any other officer at the scene has been produced, and the Department has answered that it cannot account for the location or status of such footage.

87. Phelps has also admitted that he cannot produce a complete chain-of-custody record identifying every custodian and transfer for each item seized.

88. Chief Deputy Billy Reynolds later identified a separate and serious defect in the seizure process: there was no proper inventory of the items as they left the Hamblin property. Reynolds stated that the biggest issue he saw was that there was not an inventory at all, or at least not a proper inventory done on the items as they left, such that he could not say whether particular items actually left with the sheriff's office or not. Because no reliable outgoing inventory was made, the sheriff's office could not verify what specific property law enforcement seized, what was transported under color of law, what was taken in Snellgrove's vehicles, or what specific items

entered official custody at all. This evidence-handling failure further undermined any claim that the seizure and subsequent transfer of Plaintiffs' property were conducted in an objectively reasonable or lawfully controlled manner.

89. The actions of the law enforcement defendants were objectively unreasonable. No reasonable law enforcement officer could have believed that it was lawful to use a warrant for two items to seize fifty items, to bypass the verification of serial numbers, to ignore the express objection of a present co-occupant, to transfer seized property across county lines without a magistrate's order, and to surrender disputed evidence directly to a complaining witness without a statutorily mandated due process hearing.

90. Defendants Dahl and Phelps have each admitted in sworn discovery responses that, at the time of the search, they knew or should have known that the seizure of property not described in a warrant, without an independent legal justification, violates the Fourth Amendment.

## CAUSES OF ACTION

## COUNT 1

### 42 U.S.C. § 1983

### UNREASONABLE SEIZURE AND EXECUTION OF SEARCH WARRANT

### BEYOND LAWFUL SCOPE

Against All Defendants except Martin County

91. Plaintiffs incorporate by reference the preceding paragraphs.

92. The Fourth Amendment protects Plaintiffs against unreasonable searches and seizures.

93. Plaintiffs do not premise this count on a facial challenge to the warrant itself.

94. Plaintiffs premise this count on the manner in which Defendants executed the warrant and on the scope of the seizure Defendants carried out.

95. Plaintiffs were entitled to view the warrant at the onset of the search and were denied. Furthermore, Defendants admitted they did not read the warrant prior to execution. The Supreme Court has held officers must read the warrant and satisfy himself that he understands the scope and limitations.

96. Defendants violated the Plaintiffs rights by relying on a witness's identification or their own assumptions rather than consulting the actual warrant terms.

97. Defendants, acting under color of state law and jointly with one another, used the warrant to seize broad categories of property that went far beyond the specifically described items and that were not reasonably limited by verified serial numbers, independent ownership checks, or judicial findings.

98. Defendants allowed the complaining witness, Snellgrove, to serve as a material identifier of what would be taken, to bring employees and vehicles to load the property, and to accompany officers in the search area.

99. Defendants seized items they knew or had reason to know were disputed, including items for which Plaintiffs claimed ownership and for which receipts or inventories existed.

100. Defendants also seized non-Snap-On items and other property outside any fair reading of the warrant's specifically described target property.

101. Defendants continued searching and seizing property after the specifically listed warrant items had been located.

102. The incriminating character of many of the additional seized items was not immediately apparent, and officers performed no meaningful independent verification before seizing them.

103. Defendants' execution of the warrant and resulting seizure were unreasonable under the Fourth Amendment.

104. Dahl personally participated by drafting the warrant affidavit, directing Austin to show all Snap-On products, conscripting Snellgrove, receiving and using Snellgrove's texted valuation and identification information, remaining in the barn or shop area to direct the bulk seizure, and preparing or supervising the inventory and offense documentation.

105. Ingram personally participated by joining the search, facilitating Snellgrove's role, watching the search in the shed, assisting the loading operation by obtaining a dolly for removal of property, approving the transport and storage plan, and doing so despite never personally reading the warrant he was helping to execute.

106. Brown personally participated by entering and searching the house, locating items inside the residence, and participating in the seizure of additional items after the listed warrant objects had been found.

107. Phelps personally participated in the unreasonable seizure through his role in initiating and building the case that produced the warrant and the search, and, on information and belief, through his participation in the execution of the warrant itself.

108. Phelps took the initial theft report from Snellgrove on May 11, 2023, and opened Martin County Sheriff's Office Case No. 23-0135 without interviewing Austin or Kiska Hamblin, without contacting the specific customer identified in the zeroed-out tickets, without verifying the claims against Snap-On corporate records, and without obtaining independent financial records.

109. Phelps reviewed and used the media supplied by Snellgrove's employee Nichols, classified the Plaintiffs' personal property broadly as "stolen," and forwarded the matter to Dahl, Metcalf, and Ingram. Phelps subsequently prepared and approved offense documentation that listed the

location of the alleged offense as 2100 Westside Drive, Stanton, Texas—Snellgrove's business address—rather than Plaintiffs' residence, and that valued the items at $283,000 based entirely on Snellgrove's uncorroborated representations. Phelps has admitted in discovery that at the time of the search he knew or should have known that the seizure of property not described in a warrant, without an independent legal justification, violates the Fourth Amendment.

110.    Gammons personally participated by joining the search in Howard County, assisting the operation, and facilitating the seizure and transfer of property and other items found during the search.

111.    Snellgrove acted jointly with the officers and materially participated in the unreasonable seizure by identifying property for seizure, bringing vehicles and labor to remove it, setting its value, and serving as the intended private recipient and custodian of seized property.

112.    As a direct and proximate result, Plaintiffs suffered damages.

## COUNT 2

### 42 U.S.C. § 1983

### DEPRIVATION OF PROPERTY WITHOUT PROCEDURAL DUE PROCESS

Against All Defendants except Martin County

113.    Plaintiffs incorporate by reference the preceding paragraphs.

114.    The Fourteenth Amendment prohibits the deprivation of property without due process of law.

115.    Plaintiffs had ownership interests and possessory interests in the seized property. Defendants knew or had reason to know that ownership of the property was disputed.

116. Defendants nevertheless transferred possession and effective control of the property to Snellgrove without a hearing, without notice of any ownership proceeding, without Plaintiffs' consent, and without any judicial determination awarding title or right of possession to Snellgrove.

117. Defendants then retained, withheld, or allowed retention of the property for Snellgrove's benefit even after Austin Hamblin's criminal case was dismissed.

118. Defendants did not initiate a judicial process to determine ownership and disposition of the seized property.

119. Defendants did not return the property to Plaintiffs despite Plaintiffs' requests and despite Plaintiffs' provision of receipts and ownership information.

120. Defendants also failed to give Plaintiffs written notice of where the property was being stored or of the process, if any, for contesting its disposition.

121. The deprivation of Plaintiffs' property interests was neither random nor unauthorized. It was predictable, planned, and accomplished pursuant to authority Martin County had delegated to Sheriff Ingram, its admitted final policymaker for the execution of search warrants and the handling of seized property. Defendants knew before the seizure that the ownership of the property was disputed, that Plaintiffs and Snellgrove were competing claimants, and that Texas Code of Criminal Procedure Article 47.01a prescribes a pre-deprivation hearing before a magistrate as the process due to resolve such disputes. Pre-deprivation process was available and practicable: Defendants had ample time, opportunity, and statutory authority to submit the ownership question to a magistrate before transferring possession of the disputed property to Snellgrove. Defendants deliberately bypassed that procedure in coordination with Snellgrove, who was designated as custodian and effective beneficiary of the seizure. Because the deprivation was accomplished through the deliberate decisions of authorized decision makers

bypassing an available and adequate pre-deprivation procedure, post-deprivation state-law remedies are inadequate to satisfy the requirements of the Due Process Clause.

122.    At all times relevant to this count, Defendant Snellgrove acted under color of state law. Through Dahl's admitted conscription of Snellgrove into the warrant-execution team and through Defendants' joint action with Snellgrove in identifying, seizing, transporting, storing, and retaining Plaintiffs' property, Snellgrove became a state actor for purposes of 42 U.S.C. § 1983 with respect to the property deprivation alleged in this count.

123.    Defendants thereby deprived Plaintiffs of property without procedural due process.

124.    As a direct and proximate result, Plaintiffs suffered damages.

## COUNT 3

### 42 U.S.C. § 1983

### CONSPIRACY TO DEPRIVE PLAINTIFFS OF CONSTITUTIONAL RIGHTS

Against All Defendants except Martin County

125.    Plaintiffs incorporate by reference the preceding paragraphs.

126.    Defendants reached an understanding and meeting of the minds to use the search warrant and its execution as a means to identify, seize, transport, store, and retain broad categories of Plaintiffs' disputed property for Snellgrove's benefit without judicial process and beyond the lawful scope of the warrant. The admitted friendship and prior dealings between Ingram and Snellgrove further support the inference that this was coordinated action for private benefit rather than an arms-length law-enforcement decision.

127. The object of the conspiracy was to deprive Plaintiffs of rights secured by the Fourth and Fourteenth Amendments, including the right to be free from unreasonable seizure and the right not to be deprived of property without due process of law.

128. Overt acts in furtherance of the conspiracy included, among other things, the pre-search coordination with Snellgrove vehicles and labor, Dahl's conscription of Snellgrove into the execution team, the officers' reliance on Snellgrove to identify and value property, the use of Snellgrove's employees and vehicles to remove the property, the transport of the property to Snellgrove's barn, and the continued retention of the property there without a hearing or court order determining ownership.

129. Defendants acted jointly and in concert with one another throughout the search, seizure, transport, storage, and retention of the property.

130. The conspiracy resulted in and was a moving force behind the unreasonable seizure of Plaintiffs' property and the deprivation of Plaintiffs' property without procedural due process.

131. Each conspirator personally participated in the conspiracy or committed acts in furtherance of it while acting under color of state law or jointly with state actors.

132. As a direct and proximate result of the conspiracy, Plaintiffs suffered damages.

## COUNT 4

### MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

Against Martin County Only

133. Plaintiffs incorporate by reference the preceding paragraphs.

134. Martin County is liable under 42 U.S.C. § 1983 because the constitutional deprivations described above were caused by official policy, by decisions of a final policymaker, by

ratification, by deliberate indifference in training and supervision, and by persistent customs or practices attributable to the County.

135. Brad Ingram was, and the Department has now expressly admitted he was, the final policymaker for Martin County with respect to the execution of search warrants, seizure and custody of property, evidence handling, and disposition of seized property in the circumstances alleged here.

136. Ingram personally participated in the warrant execution.

137. Ingram personally approved, directed, or ratified the use of Snellgrove as part of the execution team and as the private custodian of seized property.

138. The County's policymaker, Ingram, had training concerning warrant scope, plain- view limitations, and evidence handling, yet personally participated in this search without ever reading the warrant and permitted seized property to be diverted into Snellgrove- controlled storage without judicial authorization or complete chain-of-custody documentation.

139. Martin County lacked a written policy specifically governing execution of search warrants and lacked meaningful departmental training on search-warrant execution, evidence handling, and property disposition beyond handing deputies a policy manual and expecting them to implement it.

140. Martin County also knew that its own policy-required annual audits and annual mandated training reports were not being performed.

141. Martin County's own written evidence policies required transport of seized property to the agency office, secure storage, tagging and marking, limited access, audits, inspections, and compliance with Texas law for stolen property.

142. Ingram admitted those policy requirements were not followed in this case.

143.    Defendant Ingram has further admitted under oath that the Department's own written policies governing the handling and disposition of seized property were not followed in this case. Specifically, Ingram has admitted that a handwritten inventory required by policy was not produced or preserved; that the required two-officer sign-off on the inventory did not occur; that the property was not transported to the agency office as required; that the property was not stored in a secure area under lock and key as required; that evidence was not properly marked or tagged with report number, date of seizure, and arresting officer's name as required; that no expert was obtained for the accounting of specialty property as required; and that the seizing officers did not deliver the evidence to the property room as required.

144.    Ingram has further admitted that policy-required annual audits of the property and evidence function were not performed, that policy-required semiannual and quarterly inspections by the property and evidence manager were not performed, that policy- required annual unannounced inspections and random sample inventories were not performed, and that policy-required accountability procedures for the storage location were not maintained.

145.    Ingram has further admitted that the Department's written Duty to Disclose policy required the disclosure of any civilian witness's motivations beyond civic duty, including financial motivations; that Ingram was personally aware Defendant Snellgrove had a financial motivation beyond civic duty; and that, notwithstanding this admitted bias, Snellgrove was permitted to identify, value, load, transport, and store the seized property without that bias being meaningfully accounted for in the Department's handling of the case.

146.    Martin County had no meaningful policy or process for handling the obvious conflict created by using a civilian complainant with a personal financial motive to identify, load, transport, store, and later claim the property.

147.    Martin County had no meaningful policy or process for maintaining chain of custody, accountability, or secure access when seized property was kept offsite with the complaining witness.

148.    Martin County had no meaningful policy or practice of giving written notice to persons from whom property was seized about where the property was stored or how to contest its disposition.

149.    Martin County also failed to enforce its body-worn-camera policies in a manner reasonably calculated to preserve a complete record of searches and seizures, as shown by the incomplete video record and the absence of footage from all participating officers.

150.    These failures were not isolated mistakes by line officers. They reflected County policy, policymaker action, ratification, deliberate indifference, or longstanding noncompliance with County policy. The County's ratification and deliberate indifference are further shown by the absence of any internal investigation or corrective action after these events became known and by the Department's present inability to account for the location of all items seized from Plaintiffs' residence.

151.    The Department has admitted in sworn discovery responses that no internal investigation, review, audit, or evaluation has been conducted regarding the May 17, 2023 search, the handling or disposition of Plaintiffs' property, or the conduct of the Individual Defendants in connection with these events. The Department has likewise admitted that no discipline, reprimand, or counseling has been imposed on any Individual Defendant arising from the search or the handling of Plaintiffs' property. These admissions confirm the County's ratification of the individual defendants' conduct through inaction.

152.    These County actions and omissions were the moving force behind the deprivation of Plaintiffs' Fourth and Fourteenth Amendment rights.

153.  As a direct and proximate result, Martin County is liable for Plaintiffs' damages and for appropriate declaratory and injunctive relief.

## COUNT 5

## CONVERSION

Against Snellgrove Only

154.  Plaintiffs incorporate by reference the preceding paragraphs.

155.  Plaintiffs owned, possessed, or had the superior right to possess the personal property seized from their residence.

156.  Snellgrove exercised dominion and control over that property.

157.  Snellgrove did so by identifying property to be taken, receiving or causing receipt of the property at his business or storage location, retaining possession or control over the property, using employees and business vehicles to transport the property, and, on information and belief, selling, using, transferring, or otherwise disposing of the property for his own benefit.

158.  Snellgrove's control over the property was wrongful because no court had adjudicated the property to belong to him and because Plaintiffs had superior possessory rights.

159.  Plaintiffs demanded the return of their property, but the property was not returned.

160.  Snellgrove's conduct constitutes conversion.

161.  As a direct and proximate result, Plaintiffs suffered damages in the value of the converted property, loss of use, and related losses.

## COUNT 6
## NEGLIGENCE
*Against Snellgrove Only*
## VOLUNTARILY WITHDRAWN WITHOUT PREJUDICE

162.    Plaintiffs voluntarily withdraw Count 6, Negligence, WITHOUT PREJUDICE. This Count is retained in the pleading solely to preserve the numbering of the Third Amended Complaint and to memorialize the withdrawal. Plaintiffs seek no adjudication of Count 6 on the merits.

## COUNT 7

## ABUSE OF PROCESS

Against Snellgrove Only

163.    Plaintiffs incorporate by reference the preceding paragraphs.

164.    A valid legal process existed in the form of a search warrant issued,  by a competent court in connection with a criminal investigation.

165.    Following issuance of the search warrant, Defendant Snellgrove willfully misused and perverted the execution of the warrant for an ulterior purpose and in a manner that was not proper in the regular conduct or intended purpose of the proceeding.

166.    Specifically, Snellgrove used (or directed the use of) the warrant's execution to :

   a.    identify and target broad categories of property located on Plaintiffs' premises for seizure, rather than limiting the seizure to the specifically described items authorized by the warrant;

   b.    materially expand the practical scope and effect of the seizure beyond what the warrant permitted;

   c.    obtain possession and control of disputed property through the coercive force of state law enforcement;

   d.    involve his own employees and vehicles in the removal and transportation of the seized property; and

e.  to position himself and/or his business to retain, use, sell, or otherwise derive ongoing commercial benefit from the property through his ordinary business operations.

167.  In this manner, the legal process was not employed merely to preserve specifically described evidence as contemplated by law, but instead was deliberately deployed as an instrument of private commercial advantage—to accomplish the unilateral recovery, removal, and transfer of ownership of Plaintiffs' property without the ordinary judicial adjudication of title, ownership rights, or competing claims that would be required in a civil proceeding.

168.  Snellgrove further abused the legal process by continuing to leverage the involvement of Law Enforcement Defendants and the coercive power of the state to delay and withhold wages that Plaintiff Austin had lawfully earned. Snellgrove has admitted that he intentionally withheld those wages.

169.  Snellgrove initiated and directed the criminal investigation, and thereafter misused the resulting search warrant, with the specific ulterior motive of resolving what was fundamentally a private commercial and property dispute through the machinery of criminal process rather than through the civil judicial remedies available to him. Such misuse of a search warrant—and of criminal investigative authority generally—to seize disputed property in aid of a private business or property claim has long been recognized under Texas law as a classic and actionable form of abuse of process.

170.  Snellgrove acted willfully, intentionally, and with malice and improper purpose. As a direct and proximate result of his abuse of process, Plaintiffs have suffered actual damages. Plaintiffs are therefore entitled to recover actual damages, exemplary damages, equitable relief, reasonable attorneys' fees, costs of court, and any other relief to which they may be entitled at law or in equity.

## COUNT 8
## TEXAS THEFT LIABILITY ACT
*Against Snellgrove Only*
## VOLUNTARILY WITHDRAWN WITHOUT PREJUDICE

171.    Plaintiffs voluntarily withdraw Count 8, Texas Theft Liability Act, WITHOUT

PREJUDICE. This Count is retained in the pleading solely to preserve the numbering of the

Third Amended Complaint and to memorialize the withdrawal. Plaintiffs seek no adjudication of

Count 8 on the merits.

## COUNT 9

## UNJUST ENRICHMENT

Against Snellgrove Only

172.    Plaintiffs incorporate all preceding paragraphs by reference.

173.    Defendant Snellgrove has received and retained a massive financial benefit, specifically the

physical possession and commercial sale proceeds of the Plaintiffs' tool collection, valued in

excess of 283,000 dollars.

174.    Snellgrove obtained this benefit through the coercive use of law enforcement and the

circumvention of lawful civil repossession procedures.

175.    It is fundamentally unjust and inequitable for Snellgrove to retain this benefit, as the criminal

charges underlying the seizure were dismissed for lack of evidence, confirming he had no lawful

right to take the property.

176.    The Plaintiffs are entitled to full restitution and the disgorgement of any profits Snellgrove

has realized from the retention or sale of their property.

## REQUEST FOR RELIEF

177. Wherefore, the Plaintiffs respectfully pray that this Court:

178. Enter judgment in favor of the Plaintiffs on all counts;

179. Issue a judicial declaration that the Defendants' actions violated the Plaintiffs' Fourth and Fourteenth Amendment rights;

180. Award the Plaintiffs actual and compensatory damages for the value of the property taken, sold, or destroyed, in an amount to be determined at trial;

181. Impose a constructive trust on any proceeds Snellgrove obtained from the sale of the property and order the disgorgement of those funds;

182. (voluntarily withdrawn as directed to the TTLA claim)

183. Award Plaintiffs punitive damages against any individual Defendant found liable under 42 U.S.C. § 1983 whose conduct is shown to have been motivated by evil motive or intent or to have involved reckless or callous indifference to Plaintiffs' federally protected rights, and award exemplary damages against Defendant Brian Snellgrove under any remaining state-law cause of action for which such damages are authorized, including, to the extent the required findings are made, without application of the limitation in Texas Civil Practice and Remedies Code § 41.008(b) pursuant to § 41.008(c)(13), all to the extent permitted by law and without duplicative recovery;

184. Award the Plaintiffs reasonable attorney's fees, costs, and expenses of litigation pursuant to 42 U.S.C. Section 1988 and applicable state law;

185. Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

186. Grant such other and further relief, both at law and in equity, as the Court deems just and proper.

### JURY TRIAL DEMANDED

187. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiffs hereby demand a trial by jury on all issues so triable.

<u>Certificate of Service</u>

I certify that on the date reflected by the CM/ECF date stamps I filed the foregoing document(s)

and that they are available for viewing and downloading from the Court's CM/ECF system, and that

those participants in the case that are registered CM/ECF users and that service will be

accomplished by the CM/ECF system.

Respectfully Submitted,

/s/ Kurt Mueller

------------------------------------
Kurt Mueller
Texas Bar No. 24133133

The Kurt Mueller Law Firm PLLC
565 S Mason Rd PMB 223
Katy, Texas 77450
(713) 360-2110
kurt@kurtmuellerpllc.com